No. 24-9002

IN THE UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

———————————————

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

ROBERT BOWERS,

Defendant/Appellant.

———————————————

On Appeal from the United States District Court
for the Western District of Pennsylvania, no. 2:18-cr-292-RJC
(The Honorable Robert J. Colville)

———————————————

**BRIEF OF APPELLANT**

———————————————

SEAN J. BOLSER
Federal Capital Appellate
Resource Counsel Project
Federal Defenders of New
York
One Pierrepont Plaza, 16th
Floor
Brooklyn, NY 11201
(718) 330-1200 (tel.)
(718) 855-0760 (fax)
Sean_Bolser@fd.org

JON M. SANDS
Federal Public Defender
SARAH S. GANNETT
Assistant Federal Public
Defender
250 North 7th Avenue,
Suite 600
Phoenix, AZ 85007
(602) 382-2700 (tel.)
(602) 382-2800 (fax)
Sarah_Gannett@fd.org

CUAUHTEMOC ORTEGA
Federal Public Defender
MARGARET A. FARRAND
Deputy Federal Public
Defender
321 East 2nd Street
Los Angeles, CA 90012
(213) 894-2854 (tel.)
(213) 894-0081 (fax)
Margaret_Farrand@fd.org

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION..........................................4

STATEMENT OF THE ISSUES................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS .................9

STATEMENT OF THE CASE .................................................10

    A.    Bowers's background and history.........................................10

    B.    The crime....................................................................17

    C.    The arrest and Bowers's statements....................................21

    D.    The indictment, offer to plead, and death notice.................22

        1.    The indictment......................................................22

        2.    Bowers's offer to plead.............................................24

        3.    The notice of intent to seek the death penalty ............24

    E.    Voir dire.....................................................................26

    F.    The guilt-innocence trial.................................................28

        1.    Pretrial rulings.....................................................28

        2.    The evidence.........................................................30

        3.    Closing arguments .................................................34

        4.    Verdict ................................................................36

    G.    The eligibility trial ......................................................36

        1.    Opening statements................................................36

        2.    The government's case............................................37

# TABLE OF CONTENTS

**Page**

3. The defense case ..........................................................37

4. The government's rebuttal ..........................................39

5. The defense rebuttal ....................................................40

6. Closing arguments ......................................................41

7. Bowers is shackled without explanation. ....................42

8. Verdict ........................................................................43

H. The sentence-selection trial ..................................................43

1. Pretrial rulings............................................................43

2. Opening statements.....................................................45

3. The government's case................................................46

4. The defense case ........................................................48

5. Closing arguments ......................................................49

    a. Government closing argument...........................49

    b. Defense closing argument .................................51

    c. Government rebuttal..........................................52

6. Jury note regarding weapons ......................................54

7. Verdict and sentencing ...............................................55

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................57

ARGUMENT .................................................................................60

## POINTS RELATED TO THE INDICTMENT

I. BOWERS'S CAPITAL §924 CONVICTIONS ARE INVALID
BECAUSE §247(a)(2) IS NOT A PREDICATE CRIME-OF-
VIOLENCE. .......................................................................61

    A. Introduction ...............................................................61

    B. Standard of review ......................................................63

    C. Factual background ......................................................63

    D. Legal argument ...........................................................64

        1. Religious obstruction under §247(a)(2) is not a
crime-of-violence because it can be committed with
psychological force. .....................................................65

        2. Religious obstruction under §247(a)(2) is not a
crime-of-violence because the required force can be
used or threatened against one's *own* "person or
property." ..................................................................68

        3. Section 247(d)(1)'s "death results" sentence-
enhancement factor does not supply the necessary
use of "physical force" against the "person…of
another." ....................................................................71

            a. The "death results" factor does not require
intent, or any *mens rea*. ..........................................71

            b. Section 247(d)(1)'s indivisible provision
containing the "death results" factor includes
alternative means, like "kidnapping," that are

## TABLE OF CONTENTS

not "crimes of violence" because they do not require "physical force." .......................................75

4. Bowers's erroneous convictions and death sentences on the eleven capital §924 charges may have contributed to his death sentences on other counts, requiring resentencing on them. ................................78

II. BOWERS'S 18 U.S.C. §249 CONVICTIONS FOR RELIGIOUS HATE CRIMES ARE INVALID, BECAUSE THE THIRTEENTH AMENDMENT DID NOT AUTHORIZE CONGRESS TO CRIMINALIZE SUCH CONDUCT.. .................84

A. Introduction..........................................................84

B. Standard of review ..............................................85

C. Factual background .............................................85

D. Legal argument ...................................................87

1. Section 249(a)(1) exceeds the Thirteenth Amendment's authorization to Congress to enforce the prohibition on slavery...........................................87

2. The Thirteenth Amendment did not authorize Congress to punish religion-based assaults. ...............92

a. The Thirteenth Amendment does not permit legislation aimed at purely-religious discrimination. ....................................................92

b. The prong of §249(a)(1) under which Bowers was prosecuted targets religious hate crimes. ...95

c. The district court recognized §249(a)(1) cannot constitutionally criminalize religion-based hate crimes, but ignored that the charges here did just that.........................................................98

# TABLE OF CONTENTS

3. Because Bowers's sentences on other charges may have been influenced by the invalid §249(a)(1) convictions, he should be resentenced on all counts. 101

III. BOWERS'S 18 U.S.C. §247(A)(2) CONVICTIONS ARE INVALID BECAUSE THE STATUTE EXCEEDS CONGRESS'S COMMERCE CLAUSE AUTHORITY, AND BECAUSE OF INSTRUCTIONAL ERROR REGARDING THE JURISDICTIONAL ELEMENT. ...................................................105

A. Introduction ..........................................................................105

B. Standard of review ..............................................................106

C. Factual and procedural background ...................................107

1. Bowers moves to dismiss the §247(a)(2) counts as exceeding Congress's Commerce Clause authority, but the district court denies the motion. ...................107

2. The government introduces evidence that Bowers used firearms and ammunition that had once traveled across state lines and posted on the Internet, and that the shooting resulted in changes to the congregations' commercial activities. ..............109

3. The district court instructs the jury that §247(b) can be satisfied by Bowers's intrastate use of items that crossed state lines; intrastate use of the Internet; and insubstantial effects on the congregations' commercial activities. ........................111

D. Section 247(a)(2) is unconstitutional under the Commerce Clause, both facially and as applied to Bowers. .................113

1. Legal standards ..........................................................113

2. Section 247(a)(2) is facially unconstitutional. ...........117

a. Section 247(a)(2) cannot be sustained under *Lopez*'s first or second categories because it does not regulate the channels or instrumentalities of interstate commerce. ....... 117

b. Section 247(a)(2) cannot be sustained under *Lopez*'s third category because it does not substantially affect interstate commerce. ........ 120

c. The district court erred in denying Bowers's motion to dismiss. .............................................. 127

3. Section 247(a)(2) is unconstitutional as applied to Bowers. ....................................................... 129

a. Bowers's intrastate use of items that once moved interstate ............................................... 129

b. Bowers's intrastate use of the Internet ............ 132

c. The effects of Bowers's offense on the congregations' commercial activities ................ 134

E. The district court prejudicially erred in instructing the jury on §247(b)'s jurisdictional element. ..................................... 135

IV. BOWERS'S DEATH SENTENCES UNDER §247 AND §924 VIOLATE DOUBLE JEOPARDY. ................................................. 137

A. Introduction ........................................................ 137

B. Standard of review ............................................. 138

C. The §247 and §924(j) counts fail the *Blockburger* test, and—because Congress did not intend multiple punishments—violate Double Jeopardy. ..................................................... 138

# TABLE OF CONTENTS

**Page**

  D. The Court should vacate the §247 convictions and sentences and remand for a new sentencing hearing or at least for entry of a new judgment. .....................................................141

## POINTS RELATED TO JURY SELECTION

V. THE COURT VIOLATED BOWERS'S FIFTH AND SIXTH AMENDMENT RIGHTS BY EMPANELING A BIASED JUROR WHO AUTHORIZED AND SUPERVISED EXECUTIONS IN CHINA. ........................................142

  A. Introduction ........................................................142

  B. Standard of review ..............................................145

  C. Factual background ............................................145

    1. Juror 119's voir dire reveals that she reviewed death sentences and supervised executions in China. .........................................................145

    2. Juror 119 endorses China's 1980s death penalty policy. .......................................................150

    3. Juror 119 says American prisons are too comfortable and life sentences inadequate. ...............151

    4. Juror 119 says life sentences are not necessarily lifelong and those over 50 cannot be "changed." .......152

    5. The court tells Juror 119 she must follow the law and evidence, but does not ask if she could. ..............154

    6. The defense challenges Juror 119 for cause, and the court fails to address the bias issue. ..........................154

  D. Juror 119's empanelment violated Bowers's Fifth and Sixth Amendment right to a fair and impartial jury. ..................156

    1. Legal standards governing juror bias ........................156

# TABLE OF CONTENTS

**Page**

2. Juror 119 was impliedly biased..................................158

    a. Implied bias can arise from employment and personal experience. ...........................................159

    b. Juror 119's experience created a likelihood of identification with the death penalty. ..............164

    c. Juror 119's experience predisposed her to endorse executions over life imprisonment. .....166

    d. Juror 119's experience created a risk she would compare Bowers's case with others........167

    e. Juror 119's failure to list her experience on her questionnaire further indicates bias. .........168

    f. Juror 119 may have discussed her experiences with other jurors................................................169

3. Juror 119 was actually biased....................................171

    a. Statement that life sentences are not permanent .........................................................173

    b. Statement that life imprisonment is insufficient because prisoners live luxuriously and burden taxpayers.......................................175

    c. Statements that 50 years old is too old for a life sentence .......................................................177

4. At a minimum, remand is warranted for further consideration of the bias issue. ..................................178

VI. THE DISTRICT COURT FAILED TO CONDUCT STEP THREE OF ITS *BATSON* ANALYSIS, WARRANTING REMAND. ........................................................................181

A. Introduction........................................................181

# TABLE OF CONTENTS

**Page**

B.    Standard of review ................................................................ 183

C.    Factual background ............................................................ 183

    1.    The court denied the defense adequate time to rebut the government's proffered reasons for striking five of six people of color on the venire. ........................... 183

    2.    Bowers's post-trial Rule 33 motion asked the court to reopen the *Batson* hearing based on extensive comparative analysis showing the government's stated reasons were pretext. ..................................... 189

        a.    The government struck the African-American and Hispanic individuals for reasons that applied equally to white jurors it accepted ....... 190

        b.    The government's stated nondiscriminatory reasons misrepresented the record. .................. 192

        c.    The government engaged in racially-disparate voir dire questioning. ......................................... 195

        d.    The government struck jurors for reasons that had a disparate effect on African-Americans ... 198

    3.    The court denied Bowers's motion to reopen the *Batson* hearing without discussing any of the comparative evidence he presented. ........................... 199

D.    Trial courts deciding *Batson* challenges must engage all the evidence bearing on whether the government's strikes were discriminatory. ................................................................... 202

E.    Because the district court denied Bowers sufficient time to review the record for rebuttal and never engaged the evidence, remand is required ................................................ 205

# TABLE OF CONTENTS

1.    The district court denied Bowers adequate time pretrial to review the record to produce a comparative analysis of the government's strikes. ...206

2.    The district court's order denying Bowers's post-trial motion merely recited and affirmed the government's reasons, without engaging—and barely acknowledging—the comparative analysis evidence challenging those reasons' veracity. ...........209

3.    Remand is necessary where Bowers presented substantial evidence of pretext. .................................217

VII.  THE COURT WRONGLY STRUCK, AS SUBSTANTIALLY IMPAIRED, TWO VENIREPERSONS WHO SAID THEY COULD APPLY DEATH-PENALTY LAW. ...............................219

A.    Introduction.........................................................................219

B.    Standard of review .............................................................219

C.    Jurors opposed to the death penalty may serve so long as they are able to follow sentencing law. ...............................220

D.    The court abused its discretion by striking two jurors despite their stated ability to follow the law. ..................................221

1.    Juror 159 said she could vote to impose death if warranted. ..................................................................221

2.    Juror 164 promised to follow the law and set aside his personal feelings. ...................................................225

E.    The death qualification of the jury was unconstitutional..228

# TABLE OF CONTENTS

POINTS RELATED TO SENTENCING

VIII. THE COURT VIOLATED THE CONSTITUTION, THE RULES OF EVIDENCE, AND THE FDPA BY ADMITTING HISTORICAL AND RELIGIOUS EVIDENCE UNRELATED TO BOWERS OR THE OFFENSE. .............................................229

A. Introduction..................................................................229

B. Standard of review ......................................................231

C. Relevant background ...................................................232

D. The government's evidence went far beyond any relevant purpose to improperly hold Bowers responsible for others' actions and beliefs. ...............................................234

    1. Testimony about Nazism, the Holocaust, and antisemitism since the Middle Ages .........................236

        a. The defense unsuccessfully objects to William Braniff's proposed expert testimony. ................237

        b. Braniff testifies about antisemitic actors and groups throughout history.................................241

        c. Braniff's testimony was irrelevant, cumulative, overly prejudicial, and violative of due process and the Eighth Amendment. ........247

    2. Testimony about Jewish struggles in Europe and America, and the history of Squirrel Hill .................253

        a. Testimony of Jeffrey Myers...............................255

        b. Testimony of Dr. Barbara Burstin and the "selection-of-site" aggravating factor ................257

        c. Myers's and Burstin's testimony, and the selection-of-site factor, were irrelevant and

# TABLE OF CONTENTS

**Page**

      violated the Eighth Amendment, Due Process, and §3593. ........................................................ 260

    3.    Testimony about Jewish religious items, including ones damaged and desecrated during the attack ...... 263

    4.    Cumulative effect of the testimony ............................ 267

  E.    The government cannot prove beyond a reasonable doubt that the improperly-admitted evidence and selection-of-site factor did not influence even one juror's vote for death so as to be harmless. ................................................................... 270

IX.  THE COURT VIOLATED DUE PROCESS, THE EIGHTH AMENDMENT, AND THE FDPA BY ADMITTING IMPROPER VICTIM IMPACT EVIDENCE. ............................... 272

  A.    Introduction ........................................................................ 272

  B.    Standard of review ............................................................. 273

  C.    The district court erred by admitting comparative victim-worth evidence ................................................................... 274

    1.    The government portrayed the victims as exceptionally worthy and religious. ........................... 274

    2.    Urging the death penalty because of victims' comparative worth and religion violates the Constitution and FDPA. ........................................... 278

    3.    The government's evidence improperly urged a death sentence based on victims' comparative worth and religion. ............................................................ 281

  D.    The district court erred by admitting victim impact evidence involving hardships unrelated to the offense. .................... 284

# TABLE OF CONTENTS

Page

E.    The district court erred by admitting victim impact testimony from surviving victims.........................................285

F.    The government improperly suggested it and its witnesses "sp[oke] for" the deceased victims. ......................................290

G.    The errors prejudiced Bowers...............................................294

X.    THE GOVERNMENT'S USE OF BOWERS'S STATEMENTS TO HIS OWN MENTAL-HEALTH EXPERTS TO ADVOCATE FOR DEATH IMPROPERLY PITTED HIS EIGHTH AMENDMENT RIGHT TO INTRODUCE MITIGATING EVIDENCE AGAINST HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION. .........................................297

A.    Introduction........................................................................297

B.    Standard of review ............................................................298

C.    Factual background ..........................................................298

    1.    Bowers spoke to mental-health experts for the limited purpose of evaluating whether he suffers from a mental illness. .................................................298

    2.    The government expanded the use of Bowers's statements to the defense experts to support aggravating factors and the death sentences. ...........303

D.    Argument............................................................................316

    1.    The court's ruling, permitting the government unfettered use of Bowers's statements to his experts, imposed a constitutionally intolerable price, forcing him to choose between his Fifth Amendment right to remain silent and his Eighth Amendment right to introduce important mitigating evidence in support of a life sentence. ......................316

# TABLE OF CONTENTS

2. The Hobson's choice imposed by the court also licensed *Griffin* error, when the government commented on Bowers's Fifth Amendment right not to testify and his Sixth Amendment right to a jury trial. ......................................................................... 321

3. The government cannot show that the error was harmless beyond a reasonable doubt. ........................ 325

XI. THE AVOIDING-MARTYRDOM MITIGATING FACTOR WAS PROPER REBUTTAL AND MITIGATION, AUTHORIZED BY THE CONSTITUTION AND THE FDPA, AND SHOULD HAVE BEEN SUBMITTED TO THE JURY. .............................. 328

A. Introduction ............................................................... 328

B. Standard of review ...................................................... 330

C. The avoiding-martyrdom factor was proper rebuttal. ......... 331

D. The avoiding-martyrdom mitigating factor should have been submitted as affirmative mitigation. .................................. 338

E. The district court's error in refusing to submit the avoiding-martyrdom mitigating factor prejudiced Bowers. .............. 346

XII. BOWERS'S OFFER TO PLEAD GUILTY WAS PROPER REBUTTAL AND MITIGATION, AUTHORIZED BY THE CONSTITUTION AND THE FDPA, AND SHOULD HAVE BEEN SUBMITTED TO THE JURY. ......................................... 351

A. Introduction ............................................................... 351

B. Standard of review ...................................................... 352

C. Bowers's offer to plead was proper rebuttal. ..................... 353

D. The offer to plead should have been submitted as affirmative mitigation. ............................................................. 358

E.     The district court's error in refusing to submit the offer to plead factor prejudiced Bowers. ..........................365

XIII. THE GOVERNMENT'S IMPROPER REBUTTAL CLOSING ARGUMENT REQUIRES REVERSAL BECAUSE IT MISLED JURORS REGARDING MULTIPLE ASPECTS OF THE LIFE-OR-DEATH DECISION. ..............................368

A.     Introduction.......................................368

B.     Standard of review ..............................369

C.     The government advocated a quantitative approach to the weighing process that is contrary to law. ...........369

D.     The government told the jury its "job" was to "hold [Bowers] accountable to the fullest extent of the law," rather than to make a reasoned moral judgment about the appropriate sentence. ..............................375

E.     The government misstated the law by telling jurors that mitigating factors submitted by the district court were not, in fact, mitigating because they did not relate to the crime. .......... ..............................380

F.     The cumulative effect of the improper arguments rendered Bowers's trial unfair. .........................386

XIV. THE COURT VIOLATED BOWERS'S DUE PROCESS RIGHTS BY SHACKLING HIM WITHOUT EXPLANATION...388

A.     Introduction.......................................388

B.     Standard of review ..............................390

C.     Factual background ..............................391

    1.     Bowers posed no problem in custody and was safely unrestrained for 34 days of trial. ..............391

# TABLE OF CONTENTS

2. The court abruptly ordered Bowers shackled based on secret allegations from the marshals. .................... 392

3. The defense repeatedly objected and showed the shackles were visible and prejudicial. ....................... 394

4. The court reaffirmed its refusal to allow a hearing on the marshals' factual allegations or to fully disclose them. ............................................... 401

5. Well after the trial ended, the court finally disclosed a key allegation about a potentially threatening remark attributed to Bowers by unnamed jail officials. ........................................................ 407

D. Legal Argument ................................................. 409

1. The court erred by withholding from counsel and accepting, without a hearing, genuinely disputed factual assertions that were insufficient to justify shackling. .................................................. 409

2. The government cannot prove beyond a reasonable doubt that the erroneous shackling did not influence even one juror's vote for death and thus was harmless. ............................................... 416

a. Bowers's leg irons were visible to multiple jurors at sentencing. .......................................... 418

b. The erroneous shackling was highly pertinent to a key disputed issue, whether Bowers could be safely managed in prison. ............................ 419

c. The shackling error further undermined Bowers's defense in other important ways. ....... 421

d. A death verdict was not a foregone conclusion. 423

# TABLE OF CONTENTS

Page

3.    The Court should reverse Bowers's death sentences
      or, at the very least, remand for full disclosure and
      an evidentiary hearing. ..............................................425

XV.  THE DISTRICT COURT VIOLATED RULE 43 AND THE
     CONSTITUTION BY FAILING TO ENSURE BOWERS'S
     PRESENCE FOR PROCEEDINGS DURING
     DELIBERATIONS. ......................................................426

     A.   Introduction...................................................................426

     B.   Standard of review .........................................................427

     C.   Factual background ........................................................427

          1.    Government expert Brett Mills testified about the
                weapons' use and operability. ...................................427

          2.    The government emphasized Bowers's choice of and
                familiarity with weapons to argue for death. ............428

          3.    In summation, the government emphasized
                Bowers's weapons use and familiarity.......................429

          4.    Bowers was absent when the jurors viewed the
                weapons during deliberations. ..................................430

     D.   Excluding Bowers from the weapons viewing violated Rule
          43, the Confrontation Clause, and due process. ................431

     E.   The marshal's communications with the jury during
          Bowers's absence constituted further error. ......................436

     F.   The court's instruction failed to cure the violation. ..........437

     G.   The errors warrant vacatur under the plain error standard...
                ..................................................................................438

# TABLE OF CONTENTS

Page

H.    Remand is required because the record does not establish whether Bowers was present during the marshal's examination...................................................................... 440

XVI.  THE CUMULATIVE EFFECT OF THE ERRORS WARRANTS RELIEF............................................................................ 441

CONCLUSION ........................................................................ 442

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abdul-Kabir v. Quarterman,*
550 U.S. 233 (2007) ............................................................... 370, 372

*Adams v. Bradshaw,*
826 F.3d 306 (6th Cir. 2016) .......................................... 412

*Adams v. Texas,*
448 U.S. 38 (1980) ........................................................ 224

*Advocate Health Care Network v. Stapleton,*
581 U.S. 468 (2017) .......................................................... 96

*Allen v. Mitchell,*
953 F.3d 858 (6th Cir. 2020) ......................................... 160

*Andrus v. Texas,*
590 U.S. 806 (2020) ................................................ 270, 424

*Bachman v. St. Monica's Congregation,*
902 F.2d 1259 (7th Cir. 1990) ......................................... 94

*Bailey v. Alabama,*
219 U.S. 219 (1911) ........................................................ 88

*Batson v. Kentucky,*
476 U.S. 79 (1986) ............................... 6, 202, 203, 213

*Blockburger v. United States,*
284 U.S. 299 (1932) ....................................................... 138

*Bonadona v. Louisiana College,*
2019 WL 4073247 (W.D. La. Aug. 28, 2019) ................... 100

*Booth v. Maryland,*
482 U.S. 496 (1987) ....................................................... 280

*Borden v. United States,*
593 U.S. 420 (2021) ................................... 62, 64, 65, 72

*Boyde v. California,*
494 U.S. 370 (1990) ................................................ 283, 385

# TABLE OF AUTHORITIES

**Page(s)**

*Brewer v. Quarterman*,
550 U.S. 286 (2007) ............................................................ 319

*Brooks v. Kemp*,
762 F.2d 1383 (11th Cir. 1985) .......................................... 281

*Brown v. Ohio*,
432 U.S. 161 (1977) ............................................................ 138

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ..................................... 127, 128

*Buck v. Davis*,
580 U.S. 100 (2017) ............................................................ 270

*Burrage v. United States*,
571 U.S. 204 (2014) ....................................................... 71, 73

*Burton v. Johnson*,
948 F.2d 1150 (10th Cir. 1991) .............. 159, 164, 167, 170

*Caldwell v. Mississippi*,
472 U.S. 320 (1985) .............................. 371, 372, 375, 376

*Cargle v. Mullin*,
317 F.3d 1196 (10th Cir. 2003) ........................................ 378

*Chapman v. California*,
386 U.S. 18 (1967) ..................................................... 79, 270

*Chessman v. Teets*,
354 U.S. 156 (1957) ............................................................... 4

*Chiarella v. United States*,
445 U.S. 222 (1980) .............................................................. 99

*Ciminelli v. United States*,
598 U.S. 306 (2023) .............................................................. 99

*Citizens United v. Fed. Elec. Comm'n*,
558 U.S. 310 (2010) .............................................................. 67

*Civil Rights Cases*,
109 U.S. 3 (1883) ........................................................... 89, 90

# TABLE OF AUTHORITIES

Page(s)

*Claiborne v. Blauser*,
934 F.3d 885 (9th Cir. 2019) ........................... 411, 412, 416, 417, 421

*Clemons v. Mississippi*,
494 U.S. 738 (1990) ....................................... 385, 386, 387

*Cohens v. Virginia*,
19 U.S. 264 (1821) ........................................... 131

*Conaway v. Polk*,
453 F.3d 567 (4th Cir. 2006) ....................................... 180

*Coombs v. Diguglielmo*,
616 F.3d 255 (3d Cir. 2010) ........................... 205, 210, 215

*Cordaro v. United States*,
933 F.3d 232 (3d Cir. 2019) ........................................... 106

*Crittenden v. Ayers*,
624 F.3d 943 (9th Cir. 2010) ................................... 391, 412

*Crosby v. United States*,
506 U.S. 255 (1993) ............................................. 433, 435

*Darden v. Wainwright*,
477 U.S. 168 (1986) ........................................... 369

*Davenport v. MacLaren*,
964 F.3d 448 (6th Cir. 2020) ........................................... 419

*Davidson v. Riley*,
44 F.3d 1118 (2d Cir. 1995) ................................... 411, 425

*Davis v. Mathena*,
2014 WL 1308694 (E.D. Va. March 27, 2014) ................................. 419

*Deck v. Missouri*,
544 U.S. 622 (2005) ................................................ *passim*

*Delligatti v. United States*,
604 U.S. 423 (2025) ........................................... 72

*Descamps v. United States*,
570 U.S. 254 (2013) ........................................... 75, 76, 78

# TABLE OF AUTHORITIES

**Page(s)**

*Diaz v. United States*,
223 U.S. 442 (1912) ............................................................ 433, 440

*Dunn v. United States*,
442 U.S. 100 (1979) ...................................................................... 99

*Dyas v. Poole*,
317 F.3d 934 (9th Cir. 2003) ...................................................... 419

*Dyer v. Calderon*,
151 F.3d 970 (9th Cir. 1998) ................................................ 159, 178

*Eddings v. Oklahoma*,
455 U.S. 104 (1982) .................................................................... 318

*Elledge v. Dugger*,
823 F.2d 1439 (11th Cir.) ............................................. 391, 411, 425

*Enmund v. Florida*,
458 U.S. 782 (1982) ...................................................... 249, 252, 269

*Faretta v. California*,
422 U.S. 806 (1975) .................................................................... 437

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) .................................................................... 124

*Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
599 U.S. 382 (2023) .............................................................. 139, 140

*Flowers v. Mississippi*,
588 U.S. 284 (2019) .............................................................. *passim*

*Floyd v. Filson*,
949 F.3d 1128 (9th Cir. 2020) .................................................... 284

*Foster v. Chatman*,
578 U.S. 488 (2016) .................................................................... 204

*Freeman v. CSX Transp. Co.*,
1988 WL 384599 (M.D. Ala. Nov. 10, 1988) ............................ 94, 95

*Furman v. Georgia*,
408 U.S. 238 (1972) .................................................................... 279

# TABLE OF AUTHORITIES

**Page(s)**

*Fylling v. Royal Caribbean Cruises, Ltd.,*
91 F.4th 1371 (11th Cir. 2024) ....................................................... 178

*Getter v. Wal-Mart Stores, Inc.,*
66 F.3d 1119 (10th Cir. 1995) ....................................................... 161

*Gonzales v. Raich,*
545 U.S. 1 (2005) .................................................... 134, 135

*Gregg v. Georgia,*
428 U.S. 153 (1976) .................................................... 376

*Griffin v. Breckenridge,*
403 U.S. 88 (1971) .............................................................. 90

*Griffin v. California,*
380 U.S. 609 (1965) .................................................... 7, 321

*Hameed v. Mann,*
57 F.3d 217 (2d Cir. 1995) .............................................. 412

*Hardcastle v. Horn,*
368 F.3d 246 (3d Cir. 2004) ............................................. 215

*Harmelin v. Michigan,*
501 U.S. 957 (1991) ........................................................ 249

*Heart of Atlanta Motel, Inc. v. United States et al.,*
379 U.S. 241 (1964) .......................................................... 133

*Hedlund v. Ryan,*
854 F.3d 557 (9th Cir. 2017) ......................................... 412

*Hodges v. United States,*
203 U.S. 1 (1906) ...................................................... 88, 90

*Hopt v. People,*
110 U.S. 574 (1884) ........................................................ 440

*Humphries v. Ozmint,*
397 F.3d 206 (4th Cir. 2005) .................................... 279, 280

*Illinois v. Allen,*
397 U.S. 337 (1970) ........................................................ 432

# TABLE OF AUTHORITIES

**Page(s)**

*Illinois v. Gates,*
462 U.S. 213 (1983) ............................................................... 67

*In re Grand Jury Investigation,*
587 F.2d 589 ...................................................................... 318

*In re Terrorist Bombings of U.S. Embassies in East Africa,*
552 F.3d 93 (2d Cir. 2008) ................................................. 2

*J.E.B. v. Alabama ex rel. T.B.,*
511 U.S. 127 (1994) ......................................................... 156

*Jackson v. United States,*
395 F.2d 615 (D.C. Cir. 1968) ................................... 163, 164

*Johnson v. United States,*
559 U.S. 133 (2010) .......................................................... 65

*Jones v. Alfred H. Mayer Co.,*
392 U.S. 409 (1968) ..................................................... 90, 91

*Jones v. Ryan,*
987 F.2d 960 (3d Cir. 1993) ...................................... 212, 213

*Jones v. United States,*
529 U.S. 848 (2000) ......................................... 116, 117, 130

*Kansas v. Marsh,*
548 U.S. 163 (2006) ........................................ 230, 234, 249

*Kelly v. South Carolina,*
534 U.S. 246 (2002) ......................................................... 331

*Kelly v. California,*
129 S. Ct. 564 (2008) .................................................. 295, 296

*Kentucky v. Stincer,*
482 U.S. 730 (1987) ......................................................... 432

*Le v. Mullin,*
311 F.3d 1002 (10th Cir. 2002) ........................................ 381

*Lemons v. Skidmore,*
985 F.2d 354 (7th Cir. 1993) ................................... 412, 425

# TABLE OF AUTHORITIES

**Page(s)**

*Lesko v. Lehman,*
925 F.2d 1527 (3d Cir. 1991) .................................................. 323, 324

*Lewis v. United States,*
146 U.S. 370 (1892) .............................................................. 433, 440

*Littlejohn v. Royal,*
875 F.3d 548 (10th Cir. 2017) ......................................................... 421

*Lockett v. Ohio,*
438 U.S. 586 (1978) .................................................................. *passim*

*Lockhart v. McCree,*
476 U.S. 162 (1986) ............................................................... 220, 229

*Lora v. United States,*
599 U.S. 453 (2023) ........................................................................ 140

*Lubavitch-Chabad of Illinois v. Northwestern Univ.,*
772 F.3d 443 (7th Cir. 2014) ............................................................ 94

*Marinello v. United States,*
584 U.S. 1 (2018) ............................................................................. 66

*Marshall v. Hendricks,*
307 F.3d 36 (3d Cir. 2002) ............................................................. 369

*Martin v. Parker,*
11 F.3d 613 (6th Cir. 1993) ............................................................ 249

*Mathis v. United States,*
579 U.S. 500 (2016) ........................................................ 75, 76, 77, 78

*McCoy v. Goldston,*
652 F.2d 654 (6th Cir. 1981) ......................................................... 162

*McDonald v. Santa Fe Trail Transp. Co.,*
427 U.S. 273 (1976) ......................................................................... 91

*McKune v. Lile,*
536 U.S. 24 (2002) ......................................................................... 353

*Miller v. Webb,*
385 F.3d 666 (6th Cir. 2004) ........................................... 171, 172, 175

*Miller-El v. Dretke,*
 545 U.S. 231 (2005) ........................................ 204, 211, 212, 213, 218

*Moore v. Gibson,*
 195 F.3d 1152 (10th Cir. 1999) ................................................... 292

*Morgan v. Illinois,*
 504 U.S. 719 (1992) ............................................................. 174, 175

*Murphy v. Florida,*
 421 U.S. 794 (1975) ...................................................................... 171

*Newlon v. Armontrout,*
 885 F.2d 1328 (8th Cir. 1989) ..................................................... 269

*Norde v. Keane,*
 294 F.3d 401 (2d Cir. 2002) .................................................. 208, 209

*Ochoa v. Workman,*
 669 F.3d 1130 (10th Cir. 2012) ................................................... 412

*Oswald v. Bertrand,*
 374 F.3d 475 (7th Cir. 2004) ....................................................... 169

*Owens v. Guida,*
 549 F.3d 399 (6th Cir. 2008) ........................................... 362, 363, 364

*Patton v. Yount,*
 467 U.S. 1025 (1984) ..................................................................... 171

*Payne v. Tennessee,*
 501 U.S. 808 (1991) ................................................................ *passim*

*Penry v. Lynaugh,*
 492 U.S. 302 (1989) ............................................................... 319, 372

*Perez v. United States,*
 402 U.S. 146 (1971) ...................................................................... 135

*Pierce v. Thaler,*
 604 F.3d 197 (5th Cir. 2010) ........................................................ 385

*Pitera v. United States,*
 2000 WL 33200254 (E.D.N.Y. Dec. 21, 2000) ..................................... 3

# TABLE OF AUTHORITIES

*Portee v. United States,*
   941 F.3d 263 (7th Cir. 2019) ........................................................ 69

*Powers v. Ohio,*
   499 U.S. 400 (1991) .................................................................... 203

*Remmer v. United States,*
   347 U.S. 227 (1954) ............................................................. 437, 440

*Rhoden v. Rowland,*
   172 F.3d 633 (9th Cir. 1999) .............................................. 419, 426

*Riley v. Taylor,*
   277 F.3d 261 (3d Cir. 2001) ............................. 200, 205, 210, 215

*Robinson v. Gundy,*
   174 F. App'x. 886 (6th Cir. 2006) .............................................. 423

*Robles-Figueroa v. Foster,*
   2015 WL 8491004 (E.D. Wis. Dec. 10, 2015) ............................ 422

*Romano v. Oklahoma,*
   512 U.S. 1 (1994) ........................................................................ 249

*Rompilla v. Beard,*
   545 U.S. 374 .......................................................................... 318, 319

*Rosa v. Atty. Gen. United States,*
   950 F.3d 67 (3d Cir. 2020) ........................................................... 76

*Runyon v. McCrary,*
   427 U.S. 160 (1976) ...................................................................... 90

*Rushen v. Spain,*
   464 U.S. 114 (1983) .................................................................... 432

*Rutledge v. United States,*
   517 U.S. 292 (1996) .................................................................... 137

*Saint Francis College v. Al-Khazraji,*
   481 U.S. 604 (1987) .................................... 92, 93, 94, 95, 98

*Sampson v. United States,*
   724 F.3d 150 (1st Cir. 2013) ............................................. 156, 168

# TABLE OF AUTHORITIES

Page(s)

*Scarborough v. United States,*
431 U.S. 563 (1977) ........................................................ 116

*Shaare Tefila Congreg. v. Cobb,*
481 U.S. 615 (1987) ........................................ 93, 94, 95, 98

*Shepard v. United States,*
544 U.S. 13 (2005) ............................................................ 75

*Sides v. Cherry,*
609 F.3d 576 (3d Cir. 2010) ...................................... *passim*

*Simmons v. South Carolina,*
512 U.S. 154 (1994) ................................................. 331, 439

*Simmons v. United States,*
390 U.S. 377 (1968) ............................... 7, 297, 308, 317, 320

*Sinisterra v. United States,*
600 F.3d 900 (8th Cir. 2010) .......................... 234, 235, 383

*Skipper v. South Carolina,*
476 U.S. 1 (1986) ..................................................... 318, 381

*Smith v. Phillips,*
455 U.S. 209 (1982) ................................................. 161, 164

*Smith v. Texas,*
543 U.S. 37 (2004) ................................................... 338, 381

*Smith v. United States,*
360 U.S. 1 (1959) ............................................................. 435

*Snyder v. Louisiana,*
552 U.S. 472 (2008) ......................................... 183, 204, 218

*Snyder v. Massachusetts,*
291 U.S. 97 (1934) ................................................... 433, 440

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) ........................................................ 115

*South Carolina v, Gathers,*
490 U.S. 805 (1989) ................................................. 280, 281

# TABLE OF AUTHORITIES

Page(s)

*Stephenson v. Wilson,*
  619 F.3d 664 (7th Cir. 2010) .................................................. 415, 426

*Stokeling v. United States,*
  586 U.S. 73 (2019) .............................................................. 65

*Stouffer v. Trammell,*
  738 F.3d 1205 (10th Cir. 2013) ...................................... 169

*Stringer v. Black,*
  503 U.S. 222 (1992) ......................................................... 83

*Swain v. Alabama,*
  380 U.S. 202 (1965) ............................................. 202, 203

*Szuchon v. Lehman,*
  273 F.3d 299 (3d Cir. 2001) .................................... 156, 220, 224, 414

*Taylor v. United States,*
  495 U.S. 575 (1990) ......................................................... 96

*T.E. v. Pine Bush Central School Dist.,*
  58 F.Supp.3d 332 (S.D.N.Y. 2014) .................................... 94

*Tennard v. Dretke,*
  542 U.S. 274 (2004) ................................... 338, 380, 381, 383

*Tennessee v. Lane,*
  541 U.S. 509 (2004) ......................................................... 89

*Tison v. Arizona,*
  481 U.S. 137 (1987) ...................................................... 261

*Torres v. Lynch,*
  578 U.S. 452 (2016) ................................................. 69, 120

*Tran v. Gonzales,*
  414 F.3d 464 (3d Cir. 2005) ............................................ 69

*Ungar v. Sarafite,*
  376 U.S. 575 (1964) ........................................... 206, 207, 208

*United States ex rel De Vita v. McCorkle,*
  248 F.2d 1 (3d Cir. 1957) ............................... 145, 159, 170

# TABLE OF AUTHORITIES

Page(s)

*United States v. Abreu,*
32 F.4th 271 (3d Cir. 2022) .............................................................. 67

*United States v. Adams,*
132 F.4th 259 (3d Cir. 2025) ................................................... 135, 136

*United States v. Alaboudi,*
786 F.3d 1136 (8th Cir. 2015) ................................................. 292, 293

*United States v. Alessandrello,*
637 F.2d 131 (3d Cir. 1980) ............................................................ 432

*United States v. Allsup,*
566 F.2d 68 (9th Cir. 1977) ............................................................ 164

*United States v. Angulo,*
4 F.3d 843 (9th Cir. 1993) .............................................................. 169

*United States v. Aquart,*
912 F.3d 1 (2d Cir. 2018).......................................................... 374, 387

*United States v. Bailey,*
840 F.3d 99 (3d Cir. 2016) ............................................................. 251

*United States v. Ballinger,*
395 F.3d 1218 (11th Cir. 2005) ................................................ 106, 119

*United States v. Banegas,*
600 F.3d 342 (5th Cir. 2010) ......................................................... 418

*United States v. Basham,*
561 F.3d 302 (4th Cir. 2009) ............................................. 78, 79, 101

*United States v. Bass*
404 U.S. 336 (1971) ................................................................ 115, 116

*United States v. Battle,*
173 F.3d 1343 (11th Cir. 1999) ............................................... 415, 416

*United States v. Beckham,*
2019 WL 2869189 (M.D. Tenn. July 3, 2019) ................................... 97

*United States v. Bell,*
819 F.3d 310 (7th Cir. 2016) ......................................................... 400

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Bernard,*
299 F.3d 467 (5th Cir. 2002) ........................................................ 282

*United States v. Beyle,*
782 F.3d 159 (4th Cir. 2015) .............................................................. 4

*United States v. Bin Laden,*
156 F. Supp. 2d 359 (S.D.N.Y. 2001) .............................................. 346

*United States v. Bishop,*
66 F.3d 569 (3d Cir. 1995) ......................................................... *passim*

*United States v. Bontzolakes,*
536 F. App'x. 41 (2d Cir. 2013) .............................................. 215, 216

*United States v. Bowman,*
302 F.3d 1228 (11th Cir. 2002) ...................................................... 251

*United States v. Branker,*
418 F.2d 378 (2d Cir. 1969) ............................................................ 318

*United States v. Brantley,*
342 F. App'x 762 (3d Cir. 2009) ...................... 388, 417, 418, 422, 423

*United States v. Brown,*
441 F.3d 1330 (11th Cir. 2006) ...................................................... 224

*United States v. Brown,*
454 F. App'x 44 (3d Cir. 2011) ....................................... 412, 414, 415

*United States v. Brown,*
832 F.2d 128 (9th Cir. 1987) .......................................................... 438

*United States v. Buck,*
23 F.4th 919 (9th Cir. 2022) ............................................................. 77

*United States v. Burr,*
25 F.Cas. 49, 50 (C.C.D.Va. 1807) .................................................. 160

*United States v. Burwell,*
122 F.4th 984 (D.C. Cir. 2024) ......................................................... 77

*United States v. Canady,*
126 F.3d 352 (2d Cir. 1997) ........................................................... 439

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Candelario-Santana,*
834 F.3d 8 (1st Cir. 2016) ..................................................... 2

*United States v. Cannon,*
750 F.3d 492 498 (5th Cir. 2014) ................................. 91, 88

*United States v. Cantu,*
964 F.3d 924 (10th Cir. 2020) .......................................... 75

*United States v. Caro,*
433 F. Supp. 2d 726 (W.D. Va., May 25, 2006) ....................... 345, 346

*United States v. Caro,*
597 F.3d 608 (4th Cir. 2010) ........................... 248, 249, 362, 363, 378

*United States v. Carter,*
576 F.2d 1061 (3d Cir. 1978) .......................................... 80

*United States v. Castleman,*
572 U.S. 157 (2014) ................................................. 65, 72

*United States v. Causey,*
185 F.3d 407 (5th Cir. 1999) ...................................... 79, 81

*United States v. Cerrato-Reyes,*
176 F.3d 1253 (10th Cir. 1999) ..................................... 157

*United States v. Christensen,*
2019 WL 11867003 (C.D. Ill., June 27, 2019) ................................ 361

*United States v. Coleman,*
149 F.4th 1 (1st Cir. 2025) ............................................. 66

*United States v. Conley,*
37 F.3d 970 (3d Cir. 1994) .................................... 138, 139

*United States v. Corum,*
362 F.3d 489 (8th Cir. 2004) ................................. 133, 134

*United States v. Corum,*
2002 WL 1285078 (D. Minn. June 5, 2002) .................................... 264

*United States v. Cross,*
308 F.3d 308 (3d Cir. 2002) ........................................... 104

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Davis,*
53 F.4th 168 (4th Cir. 2022) ............................................................ 69

*United States v. Davis,*
132 F. Supp. 2d 455 (E.D. La. 2001) ............................................. 346

*United States v. DeMuro,*
677 F.3d 550 (3d Cir. 2012) .................................................... 232, 439

*United States v. Diaz,*
592 F.3d 467 (3d Cir. 2010) ........................................................... 138

*United States v. Doggart,*
947 F.3d 879 (6th Cir. 2020) .................................................... 77, 78

*United States v. Downing,*
753 F.2d 1224 (3d Cir. 1985) ......................................................... 251

*United States v. Earnest,*
536 F. Supp. 3d 688 (S.D. Cal. 2021) ............................................. 98

*United States v. Ebron,*
683 F.3d 105 (5th Cir. 2012) ........................................... 325, 326, 386

*United States v. Enoch,*
865 F.3d 575 (7th Cir. 2017) ........................................................... 77

*United States v. Eubanks,*
591 F.2d 513 (9th Cir. 1979) ........................................... 156, 163, 167

*United States v. Fell,*
531 F.3d 197 (2d Cir. 2008) ........................................... 219, 221, 380

*United States v. Fell,*
372 F.Supp.2d 773 (D. Vt. 2005) .................................................. 360

*United States v. Fell,*
2017 WL 10809985 (D. Vt. Feb. 15, 2017) ...................................... 360

*United States v. Finley,*
2014 WL 3056022 (W.D. Pa., July 3, 2014) .................................... 208

*United States v. Gagnon,*
470 U.S. 522 (1985) ...................................................................... 432

# TABLE OF AUTHORITIES

Page(s)

*United States v. Gillis,*
938 F.3d 1181 (11th Cir. 2019) ....................................... 66

*United States v. Gonzalez,*
214 F.3d 1109 (9th Cir. 2000) ................................. 159, 160, 171, 172

*United States v. Gooch,*
2006 WL 3780781 (D.D.C. Dec. 20, 2006) .............................. 287, 288

*United States v. Grassie,*
237 F.3d 1199 (10th Cir. 2001) .............................. 106, 125

*United States v. Gullo,*
502 F.2d 759 (3d Cir. 1974) ....................................... 438

*United States v. Hakim,*
344 F.3d 324 (3d Cir. 2003) ....................................... 438

*United States v. Hall,*
28 F.4th 445 (3d Cir. 2022) ....................................... 273

*United States v. Hammer,*
564 F.3d 628 (3d Cir. 2009) ....................................... 421

*United States v. Hans,*
332 F. App'x 116 (4th Cir. 2009) ....................................... 4

*United States v. Hari,*
67 F.4th 903 (8th Cir. 2023) ................................. 67, 69, 106

*United States v. Harris,*
106 U.S. 629 (1883) ....................................... 89

*United States v. Hatch,*
722 F.3d 1193 (10th Cir. 2013) ....................................... 91

*United States v. Hayes,*
589 F.2d 811 (5th Cir. 1979) ....................................... 73

*United States v. Healy,*
2024 WL 1701188 (D.N.J. Mar. 5, 2024) ....................................... 422

*United States v. Henderson,*
64 F.4th 111 (3d Cir. 2023) ....................................... 141

xxxiv

*United States v. Henderson,*
   80 F.4th 207 (3d Cir. 2023) .............................................................. 72

*United States v. Henderson,*
   613 F. App'x 113 (3d Cir. 2015) ...................................................... 163

*United States v. Hicks,*
   403 F. App'x 709 (3d Cir. 2010) ...................................................... 388

*United States v. Higgs,*
   353 F.3d 281 (4th Cir. 2003) ............................................................ 66

*United States v. Hodge,*
   870 F.3d 184 (3d Cir. 2017) ............................................................ 139

*United States v. Hoffert,*
   949 F.3d 782 (3d Cir. 2020) ............................................................. 85

*United States v. Honken,*
   541 F.3d 1146 (8th Cir. 2008) ............................................... 413, 416

*United States v. Hougen,*
   76 F.4th 805 (9th Cir. 2023) ............................................................. 91

*United States v. Inmon,*
   568 F.2d 326 (3d Cir. 1977) ............................................................ 318

*United States v. Johnson,*
   114 F.4th 148 (3d Cir. 2024) ............................................................ 71

*United States v. Johnson,*
   219 F.3d 349 (4th Cir. 2000) .......................................................... 3, 4

*United States v. Juvenile B,*
   147 F.4th 837 (8th Cir. 2025) ........................................................... 69

*United States v. Kechedzian,*
   902 F.3d 1023 (9th Cir. 2018) ........................................................ 176

*United States v. Kehoe,*
   310 F.3d 579 (8th Cir. 2002) ............................................................. 3

*United States v. Kepler,*
   74 F.4th 1292 (10th Cir. 2023) ......................................................... 69

# TABLE OF AUTHORITIES

Page(s)

*United States v. Kikumura,*
   947 F.2d 72 (3d Cir. 1991) ............................................................ 206

*United States v. Kozminski*
   487 U.S. 931 (1988) ...................................................................... 88

*United States v. Krivoi,*
   80 F.4th 142 (2d Cir. 2023) .......................................................... 66

*United States v. Lawrence,*
   555 F.3d 254 (6th Cir. 2009) .................................................. 81, 82

*United States v. Lawrence,*
   735 F.3d 385 (6th Cir. 2013) ...................................................... 235

*United States v. Lee,*
   612 F.3d 170 (3d Cir. 2010) ........................................................ 103

*United States v. Lighty,*
   2023 WL 2932960 (D. Md. Apr. 13, 2023) ............................... 83, 104

*United States v. Lopez,*
   514 U.S. 549 (1995) ............................................................. *passim*

*United States v. Lujan,*
   603 F.3d 850 (10th Cir. 2010) ..................................................... 288

*United States v. MacEwan,*
   445 F.3d 237 (3d Cir. 2006).................................................. 114, 133

*United States v. Marquardt,*
   786 F.2d 771 (7th Cir. 1986) ........................................................ 80

*United States v. Matta-Quiñones,*
   140 F.4th 1 (1st Cir. 2025) .......................................................... 438

*United States v. McAllister,*
   693 F.3d 572 (6th Cir. 2012) ...................................................... 216

*United States v. McDuffy,*
   890 F.3d 796 (9th Cir. 2018) ........................................................ 73

*United States v. McGuire,*
   178 F.3d 203 (3d Cir. 1999) ........................................................ 126

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. McKibbon*,
878 F.3d 967 (10th Cir. 2017) .......................................................... 77

*United States v. McVeigh*,
153 F.3d 1166 (10th Cir. 1998) ................................ 247, 252, 261, 289

*United States v. Mikhel*,
889 F.3d 1003 (9th Cir. 2018) ......................................................... 282

*United States v. Miller*,
527 F.3d 54 (3d Cir. 2008) .............................................................. 142

*United States v. Miller*,
767 F.3d 585 (6th Cir. 2014) ............................................................ 97

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007) ................................................... 282, 434

*United States v. Mitchell*,
690 F.3d 137 (3d Cir. 2012) ...................................................... *passim*

*United States v. Montgomery*,
635 F.3d 1074 (8th Cir. 2011) .......................................................... 73

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) .......................................................... 412

*United States v. Morrison*,
529 U.S. 598 (2000) .................................................................. *passim*

*United States v. Moussaoui*,
591 F.3d 263 (4th Cir. 2010) ............................................................. 4

*United States v. Murphy*,
323 F.3d 102 (3d Cir. 2003) .................................................... 103, 104

*United States v. Nell*,
526 F.2d 1223 (5th Cir. 1976) ................................. 157, 160, 172, 179

*United States v. Nelson*,
277 F.3d 164 (2d Cir. 2002) ....................................................... 91, 95

*United States v. Olano*,
507 U.S. 725 (1993) ............................................................... 427, 439

*United States v. Parker*,
  108 F.3d 28 (3d Cir. 1997) ............................................................ 114

*United States v. Pavelko*,
  992 F.2d 32 (3d Cir. 1993) ...................................................... 298, 317

*United States v. Pelullo*,
  14 F.3d 881 (3d Cir. 1994) ....................................................... 81, 103

*United States v. Perez*,
  491 F.2d 167 (9th Cir. 1974) ......................................................... 236

*United States v. Perrin*,
  149 F.4th 267 (3d Cir. 2025) ........................................................ 141

*United States v. Perry*,
  788 F.2d 100 (3d Cir. 1986) .......................................................... 318

*United States v. Piche*,
  981 F.2d 706 (4th Cir. 1992) .......................................................... 73

*United States v. Polizzi*,
  801 F.2d 1543 (9th Cir. 1986) ....................................................... 378

*United States v. Pollen*,
  978 F.2d 78 (3d Cir. 1992) ........................................................... 138

*United States v. Purkey*,
  428 F.3d 738 (8th Cir. 2005) .......................................................... 79

*United States v. Redd*,
  85 F.4th 153 (4th Cir. 2023) ..................................................... 75, 77

*United States v. Reliford*,
  58 F.3d 247 (6th Cir. 1995) ............................................ 234, 236, 247

*United States v. Roark*,
  924 F.2d 1426 (8th Cir. 1991) ....................................................... 248

*United States v. Robertson*,
  514 U.S. 669 (1995) .............................................................. 115, 121

*United States v. Rodia*,
  194 F.3d 465 (3d Cir. 1999) ..................................................... *passim*

# TABLE OF AUTHORITIES

Page(s)

*United States v. Rodriguez,*
  178 F. App'x 152 (3d Cir. 2006) ...................................................... 214

*United States v. Rodriguez,*
  581 F.3d 775 (8th Cir. 2009) ............................................. 292, 383, 384

*United States v. Romero,*
  189 F.3d 576 (7th Cir. 1999) ............................................................ 66

*United States v. Roof,*
  10 F.4th 314 (4th Cir. 2021) ...................................................... *passim*

*United States v. Roof,*
  2016 WL 8678863 (D.S.C. Oct. 14, 2016) ........................................ 360

*United States v. Runyon,*
  707 F.3d 475 (4th Cir. 2013) ........................................... 234, 235, 288

*United States v. Rutledge,*
  648 F.3d 555 (7th Cir. 2011) ..................................................... 216, 217

*United States v. Saipov,*
  2023 WL 4199415 (S.D.N.Y. June 27, 2023) ....................................... 2

*United States v. Saipov,*
  2024 WL 230625 (S.D.N.Y. Jan. 22, 2024) ......................................... 2

*United States v. Salamone,*
  800 F.2d 1216 (3d Cir. 1986) .................................. 163, 178, 180, 221

*United States v. Salas,*
  889 F.3d 681 (10th Cir. 2018) .......................................................... 69

*United States v. Salinas,*
  918 F.3d 463 (5th Cir. 2019) ............................................................ 73

*United States v. Sampson,*
  335 F. Supp. 2d 166 (D. Mass. 2004) ............................................. 346

*United States v. Sampson,*
  2016 WL 11573524 (D. Mass. May 13, 2016) .................................. 235

*United States v. Samuel,*
  431 F.2d 610 (4th Cir. 1970) .......................................................... 412

# TABLE OF AUTHORITIES

Page(s)

*United States v. Sanders,*
    133 F.4th 341 (5th Cir. 2025) .......................................... 139, 140, 141

*United States v. Savage,*
    970 F.3d 217 (3d Cir. 2020) ...................................................... *passim*

*United States v. Scott,*
    854 F.2d 697 (5th Cir. 1988) ........................................................... 159

*United States v. Segal,*
    534 F.2d 578 (3d Cir. 1976) ........................................................... 163

*United States v. Singletary,*
    268 F.3d 196 (3d Cir. 2001) .................................................... 131, 132

*United States v. Snarr,*
    704 F.3d 368 (5th Cir. 2013) ................................................. 224, 228

*United States v. Steiner,*
    847 F.3d 103 (3d Cir. 2017) ........................................................... 106

*United States v. Stone,*
    852 F. Supp. 2d 820 (E.D. Mich. 2012) .......................................... 249

*United States v. Stoney,*
    62 F.4th 108 (3d Cir. 2023) ............................................................. 63

*United States v. Street,*
    548 F.3d 618 (8th Cir. 2008) ................................................. 247, 248

*United States v. Taylor,*
    277 F. App'x. 610 (7th Cir. 2008) ................................................. 217

*United States v. Taylor,*
    596 U.S. 845 (2022) ........................................................... 64, 65, 74

*United States v. Thornton,*
    1 F.3d 149 (3d Cir. 1993) ............................................................... 441

*United States v. Tipton,*
    90 F.3d 861 (4th Cir. 1996) ........................................................... 427

*United States v. Tomlinson,*
    764 F.3d 535 (6th Cir. 2014) ......................................................... 216

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Torres,*
    128 F.3d 38 (2d Cir. 1997) ............................................................ 172

*United States v. Troya,*
    733 F.3d 1125 (11th Cir. 2013) ................................................ *passim*

*United States v. Tsarnaev,*
    968 F.3d 24 (1st Cir. 2020) ........................................................... 73

*United States v. Tulk,*
    171 F.3d 596 (8th Cir.1999) ........................................................ 292

*United States v. Uwaezhoke,*
    995 F.2d 388 (3d Cir. 1993) ........................................................ 214

*United States v. Vazquez,*
    271 F.3d 93 (3d Cir. 2001).................................................... 438, 439

*United States v. Velazquez,*
    1 F.4th 1132 (9th Cir. 2021) ....................................................... 384

*United States v. Vines,*
    134 F.4th 730 (3d Cir. 2025) ........................................................ 65

*United States v. Wall,*
    92 F.3d 1444 (6th Cir. 1996) ................................................ 130, 131

*United States v. Waller,*
    654 F.3d 430 (3d Cir. 2011) ........................................................ 294

*United States v. Washington,*
    2023 WL 128928 (3d Cir. 2023) .................................................. 423

*United States v. Weatherly,*
    525 F.3d 265 (3d Cir. 2008) .................................................. 85, 106

*United States v. Whitmore,*
    480 F.2d 1154 (D.C. Cir. 1973) .................................................. 236

*United States v. Whitten,*
    610 F.3d 168 (2d Cir. 2010) ....................................... 322, 323, 387

*United States v. Williams,*
    610 F.3d 271 (5th Cir. 2010) .......................................................... 3

**Page(s)**

*United States v. Wood,*
  299 U.S. 123 (1936) ..................................................... 160, 161

*United States v. Woodlee,*
  136 F.3d 1399 (10th Cir. 1998) ...................................... 73

*United States v. Wright,*
  665 F.3d 560 (3d Cir. 2012) ...................................... 102, 103

*United States v. Young,*
  470 U.S. 1 (1985) ..................................................... 377, 378

*United States v. Yurasovich,*
  580 F.2d 1212 (3d Cir.1978) ........................................ 318

*Uttecht v. Brown,*
  551 U.S. 1 (2007) ............................................. 219, 220, 228

*Victor v. Nebraska,*
  511 U.S. 1 (1994) ..................................................... 79, 417

*Wainwright v. Witt,*
  469 U.S. 412 (1985) ............................................... 220, 227

*Watson v. United States,*
  552 U.S. 74 (2007) .................................................... 96

*Weaver v. Bowersox,*
  438 F.3d 832 (8th Cir. 2006) ........................................ 255

*Whalen v. United States,*
  445 U.S. 684 (1980) .................................................. 139

*Wharton v. Vaughn,*
  722 F. App'x 268 (3d Cir. 2018) .................................... 372

*Wickard v. Filburn,*
  317 U.S. 111 (1942) .................................................. 135

*Wilber v. Hepp,*
  16 F.4th 1232 (7th Cir. 2021) ....................................... 388

*Williams v. Norris,*
  612 F.3d 941 (8th Cir. 2010) ................................... 412, 413

# TABLE OF AUTHORITIES

**Page(s)**

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968) ......................................................... 220

*Woodson v. North Carolina,*
    428 U.S. 280 (1976) ................................ 249, 377, 433, 435

*Yee v. Escondido,*
    503 U.S. 519 (1992) ........................................................... 67

*Zant v. Stephens,*
    462 U.S. 862 (1983) .............................................. 280, 289

*Zia Shadows, L.L.C. v. City of Las Cruces,*
    829 F.3d 1232 (10th Cir. 2016) ..................................... 161

## State Cases

*Block v. State,*
    100 Ind. 357 (Ind. 1885) .............................................. 160

*Commonwealth v. Morales,*
    701 A.2d 516 (Pa. 1997) .............................................. 236

*People v. Brown,*
    624 N.E.2d 1378 (Ill. 1993) ......................................... 293

*Salazar v. State,*
    90 S.W.3d 330 (Tex. Crim. App. 2002) ......................... 289

*State v. Bigbee,*
    885 S.W.2d 797 (Tenn. 1994) ....................................... 379

*State v. Deck,*
    303 S.W.3d 527 (Mo. 2010) .......................................... 425

*State v. Roberts,*
    838 S.W.2d 126 (Mo. App. 1992) .................................. 293

*State v. Stout,*
    46 S.W.3d 689 (Tenn. 2001) ......................................... 379

# TABLE OF AUTHORITIES

Page(s)

**Federal Constitutional Provisions, Statutes, Guidelines, and Rules**

U.S. CONST. art. I, § 8 .......................................................... 113

U.S. CONST. amend. VI ......................................................... 156

U.S. CONST. amend. XIV ...................................................... 156

18 U.S.C. §32 ...................................................................... 118

18 U.S.C. §33 ...................................................................... 118

18 U.S.C. §247 ............................................................... *passim*

18 U.S.C. §249 ............................................................... *passim*

18 U.S.C. §659 ...................................................................... 118

18 U.S.C. §924 ............................................................... *passim*

18 U.S.C. §1201 ............................................................... 66, 76

18 U.S.C. §1583 ...................................................................... 77

18 U.S.C. §1958 ................................................................... 118

18 U.S.C. §2118 ................................................................... 118

18 U.S.C. §2119 ................................................... 77, 118, 131

18 U.S.C. §2241 ................................................................... 78

18 U.S.C. §2252 ................................................................. 122

18 U.S.C. §2252A ....................................................... 133, 134

18 U.S.C. §2252B ............................................................... 133

18 U.S.C. §2423 ................................................................. 118

18 U.S.C. §3231 ...................................................................... 5

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. §3591 .................................................................... 25, 36, 287

18 U.S.C. §3592 ............................................................. *passim*

18 U.S.C. §3593 ............................................................. *passim*

18 U.S.C. §3595 ............................................................. *passim*

28 U.S.C. §1291 ............................................................................ 5

34 U.S.C. §30501 .................................................................... 88, 97

42 U.S.C. §1981 .......................................................................... 93

42 U.S.C. §1982 .......................................................................... 93

42 U.S.C. §2000e ........................................................................ 96

U.S.S.G. § 3E1.1 .................................................................. 359, 363

Fed. R. Crim. P. 12.2 ............................................................... 307

Fed. R. Crim. P. 33 .................................... 28, 181, 189, 195, 199

Fed. R. Crim. P. 43 .......................... 426, 431, 432, 434, 435

Fed. R. Crim. P. 51 .................................................................. 263

Fed. R. Evid. 401.......................................... 231, 238, 251, 252

Fed. R. Evid. 403.......................................................... *passim*

Fed. R. Evid. 702 ............................................ 231, 238, 248

## State Statutes and Rules

Idaho Code Ann. §19-2020 ................................................... 161

Minn. R. Crim. P. 26.02......................................................... 161

N.D. Cent. Code §29–17–36 ............................................... 161

# TABLE OF AUTHORITIES

**Page(s)**

Okla. Stat. tit. 22 §660 ........................................................ 161

Or. Rev. Stat. tit. 14 §136.220 .......................................... 161

S.D. Codified. Laws Ann. §23A–20–13.1 .......................... 161

## Legislative History

H.R. Doc. No. 102-58 (1991) .............................................. 288

H.R. Rep. No. 100-337 (1987) ............................................ 123

H.R. Rep. No. 111-86 (Apr. 27, 2009) ............................... 97

Pub. L. No. 100-346 (1988) ................................................ 119

Pub. L. No. 104-155 (July 3, 1996) .................................... 124

142 Cong. Rec. S6517-04 (June 19, 1996) ......................... 124

142 Cong. Rec. S7908–04 (July 16, 1996) ......................... 124

## Additional Sources

Associated Press, *Jury Weighs Death Penalty or Life in Prison for Pittsburgh Synagogue Shooter* (Aug. 1, 2023) ............................. 271, 290

BBC, *Robert Bowers found guilty of deadly Pittsburgh synagogue attack* (June 16, 2023) ...................................................... 230

*Black's Law Dictionary* (12th ed. 2024) .............................. 96

John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"*
   86 CORNELL L. REV. 397 (2001) ............................ 327, 328

Barbara K. Bosserman & Angela M. Miller, *Prosecuting Federal Hate Crimes*,
   70 DOJ J. FED. L. & PRAC. 127 (2022) .................... 98

Cambridge Dictionary Online .............................................. 363

# TABLE OF AUTHORITIES

**Page(s)**

City of Pittsburgh Department of Public Safety Bureau of Police 2022
Statistical Report ................................................................................. 198

Sally Constanzo & Mark Constanzo, *Life or Death Decisions: An
Analysis of Capital Jury Decision Making Under the Special Issues
Sentencing Framework*,
    18 LAW AND HUM. BEHAV. 151 (1994)...................................... 326, 327

Alain Corcos, *The Myth of the Jewish Race* (Lehigh Univ. Press 2005)
....................................................................................................................... 100

Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *But Was He
Sorry? The Role of Remorse in Capital Sentencing*,
    83 CORNELL L. REV. 1599 (1998) ....................................................... 326

Theodore Eisenberg and M. T. Wells, *Deadly Confusion: Juror
Instructions in Capital Cases*,
    79 CORNELL L. REV. 1 (Nov. 1993) ................................................... 374

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What
Do Jurors Think?*
    98 COLUM. L. REV. 1538 (1998) ....................................................... 326

Harmeet Kaur, *What does it mean to be Jewish in the US?*, CNN (Apr.
4, 2023) ............................................................................................. 100

Hallie Lauer, *"Begin to Heal": Pittsburgh reacts to the synagogue
shooter's death sentence*, Pittsburgh Post-Gazette (Aug. 2, 2023)........ 347

Bin Liang and Hong Lu, *The Death Penalty in China: Policy, Practice,
and Reform* (Columbia University Press 2016) .......................... 148, 165

Jennifer Mason McAward, *Defining the Badges and Incidents of
Slavery*,
    14 U. PA. J. CONST. L. 561, 626-27 (2012) .......................................... 91

Merriam-Webster Dictionary Online ....................................................... 96

PBS News Hour, *How the Tree of Life Shooting Reflects American Anti-
Semitism* (Oct. 30, 2018) .................................................................... 230

Eugene Robinson, *An Inarticulate Kickoff*, The Washington Post, Feb. 1,
2007 ..................................................................................................... 214

# TABLE OF AUTHORITIES

**Page(s)**

Russell K. Robinson, *Perceptual Segregation,*
108 COLUM. L. REV. 1093 (2008) ...................................................... 214

Mark Scolforo, *Judge Faces Ethics Charges Over Racist, Demeaning Comments*, WESA News (August 12, 2020) ........................................ 198

Peter Smith & Mark Scolforo, *3 Years After Pittsburgh Synagogue Attack Trial Still Ahead*, AP News (Oct. 22, 2021) ............................. 360

Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Tactics, Remorse, and the Death Penalty*,
83 CORNELL L. REV. 1557 & n.12 (1998) ......................................... 326

Scott E. Sundby, *War and Peace in the Jury Room: How Capital Juries Reach Unanimity*,
62 HASTINGS LAW JOURNAL 103 (Nov. 2010) .................................. 328

Harold M. Tanner, *Strike Hard! Anti-Crime Campaigns and Chinese Criminal Justice, 1979-1985* (Cornell East Asia Series 1999) ........... 148

Murray Scot Tanner, *State Coercion and the Balance of Awe: the 1983-1986 "Stern Blows" Anti-Crime Campaign*,
THE CHINA JOURNAL No. 44 (July 2000) ................................. 148, 149

United States Dept. of Justice, Justice Manual .................................. 360

# INTRODUCTION[1]

Robert Bowers committed a terrible crime, for which his responsibility is undisputed. On October 27, 2018, he entered the Tree of Life/Or L'Simcha synagogue in Pittsburgh, Pennsylvania, and murdered eleven worshipers who had gathered there for Saturday services. He also shot and grievously injured two additional worshipers, and several responding law enforcement officers. His acts caused incalculable suffering, casting an irreparable shadow over the lives of survivors, victims' families, their community, and the entire nation. And they were driven by virulent and destructive ideas: antisemitism, white supremacy, and the willingness to promote those concepts through violence. Bowers admitted all this, and for it, a federal jury convicted him of sixty-three counts of hate crimes, religious obstruction, and weapons offenses, resulting in death.

In support of a life sentence, Bowers's counsel presented substantial mitigating evidence of psychological impairments that

---

[1] As explained in Bowers's prior filings, counsel believe the time afforded for preparation of this brief was insufficient to permit them to fulfill their duties under the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. (*See* Appeal Docket nos. 38, 46.)

stretched back decades. Bowers was born to a volatile, mentally ill mother and violent, abusive father. Shortly after Bowers's birth a visiting social worker discovered both parents trying to murder him: his mother by throwing him from a window and his father by flooding the house with gas. The father left the family soon thereafter, then—when Bowers was six—committed suicide. Bowers passed much of his childhood cold, hungry, and inadequately-clothed as he and his mother shuttled between temporary lodgings they sometimes shared with strange men. Bowers's mother cut herself in front of him and told him she regretted he was born. At age ten Bowers became consumed by thoughts of suicide. At sixteen he tried to kill himself by swallowing a bottle of aspirin, and at seventeen he set himself on fire, sustaining severe burns. He was repeatedly psychiatrically committed. As an adult he battled overwhelming depression and ruminated about United Nations agents invading his home. He struggled to maintain employment and relationships, but became increasingly preoccupied by antisemitic and apocalyptic ideas—on which he tragically acted at the Tree of Life synagogue on October 27, 2018.

This substantial mitigation—along with evidence Bowers would present no problems if imprisoned for life—meant a death sentence was not foreordained. Even highly aggravated capital cases, like this one, frequently result in life sentences. And under the Federal Death Penalty Act ("FDPA"), if only a single juror had declined to vote for death, the district court would have been required to sentence Bowers to life without parole. That one juror might have voted to spare Bowers's life was plausible given his traumatic background, repeated psychiatric commitments, lifelong mental impairments, and the ability of the Bureau of Prisons to safely confine him.

But the jury could not fairly consider that evidence because the severity of Bowers's crime impelled the government to overreach—and the trial court to permit that overreach—distorting the trial's focus in violation of the Constitution and FDPA. The government deluged the jury with cumulative, inflammatory evidence about the Holocaust, misused Bowers's mitigation-focused statements as aggravation, wrongly multiplied the number of aggravating factors, and misstated key legal standards. The court refused Bowers's valid mitigating factors, forced Bowers to wear painful and visible shackles without

explanation, struck scrupled jurors despite their willingness to consider the death penalty, and refused to strike from the jury a former Chinese government official who had authorized and supervised executions.

The government's case would not have been compromised by adherence to proper procedures. Jurors deserved to consider that case—and the defense case in mitigation—on its merits. Especially in cases like this—of harrowing crimes that wrack the nation—due process must hold. *Chessman v. Teets*, 354 U.S. 156, 165 (1957) ("Due Process…must be respected, no matter how heinous the crime.").

This brief presents Bowers's challenges to the indictment, jury selection, and sentencing in chronological order. On many issues the district court failed to conduct adequate fact-finding or applied the wrong legal standards; as to those issues Bowers requests remand for further factfinding or consideration. Other issues warrant vacatur of Bowers's death sentences and a new sentencing hearing.

## STATEMENT OF JURISDICTION

Bowers appeals from a judgment of conviction and death sentences entered on August 3, 2023, by the United States District Court for the Western District of Pennsylvania (Colville, J.). (App.139-

55.)[2] The court denied Bowers's motion for new trial or judgment of acquittal on May 17, 2024. (App.413.) Bowers timely filed a notice of appeal on May 31, 2024. (App.156.) The district court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3595.

## STATEMENT OF THE ISSUES

This appeal raises 16 issues for review.

### Points Related to the Indictment

Did the district court err by:

1.     Denying the defense's motion to dismiss the firearm counts, under 18 U.S.C. §924(c), (j), for lack of a valid predicate crime-of-violence? <u>Raised below</u>: DE237:4-11, DE787:10-30; <u>Ruled on below</u>: App.178-79, 217-39.

2.     Ruling the hate crime statute, 18 U.S.C. §249(a)(2), a valid exercise of Congress's Thirteenth Amendment authority? <u>Raised below</u>: DE239:2-30, DE1595:3-21; <u>Ruled on below</u>: App.158-67, 392-97.

---

[2] The Appendix is cited as "App." District court docket entries not included in the appendix are cited as "DE," followed by the relevant district court docket number. Government and defense exhibits are cited as "GX" and "DX," respectively, followed by the exhibit number.

3.    Ruling the religious-obstruction statute, 18 U.S.C. §247(a)(1), a valid exercise of Congress's Commerce Clause authority? Raised below: DE239:30-62; Ruled on below: App.167-75.

4.    Ruling that the convictions for 18 U.S.C. §247(a)(2) and 18 U.S.C. §924(j) would not violate Double Jeopardy, despite §247(a)(2) being a lesser-included offense of §924(j)? Raised below: DE237:14-16; Ruled on below: App.182-83.

Points Related to Jury Selection

5.    Did the district court err by declining to dismiss for bias a juror who reviewed death sentences and supervised executions as a government official in China, or should this Court remand for further consideration of bias? Raised below: App.1698, 1700; Ruled on below: App.2010.

6.    Did the district court abuse its discretion by denying Bowers's challenge to the government's peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), or by failing adequately to consider the defense evidence on that issue, warranting remand? Raised below: DE1253, DE1595:21-37, App.5600-13; Ruled on below: App.397-412, 5561-62, 5565, 5594-96, 5616-17.

7.     Did the district court abuse its discretion by dismissing for cause two jurors who said they could fairly consider the death penalty? <u>Raised below</u>: App.2135, 2215; <u>Ruled on below</u>: App.2320.

<u>Points Related to Sentencing</u>

8.     Did the district court abuse its discretion by admitting—at both the guilt/innocence and sentencing phases—cumulative and inflammatory evidence about the Holocaust, historic antisemitism, and the history of Judaism, prejudicing the jury's sentencing determination? <u>Raised below</u>: DE981, DE1095, DE1471, DE1481, App. 5866-68, 7965, 14146-48; <u>Ruled on below</u>: App. 255-99, 382, 5871-72, 7965, 14151.

9.     Did improper victim impact evidence and argument render Bowers's death sentences unconstitutional? <u>Raised below</u>: DE241:56-59, DE1352, DE1464, DE1474, App.10972, 11006-08, 11062-63, 11127-28, 11132, 11324, 11367-80, 14153-72; <u>Ruled on below</u>: App.355-71, 379, 10906-08, 11007-08, 11064, 11127-29, 11134, 11327, 11380, 14160-72.

10.     Did the district court contravene *Simmons v. United States,* 390 U.S. 377 (1968), and *Griffin v. California*, 380 U.S. 609 (1965), by permitting the government, in sentencing-phase closing argument, to use Bowers's mitigation-focused statements to defense experts as

7

aggravation? <u>Raised below</u>: DE1524, App.10970-71; <u>Ruled on below</u>:

DE1526, App.13323.

11.    Given prosecution arguments that Bowers, if sentenced to

life, could live comfortably in prison and spread his repugnant views,

did the district court err in barring Bowers from contending at

sentencing that executing him would actually *increase* his notoriety?

<u>Raised below</u>: DE1517:1, App.13047-49, 13060-61; <u>Ruled on below</u>:

App.13301.

12.    Given prosecution arguments that Bowers enjoyed the trial,

and harmed victims by insisting on one, did the district err by barring

Bowers from contending at sentencing that he had offered to plead

guilty in exchange for a life-without-release sentence? <u>Raised below</u>:

DE1351:13-15,  DE1362:56-57; <u>Ruled on below</u>: App.308-09.

13.    Did the district court err in overruling Bowers's objections to

the prosecutor's mischaracterizations of law in sentencing-phase closing

argument? <u>Raised below</u>: DE1524:13; <u>Ruled on below</u>: App.13323.

14.    Did the district court err by permitting Bowers to be

shackled, midway during his sentencing-eligibility hearing and through

the entirety of his sentence-selection hearing, without disclosing why,

and based on disputed facts without a hearing? <u>Raised below</u>: DE1407, DE1427, DE1432, DE1492, App.9356-67; <u>Ruled on below</u>: App.372-76, 385-86, 9356-67, 13874-78, 13883-92.

15.    Did the district court violate Federal Rule of Criminal Procedure 43, the Confrontation Clause, and due process by not ensuring Bowers's presence for a jury viewing of weapons during sentencing-selection deliberations, and a subsequent hearing on jurors' interactions with a marshal during that viewing? This issue was not raised or ruled on below.

Cumulative Error

16.    Is relief warranted by the errors' cumulative effect?

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not been before this Court previously; counsel know of no related case or proceeding.

## STATEMENT OF THE CASE

### A.    Bowers's background and history

The defense argued that Bowers's functioning was influenced by childhood trauma and adversity. His life history evidence was largely undisputed and largely accepted by the jury in its mitigation findings.[3]

Robert Bowers was born in 1972, in Pittsburgh, Pennsylvania, to a family rife with genetic, economic, and psychiatric struggles. His mother, Barbara, battled profound depression while his father, Randall Bowers, was violent and mentally ill. During Barbara's pregnancy with Robert,[4] Randall assaulted her, choked her, and threw her down a flight of stairs, so she required hospitalization for a concussion. (App.11534-35.) Shortly after Robert's birth, a social worker was called to their home because both parents were threatening to murder him: his mother by throwing him out of a window and his father by turning on the gas. (App.11536-38.) Randall and Barbara divorced soon thereafter. (App.11570.) A few years later Randall was arrested for rape, and—

_____

[3] The defense presented this evidence at sentencing through psychologist Katherine Porterfield, Ph.D., (App.11508-97, 11602-11802, 11826-52, 11861-11930), and through lay witnesses.

[4] Bowers is called "Robert" in this section, to distinguish from Randall.

when Robert was six years old—Randall committed suicide. (App.11521-82; App.11611-12.)

Robert's maternal and paternal families both exhibited severe histories of mental illness, alcoholism, and substance abuse. (App.11547-57, 11563-65.) His maternal grandmother and her siblings were raised in an orphanage during the Great Depression and suffered psychiatric hospitalizations and disorders. (App.11550-56.) His maternal grandmother was psychiatrically institutionalized and battled alcohol and drug addiction. (App.11555-56.) Robert's paternal grandfather was an abusive alcoholic, and Robert's father, Randall, was psychiatrically committed while in the Navy and then was discharged after jumping off a naval ship. (App.11564-67.) Defense psychologist Porterfield testified that a family history of mental illness predisposes an individual to such illness. (App.11550.)

Robert's mother, Barbara, was unequipped to raise him. She could not hold a job or provide for Robert economically. He was often hungry, cold, and inadequately-clothed. Barbara and Robert moved constantly among marginal lodgings. (App.11573-74.) Barbara was depressed and overwhelmed. (App.11884-87.) When Robert was just a young boy

Barbara would cut herself in front of him and told him she wished he had never been born. (App.11574-75.) At one point during Robert's childhood Barbara lived with two different men—and was sleeping with both—while Robert also lived in the house. (App.11574-75.) Barbara would not take Robert to the doctor, even when he needed treatment. (App.11586-88.) And Robert had frequent, unexplained absences from school. (App.11620.)

Though Robert sometimes lived with his grandparents, this was little better. His grandparents' relationship could be violent—the grandfather once broke Robert's grandmother's arm in front of him (App.11723-24)—and his grandmother was severely addicted to alcohol, drugs, and gambling. (App.11575-76.)

Robert developed severe depression and became suicidal. He first attempted suicide at age ten, threatening to jump off a bluff.[5] (App.11618-19.) At age thirteen, alarmed school officials recommended Robert be psychiatrically treated; the same year he threatened to set

_____

[5] The government disputed that this—or Robert's later act of setting himself on fire—was a suicide attempt, citing his denials to a mental health expert. (App.11781-87.) But testing showed Bowers minimized his psychological impairments to appear normal. (App.9187.)

his mother on fire and kill himself. (App.11620-23.) He was psychiatrically committed and doctors believed he had incipient schizophrenia, chronic atypical depression, and adolescent adjustment reaction. (App.10017, 11631-32, 12033-34.) He talked about hurting himself, requiring restraints. (App.11630-35.) He became a ward of the court and was sent to a therapeutic residential treatment center. (App.11635-40.) Though he struggled with emotional regulation he improved and was discharged after six months, after which his mother discontinued therapy, even though Robert remained angry, frustrated, and depressed. (App.11646-47.)

At age sixteen Robert again attempted suicide, obtaining a gun and threatening to shoot himself or his mother. (App.11650-51.) He was again psychiatrically committed. (App.11651.) After his discharge he overdosed on aspirin and then lit himself on fire while sitting in a car drinking grain alcohol, sustaining severe burns. (App.11652.) Soon thereafter, he failed out of eleventh grade. (App.11648-79, 11654-55.) He later obtained his GED. (App.11655.)

Bowers wanted to attend a technical school, but could not get financial aid because his mother had not done her taxes so he lacked

the proper forms. (App.11655.) After a series of short-term, low-paying jobs, his grandfather found him a part-time job as a delivery person at a bakery where his grandfather also worked. (App.11657.) Bowers lived above the bakery in a subsidized apartment. (App.11657-58.)

Though employed, Bowers struggled psychologically. He often overslept, depending on his bakery co-workers to remind him to come to work. (App.11657-58.) He kept a gun by the front door of his apartment, talked about the United Nations having "blue hats," and said "you got to be ready for them." (App.11658.)[6] He had teeth pulled due to poor oral hygiene, then became addicted to the opioid painkillers he was prescribed. (App.11659-60.) In 2004, after he was fired from the bakery for stealing, he put a gun in his mouth and called police threatening to kill himself, resulting in a three-day hospitalization. (App.11660-61.)

Through his 30s, Bowers continued to struggle with his mental health. His hygiene suffered and he moved in with another patient from the hospital, then lived for the next ten years in his grandfather's

---

[6] The government disputed that Bowers believed he was threatened by "blue hats," citing his claim to a mental health expert that he knew the blue hats were not real. (App.11790-91.) But Bowers's denial is questionable given his documented tendency to minimize his impairments. (App.9187.)

basement. (App.11661-62.) At one point he reported being unable to function due to depression, anxiety and social anxiety—to the point he could not leave the house or interact with others. (App.11664.) He worked for about eighteen months at a support center for disabled individuals, then obtained his commercial trucking license, working intermittently as a long-haul trucker. (App.11665-67.) He remained isolated, lonely and depressed, to the point that his family feared he would kill himself. (App.11667.) He got his first apartment at age 44. (App.11669.)

Doctor Porterfield concluded that Bowers's life was full of trauma and inadequate caregivers that made him vulnerable to harmful ideas. (App.11671-76.)

Yet Bowers also had positive qualifies, to which several sentencing-phase witnesses testified. One friend recalled Bowers saving him from drowning when they were kids. (App.12181-83.) Bowers's former employer recalled Bowers caring for two brain-injured clients with patience and empathy, performing well, and volunteering for tasks. (App.12278-95.) Bowers's former doctors and teachers recalled that he struggled emotionally but showed promise and a desire to

succeed. (App.11988-12076; App.12104-68, 12217-60.) An employee of the trucking company Bowers worked for testified that Bowers was a good employee whom the company tried to convince to stay. (App.12261-77, 12295-96.)

But his mental illness was always in the background. Relatives described his depressed demeanor. (App.11823-26; App.11931-73; App.13005-43.) A defense investigator testified that the envelope that had contained Bowers's father's suicide note was found in Bowers's apartment. (App.12078-91.)

Around 2016, Bowers became increasingly fixated on antisemitic and white supremacist ideas. (App.12789-93.) His descent coincided with the deaths of the two people closest to him: first his grandfather in 2014, and then, in 2016, his only real friend—a person named Joe Sedley. (App.12791-92.) After their deaths Bowers quit his trucking job, began asking about the Book of Revelations at a church, and began searching on the Internet for antisemitic material. (App.12791-93.)

Bowers also began to connect antisemitic ideas with an increasing obsession with the end of the world. (App.12792-93.) He became convinced that Jewish people were working on behalf of Satan in a war

against God for world domination, and that all except 144,000 Jewish people on Earth were being used by Satan as agents to bring about the end of days. (App.12793-95.) He believed Satan wants to kill white people because Satan views Christians as a threat, and most Christians are white. (App.12796-97.) And he thought it was his duty to fight on the side of God against Satan. (App.12797-98.)[7]

## B.   The crime

On the morning of October 27, 2018, Bowers—then 46 years old—tragically acted on those ideas. After waking, he configured his home computer system to wait 200 minutes and then wipe itself clean of information. (App.8096-8118, 8131.) He left his apartment and drove, with firearms and ammunition, to the Tree of Life/Or L'Simcha synagogue in Pittsburgh's Squirrel Hill neighborhood. (App.7586-7611; App.9249-50; App.12933-34.) Seeing only a few people inside, he left and drove to a Jewish Community Center. (App.9249-50.) Then, realizing the Center was near a police station, he returned to the synagogue. (App.9249-50.)

---

[7] On the jury's sentencing-phase verdict form, eight jurors indicated they found it true that Bowers believed he was acting on the side of God against Satan in committing the offense. (App.13795.)

Bowers parked in the synagogue parking lot and, on his phone, posted a message to the social media site Gab: "HIAS [the Hebrew Immigrant Aid Society] likes to bring in invaders that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics. I'm going in." (App.6565.) Bowers then approached the synagogue with an AR-15, Glock pistols, and ammunition magazines, and fired through a glass window. (App.6110-11, 6149, 6271-72, 6310-11; App.13687.) Investigators would later piece together that Bowers had targeted this synagogue because a congregation that worshipped there supported HIAS, an organization that helped recent immigrants to the United States—something Bowers deeply, and irrationally, feared. (App.7875-82.)

Inside the synagogue, worshipers of three different congregations—Tree of Life, New Light, and Dor Hadash—were conducting or preparing for Shabbat services. Tree of Life worshipers had begun their service in an area of the building called Pervin Chapel, (App.5815-16), while two members of Dor Hadash—Dan Leger and Jerry Rabinowitz—prepared for services in the rabbi's study.

(App.6147-49; App.5973-75, 6035-36.) In the basement, members of New Light had begun their own observance. (App.5915-19, 6001-09.)

Upon hearing the shattering glass, several congregants ran to investigate. (App.5977.) Leger and Rabinowitz left the rabbi's study, encountered Bowers on a staircase mezzanine, and were shot. (App.5976-78.) Tree of Life congregation members Joyce Feinberg, Irving Younger, and Cecil Rosenthal were shot as well: Feinberg and Younger on the mezzanine, and Cecil Rosenthal outside Pervin Chapel. (App.5976-77, 6061-62, 6150, 6603-15, 6718, 8131-35.)

Several others in Pervin Chapel—Audrey Glickman, Joe Charny, Rabbi Jeffrey Myers, and Steven Weiss—escaped by running through exits at the front of the chapel, near the altar. (App.5841; App.6152, 6220.) David Rosenthal—who, like his brother Cecil, had an intellectual disability (App.5803)—initially went with this group but became frightened and ran back out of the group's hiding place. (App.6221.) He, too, was fatally shot on the mezzanine. Weiss ran downstairs to warn the New Light congregants about the attack (App.6120, 6155) and ultimately escaped. (App.6159-61.) Myers hid in a bathroom, while

Glickman and Charney hid in an upper room under prayer shawls. (App.5848-49; App.6227-29.)

Other worshipers could not run. (App.5838-39; App.8170.) Sylvan and Bernice Simon, an elderly couple, remained in Pervin Chapel in the pews. (App.6220.) Bowers entered the chapel and shot Sylvan, then walked out as Bernice, still in the pew with her husband slumped over her, called 911. (App.5725-43.) Elsewhere in Pervin Chapel, ninety-seven-year-old Rose Mallinger huddled with her daughter, Andrea Wedner, on the floor as Andrea also called 911. (App.8169-73.)

In the basement, New Light congregants Carol Black, Barry Werber, and Mel Wax hid in a storage closet at the direction of Rabbi Jonathan Perlman (App.6118-19) as two other New Light members—Richard Gottfried and Dan Stein—tried to hide in the kitchen where they had been cooking food for after the service. (App.8132; App.5917.) Bowers descended to the basement kitchen and shot Gottfried and Stein. (App.8131-35.) Wax, in the closet, opened the closet door to look out and Bowers shot him too, as Black and Werber remained hidden in the darkness. (App.8133; App.5923-24.) Perlman ultimately found a door to the outside and escaped. (App.6121.)

Bowers then returned to the lobby. Through the glass doors, he saw Pittsburgh police officers Daniel Mead and Michael Smidga approaching from outside. He fired out at them through the glass, shooting Mead in his left hand (App.6287-89), and wounding Smidga in the face. (App.6377-80.) Smidga then tried to shoot at Bowers through a window, and Bowers shot back. (App.6382-88.) Bowers then returned to Pervin Chapel, where he fatally shot Rose Mallinger, shot Andrea Wedner in the arm, shattering it in two places, and fatally shot Bernice Simon. (App.8133-34, 8177-78.)

Of the twenty-one congregants in the synagogue, Bowers fatally shot eleven. (App.8378-79.) Two, Dan Leger and Andrea Wedner, survived but with severe injuries.

## C.    The arrest and Bowers's statements

With numerous law enforcement officers beginning to arrive, Bowers fled to an upper floor of the synagogue. Officers encountered him in an upstairs room, he fired shots, and a gunfight ensued. (App.6529-30.) Officers Timothy Matson and Anthony Burke were shot and wounded, Matson nearly fatally. (App.8142-55.) Finally, Bowers surrendered and, at officers' instruction, emerged from where he had

been shooting. As he crawled, wounded, towards the officers, he called out that he had "had enough, that they were killing our children and that all Jews had to die," (App.6540-41, 6549-50), that "Jews are the children of Satan" and "murdering our children," (App.6819-20), that "invaders were committing genocide on our people" and "killing our kids," and that he "needed to kill Jews." (App.7205-06, 7210-11.) He also mentioned HIAS. (App.6659-30; App.6549-50; App.7009.) Shortly thereafter Bowers told another officer, "Those people are committing genocide on my people, and I just want to kill Jews." (App.7266.)

When officers tried to bluff Bowers into thinking they had a video of his accomplice, to see if there was another perpetrator, Bowers took full and sole responsibility for the attack. (App.6480-81.)

## D. The indictment, offer to plead, and death notice

### 1. The indictment

The government indicted Bowers on 63 counts, 22 of which carried a possible death sentence. The following counts involved the deceased victims:

- eleven counts of obstructing the deceased victims' religious exercise, resulting in death (18 U.S.C. §247(a)(2), (d)(1));

- eleven counts of commission of a hate crime against the deceased victims (18 U.S.C. §249(a)(1)(B)(i));

22

- eleven counts of using and discharging a firearm during and in relation to—and possessing a firearm in furtherance of—a crime-of-violence resulting in death, (18 U.S.C. §924(c)(1)(a)(i)-(iii), 924(j)(1)).

The following additional counts involved surviving victims:

- two counts each of §247(a)(2), §249(a)(1), and §924(c)(1)(a), for surviving victims Andrea Wedner and Daniel Leger;

- eight religious obstruction counts (§247(a)(2)) for additional surviving congregants;

- four counts of Religious Obstruction involving Use of a Dangerous Weapon, and Resulting Bodily Injury to a Public Safety Officer (§247(a)(2), (d)(3)); and

- twelve counts of using and discharging a firearm during and in relation to—and possessing a firearm in furtherance of—a crime-of-violence (§924(c)(1)(A)(i)-(iii)) for surviving victims and officers.

(App.13696-710.) The death-eligible counts were the eleven religious obstruction counts as to the deceased victims (18 U.S.C. §247(a)(2), (d)(1)) and the eleven firearm counts (18 U.S.C. §924(c), (j)), as to the deceased victims.

The defense challenged the §247, §249, and §924 counts, arguing that (among other things), the §247 charges were unconstitutional under the Commerce Clause, the §249 counts were unconstitutional under the Thirteenth Amendment, the §924(c), (j) counts were invalid

for lack of a qualifying predicate "crime-of-violence," and the §247 and §924(j) counts violated the Double Jeopardy clause. (DE237, 239.) The district court denied these challenges, except that it agreed with the defense that the §249 counts could not serve as predicate offenses for the §924(c), (j) counts.[8] (App.157-84; 211-40.)

## 2. Bowers's offer to plead

Counsel indicated Bowers's willingness to plead guilty as early as February 2019—just months after the offense—at the arraignment on the superseding indictment. (App.13526.) He made a formal offer to the government shortly thereafter, expressing a willingness to admit all charges and serve life in prison without the possibility of release. (App.13531.) The government rejected that offer. Bowers renewed the offer to plead before trial, but the government rejected it again. (DE1096.)

## 3. The notice of intent to seek the death penalty

The government filed a Notice of Intent to Seek the Death Penalty on the religious-obstruction (§247(a)(2)) and firearm (§924(j)) counts. (App.13711.) The Notice listed both statutory and non-statutory

---

[8] *See* Points I-IV, below.

aggravating factors. 18 U.S.C. §3591(a)(2)(A)-(D), 3592(c). The noticed

statutory aggravating factors were:

- Knowing creation of a grave risk of death to persons in addition to the victim of the offense, to include responding public safety officers, 18 U.S.C. §3592(c)(5);

- Substantial planning and premeditation to cause the death of a person, 18 U.S.C. §3592(c)(9);

- Commission of the offense against victims vulnerable due to age and infirmity, 18 U.S.C. §3592(c)(11); and

- Killing or attempting to kill more than one person, 18 U.S.C. §3592(c)(16).

(App.13713.) The noticed non-statutory aggravating factors were:

- Victim impact: specifically, that Bowers "caused injury, harm, and loss" to the deceased victims and their "friends, family, and co-workers";

- Religious animus— that "Bowers expressed hatred and contempt towards members of the Jewish faith and his animus…played a role in the killings";

- Selection-of-site: specifically, that Bowers targeted worshipers at the Tree of Life synagogue, "located in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania, which is home to one of the largest and oldest urban Jewish populations in the United States, in order to maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities;"

- Lack of remorse; and

25

- Injury to surviving victims.

(App13713-15.)

The defense challenged the scope and legality of the victim impact and selection-of-site nonstatutory aggravating factors. The district court denied those challenges. (App.185-209.) At the defense's request, it also trifurcated the trial into a guilt/innocence phase, eligibility phase (regarding whether the statutory requirements for death-eligibility were met), and sentence-selection phase. (DE854:936-37.)

## E. Voir dire

Voir dire lasted over a month.[9] Jurors completed questionnaires, then were interviewed by the court and counsel; the resulting transcripts span approximately 4,800 pages. (*See* App. vols. III-XIII.) One venirewoman revealed that she had worked as a lawyer for the Chinese government in 1983—during a harsh government anticrime offensive—reviewing death sentences and supervising executions. (App.1687-97.) She opined that life imprisonment is an insufficient punishment for murder because prisoners enjoy luxuries and burden

---

[9] (App.876, 1168, 1447, 1704, 1997, 2318, 2652, 2958, 3277, 3485, 3771, 4104, 4374, 4628; 4897, 5170, 5429, 5541.)

taxpayers, that life sentences are not really lifelong, and that individuals cannot be redeemed by life imprisonment if they are over fifty years old (Bowers was then fifty-one). (DE1172:246-49.)

Bowers challenged the juror for cause, based on her "personal experience and expertise." (DE1172:252, 254.) The court denied the challenge without addressing bias, instead treating the issue as merely whether the juror could apply American rather than Chinese law. (App.2010.) The juror was seated.[10] (App.5620.) The district court also sustained the government's for-cause challenges to two jurors who expressed reservations about the death penalty, though both jurors said they could consider it.[11] (App.2320.)

After voir dire concluded, the parties stated peremptory challenges to the remaining jurors. The government struck every African-American and Hispanic juror.[12] (App.5563-65; DE1545.) The government had had seven days (since voir dire ended) to consider its strikes and reasons, and—after the defense's *Batson* challenges—spent

---

[10] *See* Point V, below.
[11] *See* Point VII, below.
[12] The court also struck the only Jewish juror. (App.5563-65; DE1545.)

an entire hour explaining its proffered non-discriminatory reasons.

(DE1277:25, 53.) The court then allowed the defense just 90 minutes to

prepare its response, which required reviewing thousands of pages of

voir dire transcripts and questionnaires. (App.5561-62, 5593-97.) The

court found that the government's strikes of all except one juror of color

established a *prima facie* case of discrimination, and—though this

"raise[d] an alarm," and left the court "personally and profoundly

disappointed"—deemed the government's proffered justifications

sufficient without addressing Bowers's arguments. (App.5616-17.)

When the defense re-raised its *Batson* arguments in a post-trial

Rule 33 motion—presenting a more detailed comparative analysis of the

government's strikes than had been possible under the rushed pretrial

timeframe—the court denied the motion without addressing the

defense's evidence of pretext.[13] (App.411-12.)

## F.    The guilt-innocence trial

### 1.    Pretrial rulings

Before trial, the government noticed its intent to present an

expert witness, William Braniff, to testify about antisemitic terms,

---

[13] *See* Point VI, below.

concepts such as the dehumanizing of Jews, and "neo-Nazi and white supremacist ideological tenets as they relate to the oral and written statements." (DE981-1.) Although Bowers's intent and antisemitic motivation were clear from his statements at the crime scene (among other evidence), the government argued that was not enough and Braniff's historical testimony was needed. (DE981-1.) Bowers moved to exclude it as unduly prejudicial, not helpful to the trier of fact, and improper expert testimony, arguing it would unfairly link Bowers with white supremacists and groups with which he was not affiliated. (DE981:2) The court disagreed, holding the testimony "may help the jury understand statements made by Defendant and…will be used to show that Defendant acted on his alleged racial animus." (App.269, 300.) As discussed below, Braniff's testimony became central to all phases of the trial.[14]

---

[14] *See* Point VIII, below.

## 2.    The evidence

At the guilt-innocence phase, the government presented synagogue congregants and leaders,[15] law enforcement officers,[16] investigating personnel,[17] a DNA specialist,[18] a firearms and toolmark analyst,[19] and forensic pathologists[20] to testify about the attack, the firearms and ammunition used, the victims' injuries, and damage to religious items in the synagogue, including prayer books, yarmulkes, and prayer shawls.

Rabbi Jeffrey Myers, one of the government's first witnesses, testified about the history of Judaism and Jewish traditions generally, the history of the Tree of Life synagogue and congregation, and a "Holocaust Torah" that had been recovered after World War II from a town in Czechoslovakia, the Jewish residents of which were murdered in the Holocaust. (App.5764-73, 5780-83, 5791-93, 5819-22.)

---

[15] (App.5764-5860, 5891-6051, 6095-6322, 8156-87.)
[16] (App.6362-6554; 6595-6776, 6794-6821, 6985-7010, 7199-7268, 7514-47, 8136-55.)
[17] (App.7027-7180, 7269-76, 7394-7513, 8087-8135.)
[18] (App.7315-93.)
[19] (App.7613-87.)
[20] (App.6823-6984.)

The defense raised Myers's testimony about Jewish history with the court—arguing that a "history lesson on Judaism" had no "relevance to the guilt or innocence phase of this case." (App.5866.) The government provided no rationale for it, but the court allowed it.[21] (App.5868-71.) Rabbi Perlman gave similar historical testimony about the history of the New Light congregation, including its founding by Romanian Jewish refugees escaping pogroms, their arrival in Pittsburgh and struggles with poverty in America, and the congregation's eventual move to Squirrel Hill and the Tree of Life synagogue. (App.6100-05.)

The victims and first responders provided harrowing testimony about the attack. Congregants described arriving at the synagogue, commencing worship, hearing shattering glass, and either fleeing or—in the case of Daniel Leger and Andrea Wedner—being shot. Leger testified about running out of the rabbi's study with Jerry Rabinowitz, then suddenly being shot, falling onto the stairs, and feeling the life drain from his body. (App.5969-5995.) Wedner described huddling with her elderly mother on the floor of Pervin Chapel, listening to the

---

[21] *See* Point VIII, below.

gunshots in terror while calling 911, and finally enduring the horror of being shot, seeing her mother shot, and watching her mother die beside her. (App.8156-8185.)

Law enforcement responders gave equally harrowing accounts of entering the synagogue, finding deceased victims, searching for Bowers, then engaging in a shootout with him. Officer Timothy Matson described entering an upstairs room and being immediately shot multiple times, sustaining near-fatal wounds. (App.8136-8155.) Officer Mead testified about being shot in the hand as he approached the synagogue, (App.6282-6299), while officer Smidga testified about hearing loss from the deafening gunfire. (App.6362-6391.)

The government's firearms expert, Brett Mills, testified about the process of loading a pistol (App.7632-33), about magazines compatible with the AR-15, and that most bullets at the scene came from the AR-15 rifle. (App.7652-61; App.13584-13609.) And a shooting reconstruction expert explained the trajectories of bullets fired in the synagogue. (App.8001-65; App.13580-82.)

Witnesses also described Bowers's Gab posts and Internet searches regarding HIAS, a group that works with organizations

including the Dor Hadash congregation to assist refugees who legally immigrate to the United States. (App.7689-95.) One of Bowers's posts said, "Why hello there, HIAS. You like to bring in hostile invaders to dwell among us? We appreciate the list of friends you have provided," followed by the website HIAS.org/events/national-refuge-Shabbat" and an announcement from HIAS. (App.6568-70.) One week before the attack HIAS hosted an event called Refugee Shabbat, which was widely publicized and identified Dor Hadash as being involved. (App.7703-04, 13677.)

Though Bowers's antisemitic animus was—in the government's words during closing argument—"crystal clear" (App.10959) from his statements at the crime scene that he wanted to "kill Jews," the government presented an FBI tactical specialist to testify to voluminous antisemitic posts, likes, and reposts unrelated to the attack, from Bowers's social media account with the platform Gab, as well as usernames of people Bowers followed and who followed him. (App.7763.) These included phrases showing unmistakable antisemitic animus, such as "Hitler was right" and "with Jews you lose," and a meme saying "the only good Jew is a dead Jew." (App.7766-67, 13626, 13652.)

Bowers's user "bio" reflected further animus, saying "Jews are the children of Satan. John 8:44," and additional posts referred to Hitler and the "Shoah," or Holocaust. (App.6564-65, 7774-82.)

Although the antisemitic meaning of all this could not have been plainer, the government additionally presented, over the defense's objection, William Braniff, Director of the Department of Homeland Security's Center for Prevention, Programs and Partnerships, as an expert in "white supremacist ideologies, terms and other types of symbology," ostensibly to explain the posts still further. (App.7943, 7960.) Braniff testified extensively about the posts and also the Holocaust, Nazi ideology, Nazi terminology, modern-day neo-Nazi groups and terms, and ancient antisemitic beliefs dating back to the Middle Ages. (App.7918-8001.)[22]

The defense rested without calling any witnesses. (App.8190-91.)

### 3. Closing arguments

The prosecution's closing reprised the attack, including Bowers's deliberate progress through the synagogue, his statements "All these Jews need to die" and "Jews are the children of Satan," his Gab profile

---

[22] *See* Point VIII, below.

with antisemitic phrases, his online searches for HIAS, and his failure to surrender and shooting at officers. (App.8299-8345.)

Defense counsel argued it was not Bowers's purpose to obstruct congregants' religious exercise (as §247(a)(2) requires); he instead sought to target those assisting HIAS. (App.8362-67.) And the §924(c), (j) firearm counts were invalid for lack of a valid §247 predicate. (App.8367-68.) Regarding the hate crime counts, the defense conceded Bowers's posts reflected antisemitic animus. (App.8368-70.)

In rebuttal, the government argued that Bowers's antisemitic animus was overwhelmingly clear, even if he also wanted to target HIAS. (App.8371-72.) Moreover, "helping the stranger"—including immigrants—*is* a tenet of Jewish faith, such that Bowers purposefully interfered with the victims' religious exercise "even if you were to simply focus on [his] Gab posts about HIAS." (App.8376.) Government counsel called Bowers's belief that Jews were killing children an ancient antisemitic belief going back to the Middle Ages, (App.8371-72), emphasized the volume of antisemitic statements in Bowers's Gab posts, Bowers's decision to attack Jewish people on the Sabbath (App.8372-73), and that the victims were wearing religious clothing and

engaged in worship, (App.8374-75), and argued that a victim's torn yarmulke was "a witness to what the defendant did." (App.8380.)

### 4.    Verdict

On June 16, 2023, the jury convicted Bowers of all 63 counts. (App.8419-25.)

## G.    The eligibility trial

At the eligibility phase, the jury's task was to determine whether Bowers met the requirements for a death sentence under the FDPA: specifically, that (1) he was over 18 during the offense; (2) he had the requisite mental state; and (3) at least one statutory aggravating factor was proved beyond a reasonable doubt (knowing creation of a grave risk of death to one or more people besides the victims; substantial planning and premeditation; vulnerable victims, or intentionally killed and attempted to kill multiple victims in one criminal episode). 18 U.S.C. §3591(a)(2)(A)-(D).

### 1.    Opening statements

The government's eligibility-phase opening stressed Bowers's planning and deliberation. (App.8495-8509.) The defense argued Bowers had brain impairments and delusions. (App.8521-22.)

## 2.    The government's case

The prosecution presented evidence that several deceased victims were vulnerable due to impaired mobility, cognition, hearing, and/or vision. (App.8535-62, 8618-27, 8642-47.)

Regarding mental state, witnesses described Bowers shooting at officers and presented evidence that Bowers fired only at victims, not elsewhere. (App.8567-84, 8605-13, 8630-31, 13580-82, 13690, 13692.)

A correctional officer at Butler County Prison, where Bowers was incarcerated, testified that Bowers has always seemed rational. (App.9333-36.) To explain an alleged delusion, he testified that Butler County Prison inmates wear red jumpsuits, and the dye bleeds onto the walls and inmates' wristbands. (App.9336-37.)

## 3.    The defense case

The defense's evidence focused heavily on mental health. Neurologists and physicians testified that Bowers's brain showed abnormalities that could affect cognition, memory, and executive functioning. (App.8662-5, 8689-8739, 8825-65, 9558-9612, 9625-29, 9639-40.) One physician testified that Bowers's PET scan showed uneven brain activity suggesting "significant cognitive and/or emotional

processing problems," hallucinations or delusions, or schizophrenia. (App.8765-93.)

Neurologist Siddhartha Nadkarni diagnosed Bowers with schizophrenia, based on Bowers's psychiatric hospitalizations and suicide attempts, neuropsychological testing and presentation, abnormal EEG and PET scans, marginal functioning, and delusional belief that ink from his prison uniform was entering his body and seeping out onto his wristband. (App.8870-9097.) He also diagnosed Bowers with epilepsy, based on his EEG and childhood history of a panic attack, high fever, hallucination, and sleep paralysis. (App.8977-81.) When Bowers's disorders engaged, he was not able to inhibit his behavior. (App.9043-45, 9089-91.)

Psychologist Richard Rogers diagnosed Bowers with severe schizophrenia—existing on October 27, 2018—characterized by a delusion that Jewish people were committing genocide against white people. (App.9105-9324.) Bowers's delusions "impaired his ability to conform his conduct to the requirements of law" because "he saw himself as carrying out a mission to save white man [sic] or white persons" and believed he was morally correct in doing so. (App.9201.)

Bowers believed that Jews are in a struggle with God and doing the devil's bidding and said this all became clear to him in 2018. (App.9435.) Schizophrenic people can be exposed to racist ideas and have those ideas become delusions, and Rogers believed this happened to Bowers, whose beliefs went far beyond right-wing ideology. (App.9453.)

Rogers testified Bowers told him he had considered various other targets: a Jewish Community Center, a specific Jewish person in Cleveland, (App.9221-29), and an activist in Sweden. (App.9418.) He rejected the individual targets for logistical reasons and to make a bigger statement and find high-level Jewish figures all in one place. (App.9229-30.) Bowers also described his planning and preparation, (App.9216-50), and described shooting the victims and law enforcement officers. (App.9240-73.) He said he tried to make the shootings as gruesome, or "messy," as possible, by shooting at the victims' abdomens. (App.9255.)

### 4. The government's rebuttal

The government's experts testified that Bowers's brain irregularities were likely nonserious and caused by vascular disease,

(App.9813-18), that Bowers did not have schizophrenia or any neurological impairment, and Bowers's ideas about Jews were not delusions but rather widely- and historically-held antisemitic beliefs set forth in a book called the White Genocide Manifesto. (App.9857-58, 9865-70, 10052-53, 10153-89.) The "genocide" Bowers mentioned was not literal genocide, but instead interracial procreation, homosexuality and pornography believed to interfere with procreation of the white race. (App.10171-73.) Bowers merely has schizoid personality disorder, which is not a mental illness because it does not fundamentally change one's view of reality. (App.10236-39.)

Bowers told one government neurologist that he chose the Tree of Life synagogue because it was a "higher yield target" than the Jewish Community Center in that there would be more victims and, as a place of worship, it would make a bigger statement. (App.9864-65.)

### 5. The defense rebuttal

In rebuttal, the defense called a jail official who spoke with Bowers shortly after his arrest, who testified that Bowers said he killed the victims because of the "Kalergi Plan"—a conspiracy to flood white countries with nonwhite people so that Jews could rule. (App.10624-30.)

There were many red flags, and the government's forensic psychologist should not have relied on his perfunctory report (as the expert testified he did). (App.10615-79.)

### 6. Closing arguments

The prosecution argued that Bowers's intent to kill was clear from his planning, lethal shots aimed at victims, Gab posts and comments about wanting to kill Jews, and recollection of the shooting years later. (App.10784-85.) Bowers's mental health evidence was internally contradictory and failed to prove delusions; defense experts mistook white supremacist beliefs for delusions because they were unfamiliar with them. (App.10786-87.) And no expert testified that Bowers could not form intent to kill. (App.10788.)

Defense counsel argued that Bowers was driven by delusions—Bowers's hatred of Jews rose to the level of delusions because of its bizarreness and was why he committed the crime. (App.10833-35.) All the mental health experts agreed he had some form of brain defect. (App.10801-02.) The question was not just intent to kill, but whether that intent flowed from conscious awareness, which Bowers lacked due to his delusions. (App.10802-03.) Counsel cited Bowers's

neuropsychiatric and neuropsychological symptoms, testimony that they could have resulted from schizophrenia, and defense expert opinions that his disorders impaired his decision-making. (App.10809-33.)

In rebuttal, government counsel argued that Bowers made all of the decisions about when and how to carry out the attack and intended to kill. The defense's experts contradicted each other on the bases for their diagnoses, and mischaracterized Bowers's antisemitic beliefs as delusions because the defense experts hadn't researched them. (App.10849-74.)

## 7. Bowers is shackled without explanation.

On the fifth day of the eligibility trial, the marshals shackled Bowers with leg chains. Defense counsel asked why, but the court said only that the marshals had identified an unknown security threat. (App.9356-58.) It was not until a month later, towards the end of the sentencing phase, that the court gave any explanation for the shackling, and even that information was incomplete: Bowers had made undisclosed "statements" at the jail that prompted the shackling. The marshals also told the Court they believed Bowers had been trying to

"close the distance" between himself and the marshals while being escorted in the courtroom, that Bowers had appeared close to standing up during certain testimony, and more recently had appeared to be looking into the courtroom gallery. (App.13883-92.) The defense disputed these claims and protested that the shackles were both visible and harming Bowers's ability to participate in the trial (DE1432, DE1519; DE1525), but the court denied a hearing on the issue. (App.13890-92.) The court acknowledged it was possible the jury could see the restraints. (App.10464.) But Bowers remained shackled for the rest of the sentence-selection trial—a total of 20 court days.[23]

### 8. Verdict

On July 13, 2023, the jury found Bowers eligible for a death sentence. (App.10880-85.)

## H. The sentence-selection trial

### 1. Pretrial rulings

Before the sentence-selection phase Bowers moved to preclude certain types of victim impact evidence. (DE1352; DE1474.) The court partially granted the motion, but permitted evidence of the victims'

---

[23] *See* Point XIV, below.

"devout religious faith," though cautioning against evidence of victims' "comparative value."[24] (App.367, 379.)

The defense also moved to strike evidence regarding the "selection-of-site" factor, arguing nothing showed Bowers knew the Squirrel Hill neighborhood's historic significance, or suggested he was motivated by it in committing the offense. (DE1471:3) (quoting the court saying the factor's focus was Bowers's "motivation for choosing the Tree of Life Synagogue as his target.")

The defense additionally sought to present a mitigating factor that, if executed, Bowers would be seen as a martyr by those who shared his beliefs. (DE1517.) The court denied the motion without explanation.[25] (App.13301.) It also granted—over the defense's objection—a motion by the government to prevent Bowers from presenting a mitigating factor about his offer to plead guilty (DE1351:13-15; DE1361:53-54; App.308-09.).[26]

Finally, the defense moved to preclude the government from using Bowers's statements to mental health experts—for purposes of

---

[24] *See* Point IX, below.
[25] *See* Point XI, below.
[26] *See* Point XII, below.

mitigation—as aggravation. (DE1380:8-17.) The court largely denied

Bowers's motion, but recognized "the Government cannot introduce

evidence gleaned from its mental health examination that *only* supports

an aggravating factor or that *only* rebuts a [non-mental-health]

mitigating factor." (App.348.)

### 2. Opening statements

The government's penalty phase opening emphasized the "weight"

of each deceased victim's life and the surviving victims' pain, and

described the survivors' injuries. (App.10944-58.) Government counsel

reiterated Bowers's Gab posts, statements that he wanted to "kill Jews,"

and lack of remorse. (App.10961-64.) Counsel asked the jury to weigh in

favor of death the four statutory factors it found at the eligibility phase,

plus five newly-introduced aggravating factors, saying each additional

aggravating factor applied to 22 counts. (App.10964-66.)

The government's opening emphasized—as proof of several non-

statutory aggravating factors, in particular lack of remorse—statements

Bowers had made to his own mental-health experts for the limited

purpose of establishing that he suffered severe mental illness

(App.10948, 10959-64, 10969). The defense objected and moved for a

mistrial and—in the alternative—a curative instruction (App.10972-75;

DE1477), but the court overruled the objection.[27] (App.11008-9;

App.380).

The defense's opening told the jury Bowers's life history of trauma

and mental and psychiatric illness led him to believe he was somehow

serving society by committing the offense. (App.10979.) Defense counsel

outlined Bowers's life history of poverty, neglect by violent and

mentally-ill caregivers, psychiatric hospitalizations, and adult

dysfunction. (App.10981-94.)

### 3.     The government's case

The government presented twenty-two witnesses, twenty of whom

provided victim-impact testimony to which Bowers objected. (DE241;

App.6091-92; App.10972, 11006-08; App.11366; DE1352; DE1464;

DE1474.) The court overruled almost all of those objections, including

permitting evidence of victims' religiosity and testimony from

survivors.[28] (App.366-67, 370, 379, 10906-08.)

---

[27] *See* Point X, below.
[28] *See* Point IX, below.

Most victim-impact witnesses were relatives of the deceased victims who testified about those' victims' lives and personalities, including decades into the past. However, four surviving victims—Daniel Leger, Andrea Wedner, Anthony Burke, and Timothy Matson—also gave victim-impact testimony about their own injuries and lasting effects from the attack.[29] (App.11089-11106; App.11421-43; App.11464-11505.) Lisa Burns, the girlfriend of officer Daniel Mead, testified about Mead's injuries and the offense's impact on herself. (App.11252-63.) The survivors' testimony was deeply affecting, causing audible crying from the audience at multiple points. (App.6076-79; App.11371-75.)

Historian Barbara Burstin testified about the history of the Squirrel Hill neighborhood. (App.11204-13.) She recounted Jewish immigrants' flight from persecution in Europe to Pittsburgh in the 1840s, second wave of immigration from 1870-1900, settlement in Pittsburgh, and establishment of a vibrant Jewish community in Squirrel Hill starting in 1900. (App.11204-11.) She testified that the Tree of Life congregation was founded during the Civil War and moved to Squirrel Hill in 1947. (App.11212-13.)

---

[29] *See* Point IX.E, below.

### 4.    The defense case

The defense case centered on Bowers's life history of poverty, instability, neglect, psychiatric problems, and suicidality, described by Porterfield and other witnesses (*see* Section A, above).

Forensic psychiatrist George Corvin testified that Bowers had schizophrenia—manifested by delusions, abnormal social behavior, and disorganized thinking. (App.12730-31.) His delusions included the belief that UN "blue hats" were coming to get him, that dye from his jail jumpsuit was leaching into his bloodstream and collecting in his wristband, and that ghosts in his house caused lightbulbs to break on Sundays. (App.12731-38.) He described Bowers's superficial conversational style, illogical thought process, history of mental dysfunction and depression, family history of mental illness, brain abnormalities, and fixation on particular topics. (App.12738-72.)

Corvin testified that Bowers's schizophrenic delusions led him to commit the offense. Bowers believes that all Jewish people on earth, except for 144,000, have unwittingly been possessed by Satan, and are being used as a tool by Satan to bring about the end of the world by, among other things, promoting nonwhite immigration to majority-white

countries. (App.12788-95.) Bowers believes we are engaged in a race war with Satan, who wants to kill white people because Christians are a threat and most Christians are white. (App.12796-99.) Though Bowers had hateful beliefs about Jewish people, he believed he was saving the world because Jewish people were helping Satan destroy it. (App.12812-13004.) The evidence is overwhelming, Corvin testified, that Bowers was suffering the symptoms of extreme mental and emotional distress at the time of the offense. (App.12824-25.)

Butler County prison officials testified that Bowers did not proselytize and caused no discipline problems, and his communications were constantly monitored. (App.12446-12503.) Two Former Bureau of Prisons officials testified that Bowers, if sentenced to life imprisonment without parole, would likely be confined at ADX prison in Florence, Colorado with extremely tight security and limited communication. (App.12505-49; App.12565-12640, 12657-82.)

### 5. Closing arguments

#### a. Government closing argument

The prosecution's closing argument reminded the jury it had already found four statutory aggravating factors: grave risk of death, substantial planning and premeditation, vulnerable victims, and

multiple killings or attempted killings. It urged the jury also to find the additional nonstatutory aggravating factors and put each one "on the [aggravation-versus-mitigation] scale." (App.13181, 13183-84, 13195, 13203.)

Regarding religious animus, the prosecution emphasized Bowers's virulent Gab posts celebrating Hitler and the Holocaust. The prosecutor invoked the Holocaust Torah, saying it was "a witness to the horrors of what happened to Jews during the Holocaust. And it was a witness, over 70 years later, to what happened to Jews at the Tree of Life Synagogue." (App.13181-82.)

Regarding selection-of-site, the prosecution argued that Bowers chose the site to maximize the attack's fear and impact, targeting a Jewish congregation that dated back to the Civil War and Squirrel Hill, one of the oldest and largest Jewish communities in the United States. (App.13183-84.) It did not cite any evidence that Bowers actually knew that history.[30]

---

[30] *See* Point VIII.D.2.b, below.

Regarding victim impact, the prosecution emphasized the deceased victims' personal characteristics, life histories, and exceptional qualities, and survivors' suffering. (App.13185-13203.)

The prosecution further emphasized Bowers's lack of remorse, refusal to surrender, and shooting of officers. (App.13206-08.) In support of the lack of remorse aggravating factor, the prosecution repeatedly emphasized statements Bowers had made to mental health experts for purposes of mitigation.[31]

Regarding mitigation, the prosecution argued Bowers did not have schizophrenia or epilepsy, emphasizing contradictions among his experts' testimony and arguing they mistook white supremacist beliefs for delusions. (App.13211-15.) It did not dispute Bowers had a challenged upbringing, or Bowers's evidence of his life history, but argued he simply chose antisemitism. (App.13210-11, 13215.)

b.     **Defense closing argument**

The defense urged the jury to consider Bowers's bleak and traumatic childhood in mitigation. Bowers's psychiatric impairments flowed from genetic vulnerability and a turbulent upbringing, and

---

[31] *See* Point X, below.

Bowers's damaged childhood shaped who he became as an adult. (App.13236-44.) Bowers was dysfunctional as an adult, only able to work at a job that was very structured, with support from co-workers who could remind him to come to work. (App.13244.) But he was deeply mentally ill, as shown by his beliefs about UN "blue hats," suicide attempt when he lost the bakery job, and isolation. (App.13243-50.) It emphasized Bowers's lack of criminal history and efforts to do good. (App.13263-65.) If sentenced to life imprisonment, the defense argued, Bowers would be kept in extremely restrictive conditions at ADX Florence, would not pose a threat, and would live out his life in obscurity. (App.13260-63, 13226.)

### c.    Government rebuttal

In rebuttal, government counsel emphasized the egregiousness of the crime and Bowers's lack of remorse. (App.13270-74.) It attacked the defense's account of Bowers's life as selective, criticized the defense experts as uninformed about white supremacist ideas, and argued Bowers was not schizophrenic or as impaired as the defense claimed. (App.13279-88.) The prosecutor told the jury: "Your job is not to make things right. Your job is to hold this defendant accountable to the fullest

extent of the law. Hold him accountable for his decisions and his violent actions." (App.13270.) It also said, "this case is about October 27, 2018, and the murders of 11 innocent worshippers…And that's the type of evidence and consideration that you should have been reviewing throughout these two months" and asked "[w]hat did the defendant's mother's report card from high school [and other defense mitigation have to do with any of this?" (App.13280.)

Even though each individual sentencing decision could encompass only nine aggravating factors—the maximum alleged as to any one victim—the prosecution suggested the jury aggregate all the aggravating factors for all the victims—up to nine factors, times eleven victims—for a total of 192. (App.13290.)

As in its opening, the government's summation and rebuttal heavily emphasized statements Bowers made to his experts for the limited purpose of their clinical assessment of his mental health, as affirmative proof of non-statutory aggravating factors, especially present-tense lack of remorse for his crimes and the suffering he caused.[32] (App.13176, 13184, 13194, 13271, 13275, 13291-92.)

---

[32] *See* Point X, below.

The defense moved for a mistrial based on prosecutorial misconduct in closing argument—including citing 192 aggravating factors when no more than nine actually applied to each potential death verdict, suggesting mitigating evidence had to relate to the crime (by asking what it "ha[d] to do" with the case), and suggesting that the jury only consider evidence about the crime (not mitigation), in deciding Bowers's punishment.[33] (DE1524.) The court denied the motion. (App.384, 13323.) It reinstructed the jury that counsel's arguments are not evidence. (App.13329-30.)

### 6.    Jury note regarding weapons

Within an hour after being dismissed to deliberate, the jury sent a note asking "[m]ay we be provided with the weapons evidence." (DE1534.) The court brought the jury back into the courtroom where jurors examined the weapons. (App.13336-37.) A U.S. marshal was present for security and answered jury questions about the weapons. (App.13342.) At the suggestion of his attorneys, Bowers was not present, but he did not waive his presence on the record. (App.13337, 13339.) The defense objected to the U.S. marshal's participation, after

---

[33] *See* Point XIII, below.

which the court conducted a hearing; the record does not reveal whether Bowers was present at that hearing. (App.13344.) Following the hearing, the defense moved for a mistrial. (App.13344.) The court denied the motion, simply instructing the jury to "disregard completely anything" the marshal had said.[34] (App.13345.)

### 7. Verdict and sentencing

Shortly thereafter, jurors returned a death verdict. (App.13384-85.) They unanimously found all five nonstatutory aggravating factors. (App.13783-85.) But they also found 87 of the 115 mitigating factors the court allowed Bowers to submit, 58 of them unanimously. These included factors in every category the defense argued, relating to Bowers's family history of mental illness and substance use; childhood trauma, neglect, and instability; youth, adolescent, and adult psychiatric treatment and hospitalizations; brain abnormalities; delusional system; employment; service to others; and the ability of the Bureau of Prisons to safely confine him during a sentence of life imprisonment without the possibility of release. (App.13786-800.)

Among the factors found by all or most jurors were:

---

[34] *See* Point XV, below.

- The limitations and impairments of Bowers' parents negatively influenced his development as a child and adult (10 jurors). (App.13786.)

- Bowers' maternal grandmother was a severe alcoholic when [he] was in her care (12 jurors). (App.13789.)

- Teachers and other professionals identified the need for Bowers to receive mental health counseling and treatment from an early age (12 jurors). (App.13790.)

- When Bowers was 13 years old, he had his first psychiatric commitment (12 jurors). (App.13790.)

- At the age of 33, Bowers sought disability, reporting tremendous depression, social anxieties, and that he very infrequently left his home (12 jurors). (App.13792.)

- From 1990-2004, Bowers held a job as a delivery driver at Potomac Bakery (12 jurors). (App.13792.)

- After a series of short-term jobs, Bowers completed trucking school in 2008 and became a long-haul truck driver (12 jurors). (App.13792.)

- Bowers' work with two individuals with traumatic brain injuries showed that he has positive qualities (10 jurors). (App.13793.)

- Bowers has a multigenerational family history of mental illness and neurological problems (9 jurors). (App.13793.)

- Bowers has brain abnormalities (6 jurors). (App.13794.)

- Bowers believed he was acting on the side of God against Satan (8 jurors). (App.13795.)

- Bowers has maintained good behavior in a highly structured prison environment (12 jurors). (App.13798.)

- The Department of Justice has the power to restrict and monitor any or all of Bowers' communications with the outside world (12 jurors). (App.13798.)

- Correctional staff at Butler County Prison confirm that Bowers has not influenced or attempted to influence others to adopt antisemitic views (12 jurors). (App.13799.)

- A sentence of life in prison without the possibility of release offers the possibility of redemption and change (8 jurors). (App.13800.)

The court entered judgment on August 3, 2023, sentencing Bowers to death on all 22 capital counts, to 27 concurrent life sentences (Counts 12-22, 34 and 36, 35 and 37, 38 and 39, 40-47, and 52-63) and 20 years on each of counts 48 through 51, concurrent to each other but consecutive to all other counts. (App.13503-04.) On May 17, 2024, it denied his motion for new trial or judgment of acquittal (App.413), which focused on his legal challenges to the charges and his *Batson* claim (DE1596.) On May 31, 2024, Bowers timely filed a notice of appeal. (App.156.)

## SUMMARY OF ARGUMENT

Bowers's trial was compromised by Constitutional and statutory failures in charging, jury selection, and sentencing procedure. As a

result, it lacked the accuracy, reliability, and fairness that the death penalty demands, requiring resentencing or remand for further proceedings.

*Indictment issues.* Bowers's convictions are infirm. The 18 U.S.C. §924(c), (j) charges rested on inadequate predicates, and it violated double jeopardy to sentence Bowers based on both the §924(c), (j) charges and those predicates. The hate crime charges were also invalid, because 18 U.S.C. §249(a)(1)'s prohibition of religiously-motivated violence exceeded Congress's Thirteenth Amendment authority to legislate against slavery and involuntary servitude. The §247(a)(2) religious-obstruction charges were equally unfounded, because the Commerce Clause gave Congress no authority to criminalize Bowers's intrastate criminal conduct.

*Jury selection issues.* The court erroneously failed to consider whether a juror was impliedly or actually biased by her experience reviewing and helping carry out death sentences as a government official in China in 1983, during a period of rampant, widespread executions. It also failed to consider Bowers's challenges to the government's asserted race-neutral justifications for striking all but one

non-white juror from the venire. And it abused its discretion by dismissing, as substantially impaired, two jurors who promised to fairly consider the death penalty as a sentencing option.

*Sentencing issues.* Bowers's sentencing was undermined by improper evidence, argument, and procedure. The government distorted the trial's focus by deluging the jury with cumulative, prejudicial evidence about the Holocaust and the history of Judaism. It introduced improper victim impact testimony about the victims' comparative worthiness, hardships Bowers did not cause, and impact on surviving victims, exhorted the jury to "speak for" the deceased victims, in violation of due process, and improperly used Bowers's mitigation-focused statements to mental health experts as aggravating factors.

It committed legal error in precluding Bowers from introducing two mitigating factors that would have directly rebutted the prosecution's arguments: that executing him would make him a martyr and that he had offered to avoid a trial by pleading guilty. And the prosecution's sentence-phase closing argument misstated key legal standards to improperly minimize Bowers's mitigation.

The district court erred by forcing Bowers to wear painful shackles based on information it withheld from the defense—and on disputed and insufficient facts on which it denied an evidentiary hearing. Finally, when the jury asked to view key evidence during deliberations, Bowers was excluded in violation of the Confrontation Clause, due process, and Federal Rule of Criminal Procedure 43.

*Requested relief*. Several of these errors resulted from inadequate factual inquiry or application of erroneous legal standards; as to those issues his Court should remand for further proceedings. As to the other points, this Court should vacate or merge Bowers's convictions and vacate his death sentences.

## ARGUMENT

## POINTS RELATED TO THE INDICTMENT

Points I through IV, below, discuss the government's overreach in charging. Because it prosecuted Bowers federally, under statutes with specific elements passed under limited Constitutional authorizations, the government was forced to cabin Bowers's conduct into legal frameworks into which it did not fit. Although framed as indictment

challenges, these points primarily address those counts that resulted in death sentences.

# I. BOWERS'S CAPITAL §924 CONVICTIONS ARE INVALID BECAUSE §247(A)(2) IS NOT A PREDICATE CRIME-OF-VIOLENCE.

## A. Introduction

The jury sentenced Bowers to death based on 22 capital convictions, half for murder with a firearm during a federal crime-of-violence. 18 U.S.C. §924(c), (j). The predicate crime-of-violence was violating the Church Arson Prevention Act, 18 U.S.C. §247(a)(2), which punishes one who "intentionally obstructs, by force or threat of force… any person in the enjoyment of that person's free exercise of religious beliefs."

But §247(a)(2) was not a valid predicate crime-of-violence, because a crime-of-violence must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." §924(c)(3)(A). A violation of §247(a)(2) fails to satisfy this definition, for at least two reasons. First, it does not require "physical force." And, second, it can be committed with actual or threatened force

against the defendant's *own* person or property, rather than that "of another."

Nor is this gap filled by §247(d)(1)'s enhanced-punishment requirement that "death result[ed]" from the offense. That factor cannot establish the necessary use or threat of physical force because it does not require intent or, indeed, any mental state as to the death. *See Borden v. United States*, 593 U.S. 420, 424 (2021). It is also indivisible from other prongs of §247(d)(1), like kidnapping, that do not constitute "crimes of violence."

Because of this legal error, Bowers's 11 capital convictions for firearms murder under §924(c), (j), must be dismissed. Since these convictions and death sentences may have contributed to the jury's death-sentencing decision on the remaining capital convictions, the exacting harmlessness standard for such errors, *see* 18 U.S.C. §3595(c)(2)(C), requires remand for a new capital-sentencing hearing on those other counts.

**B.    Standard of review**

Whether a particular offense qualifies as a crime-of-violence under §924(c) is a purely legal question this Court reviews *de novo. United States v. Stoney*, 62 F.4th 108, 112 (3d Cir. 2023).

**C.    Factual background**

Bowers was tried on two sets of counts—22 counts total—eligible for death sentences. The first set, Counts 1-11, charged that he "intentionally obstructed by force each [deceased] victim…in the enjoyment of that victim's free exercise of religious beliefs," "result[ing] in th[at victim's] death," under §247(a)(2), (d)(1). (DE44:3.)

The other set of capital counts, Counts 23-33, charged that "during and in relation to a crime of violence [*i.e.* the §247 violations charged in Counts 1-11]," Bowers "did cause the death of each victim…through the use of a firearm in such a manner as to constitute murder," in violation of §924(c), (j).[35] (DE44:5.)

---

[35] While the indictment had alleged Bowers' violations of the Hate Crimes Act, 18 U.S.C. §249, in Counts 1-11, as additional predicate "crimes of violence," the district court determined they did not qualify and struck those allegations. Bowers was thus tried and convicted based on the §247 offenses as the sole predicate. (DE44:5; App.239, 8270-71.)

Pretrial, Bowers twice moved to dismiss the capital §924 counts because the underlying §247 religious-obstruction offense did not qualify as a crime-of-violence under §924(c)(3)(A). (DE237:11-13; DE787:22-31.) But the district court rejected those challenges. (App.179, 228-39.)

Bowers was convicted of all 22 capital counts, including the 11 §924 counts. (App.8261-62, 8270-71, 8275-80, 8294-96; DE1346.)

## D.    Legal argument

This "categorical approach" determines whether Bowers's §247 religious-obstruction conviction qualifies as a crime-of-violence under §924(c)(3)(A) so as to support the capital §924 convictions. *United States v. Taylor*, 596 U.S. 845, 850 (2022). Under the categorical approach, "the only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *Id.* "If any—even the least culpable—of the acts criminalized do not entail…the use, attempted use, or threatened use of physical force," the statute of conviction cannot serve as a predicate. *Borden*, 593 U.S. at 424. The categorical approach "does not require—in fact, it precludes—

an inquiry into how any particular defendant may commit the crime."

*Taylor*, 596 U.S. at 850; *Borden*, 593 U.S. at 424 ("the facts of a given

case are irrelevant"); *see also United States v. Vines*, 134 F.4th 730, 733-

34 (3d Cir. 2025).

> **1.** **Religious obstruction under §247(a)(2) is not a crime-of-violence because it can be committed with psychological force.**

The plain language of §924(c)(3)(A) requires not just "force" but

"physical force" for an offense to qualify as a "crime-of-violence."

"Physical force" means "'force exerted by and through concrete bodies.'"

*Stokeling v. United States*, 586 U.S. 73, 82 (2019) (cleaned up).

Therefore, an offense that can be committed by "intellectual force or

emotional force" fails this standard. *Id.*; *United States v. Castleman*, 572

U.S. 157, 170 (2014); *Johnson v. United States*, 559 U.S. 133, 138

(2010).

Religious obstruction under §247(a)(2) does not require "physical

force," but can be committed with non-physical types of "force". For

example, as the statute itself recognizes, obstruction can be

accomplished by a kidnapping or attempted kidnapping. *See* §247(d)(1).

But a kidnapping can be committed with "psychological" rather than

"physical" force. *United States v. Gillis*, 938 F.3d 1181, 1206-09 (11th Cir. 2019) (federal kidnapping can be committed by "intellectual or emotional force"); *see also United States v. Coleman*, 149 F.4th 1, 44 (1st Cir. 2025); *United States v. Krivoi*, 80 F.4th 142, 153 n.13 (2d Cir. 2023); *United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003); *United States v. Romero*, 189 F.3d 576, 589 (7th Cir. 1999); 18 U.S.C. §1201 (kidnapping includes when defendant "unlawfully…inveigles [or] decoys" a victim). Thus, for example, a grandfather upset by his son's religious conversion could employ "psychological force"—*e.g.*, trickery, pressure, or even a threat (not of physical force)—to kidnap his minor granddaughter to keep her from attending the new church (or mosque or synagogue). The grandfather would thereby intentionally obstruct the granddaughter's (and son's) free exercise of religious beliefs and violate §247(a)(2), but without using or threatening "physical force." Such scenarios fall well within the broad term "'obstruct'"—which "can refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 584 U.S. 1, 6 (2018) (cleaned up) (citing dictionary definitions).

The only circuits to address whether religious obstruction under §247(a)(2) is a crime-of-violence do not appear to have considered that it can be committed with psychological, intellectual, or emotional force, *i.e.*, non-physical force. *United States v. Hari*, 67 F.4th 903, 911 (8th Cir. 2023); *United States v. Roof*, 10 F.4th 314, 398-405 (4th Cir. 2021). Nor did the district court in Bowers's case. (App.228-37.)

Although not raised below, this Court should consider this argument in support of Bowers's appellate claim that §247(a)(2) is not a crime-of-violence. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. Escondido*, 503 U.S. 519, 534 (1992). *See also Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 330-31 (2010); *Illinois v. Gates*, 462 U.S. 213, 220 (1983). Although this Court has held that "a party must make the same argument in the District Court that he makes on appeal in order to preserve it," *United States v. Abreu*, 32 F.4th 271, 274 (3d Cir. 2022) (cleaned up), requiring that the appellate argument involve "both the same legal rule and the same facts as the argument presented in the District Court," *id.* at 275, that standard is met here. Bowers argued below that §247(a)(2) is not a

crime-of-violence because it does not require violent force but can be accomplished with "de minimis force," (DE237:9-10), and that "§247(a)(2) can be violated by nonviolent force that does not satisfy §924(c)." (DE:787:20.) That argument is in all meaningful respects identical to his argument here that §247(a)(2) can be violated by non-violent types of force. The legal rule—requirement of violent physical force—and the relevant facts—the absence of such a requirement from §247(a)(2)—are the same as presented below.

## 2. Religious obstruction under §247(a)(2) is not a crime-of-violence because the required force can be used or threatened against one's *own* "person or property."

To qualify as a "crime-of-violence," an offense must require the use, attempted use, or threat of physical force "against the person or property *of another*." §924(c)(3)(A)(emphasis added). Yet the §247(a)(2) offense of obstructing another's religious exercise can be committed by using force against one's *own* person or property. For example, if a father threatens to kill himself to coerce his daughter to abandon a religious group he finds objectionable, he would violate §247(a)(2), but would not use or threaten force "against the person…*of another*" (emphasis added). The same would be true if a member of that group,

who owns the building where it meets, tears it down to force cancellation of its services because he had an ideological falling-out with the minister.

It is well-recognized that statutes capable of being violated by such use or threat of physical force against one's own property are not categorically "crimes of violence," under an "against another" definition like §924(c)'s. *See Torres v. Lynch*, 578 U.S. 452, 465 (2016); *Tran v. Gonzales*, 414 F.3d 464, 469 (3d Cir. 2005); *United States v. Davis*, 53 F.4th 168, 171 (4th Cir. 2022); *United States v. Salas*, 889 F.3d 681, 684 (10th Cir. 2018). The same holds true for offenses that can be committed against one's own person. *See United States v. Juvenile B*, 147 F.4th 837, 844 (8th Cir. 2025); *Portee v. United States*, 941 F.3d 263, 271-73 (7th Cir. 2019); *see also United States v. Kepler*, 74 F.4th 1292, 1305 & n.15 (10th Cir. 2023).

The Eighth Circuit in *Hari* dismissed this disqualifying feature by inexplicably denying that "use of force" is an "element" of §247(a)(2). *Hari*, 67 F.4th at 911. And the Fourth Circuit in *Roof* dismissed it by simply ignoring whether §247(a)(2) can be violated through the use or threat of force against a defendant's own *person*. Moreover, *Roof*

erroneously declared that the *threat* of force against a defendant's own *property* "would necessarily amount to a threat of force against [another] person." 10 F.4th at 405 & n.67. To be sure, some threats by a defendant against his own property (such as a "bomb threat[]," cited in *Roof*, or perhaps burning a cross on a lawn) might also cause "intimidation" rising to the level of a "threat" of physical force against others. (App.235.) But in many other scenarios—including a defendant who owns a religious group's building—the *use* of force against the defendant's own property would not constitute a threat of physical force against anyone else.

In addition to adopting *Roof*'s flawed analysis (*see* App.235), the district court here dismissed the possibility that a defendant could violate §247(a)(2) by using or attempting to use force against his own property. Without citing any authority, it declared that, in such a scenario, the causal connection between the force-applying conduct and the result would be "attenuated" since it would "not [b]e the force that is doing the obstructing" of the victim's religious exercise. (App.234.) But that is incorrect. As with other federal penal law, §247(a)(2) is violated as long the defendant's use or attempted use of force is an indirect or

"but for" cause of the obstruction. *Burrage v. United States*, 571 U.S. 204, 211-12 (2014); *United States v. Johnson*, 114 F.4th 148, 154 (3d Cir. 2024).

**3. Section 247(d)(1)'s "death results" sentence-enhancement factor does not supply the necessary use of "physical force" against the "person...of another."**

**a. The "death results" factor does not require intent, or any *mens rea*.**

The §247(a)(2) charges in Counts 1-11 alleged that Bowers's religious obstruction "resulted in the death" of each victim. (App.13698.) This is an enhanced-sentencing factor under a different subsection of the statute, §247(d)(1) ("if death results from acts committed in violation of this section," the punishment may be imprisonment "for any term of years or for life" or a "sentence[] to death").

The Fourth Circuit in *Roof* believed this additional "death results" factor, when charged, makes religious obstruction, categorically, a "crime-of-violence," whether or not the core §247(a)(2) offense qualifies. It reasoned that an "intentional use or threatened use of force resulting in the victim's death necessitates the use of violent force." 10 F.4th at 404. That may be true under a theory that, regardless of what the defendant did, death, like bodily injury, can only be produced by

"physical force" acting on or within the decedent's body. *See Castleman*, 572 U.S. at 170 (physical force could involve, for example, "infecting [the victim] with a disease" or striking him with "a laser beam" if bodily harm results); *Delligatti v. United States*, 604 U.S. 423, 430 (2025) (physical force is used "when a person sprinkles poison in a victim's drink" and thus knowingly causes bodily harm, "even though the act of sprinkling does not itself involve force") (cleaned up).

But the Fourth Circuit was wrong to conclude from this that "a 'death results' offense under §247(a)(2)" categorically "constitutes a crime of violence." *Roof*, 10 F.4th at 404. In §924(c), "against…modifies the 'use of physical force.'" *Borden*, 593 U.S. at 430-31. Thus, a categorical crime-of-violence must include, as an element, a "'conscious object'…not a 'mere recipient'" of that physical force—in other words, "purposeful and knowing" (rather than merely "reckless") use of physical force in a "targeted way." *Id.* at 432; *see also United States v. Henderson*, 80 F.4th 207, 214 (3d Cir. 2023).

But §247(d)(1)'s "death results" factor has no *mens rea* at all—let alone a targeting requirement. It is satisfied if anyone dies, unintentionally or even purely accidentally, as a result (however

indirect) of the defendant's conduct. *See United States v. Tsarnaev*, 968 F.3d 24, 101-02 (1st Cir. 2020), *rev'd on other grounds*, 595 U.S. 302 (2022); *United States v. McDuffy*, 890 F.3d 796, 797-98 (9th Cir. 2018); *United States v. Montgomery*, 635 F.3d 1074, 1087 (8th Cir. 2011); *United States v. Woodlee*, 136 F.3d 1399, 1405 (10th Cir. 1998); *United States v. Piche*, 981 F.2d 706, 711 (4th Cir. 1992); *United States v. Hayes*, 589 F.2d 811, 821 (5th Cir. 1979). *See also Burrage*, 571 U.S. at 211. Indeed, it even includes where a victim, bystander, or accomplice suffers a fatal heart attack from the stress of some event that followed from the defendant's actions. *See United States v. Salinas*, 918 F.3d 463, 464-67 (5th Cir. 2019).

Thus, the kidnapped granddaughter might step into the road while being transported and be fatally struck by a passing vehicle, or the owner's destruction of the church building might cause the death of a homeless person who, unbeknownst to the owner, was sleeping inside. §247(d)(1)'s "death results" factor would be established despite those deaths' accidental nature. But in neither scenario would the defendant have intentionally used or threatened "physical" force, as §924 requires under *Borden*.

The Fourth Circuit dismissed similar hypotheticals as "strained" invoking a "realistic probability" test for determining "the minimum conduct [that] would actually be punished under the statute." 10 F.4th at 398, 402 & n.64, 404. And the district court here relied on that portion of *Roof*, despite claiming not to apply the "realistic probability" test. (App.216, 235.) But this standard was subsequently rejected by the Supreme Court in *Taylor* for evaluating federal statutes, like §247, because it contravenes the categorical approach and §924(c)(3)(A)'s language, which asks only "whether the government must prove, as an *element* of its case" the use or threat of physical force. 596 U.S. at 858-59. *Taylor* thus rejected the government's "atextual" argument "that a defendant must present evidence about how his crime of conviction is normally committed or usually prosecuted." *Id.* at 858.

Accordingly, even if §247(d)(1)'s "death results" factor is considered an element of the religious-obstruction offense, and even if that element necessarily involves the application of "physical force," it does not require the knowing or intentional application of such physical force that *Borden* demands for a "crime-of-violence." The capital §247

offense charged in Counts 1-11 still does not qualify as a predicate

under §924(c).

> ### b. Section 247(d)(1)'s indivisible provision containing the "death results" factor includes alternative means, like kidnapping, that are not crimes-of-violence because they do not require "physical force."

The district court deemed §247(d)(1)'s multi-prong sentence-

enhancement provision "divisible"—such that the crime-of-violence

inquiry focuses solely on the specific prong charged in this case, "death

results." (App.237-38.) *See Mathis v. United States*, 579 U.S. 500, 505-

06 (2016) (when statute is divisible, court may look to charging

documents and jury instructions to determine which statutory prong

constituted actual crime of conviction); *see also Descamps v. United

States*, 570 U.S. 254, 261 (2013); *Shepard v. United States*, 544 U.S. 13,

26 (2005).

But this, too, was incorrect; §247(d)(1) is not clearly divisible. *See

United States v. Redd*, 85 F.4th 153, 165 (4th Cir. 2023) (to find

divisibility, court needs to be "convinc[ed]…*to a certainty*"); *United

States v. Cantu*, 964 F.3d 924, 929 (10th Cir. 2020) ("[U]nless we are

certain…the statute isn't divisible"). And because the minimum conduct

needed to violate accompanying prongs of this subsection do not

constitute "crimes of violence," Bowers's religious-obstruction

convictions do not qualify under §924, even factoring in the "death

results" allegation. *See Mathis*, 579 U.S. at 505; *Descamps*, 570 U.S. at

260.

Section 247(d)(1) provides an enhanced sentence for violating

§247(a)(2) "if death results from [the violation] or if such acts include

kidnapping or an attempt to kidnap, aggravated sexual abuse, or an

attempt to commit aggravated sexual abuse, or an attempt to kill." This

provision is indivisible because it "enumerates various factual means of

committing" a single crime, aggravated religious obstruction, rather

than "elements in the alternative," "thereby defin[ing] multiple crimes."

*Mathis*, 579 U.S. at 505-06; *see Descamps*, 570 U.S. at 269-70.

There are multiple indicators of indivisibility in the statute's text.

*See Rosa v. Atty. Gen. United States*, 950 F.3d 67, 75 (3d Cir. 2020)

(court should look to language of "the statute itself"). "Death results,"

kidnapping, and the other alternatives are bundled together into a

single sentence in a single paragraph within a single subsection. This

contrasts with other statutes like kidnapping, 18 U.S.C. §1201;

enticement into slavery, 18 U.S.C. §1583; and carjacking, 18 U.S.C. §2119, in which "death results" and accompanying felonies or other sentence-enhancement factors are divided into separate paragraphs or subsections. *See United States v. Burwell*, 122 F.4th 984, 990 (D.C. Cir. 2024); *United States v. McKibbon*, 878 F.3d 967, 975 (10th Cir. 2017). Moreover, in §247(d)(1), "death results" and the other prongs are "separated by" "comma[s]...rather than more disjunctive punctuation like a semicolon." *Burwell*, 122 F.4th at 990; *see United States v. Buck*, 23 F.4th 919, 925 (9th Cir. 2022); *United States v. Enoch*, 865 F.3d 575, 580 (7th Cir. 2017). Finally, §247(d)(1) prescribes the same penalties for each alternative, which also "provides meaningful evidence" of indivisibility. *Burwell*, 122 F.4th at 990; *see also Mathis*, 579 U.S. at 518; *United States v. Redd*, 85 F.4th 153, 165 (4th Cir. 2023).

In nonetheless deeming §247(d)(1) divisible, the district court ignored the required analysis and instead relied on the Sixth Circuit's decision in *United States v. Doggart*, 947 F.3d 879, 888 (6th Cir. 2020).[36]

---

[36] The district court also cited the Fourth Circuit's decision in *Roof*, but that never addressed the divisibility of §247(d)(1). *Roof*, 10 F.4th at 402-03.

(App.232.) But *Doggart* addressed a different subsection than §247(d)(1), and wrongly eschewed the required analysis. *See id.* at 888. Moreover, it cited no authority for its view that a statute is necessarily divisible when it includes alternatives. *Id.*

The indivisibility of §247(d)(1) matters. At least one of the alternative felonies it contains, kidnapping, is categorically *not* a crime-of-violence under §924(c) since it can be committed without the use or threat of physical force. *See* §D.1, above. *See also* 18 U.S.C. §2241 (same for aggravated sexual abuse). Because §247(d)(1) is indivisible, an aggravated violation of §247(a)(2) under (d)(1), as charged here, fails to qualify. *See Mathis*, 579 U.S. at 505-06; *Descamps*, 570 U.S. at 269-70.

Therefore, for two independent reasons, Bowers's eleven capital §924 convictions—even with "death results" included as an element—are legally invalid and should be dismissed.

4. **Bowers's erroneous convictions and death sentences on the eleven capital §924 charges may have contributed to his death sentences on other counts, requiring resentencing on them.**

The government cannot meet its heavy burden of proving, beyond a reasonable doubt, that this error was "harmless" as to all of Bowers' death sentences. 18 U.S.C. §3595(c)(2); *see United States v. Basham*,

561 F.3d 302, 330 (4th Cir. 2009); *United States v. Purkey*, 428 F.3d 738, 758-59 (8th Cir. 2005); *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999). It cannot prove, to a "near certitude," that the erroneous presentation of the 11 capital §924 charges to the jury—and the jury's erroneous convictions and death sentences on them—"did not contribute" to the death verdicts on the remaining capital counts. *Victor v. Nebraska*, 511 U.S. 1, 15 (1994); *Chapman v. California*, 386 U.S. 18, 24 (1967).

This error reverberated through the capital sentencing hearing and may have affected the jury's decision-making overall. In closing arguments and final instructions at the sentence-selection phase, the jury was repeatedly told by the court and the government that Bowers was being punished for "22 offenses that carry the death penalty," or similar phrases. (App.13122, 13127, 13138, 13141, 13143-44, 13160, 13165, 13177, 13183, 13269, 13290. *See also id.* at 13138 (court tells jurors "[e]ach capital count charges a separate crime.")). Indeed, in rebuttal summation, the prosecutor supercharged the force of this number by multiplying it against the number of aggravating factors applicable to each count. Thus, as he addressed each factor, he told

jurors how it actually reflected many such factors, one for each applicable count, (App.13181, 13209-10), culminating in the argument that "[t]here were 82" statutory aggravating factors "that [the jury] found during the eligibility phase" and "those all carry over and get placed on the scale. 22 counts. Multiple statutory aggravators applying to those 22 counts. And now there are five nonstatutory aggravating factors, and each of the 22 death-eligible counts, it applies to all of them. That's 110. We're at 192."[37] (App.13290.)

Twenty-two (to say nothing of 192) is a large figure and twice the number of death-eligible convictions the jury should have considered. As this Court has recognized, more counts may prejudice a jury against the defendant by creating the impression of more criminal activity. *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir. 1978); *United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986). For that reason, the Fifth Circuit in *Causey* ordered a new capital-sentencing hearing for two condemned prisoners after it dismissed one of the three capital

---

[37] *See* Point XIII, below. The numbers the prosecutor conjured (82, 92, and 110) were not exact multiples of 22 because some aggravating factors, like the "vulnerable victim" one, applied only to certain counts.

convictions on which the jury had imposed a death sentence. "[I]t is impossible to say that the jury's penalty phase recommendations of the death penalty were not influenced by the fact that Davis and Hardy had received three death eligible convictions, rather than two." *Causey*, 185 F.3d at 423.

The capital §924 convictions also conveyed a heightened view of Bowers's culpability because they were defined for the jury as "murder" (specifically, "use of a firearm to murder" each victim "during and in relation to a crime of violence") and the remaining capital counts under §247 as "obstruction of free exercise of religious beliefs resulting in… death." (*e.g.*, App.13781-82.) A capital-sentencing jury could "very likely and very reasonably" view a §924(j) "murder" as "more culpable" than an underlying "death resulting" offense. *United States v. Lawrence*, 555 F.3d 254, 266 (6th Cir. 2009); *cf. United States v. Pelullo*, 14 F.3d 881, 899 (3d. Cir. 1994) (count with a more "pejorative connotation" may have caused "prejudicial spillover" to juror's consideration of another).

Although the district court instructed jurors to sentence Bowers "separately as to each count" and that their verdict on any count "should not control" their verdict on other counts, (App.13123, 13139), it

was highly unlikely they would impose different sentences on different capital counts. They were told a death sentence on any count would trump life sentences on any other counts (App.13124) making it pointless to vary the sentences. And the verdict form encouraged jurors to make findings "with regard to all of the applicable capital counts." (App.13783-85, 13802-03.) Nor did anything discourage jurors from considering the total number of capital counts or the total number of aggravating factors from multiplying all the counts—both of which the government encouraged—or from considering the collective nature of the §247 and §924 counts. Indeed, the court's instruction to consider all evidence from all phases of the trial (App.13129) pointed toward such collective consideration. And jurors' acceptance or rejection of mitigating factors—which here they were instructed to do collectively, for all the counts as a whole—can "hardly be made without reference to the culpability already found to be established" when the jury convicted Bowers of the capital offenses. *Lawrence*, 555 F.3d at 267.

For precisely these reasons, a federal court recently vacated a defendant's sentence on a "death resulting" count because it was "necessarily informed, at least in part" by two other noncapital

convictions under §924 that had to be dismissed—even though he was sentenced separately on those by the court. *United States v. Lighty*, No. 03-357/12-3065, 2023 WL 2932960, at **2-3 (D. Md. Apr. 13, 2023) ("resentencing is necessary when there is even a *possibility* that at least one capital juror considered an improper conviction during sentencing for other valid counts").

Here, by thus putting a "thumb…[on] death's side of the scale," *Stringer v. Black*, 503 U.S. 222, 232 (1992), for the capital §247 convictions, the unlawful capital §924 convictions may have "skewed" at least one juror's sentencing decision. Jurors were told sentencing was "a uniquely individual moral judgment" and no juror was ever "required" to vote for death, and each was left to determine individually what "sufficient" meant in the standard requiring aggravating factors to "sufficiently outweigh" mitigating ones. Each was also told a life sentence would result if just one juror perceived enough mitigation to vote against death. (App.13162-63.) Given this, it is unsurprising that federal juries have often declined to return death verdicts even in highly aggravated capital cases involving multiple murders, often because a small minority or even just one juror dissented. *See* Appendix

A. And here, most or all of the jurors found many substantial mitigating factors that weighed against a death sentence. Statement of the Case, Section H.7.

Accordingly, remand for a resentencing on the remaining capital convictions is necessary.

## II. BOWERS'S 18 U.S.C. §249 CONVICTIONS FOR RELIGIOUS HATE CRIMES ARE INVALID, BECAUSE THE THIRTEENTH AMENDMENT DID NOT AUTHORIZE CONGRESS TO CRIMINALIZE SUCH CONDUCT.

### A. Introduction

Bowers was prosecuted for attacking Jewish worshipers under a provision of the 2009 Hate Crimes Act—never before employed in any reported case—that punishes violence perpetrated "because of" the victim's "actual or perceived…religion." 18 U.S.C. §249(a)(1). Congress believed this modern expansion of federal jurisdiction was authorized by Section Two of the Thirteenth Amendment, ratified in 1865, which licensed legislation "to enforce" Section One's prohibition against "slavery" and "involuntary servitude."

That was wrong. Both facially and as applied, §249(a)(1)'s religion prong is untethered from both the text and the purpose of the Thirteenth Amendment and the more expansive interpretations of it

approved by the Supreme Court in the 1960s and 1970s. Even the law's drafters and supervisory DOJ prosecutors have acknowledged its constitutionality is questionable. Accordingly, Bowers's non-capital convictions under this provision should be dismissed. And since these charges, the evidence tied to them, and the jury's focus on them may have contributed to the death sentences he received on the capital counts, his case should be remanded for resentencing as a whole.

**B.    Standard of review**

This Court reviews *de novo* Bowers's challenge to the constitutionality of the "religion" prong of §249(a)(1). *United States v. Hoffert*, 949 F.3d 782, 787 (3d Cir. 2020); *United States v. Weatherly*, 525 F.3d 265, 273 (3d Cir. 2008).

**C.    Factual background**

The government charged Bowers with over a dozen counts under §249(a)(1), which punishes "willfully caus[ing] bodily injury to any person…because of [their] actual or perceived race, color, religion or national origin," with an enhanced sentence of life imprisonment if "death results." The counts here, 11 for the deceased worshipers and two for the injured ones, charged only the "religion" prong—that Bowers

acted "because of that victim's actual and perceived religion,"

(App.13699, 13702.)

Pretrial Bowers moved to dismiss these counts, arguing the statute's "religion" prong—facially and as-applied—exceeded Congress's authority under the Thirteenth Amendment. (DE239:25-28, 32-33; DE251:5-7.) The district court disagreed, holding that because "Jewish people…were considered a distinct race," in 1865, when the amendment was adopted, they remain covered by its enforcement clause. (App.166-67.) It cautioned, however, that this meant §249(a)(1)'s protection "appears to rest not upon a religious basis *per se* but upon an 'ethnic' or 'racial' basis. That Jews may have been…considered an 'ethnoreligious' group does not mean that the protection offered under §249(a)(1) stems from their religious affiliation." (App.163 n.5.) It thus read §249(a)(1) to prohibit racially-motivated, but not religious-affiliation-motivated, conduct.

Yet the government never obtained a superseding indictment charging Bowers under §249(a)(1)'s "race" prong; the charges remained solely under the "religion" prong. Correspondingly, at trial, jurors were instructed that—to convict Bowers—they had to find he "acted because

86

of [victims'] actual or perceived religion," not race. (App.8267, 8269-70, 8281-82; *see also* DE1346:3-5, 9.) The government accordingly told jurors Bowers shot the victims because they were "part of a religious group" and "because of [their] religion." (App.8305, 8336.)

In his post-trial motion for judgment of acquittal on the §249(a)(1) counts, Bowers reiterated his challenge to the constitutionality of the statute's "religion" prong. (DE1595:9-18; DE1609:6-10.) The government reprised its earlier arguments, maintaining that "religion," as used in §249(a)(1) and Bowers's indictment, jury instructions, and verdict form, was a "shorthand" for certain "races," like Jews. (DE1599:55.) The court denied Bowers's motion. (App.392-93, 396.)

## D. Legal argument

### 1. Section 249(a)(1) exceeds the Thirteenth Amendment's authorization to Congress to enforce the prohibition on slavery.

Under our federalist system, the national government has only those powers enumerated for it in the Constitution. General police powers remain with the States. *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in

the States, than the suppression of violent crime and vindication of its victims.") (cleaned up); *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995).

Congress enacted §249(a)(1)—which *federally* criminalizes private conduct with no required nexus to interstate commerce—in 2009, based solely on its authority under Section 2 of the Thirteenth Amendment. 34 U.S.C. §30501(7); *United States v. Cannon*, 750 F.3d 492 498 (5th Cir. 2014). That amendment, adopted almost a century-and-a-half earlier, in 1865, has two sections.

Section One provides: "Neither slavery nor involuntary servitude…shall exist within the United States." Its primary purpose "was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War." *United States v. Kozminski*, 487 U.S. 931, 942 (1988). But the text does not so limit it, nor reserve its protections for any race or group. *Hodges v. United States*, 203 U.S. 1, 17 (1906). Moreover, Section One "cover[s] those forms of compulsory labor akin to...slavery," such as peonage. *Kozminski*, 487 U.S. at 942 (cleaned up); *Bailey v. Alabama*, 219 U.S. 219, 242 (1911).

Section Two, often called the "enforcement clause," is the one on which §249(a)(1) rests. It states: "Congress shall have power to enforce this article by appropriate legislation."

Then, as now, "enforce" had a concrete, limited meaning: a leading 1860s dictionary defined it as "[t]o put in force; to cause to be applied or executed; as, 'To enforce a law.'" *Tennessee v. Lane*, 541 U.S. 509, 559 (2004) (Scalia, J., dissenting). Thus, in 1883 the Supreme Court invalidated a federal statute punishing conspiracies to deprive "free white citizens" of "equal protection of the laws," holding such an application, "cannot be authorized by the amendment which simply prohibits slavery and involuntary servitude." *United States v. Harris*, 106 U.S. 629, 641 (1883).

But later that same year, in the *Civil Rights Cases*, 109 U.S. 3 (1883), the Supreme Court read the Thirteenth Amendment's enforcement clause more broadly, as licensing Congress "to pass all laws necessary and proper" to abolish not only slavery but all of its "badges and incidents"—including those "burdens and incapacities which were inseparable incidents of [slavery]," such as "disability to hold property, to make contracts, to have a standing in court, to be a

witness against a white person." But it was not so broad as to authorize a Reconstruction-era law punishing racial discrimination in public accommodations or transportation. 109 U.S. at 8-9, 20-23. Two decades later, the Court similarly invalidated a prosecution for terrorizing several African-American men to prevent them from working at a sawmill, as beyond Congress's authority to legislate against slavery's "badges and incidents." *Hodges*, 203 U.S. at 16-17.

During the 1960s and 70s, the Supreme Court further expanded Congressional authority under the Thirteenth Amendment's enforcement clause. It overruled *Hodges* and approved Reconstruction-era prohibitions on private racial discrimination in private property transactions, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), private-school admissions, *Runyon v. McCrary*, 427 U.S. 160, 170-71 (1976), and interstate travel, *Griffin v. Breckenridge*, 403 U.S. 88, 105-06 (1971). In doing so, the Court held that Congress possessed expansive authority under the Thirteenth Amendment "rationally to determine what are the badges and incidents of slavery, and…translate that determination into effective legislation." *Jones*, 392 U.S. at 440-43. The Court also supplemented "badges and incidents" with another category, the

"relic[s]" of slavery. *Id.* And it broadly construed such Reconstruction-era statutes, enacted under the Thirteenth Amendment, to protect whites, even though they had never been enslaved and suffered no history of racial discrimination. *See, e.g.*, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-86 (1976).

Bowers challenges these decisions' unwarranted expansion of Congressional authority to effectuate the abolition of slavery, to preserve for future review his claim that §249(a)(1)'s criminalization of hate crimes—as "badges and incidents" of slavery—is unconstitutional.[38] But he focuses below on his narrower claim that this Court should not break new ground and unjustifiably expand

---

[38] Though the circuits have uniformly approved §249(a)(1) under the Thirteenth Amendment for racial hate crimes against African-American victims, *United States v. Hatch*, 722 F.3d 1193, 1209 & n.7 (10th Cir. 2013), even in that context its constitutionality has been questioned by some circuit judges and leading national experts. *See United States v. Hougen*, 76 F.4th 805, 816 (9th Cir. 2023) (Ikuta, J., dissenting); *Cannon*, 750 F.3d at 509 (Elrod, J., concurring); *Hatch*, 722 F.3d at 1201-04 (10th Cir. 2013) ("Hatch's argument raises important concerns we share"); Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. PA. J. CONST. L. 561, 626-27 (2012). *See also United States v. Nelson*, 277 F.3d 164, 190 n.25 (2d Cir. 2002) ("a statute…that federally criminalized private racially motivated violence quite generally might or might not be constitutional under the Thirteenth Amendment").

Congress's Thirteenth Amendment authority still further to license §249(a)(1)'s criminalizing of *religious* hate crimes.

## 2. The Thirteenth Amendment did not authorize Congress to punish religion-based assaults.

Since §249(a)(1)'s enactment in 2009, there appears to be no other reported case in which a defendant has been charged under its religion prong for good reason, since Supreme Court precedent does not support its constitutionality. The Thirteenth Amendment has always been interpreted to permit legislation targeting discrimination based on race, not religion.

### a. The Thirteenth Amendment does not permit legislation aimed at purely-religious discrimination.

None of the Supreme Court cases from the Civil War to the 1970s discussed above expanded the Thirteenth Amendment's reach beyond the "racial" discrimination underlying slavery, let alone to religious discrimination. That includes two Supreme Court statutory decisions on which the district court relied. (App.164-66; *see also* App.396.)

The first, *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987), involved a lawsuit under a Reconstruction-era statute guaranteeing all persons the same right to make and enforce contracts

"as is enjoyed by white citizens," 42 U.S.C. §1981. The plaintiff alleged "discrimination based on race" because he was "of the Arabian race." Though "person[s] of Arabian ancestry" are not now considered a distinct race, the Court acknowledged, they were believed to be a "race" in the 19th century when §1981 was enacted.

Critically, though, the Court clarified that the plaintiff could only present a case for "racial" discrimination, and only if he could "prove"— as his lawsuit alleged—that "that he was subjected to intentional discrimination based on the fact that *he was born an Arab, rather than* solely on the place or nation of his origin *or his religion.*" *Id.* at 613 (emphasis added).

The same day it decided *Al-Khazraji*, the Court also decided *Shaare Tefila Congreg. v. Cobb*, 481 U.S. 615 (1987), a lawsuit under a similar post-Civil-War statute guaranteeing all persons the same right to own and transact property "as is enjoyed by white citizens," 42 U.S.C. §1982. The plaintiffs, members of a Jewish synagogue that had been defaced, had similarly alleged that the defendant perpetrators were motivated by *racial* prejudice. Because, in 1866 when the statute was passed, "Jews," like Arabs, "were among the peoples then considered to

be distinct *races*," the Court held the plaintiffs, like the one in *Al-Khazraji*, could allege the defendants "were motivated by *racial animus*." *Id.* at 616-18 (emphases added). Thus, both *Al-Khazraji* and *Shaare Tefilla* allowed race-discrimination claims under statutes enacted at a time when the relevant groups were considered "races."

Lower courts addressing such Reconstruction-era statutes have adhered to this important distinction between "race" and "religion," allowing discrimination claims based on the former, but not the latter. *See, e.g.*, *Lubavitch-Chabad of Illinois v. Northwestern Univ.*, 772 F.3d 443, 446-47 (7th Cir. 2014) (disallowing claim for discrimination against Jewish plaintiffs "on the basis of religious identity, beliefs, or observances," rather than "ancestry or ethnic characteristics"); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1260-61 (7th Cir. 1990) (distinguishing "racial" from "religion" discrimination against Jews); *T.E. v. Pine Bush Central School Dist.*, 58 F.Supp.3d 332, 354-55 (S.D.N.Y. 2014) (distinguishing discrimination based on "Jewish ancestry" from that based on "religious beliefs or observance"); *Freeman v. CSX Transp. Co.*, No. 88-T-749-S, 1988 WL 384599, at **4-5 (M.D. Ala. Nov. 10, 1988) (dismissing plaintiff's claim that he suffered

discrimination "because of his religious beliefs" and "religious affiliation").

*Al-Khazraji* and *Shaare Tefila* were statutory-construction decisions that never mentioned the Thirteenth Amendment. Still, the district court here, (App.165-67), treated those cases as "implicitly rul[ing] that the Thirteenth Amendment" authorized Congress to "protect[] Jews *as a race*" in 1865 and still today. *United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002) (emphasis added). Bowers contests this. [39] Even assuming that is correct, the authority extends only to "racial" not religious, discrimination. *Al-Khazraji*, 481 U.S. at 611.

## b. The prong of §249(a)(1) under which Bowers was prosecuted targets religious hate crimes.

Despite this line drawn by the Supreme Court and lower courts, §249(a)(1) contains a prong for assaults committed "because of" the victim's "religion," separate from the one for assaults committed

---

[39] *See id.* at 214 (Parker, J., dissenting in part and concurring in part) ("[T]he fact that Jews were considered a race in the mid-Nineteenth Century does not…support the enactment of a statute which provides religious protection in the mid-Twentieth Century when Judaism was considered a religion.").

"because of" the victim's "race." The statute's text does not limit this to

religious groups that could be considered races. Any such limitation

would have rendered the religion prong surplusage, which Congress

presumably did not intend. *See Advocate Health Care Network v.*

*Stapleton*, 581 U.S. 468, 477 (2017). Nor did the Hate Crimes Act

otherwise define "religion"; thus, it carries its "generally accepted

contemporary meaning," *Taylor v. United States*, 495 U.S. 575, 596

(1990); *see Watson v. United States*, 552 U.S. 74, 79 (2007). That

definition is hardly a "shorthand" for "race," as the government claimed

below. (DE1599:55.) The standard dictionary meaning of "religion" is "a

personal set or institutionalized system of religious attitudes, beliefs,

and practices." *Merriam-Webster.com* (last visited October 17, 2025);

*Black's Law Dictionary* (12th ed. 2024) ("A system of faith and worship

usually involving belief in a supreme being and usually containing a

moral or ethical code"). *See also* 42 U.S.C. §2000e(j) (Title VII,

forbidding discrimination in the workplace: "The term 'religion' includes

all aspects of religious observance and practice, as well as belief").

Indeed, §249(a)(1)'s drafters acknowledged "open questions" about

whether its "religion" prong would survive "constitutional challenges"

questioning Congressional authority under the Thirteenth Amendment.

They tried to cover their bases with a separate section criminalizing

religious hate crimes affecting interstate commerce, §249(a)(2). H.R.

Rep. 111-86, 11th Cong., 1st Sess. 2009, 2009 WL 1137121, at **15-16

(Apr. 27, 2009). Federal prosecutors have taken heed, avoiding

§249(a)(1) entirely in cases of religious hate crimes (save for Bowers's

prosecution and one other, discussed below). *See United States v. Miller*,

767 F.3d 585, 589 (6th Cir. 2014) (Amish victim); *United States v.*

*Beckham*, No. 3:18-cr-75-1, 2019 WL 2869189, at *1 (M.D. Tenn. July 3,

2019) (Muslim victim); *United States v. Chou*, No. 08:23-cr-62, DE1:1-2

(S.D. Cal. May 10, 2023) (Presbyterian victim).

To be sure, the Congressional "findings" accompanying §249

suggested §249(a)(1) might validly cover at least certain religious

groups based on 19th-century views of its members as comprising

distinct "races." *See* 34 U.S.C. §30501(8) (citing the need to "prohibit

assaults on the basis of real or perceived religions or national origins, at

least to the extent such…origins were regarded as races at the time of

the adoption of the 13th, 14th, and 15th amendments.") But this does

not remedy the statute's punishing purely "religious" hate crimes when

*Al-Khazraji* and *Shaare Tefila* had, at most, "implicitly" extended the Thirteenth Amendment only to "racial" discrimination. *Al-Khazraji*, 481 U.S. at 613.

A recent DOJ guide to the Hate Crimes Act reflects this constitutional problem: "Congress's power under the Thirteenth Amendment extends *only* to remedying racial discrimination; it does not empower Congress to address discrimination on any other basis." Thus, the guide suggested that bias crimes against groups like Jewish people or Arabs might be prosecuted under §249(a)(1) as "'racial' hate crimes." Barbara K. Bosserman & Angela M. Miller, *Prosecuting Federal Hate Crimes*, 70 DOJ J. FED. L. & PRAC. 127, 131-32 (2022). That is what the government did in the only other reported case under this provision involving an attack on Jews. *See United States v. Earnest*, 536 F. Supp. 3d 688, 701 (S.D. Cal. 2021) (indictment charged defendant attempted to cause bodily injury because of Jewish victims' "race").

      **c.    The district court recognized §249(a)(1) cannot constitutionally criminalize religion-based hate crimes, but ignored that the charges here did just that.**

Pretrial, the district court seemed to acknowledge that §249(a)(1) could only be constitutionally applied under a prosecution theory that

Bowers attacked the victims on a "racial"—not "religious"—basis. (App.163 n.5.) And it reaffirmed that ruling post-trial. (App.392-93, 396.) Yet it overlooked that Bowers was charged and convicted exclusively under §249(a)(1)'s "religion" prong, based on his having targeted the victims because they were members of "Jewish congregations"—with no allegation or finding that the victims were chosen because of their birth or ancestry. *See* §B, above.

This Court may not speculate that Bowers *could* have been charged and convicted instead under §249(a)(2)'s "race" prong; it "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella v. United States*, 445 U.S. 222, 236 (1980); *see Ciminelli v. United States*, 598 U.S. 306, 316-17 (2023). That holds true even if "[t]he jury might well have reached the same verdict had the prosecution built its case" on the alternate theory. *Dunn v. United States*, 442 U.S. 100, 107 (1979).

Such speculation would be especially inappropriate here since it is doubtful the government could have shown the Hate Crimes Act's definition of "race" includes Jews. The Hate Crimes Act contains no separate definition of "race," nor should one so at odds with the term's

ordinary, modern meaning be inferred from the drafters' "findings," which noted that the 19th Century definition differed. *See Bonadona v. Louisiana College*, No. 1:18-cv-224, 2019 WL 4073247, at **2-3 (W.D. La. Aug. 28, 2019) (Jewish plaintiff could not sue for "racial" discrimination under Title VII, enacted in 1964, because "Jews were not [then] thought of as a separate race"; *Shaare Tefilla* distinguished as involving statute from 1866). Indeed, this Court should be especially reluctant to ascribe to Congress in 2009 an antiquated view of Jews as a distinct race, which some commentators have criticized as offensive and rooted in racist ideas. Harmeet Kaur, *What does it mean to be Jewish in the US?,* CNN (Apr. 4, 2023), *available at* https://www.cnn.com/2023/04/04/us/us-jewish-racial-identity-religion-explained-cec (last visited December 15, 2025) ("understanding" of "Jews as a separate race" was "also connected to eugenics and scientific racism," and today "evokes the ideology of Nazi Germany and White supremacists"); Alain Corcos, *The Myth of the Jewish Race*, at 11 (Lehigh Univ. Press 2005) (discussing "the false biological premises that undergird the myth of the Jewish race").

**3.  Because Bowers's sentences on other charges may
    have been influenced by the invalid §249(a)(1)
    convictions, he should be resentenced on all counts.**

Bowers was erroneously convicted of 13 counts under §249(a)(1),

for the 11 slain worshippers and two injured ones. The government

cannot prove beyond a reasonable doubt that the evidence on these

invalid, non-capital hate-crime counts did not influence the jury's

sentencing decision on the other, capital, convictions. 18 U.S.C.

§3595(c)(2); *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009).

The jury was instructed to factor that evidence into its sentencing

decision, (App.13129), and the prosecutor reminded them at sentencing

that they had convicted Bowers of "all 63 counts." (App.13177.)

The government's evidence would also have been far less

aggravated without the §249(a)(1) counts. (App.8262, 8270.) Whereas

those counts required religious animus, the religious-obstruction and

firearm counts did not. As the government argued in summation, it was

enough for the religious-obstruction counts that Bowers "intentionally

stopped the[ victims'] religious services."(App.8305.) But because the

§249(a)(1) required a hate crime, the government immersed the jury in

extensive evidence about Bowers's "white supremacist and antisemitic

beliefs" (App.13869-70), discussed below in Point VIII. It also presented voluminous evidence of his antisemitic "posts and chats…screenshots and photos…and communications with family members." (DE782:6-7; *see also* App.7766-99, 7819-83, 13868.)

Although the §247 and §924 counts did not require the government to prove motive, some of this evidence might still have been admitted as relevant to that issue, or at sentencing in support of the government's aggravating factor of Bowers's antisemitic animus. (DE86:4.) But without the need for evidence to directly prove a motivation element, the Federal Rule of Evidence 403 and 404 and 18 U.S.C. §3593(c) considerations would have weighed more heavily towards exclusion—suggesting less animus-focused evidence would have been admitted.[40]

An error directly invalidating one or more convictions will also require reversal of other convictions if there may have been "prejudicial spillover," *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012)—

---

[40] Section 3593(c) is significantly more protective than Rule 403, requiring that unfair prejudice only "outweigh" probative value to call for exclusion, whereas under Rule 403 there must be "substantial outweigh[ing]."

including when "the jury heard evidence that would not have been admissible" to prove the remaining counts." *Id.; see also United States v. Murphy*, 323 F.3d 102, 118, 121-22 (3d Cir. 2003). That is true here, as—absent the §249 counts—the district court "likely would [have] exclude[ed] some of [the religious-animus evidence] under Federal Rule of Evidence 403 or 404" or §3593(c). *Wright*, 665 F.3d at 576.

Additional factors further suggest prejudicial spillover. *See Wright*, 665 F.3d at 575; *see also United States v. Lee*, 612 F.3d 170, 180-81 (3d Cir. 2010). First, the invalid §249 charges and the §247 charges were "intertwined," since they involved the same "conduct," namely, the shootings of the synagogue worshippers. *United States v. Pelullo*, 14 F.3d 881, 898 (3d Cir. 1994). Second, the evidence for the noncapital and capital homicide counts was not "distinct;" rather, because the conduct was the same, and the mental states both related to religion, it would have been hard to "segregate[]…in the minds of jurors." *Id.* Finally, the invalid §249 hate crime counts had a "pejorative connotation" likely to "arouse a jury." *Pelullo*, 14 F.3d at 899; *see Wright*, 665 F.3d at 577. Whereas the §247 counts were couched in a more sober language ("obstructing" the "exercise of religion"), the "hate

crime" label was inherently inflammatory. The jury was undoubtedly reminded of the §249 counts by the government's sentence-selection summation, which repeatedly ascribed the word "hate" to Bowers and his acts. (App.13208, 13219, 13275, 13285-86, 13291, 13293-94.)

In noncapital appeals, reversal is required if there was "likely" spillover prejudice from evidence on invalid counts to valid ones. *Murphy*, 323 F.3d at 122 (internal citation omitted); *see also United States v. Cross*, 308 F.3d 308, 318 (3d Cir. 2002). But in capital cases this test is even more favorable to the defendant, for the government bears the burden to prove, beyond a reasonable doubt, the absence of spillover prejudice that could have altered ever one juror's sentencing vote. *See* Point I.D.4, above (citing reversal of death sentence in *United States v. Lighty*, No. 03-357/12-3065, 2023 WL 2932960, at **2-3 (D.Md. Apr. 13, 2023) due to dismissal of two capital counts).

Because the government cannot meet that heavy burden, the Court should remand Bowers's case for resentencing on all counts.

## III. BOWERS'S 18 U.S.C. §247(A)(2) CONVICTIONS ARE INVALID BECAUSE THE STATUTE EXCEEDS CONGRESS'S COMMERCE CLAUSE AUTHORITY, AND BECAUSE OF INSTRUCTIONAL ERROR REGARDING THE JURISDICTIONAL ELEMENT.

### A. Introduction

18 U.S.C. §247(a)(2) on its face exceeds Congress's Commerce Clause authority because it regulates local noneconomic conduct in a domain traditionally reserved to the States: criminal laws prohibiting violent conduct against persons. And it is unconstitutional as applied to Bowers, who never traveled outside Pennsylvania, did not direct his conduct at the channels or instrumentalities of interstate commerce, and neither intended nor caused any substantial effects on interstate commerce.

Moreover, the district court erroneously instructed the jury that the statute's jurisdictional element, which requires that the "the offense is in or affects interstate…commerce," 18 U.S.C. §247(b), could be satisfied by the most tangential of nexuses: Bowers's intrastate use of the Internet or items that had once traveled across state lines, and any

insubstantial effects of his actions on the congregations' commercial activities. This Court should vacate the §247(a)(2) convictions.[41]

## B.  Standard of review

"This Court reviews challenges to the constitutionality of a statute…*de novo*." *United States v. Weatherly*, 525 F.3d 265, 273 (3d Cir. 2008). *See also United States v. Rodia*, 194 F.3d 465, 469 (3d Cir. 1999).

This Court "review[s] *de novo* 'whether the jury instructions stated the proper legal standard.'" *United States v. Steiner*, 847 F.3d 103, 114 (3d Cir. 2017) (cleaned up). On "direct appeal of erroneous (and contemporaneously objected to) jury instructions," this Court "ask[s] whether it is clear beyond a reasonable doubt that a rational jury properly instructed would have found [the defendant] guilty." *Cordaro v. United States*, 933 F.3d 232, 245 (3d Cir. 2019).

---

[41] Whether §247(a)(2) is constitutional is a question of first impression in this Court. Two circuits have rejected challenges to the statute. *United States v. Hari*, 67 F.4th 903, 907-10 (8th Cir. 2023); *United States v. Roof*, 10 F.4th 314, 380-89 (4th Cir. 2021). Two others have rejected challenges to §247(a)(1), which criminalizes intentionally damaging real property because of its religious character (and incorporates §247(b)'s jurisdictional element). *United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005) (en banc); *United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001).

## C.    Factual and procedural background

### 1.    Bowers moves to dismiss the §247(a)(2) counts as exceeding Congress's Commerce Clause authority, but the district court denies the motion.

The superseding indictment charged Bowers in 25 counts with violations of §247(a)(2), a provision of the Church Arson Prevention Act that prohibits obstructing the free exercise of religious beliefs by force. (App.13698, 13701, 13704-05) (Counts 1–11, 34–35, 40–51). Tracking §247(b)'s jurisdictional element, each count alleged without more that "the offense was in and affected interstate commerce." *E.g.*, App.13698.

Bowers moved to dismiss, arguing §247(a)(2) exceeded Congress's authority under the Commerce Clause, so the statute was unconstitutional, both facially and as applied. (DE239:4–5.) The statute was facially invalid because it "regulates intrastate, non-economic criminal activity that does not substantially affect interstate commerce," and invalid as applied because his "alleged criminal acts"— intrastate acts of violence against persons—"did not occur in or affect interstate commerce." (DE239:34.)

The district court denied the motion. (App.167-172.) It determined that in enacting §247, Congress "exercise[d] its full authority under the

Commerce Clause," and "intended §247 to apply to all three broad categories of activity...: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce." (App.169) (citing *United States v. Lopez*, 514 U.S. 549, 558–59 (1995)). *See* §III.D.1, below (discussing *Lopez*'s three categories).

The district court upheld §247's facial validity under all three *Lopez* categories. Under the first and second, it posited hypothetical "circumstances under which an attack under §247 could be in interstate commerce," such as "mailing a bomb to a church, using a cellular phone to detonate a bomb, intentionally driving a car across state lines to transport a bomb, and using a cellular phone to instruct someone in another state to detonate a bomb." (App.169-70.) These scenarios "would implicate the channels and instrumentalities used in interstate commerce." (App.170.) Under *Lopez*'s third category, the court acknowledged that "the activity regulated by §247" was not "inherently economic in nature," but pointed to §247(b)'s jurisdictional element, as well as congressional floor statements "regarding the effects of the

proscribed activity." (App.170.) The court thought it "'well established that religious organizations can and do engage in and affect commerce.'" (App.171.)

The court rejected Bowers's as-applied challenge, explaining that the allegation the offenses were "in and affected interstate commerce" sufficed. (App.171-72.) It also noted the allegations that Bowers "post[ed] … materials to a website," and "[t]he internet is an instrumentality and channel of interstate commerce." (App.172) (citation omitted).

**2. The government introduces evidence that Bowers used firearms and ammunition that had once traveled across state lines and posted on the Internet, and that the shooting resulted in changes to the congregations' commercial activities.**

The government presented three classes of evidence to show the offenses were "in and affected interstate commerce." §247(b); *see* (App.8328-29) (government closing).

First, Bowers used firearms and ammunition manufactured outside Pennsylvania. For example, the Colt AR-15 rifle he used was made in Connecticut, and ammunition from that rifle was made in Missouri. (App.7592-93, 7596-98, 13856-1; *see* App.7681-82.) Although

both the rifle and the bullets necessarily traveled interstate before the offense, the government introduced no proof of when or how. No evidence suggested Bowers himself acquired the rifle or bullets outside Pennsylvania or knew their out-of-state provenance. In fact, Bowers had gotten the rifle years earlier from another Pittsburgh resident. (App.7509-7511, 13856-41.)

Second, Bowers used the Internet to post dozens of antisemitic comments to his 380 followers on Gab.com and posted another message about HIAS on the morning of the attack. *See* Statement of the Case, Section F.2; App.6562-69, 13610, 13679-81.

Third, the shooting impacted the congregations' commercial activities. For example, Tree of Life had been renting space in the synagogue to the New Light congregation, for about $35,000 annually. (App.7294-96, 13856-6-30, App.5798.) The congregations' lease had two years left, but New Light terminated it after the attack. (App.7297-98. *See also* App.5959-60, 7304-07, 13856-31-39) (similar evidence with respect to Dor Hadash). Thus, Tree of Life "lost tens of thousands of dollars in rental income as a result of the attack." (App.7307.) Dor Hadash also operated an afterschool religious education program at

Tree of Life, charging tuition totaling about $18,900 for the 2018–19

school year. (App.5885-86, 5889; 13856-40.) After the shooting, Dor

Hadash relocated the program. (App.5890.)

> **3.** **The district court instructs the jury that §247(b) can be satisfied by Bowers's intrastate use of items that crossed state lines; intrastate use of the Internet; and insubstantial effects on the congregations' commercial activities.**

Pretrial, the government sought jury instructions that reflected its

case-in-chief, permitting the jury to find §247(b)'s jurisdictional element

proved if Bowers: (i) used, intrastate, items (*i.e.* firearms and

ammunition) that once crossed state lines; (ii) used, intrastate,

instrumentalities of commerce such as the Internet; or (iii) if his

offenses had any effect, however insubstantial, on the congregations'

economic activities like rental of worship space. *See* DE962-1:13–16.

The district court largely adopted the government's proposal.

Bowers objected that "[u]se of items that once crossed state lines does

not render the use 'in' interstate commerce," (App.8197-98; *see* DE.934-

1:14–17; DE934-1:15), and that "[i]ntrastate use of a channel of

interstate commerce (like conducting Internet research) is not 'in'

[interstate] commerce." (DE934-1:15.) He also opposed language that

the effect of his offenses on commerce "need not be substantial," and that disruption of the congregations' modest economic activities satisfied §247(b). (DE934-1:16–17.)

The district court overruled Bowers's objections. (App.8198.) It instructed the jury that §247(b)'s jurisdictional element "may be established by several different means." Namely, it could find the offense "[i]n interstate commerce" if:

- it found Bowers used items (like a firearm, ammunition, or car) during the offense, and that item had moved across state lines at any point in the past (whether or not Bowers knew it had done so). (App. 8266), or

- it found [Bowers] used (even intrastate) any channel or instrumentality of interstate commerce (like highways, GPS, toll roads, the Internet, or interstate transportation routes) "in the commission of the offense."(App.8265.)

It further said the jury could find the offense "affects interstate commerce" if it found the offense:

- "in any way, interferes with, changes, or alters the movement of transportation or flow of goods, merchandise, money or other property in commerce between or among states. The effect of the offense on interstate commerce does not need to be substantial, nor must the [e]ffect on interstate commerce be certain. It is enough that such an effect was the natural and probable consequence of the offense." (App.8266), or

- "the offense impacted the synagogue's commercial activities even if the synagogue's primary purpose is to facilitate worship." App.8266.

## D. Section 247(a)(2) is unconstitutional under the Commerce Clause, both facially and as applied to Bowers.

### 1. Legal standards

"[E]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Congress enacted §247 under its power "[t]o regulate Commerce…among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause permits regulation of "three broad categories of activity," *Lopez*, 514 U.S. at 558: (1) "use of the channels of interstate commerce*," i.e.*, "interstate transportation routes," *Morrison*, 529 U.S. at 613 n.5; (2) "instrumentalities of interstate commerce [such as airplanes, railroads, highways, and bridges], or persons and things in interstate commerce, even though the threat may come only from intrastate activities," *Lopez*, 514 U.S. at 588; *United States v. Bishop*, 66 F.3d 569, 588 (3d Cir. 1995); and (3) "those activities having a substantial relation to interstate commerce,…*i.e.*, those activities that substantially affect interstate commerce," *Lopez*, 514 U.S. at 558–59.

The Internet is both a channel and an instrumentality of interstate commerce. *United States v. MacEwan*, 445 F.3d 237, 245.

In assessing legislation's constitutionality under *Lopez*'s third, "substantially affects," category, courts consider four factors: (i) whether the regulated activity is economic; (ii) whether the statute has a jurisdictional element requiring a link to commerce; (iii) any Congressional findings concerning the regulated activity's effects on commerce; and (iv) whether the asserted link between the prohibited conduct and commerce is direct or attenuated. *See Lopez*, 514 U.S. at 559–65; *Morrison*, 529 U.S. at 609–16. This Court's "job…is not to second-guess the legislative judgment of Congress that [the regulated activity] substantially affects interstate commerce, but rather to ensure that Congress had a rational basis for that conclusion." *United States v. Parker*, 108 F.3d 28, 30 (3d Cir. 1997) (quotation omitted).

Legislation under *Lopez*'s third category may regulate only economic or commercial intrastate activity. All the Supreme Court's decisions "sustain[ing] federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce [have involved] some sort of economic endeavor." *Morrison*, 529 U.S. at 611;

*see also United States v. Robertson*, 514 U.S. 669, 671 (1995) (per curiam) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects."). Individual instances of noneconomic behavior cannot be aggregated to yield the necessary "substantial effect" on commerce. *Morrison*, 529 U.S. at 617; *see also Rodia*, 194 F.3d at 477.

Congress's Commerce Clause power, "though broad, is not unlimited." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001). That caveat has special force when it comes to criminal law, "a domain traditionally left to the States," *United States v. Bass*, 404 U.S. 336, 339 (1971), because "[t]he Constitution...withhold[s] from Congress a plenary police power," *Lopez*, 514 U.S. at 566. "The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

In *Lopez*, the Supreme Court invalidated a federal law that criminalized possessing firearms in school zones, reasoning it was "a

criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." 514 U.S. at 561. And in *Morrison*, the Supreme Court invalidated a federal law that created a civil remedy for victims of gender-motivated violence, explaining that "our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic," and that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613 (quotation omitted).

To implement those federalism principles, the Supreme Court's Commerce Clause cases have applied three interpretive rules. "First, "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Bass*, 404 U.S. at 347 (quotation omitted). *See also Jones v. United States*, 529 U.S. 848, 859 (2000). Second, the Court requires a "clear statement" before Congress "will…be deemed to have significantly changed the federal-state balance" and "define[d] as a federal crime conduct readily denounced as criminal by the States." *Bass*, 404 U.S. at 349 & n.17. *See also Scarborough v. United States*, 431 U.S. 563, 568 (1977). Third, "it is appropriate to avoid the constitutional question[s] that would arise" were federal criminal laws

read "to render…traditionally local criminal conduct…a matter for federal law enforcement." *Jones*, 529 U.S. at 859 (cleaned up.)

## 2. Section 247(a)(2) is facially unconstitutional.

Section 247(a)(2) is facially unconstitutional because it cannot be sustained under any of *Lopez*'s three categories of permissible Commerce Clause legislation. It does not regulate the channels or instrumentalities of interstate commerce, and the conduct that it proscribes—noneconomic intrastate acts of violence against persons—does not substantially affect commerce.

### a. Section 247(a)(2) cannot be sustained under *Lopez*'s first or second categories because it does not regulate the channels or instrumentalities of interstate commerce.

As to *Lopez*'s first and second categories, §247(a)(2), on its face, says nothing about transportation routes or goods moving in commerce. Where, as here, a statute targets "violence wherever it occurs," the "proper inquiry" is to analyze the statute under *Lopez*'s third category. *Morrison*, 529 U.S. at 609. Indeed, *Lopez* itself "quickly disposed" of the first and second categories, where the statute was "not a regulation of the use of channels of interstate commerce, nor [was] it an attempt to prohibit the interstate transportation of a commodity through the

channels of commerce; nor…[had Congress] sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." 514 U.S. at 559. *See also, e.g.*, *Rodia*, 194 F.3d at 473–74 & n.3 (statute criminalizing possession of child pornography couldn't be sustained under *Lopez*'s first and second categories).

Numerous statutes fall within these categories, such as those prohibiting traveling interstate for harmful purposes, which control crime by regulating channels of commerce. *E.g.*, 18 U.S.C. §1958(a) (traveling to commit murder-for-hire); 18 U.S.C. §2118(a) (to rob someone of a controlled substance); 18 U.S.C. §2423(b) (to engage in illicit sexual conduct). Likewise, many statutes prohibit damaging or stealing items that are moving in commerce. *E.g.*, 18 U.S.C. §32(a) (aircraft); 18 U.S.C. §33(a) (motor vehicles); 18 U.S.C. §659 (shipments of goods). *See also Morrison*, 529 U.S. at 613 n.5 (approving 18 U.S.C. §2261(a)(1), traveling in interstate commerce to commit a crime of domestic violence, under *Lopez*'s first category); *Bishop*, 66 F.3d at 588 (upholding federal carjacking prohibition, 18 U.S.C. §2119, under *Lopez*'s second category).

Section 247 could have been written to align with these well-settled means of deploying Congress's Commerce Clause power. In fact, the original version of the statute was. Pub. L. No. 100-346, §1, 102 Stat. 644 (1988) (jurisdictional element required that "in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce").

But the current version, as amended in 1996, differs. Unlike the statutes just described, where "the use of the channels of commerce and the offense itself are inextricably intertwined," under the amended statute, "there is no suggestion that §247 criminalizes mere travel with the unlawful purpose or regulates…the interstate transportation of persons" or things. *Ballinger*, 395 F.3d at 1245 (Tjoflat, J., dissenting). Rather, "the statute unambiguously regulates" "a purely local crime" and so "cannot be sustained" under *Lopez*'s first or second categories. *Id.*

**b.** **Section 247(a)(2) cannot be sustained under**
***Lopez*'s third category because it does not**
**substantially affect interstate commerce.**

As to *Lopez*'s third category, obstructing religious exercise by
force—like possessing a gun in a school zone or gender-motivated
violence—has no effect on commerce, let alone a substantial one, as a
review of *Lopez*'s factors confirms:

1.     Section 247(a)(2) "is a criminal statute" not addressed to any
"economic enterprise," nor is it "an essential part of a larger regulation
of economic activity." 514 U.S. at 561. "It cannot, therefore, be sustained
under our cases upholding regulations of activities that arise out of or
are connected with a commercial transaction, which viewed in the
aggregate, substantially affects interstate commerce." *Id. See Morrison*,
529 U.S. at 610 ("[A] fair reading of *Lopez* shows that the noneconomic,
criminal nature of the conduct at issue was central to our decision.");
*Roof*, 10 F.4th at 383 (noting government's concession that "religious
obstruction is not inherently economic or commercial").

Moreover, by regulating criminal conduct, §247(a)(2) trenches on
the core State prerogative to define and enforce criminal law. *Torres v.
Lynch*, 578 U.S. 452, 464 n.9 (2016) (quotation omitted). Exercising that

authority, Pennsylvania has already used its own law to criminalize every aspect of Bowers's conduct. *See* DE239:45. "When Congress criminalizes conduct already denounced as criminal by the states, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *Lopez*, 514 U.S. at 561 n.3 (quotation omitted). Section 247(a)(2) thus encroaches into a traditional State realm.

*Lopez*'s third category is reserved for commercial or economic activity. *See Morrison*, 529 U.S. at 611; *Robertson*, 514 U.S. at 671. But §247(a)(2) regulates *noneconomic criminal* conduct. That suffices to take the statute outside the "substantially affects" class of laws.

2.      Unlike the statutes addressed in *Morrison* and *Lopez*, §247 does have a jurisdictional element requiring that the offense "is in or affects interstate…commerce." §247(b). But "[t]he mere presence of a jurisdictional element…does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it *per se* constitutional." *Bishop*, 66 F.3d at 585. "A hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute ignores the fact that the connection between the activity regulated and the jurisdictional hook may be so

attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce." *Rodia*, 194 F.3d at 472.

In *Rodia*, this Court declined to rely on the jurisdictional element of 18 U.S.C. §2252(a)(4)(B)—criminalizing possession of child pornography produced using materials that traveled in interstate commerce—in reviewing the statute's constitutionality. *Rodia* explained: "[T]he jurisdictional element—the requirement that precursor materials like film or cameras moved in interstate commerce—is only tenuously related to the ultimate activity regulated: intrastate possession of child pornography." 194 F.3d at 473. *Rodia* noted that "'[a] purely nominal jurisdictional requirement, that some entity or object involved in the crime be drawn from interstate commerce, does nothing to prevent the shifting of the federal/state balance in favor of the federal government.'" *Id.* (quotation omitted). *Rodia* deemed §2252(a)(4)(B)'s jurisdictional element "almost useless" as a limitation, because virtually all child pornography is produced with such materials. *Id.*

Here, §247(b)'s jurisdictional element—as interpreted by the district court's jury instructions—is indistinguishable from the element

deemed insufficient in *Rodia*. The jury was permitted to convict Bowers

upon finding that any item used in the crime had, at some point,

crossed a state line. *See* §C.3, above. This link bears no relationship to

the evil §247(a)(2) addresses, the forcible obstruction of religious

exercise. Moreover, any §247(a)(2) violation—indeed, any crime—would

involve using items that had moved interstate: the gun used to shoot;

the hammer used to menace; the iPhone used to call an Uber for a ride.

A jurisdictional element satisfied with such tangential proof does

nothing to "limit[] the regulation to interstate activity or ensure[] that

the intrastate activity to be regulated falls within one of the three

categories of congressional power." *Rodia*, 194 F.3d at 473.

3.    As Bowers showed below, Congress made no findings that

the forcible obstruction of religious exercise substantially affects

commerce. (DE239:48–54.) Rather, Congress was concerned with the

impact of such violence on religious freedom, especially of African-

American and Jewish congregations. *E.g.*, H.R. Rep. 100-337, at 2–4

(1987) (declaring Congressional intent to facilitate federal prosecution

of bias-motivated violence). When Congress amended the statute in

1996 to broaden §247(b)'s jurisdictional element, Congress made

express findings, but none link §247(a)(2)'s prohibited conduct to commerce. *E.g.*, Pub. L. No. 104-155, § 2(1), 110 Stat. 1392 (July 3, 1996) (codified at §247 note) (finding only that violent religious obstruction "pose[s] a serious national problem"). The findings' sole reference to commerce was the conclusory assertion that: "Congress has authority, pursuant to the Commerce Clause … to make acts of destruction or damage to religious property a violation of federal law." *Id.* § 2(5). That assertion concerns only §247(a)(1)'s prohibition on property damage, not §247(a)(2)'s prohibition on violence against persons.

Below, the government cited individual Congressmembers' floor statements to support §247(a)(2)'s putative link to commerce. (DE249:29.) But "a few stray floor statements are not the same as 'legislative findings,'" *FEC v. Cruz*, 596 U.S. 289, 310 (2022), and the government's citations all addressed destruction of religious property under §247(a)(1). *E.g.*, 142 Cong. Rec. S6517–04 (June 19, 1996) (statement of Sen. Kennedy) (discussing attacks on "churches, synagogues, and mosques"); 142 Cong. Rec. S7908–04 (July 16, 1996) (statement of floor managers) (damage to "real property"). The

government also cited *Grassie*'s treatment of the legislative history (DE249:29), but *Grassie* too addressed §247(a)(1). *E.g.*, 237 F.3d 1199, 1209. None of this shows a "legislative judgment that" obstruction of individuals' religious exercise "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 563.

4.   Finally, any link between the conduct proscribed by §247(a)(2) and interstate commerce is too distant to authorize Congressional action. *See Morrison*, 529 U.S. at 615–16; *Lopez*, 514 U.S. at 563–67. Forcible obstruction of religious exercise has no necessary relationship with interstate business or markets. It is a quintessential local crime, perpetrated in specific places against specific people. *Morrison* rejected the proposition that Congress can act to address "violent crime (the suppression of which has always been the prime object of the States' police power)" because of the potential downstream effects of crime on interstate business and commercial activity. 529 U.S. at 615. This "would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id. Lopez*, too, rejected the government's "costs of crime" justification, because "[t]he

possession of a gun in a local school zone is in no sense an economic

activity that might, through repetition elsewhere, substantially affect

any sort of interstate commerce." 514 U.S. at 564, 567.

Moreover, "in view of our complex society, there is virtually

nothing that does not *affect* interstate commerce in some manner."

*United States v. McGuire*, 178 F.3d 203, 209 (3d Cir. 1999) (cleaned up).

Even "driving a few blocks to pick up one's children (consumption of

gasoline refined from foreign oil, and wear and tear on vehicle

manufactured in another state or country) or eating dinner in front of

one's own television set (consuming food and beverages from outside of

state or country, as well as decisions on how to spend hundreds of

millions of advertising dollars), have an indirect effect on interstate,

and often foreign commerce." *Id.* at 210. But those distant connections

don't suffice.

The distinction between §§247(a)(1) and 247(a)(2) matters. While

some houses of worship do conduct some commercial activity, damage to

"religious real property" falls under §247(a)(1), so any connection

between damage to such property and commerce is immaterial. Section

247(a)(2) is an offense against *persons,* not religious buildings or organizations—let alone ones that participate in an interstate market.

### c. The district court erred in denying Bowers's motion to dismiss.

The district court's conclusion that §247(a)(2) was facially constitutional rested on multiple legal errors. For one, it upheld §247(a)(2) under *Lopez*'s first and second categories by invoking hypothetical ways a defendant could obstruct religious exercise via the channels and instrumentalities of commerce. (App.169-70) (mailing a bomb, driving across state lines, phoning a co-conspirator). But §247(a)(2) does not, on its face, regulate the mails, interstate highways, or telecommunications networks, so those scenarios are irrelevant to its constitutionality. *See* §D.2.A, above. Indeed, similar scenarios could have been imagined in *Lopez* and *Morrison*. Yet the Supreme Court didn't analyze the statutes at issue under the first two *Lopez* categories.

This Court has also expressly rejected the district court's methodology, noting that the Supreme Court "has often considered facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute

might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). In *Bruni*, this Court reiterated the Supreme Court's "warning" to "courts deciding facial challenges not to 'speculate about hypothetical or imaginary cases.'" *Id.* (cleaned up). Instead, courts should simply apply "the relevant constitutional test" to the statute. *Id.*

The district court also wrongly upheld §247(a)(2) under *Lopez*'s third category by saying a statute's "'inclusion of a jurisdictional element…is a sufficient basis on which to uphold [its] validity under the Commerce Clause.'" (App.170) (cleaned up). That misstated this Circuit's law, which holds jurisdictional elements are not decisive. *See* §D.2.b, above; *Rodia*, 194 F.3d at 472; *Bishop*, 66 F.3d at 585. The court also referenced floor statements (App.170) that—as shown above—are inapposite. *See* §D.2.b, above. Finally, the court observed that "religious organizations can and do engage in and affect interstate commerce." (App.171.) But so do schools, and that wasn't enough for *Lopez*. That unremarkable observation—again, most pertinent to §247(a)(1)'s prohibition on damaging religious real property—fails to establish the necessary link. *See* §D.2.b, above.

### 3. Section 247(a)(2) is unconstitutional as applied to Bowers.

Section 247(a)(2) fares no better on the facts of this case. The government's Commerce Clause argument rested on three types of evidence: Bowers's use of firearms and ammunition that had once crossed states lines; his use of the Internet to post antisemitic comments and announce he was "going in" to the Tree of Life; and his disruption of the congregations' commercial activities. None suffices.

### a. Bowers's intrastate use of items that once moved interstate

The intrastate use of items that once moved interstate fails to authorize federal incursion into the traditionally-state domain of criminal law. An item that once moved in a channel of commerce is not itself a channel of commerce, is not forever "in" commerce, and does not "substantially affect" commerce when used years later. *Rodia* recognized this, deeming it "doubtful" that intrastate possession of child pornography could be federally punished just because the pornography was made with out-of-state film, 194 F.3d at 473, declining to analyze the statute under *Lopez*'s first or second categories, and deeming such a past link to interstate trade inadequate to "guarantee[] that the final

product regulated substantially affects interstate commerce." *Id.* at 473-74 & n.3.

As *Rodia* observed, "virtually all criminal actions in the United States involve the use of some object that has passed through interstate commerce," so an item's prior interstate passage cannot achieve the limiting function *Lopez* envisioned for jurisdictional elements. 194 F.3d at 473 (quotation omitted). *See also Jones*, 529 U.S. at 857 (building made with out-of-state materials was not "used in" commerce, under 18 U.S.C. §844(i), because otherwise, "hardly a building in the land would fall outside the federal statute's domain"). Basing jurisdiction on prior movement "would permit a federal law outlawing the theft of a Hershey kiss from a corner store in Youngstown, Ohio by a neighborhood juvenile on the basis that the candy once traveled in interstate commerce to the store from Hershey, Pennsylvania." *Bishop*, F.3d at 596 (Becker, J., concurring in part and dissenting in part).

If the Commerce Clause authorized Congress to criminalize any behavior involving an item that once traveled interstate, the "distinction between what is truly national and what is truly local" would be illusory. *Morrison*, 529 U.S. at 617–18. *See also United States*

*v. Wall*, 92 F.3d 1444, 1471 (6th Cir. 1996) (Commerce Clause does not permit regulation of domestic relations "simply because marital beds are purchased in interstate commerce") (Boggs, J., concurring in part and dissenting in part). Congress could draft a statute prohibiting murder "in or affecting interstate commerce," and the government could prove it with evidence that the gun or ammunition (or knife, etc.) came from out-of-state. That cannot be the law: Congress has "no general right to punish murder committed within any of the States," and "cannot punish felonies generally." *Cohens v. Virginia*, 19 U.S. 264, 426, 428 (1821) (Marshall, C.J.). But holding intrastate use of an interstate-traded item suffices would allow it to do so.

Granted, this Court has upheld federal criminal laws' application based on regulated items' prior interstate movement. *E.g.*, *United States v. Singletary*, 268 F.3d 196, 197 (3d Cir. 2001) (affirming felon-in-possession conviction, 18 U.S.C. §922(g)(1), where firearm once traveled interstate); *Bishop*, 66 F.3d at 585 (affirming carjacking conviction, §2119, where motor vehicle once traveled interstate). But there, the items that moved in commerce were themselves the regulated items. *See* §922(g)("any firearm"); §2119 ("a motor vehicle"). The felon-in-

131

possession and carjacking statutes "necessarily proscribe possession of an item"—a gun or a motor vehicle—"and that item is the object that must move through interstate commerce…In contrast, the religious-obstruction statute does not focus on the possession of an item, but rather the offense of obstructing religion itself." *Roof*, 10 F.4th at 388 n.48. *Singletary* drew the same distinction, explaining that §922(g)(1), unlike the *Lopez* and *Morrison* statutes, or §247(a)(2), "regulates the possession of goods moved in interstate commerce." 268 F.3d at 204. Section 247(a)(2), by contrast, doesn't concern items in commerce at all.

### b.  Bowers's intrastate use of the Internet

If use of items that once moved interstate as a predicate for federal criminal jurisdiction compromises the federal-state balance, relying on intrastate Internet use for that purpose obliterates it altogether. Virtually all modern human activity involves the Internet, whether it's messaging a friend, using a debit card or Apple Pay to buy necessities, using Google Maps, or a thousand other examples of everyday conduct. Such conduct can easily be ancillary or preparatory to a crime: contacting a co-conspirator, purchasing burglar's tools, mapping the escape route. But, as discussed above (*see* §D.3.a, above), if

that were enough to license federal criminal legislation, Congress's Commerce Clause authority would be boundless. That result would contravene *Lopez*, which expressly rejected an interpretation of the Clause rendering it "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement…where States historically have been sovereign." 514 U.S. at 564.

True, the Internet is both a channel and an instrumentality of commerce. But Bowers's uses of the Internet were not themselves criminal, so this case does not implicate Congress's power to "keep the channels of interstate commerce free from immoral and injurious uses." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964). Nor does §247(a)(2) regulate the Internet as an instrumentality, as many federal criminal statutes do. *E.g.*, 18 U.S.C. §2252B(a) ("knowingly us[ing] a misleading domain name on the Internet" with specified intent). Moreover, Bowers's Internet use formed no part of his religious-obstruction offenses; his posts did not themselves "obstruct" anyone's free exercise. This case thus differs from decisions like *MacEwan*, where the defendant's use of the Internet to download child pornography was how he accomplished the offense of receipt, 18 U.S.C.

§2252A(a)(2)(B). *MacEwan*, 445 F.3d at 241. *See also, United States v. Corum*, 362 F.3d 489, 492-95 (8th Cir. 2004) (18 U.S.C. §844(e), prohibiting making threats through an instrumentality of commerce, could constitutionally be applied to defendant who made threatening phone calls to synagogues).

### c. The effects of Bowers's offense on the congregations' commercial activities

The government introduced evidence that the shooting caused Tree of Life to lose income it was earning by renting space to New Light and Dor Hadash and caused Dor Hadash to relocate an afterschool religious education program for which it was charging tuition. These minor disruptions did not "substantially affect" interstate commerce for purposes of *Lopez*'s third category.

As demonstrated above, *Lopez*'s third category is inapplicable to statutes regulating noneconomic activity. *See* §§D.1, D.2.b.1, above. And because §247(a)(2) governs noneconomic conduct, this Court cannot rely on the aggregate of intrastate rental leases nationwide to yield the necessary substantial effect. The aggregation principle applies only where a statute regulates economic or commercial activity. *Morrison*, 529 U.S. at 617–18; *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (discussing

"Congress' power to regulate purely local activities that are part of an *economic* 'class of activities'" that have a substantial effect on interstate commerce" (emphasis added)). "If the intrastate activity is commercial, the 'substantial effects' jurisprudence applies, allowing Congress to regulate the activity if it in the aggregate substantially affects interstate commerce; otherwise, the doctrine is inapplicable and affords Congress no basis for regulation." *Bishop*, 66 F.3d at 591 (Becker, J., concurring in part and dissenting in part). This case is therefore unlike those in which local activities could be regulated because they were part of a national, interstate market. *E.g.*, *Raich* (manufacture and possession of marijuana); *Perez v. United States*, 402 U.S. 146 (1971) (loansharking); *Wickard v. Filburn*, 317 U.S. 111 (1942) (growing wheat). Without aggregation, all that's left is tens of thousands in rental income to a single landlord with two intrastate tenants on short-term leases. That's a drop in the bucket of the national rental market.

E.    **The district court prejudicially erred in instructing the jury on §247(b)'s jurisdictional element.**

At a minimum, Bowers's §247(a)(2) convictions must be vacated because the district court committed multiple errors of law in charging the jury on the statute's jurisdictional element. Section 247(b) requires

that "the offense is in or affects interstate…commerce." While this formulation indicates Congress's intent "to exercise its full powers under the Commerce Clause," *United States v. Adams*, 132 F.4th 259, 265 (3d Cir. 2025) (quotation omitted), applicable canons of construction—lenity, the clear statement rule, and avoidance, *see* §D.1, above—cabin the provision's sweep.

Interpreting §247(b) in light of these canons and the legal arguments made in connection with Bowers's as-applied challenge reveals three errors. First, Bowers's use of items that had once traveled interstate did not make his offenses "in" or "affecting" commerce. *See* App.8266; *see* §D.3.a, above. Second, Bowers's intrastate noncriminal use of the Internet did not make his offenses "in" or "affecting" commerce. (App.8265; *see* § D.3.b, above.) And third, the effects of Bowers's offenses on commerce did indeed need to be "substantial," so proof that the congregations' commercial activities were impacted in "any" way was insufficient. (App.8266; *see* §D.3.c, above.) If this Court does not strike the statute facially or as applied to Bowers, it should nonetheless construe §247(b)'s jurisdictional element to have much narrower scope than the district court gave it. On a correct

interpretation (*see* DE934-1:14–17), the evidence did not satisfy §247(b), so the government cannot show harmlessness beyond a reasonable doubt.

## IV. BOWERS'S DEATH SENTENCES UNDER §247 AND §924 VIOLATE DOUBLE JEOPARDY.

### A. Introduction

The Double Jeopardy Clause requires courts to "presume that where two statutory provisions proscribe the same offense, a legislature does not intend to impose two punishments." *Rutledge v. United States*, 517 U.S. 292, 297 (1996) (cleaned up). Here, sentencing Bowers to death for both the §247 and capital §924 charges violated double jeopardy, since the §247 is a lesser included offense of §924(j), and Congress did not clearly authorize cumulative punishment in §924(j). It was improper for both sets of charges to be submitted to the jury and for the district court to sentence Bowers on both sets of charges. The Court should vacate the §247 convictions and sentences and remand for a new sentencing hearing or at least entry of a new judgment.

**B.    Standard of review**

The Court's review is *de novo. See United States v. Diaz*, 592 F.3d

467, 470 (3d Cir. 2010). This issue was preserved below. (DE237:14–15;

App.182-83.)

**C.    The §247 and §924(j) counts fail the *Blockburger* test, and—
because Congress did not intend multiple punishments—
violate Double Jeopardy.**

The Double Jeopardy Clause prohibits charging the same offense

in two or more counts, leading to multiple sentences for a single

criminal violation. *United States v. Pollen*, 978 F.2d 78, 83 (3d Cir.

1992). Offenses need not be identical to be the same for double jeopardy

purposes. *United States v. Conley*, 37 F.3d 970, 975 (3d Cir. 1994);

*accord Brown v. Ohio*, 432 U.S. 161, 164 (1977). The relevant inquiry is

whether each offense requires proof of an element the other does not.

*Pollen*, 978 F.2d at 85. This is sometimes referred to as the

"Blockburger" test. *See Blockburger v. United States*, 284 U.S. 299, 304

(1932).

18 U.S.C. §924(c)(1)(A)(iii) imposes liability upon anyone "who,

during and in relation to any crime of violence…uses or carries a

firearm…." It requires just two elements: a predicate crime-of-violence

and a use of a firearm. 18 U.S.C. §924(j) defines a different offense by adding an additional, third element: that someone "cause[] the death of a person through the use of a firearm...."

The predicates for the §924(j) offenses charged in Counts 23–33 were "violations of 18 U.S.C. §247 *as charged in Counts One through Eleven....*" (App.13700 (emphasis added.)) As predicates, the §247 offenses did not require proof of an element that the §924(j) offenses did not—they were lesser included offenses. In fact, the §247 offenses alleged religious obstruction solely based on Bowers's use of a firearm, so they were entirely subsumed by the §924(j) counts. (App.13698.)[42] "Accordingly, the offenses fail the elements test under *Blockburger*." *United States v. Sanders*, 133 F.4th 341, 370 (5th Cir. 2025).

If two charges fail the *Blockburger* test, a defendant cannot be punished for both unless "there is a clear indication" in the statute that Congress intended multiple punishments. *United States v. Hodge*, 870 F.3d 184, 194 (3d Cir. 2017); *accord Conley*, 37 F.3d at 975. That "clear-

---

[42] *Cf. Whalen v. United States*, 445 U.S. 684, 694 (1980) (agreeing that felony murder and rape were not inherently overlapping, but finding charges violated Double Jeopardy where government charged felony murder solely predicated on the rape).

statement rule is a demanding standard." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023). Though the rule is "not a magic-words requirement," Congress's intent to authorize double punishment must be "'clearly discernable' from the statute itself." *Id.* (cleaned up).

Section 924(j) contains no such indication. Unlike its counterpart in subsection (c),[43] §924(j) "contains no consecutive-sentence mandate." *Lora v. United States*, 599 U.S. 453, 458 (2023). And because "the express authorization of cumulative sentences in §924(c) is not part of §924(j)," *Sanders*, 133 F.4th at 371, there is no clear indication of congressional intent to authorize punishment under §924(j) and an underlying predicate. If anything, the statute's text shows the opposite: "Congress plainly chose a different approach to punishment in subsection (j) than in subsection (c)." *Lora*, 599 U.S. at 462.

Imposing two death sentences for the same conduct under §924(j) and a predicate offense therefore violates double jeopardy.

---

[43] The law is settled that §924(c) reveals a clear congressional intent to authorize multiple punishments for a single occurrence and thus presents no Double Jeopardy concerns. *See United States v. Bishop*, 66 F.3d 569, 574 (3d Cir. 1995), *as amended* (Sept. 29, 1995).

**D.** **The Court should vacate the §247 convictions and sentences and remand for a new sentencing hearing or at least for entry of a new judgment.**

This Court should vacate the §247 convictions and sentences and remand for a new sentencing hearing, or at least for entry of a new judgment. *See Sanders*, 133 F.4th at 391. For the reasons set forth in Point I.D.4, above, the government cannot meet its heavy burden of proving, beyond a reasonable doubt, that the error in permitting Bowers to be sentenced to death for both the §247 and §924(j) counts was "harmless" as to all of Bowers' death sentences.

In the alternative, remand is appropriate for entry of a new judgment, "[e]ven [if] the corrected sentence would not decrease the time [Bowers] spends in prison," because the constitutional violation still resulted in a term of imprisonment different than that permitted by law. *United States v. Perrin*, 149 F.4th 267, 290-91 (3d Cir. 2025). Constitutional defects in convictions and sentences must be remedied because "the public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *United States v. Henderson*, 64 F.4th 111, 121 (3d Cir. 2023). Entering separate convictions for the

same offenses also "saddles the defendant with separate $100 special assessments…," warranting correction. *United States v. Miller*, 527 F.3d 54, 73 (3d Cir. 2008).

POINTS RELATED TO JURY SELECTION

Points V through VII, below, challenge the district court's rulings related to jury selection. The district court's voir dire rulings failed to ensure Bowers received a reliable trial before a fair and unbiased jury, even though small, easily-implemented adjustments in the process would have avoided the errors described.

## V. THE COURT VIOLATED BOWERS'S FIFTH AND SIXTH AMENDMENT RIGHTS BY EMPANELING A BIASED JUROR WHO AUTHORIZED AND SUPERVISED EXECUTIONS IN CHINA.

### A. Introduction

The district court erroneously empaneled a juror, Juror 119, who was both impliedly and actually biased in favor of the death penalty and against life imprisonment. In 1983, Juror 119 worked as a Chinese government official reviewing death sentences and supervising executions during a government anticrime offensive. She omitted this information from her questionnaire, but disclosed it during voir dire, and opined that life imprisonment is not a sufficient punishment for

murder because prisoners burden taxpayers and enjoy unwarranted luxuries.

Even if this Court believes the current record insufficient to establish actual or implied bias, there are serious questions about Juror 119's impartiality, unaddressed by the trial court, that warrant remand. Though defense counsel questioned Juror 119 about her work in China and views on the death penalty—and challenged her for cause—the court misapprehended the issue as simply whether she could apply American rather than Chinese law and failed to consider whether she was biased.

Juror 119's statements strongly indicated the need for further inquiry by the court. Echoing China's aggressive 1980s death penalty policy, Juror 119 opined that the United States should execute more criminals to suppress its recent spate of mass shootings (just as 1980s China used widespread executions to suppress then-surging crime), that the death penalty's absence encourages mass shootings (Bowers's precise crime), that without the death penalty people "can just go ahead and kill somebody" (suggesting death is the only meaningful punishment), and that life sentences are not "some kind of punishment"

like hard labor and are "not sufficient" for murder because life-sentenced murderers burden taxpayers and enjoy luxuries in prison. She also said she believed life sentences are not permanent and that individuals over age 50 (Bowers was 51 during trial) are too old to "change" in prison if sentenced to life—views she never said she could put aside.

Juror 119's role reviewing and implementing death sentences in China created implied bias that should have disqualified her from Bowers's jury. Her strong philosophical and employment-based identification with the death penalty create the impermissible risk of emotional involvement at the heart of the implied bias doctrine. *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012). Her statements also revealed actual bias against life imprisonment. To the extent this Court finds the current record insufficient to warrant vacatur, it should remand—just as this Court did in *Mitchell*, 690 F.3d at 142—for the district court to consider the bias question in the first instance.

Because Juror 119's bias goes just to the question of penalty, this claim seeks relief only as to Bowers's death sentences, not his

convictions. *United States ex rel De Vita v. McCorkle*, 248 F.2d 1, 8 (3d Cir. 1957) (granting habeas relief on juror bias limited to penalty).

## B.    Standard of review

Whether a juror's bias may be implied is reviewed *de novo*. *United States v. Mitchell*, 690 F.3d 137, 148 (3d Cir. 2012). Claims that a juror was actually biased are reviewed for abuse of discretion. *Id.* However, a "district court by definition abuses its discretion when it makes an error of law." *Id.* Bowers preserved his objections below. (App.1697-1700; App.1705-11.)

## C.    Factual background

### 1.    Juror 119's voir dire reveals that she reviewed death sentences and supervised executions in China.

During voir dire, Juror 119 disclosed a critical fact she had omitted from her questionnaire: in China, during an aggressive 1983 anticrime offensive, she worked as a government lawyer reviewing death sentences and supervising executions.

Juror 119's pre-voir-dire questionnaire had expressed strong support for the death penalty: 10 out of 10 in favor. (App.14194.)[44] Yet it

---

[44]  The juror questionnaires were not docketed, for privacy reasons, but are lodged with the Clerk of the district court.

made no mention of her work reviewing or implementing death sentences in China. Her employment history listed only a paralegal position in Pittsburgh. (App.14177.) She claimed training in the "law/legal field," but again included only her Pittsburgh paralegal job. (App.14179.) Asked whether she ever worked for "any local, state, or federal law enforcement or prosecutorial agency" she checked "No." (App.14180.) And she again mentioned only the Pittsburgh paralegal job when asked if she had ever "worked in the legal profession." (App.14180.)

Juror 119's voir dire began uneventfully. She recounted attending law school and working as a paralegal in China: experience she believed would help her as a juror. She said:

> I would be more understanding what law requirement [sic]. What is extent of the regular person they would think about something, which is not the same as law required. I think that would help me.

(App.1679.)[45] Though her questionnaire said she was 10 out of 10 in support of the death penalty, upon questioning by the court she said she

---

[45] Juror 119 spoke English as a second language, an issue raised by the defense, but which the district court thought inconsequential. (App.1698, 1705, 1710, 2009-10.)

would not automatically vote for death and would need to "see the whole picture" before deciding punishment. (App.1681.) In response to the prosecutor's questions, she said she would consider the defendant's childhood and background, and any mental illness or abnormal brain development. (App.1682-84.)

It was not until voir dire by the defense that Juror 119 disclosed that she had reviewed and participated in death sentences in China. Defense counsel asked about her legal training, and Juror 119 said she attended law school in China for four years, graduating in 1983. (App.1686-87.) Her first job, upon her 1983 graduation, was with the "highest court in Shanghai." (App.1687.) At that time, she said, China had a very strict death penalty because the country was coming out of a counterrevolution and experiencing widespread violence. (App.1687.)

To address this crime wave, Juror 119 said, "we…passed a "very harsh[] law," whereby a person could receive the death penalty for beating someone to death or for participating in a serious group fight. (App.1688.)[46] She explained: "[t]hat means if you [commit a] crime, like

---

[46] This law formed part of China's 1983 "Strike Hard Against Crime" campaign: an aggressive government crackdown, including "swift, harsh, and arbitrary punishment" and widespread executions,

somebody beat to death or very, very badly group of people to group of people have a very bad fighting or something like that[,] [y]ou will end up to death penalty or maybe 15 years in jail."[47] (App.1688.) The death penalty process was also expedited, with only six months between arrest and execution.[48] (App.1689-90.) Juror 119 said China only

---

meant to solidify government authority and facilitate economic reforms. Susan Trevaskes, "From 'Killing Many' to 'Killing Fewer'," in *The Death Penalty in China: Policy, Practice, and Reform*, ed. Bin Liang and Hong Lu (Columbia University Press, 2016), 124, 126; Harold M. Tanner, *Strike Hard! Anti-Crime Campaigns and Chinese Criminal Justice, 1979-1985*, 85-93 (Cornell East Asia Series 1999). Approximately 24,000 people are estimated to have been executed during just eight months in 1983. Trevaskes, "Killing Many," 124.

[47] The Strike Hard Campaign expanded China's death penalty to numerous non-murder crimes, such as "hooliganism" (interpreted to include "stir[ring] up fights," "sexual promiscuity" and "homosexual activity"), "causing intentional injury," "organization of sects and secret societies," and promoting prostitution. Tanner, "Strike Hard!," 92, 94. *See also* Bin Liang, "China's Death Penalty Practice," in *The Death Penalty in China*, 3, 13.

[48] The "Strike Hard" reforms "shortened the time that it would normally take to prosecute targeted crimes," and "lowered the level of the court of authorization for review and approval of death sentences from the SPC [Supreme People's Court] to the provincial level." Trevaskes, "Killing Many," 126. "Arrest sweeps, swift trials, public sentencing rallies and mass executions" swept the country. Murray Scot Tanner, "State Coercion and the Balance of Awe: the 1983-1986 'Stern Blows' Anti-Crime Campaign," in *The China Journal* 44 (2000), at 93, 115 (describing mass executions of between 12 and 40 people in several Chinese cities).

utilized this exceptionally stringent death penalty system for one year, then modified the law.[49] (App.1690.)

Juror 119 was tasked with determining whether previously-imposed death sentences should be carried out or rescinded. (App.1688.) Though her real job was "in a different office" "study[ing] the policy," she was "pull[ed] out to help" "deal with so many [death penalty] case[s]" under the intensified regime. (App.1688-89.) In just the "couple months," she worked there, she reviewed between five and six death sentences. (App.1688-89.) In one case, she said, "we" determined that the death sentence should not be effectuated because the defendant was "not that bad" and "should…have [a] chance to correct himself in jail." (App.1688.) But in another, she and her colleagues greenlighted execution for a man who "very rudely killed his girlfriend." (App.1689.) Describing that case, she said "there was one case we do confirm." It is unclear whether she meant it was the only case where she approved execution, or simply "one case" among others. Nor did she specify

---

[49] By 1984 Beijing "had rescinded many of [the Strike Hard campaign's] key decentralizing directives." Tanner, *State Coercion*, 94.

whether the other death sentences she reviewed were for murder or lesser crimes. (App.1689.)

Juror 119 also "monitor[ed]" at least one execution: of the man who killed his girlfriend. She said, "I even went to the staging, which he is perform the death penalty, because I need to go there and like a monitor the whole thing to the end." (App.1689.) She ensured the process was completed, "until he [had] died." (App.1689.) She said, "[t]hat's only one case I monitor until he's died," *id.*, suggesting this was either one of multiple cases in which she monitored the execution, or the only case; that ambiguity was not clarified.

## 2. Juror 119 endorses China's 1980s death penalty policy.

Defense counsel asked Juror 119 whether she believed China's 1983 death penalty system was "an effective, efficient way of justice?" (App.1689.) Juror 119 replied that the process was "like a rapid procedure," much faster than in the United States, with "[s]ix months from arrested until death penalty." (App.1689-90.)

Defense counsel then asked Juror 119, "what are your views on how the death penalty is actually used in the United States?" (App.1691.) She responded that the death penalty should be used more

frequently, as it was in China in 1983, because the United States is experiencing an epidemic of mass shootings: "Maybe [it would] alert people so they can see if they kill somebody, they might end up to be killed. So I think that maybe can reduce those serious crime[s]." (App.1691.)

### 3. Juror 119 says American prisons are too comfortable and life sentences inadequate.

Juror 119 also opined that American prisons do not sufficiently punish or deter murderers because they are too comfortable. Without the death penalty, she said, "people can just go ahead and randomly kill somebody," then live "very comfortably" in American jails. (App.1692.) In "some countries they have hard labor or something," and "[t]hey give some kind of punishment," she explained, "but [American prisoners] seem like they live comfortabl[y]." (App.1692.) In Allegheny County, specifically, "they have air-conditioning," whereas many unincarcerated people's homes do not. (App.1692-93.)

Defense counsel also asked Juror 119 whether, in "murder cases, where it's unjustified, there's no excuse, putting someone in prison…for the rest of their life, that's not sufficient, because they are getting—it's a burden on us tax-wise and they're getting nice conditions. Is that fair

from your perspective?" Juror 119 responded, "[y]eah." (App.1693.) She

never qualified, nor said she could put aside, this view.

### 4. Juror 119 says life sentences are not necessarily lifelong and people over 50 cannot be "changed."

Juror 119 also volunteered, multiple times, that she believed life

sentences are not guaranteed to last for life, because life-sentenced

prisoners can obtain sentence reductions or be released early.

(App.1693.) She said, "I do see from some movie[s] and TV show[s],

somebody has life in jail without parole, but actually after 20, 30,

maybe 50 years, they do get out…Sometimes after a couple times

review, I saw they do get out so this is not. You put them in life, yeah.

On the way, change. It's a change." (App.1693.)

Defense counsel then asked whether life imprisonment would be

"a sufficient penalty" for a person who committed intentional

premeditated murder of multiple victims in a place of worship.

(App.1694.) Juror 119 responded that "[i]t depends," and that, "[i]f this

man or woman is very young, maybe he has some reasons from history,

from his childhood, from this or that, so maybe life in prison can change

him on the way down." (App.1694.) She said prison "may be good," that

it "depends on each individual," and "I don't know if he can change later

on or he's evil inside." (App.1697.) Defense counsel asked, "Is there an age where if you get to a certain age, [life imprisonment] really is not an option?" to which Juror 119 responded "For my personal opinion, I think maybe 20 some years old still can change. 50, 60, it's too old to be changed." (App.1695.)

Juror 119 then reiterated her belief that life sentences are not necessarily lifelong. Defense counsel asked her if she believed there is an age-based "cutoff" after which criminal defendants "are who they are and they're not going to change?" (App.1695.) She responded, "[b]ecause I see the movie, see the TV, see someone in jail. Some office come here review the case, review the case. Later on, they let them go out. Maybe that person was changed so they let them go out." (App.1695.)

Defense counsel then asked Juror 119 if she could accept the court's instruction that a life sentence would really be lifelong, or whether she would still believe "in the back of [her] mind" that he "may get released at some point?" (App.1696.) Juror 119 equivocated, saying "I cannot make decision until I see the specific case." (App.1696.)

**5.     The court tells Juror 119 she must follow the law and evidence**, **but does not ask if she could.**

After defense counsel concluded his questioning, the Court told Juror 119 that—if selected as a juror—she would "would be required to follow the law as was given to you by the judge, and of course that would just be U.S. law," that she "would have to disregard any other training, experience or knowledge you have of the law other than what the judge tells you," and that she would "have to make [her] decision based only upon the evidence presented in court during the trial" and disregard "movies and TV that touch on some of these issues." (App. 1696-97.) Juror 119 said "yes" and "of course." (App.1697.) But the court's instructions were declarative; it never asked Juror 119 whether she could and would actually follow its instructions, or whether her experience administering China's death penalty would impact her views of the proper punishment.

**6.     The defense challenges Juror 119 for cause, and the court fails to address the bias issue.**

Defense counsel moved to dismiss Juror 119 for cause, citing an apparent language barrier and arguing that she gave inconsistent answers about the death penalty, had personally overseen an execution,

and had reviewed death sentences. It would be "inappropriate" for her to "bring[] that personal experience and expertise to the deliberations." (App.1698, 1700.) The government opposed, saying Juror 119 gave thoughtful answers and only reviewed death sentences in China for a "short time." (App.1698-1700, 1705-11; DE1163.)

The court denied the challenge. Regarding Juror 119's language skills, the court said it found her "clear, communicative and responsive," notwithstanding "one occasion or two" where her answer didn't match the question posed. (App.2010.) Regarding Juror 119's experience in China, the court stated, "[h]er past experience with Chinese law is just what it is. I don't think it impairs her. It's just what her history is. I see no reason why it can or should cause a basis for her—constitute a basis for her disqualification." (App.2010.) The court never addressed whether—apart from "Chinese law"—Juror 119's experience reviewing and supervising death sentences created a risk of bias towards the death penalty in Bowers's case. (App.2010.)

Juror 119 sat on Bowers's jury.

**D.    Juror 119's empanelment violated Bowers's Fifth and Sixth Amendment right to a fair and impartial jury.**

**1.    Legal standards governing juror bias**

"Few accouterments of our criminal justice system are either more fundamental or more precious than the accused's [Sixth and Fourteenth Amendment] right to an impartial jury." *Sampson v. United States*, 724 F.3d 150, 154 (1st Cir. 2013); U.S. Const. amends. VI, XIV. That right "is nowhere as precious as when a defendant is on trial for his life." *Id.* at 163. And it is violated "[e]ven if 'only one juror is unduly biased.'" *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (cleaned up). Criminal defendants' right to an impartial jury is effectuated through voir dire, meant to expose juror bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994). A biased juror's presence is a "structural defect in the trial" that requires reversal without any showing of prejudice. *Mitchell*, 690 F.3d at 148; *see also Szuchon v. Lehman*, 273 F.3d 299, 331 (3d Cir. 2001).

Courts have identified two categories of juror bias: implied and actual. *Mitchell*, 690 F.3d at 142. Implied bias exists when "the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case," even if the juror states

and believes she can be impartial. *Id.* at 146. It "is rooted in the recognition that certain narrowly-drawn classes of jurors are highly unlikely, on average, to be able to render impartial jury service despite their assurances to the contrary." *Id.* at 142. If that standard is met, implied bias is "conclusively presumed." *Id.* (cleaned up).

Actual bias, by contrast, is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* (internal quotation omitted). Whereas implied bias is presumed from jurors' circumstances, "[a]ctual bias can be shown by the express admission of the juror…of a state of mind prejudicial to a party's interest, or it can be found by the court based upon the juror's voir dire answers." *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1260 (10th Cir. 1999) (internal citations omitted). Even if a juror initially claims she can be impartial, other statements can sufficiently undermine that claim to warrant a finding of bias. *United States v. Nell,* 526 F.2d 1223, 1228-29 (5th Cir. 1976).

Both implied and actual bias were exhibited by Juror 119.

## 2. Juror 119 was impliedly biased.

Defense counsel asserted an implied bias challenge to Juror 119, arguing her "personal experience and expertise" reviewing and implementing death sentences in China made it "inappropriate" for her to serve. (App.1700.) The district court denied that challenge, saying "[h]er past experience with Chinese law is just what it is"—thus misapprehending the issue as limited to her ability to apply the correct law instead of whether her experience predisposed her towards death. (App.2010.)

The district court erred by failing to consider the impact of Juror 119's experience. Her time reviewing and carrying out death sentences in 1980s China created an impermissible risk that she could not meaningfully consider life imprisonment as an alternative. That risk was confirmed by her voir dire statements implicitly identifying with the Chinese government—saying "we" passed the "harsh [death penalty] law"—her belief that her background would "help [her]" as a juror, her statement that an aggressive death penalty is essential to combat mass shootings, her agreement that life imprisonment is "not

sufficient" for murder, and her disdain for murderers living in prison at taxpayer expense. (App.1679, 1688, 1693.)

### a. Implied bias can arise from employment and personal experience.

Disqualification of jurors for implied bias is "a rule so deeply embedded in the fabric of due process that everyone takes it for granted." *Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998). "Doubts regarding bias must be resolved against the juror." *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991). *See also United States v. Scott*, 854 F.2d 697, 700 (5th Cir. 1988) (same). Concerns about implied bias carry particular salience in capital cases, where the need for juror impartiality is at its peak. *McCorkle*, 248 F.2d at 8.

This Court recognized the relevance of juror testimony to implied bias in *Mitchell*, remanding for further voir dire into potentially bias-establishing facts regarding the juror's "degree of kinship with the prosecutor." *Mitchell*, 690 F.3d at 148. Other courts agree that jurors' voir dire statements can help establish implied bias—either by confirming bias or by revealing factual circumstances bearing on the implied bias inquiry. *Burton*, 948 F.2d at 1159; *United States v. Gonzalez*, 214 F.3d 1109, 1113 (9th Cir. 2000) (juror statements

showing "*lack* of impartiality may be relevant"); *Allen v. Mitchell*, 953 F.3d 858, 874 n.9 (6th Cir. 2020) (Moore, J., concurring) ("[a] juror's equivocal statements regarding her ability to be impartial" are relevant); *Nell*, 526 F.2d at 1230 (5th Cir. 1976).

The implied bias doctrine dates to the common law, which excluded jurors whose relationships to the parties or issues suggested they could not be impartial—even if they insisted they were. As Justice Marshall explained in 1807, "[t]he law suspects the relative [of a party] of partiality; suspects his mind to be under a bias, which will prevent his fairly hearing and fairly deciding on the testimony which may be offered to him." *United States v. Burr*, 25 F.Cas. 49, 50 (C.C.D.Va. 1807). Blackstone listed several other, analogous examples of implied bias. *United States v. Wood*, 299 U.S. 123, 138 (1936) (quoting 3 Bl.Com. 363) (*e.g.*, "that he is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him").

Employment relationships, specifically, can create implied bias. *See, e.g.*, *Block v. State*, 100 Ind. 357, 363 (Ind. 1885) ("A person sustaining close business relations with either of the parties" is disqualified). While English law did not require "absolute

disqualification of governmental employees…in criminal cases," *Wood*, 299 U.S. at 137, and merely being a police officer or witness's co-worker is not sufficient, *Mitchell*, 690 F.3d at 143, disqualification is appropriate in "extreme [employment-related] situations," such as when the juror is "an actual employee of the prosecuting agency" or "an employee of the very agency or department whose conduct or interests are at issue in the case." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1247 (10th Cir. 2016). *See also Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (implied bias would be justified by "a revelation that the juror is an actual employee of the prosecuting agency"); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122-23 (10th Cir. 1995) (juror was disqualified by stock ownership in, and wife's employment by, the defendant). This Court agreed with that rule in *Mitchell*, citing "employees of the prosecuting agency" as jurors properly subject to disqualification for implied bias. *Mitchell*, 690 F.3d at 149.[50]

---

[50] Several states' statutes also disqualify jurors employed by the prosecuting agency. *See* Idaho Code Ann. §19-2020(2); Minn. R. Crim. P. 26.02, subd. 5(1)(6); N.D. Cent. Code §29–17–36(2) (1991); Okla. Stat. tit. 22 §660(2) (West 1992); Or. Rev. Stat. tit. 14 §136.220(2) (1995); S.D. Codified. Laws Ann. §23A–20–13.1(4) (1999).

Even without a direct employment relationship with a party, one's profession may itself create implied bias in case-specific circumstances. In *McCoy v. Goldston*, 652 F.2d 654 (6th Cir. 1981), the Sixth Circuit remanded for an evidentiary hearing into a juror's failure to disclose in voir dire that her son was applying to be a probation officer, where the case involved a wrongful death charge against a policeman, expressly reserving the possibility that a juror's "employment as a probation officer might...be so prejudicial as to require [his] disqualification as a matter of law." *Id.* at 659. And this Circuit's standard for implied bias— whether "the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case," *Mitchell*, 690 F.3d at 142—is broad enough to accommodate case-specific situations where a juror's employment experience is such that the average person with that experience would be prejudiced with respect to the issues under consideration.

This Court has refused to establish a rigid category of implied bias based solely on jurors' employment relationship to testifying witnesses, *Mitchell*, 690 F.3d at 875, or "membership in an organization that adheres to a particular view," absent information about the jurors'

individual beliefs. *United States v. Salamone*, 800 F.2d 1216, 1218, 1226 (3d Cir. 1986) (jurors were improperly dismissed "solely on the basis of their affiliation with the National Rifle Association"). But it has recognized exclusion is appropriate when the juror's statements show the "challenged affiliation will 'prevent or substantially impair' [their] impartiality." *Id.* at 1226. It has held a juror's prior drug conviction sufficient to establish implied bias, where the juror stated he believed drugs should be legal. *United States v. Henderson*, 613 F. App'x 113, 115 (3d Cir. 2015). And in a prosecution for bribery of an IRS agent, this Court held the defendant entitled to question jurors on "past employment by the [prosecuting] agency" to elicit, *inter alia*, "possib[le]…lingering loyalty to the service." *United States v. Segal*, 534 F.2d 578, 581 (3d Cir. 1976).

Implied bias can also arise from emotionally-charged life experiences similar to the issues under consideration in the case. *See, e.g.*, *Eubanks*, 591 F.2d at 517 (juror disqualified from a drug trial where his own sons were in prison for heroin-related crimes); *Jackson v. United States,* 395 F.2d 615, 617-18 (D.C. Cir. 1968) (juror disqualified

where he was previously involved in a "love triangle" similar to the one at issue in the case.)

### b. Juror 119's experience created a likelihood of identification with the death penalty.

Like the employment-based prejudice this Court deemed biasing in *Segal*, Juror 119's status as a former Chinese government official implementing death sentences rendered her impliedly biased in favor of death. A reasonable former employee of a pro-death penalty government aiming to eliminate crime—who personally assisted executions—would feel both personally invested in that punishment and aligned with the government's pursuit of it. Indeed, that people are "prone to favor that side of a cause with which they identify themselves...emotionally is a fundamental fact of human character," *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *Smith*, 455 U.S. at 221-22 (O'Connor, J., concurring) (implied bias creates unconscious motivations).

Juror 119's voir dire statements—which are relevant to implied bias, *Burton*, 948 F.2d at 1159—confirm that she embraced the execution-prioritizing philosophy of the government for which she worked. Tacitly aligning herself with the Chinese government's 1983 decision to expand and expedite its death penalty, she said "*we* passed a

law to punish…very severe crime[] in [the] very harshest law."
(App.1688) (emphasis added). She spoke about the death penalty and
executions being essential to prevent mass shootings—the identical
offense in Bowers's case—and opined that failing to sentence
individuals to death gives them license to commit such shootings with
impunity. (App.1692) ("They just go ahead and randomly kill
somebody.") That was precisely the philosophy underlying China's 1983
anti-crime campaign: "when there is a choice to kill or not to kill, choose
to kill."[51]

Juror 119's embrace of China's 1983 death penalty policy was also
apparent from her statements about the inadequacy of life
imprisonment for murder. She said the present-day United States
suffers from the same out-of-control crime—and need for executions—
that she said warranted China's "harshest law" in the 1980s. Compare
App.1687-88 (China passed its 1983 law because society "[was] very
unsafe[]" with "a lot of…crim[e]" and people fighting "in the street")
with App.1687-88 (the United States today has "so many shooting[s]"

_____

[51] Trevaskes, "Killing Many," 137 (attributing the philosophy to
Deng Xiaoping, one of the Strike Hard campaign's proponents).

and "so many innocent people just killed for no reason.") Her

statements that American prisoners live "comfortably" in jail with air

conditioning—as opposed to "some kind of punishment" like "hard

labor"—and agreement that life imprisonment is "not sufficient"

because it burdens taxpayers and provides luxuries to prisoners—

confirm she did not view life imprisonment as a meaningful alternative.

(App.1692-93.)

> ### c. Juror 119's experience predisposed her to endorse executions over life imprisonment.

The risk of bias is compounded by Juror 119's history of direct

involvement with the execution process. As one former corrections

official described it, "[y]ou have to transform yourself into that person

that will take a life. Every time an execution was announced, it meant

that I had to prepare myself mentally to kill." Brief for Former

Corrections Officials as Amici Curiae Supporting Petitioner at 6,

*Bucklew v. Precythe*, No. 17-8151 (U.S. 2018). Certainly, the role of

participant in an execution carries a risk of "substantial emotional

involvement," *Mitchell*, 690 F.3d at 143—whether because traumatized

or by numbing oneself to the humanity of the person executed. At a

minimum, Juror 119's personal participation in executions exemplifies

the type of extraordinary, emotionally-charged life experience that warrants disqualification. Approving and carrying out executions mapped identically onto the issue she was charged with deciding at Bowers's trial: whether he should be executed. Just as courts have found implied bias based on jurors' experiences of domestic abuse in a trial involving such abuse, *Burton*, 948 F.2d at 1158-59, or based on jurors' sons' heroin addiction when the trial involved such addiction, *Eubanks,* 591 F.2d at 517, Juror 119's personal involvement with executing individuals carried an unacceptable potential for substantial emotional involvement in the life-or-death issue here.

> ### d. Juror 119's experience created a risk she would compare Bowers's case with others.

Juror 119's review of specific death sentences also creates a risk that she mentally referenced those crimes as comparison points—consciously or not—in deciding Bowers's fate. The fact that she "confirm[ed]" the death penalty in a case with a single murder victim—that of the man who "rudely killed his girlfriend"—could easily have predisposed her to find death even more appropriate in Bowers's case by comparison, given the far greater number of victims. (App.1689.) She may have made similar comparisons based on any number of additional

factors. That her unit disapproved death in certain other cases does not suggest she could impartially consider life imprisonment as a penalty for murder, as China's 1980s death penalty permitted execution for crimes not even eligible for the death penalty under United States law, like engaging in a serious group fight. (App.1688.)

### e. Juror 119's failure to list her experience on her questionnaire further indicates bias.

Juror 119's failure to mention her employment in China on her questionnaire—despite numerous questions calling for that information—also suggests bias. "Both the juror's dishonesty and her motivation for that dishonesty may cast doubt upon her impartiality." *Sampson*, 724 F.3d at 164.

The questionnaire clearly asked about prior employment and involvement in the legal profession—yet she never mentioned her own role in administering China's death penalty at all. One question asked for "previous jobs," and Juror 119 listed only her post-1986 work as a paralegal in the United States. (App.14177.) Another question asked for any "work experience" in the "law/legal field," and she again omitted her work as a lawyer in China—despite mentioning she had attended "law school" there. (App.14179.) Her apparent reluctance to list her role

168

in China's death penalty system raises questions about its impact on her fitness to serve as a juror and her fitness period. *Cf. Johnson*, 948 F.2d at 1159 (juror "dishonesty, of itself, is evidence of bias.")

### f. Juror 119 may have discussed her experiences with other jurors.

Still further risk of prejudice flows from the possibility that Juror 119 talked with other jurors about her experience reviewing death sentences and helping carry out executions in China, or how those experiences supported the need for a death sentence in Bowers's case. Courts have repeatedly recognized the danger from biased jurors influencing the jury pool. *See, e.g.*, *Oswald v. Bertrand,* 374 F.3d 475, 480-81 (7th Cir. 2004) (jurors' violation of instruction not to discuss the case could have created impermissible bias among multiple jurors); *Stouffer v. Trammell*, 738 F.3d 1205, 1219 (10th Cir. 2013) (remanding for a hearing into, *inter alia*, "whether other jurors were aware of" one juror's improper communications about the trial); *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) (district court abused its discretion in failing to order a hearing into what information dismissed juror imparted to others). Juror 119's expressed belief that her legal training would "help [her]" understand the law beyond the "extent of

the regular person['s understanding]" suggests she may have felt

empowered to share her views with others on the jury. (App.1679.)

*    *    *

Given that guilt was largely undisputed in this case, Juror 119's

primary role was to determine whether Bowers would live or die. As to

that question, due process "insists on the most impartial tribunal the

reasonable needs of society will permit," *McCorkle*, 248 F.2d at 8. A jury

that includes a former official of a political regime that used the

"harshest law" (App.1688) and widespread executions to enforce social

order—and who personally approved and assisted those executions—

falls far short of that requirement. At a minimum, serious doubts exist

as to whether someone with such experience could impartially

administer the death penalty: doubts that must be resolved against the

juror's participation. *Burton*, 948 F.2d at 1158 ("Doubts regarding bias

must be resolved against the juror."). Juror 119 should have been

excused for implied bias, and her presence on Bowers's jury warrants

vacatur of his death sentences.

### 3. Juror 119 was actually biased.

In addition to the implied bias created by Juror 119's experience approving and implementing death sentences, her voir dire statements should have disqualified her for actual bias.

In assessing actual bias, the key question is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount,* 467 U.S. 1025, 1036 (1984). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (internal quotation omitted). Juror bias "can always be presumed" when the juror makes a statement of partiality without subsequent rehabilitation or assurances that she can be fair. *Miller v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004).

But an express admission of bias is not required, and jurors' claims of impartiality are not dispositive. "Although "[b]ias can be revealed by a juror's express admission of that fact,…more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *Gonzalez*, 214

F.3d at 1111-12 (internal quotation omitted). Even when a juror says, "I think I can be fair," disqualification is still appropriate if she continues to equivocate or express doubt. *Miller*, 385 F.3d at 668-69 (juror was actually biased, despite saying "I think I could be fair," where she initially said she would be "partial" to an acquaintance witness and continued to express "feelings about" her).[52] *See also Nell*, 526 F.2d at 1230 (further questioning should have been conducted into juror's bias, even though "he did say on several occasions that he believed he could be impartial," where circumstances suggested bias from his membership in a union that rivaled defendant's union).

Here, several of Juror 119's voir dire statements—which she never retracted or said she could disregard—cast significant doubt on her questionnaire claims that she would consider all the evidence and not automatically vote for death.

---

[52] Of course, jurors' admissions of inability to be fair can also support a bias finding. *See, e.g.*, *United States v. Torres,* 128 F.3d 38, 44 (2d Cir. 1997) (finding bias where a potential juror said he could not be impartial when evaluating a drug dealer's testimony); *United States v. Nell,* 526 F.2d 1223, 1228–29 (5th Cir. 1976) (juror responded equivocally as to whether he could render a fair and impartial verdict).

### a. Statement that life sentences are not permanent

Multiple times during voir dire, Juror 119 expressed the view that life imprisonment is not truly life imprisonment, because the sentence can be "changed." She said, "I do see from some movie[s] and TV show[s], somebody has life in jail without parole, but actually after 20, 30, maybe 50 years, they do get out." (App.1693.) Reiterating this view, she said, "Sometimes after a couple times review, I saw they do get out so this is not. You put them in life, yeah. On the way, change. It's a change." (App.1693.)

After a discussion with defense counsel about whether life imprisonment might be acceptable for persons who can be "changed," Juror 119 independently returned to the theme that life sentences are not necessarily permanent because they, too, can be changed. Using the same language she used to describe her time in an "office" reviewing death sentences in China, she said, "[s]ome office come here review the case, review the case. Later on, they let them go out. Maybe that person was changed so they let them go out." (App.1695.)

Juror 119 never backed away from this view that life sentences are not permanent. To the contrary, when defense counsel asked her

whether she could accept the judge's instruction that "if you sentence the defendant to life imprisonment that he's never going to get out"—or would instead still believe "in the back of your mind" that he would someday be released—Juror 119 equivocated by saying, "I cannot make [a] decision until I see the specific case." (App.1695-96.)

Juror 119's multiple unqualified, unretracted statements of belief that a life sentence would not actually be a life sentence, because it could be "change[d]" and the defendant might be allowed to "go out," reveal bias in favor of the death penalty as the only way to avoid the defendant's release. She never said she would be able to set that belief aside; indeed, she expressly denied that she would do so. (App.1695-96) ("I cannot make [a] decision.") The court's general follow-up admonition that she would have to follow American law and court instructions was inadequate; the court never actually *asked* Juror 119 whether she could follow the law, and—even if it had—the court's statements about following the law overall were too general to address her views about release from life sentences specifically. (App.1696-97.) *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992) ("general questions of fairness and impartiality" are insufficient because they "leav[e] the specific concern

unprobed.") Because her multiple statements of partiality were never corrected, the court should have granted the defense's motion to strike her for cause. *See Miller*, 385 F.3d at 675 (disqualification appropriate where neither the court nor counsel "ask[ed] whether she could lay aside [her feelings] and render a verdict based on the evidence presented in court.") (cleaned up).

> **b.** **Statement that life imprisonment is insufficient because prisoners live luxuriously and burden taxpayers**

Juror 119 further demonstrated bias against life imprisonment, and in favor of death, when she agreed with defense counsel that life imprisonment is not "sufficient" for murderers, that life-sentenced inmates are "a burden on us tax-wise," and they live in "nice conditions," and said life imprisonment is not "some sort of punishment" like the hard labor utilized in other countries, and that American prisoners live "comfortably" with air conditioning. (App.1692-93.) She also connected this point to Pennsylvania specifically, decrying the comfortably air-conditioned existence of prisoners in Allegheny County. (App.1692-93.) She never retracted those statements or said she could disregard them. Though she claimed earlier in voir dire that she would

consider all of the evidence, and denied she would automatically impose death, her repeated statements that life imprisonment was not sufficient and did not amount to real punishment reveal bias that—at a minimum—the court should have pursued or asked her to explain.

But it never did. Its general declarative statement to Juror 119 that she would have to follow American law, and its conclusion that her "experience with Chinese law" did not "impair[] her" said nothing about her personal views about life imprisonment being too comfortable or inadequate to punish murder. (App.2010.) By viewing the issue as merely whether she could apply the correct legal rules, the court never grappled with Juror 119's expressed belief that life imprisonment was not a real "punishment" for murder at all. Where a juror never "affirmatively state[s] that she c[an] be impartial"—which Juror 119 never did nor was asked to do—there is no reason for confidence that she will "'lay aside' her biases or prejudicial personal experiences and render a fair or impartial verdict." *United States v. Kechedzian*, 902 F.3d 1023, 1029 (9th Cir. 2018).

### c. Statements that 50 years old is too old for a life sentence

Juror 119 also indicated she would not be able to impartially adjudicate the penalty decision as to Bowers himself, because she believed he was too old to be an appropriate candidate for life imprisonment. When asked if life imprisonment could ever be an adequate punishment for someone "proven guilty of intentional premeditated murder, [of] multiple innocent victims in a place of worship and no legal excuse," Juror 119 indicated it might be adequate if "life in prison can change him." (App.1694.) But she said some people are too old to change: "[f]or my personal opinion, I think maybe 20 some years old still can change. 50, 60, it's too old to be changed." (App.1694-95.) Bowers, who was 51 years old when trial began, fell into the latter category in Juror 119's dichotomy, making him—in her view—"too old to be changed," and too old to qualify as a person who, in her view, might potentially be an appropriate candidate for life imprisonment if convicted of intentional premeditated murder of innocent victims. She never disavowed or contradicted this point of view.

\* \* \*

For all these reasons, Juror 119 was not only impliedly, but actually, biased. Her presence on Bowers's jury warrants vacatur of his death sentence.

### 4. At a minimum, remand is warranted for further consideration of the bias issue.

Even if this Court does not believe implied or actual bias is established on the current record, it should remand for further proceedings due to the trial court's failure meaningfully to address bias.

"[W]hen a defendant is trying to prove presumed bias, the court has the duty to develop the facts fully enough so that it can make an informed judgment on the question of 'actual' bias." *Fylling v. Royal Caribbean Cruises, Ltd.*, 91 F.4th 1371, 1377 (11th Cir. 2024); *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) ("A court confronted with a colorable claim of juror bias must undertake an investigation.") This Court has held voir dire inadequate where, for example, the trial court in a gun-possession case failed to question jurors who were members of the National Rifle Association about "the nature and extent" of their beliefs about firearm offenses. *Salamone*, 800 F.2d at 1226. It is also error for a district court to limit itself to "broad, vague questions"

instead of inquiring about the specific issues as to which bias may exist. *Nell*, 526 F.2d at 1229-30.

But that is what happened here. Confronted with Juror 119's prior personal participation in the death penalty, the court failed to ask about her views on that campaign or its propriety. When Juror 119 said she believed life sentences can be "changed" and that people over 50 cannot be rehabilitated, it failed to ask whether she could set those beliefs aside. Faced with her statement that imprisonment is not "some sort of punishment" and is "insufficient" for murder, it failed to follow up. Nor did it make any inquiry into her wholesale failure even to mention on her jury questionnaire that she had reviewed and carried out death sentences in China. It sidestepped all those issues with the a tautological statement that "[h]er past experience with Chinese law is just what it is" and "I don't think it impairs her." (App.2010.) It made no factual findings about what kind of work she did in China, how many executions she oversaw, what types of cases she reviewed, or anything else. Nor did it consider whether her statements about the death penalty indicated actual bias. The threadbare conclusion that Juror 119's experience with Chinese law "is what it is," like the trial court's

disqualification decision in *Salamone*, is thus "devoid of any foundation" about the juror's experience or ability to act impartially and undeserving of any deference. 800 F.2d at 1226.

That need not be the end of the discussion. "[W]hen confronting a colorable claim of implied juror bias on appeal, a reviewing court can remand for an evidentiary hearing to develop key facts necessary to decide the claim." *Mitchell*, 690 F.3d at 147. In *Mitchell*, a juror said in voir dire that she was a "close" cousin of the prosecutor, but not how close the relationship was. Because the district court "did not elicit sufficient information on the nature of the relationship," this Court "remand[ed] for additional factfinding." *Id*. at 140. *See also Conaway v. Polk*, 453 F.3d 567, 589 (4th Cir. 2006) (remanding for a hearing on juror bias involving juror's alleged relationship to co-defendant). Remand is warranted here to permit the district court to address the bias question it previously sidestepped.

## VI.   THE DISTRICT COURT FAILED TO CONDUCT STEP THREE OF ITS *BATSON* ANALYSIS, WARRANTING REMAND.

### A.   Introduction

During voir dire, the government struck every African-American and the lone Hispanic person on Bowers's venire, leaving just one nonwhite person in the venire.[53] The defense lodged *Batson* challenges to each of the strikes and the government gave extensive facially non-discriminatory reasons. But the court then afforded the defense only 90 minutes to review the thousands of pages of jury selection records to rebut the government's proffered reasons for the strikes—even though that rebuttal required comparing juror evidence over weeks of voir dire. When defense counsel presented what they were able to gather during that brief timeframe, the district court denied the challenges without acknowledging any of the evidence from either side.

In his post-trial Rule 33 motion, Bowers asked the court to re-open the *Batson* hearing and presented a far more detailed comparative analysis of the government's strikes than had been possible pretrial.

---

[53] This was a woman who had overseen executions as an attorney for the Chinese government. *See* Point V, above.

The court denied Bowers's motion without addressing—indeed, barely acknowledging—the defense's evidence of pretext, while it insisted 90 minutes had been an adequate time for the defense to prepare its rebuttal on the day of the strikes.

The district court erred in two respects. First, it never engaged Bowers's evidence challenging the veracity of the government's reasons, as it was required to do. Second, by not engaging the evidence, the district court conflated steps two and three of *Batson*—converting the finding that the reasons for the strikes were facially neutral into a factual conclusion that there was no racial motivation for the strike. These procedural defects denied Bowers's Sixth Amendment right to a jury free from the taint of racial discrimination and leave this Court without an adequate record to review Bowers's *Batson* claim.

The Court should remand for the district court to review the evidence of racial motivation and decide the claims according to the process *Batson* requires.[54]

---

[54] Bowers raises this claim only as to the sentence-selection phase of his trial.

**B.     Standard of review**

This Court reviews a district court's determination of a *Batson*

challenge for clear error. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

**C.     Factual background**

**1.     The court denied the defense adequate time to rebut the government's proffered reasons for striking five of six people of color on the venire.**

In early March 2023, over 1,000 prospective jurors were

summoned to complete a twenty-six-page questionnaire. (DE894.)

During five weeks in April and May, the court, government, and defense

questioned potential jurors individually, which was recorded across 18

transcript volumes. This process yielded 69 prospective jurors, four of

whom were African-American—two women and two men—and a single

Hispanic woman. Voir dire concluded on May 17, 2023. The court

ordered the parties to exercise their strikes a week later, on Thursday,

May 25, 2023, with the intent that opening arguments would be made

the following Tuesday, May 30.[55] (App.5536.)

Before voir dire began, the parties agreed that litigating *Batson*

challenges would require a comparative juror analysis of the jury

---

[55] The following Monday, May 29, 2023, was Memorial Day.

selection record for the final venire (DE755-1:2), which constituted

thousands of pages of transcript and questionnaires.[56] On the day for

striking, the defense asked the court that—if they lodged any *Batson*

challenge and the court found their challenge made out a *prima facie*

case of discrimination—they be allowed overnight on Thursday, May 25,

to review the record and prepare a comparative analysis to rebut

whatever reasons the government gave for its strikes.[57] (DE1253:3.)

This would have afforded time the next day, Friday, for the court to

review all the evidence, decide any challenges and, if appropriate, swear

the jury, and still proceed to opening arguments as scheduled the

following Tuesday. Nonetheless, the court denied the request.

(App.5561.) Bowers's attorneys reduced their request to only "a few"

---

[56] The entire voir dire transcript comprised approximately 4,800 pages (*See* App. vol. III-XIII.) At a minimum, the defense needed to compare the voir dire of the twelve jurors the government accepted to that of the five jurors that were the subject of the *Batson* strikes. This alone, at an average of 25 voir dire pages per juror, would total approximately 425 pages.

[57] A similar procedure had been employed six months earlier in a federal capital case of similar magnitude. *See United States v. Saipov*, No. 17-cr-722 (S.D.N.Y.), DE653, 654, 656, 658 (allowing both sides overnight to prepare *Batson* challenges, two days to prepare reasons, and overnight to prepare rebuttal).

additional hours on that same day, but the court again refused. (App.5562.)

When the government struck every African-American person and the lone Hispanic person on the venire, the defense lodged *Batson* challenges to each of the strikes. Although the government had already had seven days since the close of voir dire to consider its strikes and reasons, the court nevertheless granted it twenty minutes to prepare its explanation. (App.5565.) The government then spent an hour, across thirty pages of transcript, stating its reasons. The court gave the defense only the ninety-minute lunch break to prepare its rebuttal, seemingly accepting the government's position that "there is no reason [its] arguments could not have been anticipated." (App.5596.)

During the 90-minute recess, the defense tried frenetically to review the voluminous, multi-volume voir dire record to assess the accuracy of the government's stated reasons for its strikes and compare the application of those reasons to non-stricken white jurors. But—where the government had taken an hour just to *state* its reasons—90 minutes was not nearly enough time to review thousands of pages and prepare a rebuttal. So, after the lunch break the lawyers renewed their

request for more time to review the record, even "an hour or two." (App.5594.)

Although this would not have delayed the start of trial, the court again denied the defense's request, saying it was "not possible." (App.5594-95.) The judge insisted that, because the defense had had the questionnaires since early March and the voir dire testimony was "in the can a week ago," there was "adequate time to prepare." (App.5561, 5596.) This ignored that there was no way the defense could have predicted the reasons the government would give for its strikes, whether those reasons also applied to non-stricken white jurors, or whether the government would misstate parts of the record in explaining its strikes.

Out of time, the defense proceeded to argue what rebuttal it had been able to hastily compile. It pointed out that the government's proffered reason for striking the Hispanic woman—that she gave tentative answers about her ability to vote for a death sentence— applied equally to two white women jurors the government accepted. (App.5604.) And while the government also claimed to have struck her because she ranked her death penalty perspectives a "3" on the

questionnaire ("10" being strongly in support of capital punishment), a white man the government accepted also ranked himself a "3," and nothing related to their ranking distinguished them. (App.5603.)

Regarding one of the African-American women whom the government also said it struck because of her self-ranking on the questionnaire (a "4"), the defense pointed out again that the government had accepted a white man who gave himself the same ranking.[58] The defense also showed that the government's characterization of that African-American woman's employment status misrepresented the record. (App.5605-06.)

As to the other African-American woman the government struck, the defense again argued that the government's justification for the strike—her self-ranking of "4"—applied equally to white men the government accepted. (App.5608-10.) The defense also pointed out that the government's characterization that she had "strong general opposition to the death penalty" misrepresented the record: she said she

---

[58] The government admitted that the only jurors that it accepted who ranked themselves as a "3" or "4" were two white men. (App.5580.)

was "moderately opposed" to the death penalty but fully willing to vote

for it if the evidence warranted. (App.5581, 5609.)

After a brief recess, the judge found the government's striking all

the African-Americans and lone Hispanic person "plainly" established a

*prima facie* case of discriminatory strikes and "raise[d] an alarm" in his

mind. (App.5616.) But it deemed the government's proffered reasons for

its strikes "more than adequate facially neutral bases" that "met its

burden in the second stage." It noted that *Batson* challenges did not

address a "juror's qualifications to serve", which suggested a

misunderstanding of the defense's arguments. (App.5616-17.) The

defense did not argue that jurors of color were wrongly struck despite

being capable of considering a death sentence, but that—where the

government claimed to have struck African-American and Hispanic

venirepersons based on their death penalty perspectives but accepted

white jurors with similar perspectives—this indicated the government's

reasons were pretextual.

Although the judge was "personally and profoundly disappointed"

at the government's removal of all the African-American and Hispanic

venirepeople, he denied Bowers's *Batson* challenges without substantive

explanation. Seeming to view as dispositive the fact that the government's stated reasons were racially neutral, the court did not engage in any decisional analysis or provide any reasoning why the defense's rebuttal arguments failed to establish pretext. It merely stated that it "understood and noted" the defense's arguments. The substantive ruling covered nine lines of transcript. (App.5616-17.)

2.   **Bowers's post-trial Rule 33 motion asked the court to reopen the *Batson* hearing based on extensive comparative analysis showing the government's stated reasons were pretext.**

After his trial, Bowers filed a Rule 33 motion that, *inter alia*, asked the court to reopen the *Batson* hearing.[59] (DE1595.) It presented a detailed analysis that compared the reasons the government proffered for striking the African-American and Hispanic venirepersons to the white jurors the government accepted and checked the government's representations of the record against the transcripts and questionnaires. This analysis demonstrated that most of the

---

[59] Bowers's motion expressly did *not* ask the court to reconsider its denial of his *Batson* challenges. Rather, it asked the court to reopen the hearing to review the entirety of the evidence and, as necessary, inquire further of the government. The motion did not request or presume the right to a new trial.

government's reasons for striking the venirepersons of color applied equally to white jurors the government accepted, and many relied on misstatements of the record. The defense's analysis also revealed marked disparities in the nature and number of questions posed to the African-American and Hispanic venire members as compared to the white jurors, as well as strikes for reasons that had disparate effect on African-American people.

a. **The government struck the African-American and Hispanic individuals for reasons that applied equally to white jurors it accepted.**

Bowers's motion to reopen the *Batson* hearing showed that several of the government's purported reasons for striking the African-American and Hispanic venirepersons applied equally to white venirepersons it accepted. For instance, the government said it struck one of the African-American women because of the "hesitation" and "inability" to impose the death penalty reflected in her questionnaire answers. (App.5582-84.) But, whereas the government questioned that juror several times about her questionnaire answers, it asked almost no questions at all of a white woman it accepted who indicated on her questionnaire that she questioned the utility of the death penalty

because it would not restore the victim's life and said the prospect of being on a capital jury made her hesitant to favor a death sentence. (App.4254-56.) Similarly, the government said it struck both African-American women on the venire because of their self-rankings on the questionnaire as a "4" in support for the death penalty (where "10" was the strongest support), but it did not strike a white man who also had ranked himself a "4" and served on the jury. (App.5579-80.)

The government said it struck the lone Hispanic person because her "background in neurobiology and psychology…would give her an undue influence in the jury room." (App.5570.) The woman had completed a bachelor's degree in psychology and cognitive neuroscience and was working as part of a psychological research study. But the government accepted a white woman who had a master's degree in forensic psychology and had worked for eight years with people with "emotional, [and] mental health concerns." (App.5117.)

One of the government's reasons for striking both African-American men on the venire was their young ages: 24 and 25. (App.5578; App.14041.) But the government accepted a white woman who was 23 years old. The government also said that it struck the

African-American men because their employment histories, with multiple jobs in a short span of years, indicated they would be unreliable. But the government accepted a white woman whose employment history was virtually identical. And the government said it struck one of the African-American men because he had had three criminal narcotics or firearm charges over six years. But the government accepted a white man who had been charged with multiple counts of possession and possession with intent to distribute cocaine and pleaded guilty to two counts of possession. (DE1596:35.)

> **b.    The government's stated nondiscriminatory reasons misrepresented the record.**

Bowers's motion to reopen also argued that the court, in stating its reasons for striking the African-American and Hispanic venirepersons, misrepresented the record of their questionnaire and voir dire statements. Whereas government counsel said it struck one of the African-American women because she was "strongly opposed" to the death penalty, that woman explained in voir dire that her questionnaire answer that the death penalty is "too final" addressed situations where the wrong person is convicted and later exonerated (not an issue in Bowers's case). (App.1888; App.5582.) Indeed, she explicitly said in voir

dire that she was "not totally against the death penalty", could decide a case on the facts, and could vote for a death sentence in Bowers's case if the facts warranted. (App.1881, 1891.)

The government again misrepresented the record when it said it struck the other African-American woman because she "got emotional *throughout* her questioning." (App.5587) (emphasis added.) This woman's voir dire was the day before the one-year anniversary of her cousin being randomly shot and killed, and being asked to discuss this understandably caused her to be emotional. However, the judge stated on the record that while she was "a *bit* emotional," she "composed herself and she plainly remained engaged." (App.3864) (emphasis added.)

The government also said it struck this woman because she made "inconsistent" statements about her employment situation: specifically, "that she was concerned about her employment, but…would not be stressed about finding a job." (App.5587.) This also misrepresented the record. The woman stated clearly that she had been laid off one week after completing the questionnaire, that she received a severance package and was collecting unemployment so had no concerns about

financial hardship, and was only concerned that if she were offered another position before the trial, she would have to immediately ask for time off or a delay for the trial. (App.3830-31.)

The government gave as a reason for striking one of the African-American men that he had said Bowers was "just a guy", which it characterized as "unclear where he stands on what the defendant did and…the seriousness" of the crime. (App.5591-92.) Here, again, the government mischaracterized the venireman's answer. When the court asked this man whether he would automatically vote for death or life, he answered that he would not "jump to a conclusion", but wanted to see the evidence and "formulate my own opinion" because all he knew at that point was that Bowers was "just a guy" and he needed to know more about him before he could "properly sentence him." (App.4026.)

The government also referred to the Hispanic venirewoman it struck as "personally overseeing a research program." (App.5571.) In fact, she never said on her questionnaire or in her voir dire answers that she was "overseeing"—or otherwise in charge of—the program.

### c.  The government engaged in racially-disparate voir dire questioning.

Bowers's Rule 33 motion also provided detailed evidence that the government's voir dire questioning was racially disparate. The government asked an average of 2.6 open-ended questions and 6.9 closed-ended questions and an average of 0.8 "commit" questions to the white venirepersons whom it accepted to serve on Bowers's jury.[60] It asked the white jurors whom it struck an average of twice as many questions: five open-ended, 13 closed-ended, and 1.6 "commit" questions.

However, the government asked the African-American and Hispanic venirepersons an average of 6.4 open-ended questions, two and a half times as many as the accepted white jurors. It also asked an average of 13.8 closed-ended questions of the venirepersons of color, twice as many as the jurors it accepted. And it asked an average of four "commit" questions to the African-American and Hispanic venirepersons, five times as many as the white jurors who were

---

[60]  "Commit" questions are closed-ended questions specifically directed to a venireperson's capacity to vote for a death sentence, *e.g.*, "Could you sign your name to a verdict sheet for death?"

accepted. The disparity was even more stark for the three women of color whom the government struck.[61] It asked them an average of nine open-ended questions, 14.3 closed-ended, and 6.3 "commit" questions— 3.5 times, two times, and almost eight times as many for the accepted jurors, all but one of whom were white.



The government asked one of the African-American women five times whether she could vote for death. By contrast, the government asked a white venirewoman only two questions *in total* even though she gave very equivocal answers about her perspective on the death penalty

---

[61] The women were all within the government's first seven strikes.

196

on her questionnaire. (App.4254.) Similarly, the government asked the other African-American venirewoman five questions about whether her cousin's being killed would affect her as a juror. But it did not ask a single question of an accepted white woman about whether having a close relative who was murdered by another family member would affect her if she served on the jury.[62] (App.2636-43.)

Furthermore, the government appeared to use its questioning to offend one of the African-American women and then use her response as a reason to strike her. The government questioned this African-American woman repeatedly on whether she understood the trial process and could vote for a death sentence. When she consistently answered in the affirmative, the government questioned her about a 50-year-old misdemeanor criminal record that turned out not to be hers. (App.1889-97, 13971-75.) The government then struck her because she appeared "offended or annoyed" during the questioning. (App.5585.)

---

[62] This woman had to be excused on the second day of trial because testimony about the violence of the offense evoked upsetting memories of the killing in her family.

### d. The government struck jurors for reasons that had a disparate effect on African-Americans.

Among the government's reasons for striking three of the four African-American venirepersons was that they gave an answer on their questionnaire that indicated doubts about the fairness of policing and criminal prosecutions. (App.5579, 5586, 14042-43.) In fact, recent events in Pittsburgh showed that African-American people in Pittsburgh experienced different treatment from police and local courts.[63] Because such experiences fall on disproportionately on African-Americans, they are the people most likely to be attuned to the

_____

[63] In 2023, the Pittsburgh Police reported that although African-Americans were 22% of the city's population, in 2022 they constituted 65% of the arrests, 42% of traffic stops, 82% of traffic frisks, and 85% of stop-and-frisks. City of Pittsburgh Department of Public Safety Bureau of Police 2022 Statistical Report, *available at* https://www.pittsburghpa.gov/files/assets/city/v/1/public-safety/documents/23097_2022_annual_report_draft_2023-10-23.pdf) (last visited Dec. 11, 2025).

   In 2020 an Allegheny County judge was reassigned and barred from hearing cases over allegations that he referred to an African-American juror as "Aunt Jemima" and spoke to at least one criminal defendant using derogatorily stereotypical African American speech. Mark Scolforo, *Judge Faces Ethics Charges Over Racist, Demeaning Comments*, WESA News (August 12, 2020), *available at* https://www.wesa.fm/identity-justice/2020-08-12/judge-faces-ethics-charges-over-racist-demeaning-comments (last visited Dec. 11, 2025).

disparity and to have perspectives informed by it. Thus, though this reason was race-neutral on its face, its effect plainly was not.

### 3. The court denied Bowers's motion to reopen the *Batson* hearing without discussing any of the comparative evidence he presented.

The court denied Bowers's Rule 33 motion. (App.387-413.) The judge went to lengths in denying the defense's argument that it had not provided enough time in the hearing for the defense to present the evidence contained in the motion. It stated that because the defense had all sixty-four of the jurors' questionnaires and all eighteen volumes of the voir dire transcript before the strike day, the attorneys did not need time to prepare their response to the government's proffered race-neutral reasons. This failed to appreciate that the defense lawyers could not learn the government's reasons for its strikes, and then immediately quote and cite those portions of the record that rebutted those reasons, without having committed numerous juror questionnaires and volumes of voir dire transcripts to memory.

The judge wrote that any assertion by Bowers that he was "caught off guard by the potential" that he may wish to raise a *Batson* challenge," would be "insincere, and more importantly, unsupported."

(App.400.) But Bowers had never claimed he was caught off guard by the opportunity to lodge a challenge. His complaint was about having the necessary time to properly litigate it. Similarly, the court said Bowers could "not possibly rely on argument [sic]" that he was unaware of the peremptory strike procedure the Court would utilize. (App.402.) But Bowers never make that argument either.

The court also questioned Bowers's request to reopen the *Batson* hearing as "unlikely to constitute an appropriate avenue of relief." (App.402.) This ignored the several decisions of courts of appeal— including this Court—remanding cases to trial courts for further assessment of the discriminatory intent of government peremptory strikes.[64]

Just as the court apparently misunderstood Bowers's argument regarding the need for time to review and analyze the record, and failed to recognize the availability of post-trial review, the court's substantive

---

[64] The court cited a decision issued by the Second Circuit 30 years ago, seemingly overlooking this Court's more recent opinion in *Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001), that relied on remands in federal direct appeals for further *Batson* development as support for its remand of a habeas for a *Batson* hearing.

denial of Bowers's motion seemed not to appreciate its duty to make a determination based on *all* the evidence at step three of a *Batson* decision. The court recited the information available to both parties (questionnaires and transcripts), reviewed in detail the government's reasons for its strikes, and then restated its step two finding that the reasons were race-neutral, without engaging or addressing the defense's rebuttal arguments at *Batson* step 3. The court simply referred to the government's reasons based on the struck venirepersons' death penalty perspectives—mistakenly treating the defense's arguments as addressing whether the jurors could have been struck for cause—instead of engaging the evidence that those reasons either also applied to white jurors the government accepted or relied on misrepresentations of the record. (App.405-07.) The court found that that the government's reasons were "credible" without ever addressing the evidence that the reasons were selectively applied to, or had a disparate impact on, venirepersons of color, or were the product of disparate voir dire. (App.408-10.)

Instead of deciding whether Bowers made a showing that merited reopening the *Batson* hearing as the motion sought, or even conducting

a proper *Batson* analysis that addressed and engaged the evidence, the court made its step-two finding its step-three decision, with the conclusory statement that Bowers did "not establish" that the government's reasons were "mere pretext for discrimination." (App.411.) It provided no acknowledgement, much less analysis, of any of the evidence in Bowers's motion to support its judgment save perfunctory statements that the accepted white jurors to whom Bowers compared the struck African-American and Hispanic jurors were "readily distinguishable" and that the government's voir dire was "in no way unduly disparate." (App.411.)

Bowers's case thus arrives before this Court with virtually no basis on which to assess the district court's denial of the *Batson* challenges.

**D. Trial courts deciding *Batson* challenges must engage all the evidence bearing on whether the government's strikes were discriminatory.**

*Batson* held that the government's "privilege" of striking jurors through peremptory challenges is "subject to the commands of the Equal Protection Clause." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). This overruled the Court's decision 20 years earlier in *Swain v.*

*Alabama*, 380 U.S. 202 (1965), that allowed race-based peremptory strikes but permitted defendants to challenge those strikes with detailed evidence of a prosecutor's history of using strikes to prevent African-American people from serving on juries. *Swain*, 380 U.S. at 227-28.

In keeping with *Swain*'s placement of the burden on defendants to show discriminatory intent, *Batson* required defendants to present some proof beyond mere allegation. *Batson*, 476 U.S. at 93. This could include the disproportionate use of strikes, a pattern of strikes, or the government's questions and statements during voir dire. *Batson*, 476 U.S. at 95-97. Trial courts must conduct a "sensitive inquiry" into the "circumstantial and direct evidence of intent…." *Id.* at 93 (quotation omitted). Thus, *Batson* requires courts to consider both the government's reasons *and* the defense's evidence challenging those reasons. At stake is not only the defendant's due process right to a trial free of racial discrimination, but also citizens' right not to be excluded because of race from the "significant opportunity…to participate in the democratic process" that jury service represents. *Powers v. Ohio*, 499 U.S. 400, 407 (1991).

The Supreme Court's post-*Batson* habeas jurisprudence explicates the analysis courts must undertake in deciding *Batson* challenges and identifies additional types of evidence defendants can offer to show discriminatory intent. Defendants can point to statistical disparities in the government's removal of jurors of color and acceptance of white jurors (*Flowers v. Mississippi*, 588 U.S. 284, 305 (2019); *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)); disparate voir dire questioning by the government, in substance or quantity (*Flowers*, 588 U.S at 308-09; *Miller-El*, 545 U.S. at 255-63); comparison between struck and accepted jurors (*Flowers*, 588 U.S at 311; *Snyder*, 552 U.S. at 483); shifting explanations or misrepresentations of the record (*Foster v. Chatman*, 578 U.S. 488, 512 (2016)); and disparate investigation of venirepersons (*Flowers*, 588 U.S. at 309).

Courts deciding *Batson* challenges must consult "all of the circumstances that bear upon the issue of racial animosity," *Snyder*, 552 U.S. at 478, and consider the reasons "in light of the [parties'] arguments." *Flowers*, 588 U.S. at 302. Courts cannot ignore "lopsided" questioning by which a prosecutor can "try to find some pretextual reason…to [later] justify what is in reality a racially motivated strike"

and that produces "a record that says little about white prospective jurors" and is therefore "resistant" to comparisons between stricken and accepted jurors. *Flowers*, 588 U.S. at 310.

A trial court's *Batson* decision must also exhibit "some engagement with the evidence" and examine the prosecutor's "proffered reasons for striking minority jurors against the evidence presented by the defendant and/or the weaknesses in the prosecutor's reasons." *Riley v. Taylor*, 277 F.3d 261, 288-89 (3d Cir. 2001). Where a trial court fails to examine "all of the evidence" to assess whether the prosecution's proffered race-neutral reasons are pretextual, it "fail[s] to engage in the required analysis." *Coombs v. Diguglielmo*, 616 F.3d 255, 262 (3d Cir. 2010).

**E. Because the district court denied Bowers sufficient time to review the record for rebuttal and never engaged the evidence, remand is required.**

The district court's determination of Bowers's *Batson* challenges was deficient in every sense. After the court unreasonably denied Bowers sufficient time to review the record to respond to the government's proffered reasons for its strikes, the court twice failed to engage with—or even acknowledge—the comparative analysis evidence

Bowers submitted at the *Batson* hearing and in post-trial proceedings. Consequently, there is virtually no record of the district court's reasoning for denying Bowers's challenges for this Court to review, nor will there be a record for any subsequent proceedings wherein the *Batson* issue may be raised. Because that record is essential for this Court's review of the district court's decision, and for post-conviction litigation, the Court should remand for a proper *Batson* hearing and decision.

1. **The district court denied Bowers adequate time pretrial to review the record to produce a comparative analysis of the government's strikes.**

The district court abused its discretion when it refused to grant the defense any more than 90 minutes to prepare its response to reasons the government took an hour just to explain.

Whether to grant a continuance is a matter traditionally within the discretion of a trial judge. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Such discretion must consider "the efficient administration of criminal justice" and the "accused's rights, including an adequate opportunity to prepare a defense." *United States v. Kikumura*, 947 F.2d 72, 78 (3d Cir. 1991). To determine whether a court has abused its

discretion by denying a party's request for additional time, a reviewing court must look to "the circumstances present in every case, particularly the reasons presented…at the time [of] the request." *Ungar*, 376 U.S. at 589.

In each of the Supreme Court decisions applying *Batson*—all of which were capital cases—the Court undertook a detailed analysis of the record that included measuring statistics of the strikes, closely reviewing voir dire transcripts to determine the accuracy of the prosecution's reasons, and studying patterns in the government's questioning—including which venirepersons were asked which questions, which venirepersons were asked more or fewer questions, and for which venirepersons the government followed up on questionnaire answers. Under this precedent, rebutting the government's proffered reasons required that Bowers's attorneys, at a minimum:

- Read each struck juror's voir dire and questionnaire to verify the government's representation of their answers.

- Review the questionnaire and voir dire transcript of every accepted juror to determine whether any of the facially race-neutral reasons for striking the African-American and Hispanic venire members—age, employment history,

criminal history, perspective on capital punishment—also
applied to accepted white jurors.

- Review the questionnaires and voir dire transcript of every
accepted juror to assess disparity in the government's
inquiry into questionnaire answers between the African-
American and Hispanic jurors who were struck and the
white jurors who were accepted (*e.g.*, the study and work
experience in psychology that was inquired about for the
Hispanic venirewoman but not for the accepted white
woman juror).

To conduct this review required analyzing hundreds or thousands

of pages of voir dire (from multiple weeks), to address the specific

asserted nondiscriminatory reasons the prosecution proffered for

striking every African-American and Hispanic venireperson—a process

that could not conceivably be possible in 90 minutes.

The defense asked only for overnight to complete its review, a

reasonable timeframe under the circumstances. *See United States v.*

*Finley*, 2014 WL 3056022, No. 12-16J (W.D. Pa., July 3, 2014) (granting

three-month continuance where defense counsel presented detailed

justification and proposed a finite timeline). Had the court allowed

Bowers overnight to review the record, it could still have adhered to its

intended schedule to start the trial. *Accord Ungar* at 589 ("a myopic

insistence upon expeditiousness in the face of a justifiable request for

delay can render the right to defend with counsel an empty formality");

*Norde v. Keane*, 294 F.3d 401, 414 (2d Cir. 2002) (refusal to grant brief

adjournment during jury selection for attorney to consult with client

removed from courtroom "amounted to an unreasoning and arbitrary

insistence upon expeditiousness"). Not only could the court have stayed

on schedule, but granting Bowers's request would have produced in the

first instance an adequate record for appellate and post-conviction

review. Instead, Bowers was compelled to present his comparative

analysis for the first time in his post-trial motion. Because the court did

not recognize its duty to scrutinize the government's stated

nondiscriminatory reasons—and address the defense's responses to

those reasons—it failed to appreciate how much time was needed for

the defense to marshal that evidence.

**2.     The district court's order denying Bowers's post-trial
         motion merely recited and affirmed the government's
         reasons, without engaging—and barely
         acknowledging—the comparative analysis evidence
         challenging those reasons' veracity.**

The court's order denying Bowers's motion to reopen the *Batson*

hearing effectively repeated step two of the process without ever

conducting step three. It recited the government's reasons for its strikes

and its judgment that those reasons were race-neutral. (App.407.) But

the court then simply transferred its finding of race-neutrality to the step-three inquiry—credibility and discriminatory intent—without ever addressing the defense evidence that should have borne on that final determination. Step three required the court to engage the evidence, including the government's stated reasons *and* the defense's comparative analysis—something it did not do.

The Supreme Court and this Court have repeatedly made clear that trial courts deciding *Batson* challenges must consider and engage the evidence bearing on whether a peremptory strike was motivated by discriminatory intent. Although judges need not "comment explicitly on every piece of evidence in the record," a court's step three analysis requires "something more than a terse, abrupt, comment that the prosecutor has satisfied *Batson*." *Riley*, 277 F.3d at 289, 291 (cleaned up). The three stages for a *Batson* challenge and the judge's decision are intended to allow trial courts to weigh and decide a *Batson* challenge in a "meaningful, rather than a *pro forma*, manner." *Coombs*, 616 F.3d at 262.

As set forth above, Bowers provided evidence in every category the Supreme Court has identified as tending to show the government's

strikes were motivated, at least in part, by race. The government struck 85% of the people of color. *United States v. Savage*, 970 F.3d 217, 272 (3d Cir. 2020) (citing 91% strike rate in *Miller-El* and 83% in *Flowers* as supporting discriminatory intent). Bowers proved multiple instances where the government's reasons for striking the five venirepersons of color applied equally to white jurors it accepted. *Miller-El*, 545 U.S. at 241. The evidence also demonstrated that the government mischaracterized the voir dire answers of each of the struck venirepersons of color, particularly as to their willingness to vote for a sentence of death.[65] *Miller-El*, 545 U.S. at 244. The defense also showed that the government investigated and made an issue of African-American venirepersons' criminal histories but not those of white jurors it accepted, *Flowers* at 309, and that some of the government's reasons lacked support in the record. And Bowers provided empirical evidence of a racially disparate pattern in the government's voir dire questioning,

_____

[65] The court's order mistakenly called this evidence "wad[ing] into the issue of whether the Government could establish that the juror at issue should be stricken for cause." (App.407.) But Bowers's arguments were directed at the government's *misrepresentation* of the stricken venirepersons' death penalty perspectives.

*Flowers* at 307, and that one of the government's race-neutral reasons had a racially disparate impact.

But the court's only acknowledgement of Bowers's extensive comparative analysis was its unexplained—and unsupported—statement that the government's questioning was "in no way unduly disparate" and that the proffered comparison jurors were "readily distinguishable." (App.411.)

The order did not explain how the comparative jurors could be distinguished or why the comparisons were insufficient. Without any discussion of Bowers's evidence, it is not clear that the court's ruling comports with the Supreme Court's rule that a defendant is "not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent." *Flowers*, at 311-12 (emphasis in original); *see also Miller-El*, 545 U.S. at 248. The judge's perfunctory conclusion also violates this Court's holding in *Jones v. Ryan*, 987 F.2d 960 (3d Cir. 1993), that "the presence of white jurors who possess[] the same characteristic" for which the prosecutor struck African-American jurors, without any explanation of what distinguished

them, "indicates that [the] explanation was pretextual." *Jones*, 987 F.2d at 973.

The court's only specific reference to any of Bowers's evidence was its unsupported conclusion that the government's questioning was "in no way unduly disparate" or "suggestive of discriminatory motive." (App.411.) But a defendant is not required to show "unduly" disparate questioning (a measure the district court did not define). Indeed, *Flowers* and *Miller-El* both hold that mere "disparate questioning" is a sufficient indicator of discriminatory motive. *Flowers* at 302; *Miller-El* at 255-63; *Batson* at 97. The empirical numbers illustrated above show indisputably that the questioning was disparate.

The judge also failed to address the disparate impact of the government's reliance on African-American jurors' skepticism about the fairness of policing and prosecutions. That ignored this Court's instruction that when the government offers a race-neutral reason for a strike that "would have a disparate impact on a particular racial group," a trial judge should exercise "special scrutiny" to determine whether "intentional discrimination...underlies the government's peremptory challenge" because the existence of a disparate impact on a

particular racial group may "constitute very probative circumstantial evidence of racial animus." *United States v. Uwaezhoke*, 995 F.2d 388, 393 & n.4 (3d Cir. 1993). Far from special scrutiny, the judge credited the reason without any scrutiny at all.

The court's order also violated this Court's holding that a strike "based *solely* on intuition is insufficient." *United States v. Rodriguez*, 178 F. App'x 152, 156 (3d Cir. 2006). The government said it struck one of the African-American women because she "would have a lot of influence in the jury room" because she carried herself with "sort of regal elegance and grace…and her general sort of…gravitas."[66] (App.5584.) Yet the court not only accepted the government's reason, but endorsed it finding that the woman "presented as erudite, worldly, and astute," for which reason the government "might be warranted in

---

[66] As Bowers's motion noted (DE1595), this type of comment about African-American individuals' speech or deportment suggests implicit bias by the prosecutor. Such comments encompass "a whole range of cultural cues—dress, bearing, education" to describe African-American people around whom white people "can be comfortable,…who not only speak[] white America's language but [are] fluent in its body language as well." Eugene Robinson, *An Inarticulate Kickoff*, The Washington Post, Feb. 1, 2007; *see also* Russell K. Robinson*, Perceptual Segregation*, 108 COLUM. L. REV. 1093, 1162-63 (2008).

concluding that she *might* prove an influential figure in the jury room."

(App.409) (emphasis added).

The district court's ruling fell well short of the engagement that

this Court and the Supreme Court require for *Batson* decisions. It gave

no more than a "terse, abrupt, comment" that the government's reasons

were race-neutral and credible without examining "all of the evidence"

to determine whether the government's proffered race-neutral

explanations were pretextual.

Where trial courts fail to engage the evidence bearing on a *Batson*

challenge, this Court has adopted the reasoning of other circuits to

remand the case for proper analysis. *Riley*, 277 F.3d at 289-90 (quoting

*United States v. Harris*, 192 F.3d 580 (6th Cir. 1999), and *United States*

*v. Hill*, 146 F.3d 337 (6th Cir. 1998)); *Coombs*, 616 F.3d at 265;

*Hardcastle v. Horn*, 368 F.3d 246, 262 (3d Cir. 2004). That this Court

ordered remand in habeas cases, years after jury selection, only bolsters

Bowers's claim here that remand is warranted on direct appeal.

Other circuits also have ordered remands in both the direct appeal

and habeas posture when courts inadequately explained their *Batson*

determinations. In *United States v. Bontzolakes*, 536 F. App'x. 41 (2d

Cir. 2013), the Second Circuit held the district court's "terse acceptances" of the government's justifications "left unclear whether it actually performed the determination required at the third step of *Batson*," and remanded the case to "reconstruct the prosecutor's state of mind at the time of jury selection." *Bontzolakes*, 536 F. App'x at 44. In *United States v. Tomlinson*, 764 F.3d 535 (6th Cir. 2014), where the district court had only ruled on the last of the defendant's five *Batson* challenges, the Sixth Circuit remanded the case for a hearing on all five of the strikes. In *United States v. McAllister*, 693 F.3d 572 (6th Cir. 2012), that same court remanded the case because the district court improperly truncated the *Batson* analysis and failed to explicitly delineate each step. The district court, the appellate panel ruled, "did exactly what this court has repeatedly instructed against doing: perfunctorily accepting the prosecutor's race-neutral explanation and combining steps two and three." *McAllister*, 693 F.3d at 581.

Likewise, in *United States v. Rutledge*, 648 F.3d 555 (7th Cir. 2011) the Seventh Circuit remanded the case for further proceedings on a *Batson* challenge where the district court had simply found the government's reasons were race neutral and denied the challenge,

noting "when we confront an evidentiary gap at step three, the ultimate *Batson* issue cannot be resolved without a remand." *Rutledge*, 648 F.3d at 560. That circuit did the same in *United States v. Taylor*, 277 F. App'x. 610 (7th Cir. 2008), where the court of appeals found that further questioning was necessary because the government's race-neutral reason for its strike "applied equally to a white juror" not stricken. "It is apparent," the panel found, "that an evidentiary hearing is needed for the court to properly develop the record and…allow the court to question the prosecutor as to why the government eliminated" the African-American juror but not the similarly-situated white jurors. *Taylor*, 277 F. App'x. at 612–13.

Bowers's case is the same. The government struck all but one of the people of color on the venire, and the district court twice accepted its reasons without inquiry, analysis, or engaging the evidence the defense presented. This Court should remand.

### 3. Remand is necessary where Bowers presented substantial evidence of pretext.

The Supreme Court's *Batson* decisions demonstrate that step three is a wholly-different, more nuanced inquiry than step two. Whereas step two is an objective determination whether the reason for

a strike is race-neutral, in step three a court must determine whether a race-neutral reason is pretext. A finding that any one of the prosecution's proffered reasons is pretext must inform a court's assessment of the other reasons. *Snyder*, 552 U.S. at 485; *Savage*, 970 F.3d at 271-72. In turn, a finding of discriminatory motive as to one juror must guide a court's assessment of other challenged strikes. *Flowers*, 588 U.S. at 314-16; *Snyder*, 552 U.S. at 478; *Miller-El*, 545 U.S. at 265-66.

Bowers demonstrated that the government struck African-American and Hispanic jurors for reasons that applied equally to accepted white jurors, misrepresented the record in stating its reasons, disparately questioned African-American and Hispanic venirepersons, relied on reasons likely to have a disparate impact on African-Americans, and used gut instinct as a reason. The court was required to address Bowers's showing in determining whether each strike was in any way based on the venire persons' race. This Court should adhere to the procedure it has affirmed in other cases and remand to the district court for further proceedings on Bowers's *Batson* challenges.

# VII. THE COURT WRONGLY STRUCK, AS SUBSTANTIALLY IMPAIRED, TWO VENIREPERSONS WHO SAID THEY COULD APPLY DEATH-PENALTY LAW.

## A. Introduction

Jurors 159 and 164 both indicated on their questionnaires that they were generally opposed to capital punishment. However, in voir dire they both repeatedly said they could follow the procedures explained by the court and vote to impose a death sentence if the evidence warranted. Nevertheless, the court granted the government's motion to strike them for cause. In doing so, it abused its discretion and violated Bowers's constitutional right to a trial before an impartial jury. This Court should remand Bowers's case for a new sentencing before a constitutionally-empaneled jury.

## B. Standard of review

The Court reviews the dismissal of a juror for cause for abuse of discretion, "inquiring whether the trial court's findings are 'fairly supported by the record.'" *United States v. Fell*, 531 F.3d 197, 209 (2d Cir. 2008) (cleaned up.) It may reverse if the record "discloses no basis for a finding of substantial impairment." *Uttecht v. Brown*, 551 U.S. 1, 20 (2007). The improper exclusion for cause of even one venireperson

requires relief. *Szuchon*, 273 F.3d at 329 (cleaned up).

## C. Jurors opposed to the death penalty may serve so long as they are able to follow sentencing law.

No defendant can constitutionally be executed if the jury that imposed his sentence was chosen by dismissing venirepersons "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). This protection is grounded in defendants' Sixth Amendment right to a fair and impartial jury, *Szuchon*, 273 F.3d at 327, which requires that capital juries not be "tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Brown*, 551 U.S. at 9.

"[T]he quest is for jurors who will conscientiously apply the law and find the facts," and capital jurors need not support the death penalty. *Wainwright v. Witt*, 469 U.S. 412, 423 (1985). They may have reservations, or even "firmly believe that the death penalty is unjust," and still be qualified to serve, "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). The "central inquiry" is "whether the juror holds a particular belief or opinion that

will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *United States v. Salamone*, 800 F.2d 1216, 1226 (3d Cir. 1986) (cleaned up). Such impairment exists when the juror's views "create an obstacle to [their] impartial consideration of the law and the facts." *Fell*, 531 F.3d at 210 (cleaned up).

**D. The court abused its discretion by striking two jurors despite their stated ability to follow the law.**

**1. Juror 159 said she could vote to impose death if warranted.**

Juror 159 was an African-American woman whose questionnaire answers indicated mild opposition to capital punishment but the ability to impose a death sentence in a case like Bowers's if the facts warranted. She circled 4 and 5 on question 73, (a numerical ranking of "1" being "strongly opposed") and chose "e" on question 74 (indicating she was generally opposed to the death penalty but could vote for a death sentence in a case like Bowers's). (App.2108-09.) Asked how she feels about the frequency with which death sentences are imposed, she selected "about right." (App.2120.)

In voir dire, Juror 159 said she did not "believe in the death penalty," believed "no one should kill," and believed imposing a death sentence would violate that tenet. (App.2107-09.) But she acknowledged that "thou shalt not kill" yielded in circumstances of war (App.2118), and that, "if you're going by the law," a person may "have to make a choice." (App.2109.)

Juror 159 also affirmed her capacity to follow the law if selected for Bowers's jury, and to impose a death sentence if the evidence warranted. She denied that she would automatically vote against a death sentence, because "it definitely depends on the facts of the case." (App.2120.) She thought she could "vote for a death sentence" if "the aggravating circumstances sufficiently outweighed the mitigating circumstances" and she "believed death was appropriate." (App.2125.) She averred that she "believed" she could "give real meaningful consideration to both [sentencing] options." (App.2127.)

She was particularly strong on her ability to follow the court's instructions. When the judge asked whether, when she said "I think I could", she meant "Yes, I can" or "I really hope that I could" (App.2130), Juror 159 responded, "I believe I could do what was put before me….[I]f

I have specific requirements that I have to follow, I think I'm pretty good with that." (App.2131.) And when defense counsel asked her if she could consider both sentencing options, she unequivocally said "yes." (App.2128.)

The government moved to strike Juror 159 as "substantially impaired" by "deeply held moral and religious beliefs." (App.2135.) It was "concern[ed]" about her inability to think up a "heinous case" where death would be appropriate and deemed her "equivocal" about whether "she would be more influenced by her personal beliefs than the law." (App.2135.) Juror 159's expressions of uncertainty, the government asserted, "outweigh[ed] the few times" she expressed a "willingness to actually fairly listen to the law and evidence." (App.2135.) The court granted the government's motion. (App.2320.)

But there were no indications that Juror 159's personal objections to the death penalty would have prevented—or even substantially impaired—her following the law. Her questionnaire chose moderate rankings to describe her perspective on the death penalty, including a willingness to impose it in a case like Bowers's if appropriate. Though she expressed general opposition based on the sacredness of life, she

"did not 'express unwillingness' to impose the death penalty," and her

not "belie[ving]" in capital punishment "is by no means the equivalent

of being unwilling to impose it." *Szuchon*, 273 F.3d at 331. This

contrasted against the stricken juror in *United States v. Snarr*—who

said "she did not think she could live with herself if she voted for the

death penalty" and "would not be able to follow her oath or the court's

instruction if it meant imposing capital punishment." 704 F.3d 368, 382

(5th Cir. 2013) (cleaned up). Juror 159 was also nothing like the

stricken juror in *United States v. Brown*, who stated she would vote

based on her own internal values and not on the instructed law. 441

F.3d 1330, 1357 (11th Cir. 2006). Any uncertainty surrounding her

general disapproval of killing just indicated "that the potentially lethal

consequences" of the sentencing decision "would [have] invest[ed her]

deliberations with greater seriousness and gravity…." *Adams v. Texas*,

448 U.S. 38, 49 (1980).

The government was only entitled to jurors who could consider a

death sentence and impose one if warranted—not ones *eager* to impose

the ultimate punishment. Reluctance is not a disqualification. The

district court abused its discretion in granting the government's motion to strike Juror 159 for cause.

### 2. Juror 164 promised to follow the law and set aside his personal feelings.

Juror 164 was a man strongly opposed to capital punishment. On the questionnaire, he ranked himself a "1" ("strongly opposed") and selected "f" on question 74 ("I'm strongly opposed to the death penalty; and I would have a difficult time voting to impose the death penalty in the type of case described above."). (App.2199.) He believed the state should not "be allowed to execute anyone who does not currently present a danger to society." (App.2200.)

However, Juror 164 did believe a "limited pool of individuals" should be executed. (App.2202.) He also distinguished between his beliefs and the operations of courts and criminal prosecutions. When the government asked if he could "set aside" his "personal views" and "follow the judge's instructions" he said he "would do what [he] could to follow the judge's instructions" because he "want[ed] to do [his] civic duty." (App.2204.) When the government's attorney pressed Juror 164 on whether he could "assure" the government that he could sign his name "to a verdict slip of death," he answered,

I believe I am able to set aside my personal
beliefs, especially in very serious circumstances
such as this. Again, I've never been anywhere
near a situation like this, but I do think I would
be able to, if instructed by the judge, to follow the
instructions as he laid out, for or against a death
penalty sentence.

(App.2206.) Juror 164 admitted having a "small amount of doubt" about

being able to sign a death verdict because he had never experienced

service on a capital jury. (App.2212.)

When the defense questioned Juror 164, his responses remained

the same. He said he would "listen to the arguments on both sides and

follow whatever instructions the judge has, based upon the sentencing",

affirmed that he could give "meaningful consideration" to both

sentencing options, and affirmed that he could return a death verdict.

(App.2211.)

When the judge questioned Juror 164's statement that he would

require "compelling" arguments to change his mind, Juror 164 clarified

that he was not talking about the context of jury deliberations but

rather his own *personal* beliefs about the death penalty. Were he to

serve on Bowers's jury, he explained, he would follow the judge's

instructions and "would not need so much an overwhelming" reason to

support a death sentence, but only to find "the aggravating to be more compelling than the mitigating." (App.2214-15.)

The government moved to strike Juror 164 for cause, arguing he was substantially impaired where "[t]he law provides that substantial impairment means a juror who might vote against the death penalty under certain personal standards rather than following the law." (App.2215.) The judge granted the motion. (App.2320.)

The government's argument misstated the law. The measure for removal for cause is not "whether or not a venireman *might* vote for death under certain *personal* standards," but whether he "refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge." *Witt*, 469 U.S. at 422. Thus, the government's conjecture that Juror 164 "might vote against the death penalty under certain personal standards," (App.2215), was misplaced. The issue for the court was whether he "refus[ed] to follow the statutory scheme" of the FDPA, or his sentencing decision would be a product of adherence to the sentencing procedures prescribed by law. *Witt*, 469 U.S. at 422. And Juror 164 affirmed that he would "set aside [his own] personal beliefs and follow the law and make his decision according to the instructions

given by the judge. (App.2206, 2210.) *Compare Snarr*, 704 F.3d at 380 (juror never affirmed that she would be able to return a verdict of death if the facts and circumstances warranted it under the law.)

Before jury selection, the court appeared to understand this distinction when it issued an order saying, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (DE949:5) (quotation omitted). This was Juror 164's situation, yet the court failed to follow that rule. The Court abused its discretion by granting the government's motion to strike.

Each erroneous strike requires this Court to remand so that the trial court can conduct a new sentencing hearing before an impartial and constitutionally-empaneled jury, from which qualified jurors are not improperly excluded. *Brown*, 551 U.S. at 20.

**E.     The death qualification of the jury was unconstitutional.**

Bowers preserved below a claim that the district court's "death-qualification" process for the jury—questioning prospective jurors to learn if their opposition to the death penalty would "prevent or

substantially impair the performance of their duties as jurors" to consider death as a possible sentence, *McCree*, 476 U.S. at 165—violated his Eighth and Fourteenth Amendment rights and precluded a jury selected from a fair cross-section of the community. (DE759; App.245-53.) Bowers recognizes that this claim is currently foreclosed by *McCree*, 476 U.S. at 165. He raises the claim here to preserve it for further review.

POINTS RELATED TO SENTENCING

Points VIII through XV, below, challenge the district court's rulings relating to Bowers's sentencing, which prevented the jury from obtaining a full and fair picture of Bowers and from properly considering the evidence it did receive, undermining Bowers's death sentences.

**VIII. THE COURT VIOLATED THE CONSTITUTION, THE RULES OF EVIDENCE, AND THE FDPA BY ADMITTING HISTORICAL AND RELIGIOUS EVIDENCE UNRELATED TO BOWERS OR THE OFFENSE.**

**A. Introduction**

This Court should vacate Bowers's death sentences, and remand for a new sentencing hearing because the district court wrongly permitted the government to introduce a raft of far-ranging historical

and religious evidence—unrelated to Bowers or his offense—that distorted what should have been a trial about Bowers's conduct on October 27, 2018 into a referendum on historical atrocities: the Holocaust, Nazism, Hitler and his beliefs, antisemitic violence since the Middle Ages, and present-day white supremacist murderers and hate groups. This evidence framed Bowers not as an individual criminal defendant but as part of a centuries-long succession of virulent antisemitic actors,[67] implicitly holding Bowers responsible for the crimes of others, diverting the jury's attention from Bowers and the charged offense, and inviting the jury to use its sentencing verdict to redress historical wrongs. In doing so, it destroyed the individualized focus on the defendant's character and offense that the Fifth and Eighth Amendments require. *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). It

---

[67] This was also how the attack was discussed in the media. *See, e.g.*, PBS News Hour, *How the Tree of Life Shooting Reflects American Anti-Semitism* (Oct. 30, 2018), *available at* https://www.pbs.org/newshour/show/how-the-tree-of-life-shooting-reflects-american-anti-semitism (last visited December 15, 2025); BBC, *Robert Bowers found guilty of deadly Pittsburgh synagogue attack* (June 16, 2023), *available at* https://www.bbc.com/news/world-us-canada-65933373 (last visited Oct. 18, 2025) ("The 27 October assault inside the Tree of Life synagogue was the deadliest antisemitic attack in U.S. history.").

also violated Federal Rules of Evidence 401 and 403, and 18 U.S.C. §3593(c), because the evidence's extreme prejudicial impact outweighed its marginal probity on the largely-uncontested issues of Bowers's guilt and antisemitic animus. And it disregarded Federal Rule of Evidence 702's requirement that expert testimony assist the trier of fact.

True, Bowers expressed support for the ideas of Hitler, the Nazis, and modern white supremacists. But a criminal defendant's endorsement of an ideology cannot mean the government has free rein to make that ideology, and its adherents generally, the focus and theme of his trial. Centering such ideology and its history threatens to subsume the defendant's individual crime, making the trial a forum for the exposition and condemnation of social or political phenomena in contravention of due process and the Eighth Amendment.

Because the government cannot show these errors were harmless beyond a reasonable doubt, this Court should vacate Bowers's death sentences.

## B.    Standard of review

Bowers's preserved evidentiary objections are reviewed for abuse of discretion, while his preserved Eighth Amendment and due process

challenges are reviewed *de novo*. *United States v. Savage*, 970 F.3d 217, 298-99 (3d Cir. 2020). To the extent evidence was not objected to—and objection would not have been futile—its admission is reviewed for plain error. *United States v. DeMuro*, 677 F.3d 550, 557 (3d Cir. 2012); Fed. R. Crim. P. 51(b).

## C.    Relevant background

To establish the religious obstruction and hate crimes charges and the religious animus aggravator, the government had to prove Bowers intentionally obstructed victims' religious exercise, acted because of the victims' religion, and was motivated by anti-Jewish animus (App.8262-63, 8266-67, 8270 (jury instructions))—matters that, from the start, were abundantly clear from Bowers's statements at the crime scene that he wanted to "kill Jews" and Internet postings displaying obvious antisemitic statements like "the only good Jew is a dead Jew," (App.7821, 13626), and "Hitler was right." (App.7852, 13652.) As the prosecution conceded in its penalty-phase opening argument, "[i]t was crystal clear the day of the crime how much the defendant hated Jews" (App.10959); the matter required little elaboration.

The Section 924(j) charges additionally required that the killings be "willful, deliberate, malicious, and premeditated." 18 U.S.C. §§924(j)(1), 1111. This element was equally well-established due to—as the government argued—Bowers's evident planning, including setting up a device to erase his computer the day of the attack, arming himself, and making statements about planning the attack and wanting to kill Jewish people. (*See* App.7763-99 (tactical specialist reading Bowers's antisemitic statements on Gab); App.8338-40 (government argument).)

The selection-of-site aggravating factor focused on "[d]efendant's [*i.e.*, Bowers's] motivation for choosing the Tree of Life Synagogue as his target." (App.206.) That is, it required a showing that Bowers intentionally targeted the Squirrel Hill neighborhood "to maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities." (DE86.) It both claimed and required evidence that Bowers knew Squirrel Hill's history as a historic Jewish community: something that, as explained below, no evidence supported.

**D.**    **The government's evidence went far beyond any relevant purpose to improperly hold Bowers responsible for others' actions and beliefs.**

The government was undoubtedly entitled to present evidence on the offenses' elements and the aggravating factors. But that evidence could not be limitless, since there was no meaningful dispute about whether Bowers obstructed the victims' religious exercise, acted from religious animus, or acted with premeditation. Due process and the Eighth Amendment required that the government's evidence focus not on generalized wrongs but on Bowers and *his* offense, in accordance with the requirement that capital juries make "a reasoned, individualized sentencing determination based on [the defendant's] record, personal characteristics, and the circumstances of his crime," *Marsh*, 548 U.S. at 173-74, and "may not hold the defendant responsible for the crimes of others." *United States v. Reliford*, 58 F.3d 247, 251 (6th Cir. 1995).

Nor was the government permitted to urge the jury to sentence Bowers to death to "send a message" about larger social problems. *See, e.g.*, *Sinisterra v. United States*, 600 F.3d 900, 910 (8th Cir. 2010) ("send a message" arguments "impinge upon the jury's duty to make an

individualized determination that death is the appropriate punishment for the defendant"); *United States v. Runyon*, 707 F.3d 475, 514-15 (4th Cir. 2013) ("send a message" arguments improperly "invite[] [the jury] to play to an audience beyond the defendant [and] serve some larger social objective or to seek some broader social approval as well").[68]

The government violated those rules here. At least three major categories of prosecution evidence strayed far beyond the relevance boundary by invoking a multitude offenses and actors peripheral to Bowers, his conduct, or matters shown to be within his knowledge: (1) historical testimony from government expert William Braniff about Nazism, Hitler, the Holocaust, and antisemitism since the Middle Ages; (2) testimony from Rabbi Jeffrey Myers and Doctor Barbara Burstin recounting the history of Jewish people's struggles and contributions in Europe, America, and Pittsburgh; and (3) multiple witnesses' testimony

---

[68] *See also United States v. Lawrence*, 735 F.3d 385, 433-34 (6th Cir. 2013) (holding improper, because directed at "arguably irrelevant factors," prosecutorial arguments "invoking the need to protect community values and deter criminal conduct by others"); *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 11573524, at *5 (D. Mass. May 13, 2016) ("[A]rguments…that the death penalty does not prevent or deter serious crimes, are properly directed at legislators or judges.").

about Jewish traditions generally and specific Jewish religious items desecrated in the October 27, 2018 attack. These three categories of evidence fused to support a dichotomy between antisemitism and Judaism, with each victim and each desecrated religious item serving as a symbol of that historic conflict.

### 1. Testimony about Nazism, the Holocaust, and antisemitism since the Middle Ages

Juries "may not hold the defendant responsible for the crimes of others." *Reliford*, 58 F.3d at 251; or use their sentencing verdict to redress broader social ills.[69] Yet that is exactly what the prosecution invited the jury to do here, by bombarding it with testimony about topics outside the offense: repugnant and overpowering descriptions of the Holocaust, Nazism, the murders of millions of Jewish people during the Holocaust, and Nazi ideology, modern neo-Nazi murderers,

---

[69] *See also Commonwealth v. Morales*, 701 A.2d 516 (Pa. 1997) (improper for prosecutor to urge jury to impose the death penalty to counteract liberal judges); *United States v. Perez*, 491 F.2d 167, 174 (9th Cir. 1974) (improper to urge the jury to imagine the quantity of heroin taken out of children's hands by agents, or the general public welfare); *United States v. Whitmore*, 480 F.2d 1154, 1158 (D.C. Cir. 1973) (improper to invoke general public welfare by arguing that people like defendants "tear up the lives of many young people," and "wreck the lives of people").

antisemitic prejudices and atrocities reaching back to the Middle Ages, and present-day antisemitic groups. Though all agreed Bowers's crime was not directly linked to those groups and their conduct, the government's evidence and argument repeatedly tied them together on the spectrum of egregious historic wrongs.

### a. The defense unsuccessfully objects to William Braniff's proposed expert testimony.

The government's main source of testimony about Nazism and antisemitism was its guilt-innocence expert witness William Braniff: Director of the Department of Homeland Security's Center for Prevention, Programs and Partnerships. (DE981-1.) When the government noticed Braniff as an expert, it proposed that:

> Braniff will testify about anti-Semitism as it relates to the oral and written statements of the defendant. Specifically, he will discuss terminology, such as words like "kike," "holohoax" and "Yids," and concepts such as the dehumanizing of Jews. He will also testify about neo-Nazi and white supremacist ideological tenets as they relate to the oral and written statements of the defendant…
>
> He will testify about the defendant's support for Hitler and the mass killing of Jews in the Holocaust, the white supremacist murder of a counter-protester in Charlottesville during a

white supremacist rally, and the terrorist attack
perpetrated by Anders Breivik in Norway…

Mr. Braniff will testify about the statements the
defendant made regarding the Jewish community
and its relationship to immigrants and refugees,
including the Hebrew Immigrant Aid Society
(HIAS), and specifically the white supremacist
idea that white people are being replaced by non-
white populations. Finally, Mr. Braniff will
testify about the role of social media platforms,
including Gab, with respect to domestic terrorism
and the proliferation of white supremacist and
neo-Nazi ideological tenets.

(DE981-1.)

The defense moved to exclude Braniff's proposed testimony as
irrelevant and unduly prejudicial under Evidence Rules 401 and 403, 18
U.S.C. §3593(c), and under Federal Rule of Criminal Procedure 702(a),
arguing it was not based on sufficient facts or data, or reliable
principles and methods, and would not "help the trier of fact to
understand the evidence or determine a fact in issue" because it "is
little more than a general history lesson about past historical events or
figures based on Mr. Bowers's statements purportedly supporting those
events or figures" that would inflame the jury. (DE981:2, 7-9, 11, 13-15;
*see also* DE1095.)

The government countered that Bowers's "own words" linked him to this material because his Gab account contained "over 600 posts" (most of which Bowers did not author but only "liked" or reposted) "express[ing] anti-Semitic, white supremacist slurs, tropes, and ideologies"—"[s]ome of [which]…require no additional explanation." (DE1034:3-5.) Yet—even though the jury was already going to read these clearly-antisemitic Gab posts—the government argued it was still necessary for Braniff to testify further about the Holocaust, Nazism, and antisemitism to explain certain of the posts whose meaning, it claimed, was less apparent. (DE1034:5.) These included "anti-Semitic stereotypes," "theories, such as that Jews kill children and…are disproportionately represented among pedophiles" and references to white supremacist "ideologies [such as] that Jews are taking over the government…and that Jews want non-whites to replace whites and are assisting immigrants to achieve that goal." (DE1034:6-8.)

The government argued that all of this information was relevant to allow it to prove Bowers acted "because of" the victims' religion, under 18 U.S.C. §249, and that Bowers acted with premeditation and "malice aforethought" so as to commit murder under 18 U.S.C. §924(j).

(DE1034:16) (quoting 18 U.S.C. §1111(a)). It also relied on *United States v. Roof*, 10 F.4th 314, 386 (4th Cir. 2021) (per curiam), to argue that Bowers's "use of social media to amplify his message…[was] directly probative of the interstate commerce nexus element of the §247 counts." (DE1034:17.)

The court denied the defense's motions and ruled that the government could present testimony about terms and white supremacist figures referenced in Bowers's posts with which jurors might be unfamiliar, such as the Norwegian white supremacist mass murderer Anders Breivik or the hashtag #DodgeChargerDidNothingWrong—a reference to the murder of protestor Heather Heyer by white supremacist James Fields at a white supremacist rally in Charlottesville, Virginia in 2017. (App.278.) But even the court appeared to recognize the peril in this evidence: it cautioned that, while some discussion of the Holocaust was permissible, Braniff should not "provide over-expansive context or explanation as to who Hitler is as the court concludes that information is, in largest part, well within the knowledge of an average juror" and that "Braniff's testimony should be properly limited to only providing the necessary

context for the jury to understand the[] terms [in Bowers's Gab postings] and in no way should be testimony on Defendant's mental state." (App.278-79.) It also cautioned the government not to refer to the victims as martyrs. (DE1403:8.)

The defense secured a continuing objection to Braniff's use or definition of the phrases "white supremacy" or "white supremacist ideologies." (App.7926.) It also objected, unsuccessfully, to Braniff's testimony about "emanating principles and ideologies of the Nazi regime that led to the Holocaust"—a broad category including antisemitic beliefs that led up to and comprised Nazi ideology. (App.7965.) This objection preserved the defense's challenges to Braniff's testimony regarding Nazism and the various antisemitic "principles" and "ideologies" to which he testified.

> **b.** **Braniff testifies about antisemitic actors and groups throughout history.**

Over objections, Braniff delivered precisely the "general history lesson" the defense's motions had warned against. Parts of his testimony simply explained terms in the Gab posts. (App.7895-96.) But even these explanations exceeded what was necessary to show Bowers acted because of the victims' religion.

Braniff started by defining commonly-known racist terms from the Gab posts, like "kikes" and "yids." (App.7962.) Other posts Braniff referenced were even more unmistakably antisemitic, such as "the only good Jew is a dead Jew," (App.7821) and "Hitler did nothing wrong." (App.7965.) Though these terms established anti-Jewish animus beyond doubt, Braniff continued to expound on additional vile and offensive terms from the posts, including "a caricature of Jews as greedy, hence…rubbing [their] hands together," (App.7963), drawings of "accentuated nose[s]" in the shape of an Israeli flag, (App.7963-64), a photograph of a "white power hand gesture," (App.7964), "degeneracy" as a white supremacist term to describe Jewish people as inferior, (App.7969), and that "shoah" is the Hebrew word for the Holocaust. (App.7969-70.) In one particularly repugnant example, Braniff explained that references to "gas," "bake" and "ovens" referred to the fact that "mass murder of the Jews during the Holocaust was conducted primarily through gassing individuals in gas chambers and then disposing of their bodies by cremating them in ovens." (App.7970-71.)

As if the posts were not enough, Braniff also ventured into generalized historical descriptions of the Holocaust, antisemitic beliefs

in Europe and America since the Middle Ages, and present-day antisemitic groups with which Bowers was never alleged to be affiliated. Like his cumulative testimony about the Gab posts, this far exceeded the modest showings needed to prove the charges and aggravating factors.

Braniff began by defining white supremacy generally as "the idea that whites are physically superior, morally superior and intellectually superior to nonwhites," flowing from religious beliefs or "pseudo-scientific racial argument[s]," (App.7926)—and the Holocaust as "the intentional attempts to exterminate Jews in Europe by the Nazis in Germany"—a fact to which Rabbi Jeffrey Myers had already testified. (App.5822; App.7965.) Braniff then described a proliferation of modern-day Nazi groups with which Bowers was not shown to have any connection. Discussing a post mentioning the "reading list for the New Awakening," Braniff explained that "the New Awakening is an American neo-Nazi group founded around 2017" that seeks to establish "a white ethnostate in the [American] northwest…built on the ideas of Hitler and the Nazi[s]." (App.7966-67.) He also described for the jury "a violent extremist interpretation of Christianity called the Christian

identity movement that relies on certain passages of the Bible in which Jews are described as the children of Satan…as a way to describe Jews as evil and to justify… attacking Jews." (App.7979.)[70]

Braniff also expounded on some Christian identity movement Biblical interpretations. Asked about a Gab post saying "Behold the synagogue of Satan, which say they are Jews and are not but do lie[,]" Braniff testified that "this Christian identity movement…believe[s] that Adam and Eve produced the white race, but that sexual intercourse between the serpent or the devil and Eve produced Cain and the Jewish race and, therefore, Jews are literally the children of Satan and evil." (App.7851, 7981.) He further testified that James Fields, Jr. (referenced in the Gab posts) who used a car to murder an anti-Nazi protestor at a 2017 white supremacist rally, was "a member of a neo-Nazi organization or affiliated with a neo-Nazi organization called Vanguard America." (App.7984-85.)

---

[70] FBI tactical specialist Browne, similarly, elaborated on a posted photograph of a person named Patrick Little holding a sign saying "Jews rape kids," and "Jews killed 30 million," and testified that Little "ran for U.S. Senate in California and had over 50,000 votes." (App.7777.)

Braniff also delved into Nazi writings described in the New Awakening's "reading list," including "Mein Kampf," Hitler's "biography and manifesto," which "lays out the rationale for the Nazi regime and the Holocaust." (App.7966-68.) Rather than merely explaining that "final solution" referred to the Nazi policy of genocide against Jewish people, Braniff expounded that it was Nazis' "answer to the Jewish question" and that "Nazi Germany felt that Jews were a threat to the racial purity of the Aryan race, and…explored different ways to deal with this threat, first by ghettoizing Jews, but ultimately decided on…intentional genocide, which ran from 1941 to 1945, in which nearly six million Jews were killed." (App.7969.) Braniff testified that Joseph Goebbels was the "chief propagandist of the Nazi regime responsible for producing propaganda that dehumanized the Jews and justified the Holocaust." (App.7967-68.)

Braniff further testified about centuries of antisemitic beliefs and practices worldwide. Asked about derogatory references to vermin and disease in the Gab posts, Braniff testified that "[t]here is a long history of equating Jews with disease" which started "in the Medieval Era," when Jews were blamed "for poisoning wells during the Bubonic

Plague" and "continued throughout history as Jews were resigned to ghettos and denied the ability to…move up economically." (App.7968.) Historically, he testified, "[t]hese ghettos often became places where diseases ran rampant and then Jews were blamed for diseases" there, and "[o]ver time, Jews have been depicted as germs or as diseases in caricatures and in modern-day social media memes," such that "Jews will literally be depicted as diseases." (App.7968.)

Braniff was also asked to testify generally about "holocaust denialism"—including "sort of what that is and how it's used." (App.7972.) He responded that "Holocaust denialism is a common facet of anti-Semitism" that "involves either downplaying the significance of the Holocaust or denying that it happened at all as a way to delegitimize the suffering of the Jewish community during that period of time." (App.7972.) In addition, he testified, it "evoke[s] this idea that Jews are always crying that they're the victims, when in reality they're the perpetrators of evil." (App.7972.) Braniff also described the term "white genocide" (App.7974), testifying that it "dat[es] back to at least 1903 and a document called The Protocols of the Elders of Zion." (App.7978.)

Braniff additionally discussed the history—"dating back to the Middle Ages"—of the term "blood libel," saying "Jews have been scapegoated for children who disappeared, for torturing children so that their bodies release a hormone into the bloodstream and then drinking the blood of those children to sustain their life force, and in more modern versions, that Jews prey on children sexually. So this is a motif that has been repeated throughout history." (App.7982-83.)

c. **Braniff's testimony was irrelevant, cumulative, overly prejudicial, and violative of due process and the Eighth Amendment.**

In evoking other individuals' and groups' beliefs and actions over centuries of history, the government implicitly sought to hold Bowers "responsible for the crimes of others," *Reliford*, 58 F.3d at 251, and connect him to matters not within his knowledge, in which he did not participate. *United States v. McVeigh*, 153 F.3d 1166, 1215 (10th Cir. 1998) (information not known to the defendant "has no relevance to any aspect of [the defendant's] character, or record, or the circumstances of the crime."); *United States v. Street*, 548 F.3d 618, 631 (8th Cir. 2008) (district court erred by permitting wide-ranging gang evidence, including long-ago violent acts, gang insignia, and intimidation

procedures, "[n]one of [which] was tied to the actual crimes with which Street was charged or the particular facts of his case."). Even when a criminal defendant *is* a member of a known criminal group, it is improper for the prosecution to present evidence of reprehensible practices of that group: such evidence is "inherently and unfairly prejudicial" and "deflect[s] the jury's attention from the immediate charges." *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991). That is even more strongly true here, where Bowers was never alleged to be a member of any of the groups about which Braniff testified.

Braniff's testimony was also irrelevant, egregiously cumulative, unhelpful to the jury under Rule 702, and vastly disproportionate to the issues. The jury's job at sentencing was to undertake "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *United States v. Caro*, 597 F.3d 608, 625

n.17 (4th Cir. 2010)[71]—not a survey of the Holocaust, Nazism,[72] or

antisemitic atrocities throughout world history. The government

conceded the charges required proving only that Bowers acted "because

of" the victims' religion under Section 249, and exhibited anti-Jewish

animus under the religious animus aggravating factor. (DE1034:16.)

But that was already—in the government's words—"crystal clear the

day of the crime." (App.10959.) Bowers said when arrested that he

---

[71] *See also Marsh*, 548 U.S. at 173-74 (sentence must be individualized, "based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."); *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994) ("States must ensure that 'capital sentencing decisions rest on [an] individualized inquiry.") (cleaned up); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (capital sentence violates the Eighth Amendment if "imposed without an individualized determination that that punishment is 'appropriate [.]'"); *Enmund*, 458 U.S. at 801 (the defendant's "punishment must be tailored to his personal responsibility and moral guilt."); *Woodson*, 428 U.S. at 303 (plurality opinion) (capital sentencings must "allow the particularized consideration of relevant aspects of the [defendant's] character and record.").

[72] The Holocaust is a topic that threatens extreme and unparalleled prejudice when invoked at criminal trials. *See, e.g., Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993) (per curiam) (calling "especially deplorable the prosecutor's attempt to suggest…a similarity between [the defendant] and Adolf Hitler"); *United States v. Stone*, 852 F. Supp. 2d 820, 837 (E.D. Mich. 2012) (excluding as unduly "inflammatory," in a trial for conspiracy to levy war against the United States, "images [found in defendant's possession] of Hitler, Stalin, [and] Nazi concentration camps.").

wanted to "kill Jews," and he expressed unmistakable support for Hitler in his posts. (App.7821; App.7266.) An FBI technical specialist read the jury excerpts of Bowers's posts, and usernames of his followers and followed accounts, that needed no elaboration, such as "Hitler was right." (App.7852; App.13652.) And the district court acknowledged that Hitler and his ideas were "well within the knowledge of an average juror" and required no further unpacking. (App.278-79.)[73] No conceivable rationale justified piling on abhorrent details and exposition.

As this Court has recognized, the "availability of other methods that would serve the purposes for which the [proponent] seeks to introduce expert testimony may…serve to justify exclusion under Rule

---

[73] An explanation of the Holocaust was one of the first things the jury heard. Rabbi Myers, the government's third guilt-innocence phase witness, testified that the Holocaust was "the attempt by the Nazi government to systematically destroy the entire population of the Jews in Europe during World War" resulting in the deaths of six million Jews. (App.5822.) The prosecution argued that Myers's testimony was relevant because Bowers's "Gab, his posts, reposts, likes are replete with references to the Holocaust," "[s]o someone has to say what the Holocaust is." (App.5869-70.) Once Myers did so there was no need for Braniff to repeat it—let alone multiple times.

403." *United States v. Downing*, 753 F.2d 1224, 1243 (3d Cir. 1985).[74]

The government had ample alternatives: simply apprising the jury of

Bowers's clearly-antisemitic Gab postings and followed accounts

(App.7821, 7852, 13626, 13652) ("kikes" or "the only good Jew is a dead

Jew" or "Hitler was right")), or emphasizing that Bowers had

proclaimed his desire to "kill Jews." As the prosecutor argued to the

jury in penalty-phase closing, "[t]here is so much evidence of [Bowers's]

religious hatred," including "hundreds of Gab posts, reposts and likes,"

among which the word "'kike' appeared…over 400 times." (App.13182.)

That statistic alone showed the animus the government sought to prove.

Given that even "a relatively minor risk of substantial undue prejudice

should counsel against admitting" evidence whose "probative value…is

tenuous," *United States v. Bailey*, 840 F.3d 99, 118–19 (3d Cir. 2016),

neither Section 3593(c) nor Federal Rules of Evidence 401 or 403 could

justify the government additionally submerging the jury under a flood

of repugnant Gab content—let alone further layered descriptions of

---

[74] *See also United States v. Bowman*, 302 F.3d 1228, 1240 (11th Cir. 2002) (per curiam) (evidence of "whites-only" policy of defendant's motorcycle gang, while relevant to show uniformity, should have been redacted where "there was other evidence of this uniformity.").

Nazi ideology, Nazi murders of Jews, Nazi dehumanization of Jews, Nazi propaganda, current Nazi adherents, the Holocaust, modern-day Nazis, and ancient antisemitic beliefs of others.

The prosecutor's linking of Bowers with Nazis, Hitler, the Holocaust and antisemitic people in the Middle ages also wrongly invited the jury to sentence Bowers based on historical information, in violation of the relevance requirement of Federal Rule of Evidence 401 and 18 U.S.C. §3593(c), due process, and the Eighth Amendment principle that trial evidence must have some bearing on the defendant's "personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982); *McVeigh*, 153 F.3d at 1215 (information unknown to the defendant "has no relevance to any aspect of [the defendant's] character, or record, or the circumstances of the crime.")

The government attempted to justify this evidence by citing *United States v. Roof*—a hate crime and religious-obstruction prosecution for a racially-motivated murder of African-American parishioners in Charleston, South Carolina. (DE1159:19-23.) But the prosecution in *Roof* presented nothing similar to either the cumulative Gab posts, likes, and reposts, nor the broad-ranging history lesson here.

Instead, it confined its presentation to Roof's substantive Internet

conversations on a particular website, a KKK hood found in his house,

his own writings, and still frames and titles of particular movies, and

particular photographs and books, found in his possession.[75] To be

analogous to this case, the *Roof* testimony would also have had to

include all posts by others that Roof had ever liked or reposted, and a

historical disquisition on racism, slavery, the Civil War, segregation,

and the history of Emanuel Church and the Charleston community. But

the government attempted nothing close in that case.

## 2. Testimony about Jewish struggles in Europe and America, and the history of Squirrel Hill

The government also presented testimony chronicling the

historical struggles of Jewish people in Europe and America. This

testimony described Jewish people, and Judaism itself, as the victim of

---

[75] *See United States v. Roof*, No. 15-cr-472-RMG-1 (D.S.C.), Docket no. 878 (Exhibit and Witness List); Gov. Trial Exs. 7 (timeline with photographs), 108-109g (photographs); 183-84 (CDs and book); 270 (KKK hood), 294 (photographs); 308 (photographs); 331 ("manifesto"); 340 (poster), 343 (book), 344 (movie still), 500 (drawings and writings), 427-49 (photographs); 505 (Internet posts); CourtEx.1; *United States v. Roof*, 4th Cir. appeal, No. 17-3, Docket No. 81, (Joint Appendix) Vol. XIV at 6473 (Gov.Ex.6a); Vol. XI at 4603-09, 4744-45, 4757-58, 4777-79, 4835-47, 4853-54, 4894-95, Vol. XIV at 6178-6254, 6282-6313.)

historical antisemitism—with each individual victim a symbol of that global religious injury. The prosecution also implicitly invited the jury to use its verdict to redress the historical existence of antisemitism from World War II through the present day by invoking the Holocaust Torah—"a witness to the horrors of…the Holocaust," and also "a witness, over 70 years later, to what happened to Jews at the Tree of Life Synagogue" (App.13182, 13274)—warning that "[t]here are many, many, people who believe the same things [Bowers] does," (App.13209), saying Bowers "chose violence[,] [l]ike many other people" (App.13214), and telling the jury that "what [Bowers] believes is exactly what so many other people believe about Jews, about the replacement of white people and white culture and Jews' role in it." (App.13214-15.) Though this argument was nominally presented to rebut Bowers's mental health claims (by showing his beliefs were not delusions because shared by others), it also served to frame Bowers as part of a larger social scourge that warranted death. The prosecutor also referenced individual victims' religiosity and life histories decades into the past, reinforcing the trial's broad-lens historical focus. (*See* Point IX.C, D.)

Situating Bowers as a symptom of antisemitism, and the victims as symbols of injury to Judaism, was tantamount to telling the jury to combat antisemitism generally or "send a message" against it—thus improperly "prevent[ing] an individual determination of the appropriateness of capital punishment." *Weaver v. Bowersox*, 438 F.3d 832, 836, 841 (8th Cir. 2006).

### a. Testimony of Jeffrey Myers

The first testimony about Jewish history came from guilt-innocence phase witness Rabbi Jeffrey Myers. When the defense objected to Myers giving a "history lesson on Judaism [and] the Holocaust," the government proffered no justification but said merely that Myers's testimony about the Holocaust was "brief" and "didn't go into detail." (App.5866, 5870-71.) The court overruled the objection. (App.5871-72.)

Myers testified that Judaism is a 4,000-year-old religion that branched into conservative and reform movements around 1850. (App.5766-67.) In "the middle of the 19th century, if not earlier," he testified, Jewish people in Europe "did not have adjectives applied to a particular movement they were in," but "were just Jewish." (App.5766.)

"With the rise of the Reformation period, [and] the reform within Germany in 1850," he continued, "Jewish people [began] taking on labels based upon the movement they were in." (App.5766-67.) Then, in the late 1800s, the "[c]onservative movement was founded…as a response [to] feeling that the reform movement had moved a bit too far in the liberal direction." (App.5767.) Myers explained that, whereas Christians believe Jesus is the messiah, Jewish people believe the messiah has not yet come. (App.5765.)

Again reaching centuries into the past, Myers testified that Jewish people aided the United States during the American Revolutionary War, have "through[out] American history…participated in wars on behalf of the United States Government," and took part in the United States's founding. (App.5831.) Myers later added, at the penalty phase, that the Tree of Life Synagogue itself was founded during the Civil War. (App.11212.)

Myers also described the struggles of generations of Jewish refugees to America. He testified that the New Light congregation was founded in 1903 by Romanian Jewish refugees escaping pogroms and poverty. (App.6100-01.) Despite initially "liv[ing] in slums," the first

thing they did in America was "build their synagogues." (App.6101.)

Because Jewish people at that time "desperately wanted to become

Americans and find the American way," the congregation adopted the

English-language translation of its original name. (App.6101-02.)

> ### b.  Testimony of Dr. Barbara Burstin and the "selection-of-site" aggravating factor

The government also presented, at the sentencing phase, a

historian of Pittsburgh's Jewish Community, Barbara Burstin, to

support its nonstatutory "selection-of-site" aggravating factor.

(DE1471.)

As framed by the prosecution, the selection-of-site factor posited

(and required evidence) that Bowers knew Squirrel Hill was "home to

one of the largest and oldest urban Jewish populations in the United

States," and chose it as his target for that purpose. The defense objected

to Burstin's testimony because "there [was] no indication from discovery

or from the government's pleadings that Mr. Bowers was aware of any

of the history of Squirrel Hill, its significance in Jewish history or its

significance today" so it was "irrelevant to the jury's sentencing

decision." (DE1471:3.) The defense also argued that Burstin's testimony

was cumulative, and constituted improper community-wide impact

testimony, and that the selection-of-site factor should be stricken or limited to matters as to which the government could present evidence. (DE1481; App.11178-79.)

The government, despite having framed the factor as requiring knowledge of Squirrel Hill's history, now appeared to concede that the evidence did *not* show Bowers knew that history. It instead argued that "[t]he government *does not have to* prove the defendant was aware of [Squirrel Hill's] history," and that evidence showed Bowers "was aware of Squirrel Hill" itself, "that he wanted a high value target, [and] that he chose the Tree of Life Synagogue which was associated with Dor Hadash and had its relationship with HIAS." (App.14149) (emphasis added).

That Bowers was "aware of Squirrel Hill's" existence, and targeted a synagogue in a predominantly Jewish neighborhood as a "high value target," does not show he knew the historical significance of Squirrel Hill or the history of its population. Yet the court overruled the defense's objections. (App.14151.) It ruled that the evidence *was* sufficient for the jury to conclude Bowers knew the facts underlying the selection-of-site factor: specifically, "his statements at the time, the fact

that he went there [to Tree of Life], [and] the fact that he had potentially two targets." (App.14152.)

Dr. Burstin then gave the jury a history lesson on Pittsburgh's Jewish community. The first Jewish immigrants to Pittsburgh, she testified, fled "German lands" in the 1840s for "the promise of a better life" in America. (App.11207.) They initially settled in downtown Pittsburgh, later migrated to Allegheny City, and ultimately settled in Squirrel Hill. (App.11207-09.) A second wave of Jewish immigrants— also fleeing persecution—arrived starting in the 1870s from the Soviet Union and Austro-Hungarian empire. (App.11208-09.)

Squirrel Hill's primary Jewish institutions date from approximately 1917, with five or six more established after World War II—a timeframe that tied her testimony to Braniff's discussion of Nazism and the Holocaust. (App.11209-10.) Since World War II, Squirrel Hill has remained "the home to the Pittsburgh urban Jewish population," with approximately forty Jewish organizations as of 2016. (App.11211.) Squirrel Hill is a "very vibrant Jewish community with very active institutions," (App.11212) and "one of the oldest and largest remaining Jewish communities in the United States." (App.11213.)

### c. Myers's and Burstin's testimony, and the selection-of-site factor, were irrelevant and violated the Eighth Amendment, Due Process, and §3593.

Myers's and Burstin's testimony was before the jury regarding the selection-of-site aggravator. But neither was relevant to it. Indeed, Myers's guilt phase testimony about Jewish history was not relevant to any issue. (App.5870-71.)

Burstin's penalty phase testimony was also improper. Though the government claimed it supported the selection-of-site factor, that was incorrect because no evidence suggested Bowers knew the key fact at its crux: that Squirrel Hill was "home to one of the largest and oldest urban Jewish populations in the United States." As the district court held, the factor depended on Bowers's "motivation for choosing the Tree of Life Synagogue as his target"—that is, it depended, by its plain language, on the government showing that Bowers intended to target what he knew was a historic Jewish population. (App.206.) But no testimony supported that conclusion; at most, the trial testimony indicated that Bowers chose Tree of Life because it was a "high[] yield target" and would make a statement simply by virtue of being a synagogue. (App.9864.)

The district court also clearly erred by concluding that "there [was] ample evidence from which the jury c[ould] reasonably infer that Mr. Bowers did know" about Squirrel Hill's status as a historic Jewish community, such as "his statements at the time, the fact that he went there, [and] the fact that he had potentially two targets." (App.14152.) Bowers's "statements" never suggested he targeted Tree of Life or Squirrel Hill for their history or impact, but solely that he "want[ed] to kill Jews." (App.7266.) Nothing suggested Bowers considered that "value" connected to Squirrel Hill's history.

It is the defendant's knowledge of the probable consequences of his actions that bears on his culpability. *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987) (intent and awareness of consequences of crime are highly relevant to culpability). *Cf. Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (unconstitutional to preclude consideration of defendant's lack of intent to kill). Information unknown to the defendant "has no relevance to any aspect of [the defendant's] character, or record, or the circumstances of the crime." *McVeigh*, 153 F.3d at 1215. The government drafted the selection-of-site factor to target Bowers's subjective knowledge and motivation by positing that Bowers intentionally targeted a historic

Jewish community. But because Bowers lacked knowledge of that history, it was improper for the government to present evidence of it. The district court should have excluded that evidence as irrelevant and unduly prejudicial under §3593(c) and Rule of Evidence 403, unnecessarily cumulative among Myers and Burstin (who testified to the same matters), as well as violative of due process and the Eighth Amendment's requirement of individualized sentencing.[76]

Instead of showing knowledge, Myers's and Burstin's testimony portrayed Judaism as the target of the historical antisemitism Braniff had chronicled in the guilt-innocence phase. Jewish people's struggles in Europe and America resulted directly from the antisemitic beliefs Braniff described, and Myers and Burstin gave content to Judaism as a distinct concept and an independent victim. The prosecution reinforced that historic religious injury in closing by referencing individual

---

[76] Here, too, the *Roof* case is distinguishable. Evidence showed Roof chose the site of the attack—a historic African-American church in Charleston, South Carolina—because he knew it was a historic African-American church. *United States v. Roof*, 4th Cir. appeal No. 17-3, Docket No. 81 (Joint Appendix), Vol. X at 4152 (Internet searches for churches); 4271 (Roof telling agents he chose the site because "it was a historic AME [African Methodist Episcopal] church"); Vol. XI at 4628-31 (list of churches), 4893-94 (list of sites including churches).

victims' religious lives from decades in the past, as far back as the

1940s (Sylvan and Bernice Simon), and World War II and its aftermath

(Mel Wax). (App.13190, 13192.)

### 3. Testimony about Jewish religious items, including ones damaged and desecrated during the attack

The jury also heard testimony about specific Jewish religious

items—including a "Holocaust Torah"—that were damaged or

desecrated during the October 27, 2018 attack or during the

Holocaust.[77] These items reinforced the government's portrayal of

Judaism itself as a victim by serving as tangible symbols: ones the

prosecution described as riddled with "bullet holes" (App.5821;

App.10961) and personified as "witness[es]" to both Bowers's attack and

the Holocaust—thus connecting those two events. While the

government claimed this testimony was relevant to the obstruction-of-

religion element of the Section 247 charges—*i.e.* to explain the religious

---

[77] Although individual items of testimony and evidence regarding these items were not separately objected to, Rule 51(b) did not require objection because the enormous volume of testimony and minute focus on particular objects made individual objections not feasible. Objection would also have been futile given the court's approval of Rabbi Myers's testimony about Jewish history and overruling of defense objections to Braniff's testimony.

rituals that were interrupted during the attack and show that Bowers's

conduct forcefully "obstruct[ed]…[the victims] in the enjoyment of

[their] free exercise of religious beliefs"—it was out of all proportion to

that purpose. Bowers's actions obviously obstructed the victims' exercise

of religion because he attacked them in the middle of religious services.

Bowers did not target the religious objects as such; the damage to the

items was merely a byproduct of his assault on the victims, who were

undisputedly engaged in worship. This is consistent with §247(a)(2),

which "targets the obstruction of a person's free exercise

of religious beliefs, not the damage or destruction to the property itself."

*United States v. Corum*, No. 01-236 (JRT/FLN), 2002 WL 1285078 at *3

(D. Minn. June 5, 2002).

Nevertheless, Rabbi Myers focused the jury on inanimate religious

items. He testified that the Torah is the most sacred object in the

Jewish religion, "is the words of God as given by God on Mt. Sinai,"

"reflects the relationship between God and Israelites at that time," and

"is the source of who [Jewish people] are and how we are to behave on

this planet during our lifetime." (App.5770.) Each Torah is written by

hand over the course of a year. (App.5821.)

One particular Torah, a "Holocaust Torah," sat inside the Tree of Life synagogue during the attack and was a "witness" to its horrors. (App.5821, 5824, 13682.) The Holocaust Torah, Myers testified, was recovered after World War II from a town in Czechoslovakia whose Jewish residents were all slaughtered.[78] (App.5822.) A Tree of Life member named Judah Samet—a Holocaust survivor who had been imprisoned at Bergen-Belsen concentration camp with his mother and brothers—recovered the Holocaust Torah from England and brought it back to the Tree of Life. (App.5822.) Although the Holocaust Torah was "[damaged] beyond repair" and damaged Torahs are usually buried, it was kept at Tree of Life because "it is a witness to what happened" during the Holocaust, and "the only survivor of the destruction of its community." (App.5824.) The government used the Holocaust Torah to draw a direct line from the Holocaust to the October 27, 2018 attack: during his sentencing-phase closing argument, the prosecutor said the Holocaust Torah was a "witness to the horrors of what happened to

---

[78] This testimony was particularly affecting because Samet, who was present for Bowers's attack, died during the years between the offense and the trial.

Jews during the Holocaust," as well as "a witness, over 70 years later, to what happened to Jews at the Tree of Life Synagogue." (App.13182.)

Myers also testified about other Biblical items: prayer books, yarmulkes (a head covering meant to be worn during worship), mezuzahs (doorway adornments "commanded in Deuteronomy" containing Torah passages), and prayer shawls, called tallits, which Jewish people are "commanded in the Book of Numbers to wear…to remind [them] of God's presence." (App.5828-29.)

Yarmulkes, prayer shawls, and prayer books were cast to the ground during the October 27, 2018, attack—a "sign of disrespect" in Judaism. (App.5830; App.6116.) The jury saw photographs of torn prayer books and yarmulkes, and a prayer shawl, lying on the synagogue floor. (App.5856, 6114-15, 6166, 13578-79, 13683, 13686, 13691.) Although damaged Jewish religious items are usually buried, Myers testified, he kept a damaged prayer book as a "witness to the horror of the day." (App.5856-57, 5860.) Rabbi Jonathan Perlman, similarly, testified that he was wearing in court the yarmulke that fell from his head as he fled, which bore an inscription saying "there is nothing aside from [God]." (App.6114-16, 13686.)

The jury also saw photographs of multiple yarmulkes, and two partial black yarmulkes, strewn on the floor of the synagogue mezzanine near several deceased victims. (App.8128, 13576-77.) The agent testified that the yarmulke pieces belonged to Irving Younger and were found near his body and showed the torn yarmulke pieces to the jury. (App.8127-29; App.13576-77.)

### 4. Cumulative effect of the testimony

These three categories of evidence—historical antisemitism, Jewish history, and desecrated religious objects—jointly amplified and distorted Bowers's case from a discrete criminal trial into a referendum on global antisemitism throughout world history. Braniff's testimony depicted an unbroken succession of antisemitic actors into which Bowers was subsumed as just the latest incarnation. Myers's and Burstin's testimony framed Judaism itself—and the Squirrel Hill community—as the victim of this historical violence. And the anthropomorphized yarmulkes and prayer shawls formed tangible symbols of this global religious injury. At the apex of those symbols was the Holocaust Torah, which the government personified as a "witness" to both the Holocaust in the 1940s and Bowers's attack in 2018.

(App.13182.) Rabbi Myers even more directly connected this case to the Holocaust by testifying about congregant and Holocaust survivor Judah Samet bringing the Holocaust Torah from the scene of a Nazi massacre in Czechoslovakia to Tree of Life and, ultimately, to Bowers's attack on it.

The prosecution then built on this evidence to situate Bowers among a succession of past and present perpetrators. Depicting Bowers as just one example of a global scourge—and by way of arguing Bowers's beliefs were not delusions—the prosecutor told the jury that "[t]here are many, many, people who believe the same things he does and would be just as proud [to kill Jewish people]," who "are not delusional" but "just white supremacists." (App.13176, 13209, 13222.) Bowers, the prosecutor said, "chose violence," just "[l]ike many other people in the optics debate,"[79] and "what he believes is exactly what so many other people believe about Jews, about the replacement of white people and white culture and Jews' role in it." (App.13176, 13214-15.)

---

[79] Braniff testified the "optics debate" is a debate among white supremacists about whether to achieve their goals through violence or nonviolent attempts to alter social norms. (App.7985-86.)

At the same time, the prosecution reinforced the idea of Judaism itself as the target of this larger animus, emphasizing in penalty phase argument the individual victims' religiosity and life histories stretching back to World War II and before, and the "bullet holes" through prayer books, prayer shawls, pews, and the synagogue itself. (App.10961.)

In this fashion, the government framed the opposition between global antisemitism and Judaism as the theme of its case: "a relentless, focused, uncorrected argument…calculated to remove reason and responsibility from the sentencing process." *Newlon v. Armontrout*, 885 F.2d 1328, 1338 (8th Cir. 1989) (affirming grant of habeas relief where prosecutor's sentencing argument compared defendant to mass murderers and jurors to soldiers in a "street war" on crime). It was irrelevant, cumulative, not helpful to the trier of fact, and fundamentally irreconcilable with §3593(c)'s prohibition on unduly prejudicial evidence at capital sentencings. And it flatly contravened both fundamental fairness and the Eighth Amendment's requirement that capital sentencings "be tailored to [the defendant's] personal responsibility and moral guilt." *Enmund,* 458 U.S. at 801.

**E.    The government cannot prove beyond a reasonable doubt that the improperly-admitted evidence and selection-of-site factor did not influence even one juror's vote for death so as to be harmless.**

Because the errors at issue here are Constitutional, to avoid vacatur of Bowers's sentences the government must prove they were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *Savage*, 970 F.3d at 298 n.82 (applying the harmless-beyond-a-reasonable-doubt standard to constitutional trial error). That is, the government must prove beyond a reasonable doubt that not even one juror's sentencing verdict would have been different without the challenged evidence. *See* 18 U.S.C. §3593(e); *Andrus v. Texas*, 590 U.S. 806, 821 (2020) (per curiam); *Buck v. Davis*, 580 U.S. 100, 120 (2017). It cannot make that showing.

Although Bowers's offense was highly aggravated, the prosecution's evidence made it even more so. Bowers was not just an individual antisemitic actor, but part of an ongoing historical blight comprising innumerable individuals, groups, and governments, and spanning centuries. During the government's closing argument a 3-D model of the synagogue sat in the courtroom, as the prosecution displayed not only horrifying images of the deceased victims lying slain

270

on the synagogue floor but also a large-screen photograph of the Holocaust Torah followed by a slide of photos from Bowers's Gab results, showing concentration camp crematoria and ashes—meant to signify murdered Jewish victims during the Holocaust.[80] The prosecutor described the Holocaust Torah as a "witness" to the horrors of both the Holocaust and the Tree of Life attack seven decades later. (App.13182.)

Had the jury not been saddled with the immense historical weight of the government's evidence and argument, it would have been better equipped to make the "uniquely individual moral judgment" the court instructed it to conduct, based on the individual defendant before it. The court told the jurors that they were "never required to vote for a sentence of death," (App.13123, 13161) and to eschew any "mechanical" or numerical comparison of the number of aggravating versus mitigating factors. (App.13162-63.) With each juror individually charged with determining what was "sufficient" for him or her to vote

---

[80] *See* Associated Press, *Jury Weighs Death Penalty or Life in Prison for Pittsburgh Synagogue Shooter*, (Aug. 1, 2023) (courtroom sketch of government closing), *available at* https://www.koin.com/news/national/ap-jury-begins-weighing-death-penalty-or-life-in-prison-for-pittsburgh-synagogue-shooter/ (last visited October 29, 2025).

for life, (App.13162-63.), at least one juror might well have struck the balance on the side of life based on the voluminous mitigating evidence presented. *See* Appendix A, below (listing highly-aggravated federal capital cases in which juries declined to return death verdicts); Statement of the Case, Section H.7 (describing mitigation findings).

At least a reasonable doubt exists as to whether one or more jurors would have found the mitigating factors warranted a sentence less than death. Certainly, the government cannot prove beyond a reasonable doubt that it would not have done so. This Court should thus vacate Bowers's death sentences and remand for a new sentencing hearing.

## IX. THE COURT VIOLATED DUE PROCESS, THE EIGHTH AMENDMENT, AND THE FDPA BY ADMITTING IMPROPER VICTIM IMPACT EVIDENCE.

### A. Introduction

The government may introduce evidence of "injury and loss suffered by the victim and the victim's family" at a capital sentencing. 18 U.S.C. §3593(a); *Payne v. Tennessee*, 501 U.S. 808, 825-26 (1991). But such evidence is carefully circumscribed by the Fifth and Eighth

Amendments. These limits protect the reliability of capital sentencing proceedings against arbitrary, irrelevant, or inflammatory testimony.

The government far overstepped those limits. Rather than confining its evidence to victims' unique qualities, it presented testimony depicting them as more virtuous, worthy, and devout than others, in violation of both the Supreme Court's prohibition on comparative-victim-worth evidence and the FDPA's bar against religion-based sentencing. It also presented extensive evidence of hardships victims suffered unrelated to Bowers's offense. And it overreached by suggesting its witnesses "sp[oke] for" the deceased victims, amid an emotionally-wrenching closing argument that included images of the deceased victims enlarged in the courtroom. It even presented victim-impact testimony from surviving victims not named in the capital counts. These violations permeated Bowers's sentencing, requiring his death sentences be vacated.

## B.    Standard of review

This Court applies "*de novo* review to legal questions implicated in a decision to admit evidence." *United States v. Hall*, 28 F.4th 445, 449 n.1 (3d Cir. 2022). Bowers objected to testimony about victims'

comparative worth, religiosity, and hardships outside the offense in written pleadings and at multiple points on June 1, 2023 (App.6091-92), July 17, 2023 (App.10972, 11006-08) and July 19, 2023 (closed session) (App.11366; DE1352, DE1464, DE1474), and was granted a standing objection to such evidence. (App.8613.) He also objected to testimony about injuries to surviving victims. (DE241.) But the court largely denied these objections, (App.367, 370-71), as it again did when the defense re-raised them at the penalty phase. (DE1474, App.379, 10906-08.)

## C.  The district court erred by admitting comparative victim-worth evidence.

### 1.  The government portrayed the victims as exceptionally worthy and religious.

The government listed as an aggravating factor "victim impact": specifically, that Bowers "caused injury, harm, and loss to [the deceased victims] as well as to [their] family, friends, and co-workers." (App.13713-14.)

But the government's penalty phase evidence extended far beyond such injury, harm, or loss, to testimony about each victim's heightened goodness and worthiness compared to others. Witnesses detailed not

only the victims' unique qualities but also their exceptionally important and virtuous roles within their religious communities. They were described as "pillar[s]" of the congregation, (App.5902, 13186 (closing argument)), a "leader[]," (App.11002), a "very, very important" member of the congregation, (App.6004), "always the first two at shul," (App.11450), "president of the congregation" (App.11002, 11502), "president," "financial vice president" and board member of New Light congregation, (App.11117), "chairman of the religious committee," (App.11002), "secretary of the sisterhood" of Tree of Life, (App.11331), "the first person to say 'I'll do it,' when something needed to be done," (App.11502-03), "grateful and devoted to going to the shul," (App.11312), "valued member of the congregation," (App.11004), and the "first person there [at the synagogue in the morning] and the last person to leave." (App.11194; *see also* App.11450.) The prosecutor described them, in guilt-phase closing argument, as "among the most devout of all of the worshippers" (App.8300-01) and in the penalty phase closing argument as "[t]he most observant members of" the involved congregations. (App.13176.)

The prosecution supplemented these superlatives with testimony about the victims' religious faith. During the guilt-innocence phase witnesses testified that the victims had worn yarmulkes and prayer shawls to remind them of God's presence and detailed the particular prayers that each would lead during services. (App.5902-16, 6136-37.) The jury also heard about the specific roles each victim fulfilled in those services, such as carrying and dressing the Torah, ensuring correct reading of the Torah, and saying blessings. (App.6135-40.) Surviving witness Dan Leger—who was nearly-fatally shot during the attack—testified extensively about his personal faith, including that Judaism is the anchor of his life, that he had been practicing Judaism for 40 or 50 years, and that he acknowledged God's presence every morning and night. (App.5957-58.) Leger also testified about Jewish rituals surrounding death, including how a local Jewish burial society (of which he was a member) would wash and dress the deceased person's body and place it in a coffin. (App.5965-66.)

Further evidence of the victims' religiosity pervaded the penalty phase. Witnesses testified about family sabbath dinners one victim had as a child, (App.10998-99), another victim's practice of combining

religious traditions with his wife of a different faith—including reciting

prayers in both English and Hebrew with candles, bread, and wine,

(App.11025-26)—that another victim always stood up during the

Mourner's Kaddish prayer and had a tradition of singing the four

prayers in Yiddish, (App.11195-97; *see also* App.11502-04), and that

another celebrated the anniversary of his bar mitzvah every year by re-

reciting the Torah portion from it. (App.11388-89.) Other victims were

described as participating extensively in religious services, carrying the

Torah during services, (App.11449), knowing the songs by heart,

(App.11451), and having "such love for their congregation, [and] for

Tree of Life." (App.11453.) And the jury was shown photographs and

two videos of victims engaged in worship service,[81] a photo of one

victim's prayer books, (App.14218), a bar mitzvah certificate,

(App.14221), and a victim holding a Torah. (App.14243.) Carol Black

testified that her brother, Richard Gottfried, attended a daily minyan

for eleven months after his father died. (App.11002.) And witnesses

Daniel Kramer and Daniel Leger testified that Leger and his friend

---

[81] These videos, each 5-10 seconds long, showed Cecil Rosenthal
participating in a worship service. (GX1404B, 1404C.)

Marty Gaynor had begun a daily practice of reading the Talmud in remembrance of victim Jerry Rabinowitz. (App.11201-02, 11503-04.)

The prosecution further emphasized these religious traditions in closing argument. The prosecutor described the victims as having, respectively, "t[aken] his faith seriously" and having "vow[ed] to study every book of the Talmud," (App.13188), experiencing Judaism as "one of the most important things in their li[ves]," (App.11447), fulfilling "important roles during Shabbat services," "singing with open-hearted joy," "lead[ing] an entire Shabbat service," (App.13189), "recit[ing] a portion from [his bar mitzvah] service every single year," and "lov[ing] attending Shabbat services up until the last day of his life." (App.13191.) The prosecutor also described the prayer shawls, prayer books, and yarmulkes found with the deceased victims after the attack. (App.13193-95.)

2. **Urging the death penalty because of victims' comparative worth and religion violates the Constitution and FDPA.**

The Supreme Court held in *Payne v. Tennessee* that prosecutors can present "a quick glimpse of the life which a defendant chose to extinguish" and the loss to victims' loved ones. *Payne*, 501 U.S. at 822

(quotations omitted). But *Payne* emphasized this evidence must not be used to draw comparisons between more- and less-worthy victims; the prosecution must not encourage jurors "to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823. When prosecution evidence and argument oversteps *Payne*'s carefully-circumscribed "legitimate purpose[]" of victim-impact information—showing a "quick glimpse" of the victim's life and the victim's "uniqueness as an individual"—and introduces comparative-victim-worth evidence, the resulting sentence violates due process. *Id.* at 823, 825 (quotations omitted); *Humphries v. Ozmint*, 397 F.3d 206, 219, 224 n.8 (4th Cir. 2005).

In addition to *Payne*'s due process-based limitation, comparative-victim-worth testimony also contravenes a separate line of cases, beginning with *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), holding that the Eighth Amendment forbids capital sentencing decisions based on arbitrary factors unrelated to the defendant, his circumstances, and the offense. These cases require courts to "direct[] and limit[]" capital juries' discretion to "minimize the risk of wholly

arbitrary and capricious action." *Zant v. Stephens*, 462 U.S. 862, 874 (1983) (quotations omitted). The FDPA similarly requires remand if "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. §3595(c)(2)(A).

Allowing a glimpse of the victims' lives to shade into comparisons of victims' relative worthiness unconstitutionally encourages jurors to sentence a defendant to death based on arbitrary factors in violation of the Eighth Amendment. *Booth v. Maryland*, 482 U.S. 496, 508 (1987) *overruled in part by Payne*, 501 U.S. at 825; *see also United States v. Savage*, 970 F.3d 217, 299 (3d Cir. 2020) (improper victim impact evidence "create[s] an impermissible risk" of arbitrary capital sentencing) (cleaned up). And it is particularly unconstitutional—and violative of 18 U.S.C. §3593(f)—for the government to inject into the penalty decision consideration of a victim's religion. *Zant*, 462 U.S. at 885; *South Carolina v, Gathers*, 490 U.S. 805, 821 (1989) (O'Connor, J., dissenting) (prosecutor cannot argue for a death sentence "because of the [victim's] race, religion, or political affiliation."); *Humphries*, 397 F.3d at 226 (victim comparisons "based on…religion, unquestionably are unconstitutional."); 18 U.S.C. §3593(f).

### 3. The government's evidence improperly urged a death sentence based on victims' comparative worth and religion.

*Payne*, permitted the government to present a "quick glimpse" of each victim's life and uniqueness, and evidence about the loss from their deaths. *Payne*, 501 U.S. at 822. It did not permit the government to encourage a death sentence *because* of the victims' comparative worth or religion. *Payne*, 501 U.S. at 823; *Brooks v. Kemp*, 762 F.2d 1383, 1409 (11th Cir. 1985) (en banc), *reinstated after vacatur*, 809 F.2d 700, 701 (11th Cir. 1987) (urging a death sentence based on victim's religion is "clearly improper."); *Gathers*, 490 U.S. at 821 (O'Connor, Scalia and Kennedy, J.J., and Rehnquist, C.J., dissenting).

But the government violated those principles. The victims were portrayed as not only religious, but *more* religious, and *more* devout, than others: exceptionally devoted members and leaders of the congregation. This portrayal was not necessary to illustrate the victims' uniqueness; the jury heard extensive evidence about the victims' characters, relationships with family and friends, activities, and religious and community associations wholly apart from their religious beliefs. Nor was victims' comparative religiosity relevant to the

selection-of-site factor; the government asserted that that factor was adequately shown by evidence that Bowers selected a synagogue as a "high[] value target" and a Jewish house of worship (App.9498, 14149), and no evidence suggested he knew the characteristics of the victims that made them exceptionally virtuous or devout. Evidence about victims' religious beliefs and practices only illustrated their exceptional religiosity and suggested its significance.

Although courts in several capital cases have held government evidence about victims' religion did not impermissibly invite religion-based sentencing—*see, e.g.*, *United States v. Mikhel*, 889 F.3d 1003, 1053-54 (9th Cir. 2018), *United States v. Mitchell*, 502 F.3d 931, 989-90 (9th Cir. 2007), and *United States v. Bernard*, 299 F.3d 467, 477 (5th Cir. 2002)—those cases are distinguishable. Each involved relatively brief descriptions of religion tethered to the case facts or victims' interactions with family members, so as to reflect their families' losses. None involved extended stand-alone discussions of the victims' religious beliefs or practices for its own sake.

Also distinguishable is the Fourth Circuit's holding in *Roof* that evidence of victims singing, preaching, and praying was permissible

under *Payne* as showing their "uniqueness." *United States v. Roof*, 10 F.4th 314, 377 (4th Cir. 2021) (per curiam). The Fourth Circuit noted Roof's jury was expressly instructed that "victim testimony is limited by law to personal characteristics of the victim and the emotional impact o[n] the family" and was told to "disregard any other statements outside that." *Id.* No similar instruction was given here. Bowers's jury received no guidance on how to consider the extensive evidence of victims' religious observance or heightened virtue. Absent any such direction, the logical (but impermissible) implication was that the victims were exceptionally virtuous and religious people, and Bowers consequently was all the more deserving of death.[82]

---

[82] Although jurors were instructed on §3593's statutory prohibition against sentencing on the basis of religion, and certified on the verdict form they had followed it, (App.13167, 13805), it would have been illogical for them to ignore all the above-described evidence. *See Boyde v. California*, 494 U.S. 370, 383-84 (1990). Indeed, the jury might have complied with the certification and not based its sentence on the fact that victims were Jewish (which the certification prohibits), but still based its death sentence on the victims' exceptional virtue and devoutness.

**D.   The district court erred by admitting victim impact evidence involving hardships unrelated to the offense.**

The prosecution also presented detailed testimony about hardships victims suffered, unrelated to Bowers or the offense. This evidence "risk[ed] inappropriately affecting jurors who might feel that" the victims "should be vindicated for all [their] tragedies, not just for the one caused by [the defendant]." *Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020).

Such tragedies were common among the victims and their families. The jury heard testimony that one victim and his wife had been unable to bear children, (App.11032), the same victim severely injured his legs months before the offense, (App.11029-30), two victims' parents faced challenges raising them, (App.11071), other victims' adult son died in a motorcycle accident, (App.11220-21), multiple victims spent years caring for terminally-ill spouses, (App.11282-83, 11291, 11310, 11335), or had a spouse pass away, (App.11332-33), and a victim had lost his father as a child, his family struggled financially, and he experienced difficulty as a soldier stationed in Germany soon after the Holocaust. (App.11108-09.) Lisa Burns, the girlfriend of Officer Dan Mead, testified that Mead suffered neuropathy and nerve damage in his

legs, even though doctors were not sure whether those conditions resulted from the October 27, 2018 attack. (App.11252-54.) And Stanley Mallinger testified that he suffered a stroke sixteen years before his testimony. (App.11335.)

The prosecution reemphasized many of these unrelated hardships in closing argument, describing victims as having "ta[ken] care of his wife for many years before she died," "gr[own] up poor, [h]is father died when he was young, and his mother suffered from mental illness," and "[starting] working when he was twelve and work[ing] hard throughout his entire life," and "witness[ing] the aftermath of the Holocaust firsthand" while stationed in Germany after World War II. (App.13191-92.)

Absent any relation to the offense, this evidence improperly encouraged the jury to sentence Bowers to death arbitrarily, to compensate for victim hardships he did not cause, in violation of the Eighth Amendment and due process.

**E.    The district court erred by admitting victim impact testimony from surviving victims.**

The court admitted evidence concerning impacts on surviving victims outside the capital counts. The nonstatutory aggravating factor

that Bowers "caused [the surviving victims] serious physical and emotional injury" (App.13714-15)—which the court permitted over Bowers's objection, (DE241:56)—should have been stricken.

The surviving victims' testimony was some of the most powerful and emotionally-impactful evidence the jury heard. Dan Leger testified about his devastating physical and psychological injuries, inability to work or enjoy prior activities, emotional scars, and feeling of diminishment as a person. (App.11478-11505.) Officers Burke and Matson testified about their multiple surgeries, shattered bones and tendons, nerve damage, limited ability to work, and (in Matson's case) suicidal thoughts. (App.11089-11106 (Burke), 11421-43 (Matson).) Officer Mead's girlfriend, Lisa Burns, testified that Mead suffers nerve damage, cannot feel his feet, has trouble walking and using his hand, cannot drive, do carpentry or sports, or work, and suffers from feelings of worthlessness and lethargy. (App.11252-62.) At the guilt-innocence phase Officer Persin testified about his hearing loss (App.7006-08), while Officer Smigda testified about being sprayed with glass and shrapnel. (App.6373-91.) Andrea Wedner testified about being shot in the arm, her numerous surgeries and skin grafts, the loss of her

decades-long career as a dental hygienist, and her psychological trauma. (App.11464-76.) And the jury heard testimony about secondary impacts on survivors' loved ones, including Burns learning of the attack, and Leger telling his wife in the hospital "let me go" to avoid burdening her. (App.11480-81, 11486.) The prosecutor reprised this testimony at length in closing argument. (App.13196-13203, 13220.)

This evidence was wrongly admitted. The FDPA permits "a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. §3593(a). This language "[c]learly…refers to the victims of a capital crime," not surviving victims covered by noncapital counts on which capital juries do not pronounce sentence. *United States v. Gooch*, No. 04-128-23 (RMC), 2006 WL 3780781 at 22 (D.D.C. Dec. 20, 2006). Other FDPA provisions clearly show that "victim," means victims of capital counts. *See, e.g.*, §§3591(a)(2)(A)("killed the victim"); 3591(a)(2)(B)("death of the victim"); 3591(a)(2)(C)("the victim died"); 3591(a)(2)(D)("the victim

died"); 3592(a)(7)("the victim's death"); 3592(c)(5)("a grave risk of death

to 1 or more persons *in addition to the victim*") (emphasis added).[83]

This does not mean capital juries cannot consider attempted

murders at all. Such evidence "may be noted as a nonstatutory

aggravating factor" at sentencing. *Gooch*, 2006 WL 3780781, at *22;

*see, e.g.*, *United States v. Lujan*, 603 F.3d 850, 856 (10th Cir. 2010)

(permitting evidence about other murders at capital penalty); *United*

*States v. Runyon*, 707 F.3d 475, 505 (4th Cir. 2013) (unadjudicated acts

of violence against women). But this "does not mean…that the families

of [the defendant's] [noncapital] victims," or those noncapital victims

themselves, "can properly testify at the selection phase" about their own

resulting pain, loss, and ongoing impacts. *Gooch*, 2006 WL 3780781 at

*22; *see also United States v. Gendron*, No. 1:22-cr-00109-LJV,

DE464:10 (Sept. 16, 2024) (agreeing with *Gooch* that "victim impact

---

[83] Legislative history is equally clear. Before the FDPA's enactment, then-President George H.W. Bush proposed legislation with almost the identical language in § 3593(a), with an explanation saying victim impact evidence could include "the suffering of the victim in the course of the killing or during a period of time between the infliction of injury and resulting death." Comprehensive Violent Crime Control Act of 1991, H.R. Doc. No. 102-58, at 166 (1991), *available at* https://www.ojp.gov/pdffiles1/Digitization/145480NCJRS.pdf (last visited December 1, 2025).

evidence related to the non-capital crimes is not relevant to the capital sentencing.") Indeed, victim impact evidence is already a narrow exception to the general requirement that capital sentencing evidence must relate to the "character of the individual and the circumstances of the crime" *Zant*, 462 U.S. at 879, and matters within the defendant's knowledge. *United States v. McVeigh*, 153 F.3d 1166, 1215 (10th Cir. 1998). Stretching victim impact—a matter already outside the defendant's knowledge—beyond the capital crimes themselves contravenes *Payne*'s limits, the statute, and the Constitution.

The need for limits was particularly urgent here due to the force and volume of the survivor testimony. *See Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002) (cautioning "that victim impact and character evidence may become unfairly prejudicial"). Hearing agonizing testimony about maimed victims struggling to rebuild their lives—though unquestionably relevant to sentencing on the noncapital counts—was overwhelming. In a capital proceeding requiring heightened reliability, survivors' impact testimony wrongly focused the jury on impacts other than those from the capital offenses.

**F.    The government improperly suggested it and its witnesses "sp[oke] for" the deceased victims.**

In penalty phase closing argument, the government suggested it (or its witnesses) "sp[oke] for" the deceased victims, or that the jury should do so by imposing a death sentence. (App.13221-22, 13293.) This haunting claim—delivered amid large-scale photographs of each murdered parishioner displayed on a large-scale courtroom screen[84]—improperly urged the jury to sentence Bowers to death based on emotion and posited improper victim-impact testimony by hypothesizing that the deceased victims supported sentencing Bowers to death.[85]

---

[84] Video screens were situated inside the jury box, displaying video material just a few feet away from jurors' faces. (*See* DE:1492-8 (photograph of jury box).) The courtroom also contained a large screen visible to, and elevated slightly above, the jury. *See* Associated Press, *Jury Weighs Death Penalty or Life in Prison for Pittsburgh Synagogue Shooter*, (Aug. 1, 2023) (courtroom sketch of government closing), *available at* https://www.koin.com/news/national/ap-jury-begins-weighing-death-penalty-or-life-in-prison-for-pittsburgh-synagogue-shooter/ (last visited October 29, 2025).

[85] The defense initially moved *in limine* to preclude "speak for the victim" statements (DE1347), and, on the day of argument, the court permitted the defense to reserve its objections to the government's closing argument until after the argument concluded. (App.13222.) The defense promptly objected to the "speak for [the victims]" arguments in a motion for mistrial or curative instruction filed the same day,

Towards the end of its initial penalty-phase closing argument, the government described each deceased victim, while showing a PowerPoint depicting him or her deceased in the synagogue, juxtaposed against a photograph of the victim in life. Government counsel evoked a series of harrowing scenes from the October 27 attack, including Rabbi Myers hiding in the choir loft, Audrey Glickman and Joe Charney hiding under clothing, Jerry Rabinowitz turning to Dan Leger to say "Oh, Dan" before running into fatal gunfire, custodian Augie Siriano encountering the lifeless body of Cecil Rosenthal, Barry Werber watching in horror from the closet as Bowers stepped over Mel Wax, Andrea Wedner urging her mother to stay quiet, Officer Saldutte diving in front of Officer Matson to shield him from lethal gunfire, and Dan Leger lying near death in the hospital, begging his wife "Let me go." (App.13220-21.) The prosecutor then said "[w]hen you're deciding what is sufficient, don't forget the dead. The ones who couldn't speak for themselves," and named each deceased victim, saying his or her loss "alone is sufficient to justify a sentence of death." (App.13221-22.)

---

(DE1524:9), and argument the following morning (App.13324), but the court denied the motion. (App.384, 13327-28.)

Later, in rebuttal closing, government counsel evoked scenes of victims' families learning about the attack, officers' heroism, and Andrea Wedner's psychological and physical suffering, and again urged the jury to sentence Bowers to death. (DE1573:225-26.) In doing so, government counsel said, "[t]he family members, the people at the Tree of Life Synagogue who experienced this defendant's horror, they came in and they bore witness on behalf of those 11 men and women who cannot speak for themselves." (App.13293.)

"Arguments intended to inflame juror emotions…are inappropriate." *United States v. Tulk,* 171 F.3d 596, 599 (8th Cir.1999). Prosecutorial claims or directives to "speak for" deceased victims are improper if overly emotional or speculative. *See, e.g.*, *Moore v. Gibson*, 195 F.3d 1152, 1172 n.11 (10th Cir. 1999) (improper for prosecution to urge the jury to impose a death sentence for defendant's "future and…past victims"); *United States v. Rodriguez,* 581 F.3d 775, 803 (8th Cir. 2009) (improper for prosecutor to claim she can "speak for" the victim if, in context, "the comment appeals excessively to jurors' emotions"); *United States v. Alaboudi*, 786 F.3d 1136, 1144–45 (8th Cir.

2015) (improper to say in closing that the jury was "the only jury that gets to speak for each of" the victims).[86]

Here, the prosecutor's suggestion to "speak for" the deceased victims was both inflammatory and speculative. The prosecutor's statement "don't forget the dead. The ones who couldn't speak for themselves" immediately followed large-scale PowerPoint images of the deceased victims on the synagogue floor and harrowing descriptions of victims being murdered or hiding. (App.13220-21.) The government then described devastating injuries to Dan Leger and Andrea Wedner, and said they "bore witness on behalf of those 11 men and women who cannot speak for themselves." (App.13293.) These depictions of horror and heroism were exceptionally powerful.

They also urged the jury to speculate about what penalty the victims would want. Urging the jury to remember victims who could not speak for themselves, while advocating for a death sentence, suggested

---

[86] *See also People v. Brown*, 624 N.E.2d 1378, 1388 (Ill. 1993) (prosecutor's statement "we speak for the victims in this case" was irrelevant to defendant's guilt); *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. App. 1992) (improper for prosecutor to argue, "[t]he victim…isn't here to speak for himself and able or not, it is my job to speak for [him].").

the deceased victims wanted Bowers to receive that sentence. But there was no evidence of what the deceased victims would have wanted. And any such victim opinions about the proper punishment would have been barred under the Eighth Amendment as "opinions about the crime, the defendant, and the appropriate sentence." *Payne*, 501 U.S. at 830 n.2 (1991). For these reasons, the government's "speak for the victims" statements were improper, inflammatory, and unduly prejudicial.

## G.    The errors prejudiced Bowers.

Because the government cannot prove beyond a reasonable doubt this improper evidence and argument did not affect the verdict, Bowers's sentences should be vacated and the case remanded for resentencing. *United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011).

Victim impact testimony formed the core of the government's penalty-phase case, and—as described—repeatedly emphasized victims' exceptional virtuousness and profound religious faith. The prosecution devoted over one-third of its penalty-phase closing argument—eighteen of forty-six pages—to the victims' exemplary qualities and impact of the crime on their loved ones. (App.13176-13222.) It also played for the jury, in closing argument, an emotionally-devastating recording of victims

being fatally shot, (App.13205), displayed a graphic PowerPoint

showing each victim lying, deceased, on the synagogue floor, juxtaposed

against a photograph of him or her in life, and referred back to victims'

hardships unrelated to the offense. (App.13191-92.) Surviving victims

testified to their excruciating injuries—both physical and psychological,

(App.11089-11106, 11421-43, 11464-76, 11478-11505), as the

prosecution's closing arguments evoked overpoweringly emotional

scenes of victims being killed, seeing friends killed, and hiding in terror.

(App.13220-21.) And the jury was repeatedly instructed, both by the

court and on the verdict form, that it must consider victim impact

evidence. (App.13141-44, 13783, 13785.) The evidence's pervasiveness

and power made it impossible for the jury to ignore. Indeed, no juror

seeing and hearing the horrifying images and sounds of the

government's closing could have failed to respond with powerful

emotion.

Even without the horrifying images and sounds displayed in this

case, the force of victim impact testimony over jurors is well-recognized

and irrefutable. *Kelly v. California*, 129 S. Ct. 564, 567 n.3 (2008)

(Stevens, J., respecting denial of cert.) (describing "unsurpassed

emotional power of victim impact testimony on a jury"). Bowers's trial took this principle to its extreme: at multiple junctures victim-impact evidence left audience members audibly crying; counsel pointed out several instances of this. (App.6076-79) (discussing audience members crying audibly during 911 call, 911 operator testimony, and Myers's testimony); App.11371-75 (discussing audience crying during Amy Mallinger's testimony].) At least one witness fought back tears during his own testimony. (App.6079.) And at another point two survivors— Andrea Wedner and Officer Timothy Matson—engaged in an extended hug in the corner of the courtroom, in view of the jury. (App.5880-81.) The videos and photographs of religious services and items compounded the prejudice still further. *Kelly*, 129 S. Ct. at 567 (Stevens, J., respecting denial of cert.) ("[W]hen victim impact evidence is enhanced with music, photographs, or video footage, the risk of unfair prejudice quickly becomes overwhelming."). The government cannot prove beyond a reasonable doubt that at least one juror wasn't persuaded by this evidence of victims' exceptional worth, religion, unrelated hardships, and prosecutors' haunting claim to "speak for" the deceased victims, to sentence Bowers to death.

**X.    THE GOVERNMENT'S USE OF BOWERS'S STATEMENTS TO HIS OWN MENTAL-HEALTH EXPERTS TO ADVOCATE FOR DEATH IMPROPERLY PITTED HIS EIGHTH AMENDMENT RIGHT TO INTRODUCE MITIGATING EVIDENCE AGAINST HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.**

**A.    Introduction**

Bowers spoke to mental-health experts retained by the defense and by the government for the sole purpose of evaluating whether he suffers a severe mental illness, relevant to eligibility and selection.

The district court permitted the government to argue, well beyond and directly contrary to that limited purpose, that statements Bowers made to his own mental health experts showed he currently—at the trial—felt no remorse for his crimes and believed that he was engaged in a white supremacist war.

In doing so the court created an impossible dilemma for Bowers: forgo presenting the mitigating evidence that he suffers a severe mental illness or permit the government to distort that evidence into aggravation that would support a sentence of death. The United States Supreme Court condemned such a Hobson's choice in *Simmons v. United States*, 390 U.S. 377 (1968). For the same reasons, burdening Bowers's Fifth and Eighth Amendment Rights here was error. Given

the way prosecutors deployed this evidence, the government cannot show the error was harmless.

**B.    Standard of review**

Whether permitting the government to use Bowers's statements as evidence against him violated his constitutional rights is "a legal issue subject to plenary review." *United States v. Pavelko*, 992 F.2d 32, 33 (3d Cir. 1993).

**C.    Factual background**

**1.    Bowers spoke to mental-health experts for the limited purpose of evaluating whether he suffers from a mental illness.**

A central mitigating theme proffered by the defense at sentencing (in addition to a childhood characterized by trauma, neglect, and adversity) was that Bowers suffers a severe mental illness, specifically a psychotic disorder, the symptoms of which impaired his thinking and behavior and underlay his actions in committing the crimes in this case. (App.13795) (enumerating mitigating factors, including "Robert Bowers is a person with schizophrenia" and Robert Bowers was "motivated by the delusional belief that Jewish people were responsible for the deaths of children in America.").

To prove that Bowers suffers from that mental illness, the defense called a number of experts, including, during the eligibility phase of the sentencing proceedings, Siddhartha Nadkarni, who is board certified in neurology, psychiatry, and neuropsychiatry (App.8874), forensic psychologist Richard Rogers (App.9122), and, during the selection phase, George P. Corvin, a psychiatrist and an expert in general and forensic psychiatry (App.12642, 12652).[87] Each evaluated Bowers by reviewing thousands of pages of documents, including life and family history material, witness interviews, and other assessments of him, interviewing him multiple times, and interviewing collateral witnesses as well. (App.8905; App.12653-55, 12684-86).

Each expert opined that Bowers suffered a severe mental illness specifically, schizophrenia. (App.8934, 8981,.9169, 12687.) The diagnosis was supported by findings that he suffers both the positive symptoms of schizophrenia, including delusions and disordered thought,

_____

[87] As described above in the Statement of the Case, Section D, the sentencing proceedings were divided into an eligibility phase and a selection phase. During the selection deliberations, the jurors were allowed to consider the evidence adduced during eligibility proceedings. (App.13129.)

and the negative symptoms, including social impairment, lack of social interactions and flat affect, thus meeting the diagnostic criteria described in the Diagnostic and Statistical Manual. (App.8935, 8977, 9145, 9169-70, 9201, 9207-08, 12685-88, 12730-31, 12738.) The experts also determined that Bowers's illness impaired his functioning, including at the time of the offenses. (App.8938, 8979, 9201, 12731.)

The government's mental-health experts—Richard Darby, an expert in neurology, behavioral neurology, and neuropsychiatry (App.9806), and Park Dietz, a forensic psychiatrist (App.10110)—disagreed with the defense experts' conclusions that Bowers suffered schizophrenia or any severe mental illness. (App.9875-78, 10145.)

A primary dispute between the parties' experts turned on whether Bowers suffered delusions, one of the diagnostic criteria for schizophrenia. (App.8912, 9033, 9171, 10116-17, 12690.) The experts generally agreed that delusions are fixed, false beliefs. (App.8935, 9135, 12688, 12712-14.) They all agreed that determining whether Bowers suffers delusions—and, thus, whether the defense experts' schizophrenia diagnoses were correct—required a clinical interview of Bowers, during which the experts elicited and evaluated statements

from him. (App.9033-35, 9042, 9169, 9209, 12700-01, 12716-18, 12740, 12748-49.) The dispute between the parties over the diagnosis therefore turned, in large measure, on evaluation of statements Bowers made to the experts. (App.12740, 12747.)

Some of the statements elicited by the experts, including the defense experts, were shocking and offensive. For example, Dr. Nadkarni acknowledged that "[Bowers] said when the shooting stopped, he was, quote 'in the war now,' right?" and that he had described his victims as silhouette targets. (App.9051, 9053).

Dr. Rogers, during his clinical interview of Bowers, elicited similar statements, including that: Bowers saw himself as a warrior; he was proud of his actions; he felt he had done something heroic and was hurt that there were no medal or parades for him; and that he was a soldier in a war (App.9175, 9195). On cross-examination, the government elicited further statements, including that: Bowers wanted to avoid killing children because it would "not [be] good for the optics," and he described the killings, with pride, as the "worst attack in anti-Semitic history." (App.9223, 9234.) Dr. Rogers testified that, during the interview, Bowers expressed humor at having parked illegally when he

went to commit the far more illegal act of killing (App.9251-52) and found it ironic that one of his victims was left in the kitchen "near the oven" (App.9256-57); and he considered using poison gas to kill the victims, but ruled it out as impractical (App.9242). Bowers described the victims to Dr. Rogers as a "Yiddish dozen", meaning 11 and not 12, explaining that he was pleased, but wished he had killed more people. (App.9269-70.) And Bowers told Dr. Rogers that he wanted "messy kills", with the largest amount of "goo" to create a "horrific reaction," a theme the government returned to repeatedly on cross-examination. (App.9255, 9267, 9270-71.)

These defense experts elicited these statements from Bowers for the limited purpose of determining whether he was mentally ill. (DE1380:2-5; App.9033-34.) They believed that the statements evinced delusions and thus supported a schizophrenia diagnosis; the government's experts disagreed. (App.9171, 9177, 9191-9201 (Rogers, concluding delusions), 12730-38, 12804-05, 12812-13, 12823-24 (Corvin, concluding delusions); 9855-72 (Darby, concluding no delusions); 10137, 10154-77, 10183-84 (Dietz, concluding no delusions).) Ultimately, although the jurors did not find many of the mental-health mitigating

factors established, eight jurors found that Bowers believed he was acting on the side of God against Satan, and one found that his belief system was "fixed and false." (App.13795.)

## 2. The government expanded the use of Bowers's statements to the defense experts to support aggravating factors and the death sentences.

Bowers spoke to the parties' experts for the limited purpose of determining whether he suffered a mental illness. (DE1380:2-5.) As discussed below, the government agreed that any statements Bowers made to the *government's* experts could be used only to rebut his own mental-health evidence and mitigating factors. But as to statements Bowers made to his own experts, the government urged a free-for-all. They argued those statements could be used, without limits, to establish aggravating factors and in favor of a death sentence. (App.10972-73.) As detailed below, the court endorsed the government's view that unfettered use could be made of Bowers's statements to defense experts, overruled repeated defense objections, and ultimately, in its final instructions, imposed no limits on the jurors' consideration of those statements in support of aggravating factors and death sentences.

In its selection-phase opening, the government urged Bowers's statements to defense expert Dr. Rogers as proof of three of its aggravating factors.

In support of its religious-animus aggravating factor, the government argued:

> You also heard from Dr. Richard Rogers, the defendant's own witness, about how the defendant, even years after the crime, continues to spew his hatred of Jews. These are Dr. Rogers' notes which you saw and which Dr. Rogers testified about.
>
> The defendant called the 11 murdered victims the Yiddish dozen because he was shorted one. Dr. Rogers testified this was a reference to the common trope that Jews are cheap.
>
> Dr. Rogers evaluated the defendant in 2022, four years after his crime. The defendant made a callous and hateful joke about the victims he shot and killed. Dr. Rogers' notes also show the defendant said it was ironic that he killed a Jew by an oven, a reference to the Holocaust.
>
> The defendant continues to hate and denigrate Jews long after the crime....We will ask you to give substantial weight to the fact that the defendant killed these 11 victims simply because they belonged to a particular faith. He didn't know them personally. He killed them because, as he told Dr. Rogers, a Jew is a Jew is a Jew.

(App.10959-60.)

To prove the site-selection aggravating factor, the government

argued:

> As you heard from Dr. Rogers, the defendant
> developed three goals for his attack: kill people
> committing white genocide, the Jews; scare those
> thinking about such acts; and attract others to
> his mission.

(App.10960-62.)

Finally, the government used Bowers's statements to his mental-

health experts most extensively and repeatedly in its discussion of lack

of remorse:

> He made these decisions and he is proud of them.
> Even years later, he had absolutely no remorse
> for his crimes when he discussed them with his
> own expert.

(App.10948.)

> You have also heard from the defendant's own
> witness, Dr. Rogers, about statements the
> defendant made years after the attack. Dr.
> Rogers explained several things the defendant
> said about his victims that clearly show his lack
> of remorse. The defendant spoke about one of his
> victims crawling and then shooting that man
> three more times in the back.
>
> Dr. Rogers' notes also show that the defendant
> recalls one of his victims saying he was hurt bad.

What did the defendant tell Dr. Rogers he did? Put a shot in the back of his head.

You also remember Dr. Rogers' notes and testimony about how the defendant told him he wanted messy kills with as much goo as possible from the lower ribs to the belt.

The notes also say that the defendant talked about putting three bullets in 97-year-old Rose Mallinger. The defendant recalled she was bleeding everywhere.

Dr. Rogers also testified that the defendant talked about two people, who we know from the evidence were Richard Gottfried and Dan Stein, hiding in the kitchen and one of them hiding under the table and screaming no, no before the defendant killed him. The way he talked about his victims years after the crime shows his complete lack of remorse.

Dr. Rogers also explained the defendant's pride in what he had done. This too shows his lack of remorse. You will recall Dr. Rogers testified the defendant wanted parades and medals because he was proud and felt he had done something heroic.

Dr. Rogers also told you the defendant described with a sense of pride what he did as the worst attack in anti-Semitic history.

Finally, you heard from Dr. Rogers that the defendant said about his crimes, I was pleased but I have a sense of disappointment. I wished I had shot more.

> Years later, this defendant has no remorse for his
> decisions, no remorse for his actions, no remorse
> for these murders. We will ask you to give the
> defendant's lack of remorse immense weight.

(App.10963-64.)

> Lack of remorse, zero, the number of times the
> defendant told Dr. Rogers he was sorry about
> what he did.

(App.10969.)

Immediately after the openings, the defense objected to the government's expanded use of Bowers's clinical-interview statements in support of aggravating factors and sought a curative instruction. (App.10970-71.) The government agreed that statements to its experts could not, consistent with the Fifth Amendment or Federal Rule of Criminal Procedure, Rule 12.2, be used except to rebut the defense mental-health evidence and mitigating factors, but distinguished those from statements made to defense experts. As to statements Bowers made to Dr. Rogers, the government argued that neither the Fifth Amendment nor Rule 12.2 posed any limitations, and the government should be permitted to argue that evidence, without limits, including as affirmative proof of its aggravating factors. (App.10972-73.) The defense replied that such use was analogous to the Hobson's choice of playing

one constitutional right against the other that the Supreme Court

condemned in *Simmons*, 390 U.S. 377. (App.10973-75.)

The district court initially deferred ruling, inviting the defense to

submit a curative instruction, but indicated it was not inclined to so

instruct. (App.10974.) The defense filed a written motion that same day,

asking for a mistrial or a curative instruction stating that the

government's arguments had been improper and that statements made

by Bowers to the experts could be considered only for the limited

purpose of evaluating whether the defense had proven the mental-

health mitigating factors. (DE1477:1-2.) The court denied the motion.

(App.380, 11008-09.)

Later, during the selection-phase proceedings, the defense called

Dr. Corvin who, as described above, diagnosed Bowers as suffering from

delusions and, therefore, schizophrenia, evidenced by statements made

by Bowers during the clinical examination. On direct examination, Dr.

Corvin described at length what he viewed as Bowers's descent into a

delusional belief system that led ultimately to the crimes and supported

the schizophrenia diagnosis. Dr. Corvin, for example, testified that

Bowers described the Tree of Life Synagogue as being like "the Statue

of Liberty...for the Jews" and explained that he viewed himself as a soldier in a war directed by God: Bowers's belief that he had to act was "based on a belief that it's God's will for him to do this and that by ending those lives, he would save many, many more lives. When I last saw him, he still thought that." (App.12804-05.)

The government, licensed by the court's overruling of the previous defense objection, used its cross-examination of Dr. Corvin to emphasize extensive and damning statements by Bowers—never elicited by the defense—in support of its aggravating factors and a death sentence. For example, it elicited that Bowers saw himself, in custody, as a prisoner of war, saying more than once that jail was a "pretty good POW camp." (App.12933.) It asked Dr. Corvin to expand on the Statue of Liberty description, eliciting that Bowers had gone on to say "I shit on it." (App.12936.) And the government had Dr. Corvin confirm that Bowers had told him that he considered putting one of his victims in an oven. (App.12957.) Its cross-examination elicited that Bowers saw himself, in that moment, so long as he is still breathing, as involved in a war (App.12958-59), that the crimes were like signing the Declaration of Independence (App.12955), and, that he told Dr. Corvin, "If I have [a]

chance, [I] will continue war." (App.12975.) Near the end of its cross, it elicited that, during the trial, Bowers had told Dr. Corvin that he enjoyed hearing the evidence, because it meant that others were, too (and offered an opportunity to learn how effective his shooting had been), but he regretted that he still holds the "record for [an] anti-Semitic attack." (App.12975-76.)

Again, the defense objected, and again the court overruled the objection. (App.13003-04.)

With a green light from the court, the government's closing sentencing arguments emphasized Bowers's clinical interviews in urging the jurors to find its aggravating factors and to impose death. Bowers's statements to his experts comprise page after page of the government's summation remarks:

Religious Animus

> Dan Stein…He died feet from these ovens. The defendant told Dr. Rogers, a defense expert, that he thought that was ironic. And remember what he told Dr. Corvin, another defense expert? He thought about putting one of the victims, either Richard or Dan, in the oven, but he decided it might be bad for optics and, besides, he would have to put his gun down.

(App.13194.)

This defendant intended to kill with messy shots between the lower ribs and belt, to pulverize internal organs and create the largest amount of goo. That's his hatred.

(App.13291-92 (rebuttal).

Site Selection

Selecting a synagogue was central to achieving his goals, to amplify his message. Remember what he called this building? He said it was the Jews' Statute of Liberty. That's why he chose it. Because it was much more of a symbol than any other target he considered.

What did he tell Dr. Corvin, his own defense expert, about the Jewish Statute of Liberty, the Tree of Life synagogue? He said, "I shit on it."

(App.13184.)

The selection of target. The defendant viewed it as a high-value target, the Statute of Liberty.

He told his mental health experts he had three goals; kill Jews who threaten the existence of the white race, scare Jews who were helping to commit white genocide, and attract others to his mission. And he was able to do that through choosing a high-value target.

(App.13292 (rebuttal)).

Lack of Remorse

And, as it had in its opening, the government in closing relied extensively on Bowers's clinical interview statements to the defense experts to urge he lacked remorse.

> On the morning of October 27, 2018, Robert Bowers murdered 11 innocent people at the Tree of Life Synagogue in Squirrel Hill. He turned an ordinary Jewish Sabbath into the worst anti-Semitic mass shooting in US history. And he is proud of it. That's why you're here.

(App.13176.)

> And since then, you heard from his own witnesses that he has no remorse for the people he killed.
>
> All of the carnage he created all these years later, he hates Jews even more than he did then. He said that to Dr. Corvin. In the 15 total meetings the defendant had with defense experts, Dr. Corvin, Dr. Nadkarni and Dr. Rogers, over the last almost two years, not a word of remorse.
>
> Quite the opposite. He is proud, proud of what he did. So proud, in fact, that he told Dr. Corvin on June 3rd, during this trial, that he likes hearing the evidence in the case. By that date, almost every single surviving victim had testified. Most of the 911 calls had been played. And he liked what he was hearing.
>
> He told Dr. Corvin he wanted to know how effective his shooting was....Now, you heard Dr. Corvin say on Friday that the defendant is

somehow not capable of feeling remorse. Put aside that no other expert claimed that before Dr. Corvin, who didn't bother to say anything about remorse in his 29-page report, and use your common sense, just like you have all along.

People who are proud of what they do, who view their actions as accomplishments, they do not feel regret for those actions. It doesn't make you schizophrenic to be happy about something that you set out to do and actually did. This defendant just happens to be a white supremacist whose accomplishment is killing Jewish people.

There are many, many, people who believe the same things he does and would be just as proud. And like the defendant, they also are not delusional. They're just white supremacists. And remember, you know that he's not incapable of regret, because he definitely has some regrets.

You heard what he told his own experts. He regrets that he did not plan better. He regrets that he didn't bring more ammunition inside the synagogue. He regrets that he did not kill more Jews. He even regretted parking in a handicapped spot.

He regrets that although he tried to set the bar low enough, no one has come along and beaten his score. He regrets that he still holds the record for the worst anti-Semitic mass shooting in our country's history. That's what he regrets.

And it all underscores how aggravating his lack of remorse is for his crimes.

(App.13176.)

This defendant is proud of what he did. He's proud he killed 11 people, and he wishes he could kill more. His words are not stop the killing. Remember what he said to his own defense witness? His own mental health witness?

He wished he had killed more. He feels pleased. Regrets not taking out more. What did you just see a couple days ago in Dr. Corvin's notes? "No regret. Nope. Only regret not more."

For this defendant, 11 wasn't enough, so please consider this stop the killing argument within the context of this case and this defendant. Because in his own words, he wished he had killed more.

(App.13271-72 (rebuttal).)

Four and a half years have passed. Four and a half years since he committed these horrific murders. And he remains filled with hate for Jews. He said he has more, actually. No remorse, and he's proud.

He told his own expert he liked watching this trial. He sat through the testimony of the victims of these crimes, and he enjoyed it.

(App.13275 (rebuttal).)

Lack of remorse. He believes he deserves medals and parades for what he did. All of this goes on the scale. He compared what he did to the founding fathers in the history of our country establishing the US Constitution.

And after hearing the victims testify in the guilt phase of this trial, he told his own expert, Dr.

> Corvin, he welcomed hearing that evidence,
> especially about what an efficient shooter he is. All
> of that goes on the scale.

(App.13292 (rebuttal).)

After the summations, the defense again renewed its objections to the use of Bowers's statements, filing a written motion for a mistrial and a request for a curative instruction. (DE1524:1-2,10.) Following oral arguments on the motion, the district court again overruled the objection and denied the request for a mistrial and curative instructions. (App.384, 13323; App.384.)

In a final effort to cabin the clinical-interview evidence, the defense proposed instructions that would have restricted the jurors' use of Bowers's statements to all of the experts—government and defense— to evaluating the mental-health mitigating factors he proffered. (DE1508-3:18; App.13050-52, 13169-70.) The district court rejected the proposed instructions (App.13052, 13170) and, over objection, instructed the jurors only regarding the statements to government experts:

> The government and the defense introduced
> evidence that Robert Bowers made statements to
> law enforcement officials and mental health
> experts. Please note the statements Bowers made
> to the government's mental health experts may
> only be considered by you in evaluating Bowers'

> asserted mitigating factors related to mental illness. You may not consider the statements made by Bowers to the government's mental health experts in evaluating or in support of any asserted aggravating factors.

(App.13136-37.)

Its instructions, restricting use of statements made to government experts, but omitting reference to statements made to defense experts, left the jurors free use Bowers's statements to his own mental-health experts to support a death sentence.

**D.   Argument**

**1.   The court's ruling, permitting the government unfettered use of Bowers's statements to his experts, imposed a constitutionally intolerable price, forcing him to choose between his Fifth Amendment right to remain silent and his Eighth Amendment right to introduce important mitigating evidence in support of a life sentence.**

Bowers spoke to his mental-health experts for a limited purpose: to permit them to evaluate whether he suffered a severe mental illness—potentially important mitigating evidence. Despite that narrow purpose, the district court permitted the government to use his statements to his own experts, without limit, as affirmative evidence in support of a death sentence. In doing so, it imposed an impermissible

cost, pitting Bowers's Eighth Amendment right to introduce mitigating mental-health evidence against his Fifth Amendment right not to incriminate himself.

In *Simmons v. United States*, the Supreme Court condemned as "intolerable" procedures that play a defendant's constitutional rights one against the other. There, the Court held when a defendant testifies at a pretrial hearing in support of a motion to suppress evidence, his testimony may not thereafter be used against him at trial. 390 U.S. at 394. To permit otherwise would, in effect, create a "Hobson's choice" for the defendant, forcing him to choose between his Fourth Amendment right against unreasonable searches and seizures and his Fifth Amendment right against self-incrimination. The Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.*

Although mindful not to over-extend the *Simmons* concerns or solutions, this Court has not hesitated to conclude that *Simmons* required relief in like situations where, otherwise, exercising of one's Fifth Amendment rights would impair the exercise of other enumerated rights. *See*, *e.g.*, *Pavelko*, 992 F.2d at 34-35 (Sixth Amendment: error to

admit evidence about financial affidavit submitted in support of appointment of counsel); *United States v. Perry*, 788 F.2d 100, 115-16 (3d Cir. 1986) (bail hearing); *In re Grand Jury Investigation*, 587 F.2d 589, 597-98 (3d Cir. 1978) (Speech or Debate Clause); *United States v. Inmon*, 568 F.2d 326, 332-33 (3d Cir. 1977) (pretrial hearing before retrial on double jeopardy claim); *United States v. Branker*, 418 F.2d 378, 380 (2d Cir. 1969) (defendant's testimony at appointment-of-counsel hearing may not be admitted against him at trial); *Cf. United States v. Yurasovich*, 580 F.2d 1212, 1218 (3d Cir.1978) (guilty plea constitutes waiver of Fifth Amendment rights solely with respect to the crime to which the guilty plea pertains.). The concerns underlying *Simmons*, an intolerable pitting of enumerated rights one against the other, apply here with equal weight.

The Eighth Amendment guarantees the right to present mitigating evidence at a capital sentencing. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986). And both the Supreme Court and this Court have expressly recognized the importance, under the Eighth Amendment, of mental-health mitigating evidence. *See, e.g., Rompilla v.*

*Beard*, 545 U.S. 374, 390-91 (2005); *Brewer v. Quarterman*, 550 U.S. 286, 294 (2007); *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002).

The statements at issue here, derived from wide-ranging clinical interviews, were—according to the experts themselves—essential to a reliable evaluation of whether, in fact, Bowers suffered schizophrenia. As Dr. Corvin explained,

> [T]here is one way to diagnose schizophrenia. You see the patient, you evaluate the patient, you examine the patient, you look at their life history, you look—and you look at these things, but the only way that you diagnose schizophrenia is with a detailed personal evaluation, personal psychiatric mental status examination, and it is somewhat a diagnosis of history as we've discussed.

(App.12700-01; *see also* App.12727 ("Q. So in a clinical setting, you're listening for how someone is communicating with you? A. I'm listening for what they are saying. I'm observing how they say it, but it's equally important how I converse with them, too.")

The government's experts agreed. Dr. Dietz explained, "[t]he interview and the history are the bulk of what is significant for making a diagnosis of schizophrenia," and the interview "was really the most

important thing I had to do in order to determine the diagnosis in this case and whether the beliefs motivating the crimes of which the defendant has been convicted were due to delusion and mental illness, on the one hand, or due to something else on the other." (App.10144, 10154.) Similarly, Dr. Darby explained that he talked to Bowers about the crimes because "the entire purpose of the evaluation is to see, are any of these diseases, or the behaviors that they cause, are they relevant to his criminal actions, so did they contribute in any way to that behavior." (App.9855.)

The interviews, and Bowers's limited waiver of his Fifth Amendment rights, were thus "integral," as used in *Simmons*, 390 U.S. at 391, to his assertion of his Eighth Amendment right to offer mental-health evidence in mitigation. But, licensed by the district court, the government then used the same statements to incriminate Bowers, as affirmative proof of aggravating factors and in support of the death sentences—the same Hobson's choice, playing enumerated rights against each other, condemned in *Simmons*, but with far more severe consequences.

**2.** **The Hobson's choice imposed by the court also licensed *Griffin* error, when the government commented on Bowers's Fifth Amendment right not to testify and his Sixth Amendment right to a jury trial.**

The free-for-all licensed by the district court extended further, to permitting improper comments by the government on Bowers's exercise of his Fifth Amendment privilege not to testify, in violation of *Griffin v. California*, 380 U.S. 609, 615 (1965). For example, the government emphasized that Bowers never told "Dr. Rogers that he was sorry about what he did" (App.10969) and that "remorse" does not appear in Dr. Corvin's "29-page report" (App.13208): "In the 15 total meetings the defendant had with the defense experts…over the last almost two years, not a word of remorse." (App.13208.)

The purpose of speaking to the experts, however, was not to establish whether Bowers felt remorse for his actions; instead he participated in the interviews solely to permit the experts to evaluate whether he suffered a delusional system supportive of a schizophrenia diagnosis. Urging what Bowers did <u>not</u> say during the clinical examinations undertaken for a limited purpose—and suggesting that he be punished for not fully waiving his Fifth Amendment privilege to speak directly on the issue of remorse—violates *Griffin*, which forbids

comments on a defendant's silence. *See United States v. Whitten*, 610 F.3d 168, 198-200 (2d Cir. 2010) (defendant's unsworn, uncrossed expression of remorse effected only a limited waiver of his Fifth Amendment privilege not to testify, so government closing argument that "the path to that witness stand has never been blocked for Mr. Wilson" required vacating death sentence).

And the government's closing further strayed into comment on Bowers's purported election to demand a jury trial on the issue of punishment.[88] It argued, in support of lack of remorse as a reason to impose a death sentence:

> [H]e told Dr. Corvin on June 3rd, during this trial, that he likes hearing the evidence in the case. By that date, almost every single surviving victim had testified. Most of the 911 calls had been played. And he liked what he was hearing.

(App.13208.)

Thus, the government explicitly asked the jurors to draw an adverse inference—to place on the death side of the scale—the fact of the trial, burdening Bowers's Sixth Amendment right to a jury trial on

---

[88] As discussed below in Point XII, Bowers offered to plead guilty and avoid trial on all issues.

the issue of sentence. *See Whitten*, 610 F.3d at 195-96 ("[i]f the government invites the jury to find the existence of an aggravating factor based on 'inferences from conduct that is constitutionally protected...for example...the request for trial by jury,...due process of law would require that the jury's decision to impose death be set aside.") (quoting *Zant v. Stephens*, 462 U.S. 862, 885 (1983)).

Ultimately, the use of Bowers's statements in aggravation permitted by the court, and resultant impairment of Bowers's constitutional rights, was unnecessary. The statements given by Bowers need not have been suppressed entirely, but only channeled into the context in which they were made by an appropriate instruction that balanced the parties' interests. The defense proposed this solution. Limiting the jury's consideration of the statement to their mitigating value would have accommodated, seamlessly, both Bowers's to put on evidence of his mental illness and the government's right to meet that evidence.

Such a limitation would have comported precisely with, and was required by, this Court's holding in *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991). There, the defendant testified at his own capital sentencing,

about biographical information, including his deprived childhood and family background. He did not testify about the merits of the charges against him. *Id.* at 1540. As in this case, the prosecution in its closing arguments commented on the defendant's failure to express remorse in his testimony. *Id.* ("[H]e didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say I'm sorry.").

This Court found the defendant's testimony about biographical mitigating circumstances, and not about the crime, effected only a limited waiver of his Fifth Amendment privilege such that the lack-of-remorse comments were improper. *Id.* at 1542 ("[W]e do not believe that a defendant's penalty phase testimony about mitigating factors that are wholly collateral to the charges against him operates as a complete waiver of the defendant's self-incrimination privilege…"). And the Court held that the error, combined with a second improper argument in closing, could not be deemed harmless, requiring reversal of the death sentence. So too, here, Bowers effected only a limited waiver, for the purpose of establishing mitigating mental-health evidence. The district

court's failure to confine the government's use and the jurors'

consideration of Bowers's statements was error.

### 3. The government cannot show that the error was harmless beyond a reasonable doubt.

The government cannot, as it must, establish that the error was

harmless beyond a reasonable doubt. 18 U.S.C. §3595.

As described above, although the case was highly aggravated, in

the federal system highly aggravated cases often result in sentences

less than death. *See* Appendix A (citing cases).

Moreover, and as also detailed above,[89] the defense at sentencing

offered substantial mitigating evidence of Bowers's traumatic,

adversity-filled childhood and youth, his family history and his own

history of mental illness and suicidality, and his positive adjustment to

custody. In all, the defense submitted 115 mitigating factors for the

jurors' considerations, most of which were found unanimously or by

most or many of the jurors. (App.13786-13800.)

The government's arguments were neither brief nor isolated.

*United States v. Ebron*, 683 F.3d 105, 130 (5th Cir. 2012) ("an

---

[89] Statement of the Case, Section A.

aggregation of non-reversible errors…can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (cleaned up). To the contrary, they were highly inflammatory and featured prominently, comprising multiple pages in the transcripts and forming central pillars for their arguments in favor of three aggravating factors.

And the arguments focused on lack of remorse, an aggravating factor of particular salience to jurors. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 COLUM. L. REV. 1538, 1560 (1998); *see also* Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 CORNELL L. REV. 1599, 1633 (1998) ("In short, if [South Carolina] jurors believed that the defendant was sorry for what he had done, they tended to sentence him to life imprisonment, not death."); Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Tactics, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1560 & n.12 (1998). *See also*, e.g., Sally Constanzo & Mark Constanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 LAW AND HUM. BEHAV. 151, 161 (1994) (A

significant number of Oregon capital jurors, in opting for death, relied on the fact that the "defendant displayed no remorse for his crime.").

Worse, the government's repeated theme of the recency of the statements, urging that in that moment Bowers, in the words of his own experts, continued, in the present tense—e.g., in "15 total meetings the defendant had with defense experts...over the last almost two years, not a word of remorse," "[h]e regrets that he did not kill more Jews," "he is proud of what he did," and if he is still breathing, "[i]f I have a chance, [I] will continue the war." (App.12891, 12975, 12986-87)—to feel no remorse and to harbor the motive and goal to kill, unabated, undermined the defense mitigation that he could be maintained safely in prison if sentenced to death. It also injected the issue of future-dangerousness—the risk that Bowers might commit acts of violence in the future if not executed—into the case, an aggravating factor that, like lack of remorse, weighs heavily with sentencing jurors. Empirical studies of actual capital jurors show that, whether formally alleged or not, future dangerousness weighs heavily on their minds. *See*, *e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev.

397, 398 (2001); Scott E. Sundby, *War and Peace in the Jury Room: How Capital Juries Reach Unanimity*, 62 HASTINGS LAW JOURNAL 103, 117 (Nov. 2010) (capital jurors "consistently expressed the view – even those who were strongly moved by the defendant's case for life – that they would vote for a death sentence if they were not assured that the defendant would be safely locked away").

Given the importance of these factors and the inflammatory and extensive comments by the government, the error was not harmless and reversal is required.

## XI. THE AVOIDING-MARTYRDOM MITIGATING FACTOR WAS PROPER REBUTTAL AND MITIGATION, AUTHORIZED BY THE CONSTITUTION AND THE FDPA, AND SHOULD HAVE BEEN SUBMITTED TO THE JURY.

### A. Introduction

The government portrayed Bowers as a remorseless and determined white supremacist who viewed himself as a prisoner of war, for whom life imprisonment would be insufficient punishment and might actually risk additional harm by allowing him to continue to spread his hateful ideas. Victim impact testimony during the post-verdict sentencing proceeding suggested this characterization

resonated; relatives of those killed feared Bowers would promote hate and violence if sentenced to life in prison. Jurors likely feared the same.

As discussed, the jury heard substantial mitigating evidence about Bowers's disadvantaged family background, childhood trauma, medical and mental health impairments, and positive adjustment to incarceration, as well as expert perspectives on his functioning. Although their verdict was death, jurors found mitigating factors on all these topics, plus that a life sentence is severe, that the government could safely house Bowers, and that a life sentence could produce redemption and change. (App.13786-800.)[90] A possible reason for their death verdict despite those mitigation findings was suggested in relatives' testimony at imposition of sentence: adoption of the fear propagated by the government that Bowers would promote hate and violence during a sentence of life in prison.

However, jurors were not permitted to consider an enumerated mitigating factor that would have countered this concern: "[i]f Mr. Bowers is sentenced to death, he may be seen as a martyr and his death

---

[90] In total, jurors found 87 mitigating factors, 58 of them unanimously.

exploited by others to justify future hateful acts." The defense timely proffered that mitigating factor (DE1517:1; App.13047-49, 13060-61), but the government opposed its submission (App.13048), and the district court refused to include it on the verdict form (App.13301). The court did not say why. (App.13301.)[91] This was error. The Constitution and FDPA entitled Bowers to submit the "avoiding-martyrdom" factor in rebuttal, given the government's emphasis on Bowers's "war" mentality, his lack of remorse, how his attack could inspire others, and that life in prison would not sufficiently punish him. Bowers was also entitled to offer the mitigating factor as affirmative mitigation, since it addressed the circumstances of the offense and described the impact of a life sentence on him.

## B. Standard of review

The district court's refusal to submit a mitigating factor is reviewed *de novo*. *See United States v. Roof*, 10 F.4th 314, 369 n.37 (4th Cir. 2021) (per curiam).

---

[91] The court ruled: "Some quick rulings. At ECF 1517, the martyr mitigating motion, I'm going to deny that motion. I'm not going to identify it when I charge the jury on martyr mitigator." (App.13301.)

## C.    The avoiding-martyrdom factor was proper rebuttal.

Both the Constitution and the FDPA permit capital defendants to rebut information presented in support of a death sentence. *See Simmons v. South Carolina*, 512 U.S. 154, 165 (1994) (plurality opinion) (capital defendant was entitled to inform jury of parole ineligibility where state placed future dangerousness at issue); 18 U.S.C. §3593(c) ("the defendant shall be permitted to rebut any information received at the hearing."). This is true even when the government merely implies, rather than explicitly argues, a point. *See Kelly v. South Carolina*, 534 U.S. 246, 252-57 (2002) (a capital defendant has a right to rebut future dangerousness that government has put "at issue" in the case).

Here, the government urged the jury to sentence Bowers to death due to the nature of his crimes, his lack of remorse, his adherence to white supremacist ideology, the risk he would continue to spread hate in prison, and its view that lifetime imprisonment would not be sufficiently harsh for him. (App.13176-13210, 13289-90.) As discussed further below, the aggravating factors, evidence, and argument emphasized these issues, including Bowers's selection of the site of the crime for maximum impact, his hope to engage others in his cause, the

government's alleged inability to control him in prison, his continuing fealty to his hateful ideas, and even his age. This idea—that a death sentence was the only way to control the hateful ideology underlying the attack—would have been directly rebutted by the avoidance-of-martyrdom mitigating factor, which posited that an execution could actually *increase* the likelihood this hateful ideology would be spread and incite further violence.

These issues infused every aspect of the government's case and were implicated in four aggravating factors the Court instructed the jury to weigh (App.13160), and which the jury found unanimously beyond a reasonable doubt. (App.13073-74, 24776-78.) As part of the statutory "substantial planning and premeditation" aggravating factor (DE86:3), the government argued that one of Bowers's goals in committing the attack was to "attract others to his mission." (App.10790.) It elicited testimony from jail staff that Bowers spoke about his beliefs during pretrial detention (App.9332-33),[92] and it

---

[92] This evidence was slim—one staff member recounted that Bowers reacted to TV news reports. (App.9330-33.) Nonetheless, the government specifically elicited it.

attempted to undermine the idea that the Bureau of Prisons could control his communications during a sentence of life imprisonment. (App.12599-608, 12614, 12631-32.)

With the "religious animus" non-statutory aggravating factor (DE86:4), the government emphasized the depth and breadth of Bowers's antisemitic hatred. This focus on Bowers's "expression" of hate (DE86:4)—beyond the role that religious animus played in the attack— supported the notion that the world would not be safe from him during a sentence of life imprisonment. The expression included the hundreds of Gab posts and "likes," and the content from Bowers's email and phone, not directed at HIAS, the Tree of Life, or Bowers's motive or intent. This "hate" evidence consumed the testimony of five witnesses and involved two lengthy summary charts.[93] It ranged from angry to threatening to vile. It contained slurs, references to the Holocaust, and ugly stereotypes.[94] Most was not original to Bowers; he simply "liked" or

---

[93] The witness testimony is at: App.6551-54 (Collins); App.6555-77 (Browning); App.7717-57 (Torba); App.7763-99, 7819-7907 (Browne); App.7918-8001 (Braniff). The summary charts are at App.13610-38 [GX411A] and App.13639-75 [GX411B].

[94] *See generally* App.13610-38 [GX411A] and 13639-75 [GX411B], *e.g.*, referring to Jewish people as "kikes," embracing the Holocaust, and

333

"reposted" it. (App.7895-96.) But the government emphasized the sheer

quantity of hateful content.[95] In urging the jury choose the death

penalty, it referenced an expert who situated Bowers's expression in the

context of "Nazi Germany and the Final Solution…the intentional

genocide…in which nearly six million Jews were killed." (App.13282-83.

*See also* App.13181-82 ("You've heard how he downplayed the

Holocaust, or as it is known in Hebrew, the Shoah, the systematic

extinction of six million Jews by the Nazis during World War II. The

defendant claimed it didn't happen, but he wished it had."))

Reinforcing the potential threat, the government stressed

Bowers's "lack of remorse," another non-statutory aggravating factor

(DE86:4.) Discussion of lack of remorse pervaded the eligibility and

penalty phases. (*See* Point X, above.) And in closing argument, the

government cited examples implying Bowers would be dangerous

---

suggesting that Jews rape children. Witnesses Browne and Braniff
reviewed dozens of individual expressions of hate in their testimony.
(App.7773-98; 7820-34, 7840-77, 7961-86.)

[95] One witness conducted word searches of Bowers's social media
and told the jury that he used a particular slur 131 times. (App.7840-
41.) In closing argument, the government cited his "hundreds of Gab
posts, reposts, and likes," which contained slurs and denials of the
Holocaust, repeated by the prosecutor. (App.13181-82.)

during lifetime imprisonment, including his "regret[] that although he tried to set the bar low enough, no one has come along and beaten his score. He regrets that he still holds the record for the worst anti-Semitic mass shooting in our country's history." (App.13209. *See also, e.g.*, App.13204 ("[N]o remorse for what he did. None. None."); App.13275 ("No remorse, and he's proud.")) It further argued that Bowers was beyond redemption, due to his age, suggesting the danger could persist for decades. (App.13275.)

Moreover, during a term of life imprisonment, according to the government, Bowers would be comfortable, despite testimony by defense experts about the isolating conditions at USP Florence Administrative Maximum. (*See* App.12533-49, 12566-75, 12626-30.) Therefore, the government urged the jury that, for Bowers, life imprisonment was a "lesser" punishment:

> Life in prison is the minimum sentence here. If you sentence this defendant to life in prison, you're giving him the minimum punishment. It is a lesser punishment than death. And so you need to ask yourself, should this defendant receive the minimum penalty under the law for the murder of 11 people? Does he deserve the minimum punishment, or do these crimes demand more. If he ends up at ADX, he won't find it that bad. All he does now is sit alone and watch TV. He doesn't

> take rec. He'll have a TV and a tablet in his cell.
> Justice doesn't call for the minimum sentence, it
> calls for death.

(App.13289-90.)

The avoiding-martyrdom mitigating factor directly rebutted these

contentions by explaining that life imprisonment would—as defense

counsel argued in closing—condemn Bowers to a life of obscurity

(App.13226), where he could not fulfill his alleged desire to promote his

ideology. (App.13262.) *See United States v. Troya*, 733 F.3d 1125, 1135

(11th Cir. 2013) (quoting *United States v. Frazier*, 387 F.3d 1244, 1269

(11th Cir. 2004) ("[T]he purpose of rebuttal evidence is to explain, repel,

counteract, or disprove the evidence of the adverse party." (internal

quotation marks omitted))). This argument was especially strong for

Bowers, who was a "socially isolated loner" even when not incarcerated

(App.10144), had few loved ones (App.9347, 10239, 10244), and had

demonstrated during almost five years of pretrial detention that he

could not effectively promote his agenda while incarcerated. (App.9332,

9350). And because he would almost surely be committed to a

Supermax prison under communications restrictions. (App.12522,

12620, 12626-27.)

The power of the avoiding-martyrdom argument is evident in the cases where it was submitted and found by the jurors. For example, in *Mohamed*, the 1998 Embassy Bombing case, in which the defendant was similarly responsible for the deaths of eleven people, planned to kill more, and was a member of Al Qaeda in the heyday of Usama Bin Laden, seven jurors found this mitigating factor. Defense counsel's closing argument focused on how we all understand that putting someone to death can immortalize them:

> Now, all of you know the power of martyrdom. It's not just an Islamic thing. All of us know the name of Joan of Arc because she was burned at the stake. But it's not just big people who are immortalized by martyrdom. Small people, too. You all know the name Nathan Hale: I regret that I have but one life to give for my country. He was just a soldier in the revolutionary war, just a Vermont soldier. No one would know who he was, had he be[en] held in a prisoner of war camp, but instead, once he was executed, he became a rallying cry, a martyr, and we remember him to this day.
>
> Send him to jail and he'll quickly be forgotten by all except those who love him. Kill him, and you've guaranteed him immortality.

*Mohamed*, No. S(7) 98 Cr. 1023 (S.D.N.Y.), Tr. July 2, 2001, at 8639. A similar argument could have been made here, with special focus on how

the online community in which Bowers participated had a "war" mentality likely to incorporate Bowers's martyrdom. (App.13640-41, 13644-45, 13655, 13674.) Since, as discussed below, jurors found other mitigating factors underlying this one, the argument would likely have been effective.

The district court erred in prohibiting it.

## D. The avoiding-martyrdom mitigating factor should have been submitted as affirmative mitigation.

A capital defendant has the Eighth Amendment right to present and have the jury consider all relevant mitigating evidence at a capital sentencing hearing. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). Mitigating evidence broadly includes any information that "might serve as a basis for a sentence less than death," *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (cleaned up), or that "a fact-finder could reasonably deem to have mitigating value," *Smith v. Texas*, 543 U.S. 37, 44 (2004) (per curiam). Its purpose is to individualize the sentence, so "the sentencer…[can]not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

338

The FDPA reflects this broad right. It provides that the sentencing jury "shall consider any mitigating factor, including the following." 18 U.S.C. §3592(a). It then sets forth seven specific mitigating factors[96] and an eighth, "catch-all" provision, requiring the jury to consider "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. §3592(a)(8). The avoiding-martyrdom factor should have been submitted as a "catch-all" factor.

Martyrdom was implicated by the circumstances of the offense and the government's framing of it. The government portrayed Bowers as a member of a broader antisemitic conversation about the Great Replacement theory—the belief of some white supremacists that nonwhite people are undermining white people through interracial marriage, increased divorce, immigration, and other means. Witness Evan Browne testified about Bowers's participation in the Gab online

---

[96] These factors are: (1) impaired capacity; (2) duress; (3) minor participation; (4) equally culpable defendants; (5) no prior criminal record; (6) severe mental or emotional disturbance; (7) victim's consent. 18 U.S.C. §3592(a).

forum where he posted, "liked," and reposted hundreds of antisemitic messages and memes. (App.7763-99, 7819-7907, 13610-38 [GX411A] and 13639-75 [GX411B].) Some of these discussed the need to "stand up now," or "riseup." *See, e.g.*, (App.7827-28, 13630-31.) Ultimately, Bowers posted on the day of the attack, "[s]crew your optics. I'm going in." (App.7838.) Browne shared with the jury the names of other online community members with whom Bowers communicated and who, the jury could have reasonably concluded, might have been interested in the outcome of his attack. (App.7763-67.)

Others outside Bowers's online community would also be interested. The government's expert in "white supremacy ideology," William Braniff (App.7960), who specializes in counterterrorism and terrorism prevention (App.7919-20), situated Bowers's crime in a broader context, including the "Unite the Right" rally in Charlottesville, Virginia that culminated in the murder of counterprotestor Heather Heyer. (App.7960-86.) Historian Barbara Burstin described the historic significance of Bowers's target, the Tree of Life Synagogue, in the Squirrel Hill neighborhood of Pittsburgh, "one of the oldest and largest Jewish communities in the United States." (App.11205-14.)

The government also emphasized Bowers's own views about the attack, conveyed to mental health experts, including that one of his goals was to bring attention to the Great Replacement theory (App.9861, 10298),[97] and that he believed he had achieved something deserving of recognition by society (App.9273-74, 9278). These were themes in the government's eligibility and selection closing arguments. (App.10790, 13176, 13209, 13222, 13274.) The government opened and closed its summation in the selection phase with Bowers's pride in carrying out the worst antisemitic mass shooting in history. (App.13176, 13222, 13274.) It noted his regret that nobody had "beat[en] his score" (App.13209), and his hope to attract others to his mission. (App.10790).

The avoiding-martyrdom mitigating factor has been approved in at least four analogous FDPA cases, including terrorism and gang cases.[98] The verdict forms in these cases are available at

---

[97] In closing, the government called this "attract[ing] others to his mission" (App.10790), and "draw[ing] other people to his cause" (App.13183).

[98] It does not appear to have been requested in the most recent analogous case, *Roof*, involving the shooting attack at the Emanuel AME Church in Charleston, S.C.

https://fdprc.capdefnet.org/verdict-forms (last visited Dec. 12, 2025). The cases are:

- *United States v. Zacarias Moussaoui*, No. 01cr455 (E.D. Va. 2006), convicted and sentenced to life for his role in the 9/11 attacks. The court submitted, but no jurors found, the mitigating factor "[t]hat the execution of Zacarias Moussaoui will create a martyr for radical Muslim fundamentalists, and to al Qaeda in particular," but the court approved its submission.[99] (DE1517:5-6.)

- *United States v. Oscar Antonio Grande*, No. 1:04cr283A (E.D. Va. 2005), convicted and sentenced to life for witness tampering. The court submitted, and one juror found, "[t]hat the execution of Oscar Antonio Grande will aggrandize his name and reputation among other members of MS-13 and will likely encourage adherence and respect for the 'rules' of MS 13 [sic] that a sentence of life in prison would not achieve." (DE1517:6.)

- *United States v. Khalfan Mohamed*, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. 2001), convicted and sentenced to life for his role in the 1998 United States Embassy bombings. The court submitted, and eleven jurors found, the mitigating factor that, "[i]f Khalfan Mohamed is executed, he will be seen as a martyr and his death may be exploited by others to justify future terrorist acts." (DE1517:5.)

---

[99] Another avoidance-of-martyrdom factor was also submitted: "That Zacarias Moussaoui believes that his execution will be part of his Jihad and will provide him with the rewards attendant to a martyr's death." Special Verdict Form, *United States v. Moussaoui*, No. 01-cr-455 (E.D. Va. 2006), at Mitigating Factor F, *available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/Verdict%20Forms/moussaoui_zacarias_ed_va_2006_redacted_and_anonymous_jury.pdf (last visited Oct. 21, 2025).

- *United States v. Mohamed Rashed Daoud Al-ʿOwhali*, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. 2001), convicted and sentenced to life for his role in the 1998 United States Embassy bombings. The jury wrote in the mitigating factor that, "[e]xecuting Al-ʿOwhali could make him a martyr for al Qaeda's cause," and 10 jurors found it. (DE1517:6.)

The circumstances of Bowers's offense raised similar concerns, and the defense appropriately proffered a mitigating factor that accounted for them. *See Lockett*, 438 U.S. at 604 (defining mitigation as including "circumstances of the offense" that provide a basis for a sentence less than death); 18 U.S.C. §3592(a)(8)("any other circumstance of the offense that mitigate against imposition of the death sentence").

The avoiding-martyrdom factor also described the impact of a life sentence on Bowers and therefore spoke to his "character." *See id.* For Bowers, who viewed himself as a prisoner of war and sought to inspire other white supremacists, condemnation to obscurity during a life sentence was arguably a more severe punishment than the martyrdom of a death sentence. The avoiding-martyrdom factor would have allowed the jury to weigh in favor of a life sentence the impact on Bowers of being committed to a "very controlled," "super max" prison (App.12531) forever.

Those conditions would be very different from what Bowers was used to when he was free or even during pretrial detention. Defense expert and former Bureau of Prisons administrator Maureen Baird, a prison consultant, explained that Bowers was likely to be designated to USP Florence's Administrative Maximum ("ADX") if sentenced to life without release. (App.12506-20, 12521-25.) There, he would live in solitary confinement, isolated behind gun towers, razor wire, and electrified fences, in an underground facility accessible only through multiple locked metal doors. (App.12534, 12536-42.) He would be unable to communicate with other prisoners (App.12542) and have limited, monitored communication with the few people who loved him (App.12545-47).[100] The government also could set additional restrictions on his communication if it determined he presented a national security concern or other threat. (App.12549-50.) This would surely be a challenge for Bowers, whom the government emphasized thrived off public attention. (App.12498, 12752.)

---

[100] As discussed, the evidence established Bowers as a loner, with few friends and limited family support. *See* Statement of the Case, Section A.

The avoiding-martyrdom factor therefore fit comfortably within both the Constitutional and FDPA definitions of mitigation—as related to both circumstances of the offense and background and characteristics of the defendant—and should have been submitted to the jury. *See Lockett*, 438 U.S. at 604; 18 U.S.C. §3592(a)(8). Even if it had not met these definitions, the language of the FDPA suggests that there may be mitigation that extends beyond the 18 U.S.C. §3592(a)(8)'s catch-all factor for any "other [mitigating] factors in the defendant's background, record, or character or any other circumstance of the offense." *See* 18 U.S.C. §3592(a) (list of illustrative factors, including the catch-all, is prefaced by requirement that "finder of fact shall consider any mitigating factor, *including the following…*") (emphasis added); 18 U.S.C. §3593(c) ("information may be presented as to any matter relevant to the sentence, *including* any mitigating…factor permitted or required to be considered under section 3592") (emphasis added). A number of courts have held that the FDPA authorizes mitigation beyond the minimum specified, *i.e.*, not just evidence or factors related to the crime, or the defendant's character or background. *See, e.g., United States v. Caro*, 433 F. Supp. 2d 726, 727-28, *aff'd in part and*

*rev'd in part on other grounds*, 461 F. Supp. 2d 459 (W.D. Va. 2006);

*United States v. Sampson*, 335 F. Supp. 2d 166, 194-95 (D. Mass. 2004);

*United States v. Bin Laden*, 156 F. Supp. 2d 359, 370 (S.D.N.Y. 2001);

*United States v. Davis*, 132 F. Supp. 2d 455, 464-65 (E.D. La. 2001). The district court's failure to submit the avoiding-martyrdom factor therefore was error.

## E. The district court's error in refusing to submit the avoiding-martyrdom mitigating factor prejudiced Bowers.

The concerns the government referenced about Bowers's service of a sentence of life imprisonment likely alarmed the jury by suggesting that Bowers might inspire others to commit similar attacks if not sentenced to death. Victims' relatives expressed those same concerns during the sentencing proceeding following the jury's death verdict, supporting that they were likely on the minds of jurors, as well. But the district court's refusal of the avoiding-martyrdom mitigating factor left the defense unable to address them.

The victim impact statements echoed the government's evidence and arguments about Bowers's lack of remorse and desire to inspire others, and about how prison would be both too comfortable for him and a place to foment his cause. *See* App.13407-08, 13417, 13429, 13458,

346

13473, 13476. But some statements also showed how the avoiding-martyrdom mitigating factor might have helped at least one juror consider how a life sentence would have better achieved the goal of minimizing the spread of hatred. Victims spoke of the need to control Bowers's ideas and suggested that the death penalty would be the simplest way to accomplish this. (App.13417, 13429, 13457.)[101] But the avoiding-martyrdom factor challenged this, especially when considered alongside the evidence that Bowers was an isolated loner who hadn't spread hate while incarcerated and whose communication the government—indeed, these prosecutors (App.12569, 12627)—could control. In fact, the avoiding-martyrdom factor posited, the death penalty would exacerbate the problem and remove it from the government's control. Bowers would die, but others would carry on in his name.

The defense mentioned martyrdom in closing argument but appears to have felt compelled by the Court's order not to argue it.

---

[101] These views were amplified in media coverage. *See, e.g.*, Hallie Lauer*, "Begin to Heal": Pittsburgh reacts to the synagogue shooter's death sentence*, Pittsburgh Post-Gazette (Aug. 2, 2023).

It devoted just one sentence to the concept: "[t]o be sure, prison is where Mr. Bowers will die in obscurity, not as a hero and not as a martyr." (App.13226.) This was inadequate to convey the issue to the jury. It did not explain the decision jurors had to make between committing Bowers to the bowels of a Supermax prison under communications restrictions and giving his allies the platform of the death penalty process to promote their ideology. It did not explain how the evidence showed Bowers, in particular, was more likely to die in obscurity in prison— because of his loner character, lack of loved ones, and unremarkable jail record—than if executed. This mattered; jurors found multiple mitigating factors that suggest this factor would have resonated with them, several unanimously.[102]

---

[102] These included that: "The Department of Justice has the power to restrict and monitor any or all of Robert Bowers' communications with the outside world." (App.13798 (factor 101, 12 jurors)); "During Robert Bowers' pre-trial confinement he has not communicated or attempted to communicate with anyone other than family." (App.13798 (factor 102, 2 jurors)); "Correctional staff at Butler County Prison confirm that Robert Bowers has not influenced or attempted to influence others to adopt antisemitic views." (App.13799 (factor 103, 12 jurors)); "If sentenced to imprisonment without the possibility of release, Robert Bowers will be designated to a highly secure federal prison." (App.13799 (factor 105, 12 jurors)); "A sentence of life imprisonment without the possibility of release provides hope that

Moreover, by refusing to submit the avoiding-martyrdom mitigating factor, the court prevented the jury from weighing the argument as part of its decision whether Bowers should live or die. Indeed, the jury was instructed to consider only "whether the aggravating factors sufficiently outweigh the mitigating factors…to justify a sentence of death [on each count]." (App.13160.) This effectively communicated that other arguments were out of bounds in the life-or-death determination. That allowed the government to take unfair advantage and create the misleading impression that death was the only option to control Bowers.

True, the district court told the jury that it could identify mitigating factors not submitted to it, but which it found to constitute a reason that a sentence of death was not appropriate. (DE1537:21-22; DE1573:90.) However, given that the defense submitted 115 mitigating factors, covering everything from Bowers's early childhood to his education to his employment history to his medical and mental health

---

Robert Bowers may one day come to understand the wrongfulness of his conduct." (App.13800 (factor 113, 4 jurors)); "A sentence of life in prison without the possibility of release offers the possibility of redemption and change." (App.13800 (factor 114, 8 jurors)).

(DE 1537:7-21), it is unsurprising jurors did not write in additional factors. Indeed, a review of verdict forms in federal capital cases demonstrates that jurors tend to exercise this authority more often where the range of mitigating factors is relatively limited. *See generally* https://fdprc.capdefnet.org/verdict-forms.[103] And the jury had hardly any basis from which to identify an avoiding-martyrdom mitigating factor because the defense adhered to the district court's order prohibiting it.

Under these circumstances the government cannot demonstrate that the court's error in refusing to submit the avoiding-martyrdom mitigating factor was harmless beyond a reasonable doubt. *See Troya*, 733 F.3d at 1137-38.

---

[103] The average number of mitigating factors submitted in cases in which jurors wrote in mitigating factors is 18.75. *See id.* Examples include: *United States v. Barrett*, No. CR-04-115-P (E.D. Okla.) (2005) (death sentence) (10 mitigating factors submitted; jurors wrote in 2); *United States v. Corley*, No. 3:02-CR-116 (N.D. Ind. 2004) (death sentence) (7 mitigating factors submitted; jurors wrote in 5); *United States v. Con Ui*, No. 2:CR-13-123 (M.D. Pa. 2017) (life sentence) (61 mitigating factors submitted; jury wrote in 1); *United States v. Al Owhali*, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. 2001) (life sentence) (9 mitigating factors submitted; jury wrote in 5); *United States v. Savage*, No. 07-550-03 (E.D. Pa. 2013) (death sentence) (20 mitigating factors submitted; jury wrote in 2). *But see United States v. Williams*, No. 06-00079 JMS (D. Haw. 2014) (life sentence) (149 mitigating factors submitted; jurors wrote in 7).

# XII. BOWERS'S OFFER TO PLEAD GUILTY WAS PROPER REBUTTAL AND MITIGATION, AUTHORIZED BY THE CONSTITUTION AND THE FDPA, AND SHOULD HAVE BEEN SUBMITTED TO THE JURY.

## A. Introduction

As discussed, a dominant theme for the government's case was Bowers's lack of remorse. *See* Point X, above. In addition, throughout pretrial proceedings, the government repeatedly complained that the defense was dilatory in bringing this case to trial, causing harm to surviving victims and the family members of deceased victims. *See, e.g.*, DE91, DE222, App.13539-48. At trial, as described below, it similarly emphasized the distress and anxiety the proceedings were causing the victims and their families, as they were forced to relive the trauma of the attack. Never mentioned, however, was the fact that Bowers offered to forgo a trial completely, enter a guilty plea, and spend the rest of his natural life in prison.

That is because the district court prohibited the defense from offering in evidence or as a mitigating factor that "from an early point in this case, Mr. Bowers offered to plead guilty, and had agreed to plead guilty in…exchange for a sentence of life imprisonment without the possibility of release." (DE1362:53.) Counsel had indicated Bowers's

willingness to plead guilty as early February 2019—just months after the offense—at the arraignment on the superseding indictment. (App.13526.) He made a formal offer to the government shortly thereafter. (App.13531.) But prosecutors moved *in limine* to preclude the evidence of this, or submission of a mitigating factor, even before counsel could suggest it. (DE1351:13-15.) The defense argued the point (DE1362:56-57), but the district court sided with the government. (App.308-09.) This was error.

The Constitution and the FDPA entitled Bowers to submit the "offer to plead" mitigating factor, both as affirmative mitigation and in rebuttal. The district court's error in excluding it—and excluding any evidence of the plea at all—left the defense unable to counter the government's messaging about the detrimental impact of the trial on victims and their families, and jurors unable to weigh whether Bowers's acceptance of responsibility was mitigating, despite his lack of remorse.

## B.    Standard of review

The district court's refusal to submit a mitigating factor is reviewed *de novo*. *See Roof*, 10 F.4th at 369 n.37. The erroneous

exclusion of mitigating evidence offered in rebuttal is reviewed for

constitutional harmless error. *Troya*, 733 F.3d at 1134.

## C.     Bowers's offer to plead was proper rebuttal.

Point XI.C, above, explains that both the Constitution and the

FDPA permit a defendant to rebut information received at sentencing,

even when the government merely implies, rather than explicitly

argues, a point.

Pertinent here, the government urged the jury to choose the death

penalty for Bowers in significant part because of his lack of remorse.

The evidence and argument on lack of remorse pervaded the trial (*see*

Point X, above) and were the basis for a nonstatutory aggravating factor

(DE86:4), found unanimously by jurors (DE1537:5). Although remorse

and acceptance of responsibility are not the same, acceptance of

responsibility is a necessary first step toward remorse, since one cannot

be sorry for something he denies having done. *See McKune v. Lile*, 536

U.S. 24, 47 (2002) ("[a]cceptance of responsibility is the beginning of

rehabilitation."). The offer to plead therefore should have been admitted

as at least partial rebuttal to the lack of remorse nonstatutory

aggravating factor.

The offer to plead would also have responded to the government's repeated references to the harm surviving victims and victim family members suffered as a result of Bowers's "choice" to take the case to trial.[104] This began in guilt-innocence phase opening statements, when the prosecutor noted that two surviving victims had died during the nearly five-year pendency of the case. (App.5698.) Messrs. Charny and Samet, and their deaths during pretrial proceedings, were mentioned repeatedly by witnesses. *See, e.g.*, App.5808-09; App.6242. Samet was referenced as a survivor of the Holocaust and in connection with the "Holocaust Torah." *See, e.g.*, App.5820-23; App.6139-40. The government's guilt-innocence closing argument reminded the jury that it had met all of the victims except Charny and Samet, who had passed away. (App.8323.)

The jury also saw surviving victims and victim family members struggle through the proceedings, during their testimony and as observers. (*See generally* Point IX.E.) At one point, the district court had

---

[104] This was an independent error. Prosecutors may not invite the jury to consider a defendant's decision to plead not guilty or his exercise of trial rights. *See* App.328-29 (district court order collecting cases). *See also* Point X.D.2.

to remind the courtroom to rededicate itself to not reacting visibly or vocally to the emotional testimony. (App.11420.)[105] One witness, a loved one of surviving victim Dan Mead, testified that his participation in an earlier phase of the trial so impacted him that he required medical care for 33 days afterward. (App.11254.) A defense objection to this testimony, citing Bowers's offer to plead and seeking a mistrial or to strike the testimony, was overruled. (App.11264-67.)[106]

The government repeatedly referred to the lengthy period between the offense and the trial, especially when discussing Bowers's lack of remorse. *See, e.g.*, App.10960 ("long after the crime"); App.10785, 10851 (emphasizing date of Rogers evaluation (2022, "four years later")); App.10963-64 (same); App.13275 ("four and a half years"). It even invoked the jury's own experience of the long, difficult trial, noting "[y]ou've been here for two months. Do not be numb to the magnitude of the pain and loss." (App.13293.)

---

[105] Defense counsel also made a record about the visible and audible crying in the gallery and the jury's apparent awareness of it. (App.11371, 11374.)

[106] The district court offered no reasoning.

During argument, the government also implied Bowers's defense had wasted the jury's time.[107] It criticized the defense case as "distractions" (App.10869-70) ("Everything you heard from Burt was a distraction"), fabrications (App.13279) (calling defense witness Porterfield a "storyteller"), and irrelevant (App.13280) ("this case is about October 27, 2018, and the murders of 11 innocent worshippers at the Tree of Life. And that's the type of evidence and consideration that you should have been reviewing throughout these two months. What did the defendant's mother's report card from high school have to do with any of this? What does Deanna Bowers' wedding certificate have to do with it….").[108]

Finally, the government implied that the trial occurred only because Bowers demanded it, arguing in selection phase rebuttal—in its very last words to the jury, "[t]his defendant under the law was entitled to his trial. He has had his trial and now it's time for his verdict."

---

[107] The trial court did not agree. At the final sentencing proceeding, it recognized all counsel's efforts as "courteous, professional and ethical," noting as well their "personal courtesy and humane grace." (App.13499.)

[108] *See also* DE1524:17(no. 13), 20(no. 20), 24-25(no.33).

(App.13295.) The court's instructions to the jury throughout bolstered the misleading impression that Bowers sought the trial, telling jurors that Bowers pleaded not guilty to the charges and emphasizing the "burden" his not-guilty plea placed on the government. (App.5653, 5665, 5674-75, 8242.)

Bowers's offer to plead would have directly rebutted all of this by explaining that Bowers was willing to forgo a trial—and the associated time, expense, and impact on all involved—altogether and spend the rest of his natural life in prison. *See United States v. Troya*, 733 F.3d 1125, 1135 (11th Cir. 2013) (quoting *United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) ("[T]he purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party." (internal quotation marks omitted)). Had these proceedings concluded in 2019, with Bowers's plea to life imprisonment without release, four years of pretrial proceedings could have been obviated, Messrs. Samet and Charny could have provided victim impact testimony at a non-capital sentencing, Mr. Mead would not have suffered the harm from testifying in the guilt-innocence phase of a trial, and everyone would have been spared the more than three months of

jury selection and trial. Jurors should have been permitted to consider this, along with the reality that a sentence of life imprisonment without the possibility of release would have condemned Bowers to isolation and obscurity forever. *See* Point XI.

## D.   The offer to plead should have been submitted as affirmative mitigation.

The evidence showed that Bowers accepted responsibility, which is indisputably mitigating in sentencing, but jurors had no way to weigh that evidence in selecting Bowers's sentence. The district court's failure to submit the offer-to-plead mitigating factor therefore was error.

The constitutional and statutory rights of a capital defendant to present and have the jury consider all relevant mitigating evidence at a capital sentencing hearing are described in Point XI.D. Like the avoiding-martyrdom mitigating factor, the offer-to-plead mitigating factor should have been submitted under the Eighth Amendment and as an FDPA "catch-all" factor. The offer to plead would have communicated to the jury—and permitted it to weigh—important facts about Bowers's character, record, and the circumstances of the offense, especially his acceptance of responsibility and willingness to forego a trial. *See Lockett*, 438 U.S. at 604 (defining mitigation as including

"circumstances of the offense" that provide a basis for a sentence less than death); 18 U.S.C. §3592(a)(8)("[o]ther factors in the defendant's background, record, or character…that mitigate against imposition of the death sentence").

Because the purpose of mitigation is to individualize the sentence, *see Lockett*, 438 U.S. at 604-05, whether an offer to plead guilty is submitted to the jury should be a fact-intensive decision about the case being considered. Here, Bowers not only truthfully and timely admitted his role and offered to resolve the case, he immediately and fully accepted responsibility at the crime scene itself, before the legal proceedings even began. (*See* Statement of the Case, Section C.) But the district court did not account for these facts in refusing his proposed mitigating factor. (DE1394:8-9.)

Acceptance of responsibility—as evidenced by admission of the offense conduct and willingness to plead guilty—is unquestionably mitigating. The United States Sentencing Guidelines reduce offense levels by up to three on this basis. *See* U.S. Sentencing Comm'n Guidelines Manual, §3E1.1 comment. n.1 & 3 (Nov. 2024). Similarly, the Department of Justice lists acceptance of responsibility as a

consideration weighing against seeking the death penalty. *See* U.S.

Dept. of Justice, Justice Manual §9-10.140(D)(9). Bowers's willingness

to plead guilty therefore should have been submitted to the jury. *Cf.*

*United States v. Fell*, 372 F.Supp.2d 773, 785 (D. Vt. 2005) (allowing

offer-to-plead mitigating factor as relevant to acceptance of

responsibility).[109]

Other courts have permitted an offer-to-plead mitigating factor

when, as here, the facts support it. In *Roof*, the court permitted an offer-

to-plead mitigating factor, finding that the defendant "unambiguously

claimed responsibility for the charged conduct, and that this had been

widely reported, so that the jury would be confused by exclusion of the

information. *See Roof*, No. 2:15-472-RMG, 2016 WL 8678863 at *2,

(D.S.C. Oct. 14, 2016). Bowers's offer to plead was also widely reported.

*See, e.g.*, Peter Smith & Mark Scolforo, *3 Years After Pittsburgh*

*Synagogue Attack Trial Still Ahead*, AP News (Oct. 22, 2021), *available*

*at* https://apnews.com/article/coronavirus-pandemic-religion-pittsburgh-

---

[109] The *Fell* court also described the offer to plea as reflective of "state of mind." *Id.* After remand, the court reviewed this issue again, coming to the same conclusion. *See United States v. Fell*, No. 5:01-cr-12, 2017 WL 10809985, at *5-6 (D. Vt. Feb. 15, 2017).

[health-race-and-ethnicity-c95672bf4652cf0ad1f2bd11d23c2e29](health-race-and-ethnicity-c95672bf4652cf0ad1f2bd11d23c2e29) (last

visited Oct. 19, 2025).[110] In *United States v. Christensen*, No. 17-cr-

20037-JES-JEH, 2019 WL 11867003, at *2 (June 27, 2019), the district

court also permitted an offer-to-plead mitigating factor, so long as the

negotiations were fairly contextualized.

In total, acceptance of responsibility has been offered as a

mitigating factor in at least thirteen federal death penalty cases;[111] and

an offer to plead in six.[112]

---

[110] The district court did not address the similarities between this case and *Roof*.

[111] *United States v. Council*, No. 4:17-cr-866-RBH (D.S.C. 2019) (death sentence); *United States v. Sampson*, No. 01-10384-LTS (D. Mass. 2017) (death sentence); *United States v. Roof*, No. 2:15-CR-00472-RMG (D.S.C. 2017) (death sentence); *United States v. Sanders*, No. 10-00351 (W.D. La. 2010) (death sentence); *United States v. Williams*, No. 06-00079 (D. Haw. 2014) (life sentence); *United States v. Krylov*, No. 02-220(B)-SJO (C.D. Cal. 2007) (life sentence); *United States v. Fell*, No. 2:01-CR-12-01 (D. Vt. 2005) (death sentence); *United States v. Barrett*, No. CR-04-115-P (E.D. Okla. 2005) (death sentence); *United States v. Breeden*, No. 3:03cr00013 (W.D. Va. 2004) (life sentence); *United States v. Carpenter*, No. 3:03cr00013 (W.D. Va. 2004) (life sentence); *United States v. Ostrander*, No. 1:01-CR-218 (W.D. Mich. 2003) (life sentence); *United States v. Mohamed*, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. 2001) (life sentence); *United States v. Barnette*, No. 3:97CR23-P (W.D.N.C. 1998) (life sentence). Verdict forms may be found at [https://fdprc.capdefnet.org/verdict-forms](https://fdprc.capdefnet.org/verdict-forms).

[112] *United States v. Con-Ui*, No. 2:CR-13-123 (M.D. Pa. 2017) (life sentence); *United States v. Council*, No. 4:17-cr-866-RBH (D.S.C. 2019)

True, some courts have determined that offers to plead should not be submitted. But those courts either erred in their reasoning or decided cases distinguishable on their facts. This Court should find— based on the facts here—that Bowers's offer to plead was mitigating and should have been submitted to the jury. Alternatively, it should remand for factfinding by the district court on this point.

The district court relied primarily on three cases in precluding the offer-to-plead mitigating factor: *United States v. Caro*, 597 F.3d 608, 635 (4th Cir. 2010); *Owens v. Guida*, 549 F.3d 399, 419-22 (6th Cir. 2008); and *United States v. McCluskey*, Doc. 1060, No. 10-2734 JCH (D.N.M. June 23, 2013) (hereinafter DE1351-1). These cases all make the same legal error—equating acceptance of responsibility and remorse and rejecting the offer-to-plead factor because the defendants did not show remorse. *See Caro*, 597 F.3d at 635 ("Caro's letter was calculated to persuade the government not to seek the death penalty, rather than expressing unqualified remorse."); *Owens*, 549 F.3d at 420 ("[Owens]

---

(death sentence); *United States v. Jones*, No. 6:10-cr-03090-DGK (W.D. Mo. 2017) (life sentence); *United States v. Roof*, No. 2:15-CR-00472-RMG (D.S.C. 2017) (death sentence); *United States v. Johnson* (No. 04-017) (E.D. La. 2009) (life sentence); *United States v. Fell*, No. 2:01-CR-12-01 (D. Vt. 2005) (death sentence).

did not offer any other evidence of acceptance of responsibility or, as the district court noted, take the stand to 'express remorse or contrition in hopes of mitigating her sentence….'"); *McCluskey*, DE1351-1 at 26 ("[T]he plea offers are simply attempts at settlement; they are not unqualified statements of remorse.") (internal citation omitted). Acceptance of responsibility and remorse may be related, but because they are not the same,[113] the defense need not introduce evidence of remorse to justify an offer-to-plead mitigating factor. Pleading guilty has mitigating value regardless of remorse, because—as discussed above—it constitutes legal acceptance of responsibility and saves all parties the ordeal and expense of a trial.

In *Caro*, *Owen*, and *McCluskey*, however, there was little evidence of acceptance other than the offer to plead itself. The *Caro* opinion gives no indication of the timing of the plea offer. *Caro*, 597 F.3d at 635. In

---

[113] Acceptance of responsibility involves truthful admission of offense conduct. *See* U.S. Sentencing Comm'n, Guidelines Manual, §3E1.1 comment. n.1(A) (Nov. 2024). Remorse, on the other hand, is "a feeling of sadness and being sorry for something you have done." Cambridge University Press, n.d., Cambridge Dictionary, remorse, https://dictionary.cambridge.org/us/dictionary/english/remorse (last checked October 22, 2025).

*Owens*, there was evidence that the defendant initially *denied* responsibility and then made her plea offer "because this case carries the ultimate [punishment,] death by electr[o]cution and because [she] wants this matter done and over with, but not because she had accepted responsibility." *Owens*, 549 F.3d at 420 & n.8 (internal quotation omitted). Here, Bowers accepted responsibility fully and promptly.

Because the offer to plead reflected Bowers's character, record, and circumstances of the offense, it fit comfortably within both the Constitutional and FDPA definitions of mitigation and should have been submitted to the jury. *See Lockett*, 438 U.S. at 604; 18 U.S.C. §3592(a)(8). Even if it had not met these definitions, as discussed in Part XI.D, above, the language of the FDPA suggests that there may be mitigation that extends beyond the catch-all in Section 3582(a)(8), and a number of courts have agreed.

Since jurors had no way to weigh Bowers's acceptance of responsibility in selecting his sentences, the district court's failure to submit the offer-to-plead mitigating factor was error.

**E.    The district court's error in refusing to submit the offer to plead factor prejudiced Bowers.**

The government cannot prove that, individually or in combination with the avoiding-martyrdom mitigating factor, the failure to submit the offer-to-plead mitigating factor was harmless beyond a reasonable doubt. *See Troya*, 733 F.3d at 1137-38.

As with the avoiding-martyrdom mitigating factor, there is reason to think the jury relied on the inferences that the omitted mitigating factor would have countered. At sentencing, victims and their families referenced Bowers's lack of remorse and the delay of trial, concerns jurors likely also had in mind. *See* App.13408-09, 13449, 13491 (discussing lack of remorse and delay, criticizing defense). But the district court's preclusion of the offer-to-plead mitigating factor left the defense unable to address these concerns.

Moreover, by refusing to submit the offer-to-plead mitigating factor, the court prevented the jury from weighing either Bowers's acceptance of responsibility or his willingness to forgo a trial as part of its decision whether Bowers should live or die, assuming any juror even

knew about those things.[114] As noted in Point XI, the jury was instructed to consider in imposing sentence only "whether…the aggravating factors…sufficiently outweigh any mitigating factors…to justify a sentence of death on [each] count." (App.13160.) And since the jury also was instructed not to consider material from outside the record, it would not have written in—or weighed—an offer-to-plead mitigating factor. (App.13129-30.)[115]

But at least one juror might have credited Bowers's offer to plead if permitted to consider it as a mitigating factor. Although jurors rejected several mitigating factors related to Bowers's mental health and conception of the crime, they found others that harmonized with the offer to plea. For example, jurors found that Bowers believed he was acting on the side of God against Satan (8 jurors) (DE1537:16), and that his belief system was fixed and false (1 juror) (DE1537:17). Jurors might have credited his acceptance of responsibility, along with these

---

[114] This was unlikely, due to extensive voir dire about publicity and daily inquiries by the district court about exposure to media.

[115] The court's instruction read: "The following are not evidence:… No. 6, anything you may have seen or heard about this case outside the courtroom." *Id.*

factors. Knowing that—despite his other horrific conduct—Bowers was willing to spare victims and their families the ordeal of a trial could have made the difference in at least one juror's life-or-death decision.

The offer to plead at least helped explain why there *was* a trial, even though Bowers had admitted guilt and the defense argued he should serve out his natural life in prison. It therefore might have affected jurors' weighing of the much-emphasized lack of remorse aggravating factor, particularly in combination with the other findings regarding the ability to control Bowers during a life sentence without the possibility of release. *See* Point XI.D, above. It might also have moderated any animosity jurors felt toward Bowers for having been forced to sit through months of traumatizing evidence. Given the importance of lack of remorse in capital jury decision-making, *see* Point X.D.3, the damage the unavailability of the offer-to-plead mitigating factor did to the defense's case for life cannot be overstated.

Without the offer-to-plead mitigating factor, jurors were left with the terribly aggravating impression—created by prosecutors—that Bowers *chose* to inflict *additional* harm on the victim community—not to mention subjecting the jurors themselves to a traumatizing

experience—by demanding a trial. This Court should reverse and order a new sentencing hearing free from that faulty impression. In the alternative, it should remand for factfinding regarding Bowers's acceptance of responsibility and the offer to plea, since the district court failed to make any case-specific findings. (App.308-09, 11267.)

XIII.   **THE GOVERNMENT'S IMPROPER REBUTTAL CLOSING ARGUMENT REQUIRES REVERSAL BECAUSE IT MISLED JURORS REGARDING MULTIPLE ASPECTS OF THE LIFE-OR-DEATH DECISION.**

A.   **Introduction**

As at other points during the trial, the government overreached during closing argument, resorting to several types of well-recognized misconduct to argue for Bowers's death. In the rebuttal closing argument, after defense counsel had already spoken to jurors for the last time, the prosecutors:

1)   Encouraged jurors to conduct a quantitative weighing of aggravating factors, contrary to law;

2)   Misstated the law regarding the jurors' role at sentencing; and

3)   Argued that mitigation evidence unconnected to the crime should not be considered, when that is not a valid limitation.

These errors require vacatur of Bowers's death sentence and

remand for a new sentencing hearing.

**B.** **Standard of review**

As discussed below regarding each, these errors were preserved,

so the Court's review is for abuse of discretion. *United States v. Savage*,

970 F.3d 217, 291 (3d Cir. 2020). This inquiry turns on whether the

prosecutor's remarks were improper and, if they were, whether the

remarks so "infected the trial with unfairness as to make the resulting

[death sentences] a denial of due process." *Darden v. Wainwright*, 477

U.S. 168, 181 (1986) (internal citation omitted).

**C.** **The government advocated a quantitative approach to the weighing process that is contrary to law.**

In its rebuttal closing argument, the government urged the jury to

quantify the weighing process by multiplying the number of

aggravating factors by the number of counts in the indictment. But the

process of selecting the sentence in a capital case is qualitative, not

quantitative. *See Marshall v. Hendricks*, 307 F.3d 36, 108 (3d Cir. 2002)

(noting the "non-mathematical" nature of a jury's weighing of

aggravating and mitigating circumstances). It requires jurors to make

"a reasoned *moral*"—not numerical—"response to the defendant's

background, character, and crime." *Abdul-Kabir v. Quarterman*, 550

U.S. 233, 252 (2007) (quoting *California v. Brown*, 479 U.S. 538, 545

(1987) (O'Connor, J., concurring)). When defense counsel objected to the

government's attempt to turn deliberations into a numbers game

(DE1524:13), however, the district court overruled the objection and

request for mistrial. (App.13323.)

The government's argument portrayed its case in starkly

mathematical terms, arguing that—although only nine aggravating

factors were alleged— hundreds of aggravating factors had accumulated

over the course of the eligibility and selection phases that should be

"placed on the scale":

> Judge Colville explained to you that in order for
> this trial to proceed to this final stage, the
> sentence selection phase, under the law, you
> would need to find one statutory aggravating
> factor beyond a reasonable doubt, one, to decide if
> this defendant is eligible for consideration of a
> death sentence.
>
> Here, the defendant murdered 11 innocent
> worshippers, and there are 22 death-eligible
> counts you had to consider. And you found that
> multiple statutory aggravators applied to all 22
> counts. You only had to find one. You found 82.
> Before we even got to this final stage…

There were 82 that you found during the
eligibility phase. Those all carry over and get
placed on the scale.

22 counts. Multiple statutory aggravators
applying to those 22 counts. And now there are
five nonstatutory aggravating factors, and each of
the 22 death-eligible counts, it applies to all of
them. That's 110. We're at 192.

(App.13269-70, 13290.) The government had pointed out in its main

closing argument that the defense submitted fewer—115—mitigating

factors. (App.13212.)

This approach was incorrect mathematically and as a matter of

law. Mathematically, the aggravating factors are not cumulated into

one sentencing decision. The jury made a sentencing decision for each

count individually: each of those decisions could only consider, at most,

the nine aggravating factors that pertained to that particular count.

Thus, the jury could not have weighed any more than nine aggravating

factors for any of the individual death penalty decisions it made.

(DE1524:13-14; App.13123, 13139, 13160, 13711-15, 13783-85.)

More importantly, as a matter of law, the weighing process—in

which jurors confront "the truly awesome responsibility of decreeing

death for a fellow human," *Caldwell v. Mississippi*, 472 U.S. 320, 329-30

(1985) (internal quotation omitted)—is not quantitative at all. It is how jurors come to their individual "reasoned moral response[s]" to the evidence. *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989). It may not be reduced to counting. *See Wharton v. Vaughn*, 722 F. App'x 268, 281 (3d Cir. 2018).

The district court instructed the jury about this before the prosecutor's argument. *See* App.13123 ("uniquely individual moral judgment"), App.13160 ("[y]ou are to conduct this weighing process separately with respect to each of the capital counts"), App.13162 ("it is not an arithmetic analysis, but a qualitative weighing and reasoning analysis"). But the government directly and erroneously contradicted those instructions after they were given. *See Abdul-Kabir*, 550 U.S. at 259 n.21 (observing that jurors may feel precluded from considering relevant mitigating evidence as a result of prosecutorial argument). And the district court did nothing to correct the contradiction, leaving it up to jurors to determine whether the government's mathematical approach to weighing conflicted with the instructions. (App.13330.) This was error.

The district court also erroneously permitted the government to reiterate its main closing argument regarding the harm underlying particular aggravating factors, such as religious animus, vulnerable victims, selection of site, and lack of remorse—over defense objection (App.13291-95)—even though it was beyond the scope of the defense closing.[116] Defense counsel was forced to object three times before the prosecutor finally sat down. (App.13291-95.) Thus, jurors were left holding not just the incorrect and inflammatory numerical soundbite of "192" aggravating factors, but also the details of "the unbearable loss of all these victims" which, the government said, "all goes on the scale." (App.13294-95.)

After closing argument, the district court reiterated to the jury generally that closing argument is not the law and that jurors should follow the court's instructions, but did not address the prosecutor's misstatements, instead leaving it to the jury to decide whether

---

[116] The defense closing acknowledged the immense harm from the crime and addressed Bowers's life history and reasons for mercy. (App.13223-67.)

misstatements were made. (App.13330.)[117] This was insufficient to correct the error. *See United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (holding that district court's curative instructions "were not sufficiently focused and emphatic").

The government cannot show the error was harmless beyond a reasonable doubt. 18 U.S.C. §3595(c). "The data suggest that the sentencing phase of a capital trial commences with a substantial bias in favor of death." T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 12 (Nov. 1993). The framework the government provided, and which the court did not correct, reinforced this bias, suggesting the numbers demanded death in Bowers's case. "[T]he tilt towards death suggests that a defendant with a confused jury may receive a death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life." *Id.* As discussed below, the verdict form supports that

---

[117] The court told the jury: "[T]o the extent any of you individually or collectively believe that any attorney made any comment that was inconsistent with the evidence as you recall it and/or inconsistent with the jury instructions that I have delivered, you are to entirely disregard that argument of counsel."

this likely occurred here, at least in part because jurors were misled about how to weigh the aggravating factors compared to Bowers's mitigation.

**D.   The government told the jury its "job" was to "hold [Bowers] accountable to the fullest extent of the law," rather than to make a reasoned moral judgment about the appropriate sentence.**

In its rebuttal closing argument, the government told the jury, "*Your job is to hold this defendant accountable to the fullest extent of the law*. Hold him accountable for his decisions and his violent actions." (App.13270) (emphasis added). This argument was improper because it incorrectly described the jury's role in the selection phase of a capital trial, which is to determine the punishment to be imposed—life or death. *See* 18 U.S.C. §3593(b), (d). Defense counsel moved pretrial to prevent such argument (DE1347:41-45), and the district court ruled that it "[would] not permit any argument that the jury is anything other than a neutral arbiter of the evidence." (App.324.) After closing argument, however, the court denied the defense objection and request for a mistrial (DE1524:19, App.13323).

The Supreme Court has said that the jury's job at sentencing in a capital trial is "determining *whether a specific human being should die*

at the hands of the state." *Caldwell*, 472 U.S. at 329 (emphasis added).

Thus, in the sentence selection phase, the defense endeavored to focus

the jury on "the characteristics of the person who committed the

crime:…[including] any special facts about this defendant that mitigate

against imposing capital punishment." *Gregg v. Georgia*, 428 U.S. 153,

197 (1976). To that end, counsel presented witnesses who testified

about Bowers's chaotic upbringing, the psychiatric issues that emerged

in his adolescence, his multiple suicide attempts, his efforts to live a

normal life, and the people he helped. (*See* Statement of the Case,

Sections A, H.)

The circumstances of the crime are also relevant, *see Gregg*, 428

U.S. at 197, and the government addressed these through its witnesses

and in the aggravating factors. But its argument portrayed those

aspects of the case as the determinative considerations. (App.13270.)

And it expressly—and incorrectly—told the jury that the law dictated

the death penalty because of the crime committed, when the life-or-

death decision was solely the jury's to make and required other

considerations.

The government argued—in clear contravention of *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)—that a death sentence was legally required: "[t]he law values life. But let's be clear here. *The rule of law protects that value with clear laws that impose the most severe penalty for taking an innocent life.*" (App.13268) (emphasis added).[118] In doing so, the government encouraged the jury to see the death penalty as necessary, even mandatory, and to see its "job" as imposition of that sentence. This was error. "[T]he fundamental respect for humanity underlying the Eighth Amendment…[also] requires consideration of the character and record of the individual offender…as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304.

The reference to the jury's "job" was similar to arguments portraying jurors as law enforcement or urging them to fulfill their "duty," which federal courts have found improper. *See United States v. Young*, 470 U.S. 1, 18 (1985) ("The prosecutor was…in error to try to

---

[118] *See also* App.13222 ("Weigh [the loss]. And when you're done, impose *the only punishment that is sufficient under our law*, a sentence of death.") (emphasis added).

377

exhort the jury to 'do its job'; that kind of pressure...has no place in the administration of criminal justice."); *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010) ("calling upon the jury to 'control' Caro gives them a role more akin to law enforcement than to impartial arbitration"); *Cargle v. Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003) ("extremely improper" for prosecutor to suggest to jurors they "are part of 'the team' of prosecution and police, rather than impartial arbiters between the State and the defendant"); *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986) (finding it "improper" to "tell[] [the] jury it had any obligation other than weighing the evidence").

The improper argument regarding the jury's "job" was not an isolated statement, unlike in cases where courts have found error but denied relief. *See, e.g.*, *Caro*, 597 F.3d at 626.[119] The government gave lip service to weighing of mitigating factors, but emphasized, "it's the facts and the circumstances of this case that lead you to your decision. Do the facts and the law call for death as the appropriate sentence?"

---

[119] Nor is Bowers's claim subject to only plain error review, as has been the situation in so many cases of improper argument where relief is denied. *See, e.g.*, *id.*

378

(App.13271.) What the government meant by this became clear, "[c]onsider and weigh the aggravating factors based on the evidence," the prosecutor argued, without mentioning the mitigating factors. (App.13272.) Then he repeated the job-related exhortation, "[h]old this defendant accountable to the fullest extent of the law and make a reasoned moral judgment." (App.13272.) Such an argument is a "thinly veiled appeal to vengeance" that "encourage[s] the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *State v. Bigbee*, 885 S.W.2d 797, 812 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Stout*, 46 S.W.3d 689 (Tenn. 2001).

The prosecutor's erroneous suggestion that the aggravated crime mandated a death sentence was clearly harmful, because the case was replete with aggravation. (*See* Points VIII, X.) As discussed in Part C, the court's general instruction after argument did not remedy the harm. Due process demanded that all involved provide the jury accurate information about its role in sentence selection, to assure jurors could consider the mitigation that was presented as well. *Cf. Lockett v. Ohio*,

438 U.S. 586, 605 (1978). The prosecutor's misdirection therefore requires reversal.

E.  **The government misstated the law by telling jurors that mitigating factors submitted by the district court were not, in fact, mitigating because they did not relate to the crime.**

Consistent with its message that the crime mandated the death penalty, the government told jurors not to consider mitigating factors about Bowers's life history—even though they had been approved for submission by the district court (DE1462)—because those factors had no connection to the attack. (App.13218, 13280, 13286-87.) This was improper under *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (rejecting view that mitigating evidence must have nexus to the crime). "A capital defendant's mitigating evidence…need only allow 'the sentencer to reasonably find that it warrants a sentence less than death,'" whether or not connected to the crime. *United States v. Fell*, 531 F.3d 197, 222 (2d Cir. 2008) (quoting *Tennard*, 542 U.S. at 285).

Defense counsel moved pretrial to prevent such argument (DE1347:41-45), but the district court ruled the request "moot," given the instructions, which would define mitigation in accord with Supreme Court precedent. (App.320.) Despite this, after the government's

argument contradicted *Tennard* and the instructions, the court denied

the defense objection (DE1524:19; App.13322) and refused to issue a

specific curative instruction (App.13323-25, 13327-28, 13330).

The law is clear: jurors must be able to consider and give effect to

all relevant mitigating evidence offered in support of a sentence less

than death. *See Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (citing

cases). Mitigating factors need *not* relate to the defendant's "culpability

for the crime." *Tennard*, 542 U.S. at 285; *Smith v. Texas*, 543 U.S. 37,

45 (2004) (per curiam). "The question is not whether evidence in

mitigation makes the defendant any less guilty, or the crime any less

horrible, but whether it provides a reason why, despite those things, the

defendant should not die." *Le v. Mullin*, 311 F.3d 1002, 1017 (10th Cir.

2002).

As discussed, defense counsel offered extensive life history

mitigation and focused closing argument on those issues. The

government, however, told the jury in rebuttal that this case was not

about Bowers's life history, that his life history did not excuse what he

did, and that this evidence was a distraction:

> Ladies and gentlemen, *this case is about October
> 27, 2018, and the murders of 11 innocent*

> *worshippers at the Tree of Life. And that's the type
> of evidence and consideration that you should
> have been reviewing* throughout *these two months.*
> What did the defendant's mother's report card
> from high school have to do with any of this?
>
> What does Deanna Bowers' wedding certificate
> have to do with it, that's Defense Exhibit 467, her
> marriage certificate to Wendell Bowers from
> 1978. They put that into evidence. They brought
> her from California and she had met the
> defendant one time when he was eight years old.
> She told you she was married to the defendant's
> father's deceased brother who had the same
> difficult childhood as the defendant's father, but
> was able to move past that. He became a
> wonderful, devoted husband. He was president of
> the rotary club, and he made a contribution to his
> community.
>
> Childhood does matter. But it does not control
> who you become as an adult. It does not
> foreordain, and *it does not excuse*.

(DE13280-81) (emphasis added.)[120] It told the jury to question whether

Bowers's life history was mitigating at all, given that, in adulthood, he

killed 11 people:

> So when you consider childhood issues, remember
> and decide how much weight, *if any*, should it be

---

[120] Bowers's mother's report card was introduced to help establish
the onset of her psychiatric problems (App.11559-60). Deanna Bowers's
marriage certificate was introduced to establish her 41-year marriage to
Wendell Bowers and basis of knowledge about the family. (App.11805-
06.)

given as a mitigator when he committed these crimes as a fully formed adult, when he brutally killed 11 people. And when you review that long list, for several of them, *ask whether the factor is actually mitigating.*

(App.13286-87) (emphasis added.)[121]

These arguments violated *Tennard* by suggesting to the jury that, to deserve consideration, mitigating evidence must be related to the crime, explain, or excuse it. Though distinct from the facts of *Tennard*, where the prosecutor explicitly labeled the mitigation "irrelevant," 542 U.S. at 278, the arguments had the same consequence. "To ensure the reliability of the determination that death was the appropriate punishment, a prosecutor may not argue that [meaningful] consideration [of potentially relevant mitigating evidence] is forbidden." *Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010) (citation omitted) (distinguishing characterizations like "smoke screen" and "octopus" from directions to disregard). *See also United States v. Rodriguez*, 581 F.3d 775, 800-01 (8th Cir. 2009) (citations omitted) (finding error in prosecutor's direction to jurors to disregard impact of

_____

[121] The government sowed the seeds for this in its initial closing argument, when it urged the jury to discount the evidence of Bowers's childhood as attenuated from the offense. (App.13218.)

death sentence on defendant's family). That was the effect of the government's argument about Bowers's life history.

In a case as aggravated as this one, the prosecutor's erroneous message—what does *that* have to do with it?—would have been appealing to jurors. It was prejudicial because it reinforced the message that only the crime mattered, *see* §D, and because it came during rebuttal, so "the prosecutor's distortion of the [legal] standard was among the last things the jury heard," *United States v. Velazquez*, 1 F.4th 1132, 1140 n.4 (9th Cir. 2021).

Although the court had instructed jurors correctly that mitigation need not explain or excuse the crime (App.13147, 13159-60), those instructions came before the government's argument, which contradicted them. *See* §C, above. And, the court's instructions that the jury should first make factual findings, then "consider the weight and value of each factor" (App.13161), created the misimpression that certain factors might not be mitigating, as the government argued. Bowers requested a curative instruction to explain that the court had determined the life history mitigating factors were—as a matter of law—mitigating. (App.13323-24, 13326-27.) The district court's refusal

to give the curative instruction (App.13327) left the government's words echoing in the jury room.

The prejudice is plain where the jury found 52 of the 58 life-history-related mitigating factors, 40 of them unanimously, *see* App.13786-93. The life-history evidence was largely uncontested, but jurors had been led to believe that, though true, these factors had no bearing on whether death was the proper sentence. *See Boyde v. California*, 494 U.S. 370, 384 (1990) ("Presentation of mitigating evidence alone...does not guarantee that a jury will feel entitled to consider that evidence."). Indeed, given the extensive findings made by the jury, *see* Statement of the Case, Section H, the government cannot demonstrate beyond a reasonable doubt that the improper argument did not impact jurors' ability to give effect to the life history findings in the weighing process and influence the death verdicts. *See Pierce v. Thaler*, 604 F.3d 197, 211 (5th Cir. 2010) ("By essentially instructing the veniremembers that 'youth isn't relevant,' the [prosecutor's] comments may have undermined the jury's ability to give mitigating effect to evidence of [defendant's] youth...."). *See also Clemons v. Mississippi*, 494 U.S. 738, 753 (1990) (the prosecution's reliance on a

particular issue bears on whether error regarding that issue is harmless).

## F. The cumulative effect of the improper arguments rendered Bowers's trial unfair.

Even if the instances of misconduct, viewed individually, may not warrant relief, the Court should consider their cumulative effect. "Under the cumulative error doctrine, 'an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.'" *Ebron*, 683 F.3d at 130 (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998) (citations omitted)). "In applying this doctrine, a court must determine whether the errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *Id.* (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)).

The combination of errors here did. The government's improper evidence regarding the Holocaust (Point VIII), the lack-of-remorse evidence obtained from Bowers's mental health experts (Point X.D.1), his trial rights (Point X.D.2), and their own witnesses' ability to speak for the victims (Point IX.F), combined with the errors discussed here

about how the jury should deliberate, "cast such doubt on the fairness of the proceedings that a new [sentencing] is warranted." *See United States v. Whitten*, 610 F.3d 168, 201-02 (2d Cir. 2010) (reversing death sentence due to cumulative effect of improper argument). *See also Aquart*, 912 F.3d at 44 (same). Virtually every aspect of the government's selection phase closing arguments—and as a consequence, the jury's death verdicts—was tainted by one of these errors. *See Clemons*, 494 U.S. at 753 (the prosecution's reliance on a particular issue bears on whether error regarding that issue is harmless).

Individually or in combination with each other and other improper arguments discussed elsewhere in the brief, given the jury's findings and the district court's failure to make specific curative instructions, a new sentencing hearing is warranted. *See Savage*, 970 F.3d at 291 (citing *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)). *See also Aquart*, 912 F.3d at 31 ("[W]e cannot confidently conclude that the jury would have returned a death verdict absent these errors.").

# XIV. THE COURT VIOLATED BOWERS'S DUE PROCESS RIGHTS BY SHACKLING HIM WITHOUT EXPLANATION.

## A. Introduction

A "remnant of an earlier era," *United States v. Brantley*, 342 F. App'x 762, 770 (3d Cir. 2009), shackling a defendant before the jury is an "extraordinary measure" and "last resort," *United States v. Hicks*, 403 F. App'x 709, 711 (3d Cir. 2010), for "extreme and exceptional cases." *Deck v. Missouri*, 544 U.S. 622, 626 (2005) (cleaned up). In other federal death-penalty trials, it has been employed only rarely—upon robust, reliable proof that the defendant poses a threat—due to shackling's "'inherently prejudicial'" nature, particularly at sentencing. *Deck*, 544 U.S. at 628 (cleaned up). Shackling conveys the judge's belief the defendant "pose[s] such a danger that he must be manacled in order to protect others in the courtroom, including the jurors." *Wilber v. Hepp*, 16 F.4th 1232, 1235 (7th Cir. 2021).

But the court ignored those limitations here. Early in the sentencing phase, without warning, it approved the marshals' sudden decision to have Bowers put in leg irons for the remaining 19 days of his capital trial. Though the court admitted it had seen nothing troubling in Bowers's courtroom conduct, it accepted the marshals' asserted reasons

at face value. It then refused to hold a hearing and concealed the marshals' claims from the defense, thus preventing any challenge.

Third Circuit precedent forbade this truncated process. The required response to "genuine and material factual disputes" about the need for shackling is an "evidentiary hearing to resolve" them. *Sides v. Cherry*, 609 F.3d 576, 582, 586 (3d Cir. 2010). Without even disclosure to the defense—let alone a hearing—the district court could not reliably determine if "case-specific" reasons made shackling "unavoidable," *Deck*, 544 U.S. at 632-34, "to maintain safety or security," *Sides*, 609 F.3d at 581 (cleaned up).[122]

When the court belatedly disclosed the marshals' highly questionable justifications for the shackling (some toward the end of the sentencing phase and the rest six months later), it only confirmed how unwarranted it had been to hide them, let alone accept them on faith. The assertions consisted of an unidentified jail guard's hearsay allegation that Bowers had boasted of being able to disarm the marshals, and the marshals' speculative interpretations of Bowers's

---

[122] *Sides* involved a civil trial; even "weightier due process concerns" arise from "shackl[ing] a criminal defendant." *Id.* at 581 n.2.

recent behavior as "restless," trying to count the number of court security officers, and trying to get too close to the armed marshal. Such vague, unsubstantiated reports fell short of the kinds of reliable justifications this and other courts have required before manacling a defendant in front of his jury.

The government cannot prove this constitutional error was harmless. The chains binding Bowers's ankles were visible to jurors; encouraged them to accept the government's argument that he might be dangerous in prison, a critical sentencing issue; and seriously prejudiced his defense in other recognized ways. Accordingly, the Court should reverse Bowers's death sentences and remand for a new capital-sentencing hearing. Alternatively, it should remand for an evidentiary hearing on the shackling decision, its prejudicial effects, or both.

## B.    Standard of review

A district court's shackling decision is reviewed for abuse of discretion, but only if it first "engages in an appropriate inquiry." Whether it did so is reviewed *de novo*. *Sides*, 609 F.3d at 581, 586.

## C.   Factual background

### 1.   Bowers posed no problem in custody and was safely unrestrained for 34 days of trial.

Before trial, the court permitted Bowers to appear in court without physical restraints.[123] No party suggested he might pose a security risk.[124] (App.2647-50; 5628-32, 13573-74.) Indeed, Bowers had been a peaceful, problem-free jail inmate for the four-and-a-half years since his arrest. (App.9329-33, 9340-47.) Nothing suggests he was ever threatening or disruptive in court. Nor did he pose a distinguishing physical threat; he was an unexceptional 51-year-old inmate with no particular physical skills. (*See* App.13693-95) (photographs of Bowers in custody).[125] Bowers remained in court without restraints—without incident—for all 17 days of voir dire, all 13 days of the guilt-innocence

---

[123] It was also agreed that Bowers would be brought into the courtroom and seated before the jury entered, and escorted out after the jury left. (App.2648-50, 13574.)

[124] In the courtroom, the marshals sat close to Bowers and had unimpeded access to him. (DE1407:4, App.14073.)

[125] *Cf. Crittenden v. Ayers*, 624 F.3d 943, 971 (9th Cir. 2010) (shackling order cited defendant's "athleticism"); *Elledge v. Dugger*, 823 F.2d 1439, 1450 (11th Cir.), *modified on other grounds*, 833 F.2d 250 (11th Cir. 1987) (shackling order cited defendant's having "become proficient at karate").

trial, and the first four days of the sentencing-eligibility phase—a total of 34 trial days.

### 2. The court abruptly ordered Bowers shackled based on secret allegations from the marshals.

But on the fifth day of the sentencing-eligibility phase, the court abruptly ordered Bowers shackled without notice. Upon arriving in court, defense counsel learned from the marshals that, based on an *ex parte* directive from the court, they had chained Bowers's legs together. The marshals refused to say why, except to cite an unidentified security threat. (App.9356-60.) The defense strenuously objected to the restraints and asked what had prompted them. (App.9356-58.)

But the court refused to disclose its reasons. It said it had only learned that morning that "the marshals were intending to make that change" and that, in security matters, it "would generally be *very deferential* to the marshals" (emphasis added).

The court admitted it had "not observed anything" from Bowers that could support shackling him during trial, but said "I'm not the one escorting Mr. Bowers in and out." (App.9358.) Displaying that deference, the court declared itself "satisfied there's adequate cause *in the[ marshals'] mind*, based upon their training, experience, and the

best I understand it, recent observations" (emphasis added). (App.9357.) The court would not say more, simply noting it would "leave it to them [the marshals]" whether to disclose anything further. (App.9358.) While defense counsel could object, the court advised, "I'm not inclined to reconsider *in light of the position of the marshal's service*." (App.9357-59) (emphasis added).

When defense counsel protested the court's opacity and that Bowers had done "nothing" to warrant the change, a marshal said the shackling was "[d]ue to ongoing security concerns for the trial, for Mr. Bowers safety, our safety, the safety of everybody in the courtroom." (App.9360.) The court acknowledged "that's not a factually detailed explanation," but, again deferring to the marshals, said "I don't think I'm free to share more," and that it was "comfortable…with the recommendation." (App.9359-60.)

The court tried to reassure counsel that the marshals thought it was "workable" to conceal the leg irons, but defense counsel noted that jurors would be "seeing a difference" in Bowers's appearance and that shackles "are very uncomfortable as time goes on." (App.9357, 9360.) They also called the court's attention to *Deck*'s restrictions on shackling

at a capital penalty phase, warning that it was "allowing the marshals to go down a path that's unsupported by the evidence." (App.9361-63.)

Later that day, the court offered to file a statement with "case-specific" reasons for shackling Bowers, but "substantively redacted…for reasons I'm just not either comfortable with or free or able to disclose at this point." (App.9365-66.) When defense counsel again protested the secrecy, the court acknowledged it was not "creating an evidentiary record of any nature" and that "it's not been part of a hearing. I don't have affidavits." (App.9367.)

### 3. The defense repeatedly objected and showed the shackles were visible and prejudicial.

Before the next court day, the defense renewed, in writing, its objections to the court's shackling decision and its truncated process.[126] It complained that the court's secrecy, denial of a hearing, and deference to the marshals "deprive[d] the defense of a chance to explain, or rebut" the allegations, in violation of *Sides* and similar decisions from other circuits. (DE1407:5-10.) The defense denied there was any justification for chaining Bowers, a step rarely employed in federal

---

[126] This defense filed six more such sets of objections over the next month, the last on the day the jury began its sentencing deliberations.

capital cases, let alone the required proof of an "essential state interest" making this "extreme measure" a necessary "last resort." (DE1407:1, 4, 7) (citations omitted). Counsel also warned that Bowers's leg irons appeared potentially visible to jurors and were already becoming uncomfortable for him. (DE1407:2-3, 7 & n.1.)

On the afternoon of the next court day, July 3, after the defense had again protested Bowers's shackling (App.9728), the court entered an order that it sealed from both the public and counsel. (App.372-76, 13874-78.) The court filed a version accessible to counsel, but with key paragraphs redacted. (App.372-76.) It said the court had approved the "modest restraint" of chaining Bowers at the legs for the rest of his capital-sentencing trial, based on the marshals' "representations," which it still refused to disclose because the marshals wanted them "withheld." (App.372-73.) The redacted order expanded the cloak of secrecy by revealing the court had been emailing privately with the chief deputy marshal the evening before it ordered shackling, but blacking out the contents of that communication as well.[127] (App.372.)

_____

[127] In the 15 pages of colloquy with counsel about this issue on June 30, the court never mentioned its email communication with the

Thus, the redacted order revealed only that the chief deputy marshal had emailed the court a "report" of something he considered "troubling," and the next morning, the two deputy marshals had "confirmed," "noted their observations" that "raise [a] concerning possibility," and "expressed their opinion." (App.372-73.) But the court gave no hint of what the report, confirmation, observations, and opinion were.[128] (App.372-75.)

The court belatedly recognized that the law meant it could not simply "defer[]" to the marshals—which its order (furnished for "appellate review") (App.13883), denied it had done, even though it had simply accepted the marshals' secret allegations, apparently on faith. (App.374.) The court did not even mention *Sides*, let alone reckon with its holding (quoted in Bowers's filing the previous day) that a defendant must receive "an opportunity to challenge" such allegations, and an

_____

chief deputy the evening before. Rather, it told counsel it had only "learned this morning also that the marshals were intending to make that change." (App.9357.)

[128] Though, on the previous court day, the court had denied noticing anything concerning about Bowers's behavior, and now repeated it had observed no "agitation" from him, it added that Bowers had seemed "more expressive in recent days." (App.375.) The court somehow thought this "bolstered" the "marshals' concerns." (*Id.*)

evidentiary hearing if the allegations are genuinely contested.

(DE:1407:9, quoting *Sides*, 609 F.3d at 583; *see* App.372-76.)

As to prejudice, the court acknowledged "the potential risk that the jury will see the defendant restrained," (App.375), and admitted "I don't know whether anyone has seen the restraints." (App.10464.) But it hoped that risk would be mitigated because Bowers was seated on the far side of the courtroom from the jury box at a front-skirted table, some attorneys were seated in between, and the shackles were taped to "minimize" any clanking noise. (App.375; *see also* App.10464; DE1451:2.)

A few days later, the defense supplemented its objections and requests for relief, again in writing. It complained that the court's redacted order "continues to conceal" the marshals' allegations that prompted Bowers's shackling, and even the court's justification for such secrecy. Given the potential unreliability of the marshals' interpretations and outside sources, the defense argued, the court should not simply have deferred to them. (DE1427:1-3,6-11.) In an accompanying *ex parte* filing, the defense shared that it had spoken with jail staff and their client and reviewed recent records and found

"nothing" that Bowers had said to anyone at the jail "to suggest any change in security risk or threat level."[129] (DE1432:2.) They again asked for disclosure so they could explain or rebut the allegations, and an evidentiary hearing and independent findings by the court to resolve disputed facts. (DE1427:1-8.)

Regarding prejudice, the defense confirmed Bowers's leg irons likely could not be hidden from the jurors. During a break, his lawyers viewed the defense table from the jurors' positions and determined that entering or exiting jurors could potentially see Bowers's feet as he stood. (DE1427:13.) Moreover, during sidebars, when jurors were allowed to stand and stretch, some could potentially see his feet while he was seated. *Id.*

Counsel also detailed other, worsening prejudicial effects of the shackling, in the accompanying *ex parte* filing. (DE1432.) In the courtroom, Bowers was now "rigid in his movements and could not move

---

[129] Counsel also responded to the court's post-hoc statement that Bowers had recently appeared more "expressive" at counsel table: since the sentencing-eligibility phase had featured expert testimony about Bowers's state of mind, he had naturally been more engaged and communicative with counsel. (DE1427:9.)

easily without it being apparent his movement was restricted." He reported that the shackles were "painful," and counsel observed they were so tight even a thin pencil could not fit between the metal clamps and his ankles. Counsel also noticed, and Bowers confirmed, that the leg irons were "distracting and impair[ing] his ability to focus" and "track the proceedings," as well as to "communicate with and listen to and understand counsel, and comport himself at counsel table." His attorneys were "concerned that jurors"—who were intently watching Bowers in court, especially during sidebars—"may misperceive [his] discomfort as dangerous or threatening." Furthermore, Bowers "view[ed] the shackles as unexplained punishment, and his counsel's inability to provide him with any explanation...impairs their relationship with him." This was a "special concern," since his lawyers were presenting the sentencing jury with "evidence of his serious mental illness, contrary to his belief that he is not mentally ill." (DE1432:3-4.) Bowers's lawyers provided two more such *ex parte* supplements during the sentencing phase, describing how these prejudicial effects of his ankle chains continued to worsen. (DE1498, DE1525.)

The defense also filed another supplement showing how jurors could see Bowers's leg irons. It included a series of color photographs, taken in the courtroom during a recess, with a defense paralegal seated where Bowers was during trial. These illustrated (and the defense supplement described) how multiple jurors could see Bowers's leg irons, notwithstanding the defense lawyers seated beside him and the government counsel table between them and the jury. (DE1492; 1492-1 to 1492-13.) This included not only during sidebars and while the jury was entering and exiting the courtroom, but at other times as well when one or more jurors had an unobstructed view of Bowers's lower legs.[130] (DE1492:2-3, 1492-4 to 1492-12; *see also* DE1498:2, 1525:2.) Other, close-up photographs showed the chains were so tight they seemed to be biting into Bowers's skin, leaving red marks. (DE1492-1 to 1492-3; *see*

---

[130] Because the court allowed shackling to be commenced unexpectedly in the midst of the trial, any effort to conceal Bowers's leg irons by altering practices involving his placement and movement that jurors had already grown accustomed to, like his standing along with everyone else when jurors entered and exited (*see* DE1427:13), would only have made jurors suspicious and spurred them to scrutinize him more closely. *Cf. United States v. Bell*, 819 F.3d 310, 323 (7th Cir. 2016) (shackles worn by defendant from start of trial were less noticeable because "both sets of parties and their counsel were directed not to rise when the jury entered the courtroom").

DE1498:1.) This supported counsel's repeated complaints that the constant pain from the leg irons was undermining Bowers's ability to communicate and focus and making him appear more restless and thus potentially more concerning to jurors.[131] (*See* DE1498:1-2; DE1525:1.)

The court acknowledged that the photographs "accurately capture the layout of the courtroom," but did not otherwise substantively address them. (App.13884-85 & n.1.) The government never addressed the photographs, nor the defense's description of how they showed the shackles were visible.

### 4. The court reaffirmed its refusal to allow a hearing on the marshals' factual allegations or to fully disclose them.

About a month after its shackling decision, toward the very end of the sentencing phase, on July 26, the court entered another, longer order rejecting Bowers's objections and requests. (App.13883-92.)

The court said the email from the chief deputy marshal the evening before it approved shackling had "communicated information

---

[131] As the defense noted, because Bowers was also shackled for transport between the jail and the courthouse, he was being kept chained 11-12 hours a day. (DE1498:2.)

about statements Mr. Bowers made" at the jail. (App.13885.) But, at the marshals' insistence, the court still refused to unredact the portion of its original order recounting that information (*see* App.372) or otherwise identify the source or "disclose [its] substance…in the interest of protecting the Marshals' sources."[132] (App.13885, 13887.)

While still not disclosing other portions of the chief deputy marshal's June 29 email quoted in the original order (*see* App.372), the court belatedly (again, a month into the shackling) shared some of the two deputy marshals' allegations from the morning the court ordered shackling, about how they had perceived and interpreted some of Bowers's recent behavior. The court said they claimed Bowers had "made efforts in recent days to close the distance between himself and the armed Deputy." (App.13886.) The marshals described one previous incident in which they were releasing Bowers from restraints before

---

[132] While the report from the jail as recounted by the chief deputy appeared to be the primary reason for the shackling decision judging from the court's initial order (App.13874-75, 13877), the court backpedaled in its second order, saying the other deputy marshals' interpretations of Bowers's behavior "independently support[ed]" shackling, and that the behavior was "more concerning" because of the report from the jail. (App.13887.)

escorting him into the courtroom and, after glancing away momentarily, saw that Bowers was "pressed against the Deputy's shoulder," thus near his firearm.[133] The court noted it "unders[tood]" (without saying how or from whom) the deputies had warned Bowers about this behavior before. (App.13886 n.2.) The order also revealed claims the court received from the two marshals on June 30 that, as the court recalled, they had perceived Bowers was "restless in the courtroom in recent days, had been looking frequently at the exhibits, and had appeared close to standing up during some testimony." The deputies had speculated that Bowers "might be feeling emboldened now that he has been found guilty" and faced a sentence of either life imprisonment or death.[134] (App.13886.)

The court cited no reason for waiting to disclose these allegations to defense counsel until a month after the shackling decision had been made and Bowers had already appeared in leg chains before the jury for

---

[133] At the time, the marshals did not explore shackling Bowers, implementing any other additional security, or even reporting this to the court. (App.13874-75.)

[134] This speculation depended on a premise belied by the record, namely that Bowers was surprised and disconcerted when the jury convicted him of the most serious charges. *See* App.9070.

most of the sentencing phase. Nor can any such reason be gleaned from the record. The disclosure came far too late for the court to undo the decision or for counsel to do anything with the information.

This new order also recounted an additional accusation from the marshals that the court had received (again, privately) in the interim, two weeks before, on July 10—over a week after Bowers's shackling had already begun. One of the deputy marshals told the court that, on that morning, when the jury entered the courtroom, he had observed Bowers turn back to the gallery, and thought Bowers might be "counting something in the crowd." Defendants, the marshals told the court, "are generally instructed to face forward toward the jury when standing." (The order did not say the marshals claimed to have so instructed Bowers, let alone recently.) The deputy speculated to the court that Bowers "might have been attempting to count the number of Marshals or other court security officers in the gallery."[135] (App.13886-87.)

---

[135] The order also noted that, at one point in voir dire months before, the marshals had observed Bowers writing on himself, though the order did not include that as a basis for shackling. (App.13884.) In that instance, Bowers had written a few letters on his hand, was told by the marshals not to do so, and complied. (DE1519:1.)

Most critical, the court finally addressed the constricted process it had used to approve shackling based on undisclosed, untested factual assertions. It acknowledged, for the first time, this Court's decision in *Sides*. (App.13888, *citing Sides*, 609 F.3d at 586.) But it dismissed the need for a hearing because, in its view: "The facts that the Court relied on in reaching its decision in this case are not reasonably in dispute." (App.13890.) The court believed it had "met its obligations" by permitting the defense "to make arguments," though it had kept counsel from even knowing (let alone testing) the marshals' claims. (App.13890.) It also denied it had "defer[red] to the Marshals." (App.13888-89.)

A few days later, before the sentence-selection phase concluded, Bowers's lawyers tried to address the court's limited, belated disclosure. They argued the marshals had misperceived and "misinterpreted" his behavior, and that counsel had never seen him crowd the armed deputy or stand too close during testimony. As for the claim that he had appeared more "restless," defense counsel again explained that the government's guilt-innocence case had been largely uncontested, whereas the opposite was true at the sentencing phase, and so everyone

at defense table including Bowers, was conspicuously more engaged. Counsel explained it was "pure and unfounded speculation" to suggest that Bowers looked at the gallery to count the number of marshals. Finally, the defense reported it still had not learned of any statement by Bowers to any jail staff that could be construed as a security threat. (DE1519:1-5.)

The defense objected to the absence of any real process, and to the court's "adopt[ing] as fact the marshals' allegations without having given Mr. Bowers an opportunity to test the[ir] accuracy" or show that "the marshals have misinterpreted facts." The defense again unsuccessfully sought an evidentiary hearing "to contest the allegations and provide additional context that would clarify what happened."[136] (DE1519:2-3; App.13302.)

---

[136] Given the continuing disclosures, the defense also moved, again unsuccessfully, for complete disclosure of all such communications. (DE1519:3 n.2; App.13302.)

**5. Well after the trial ended, the court finally disclosed a key allegation about a potentially threatening remark attributed to Bowers by unnamed jail officials.**

Almost six months after the sentencing phase ended, the court finally shared the first information about the marshal's report of a statement Bowers supposedly made at the jail. (DE1601:2 (disclosing an unredacted version of the court's Sealed Memorandum Order at DE1409 (providing the marshal's stated reasons)); App.386, 13874-77.) This newly revealed passage from the court's original order—which the court now disclosed to counsel in its entirety—quoted the chief deputy marshal's email (sent the evening before the shackling decision) claiming that "Butler County Prison Officers have reported that Bowers told them he knows who is armed and the feels confident he could disarm them."[137] (App.13874.) This belated disclosure only bolstered trial counsel's earlier objection that this (along with the marshals' other

---

[137] The chief deputy and the court regarded this as significant alongside the attending marshals' report of Bowers crowding them on at least one occasion. The chief deputy marshal speculated that Bowers might be "trying to bait Deputies into an altercation or…testing the water to see if he actually has a chance to disarm my Deputies." (App.13874, 13877.)

allegations) should have been promptly disclosed and counsel permitted to test and challenge it at the time of the shackling decision.

The marshals had urged the court to withhold the report's "source and substance" so as "to preserve their sources and to prevent the defendant from changing his pattern." (App.13875.) But the court never explained why revealing that the report had come from jail guards, or even naming them, would have created a security problem, especially since Bowers was confined in an "isolation bubble," away from staff and other prisoners. (App.12448-62.) Nor did the order say what "pattern" Bowers could "change."

Critical questions also surrounded this allegation: Which jail guard (or guards) reported the statement to the marshals? Did that guard hear it directly from Bowers? When was it made and what exactly did Bowers say? Did his words or the context suggest he was making a threat, or just joking or idly boasting? If it was perceived as a threat, did the jail memorialize it in any incident report or other record? And why did it not come out in any of the jail officers' sentencing testimony about Bowers's custodial behavior, or apparently even come to the attention of counsel for either side? The court's concealment of

the allegation's substance and source kept the defense from investigating these important questions. Rather than allowing that, an evidentiary hearing, or any other process for testing the allegation, the court simply accepted it as "fact[]." (App.13890.)

## D. Legal Argument

### 1. The court erred by withholding from counsel and accepting, without a hearing, genuinely disputed factual assertions that were insufficient to justify shackling.

The district court said it understood that the Fifth Amendment's due process clause forbade shackling Bowers based solely on the marshal's recommendation that it was necessary for security. *See Deck*, 544 U.S. at 632-33; *Sides*, 609 F.3d at 583. But the court missed that it also could not just accept, at face value, the marshals' *factual* allegations or interpretation of what Bowers had said and done. Rather, because the defense had raised "genuine and material factual disputes" about those, Third Circuit precedent required "an evidentiary hearing to resolve them." *Sides*, 609 F.3d at 586; *see id.* at 582 (repeating this requirement).

Only after a hearing could the court reliably determine whether facts "specific to" Bowers constituted "special security needs" showing

shackling was "justified by an essential state interest." *Deck*, 544 U.S.
at 624, 633; *see Sides*, 609 F.3d at 580-81. Though the court held itself
out as "'uniquely positioned and qualified'" to assess the need for
shackling, (App.13888, quoting *United States v. Ayala*, 917 F.3d 752,
763 (3d Cir. 2019)), that extended only to gauging courtroom security
needs based on established facts, *not* determining the veracity of
disputed and unsubstantiated allegations. Such factual determinations
require disclosure, an evidentiary hearing, and meaningful testing.
*Sides*, 609 F.3d at 585-86. ("appropriate inquiry" is required for court's
shackling decision to merit deference) (cleaned up).

Sides recognized this distinction. There, as here, the district court
received the marshals' factual rationale for shackling in "an *ex parte*
communication." *Sides*, 609 F.3d at 582. The court later told Sides the
marshals had reported he was classified as a "category five security
risk[], which is the highest" and housed in a "special needs unit at the
prison." And a corrections department attorney told the court that Sides
had a "track record" of "misconduct" and "violence" in prison. Yet
because legitimate questions remained about the nature of his
classification, placement, and record, the district court erred by

ordering shackling without "allowing Sides an opportunity to challenge the rationale" at an evidentiary hearing. *Id.* at 579, 582-83, 586.

Other circuits (including in decisions *Sides* relied on) have similarly recognized that due process obligates trial courts to disclose the factual assertions supporting shackling requests and to hold evidentiary hearings to resolve genuine disputes. Thus, in *Davidson v. Riley*, 44 F.3d 1118, 1120-21, 1125-26 (2d Cir. 1995), for instance, the Second Circuit reversed because the district court "failed to conduct an evidentiary hearing" on security officers' disputed claim that the prisoner had previously attempted an escape. Similarly, in *Elledge v. Dugger*, 823 F.2d 1439, 1450-52, *modified on other grounds*, 833 F.2d 250 (11th Cir. 1987), the Eleventh Circuit invalidated a state death sentence because the trial court's denial of an evidentiary hearing deprived the defendant "an adequate opportunity to challenge the untested information that served as the basis for…shackling," namely, law enforcement's claim that he had threatened in the jail to attack a court bailiff. And in *Claiborne v. Blauser*, 934 F.3d 885, 901 (9th Cir. 2019), the Ninth Circuit reversed for a shackling error, saying such restraints were permissible "only…after a *full* hearing at which officers

*show* a compelling need for security" (emphasis added). *See also, e.g.,*

*Hameed v. Mann*, 57 F.3d 217 (2d Cir. 1995); *Lemons v. Skidmore*, 985

F.2d 354 (7th Cir. 1993); *Ochoa v. Workman*, 669 F.3d 1130, 1140, 1145

(10th Cir. 2012) (quoting *People v. Ochoa*, 136 P.3d 661, 667

(Okl.Cr.App. 2006)); *United States v. Moore*, 651 F.3d 30, 46 (D.C. Cir.

2011) (quoting *United States v. Theriault*, 531 F.2d 281, 285 (5th Cir.

1976)); *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970);

*Benchbook for U.S. District Judges*, §5.01(B)(4) & n.8 (Mar. 2013).

By contrast, shackling has been upheld when trial courts

conducted evidentiary hearings to resolve genuine disputes over such

assertions. *See, e.g., United States v. Brown*, 454 F. App'x 44, 47 (3d Cir.

2011) (allegation of history of assaults in jail and against law

enforcement); *Hedlund v. Ryan*, 854 F.3d 557, 567-70 (9th Cir. 2017)

(report from jail that defendant was planning violent escape); *Adams v.*

*Bradshaw*, 826 F.3d 306, 310, 313-14 (6th Cir. 2016) (allegation of

defendant's statements to psychologists threatening to attack his

attorney); *Crittenden v. Ayers*, 624 F.3d 943, 970 (9th Cir. 2010)

(allegation of defendant's attempted escapes from the jail); *Williams v.*

*Norris*, 612 F.3d 941, 957 (8th Cir. 2010) (allegation of defendant's

threatening behavior during his prior trial); *United States v. Honken*, 541 F.3d 1146, 1162-63 (8th Cir. 2008) (allegations of prior escape attempts and threats against trial participants).

Of course, not every purported dispute about the factual basis for a shackling request will necessitate a hearing. Thus, this Court noted in *Sides* that "an evidentiary hearing…is not an appropriate forum in which to re-litigate the events underlying a prisoner-plaintiff's prior convictions or disciplinary infractions while in prison," since those have already been reliably adjudicated. *Id.* at 582 n.3.

Here, though, as in *Sides*, the marshals' representations were hardly free of "genuine and material dispute." (App.13890.) Unidentified jail guards' summary hearsay claim about a potentially threatening statement from Bowers was the very kind that, as discussed above, courts of appeal have required to be aired and tested at an evidentiary hearing. That the report's content and source were hidden from defense counsel until after trial only compounded the problem, as it hamstrung them from investigating and meaningfully

challenging it.[138] Similarly, there was nothing self-authenticating about the marshals' report that Bowers had engaged in certain behaviors, let alone their speculative interpretations (that Bowers was looking to grab the armed deputy's gun, count the security in the courtroom, or stand up from counsel table). These claims were disputable—indeed, *were* disputed by defense counsel when the court finally disclosed them.

Even if the allegations of what Bowers said and did were properly tested and found credible, these were so equivocal that they would not have supported the shackling decision. This Court has approved shackling only where there was proof the defendant had committed or seriously threatened violence in a custodial setting or against the trial participants. That was absent here. *See Szuchon*, 273 F.3d at 314 (approving shackling of state capital defendant after he violently assaulted a witness leaving the stand); *Brown*, 454 F. App'x at 47 (citing undisputed evidence of defendant's "involvement in a recent

---

[138] The need for a targeted investigation was heightened because defense counsel's conversations with jail staff and their client and review of his jail records revealed "nothing" that Bowers had said there "to suggest any change in security risk or threat level." (App.13880.)

assault inside the…jail"). None of the marshals' claims, even taken as true, established such a serious threat.

Nor are the requirements for using leg irons relaxed "when a defendant is on trial for multiple murders and the prosecution is seeking the death penalty." *Stephenson v. Wilson*, 619 F.3d 664, 668 (7th Cir. 2010). The extraordinary measure of chaining a defendant before the jury is rarely employed in federal capital cases, even ones involving the most aggravated crimes. There is no indication in the docket entries that courtroom shackling was employed in any of the other recent federal capital trials for mass killings, like the Boston Marathon bombing, the Charleston church shootings, or the ISIS bike-path murders in New York City. And proposals for shackling have been rejected by courts in other federal death-penalty trials. *See, e.g., United States v. Fell*, No. 5:01-cr-12, DE1091 (D. Vt. Jan. 13, 2017); *United States v. Williams*, No. 1:06-cr-79, DE992 (D. Haw. Dec. 3, 2009). Instead, at least when challenged by the defense, it apparently has been reserved for the handful of capital cases involving proof of custodial violence or threats. *See, e.g., United States v. Battle*, 173 F.3d 1343, 1346 (11th Cir. 1999) (defendant who had committed three separate

attacks on correctional officers, one fatal, including two using concealed, sharpened weapons); *Honken*, 541 F.3d at 1163 (defendant with "prior escape attempts" and recent "threats against witnesses" and "prosecutors").

2.     **The government cannot prove beyond a reasonable doubt that the erroneous shackling did not influence even one juror's vote for death and thus was harmless.**

Shackling a capital defendant at his sentencing trial is "inherently prejudicial," a recognition "rooted in our belief that the practice will often have negative effects that "cannot be shown from a trial transcript." *Deck*, 544 U.S. at 628, 635 (cleaned up). Whether the defendant poses a future danger is "nearly always a relevant factor" to capital jurors. And physically chaining a defendant conveys to jurors that "court authorities" do not trust him to avoid violence even at his own trial, against the lawyers, the judge, or perhaps the jurors themselves.[139] *Id.* at 633. Shackling also tends to "confuse and embarrass" the defendant's "mental faculties," and make it harder for

---

[139] "The sight of a shackled litigant is apt to make jurors think they're dealing with a mad dog." *Claiborne*, 934 F.3d at 900 (cleaned up).

him to communicate with his lawyers, focus on the proceedings, and act appropriately in court. *Id.* at 631-33; *Brantley*, 342 F. App'x at 767 n.5.

Thus, as the Supreme Court explained, shackling at a capital-sentencing trial "inevitably undermines the jury's ability to weigh accurately all relevant considerations—considerations that are often unquantifiable and elusive—when it determines whether a defendant deserves death. In these ways, the use of shackles can be a thumb on death's side of the scale." *Deck*, 544 U.S. at 633 (cleaned up).

For these reasons, "the defendant need not demonstrate actual prejudice to make out a due process violation. Instead, the [government] must prove 'beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.'" *Id.* at 635 (quotation omitted); *see also* 18 U.S.C. §3595(c)(2)(C). That would require proving to a "near certitude," *Victor v. Nebraska*, 511 U.S. 1, 15 (1994), that the potential prejudice could not have tipped even one juror's weighing of aggravating and mitigating factors from a death sentence to life imprisonment. Here, every recognized factor points away from harmlessness.

### a. Bowers's leg irons were visible to multiple jurors at sentencing.

Part of what determines the "kinds of prejudice" is "the degree of the jury's awareness" of the defendant's shackling. *Deck*, 544 U.S. at 634; *see Sides*, 609 F.3d at 584. Here, the government certainly cannot prove that jurors did not observe Bowers chained at the legs. *See United States v. Banegas*, 600 F.3d 342, 347 (5th Cir. 2010) ("government has the burden of proving beyond a reasonable doubt that the leg irons could not be seen by the jury"). Its failure to do so means "we must assume the leg irons were visible to the jury." *Id.*

As discussed, defense counsel's submissions showed that Bowers leg chains *were* visible to some or all jurors, including as they entered and exited the courtroom while Bowers and others stood, during sidebars when counsel were at the bench but Bowers remained at counsel table, and at other times.

Neither the government nor the court seriously disputed the defense proffer that Bowers's shackles were observable by multiple jurors. Indeed, the court candidly admitted at the outset that jurors might see Bowers's leg irons, despite efforts to conceal them. *Cf. Brantley*, 342 F. App'x at 769 ("misguided" to justify ill-considered

418

shackling decision by efforts to obscure shackles since such efforts often fail).

It would have been natural for any jurors who noticed the shackles to mention them to other jurors. *See, e.g., Davenport v. MacLaren*, 964 F.3d 448, 453 (6th Cir. 2020), *rev'd on other grounds*, 596 U.S. 118 (2022); *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999); *Davis v. Mathena*, No. 2:12-cv-92 (AWA/LRL), 2014 WL 1308694, at *16 (E.D. Va. March 27, 2014). No matter the exact number, "if even one juror is biased by the sight of the shackles, prejudice can result." *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (*citing Parker v. Gladden*, 385 U.S. 363, 366 (1966) (defendant "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors")).

      **b.**    **The erroneous shackling was highly pertinent to a key disputed issue, whether Bowers could be safely managed in prison.**

The government also cannot show this error was harmless because the unmistakable message Bowers's shackling sent to jurors — that the court considered him dangerous even in custody—bore heavily on key mitigating factors the defense asserted but jurors rejected. *See Sides*, 609 F.3d at 584 ("Where the restraints would appear to be

pertinent to the substance of the plaintiff's claims, the error may well

not be harmless") (cleaned up).

At the sentencing phase, Bowers presented testimony from one of

his jail guards and two experts on Bureau of Prisons (BOP) security

conditions. They testified that he had been a well-behaved detainee

and, if sentenced to life imprisonment, would likely be confined by the

BOP under highly restrictive conditions. The government fought to

confine the testimony and aggressively cross-examined these witnesses.

(App.12446-73, 12565-12632, 12657-83.) That included eliciting from

the jail guard that Bowers had been kept isolated, which limited his

recent opportunities to harm anyone or influence other detainees.

(App.12464; *see id.* at 12465: prosecutor also suggests "that while he

hasn't been disciplined...there may be some incidents.") The government

also elicited evidence from other witnesses that, even after having been

incarcerated for more than four years, Bowers still regarded himself as

a "prisoner of war" in the "war on white people orchestrated by the

Jews," and was zealously committed to the fight as long as he remained

alive. (*e.g.*, App.10131, 12825, 12933, 12958-59.)

Future dangerousness is "perhaps the most important" factor juries consider in weighing the death penalty. *Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017) (cleaned up). And the only two other federal defendants sentenced to death in this Circuit in the modern era (out of ten capital sentencings) were found by the jury to present a likelihood of future violence in prison. *See United States v. Savage*, 970 F.3d 217, 290 (3d Cir. 2020); *United States v. Hammer*, 564 F.3d 628, 630 (3d Cir. 2009).

Thus, in this particular context, shackling's general tendency to "inevitably impl[y] to a jury…that court authorities consider the offender a danger" even in custody would especially have undermined Bowers's defense against a death sentence. *Deck*, 544 U.S. at 633; *see Claiborne v. Blauser*, 934 F.3d 885, 899 (9th Cir. 2019) (erroneously ordered shackling was especially prejudicial because "Claiborne's dangerousness" was "key issue at trial").

### c. The shackling error further undermined Bowers's defense in other important ways.

Also realized here were shackling's additional tendencies to "inevitably…confuse and embarrass the defendant's mental faculties" and thereby "abridge…his constitutional rights of defense." *Deck*, 544

U.S. at 631; *Brantley*, 342 F. App'x at 767 n.5 ("courts have long expressed concern that shackles may affect the mental state of the defendant"). As discussed, defense counsel detailed for the court, through *ex parte* proffers and photographs, how having to wear the very tight and "painful" leg irons all day was degrading Bowers's already diminished ability to focus on the proceedings, communicate with his lawyers, and comport himself in the courtroom. *See Deck*, 544 U.S. at 631. And the court never questioned that showing. This also weighs against any effort by the government to establish harmlessness. *Cf., e.g., United States v. Healy*, No. 18-703 (MEF), 2024 WL 1701188, at *5 (D.N.J. Mar. 5, 2024) (court personally confirmed that defendant's leg shackles were "not painful" and would not be "distracting," since "a distracted defendant sometimes cannot participate as effectively in his own defense"); *Robles-Figueroa v. Foster*, No. 14-cv-1424 (JPS), 2015 WL 8491004, at *4 (E.D. Wis. Dec. 10, 2015) (record established defendant's "discomfort was minimal at best and did not affect his ability to assist his defense at trial").

### d.   A death verdict was not a foregone conclusion.

Shackling errors at non-capital trials have sometimes been deemed harmless in part because conviction was a foregone conclusion. *See United States v. Washington*, 2023 WL 128928, at *5 (3d Cir. 2023) (defendant "conceded that he was aware he was a felon and prohibited from possessing a firearm," and "did not dispute" police testimony that they observed him with a gun when arrested); *Brantley*, 342 F. App'x at 768 ("When he testified, Brantley admitted two of the three elements of the crime…and he did not contest the third" interstate-commerce element); *see Sides*, 609 F.3d at 584 (listing "strength of the case" as factor in harmless-error analysis); *Robinson v. Gundy*, 174 F. App'x. 886, 893 (6th Cir. 2006) (shackling error harmless where the "evidence against Robinson was truly overwhelming" as he repeatedly "confessed," to intentionally killing victim).

But such a simple, largely factual harmlessness analysis does not translate to a capital-sentencing determination. To be sure, Bowers's was a highly aggravated case. But, unlike at a trial, capital-sentencing jurors are instructed that the sentencing decision involved "a uniquely individual moral judgment" rather than any kind of "mechanical

process" that depended on "the number of aggravating and mitigating factors." They are cautioned that "a juror is never required to vote for a sentence of death." (App.13123, 13161.) And in determining whether the aggravating factors "sufficiently outweigh" the mitigating ones, each juror is left to determine what was "sufficient" for him or her, based on individual (not group) findings on mitigation. (App.13162-63.) Finally, because, unlike at trial, jurors are instructed that a non-unanimous verdict was permissible, a life sentence would have resulted if even one juror perceived enough mitigation to vote against capital punishment. (App.13123, 13163.) *See* 18 U.S.C. §3593(e); *Andrus v. Texas*, 590 U.S. 806, 821 (2020) (per curiam).[140]

Given this, it should not surprise that federal juries have regularly declined to return death verdicts even in highly aggravated capital cases involving multiple murders, because at least one juror, exercising the broad discretion afforded by such instructions, concluded that life imprisonment provided harsh enough punishment. *See* Appendix A.

---

[140] As discussed above in Point XIII.E, this process was undermined here by the government's improper rebuttal closing argument.

Here, notwithstanding the gravity of the crime, the Court cannot

be nearly certain that Bowers's erroneous shackling did not tip the

balance between mitigating and aggravating factors for at least one

juror. That is particularly so given that most or all of the jurors found

many substantial mitigating factors. *See* Statement of Facts, Section H.

3. **The Court should reverse Bowers's death sentences or, at the very least, remand for full disclosure and an evidentiary hearing.**

The Court should reverse Bowers's death sentences and remand

for a new capital-sentencing hearing. *See, e.g., Banegas*, 600 F.3d at

347; *Davidson*, 44 F.3d at 1126; *Elledge*, 823 F.2d at 1452. *See also*

*State v. Deck*, 303 S.W.3d 527, 532 (Mo. 2010) (noting relief afforded on

remand from Supreme Court).

Alternatively, this Court should remand for the district court to

(1) disclose all its communications with the marshals potentially

relevant to its shackling order, and conduct an evidentiary hearing and

make specific findings on the allegations it relied on in that order, *see,*

*e.g., Lemons*, 985 F.2d at 359 (cited approvingly in *Sides*, 609 F.3d at

581-82), and/or (2) conduct an evidentiary hearing and make specific

findings on prejudice, including the extent to which Bowers's leg irons

were visible to jurors, *see, e.g., Stephenson*, 619 F.3d at 673-74; *Rhoden v. Rowland*, 172 F.3d 633, 637-38 (9th Cir. 1999); *see also Brown*, 596 U.S. at 124.

## XV.   THE DISTRICT COURT VIOLATED RULE 43 AND THE CONSTITUTION BY FAILING TO ENSURE BOWERS'S PRESENCE FOR PROCEEDINGS DURING DELIBERATIONS.

### A.   Introduction

During deliberations, jurors asked to view the weapons in evidence, and the court permitted an in-court viewing without Bowers's presence or any valid waiver. During that viewing, a U.S. marshal improperly responded to jurors' questions about how the weapons operated, providing new information to which Bowers could not respond. Though the court later questioned the marshal about these exchanges, the record does not establish whether Bowers was present for that examination.

A capital defendant's presence at every critical stage of trial is constitutionally indispensable and cannot be waived by counsel or presumed from a silent record. These errors, individually and cumulatively, warrant vacatur of Bowers's death sentences or remand

for an evidentiary hearing to establish whether Bowers was present for the post-viewing examination of the marshal.

## B.    Standard of review

Bowers's absence from the viewing and marshal's examination is reviewed for plain error. *See United States v. Olano*, 507 U.S. 725, 732–36 (1993); *United States v. Tipton*, 90 F.3d 861, 873 (4th Cir. 1996).

## C.    Factual background

Bowers's familiarity with—and use of—the involved weapons was an important part of the government's case for death. Both sides' experts discussed it, and the prosecution centered it in closing argument.

### 1.    Government expert Brett Mills testified about the weapons' use and operability.

In the guilt-innocence phase, Brett Mills, a retired FBI Supervisory Forensic Examiner, gave lengthy and technical testimony about the firearms Bowers used—including their microscopic and ballistic properties. (App.7613-84.) He also described "the basic mechanics of how a firearm works and how that impacts [] the markings that are left on a cartridge or a bullet," and the technical

features of ammunition. (App.7632-42.) And he matched bullet

fragments from the victims to Bowers's firearms. (App.7682.)

## 2. The government emphasized Bowers's choice of and familiarity with weapons to argue for death.

Bowers's weapons use was key in the eligibility and selection

phases. In support of its proof of Bowers's intent and the substantial-

planning-and-premeditation aggravating factor, the government elicited

testimony from defense expert Dr. Richard Rogers about Bowers's

"weapons testing" at the rifle range to "make sure that his weapons

were operational." (App.9243-44; *see also* App.10289.) Rogers testified

that Bowers wanted to ensure his guns did not jam, explaining that

Bowers knew another synagogue shooter's weapon had malfunctioned

and wished to avoid the same problem. (App.9244.) Dr. Park Dietz, the

government's expert, similarly testified that Bowers "criticized other

active shooters who had failed to train with and test their weapons and

had lesser success than he," who were not "familiar enough with their

weapons." (App.10289-90.) Dietz told the jury Bowers "delighted" in

sharing that "he had no malfunctions, everything fit perfectly, his

reloads were flawless," and boasted, "I have 30 years of experience with

weapons." (App.10306.) Bowers explained to both experts the technical

advantages of the older Colt AR-15 rifle platform he used and his decision to purchase a .357 SIG Glock because it was "very reliable, very fast and very likely to penetrate [body] armor." (App.10291; *see also* App.9244.) And he told Dr. Rogers he wanted to be able to reload "very quickly." (App.9244.)

### 3. In summation, the government emphasized Bowers's weapons use and familiarity.

The prosecution argued in penalty-phase closing that Bowers's extensive weapons familiarity and testing showed premeditation and deliberation. It told jurors that "for months [Bowers] tested his weapons," "practiced his tactical reloads," and "wanted to avoid any risk that his guns would jam on his attack day." (App.10783.) These facts, prosecutors argued, demonstrated "careful planning and premeditation," (App.10792), supporting an aggravating factor that jurors should give "tremendous weight."[141] (App.13181). It also argued that Bowers used the AR-15's empty magazine "and left it on a set of steps near the classroom where he decided to hide…as bait" "for the police so that he could kill them, too." (App.13207.)

---

[141] As discussed in Point X, the use of this testimony for this purpose was inappropriate.

### 4. Bowers was absent when the jurors viewed the weapons during deliberations.

Roughly forty minutes after sentence-selection deliberations began, the jury sent a note asking to "be provided with the weapons in evidence." (App.13337; DE1534.) The court conferred with counsel and decided the firearms would be displayed on a table in the courtroom for jurors to view. Jurors were told they could privately confer but not touch the weapons. (App.13340-41.)

Although the judge and counsel remained in the courtroom, defense counsel advised that "Mr. Bowers will go back with the marshals," thereby removing him from the courtroom. (App.13337, 13339.) When the jurors entered, the court instructed them that they could look at the weapons but not handle them and that marshals would remain present for security. (App.13340-41.)

Moments later, the judge reminded everyone on the record that "the marshals do not respond to any questions" and "there [should] be no communications between the marshals and the jurors." (App.13341.) Yet when the jurors returned to deliberations, defense counsel reported that a marshal had spoken with jurors during the viewing. (App.13342.) The marshal was sworn, and he testified that when jurors asked how to

load a shotgun, he answered, "from the bottom and from the side," and when asked whether the magazine on the table was the one used in the AR-style rifle, he "said yes." (App.13343.) The record does not indicate whether Bowers was present for this hearing.

Defense counsel moved for a mistrial, arguing that the marshal had "interjected evidence that was not before the jury" and "instruct[ed] the jurors" on matters for them alone to decide. (App.13344.) The government opposed, arguing a curative instruction would suffice. The court denied the mistrial motion, simply instructing jurors to "disregard completely anything" the marshal had said. (App.13345.)

## D. Excluding Bowers from the weapons viewing violated Rule 43, the Confrontation Clause, and due process.

The weapons and magazine were an integral part of the government's case for death and the basis for one of just two questions the jury asked. And the weapons viewing placed before the jury the very instruments they had been told represented Bowers's premeditation, skill, and intent, making it one of the most consequential moments in the sentencing phase. At that point, Bowers had the right to be present. His absence constituted plain error.

"One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970). *See also Rushen v. Spain*, 464 U.S. 114, 117-18 (1983) (per curiam) (right to personal presence at all critical stages of the trial is a "fundamental right[] of each criminal defendant"). The right is also rooted in the Fifth Amendment's Due Process Clause, *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), and extends to all trial-related proceedings "whenever [the defendant's] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (cleaned up). Rule 43(a)(2)-(3) codifies this principle, requiring presence "at every trial stage…and sentencing." *See also United States v. Alessandrello*, 637 F.2d 131, 138 (3d Cir. 1980), cert. denied, 451 U.S. 949 (1981) (internal citation omitted) ("Rule 43 embodies the right to be present derived from the Sixth Amendment Confrontation Clause, the Due Process Clause of the Fifth and Fourteenth Amendments, and the common law privilege of presence."). In a capital case, where jurors must make the gravest moral and factual determinations, removing the defendant from

an evidentiary proceeding tied to the heart of the government's theory not only denies him that opportunity but also undermines the appearance of justice itself.

Here, Bowers's presence at the viewing was plainly essential to ensuring the proceeding's integrity. Not only could he have consulted with counsel and participated in his defense, but his presence would have reminded the jury that their deliberations directly impacted another human being. For all these reasons, the right to presence is "scarcely less important to the accused than the right of trial itself," *Snyder v. Massachusetts*, 291 U.S. 97, 131 (1934), because it affirms his right to be treated as an individual. These principles carry special force in a capital case, where the Eighth Amendment demands that the process uphold dignity and ensure heightened reliability. *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976).

Nor was there a valid waiver. "[I]t is not in the power of the prisoner…to waive the right to be personally present during the trial." *Lewis v. United States*, 146 U.S. 370, 372 (1892); and waiver is permitted only "where the offense is not capital." *Diaz v. United States*, 223 U.S. 442, 455 (1912); *Crosby v. United States*, 506 U.S. 255, 260

(1993) (same); Fed. R. Crim. P. Rule 43(c)(1)(B)(allowing waiver of presence only "in a noncapital case.") Even assuming the right to presence can be waived, any waiver must be made by the defendant personally. *See United States v. Mitchell*, 502 F.3d 931, 984-86 (9th Cir. 2007) (upholding Mitchell's waiver of presence during capital sentencing trial where the judge repeatedly questioned and advised him to ensure the waiver was knowing and voluntary).

Yet nothing remotely similar occurred here. Defense counsel's statement that "Mr. Bowers will go back with the marshals" was not a waiver, or even an assertion of Bowers's intention. (App.13337, 13339.) The court never asked Bowers whether he wished to leave, confirmed that he understood the significance of the proceeding, nor obtained any personal acknowledgment that he was knowingly relinquishing a constitutional and Rule 43 right. It thus denied Bowers the opportunity to make an informed choice about remaining in the courtroom during an evidentiary event that went to the core of the government's aggravating case. That omission is especially consequential in a capital trial where the law demands heightened reliability and strict adherence to

procedural safeguards designed to ensure the defendant's presence at every critical stage. *See Woodson*, 428 U.S. at 305.

This was not the first time that defense counsel had unilaterally waived Bowers's appearance. Almost two years earlier, in October 2021, the government had voiced opposition to counsel's waiver of Bowers's appearance at a scheduled suppression hearing, arguing Bowers's personal participation was essential and that counsel could not waive his presence without an on-the-record colloquy confirming a knowing and voluntary waiver. (DE608:1-3.) The government itself recognized that Rule 43 permits waiver of presence *only* in non-capital cases, citing *Crosby v. United States*, 506 U.S. 255 (1993), and *Smith v. United States*, 360 U.S. 1 (1959), and argued at an earlier point, "in a capital case of this magnitude, this Court should require defendant Bowers to be present for the suppression hearing," a critical stage in the case (DE608:6). Despite this, the court continued to treat waivers of Bowers's presence as routine. (DE610.) The government's prior position that Bowers's presence at a critical stage was indispensable—and could not be waived by defense counsel—underscores the gravity of the error in excluding him from the jury viewing. (DE608:1–7.)

**E.    The marshal's communications with the jury during Bowers's absence constituted further error.**

The prejudice from Bowers's exclusion deepened when the marshal—a uniformed court officer—gave the jurors information about the weapons. (App.13343.) That jurors had questions on that issue was unsurprising, given FBI expert Brett Mills's complex and technical testimony about them.  (*See* App.7651-82.) Jurors' question about how to load the shotgun, and whether the magazine fit the AR-style rifle, appeared to be an effort to imagine how Bowers operated the guns during the offense.

The marshal's responses—that the shotgun loaded "from the bottom and from the side" and that a specific magazine matched the AR-style rifle—reinforced the government's closing argument that Bowers was a skilled marksman who had perfected his tools for killing, and that Bowers made deliberate and repeated motions as he moved around the synagogue: things the government claimed reflected premeditation and a lack of remorse. (App.10783, 10792, 13204-07.) This exchange's timing and substance could not have been more prejudicial: it occurred during sentencing deliberations, concerned central aggravating evidence, and came from a source clothed with

official authority. This unsworn, untested information came from an agent of the court at the most sensitive moment of the trial, when the jurors were deciding whether Bowers would live or die. *Cf. Remmer v. United States*, 347 U.S. 227, 229 (1954). ("The integrity of jury proceedings must not be jeopardized by unauthorized invasions.").

The court's subsequent colloquy with the marshal failed to cure the prejudice because Bowers was not there. Due process requires a "hearing with all interested parties permitted to participate," which did not occur. *See Remmer*, 347 U.S. at 229–30; *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975)("[A]n accused has a right to be present at all stages of the trial where his absence might frustrate [its] fairness.")

**F. The court's instruction failed to cure the violation.**

Defense counsel moved for a mistrial once the marshal's communication came to light, (App.13344), but the court offered only a perfunctory instruction that jurors "disregard completely anything" the marshal said. (App.13345.) That was inadequate: jurors cannot realistically be expected to "disregard completely" factual explanations, provided during deliberations from an official court figure, particularly as the curative instruction was not instantaneous but required the

jurors to return to the courtroom after they had resumed deliberations. *See United States v. Hakim*, 344 F.3d 324, 326 (3d Cir. 2003) ("[T]he timing of a jury instruction may impact [the curability of] improperly admitted testimony."); *United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974) ("whatever efficacy curative instructions possess cannot help but be weakened by the lapse of time.").

The marshal's statements—coming from an authority figure— would have been indelible. *See, e.g.*, *United States v. Matta-Quiñones*, 140 F.4th 1 (1st Cir. 2025) (reversing a criminal conviction *solely* on the basis that an FBI case agent was present in the courtroom with jurors as they reviewed physical evidence. ) *See also United States v. Brown*, 832 F.2d 128, 130 (9th Cir. 1987) (explaining that the appellate court could not conclude that "no prejudicial contact occurred" because "[s]uch contact could be very subtle, such as a nod...[and] might have been unintended, or even unnoticed by the case agent himself").

## G. The errors warrant vacatur under the plain error standard.

As explained above, the errors were plain and violated Bowers's substantial rights under the Constitution and federal law. *See United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001) (en banc) (An error is

plain if it is "obvious" or "clear under current law.") (quotation omitted).

They also undermined the proceedings' fairness, integrity, and public

reputation by permitting a critical evidentiary hearing in a high-profile

death penalty case to transpire outside the defendant's presence. *See*

*Olano*, 507 U.S. at 733–36; *DeMuro*, 677 F.3d at 557. Without Bowers

present, jurors were left to confront not the living person whose fate

they were to decide, but the cold implements of his crime. Worse, the

optics of that moment—the weapons present, Bowers's obvious absence,

and marshals surrounding the evidence and the jurors—prejudicially

suggested a "need to separate [Bowers] from the community at large"

distorting the jury's deliberations. *Deck v. Missouri*, 544 U.S. 622, 630-

33 (2005). But that need was illusory given Bowers's immobilization,

handcuffs and shackles, the heavily-guarded courtroom, and the

impossibility that Bowers would ever have access to firearms again. *See*

*Simmons v. South Carolina*, 512 U.S. 154, 163-64 (1994).

Bowers's absence sent a profound psychological message to the

jury. *See, e.g., United States v. Canady*, 126 F.3d 352, 362 (2d Cir. 1997)

("[S]everal courts…have pointed to the fact that the defendant's mere

presence exerts a 'psychological influence upon the jury.'") (cleaned up).

An accused must personally stand before the tribunal whenever his life or liberty is at stake, *Hopt v. People*, 110 U.S. 574, 578-79 (1884), and excluding Bowers while jurors viewed and discussed weapons with a marshal created a one-sided and manifestly unfair proceeding.

H.  **Remand is required because the record does not establish whether Bowers was present during the marshal's examination.**

Defendants, as "interested part[ies], must be permitted to participate meaningfully in any proceeding assessing juror exposure to outside influence." *Remmer*, 347 U.S. at 229–30. Bowers's presence at the colloquy with the marshal bore a "reasonably substantial [relation] to the fullness of [Bowers's] opportunity to defend" against the government's case. *Snyder*, 291 U.S. at 105–06. And his presence could not be presumed waived. *Hopt*, 110 U.S. at 578; *Lewis*, 146 U.S. at 372–73; *Diaz*, 223 U.S. at 455. Yet it is not clear from the record whether he was present. (App.13342–43.) Trial counsel said Bowers "will go back" before the jury viewed the weapons, and nothing indicates Bowers returned afterward. This uncertainty warrants remand for determination whether Bowers was present.

# XVI. THE CUMULATIVE EFFECT OF THE ERRORS WARRANTS RELIEF.

Even when no single error is determined to have caused sufficient prejudice to warrant reversal, reversal is still warranted if multiple "errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993). Each of the errors alleged in this brief is alone sufficient to warrant remand or vacatur of Bowers's death sentences. Assuming this Court disagrees, it should still grant relief due to the errors' cumulative effect.

//

//

## CONCLUSION

Bowers respectfully requests that this Court vacate his specified convictions and death sentences, or remand for further proceedings.

Respectfully submitted this 18th day of December, 2025.

ROBERT BOWERS

by his attorneys:

*s/ Sean J. Bolser, Esq.*
Federal Capital Appellate Resource
Counsel Project
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
718-330-1200
Sean_Bolser@fd.org

*s/ Sarah S. Gannett, Esq.*
Office of the Federal Public Defender
District of Arizona
250 N. 7th Avenue, Suite 600
Phoenix, AZ 85007
602-382-2700
Sarah_Gannet@fd.org

*s/ Margaret A. Farrand, Esq.*
Office of Federal Public Defender
Central District of California
321 E. 2nd Street
Los Angeles, CA 90012
213-894-7528
Margaret_Farrand@fd.org

## CERTIFICATION OF BAR MEMBERSHIP, IDENTICAL TEXT, VIRUS CHECK, AND WORD COUNT

I, Sean J. Bolser, Esquire, of the Federal Public Defender's Office, certify that:

1) I am a member in good standing of the bar of this Court;

2) The text of the electronic format of the Brief of Appellant is identical to the hard copy format;

3) A virus check was performed on the Brief of Appellant, using Trend Micro Apex One, version 14.0.14096 (last update November 18, 2025) and no virus was detected;

4) This Brief of Appellant contains fewer than 85,000 words: specifically, it contains approximately 83,234 words.

I make this combined certification under penalty of perjury. *See* 28 U.S.C. §1746.

*/s/ Sean J. Bolser*
Sean Bolser, Esq.
Assistant Federal Public Defender

Date: December 18, 2025

# CERTIFICATE OF SERVICE

I, Sean J. Bolser, Esquire, of the Federal Public Defender's Office,

certify that I served on this date a copy of the attached Brief of

Appellant, via Electronic Case Filing, and/or by placing a copy in the

United States mail, first class in New York, New York, and/or by hand

delivery, addressed to the following:

> John-Alex Romano
> United States Department of Justice
> Criminal Division
> Room 7101
> 1400 New York Avenue NW
> Washington, DC 20005
> Direct: 202-353-0249
> Email: John-Alex.Romano@usdoj.gov

> */s/Sean J. Bolser*
> Sean J. Bolser, Esq.
> Asstistant Federal Public Defender

Date: December 18, 2025

# APPENDIX A

## Federal Capital Trials Involving Multiple Murders Where the Jury Declined to Impose a Death Sentence

- An Islamic terrorist who, in a plan to promote ISIS and its jihad against the West, drove a truck onto a recreational path in New York City at high speed and intentionally struck numerous bicyclists and pedestrians, killing eight and injuring at least 18 others;[142]

- Several Al-Qaeda members responsible for bombing the U.S. embassies in Kenya and Tanzania and killing 224 people, including 12 Americans, and injuring more than 5,000;[143]

- The head of a drug-trafficking organization in Puerto Rico who killed a total of 20 people, including eight RICO murders, soon after being released from prison;[144]

- A gang leader in California who committed eight murders, including three to further his racketeering enterprise;[145]

---

[142] *See United States v. Saipov*, 2024 WL 230625, at *1 (S.D.N.Y. Jan. 22, 2024); *United States v. Saipov*, 2023 WL 4199415, at *1 (S.D.N.Y. June 27, 2023).

[143] *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 103-07 (2d Cir. 2008).

[144] *United States v. Candelario-Santana*, 834 F.3d 8, 15-16 (1st Cir. 2016).

[145] *United States v. Duong*, No. 5:01-cr-20154, ECF #1515, at 6, 21 (N.D. Cal. Feb. 1, 2011).

- A smuggler who locked a group of aliens in his tractor-trailer without air conditioning, causing 19 of them to die of dehydration and suffocation;[146]

- A Mafia hitman in New York who committed seven contract killings, including several in which he tortured and dismembered his victims;[147]

- A large-scale drug-supplier in Virginia who committed or ordered five murders in support of his racketeering enterprise;[148]

- A white supremacist in Arkansas who drowned an eight-year old girl and her parents after robbing them, putting bags over their heads, binding them with duct tape, and weighting them down with rocks;[149]

- A Washington, D.C. drug-kingpin convicted of 18 murders;[150]

- The so-called "20th hijacker" whose actions enabled the 9/11 plot to go forward undetected, resulting in thousands of deaths when

---

[146] *United States v. Williams*, 610 F.3d 271, 274-76 (5th Cir. 2010).

[147] *Pitera v. United States*, 2000 WL 33200254, at *1 (E.D.N.Y. Dec. 21, 2000); *United States v. Pitera*, No. 90-0424, Verdict Form, (E.D.N.Y. Jul. 6, 1992).

[148] *United States v. Johnson*, 219 F.3d 349, 351 (4th Cir. 2000).

[149] *United States v. Kehoe*, 310 F.3d 579, 584 (8th Cir. 2002).

[150] *United States v. Gray*, Brief of Appellee, 2011 WL 8193753, at *1, 4 (D.C. Cir. Jan. 21, 2011).

his fellow Al-Qaeda terrorists flew hijacked planes into the World Trade Center and Pentagon;[151]

- The nationwide leader of the Aryan Brotherhood prison gang who, while serving a sentence for murder, committed or ordered five additional murders, as well as a number of other attempted murders and assaults;[152]
- A South Carolina man who intentionally set fire to a hotel room, killing six people, including a 16-month old baby;[153]
- Somali pirates who kidnapped and shot to death two couples on their boat;[154]
- Drug trafficker brothers who murdered five victims in furtherance of their racketeering conspiracy.[155]

---

[151] *United States v. Moussaoui*, 591 F.3d 263, 301 n.24 (4th Cir. 2010).

[152] *United States v. Mills*, No. 2:02-cr-938, ECF #4074, at 4-5 (C.D. Cal. Oct. 30, 2006).

[153] *United States v. Hans*, 332 F. App'x 116 (4th Cir. 2009).

[154] *United States v. Beyle*, 782 F.3d 159, 161-62 (4th Cir. 2015).

[155] *United States v. Johnson*, 219 F.3d 349, 352 (4th Cir. 2000).

## Federal Capital Cases Involving Multiple Murders Where Non-Death Resolutions Occurred Pretrial[156]

- A bomber motivated by anti-abortion and anti-gay beliefs, who committed three terrorist attacks over a two-year period that killed two people and injured at least 150 more;[157]

- The so-called "Unabomber," who was responsible for mailing or hand-delivering a series of explosive devices that killed three people and injured 23 others.[158]

- Drug traffickers who committed 13 and nine murders respectively.[159]

- A white supremacist who killed one worshipper at a Chabad, injured another, and attempted to kill more than 50 individuals, all targeted because they were Jewish people at a place of worship—and would have done so but for the

---

[156] This is a selection of cases analogous to Bowers's. According to data maintained by the Federal Death Penalty Resource Counsel Project, non-death resolutions occur pretrial in the vast majority of federal capital cases.

[157] *United States v. Rudolph*, No. 1:00-cr-00805-CAP, ECF #24 (N.D. Ga. 2005).

[158] *United States v. Kaczynski*, No. 2:96-cr-00259-GEB-GGH-1, ECF #550 (E.D. Cal. 1998).

[159] *United States v. Heatley*, No. 1:96-cr-00515-LAP-1, ECF #461 (S.D.N.Y. 1999); *United States v. Cuff*, No. 1:96-cr-00515-LAP-1, ECF # 466 (S.D.N.Y. 1999).

fact that his gun jammed.[160]

- A white person who shot to death 23 shoppers in an El Paso Walmart (and injured at least 22 more) for the purpose of "defending my country" from "the Hispanic invasion of Texas."[161]

- A drug trafficker tied to a Mexican cartel that supplied cocaine throughout the Midwest, responsible for at least 11 murders.[162]

- Mass-shooter of five victims at Club-Q in Colorado Springs, Colorado, who wore body armor and used an AR-15 style rifle in the hate-crime murders.[163]

- MS-13 gang members who murdered ten people in 2017 and 2018, eight of them by gunshot. One member was charged with nine of the murders, another with seven. Case reviewed by the current administration.[164]

---

[160] *United States v. Earnest*, No. 3:19-cr-01850-AJB-1, ECF # 139 (S.D. Cal. 2021).

[161] *United States v. Crusius*, No. 3:20-cr-00389-DCG-1, ECF #82, 254, 280 (W.D. Tex. 2023).

[162] *United States v. Jordan*, No. 4:15-cr-00404-HEA-3, ECF #4288 (E.D. Mo. 2025).

[163] *United States v. Aldrich*, No. 1:24-cr-00006-CNS-1, ECF #36 (D. Colo. 2024).

[164] *United States v. Reyes-Castillo, et al.*, No. 2:19-cr-00103-GMN-MDC-1, ECF #223, 343 (D. Nev. 2025).