No. 24-9002

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————————

## UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

## ROBERT BOWERS,

Defendant–Appellant.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

———————————————

## ANSWERING BRIEF FOR THE UNITED STATES

———————————————

A. TYSEN DUVA
  Assistant Attorney General
JOSH A. GOLDFOOT
  Deputy Asst. Attorney General
BARRY K. DISNEY
JOHN-ALEX ROMANO
  U.S. Department of Justice
  Criminal Division
  950 Pennsylvania Avenue, NW
  Washington, DC 20530

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Dep. Asst. Attorney General
DAVID N. GOLDMAN
JANEA L. LAMAR
JOSHUA R. ZUCKERMAN
  U.S. Department of Justice
  Civil Rights Division

TROY RIVETTI
  United States Attorney
SOO C. SONG
  Special Assistant U.S. Attorney
LAURA IRWIN
  Appellate Chief
  Western District of Pennsylvania

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................i

TABLE OF AUTHORITIES ................................................................ xv

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION..................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF RELATED CASES OR PROCEEDINGS ...................... 5

STATEMENT OF THE CASE............................................................. 5

       A.    Factual History................................................................ 5

            1.    The Tree of Life Synagogue was home to three Jewish congregations.................................................. 5

            2.    Bowers spent the year prior to his attack on the Tree of Life Synagogue making hateful and threatening comments about Jewish people online.................................................................. 8

            3.    On October 27, 2018, the three congregations gathered for religious worship and study. ................ 11

            4.    Bowers kills 11 congregants, injures 2, and injures 2 law enforcement officers. .......................... 14

                  a.    Bowers attacks Dor Hadash congregants. ...... 15

                  b.    Bowers attacks Tree of Life congregants. ....... 17

                  c.    Bowers attacks New Light congregants........... 20

                  d.    Outside, congregants realized there was a shooter inside their synagogue and called 911. ............................................................ 22

e.  Bowers injures law enforcement and reenters Pervin Chapel where he shoots three more Tree of Life congregants............... 23

5.  Bowers exchanges gunfire with law enforcement and injures two additional officers. ......................... 25

a.  Bowers barricades himself in a children's classroom.................................................... 25

b.  Bowers ambushes officers.............................. 25

6.  Bowers surrenders and explains that he "just want[ed] to kill Jews." ............................................. 27

7.  Officers clear the synagogue to ensure that no one is working with Bowers. .................................. 29

B.  The Federal Death Penalty Act......................................... 30

C.  Procedural History ........................................................ 31

SUMMARY OF ARGUMENT.................................................... 37

ARGUMENT.......................................................................... 42

I.  Bowers's Death Sentences for the Section 924(j) Offenses (Counts 23-33) Should Be Vacated Following *Barrett v. United States*, but Resentencing on the Remaining Capital Counts Is Not Warranted......................................................... 42

A.  Background................................................................. 42

B.  Standard of Review ....................................................... 44

C.  Argument..................................................................... 44

1.  The death sentences imposed on Counts 23-33 should be vacated in light of *Barrett*......................... 44

2.  Resentencing on Counts 1-11 is unwarranted. ......... 46

a. The district court repeatedly instructed the jury to consider each capital count separately...................................................... 47

b. Counts 1-11 were based on the same evidence as Counts 23-33. ........................... 48

c. Overwhelming evidence justified the death sentences. ............................................ 49

    i. Threshold intent to kill........................ 49

    ii. Statutory aggravating factors................ 53

    iii. Non-statutory aggravating factors......... 55

d. The defense's mitigation case was weak......... 58

II. Bowers's Convictions Under 18 U.S.C. 247 Are Valid. .............. 64

A. Background................................................. 65

B. Standard of Review ...................................... 69

C. Section 247(a)(2) is a valid exercise of Congress's Commerce Clause authority............................................ 69

1. Congress used the full scope of its Commerce Clause authority when it enacted Section 247.......... 70

2. Section 247's constitutional applications defeat Bowers's facial challenge. ....................................... 72

3. Section 247's jurisdictional element defeats Bowers's facial challenge. ....................................... 73

D. Section 247(a)(2) is constitutional as applied to Bowers. ................................................................. 79

1. Bowers used weapons, ammunition, and holsters that had traveled in interstate and foreign commerce................................................. 79

2.      Bowers used a channel and instrumentality of interstate commerce. ................................................. 84

3.      Bowers's attack affected the three congregations' commercial activities. ............................................... 86

E.      The district court properly instructed the jury on the types of evidence that satisfy Section 247's interstate commerce element. ......................................................... 89

III.    Bowers's Convictions Under 18 U.S.C. 249 Are Valid. .............. 92

A.      Background .................................................................. 92

B.      Standard of Review ..................................................... 95

C.      Section 249(a)(1) is a valid exercise of Congress's Thirteenth Amendment enforcement authority ................. 95

1.      Congress acted rationally when it prohibited racial violence in Section 249(a)(1) ........................... 96

2.      Section 249(a)(1) constitutionally protects those, including Jewish people, who were considered distinct "races" at the time of the Thirteenth Amendment's passing ............................................. 99

a.      Section 249(a)(1) validly prohibits racial violence committed because of a person's race or religion. ........................................... 99

b.      Bowers erroneously argues that Section 249(a)(1)'s inclusion of religion in its prohibition against racial discrimination is unconstitutional. ....................................... 100

D.      None of Bowers's arguments warrants resentencing. ...... 103

IV.     Bowers's Convictions Under 18 U.S.C. 924 Are Valid. ............. 106

A.      Background .................................................................. 107

B.      Standard of Review ..................................................... 108

C.   Section 247(a)(2), (d)(1) is a categorical crime of violence............................................................. 108

   1.   Courts use the categorical and modified categorical approaches to determine if an offense is a crime of violence. ............................. 108

   2.   Section 247 is divisible, so the modified categorical approach applies. ............................. 109

D.   A Section 247(a)(2) offense resulting in death requires the use, attempted use, or threatened use of force. .......... 110

   1.   Bowers's offense of conviction contains two elements that require the use of physical force....... 111

   2.   Subsection (d)(1)'s reference to kidnapping does not eliminate the statute's requirement of physical force. ..................................................... 113

      a.   Bowers forfeited any argument that a defendant can violate Section 247 using psychological force alone............................. 114

      b.   A defendant must use physical force to violate Section 247(a)(2), (d)(1)..................... 117

         i.   Psychological force alone does not violate Section 247(a)(2), (d)(1). .......... 117

         ii.   Subsection (d)(1) is divisible, and the government did not charge Bowers with an offense that he could commit through psychological force............................. 118

E.   Section 247(a)(2) does not apply to a defendant's use of force against his own person or property. ................... 121

F.   Section 247(a)(2), (d)(1) requires intentional conduct...... 125

G.   None of Bowers's arguments warrants resentencing. ...... 126

V.    The District Court Properly Rejected Bowers's *Batson* Challenge. ................................................................. 129

    A.    Background .......................................................... 129

       1.    The district court established and implemented voir dire procedures. ............................... 130

       2.    The parties each exercised peremptory strikes. ...... 135

       3.    The district court held a *Batson* hearing and rejected Bowers's contention that the government intentionally discriminated against several prospective jurors. ....................................... 137

       4.    The district court denied Bowers's post-trial request to "reopen" the *Batson* hearing but nonetheless considered his new arguments and again found that he had not proven intentional discrimination. ..................................................... 140

    B.    Standard of Review ...................................................... 141

    C.    The district court did not abuse its discretion by denying Bowers's request for a continuance. .................. 142

    D.    The district court properly conducted the *Batson* analysis and appropriately found that the government did not intentionally discriminate during voir dire. ......... 147

       1.    The district court properly conducted step three of the *Batson* analysis. ........................................... 148

       2.    The district court did not clearly err when it found that the government did not discriminate in using its peremptory strikes. ............................. 153

          a.    The government credibly struck Juror 257 primarily because she opposed the death penalty. ....................................................... 155

vi

b.    The government credibly struck Juror 148 primarily because she opposed the death penalty...................................................... 160

c.    The government credibly struck Juror 290 primarily because she opposed the death penalty...................................................... 167

d.    The government credibly struck Juror 95 primarily because he did not come to court. ......................................................... 172

e.    The government credibly struck Juror 332 primarily because of his criminal history...... 174

VI.    The District Court Correctly Denied Bowers's Motion to Disqualify Juror 119. ............................................................ 179

A.    Background ................................................................... 179

1.    Jury questionnaire ................................................ 179

2.    Voir dire............................................................... 180

3.    Denial of challenge for cause ............................... 184

B.    Standard of Review ...................................................... 185

C.    Argument...................................................................... 185

1.    The district court did not err in denying the implied-bias challenge. ......................................... 187

a.    Implied bias arises only in exceptional circumstances............................................ 187

b.    Juror 119's past work in China did not trigger implied bias...................................... 190

2.    The district court did not abuse its discretion in denying the actual-bias challenge. .......................... 196

a.  Actual-bias rulings are accorded substantial deference. ................................. 196

b.  Juror 119 was not substantially impaired. .... 198

3.  Remand is unwarranted........................................ 204

VII.  The District Court Properly Exercised Its Discretion in Dismissing Prospective Jurors 159 and 164 for Cause. ............. 206

A.  Background ................................................................. 206

1.  Prospective Juror 159 ......................................... 206

2.  Prospective Juror 164 ......................................... 208

B.  Standard of Review ..................................................... 210

C.  Argument .................................................................... 210

1.  Prospective Juror 159 was substantially impaired............................................................... 212

2.  Prospective Juror 164 was substantially impaired............................................................... 214

VIII.  The District Court Properly Admitted Expert Testimony About Bowers's Social-Media Postings and Lay Testimony About Judaism and Pittsburgh's Jewish Community. .............. 217

A.  Background ................................................................. 217

1.  Relevant Guilt-Phase Overview ........................... 217

2.  Relevant Selection-Phase Overview ...................... 219

B.  Standard of Review ..................................................... 220

C.  Argument .................................................................... 220

1.  The district court properly admitted Braniff's expert testimony.................................................. 220

a.  Additional background............................... 220

b.    Braniff's testimony was admissible in the guilt phase................................................ 223

c.    The district court did not plainly err by not excluding Braniff's testimony for penalty-phase purposes............................. 229

d.    Braniff's testimony did not plainly violate the Constitution. ......................................... 231

e.    Bowers's arguments are meritless. ............... 232

2.    The district court did not plainly err in admitting Rabbi Myers's testimony about Judaism. .............. 235

a.    Additional background............................... 235

b.    At most, plain-error review applies. ............. 237

c.    Rabbi Myers's testimony was admissible. .... 237

3.    The district court did not plainly err in admitting testimony about religious items............................. 239

a.    Plain-error review applies ........................... 239

b.    The testimony was admissible. .................... 240

4.    The district court properly exercised its discretion in admitting Burstin's testimony............ 243

a.    Additional background............................... 244

b.    Burstin's testimony was admissible.............. 244

5.    Bowers distorts the government's use of evidence.......................................................... 248

6.    Any error did not prejudice Bowers. ..................... 251

IX.   The Government's Victim-Impact Evidence and Arguments Did Not Violate the Constitution or the FDPA........................ 253

A.    Background............................................................. 253

ix

  1.   Pre-trial ruling on surviving-victims aggravator ..... 253

  2.   Pre-selection-phase rulings on victim-impact
       evidence .......................................................... 253

  3.   Selection-phase evidence ................................... 256

  4.   Selection-phase closing argument......................... 257

B.   Standard of Review ...................................................... 258

C.   Argument................................................................... 259

  1.   The Constitution and FDPA permit the
       presentation of victim-impact evidence. ................ 259

  2.   The district court properly admitted evidence of
       victims' religious faith and roles within their
       religious communities.......................................... 260

       a.   Bowers's claim is partially unpreserved........ 260

       b.   The court committed no error...................... 262

  3.   The district court properly admitted testimony
       about victims' past experiences. ........................... 266

  4.   The district court properly admitted evidence of
       surviving victims' injuries. .................................. 268

       a.   Bowers conceded below that evidence of
            surviving victims' physical injuries was
            admissible. ............................................... 269

       b.   The FDPA allows the jury to consider
            injuries to surviving victims. ....................... 270

  5.   The government appropriately referenced
       victims during argument. .................................... 274

  6.   Vacatur is not warranted...................................... 278

x

X.   The Government's Selection-Phase Use Of Bowers's Statements To Defense Experts Did Not Violate The Constitution.................................................................. 281

   A.   Background ............................................................. 281

        1.   The Fifth Amendment and mental-health evidence............................................................ 281

        2.   Bowers noticed his intent to present expert mental-health evidence during the penalty phase. .............................................................. 282

        3.   During the eligibility phase, the government elicited and relied on testimony about Bowers's statements to his own expert. ............................... 283

        4.   During the selection phase, the government elicited and relied on testimony about Bowers's statements to his own experts............................. 287

   B.   Standard of Review ...................................................... 290

   C.   Argument.................................................................. 290

        1.   The government's use of Bowers's statements did not violate the Fifth Amendment. .................... 290

        2.   Bowers was not forced to make an impermissible choice between constitutional rights................................................................. 292

             a.   The Supreme Court has limited *Simmons*. .... 292

             b.   Simmons does not apply here. ...................... 295

        3.   Bowers's *Griffin* and Sixth Amendment claims are meritless. ........................................................ 300

        4.   Any error does not warrant relief. ......................... 303

XI.    The District Court Properly Denied Bowers's Request for a
       Mitigator on Martyrdom and Excluded Evidence of His
       Conditional Offer to Plead Guilty. ......................................... 305

       A.    Background ................................................................. 305

             1.    Avoiding martyrdom ............................................ 305

             2.    Conditional offer to plead guilty .......................... 306

       B.    Standard of Review ..................................................... 306

       C.    Argument .................................................................... 306

             1.    Legal background ................................................ 306

             2.    The district court correctly excluded the
                   martyrdom mitigator. .......................................... 308

                   a.    Avoidance of martyrdom is not
                         mitigating. ................................................. 309

                   b.    The factor was not warranted as rebuttal. ...... 312

                   c.    Any error did not prejudice Bowers. ............ 317

             3.    The district court properly excluded evidence of
                   Bowers's conditional plea offer. .......................... 318

                   a.    Offering to plead guilty to avoid the death
                         penalty is not mitigating. ............................. 318

                   b.    The evidence was not warranted in
                         rebuttal. .................................................... 322

                   c.    Any error did not prejudice Bowers. ............ 327

XII.   The District Court Properly Denied Bowers's Challenges to
       The Government's Selection-Phase Rebuttal Argument. .......... 328

       A.    Background ................................................................. 328

       B.    Standard of Review ..................................................... 330

C.   Argument ................................................ 330

   1.   The prosecutor did not misstate the standard for weighing aggravators and mitigators. ................... 331

   2.   The prosecutor did not argue or imply that death sentences were legally required. ................... 335

   3.   The prosecutor did not ask the jury to disregard or ignore Bowers's mitigating factors. ................... 338

   4.   The cumulative-error doctrine does not help Bowers. ............................................. 342

XIII.  The District Court Properly Exercised Its Discretion in Approving the Use of Ankle Restraints on Bowers During Penalty-Phase Proceedings. ................................... 342

A.   Background ............................................. 342

B.   Standard of Review ...................................... 348

C.   Argument ................................................ 348

   1.   The district court properly authorized ankle restraints based on specific security needs in this case. ................................................ 350

   2.   Bowers's challenges are meritless. ........................ 355

      a.   An evidentiary hearing was unnecessary. ...... 355

      b.   The court acted reasonably in protecting the information provided by the Marshals. ... 359

      c.   The court did not delegate authority to the Marshals. ................................. 361

   3.   Any error was harmless beyond a reasonable doubt. ............................................. 362

XIV.   Bowers's Absence from the Jury's Courtroom Viewing of Evidence During Deliberations and Alleged Absence from the Questioning of a Marshal Were Not Reversible Plain Error. ............................................................................ 368

    A.   Background ............................................................. 368

    B.   Standard of Review ............................................... 371

    C.   Argument ............................................................... 371

        1.   Bowers's absence during the evidence viewing was not reversible plain error. .............................. 373

        2.   Bowers's alleged absence from the Marshal's questioning was not reversible plain error.............. 378

XV.   The Cumulative-Error Doctrine Does Not Apply. ................... 380

CONCLUSION ............................................................................ 381

CERTIFICATE OF COMPLIANCE ...................................................... 382

CERTIFICATE OF SERVICE .............................................................. 383

# TABLE OF AUTHORITIES

**Cases**

*Abdul-Kabir v. Quarterman,*
  550 U.S. 233 (2007) ............................................................. 338

*Abramski v. United States,*
  573 U.S. 169 (2014) ............................................................. 266

*Anderson v. Bessemer City,*
  470 U.S. 564 (1985) ............................................................. 246

*Antwine v. Delo,*
  54 F.3d 1357 (8th Cir. 1995)........................................212, 214, 216

*Ayers v. Belmontes,*
  549 U.S. 7 (2006) ................................................................. 339

*Bachman v. St. Monica's Congregation,*
  902 F.2d 1259 (7th Cir. 1990)................................................. 102

*Bailey v. Alabama,*
  219 U.S. 219 (1911) ..........................................................93, 96

*Ball v. United States,*
  470 U.S. 856 (1985) ..........................................................44, 47

*Barrett v. United States,*
  146 S. Ct. 482 (2026)..................................................... 43, 44, 45

*Batson v. Kentucky,*
  476 U.S. 79 (1986) ........................................................129, 171

*Blockburger v. United States,*
  284 U.S. 299 (1932) ............................................................. 44

*Bonin v. Calderon,*
  59 F.3d 815 (9th Cir. 1995) ...............................................294, 298

*Booth v. Maryland,*
  482 U.S. 496 (1987) ............................................................. 259

*Boyde v. California*,
  494 U.S. 370 (1990) ...............................................................330, 337, 340

*Bruni v. City of Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016).................................................................72, 73

*Buchanan v. Kentucky*,
  483 U.S. 402 (1987) .............................................................................281, 290

*Burton v. Johnson*,
  948 F.2d 1150 (10th Cir. 1991).............................................................. 193

*Butler v. City of Camden, City Hall*,
  352 F.3d 811 (3d Cir. 2003).................................................................. 206

*Campbell v. Wood*,
  18 F.3d 662 (9th Cir. 1994) (en banc) ..................................................... 374

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) ............................................................................... 78

*Cargle v. Mullin*,
  317 F.3d 1196 (10th Cir. 2003)............................................................. 337

*Cazares v. United States*,
  No. 04-cr-415, 2021 WL 1153040 (C.D. Cal. Feb. 15, 2021) .................. 112

*Chambers v. United States*,
  555 U.S. 122 (2009), *abrogated on other grounds by*
  *Johnson v. United States*, 576 U.S. 591 (2015)............................................. 118

*Chapman v. California*,
  386 U.S. 18 (1967) ............................................................................251, 362

*Chevron U.S.A. Inc. v. Echazabal*,
  536 U.S. 73 (2002) ............................................................................... 272

*Claiborne v. Blauser*,
  934 F.3d 885 (9th Cir. 2019)............................................................. 358

*Clark v. Martinez*,
  543 U.S. 371 (2005) ............................................................................ 124

*Clemons v. Luebbers*,
    381 F.3d 744 (8th Cir. 2004)................................................................... 213

*Coombs v. Diguglielmo*,
    616 F.3d 255 (3d Cir. 2010)............................................. 129, 148, 151, 152

*Corbitt v. New Jersey*,
    439 U.S. 212 (1978) .............................................................................. 295

*Dallago v. United States*,
    427 F.2d 546 (D.C. Cir. 1969)................................................................ 375

*Darden v. Wainwright*,
    477 U.S. 168 (1986) .......................................................................275, 280

*Davidson v. Riley*,
    44 F.3d 1118 (2d Cir. 1995)..............................................................356, 357

*Deck v. Missouri*,
    544 U.S. 622 (2005) .................... 348, 349, 350, 351, 357, 360, 362, 365, 367

*Delligatti v. United States*,
    604 U.S. 423 (2025) .............................................................................. 108

*Dennis v. United States*,
    339 U.S. 162 (1950) .............................................................................. 189

*Descamps v. United States*,
    570 U.S. 254 (2013) .............................................................................. 109

*Dietz v. Bouldin*,
    579 U.S. 40 (2016) ................................................................................ 142

*Dixon v. Houk*,
    737 F.3d 1003 (6th Cir. 2013)................................................................ 318

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974) ................................................................330, 331, 333

*Dubin v. United States*,
    599 U.S. 110 (2023) .............................................................................. 266

xvii

*Eddings v. Oklahoma*,
455 U.S. 104 (1982) .......................................................................... 307

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)................................................................ 227

*Elledge v. Dugger*,
823 F.2d 1439 (11th Cir. 1987), *modified on other grounds*,
833 F.2d 250 (11th Cir. 1987)............................................................ 359

*Faretta v. California*,
422 U.S. 806 (1975) .......................................................................... 371

*Flowers v. Mississippi*,
588 U.S. 284 (2019) ........................................ 154, 163, 165, 166, 169, 170

*Floyd v. Filson*,
949 F.3d 1128 (9th Cir. 2020)............................................................ 268

*Foster v. Chatman*,
578 U.S. 488 (2016) .......................................................................... 148

*Furman v. Georgia*,
408 U.S. 238 (1972) .......................................................................... 294

*Georgia v. McCollum*,
505 U.S. 42 (1992) ............................................................................ 172

*Gibbs v. Shannon*,
618 F. App'x 59 (3d Cir. 2015)............................................................ 291

*Gibson v. Mayor and City Council of City of Wilmington*,
355 F.3d 215 (3d Cir. 2004)................................................................ 238

*Gonzales v. Raich*,
545 U.S. 1 (2005) ............................................................................... 70

*Government of the Virgin Islands v. Mills*,
821 F.3d 448 (3d Cir. 2016)................................................................ 275

*Government of Virgin Islands v. Williams*,
476 F.2d 771 (3d Cir. 1973)............................................................188, 191

xviii

*Greer v. United States*,
   593 U.S. 503 (2021) ............................................................... 368, 379

*Gregg v. Georgia*,
   428 U.S. 153 (1976) .......................................................................... 294

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) ........................................................................95, 96

*Griffin v. California*,
   380 U.S. 609 (1965) ......................................................................... 300

*Haight v. Jordan*,
   59 F.4th 817 (6th Cir. 2023) ........................................................... 199

*Hall v. Luebbers*,
   341 F.3d 706 (8th Cir. 2003).......................................................... 327

*Hameed v. Mann*,
   57 F.3d 217 (2d Cir. 1995)............................................................. 358

*Hassan v. City of New York*,
   804 F.3d 277 (3d Cir. 2015)........................................................... 103

*Hebert v. Rogers*,
   890 F.3d 213 (5th Cir. 2018)...................................................159, 162, 168

*Hernandez v. New York*,
   500 U.S. 352 (1991) ................................................................153, 166

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*,
   542 U.S. 177 (2004) ........................................................................ 291

*Illinois v. Allen*,
   397 U.S. 337 (1970) ........................................................................ 374

*In re Fine Paper Antitrust Litig.*,
   685 F.2d 810 (3d Cir. 1982)..........................................................141, 146

*In re Grand Jury Investigation*,
   587 F.2d 589 (3d Cir. 1978).......................................................... 299

*In re Sealed Case,*
  356 F.3d 313 (D.C. Cir. 2004) ................................................................. 379

*J.E.B. v. Alabama ex rel. T.B.,*
  511 U.S. 127 (1994) ................................................................. 186

*Jackson v. United States,*
  395 F.2d 615 (D.C. Cir. 1968) ................................................................. 193

*Johnson v. United States,*
  520 U.S. 461 (1997) ................................................................. 378

*Johnson v. United States,*
  559 U.S. 133 (2010) ................................................................111, 113, 118

*Jones v. Alfred H. Mayer Co.,*
  392 U.S. 409 (1968) ................................................................96, 97

*Jones v. Cooper,*
  311 F.3d 306 (4th Cir. 2002) ................................................................. 197

*Jones v. Thomas,*
  491 U.S. 376 (1989) ................................................................. 45

*Jones v. United States,*
  527 U.S. 373 (1999) ................................................................. 276

*Jones v. United States,*
  529 U.S. 848 (2000) ................................................................82, 84

*Kansas v. Cheever,*
  571 U.S. 87 (2013) ................................................................281, 290

*Kansas v. Marsh,*
  548 U.S. 163 (2006) ................................................................232, 298

*Kentucky v. Stincer,*
  482 U.S. 730 (1987) ................................................................. 376

*Lemons v. Skidmore,*
  985 F.2d 354 (7th Cir. 1993) ................................................................. 358

*Lesko v. Lehman*,
  925 F.2d 1527 (3d Cir. 1991)...................................................295, 301, 302

*Lewis v. United States*,
  146 U.S. 370 (1892) ...................................................................... 374

*Lockett v. Ohio*,
  438 U.S. 586 (1978) ...............................................................307, 309

*Lockhart v. McCree*,
  476 U.S. 162 (1986) .........................................................210, 211, 217

*Lora v. United States*,
  599 U.S. 453 (2023) ...................................................................43, 45

*Lubavitch-Chabad of Ill. v. Northwestern Univ.*,
  772 F.3d 443 (7th Cir. 2014)................................................... 101

*Mathews v. United States*,
  485 U.S. 58 (1988) ...................................................................... 234

*Mazo v. New Jersey*,
  54 F.4th 124 (3d Cir. 2022) ........................................................ 100

*McCoy v. Goldston*,
  652 F.2d 654 (6th Cir. 1981)....................................................... 194

*McGautha v. California*,
  402 U.S. 183 (1971), *vacated on other grounds sub nom.*,
  *Crampton v. Ohio*, 408 U.S. 941 (1972)................................293, 294

*McKune v. Lile*,
  536 U.S. 24 (2002) ...................................................................... 294

*Miller v. Webb*,
  385 F.3d 666 (6th Cir. 2004)....................................................... 204

*Miller-El v. Cockrell*,
  537 U.S. 322, (2003) ................................................................... 166

*Miller-El v. Dretke*,
  545 U.S. 231 (2005) ..............................................153, 156, 173, 176

*Miranda v. Arizona*,
384 U.S. 436 (1966) ................................................................ 291

*Missouri v. Hunter*,
459 U.S. 359 (1983) .................................................................. 44

*Mitchell v. United States*,
526 U.S. 314 (1999) ..........................................................296, 300

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................................................................. 73

*Moore v. Gibson*,
195 F.3d 1152 (10th Cir. 1999) ............................................277, 279

*Morales v. Mitchell*,
507 F.3d 916 (6th Cir. 2007) .................................................... 211

*Morgan v. Illinois*,
504 U.S. 719 (1992) ..........................................................197, 199

*MRL Dev. I, LLC v. Whitecap Inv. Corp.*,
823 F.3d 195 (3d Cir. 2016) ...................................................... 90

*Mu'Min v. Virginia*,
500 U.S. 415 (1991) ................................................................ 205

*Murphy v. Florida*,
421 U.S. 794 (1975) ................................................................ 200

*Muscarello v. United States*,
524 U.S. 125 (1998) .................................................................. 90

*Ochoa v. Davis*,
16 F.4th 1314 (9th Cir. 2021) ................................................... 293

*Ochoa v. Workman*,
669 F.3d 1130 (10th Cir. 2012) ................................................ 358

*Ohio v. Johnson*,
467 U.S. 493 (1984) .................................................................. 44

*Old Chief v. United States,*
  519 U.S. 172 (1997) ...............................................................229, 234, 243

*Oswald v. Bertrand,*
  374 F.3d 475 (7th Cir. 2004)................................................................. 196

*Owens v. Guida,*
  549 F.3d 399 (6th Cir. 2008)................................................................. 319

*Parrish v. Small,*
  315 F.3d 1131 (9th Cir. 2003)............................................................... 368

*Patton v. Yount,*
  467 U.S. 1025 (1984) .................................185, 197, 198, 199, 200, 201, 203

*Payne v. Tennessee,*
  501 U.S. 808 (1991) ........................... 255, 259, 260, 262, 266, 272, 275, 276

*Penry v. Lynaugh,*
  492 U.S. 302 (1989), *abrogated on other grounds by*
  *Atkins v. Virginia*, 536 U.S. 304 (2002)......................................307, 309, 312

*People v. Brown,*
  624 N.E.2d 1378 (Ill. App. Ct. 1993)..................................................... 276

*Pineda v. Ford Motor Co.,*
  520 F.3d 237 (3d Cir. 2008)................................................................. 227

*Portee v. United States,*
  941 F.3d 263 (7th Cir. 2019)................................................................ 124

*Puckett v. United States,*
  556 U.S. 129 (2009) .......................................................................... 117

*Richardson v. Marsh,*
  481 U.S. 200 (1987) ...............................................................252, 265, 377

*Riley v. Cockrell,*
  339 F.3d 308 (5th Cir. 2003)................................................................ 327

*Riley v. Taylor,*
  277 F.3d 261 (3d Cir. 2001)...................................................141, 151, 152

*Rolan v. Coleman,*
  680 F.3d 311 (6th Cir. 2012)................................................................. 326

*Rosales-Lopez v. United States,*
  451 U.S. 182 (1981) ............................................................................ 202

*Runyon v. McCrary,*
  427 U.S. 160 (1976) .............................................................................. 96

*Russell v. United States,*
  471 U.S. 858 (1985) .............................................................................. 87

*Saint Francis Coll. v. Al-Khazraji,*
  481 U.S. 604 (1987) ................................................................ 99, 101, 103

*Salinas v. Texas,*
  570 U.S. 178 (2013) ............................................................................ 301

*Saranchak v. Beard,*
  616 F.3d 292 (3d Cir. 2010)................................................................. 291

*Scarborough v. United States,*
  431 U.S. 563 (1977) ................................................................ 79, 80, 84, 91

*Shaare Tefila Congregation v. Cobb,*
  481 U.S. 615 (1987) ................................................................ 99, 100, 103

*Shrum v. Cooke,*
  60 F.4th 1304 (10th Cir. 2023)............................................................. 295

*Sides v. Cherry,*
  609 F.3d 576 (3d Cir. 2010)................ 349, 353, 355, 356, 360, 361, 362, 365

*Simmons v. United States,*
  390 U.S. 377 (1968) .....................................................................292, 293

*Smith v. Horn,*
  120 F.3d 400 (3d Cir. 1997)..............................................................69, 91

*Smith v. Phillips,*
  455 U.S. 209 (1982) ............................................................................ 187

*Snyder v. Louisiana,*
   552 U.S. 472 (2008) ..................................................................... 141

*Snyder v. Massachusetts,*
   291 U.S. 97 (1934) ...................................................................... 376

*State v. Roberts,*
   838 S.W.2d 126 (Mo. Ct. App. 1992) ..................................................... 276

*Stokeling v. United States,*
   586 U.S. 73 (2019) ..............................................................111, 112, 118

*Stouffer v. Trammell,*
   738 F.3d 1205 (10th Cir. 2013) ............................................................ 196

*Stuard v. Stewart,*
   401 F.3d 1064 (9th Cir. 2005)............................................................... 299

*Szuchon v. Lehman,*
   273 F.3d 299 (3d Cir. 2001)................................................................. 351

*Taccetta v. Adm'r New Jersey State Prison,*
   601 F. App'x 165 (3d Cir. 2015) ........................................................... 295

*Taylor v. United States,*
   414 U.S. 17 (1973) ...................................................................... 371

*Taylor v. United States,*
   495 U.S. 575 (1990) ..................................................................... 109

*Taylor v. United States,*
   579 U.S. 301 (2016) ...................................................................... 87

*Tennard v. Dretke,*
   542 U.S. 274 (2004) ...............................................................310, 338

*The Civil Rights Cases,*
   109 U.S. 3 (1883) ....................................................................... 95

*Tinsley v. Borg,*
   895 F.2d 520 (9th Cir. 1990)............................................. 187, 189, 191, 192

*Town of Newton v. Rumery*,
  480 U.S. 386 (1987) ................................................................ 295

*Tuilaepa v. California*,
  512 U.S. 967 (1994) ........................................................232, 246

*United States ex rel. De Vita v. McCorkle*,
  248 F.2d 1 (3d Cir. 1957) (en banc) ..................................... 189

*United States v. Abrams*,
  165 F.4th 784 (3d Cir. 2026)................................................. 377

*United States v. Abreu*,
  32 F.4th 271 (3d Cir. 2022) ...................................113, 114, 116

*United States v. Adair*,
  38 F.4th 341 (3d Cir. 2022) ................................................. 220

*United States v. Alaboudi*,
  786 F.3d 1136 (8th Cir. 2015)............................................... 277

*United States v. Allen*,
  341 F.3d 870 (9th Cir. 2003)................................224, 229, 234

*United States v. Alvarez*,
  519 F.2d 1036 (3d Cir. 1975)................................282, 291, 301

*United States v. Al-Zubaidy*,
  283 F.3d 804 (6th Cir. 2002)..........................................75, 89

*United States v. American Bldg. Maint. Indus.*,
  422 U.S. 271 (1975) ............................................................. 71

*United States v. Angulo*,
  4 F.3d 843 (9th Cir. 1993) ................................................... 196

*United States v. Arias-Izquierdo*,
  449 F.3d 1168 (11th Cir. 2006)............................................ 277

*United States v. Ayala*,
  917 F.3d 752 (3d Cir. 2019).............................. 348, 349, 350, 353, 357, 361

xxvi

*United States v. Ballinger*,
  395 F.3d 1218 (11th Cir. 2005) ...................................... 70, 71, 72, 80, 81, 90

*United States v. Banegas*,
  600 F.3d 342 (5th Cir. 2010) .................................................................. 364

*United States v. Barrett*,
  496 F.3d 1079 (10th Cir. 2007) ............................................................. 272

*United States v. Baskerville*,
  448 F. App'x 243 (3d Cir. 2011) ............................................................ 154

*United States v. Bates*,
  46 F. App'x 104 (3d Cir. 2002) ....................................................... 249, 275

*United States v. Battle*,
  173 F.3d 1343 (11th Cir. 1999) .............................................................. 358

*United States v. Bell*,
  819 F.3d 310 (7th Cir. 2016) .......................................................... 351, 354

*United States v. Benkahla*,
  530 F.3d 300 (4th Cir. 2008) .......................................................... 227, 229

*United States v. Bernard*,
  299 F.3d 467 (5th Cir. 2002) ........................................... 230, 263, 264, 265

*United States v. Berrios*,
  676 F.3d 118 (3d Cir. 2012) ........................................................ 42, 45, 280

*United States v. Bertoli*,
  40 F.3d 1384 (3d Cir. 1994) .......................................371, 373, 374, 376, 380

*United States v. Bin Laden*,
  126 F. Supp. 2d 290 (S.D.N.Y. 2001) .................................................... 273

*United States v. Bin Laden*,
  156 F. Supp. 2d 359 (S.D.N.Y. 2001) .................................................... 312

*United States v. Bishop*,
  66 F.3d 569 (3d Cir. 1995) ...................................................... 44, 81, 82, 83

*United States v. Bolden*,
  545 F.3d 609 (8th Cir. 2008)...................................................................... 340

*United States v. Bonner*,
  302 F.3d 776 (7th Cir. 2002)...................................................................... 296

*United States v. Booth*,
  996 F.2d 1395 (2d Cir. 1993) ..................................................................... 145

*United States v. Bornman*,
  559 F.3d 150 (3d Cir. 2009)......................................................................... 48

*United States v. Bowers*,
  432 F.3d 518 (3d Cir. 2005)........................................................................ 274

*United States v. Bowman*,
  302 F.3d 1228 (11th Cir. 2002)................................................................... 235

*United States v. Branker*,
  418 F.2d 378 (2d Cir. 1969)........................................................................ 300

*United States v. Brantley*,
  342 F. App'x 762 (3d Cir. 2009) ................................................................. 360

*United States v. Brennan*,
  326 F.3d 176 (3d Cir. 2003)...............................................................290, 301

*United States v. Brown*,
  254 F.3d 454 (3d Cir. 2001)........................................................................ 330

*United States v. Brown*,
  441 F.3d 1330 (11th Cir. 2006) .................................................................. 231

*United States v. Brown*,
  454 F. App'x 44 (3d Cir. 2011)...............................................351, 354, 360

*United States v. Brown*,
  765 F.3d 185 (3d Cir. 2014)........................................................................ 108

*United States v. Browne*,
  525 F. App'x 213 (3d Cir. 2013) ................................................................. 190

*United States v. Burwell*,
  122 F.4th 984 (D.C. Cir. 2024) ........................................................ 120, 121

*United States v. Campbell*,
  295 F.3d 398 (3d Cir. 2002) ................................................................. 290

*United States v. Cannon*,
  750 F.3d 492 (5th Cir. 2014) ........................................................... 97, 224

*United States v. Caro*,
  597 F.3d 608 (4th Cir. 2010) ........................................................... 319, 336

*United States v. Castleman*,
  572 U.S. 157 (2014) ............................................................................. 112

*United States v. Centeno*,
  793 F.3d 378 (3d Cir. 2015) ................................................................... 46

*United States v. Chadwell*,
  798 F.3d 910 (9th Cir. 2015) ........................................................... 375, 376

*United States v. Cheeseman*,
  600 F.3d 270 (3d Cir. 2010) .................................................................. 122

*United States v. Chesney*,
  86 F.3d 564 (6th Cir. 1996) .................................................................... 74

*United States v. Christensen*,
  No. 17-cr-20037, 2019 WL 11867003 (C.D. Ill. June 27, 2019) ............... 322

*United States v. Chrzanowski*,
  502 F.2d 573 (3d Cir. 1974) .................................................................. 322

*United States v. Console*,
  13 F.3d 641 (3d Cir. 1993) .................................................................... 269

*United States v. Cook*,
  488 F. App'x 643 (3d Cir. 2012) ............................................................. 81

*United States v. Coonce*,
  932 F.3d 623 (8th Cir. 2019) ................................................................. 339

xxix

*United States v. Copple,*
    24 F.3d 535 (3d Cir. 1994)..............................................................342, 380

*United States v. Cross,*
    308 F.3d 308 (3d Cir. 2002)................................................................. 228

*United States v. Cruz,*
    757 F.3d 372 (3d Cir. 2014)................................................................. 377

*United States v. Danks,*
    221 F.3d 1037 (8th Cir. 1999)............................................................75, 89

*United States v. DeMuro,*
    677 F.3d 550 (3d Cir. 2012)................................................................. 220

*United States v. Doggart,*
    947 F.3d 879 (6th Cir. 2020)......................................................... 83, 88, 90

*United States v. Dorsey,*
    105 F.4th 526 (3d Cir.), *cert. denied,* 145 S. Ct. 457 (2024)........................ 304

*United States v. Dorsey,*
    418 F.3d 1038 (9th Cir. 2005), *abrogated on other grounds by*
    *Arizona v. Gant,* 556 U.S. 332 (2009) ............................................. 75, 77, 89

*United States v. Downing,*
    753 F.2d 1224 (3d Cir. 1985)................................................................ 235

*United States v. Dunnaway,*
    88 F.3d 617 (8th Cir. 1996) ................................................................. 224

*United States v. Earnest,*
    536 F. Supp. 3d 688 (S.D. Cal. 2021) .............................................112, 113

*United States v. Eubanks,*
    591 F.2d 513 (9th Cir. 1979)................................................................ 193

*United States v. Fell,*
    372 F. Supp. 2d 773 (D. Vt. 2005) ....................................................... 321

*United States v. Flanders,*
    635 F. App'x 74 (3d Cir. 2015)............................................................. 188

xxx

*United States v. Forsythe*,
   711 F. App'x 674 (3d Cir. 2017) ................................................................. 87

*United States v. Frost*,
   125 F.3d 346 (6th Cir. 1997)................................................................. 196

*United States v. Fulks*,
   454 F.3d 410 (4th Cir. 2006)................................................................. 200

*United States v. Fulton*,
   837 F.3d 281 (3d Cir. 2016)................................................................251, 278

*United States v. Gabrion*,
   719 F.3d 511 (6th Cir. 2013) (en banc)............... 307, 308, 309, 310, 311, 312

*United States v. Gagnon*,
   470 U.S. 522 (1985) ................................................................371, 372, 374

*United States v. Gendron*,
   800 F. Supp. 3d 503 (W.D.N.Y. 2025) ................................................... 274

*United States v. Gibbs*,
   190 F.3d 188 (3d Cir. 1999)................................................................. 227

*United States v. Gonzales*,
   520 U.S. 1 (1997) ................................................................272, 274

*United States v. Gonzalez*,
   905 F.3d 165 (3d Cir. 2018)................................................................. 306

*United States v. Gooch*,
   No. 04-cr-128, 2006 WL 3780781 (D.D.C. Dec. 20, 2006) ...................... 274

*United States v. Gordon*,
   290 F.3d 539 (3d Cir. 2002)................................................................. 95

*United States v. Grassie*,
   237 F.3d 1199 (10th Cir. 2001)................................................................72, 91

*United States v. Greenspan*,
   923 F.3d 138 (3d Cir. 2019)................................................................. 306

*United States v. Grote,*
961 F.3d 105 (2d Cir. 2020)............................................................... 240

*United States v. Hager,*
721 F.3d 167 (4th Cir. 2013)............................................................. 308

*United States v. Hall,*
945 F.3d 1035 (8th Cir. 2019)........................................................... 231

*United States v. Hall,*
28 F.4th 445 (3d Cir. 2022) .....................................................220, 258

*United States v. Hardwick,*
544 F.3d 565 (3d Cir. 2008)....................................................278, 279

*United States v. Hari,*
67 F.4th 903 (8th Cir. 2023) ............................................................. 72

*United States v. Hassan,*
742 F.3d 104 (4th Cir. 2014)............................................................. 227

*United States v. Hatch,*
722 F.3d 1193 (10th Cir. 2013).........................................................97, 98

*United States v. Henderson,*
613 F. App'x 113 (3d Cir. 2015) ......................................................... 193

*United States v. Hernandez,*
999 F.3d 1181 (8th Cir. 2021)............................................................. 334

*United States v. Higgs,*
353 F.3d 281 (4th Cir. 2003)...............................................246, 308, 309

*United States v. Hill,*
927 F.3d 188 (4th Cir. 2019)..........................................................74, 87

*United States v. Hodge,*
870 F.3d 184 (3d Cir. 2017).......................................................237, 258

*United States v. Holton,*
116 F.3d 1536 (D.C. Cir. 1997) ......................................................... 376

*United States v. Honken*,
541 F.3d 1146 (8th Cir. 2008)........................................................... 358

*United States v. Howald*,
104 F.4th 732 (9th Cir.), *cert. denied*, 145 S. Ct. 781 (2024) ...................80, 81

*United States v. Hughes*,
117 F.4th 104 (3d Cir. 2024).............................................................. 113

*United States v. Inmon*,
568 F.2d 326 (3d Cir. 1977)............................................................... 299

*United States v. Jackson*,
443 F.3d 293 (3d Cir. 2006)............................................................... 258

*United States v. Jimenez*,
513 F.3d 62 (3d Cir. 2008)................................................................47, 49

*United States v. Johnson*,
495 F.3d 951 (8th Cir. 2007)........................................................339, 340

*United States v. Johnson*,
677 F.3d 138 (3d Cir. 2012)....................................................372, 373, 374

*United States v. Johnson*,
89 F.4th 997 (7th Cir. 2024) .............................................................. 229

*United States v. Joos*,
638 F.3d 581 (8th Cir. 2011)............................................................... 81

*United States v. Joseph*,
730 F.3d 336 (3d Cir. 2013)............................................................... 116

*United States v. Juvenile B*,
147 F.4th 837 (8th Cir. 2025) ............................................................ 124

*United States v. Kahan*,
415 U.S. 239 (1974) ......................................................................... 295

*United States v. Kechedzian*,
902 F.3d 1023 (9th Cir. 2018)............................................................. 189

*United States v. Knight*,
700 F.3d 59 (3d Cir. 2012)............................................................ 228

*United States v. Knight*,
705 F. App'x 58 (3d Cir. 2017) ......................................................... 120

*United States v. Kolodesh*,
787 F.3d 224 (3d Cir. 2015)............................................ 224, 237, 266, 323

*United States v. Kozminski*,
487 U.S. 931 (1988) ......................................................................... 96

*United States v. Lawrence*,
735 F.3d 385 (6th Cir. 2013)........................................................ 280, 302

*United States v. Leahy*,
152 F.4th 1356 (11th Cir. 2025)........................................................... 98

*United States v. Lee*,
612 F.3d 170 (3d Cir. 2010)..................................... 229, 330, 331, 335, 338

*United States v. Lighty*,
Nos. 03-cr-357/12-cv-3065, 2023 WL 2932960 (D. Md. Apr. 13, 2023)... 128

*United States v. Lopez*,
514 U.S. 549 (1995) ............................................ 70, 73, 74, 76, 77, 78, 89

*United States v. MacEwan*,
445 F.3d 237 (3d Cir. 2006)........................................................... 85, 91

*United States v. Mahasin*,
442 F.3d 687 (8th Cir. 2006)........................................................... 353

*United States v. Mathis*,
579 U.S. 500 (2016) .......................................................... 109, 110, 119

*United States v. Maybee*,
687 F.3d 1026 (8th Cir. 2012)............................................................ 97

*United States v. Mayfield*,
134 F.4th 1101 (10th Cir.), *cert. denied*, 146 S. Ct. 219 (2025)................... 240

*United States v. Mayo*,
   901 F.3d 218 (3d Cir. 2018)................................................................ 108

*United States v. McAllister*,
   693 F.3d 572 (6th Cir. 2012)............................................................. 151

*United States v. McGuire*,
   178 F.3d 203 (3d Cir. 1999)...........................................................78, 79

*United States v. McKibbon*,
   878 F.3d 967 (10th Cir. 2017)........................................................... 121

*United States v. McVeigh*,
   153 F.3d 1166 (10th Cir. 1998).................................................233, 272

*United States v. Meehan*,
   741 F. App'x 864 (3d Cir. 2018) ....................................................... 200

*United States v. Metcalf*,
   881 F.3d 641 (8th Cir. 2018)............................................................... 97

*United States v. Mikhel*,
   889 F.3d 1003 (9th Cir. 2018)........................................ 264, 266, 339, 341

*United States v. Miller*,
   527 F.3d 54 (3d Cir. 2008)..............................................................46, 47

*United States v. Minter*,
   164 F.4th 243 (3d Cir. 2026).............................................................. 108

*United States v. Mitchell*,
   145 F.3d 572 (3d Cir. 1998)............................................................... 220

*United States v. Mitchell*,
   502 F.3d 931 (9th Cir. 2007)...................................216, 264, 266, 372, 374

*United States v. Mitchell*,
   690 F.3d 137 (3d Cir. 2012)................ 185, 186, 187, 188, 190, 191, 192, 197

*United States v. Moore*,
   149 F.3d 773 (8th Cir. 1998).......................................................213, 216

*United States v. Moore*,
   651 F.3d 30 (D.C. Cir. 2011).........................................................357, 358

*United States v. Moreno*,
   727 F.3d 255 (3d Cir. 2013)................................................................ 69

*United States v. Morgan*,
   748 F.3d 1024 (10th Cir. 2014) ........................................................... 85

*United States v. Mornan*,
   413 F.3d 372 (3d Cir. 2005)............................................................... 220

*United States v. Morrison*,
   529 U.S. 598 (2000) ....................................................................70, 75

*United States v. Muhammad*,
   146 F.3d 161 (3d Cir. 1998)............................................................... 321

*United States v. Murphy*,
   323 F.3d 102 (3d Cir. 2003)................................................................ 49

*United States v. Nasir*,
   17 F.4th 459 (3d Cir. 2021) (en banc) ................................................. 200

*United States v. Nelson*,
   277 F.3d 164 (2d Cir. 2002).........................................................102, 103

*United States v. Noel*,
   905 F.3d 258 (3d Cir. 2018)............................................................... 205

*United States v. Olano*,
   507 U.S. 725 (1993) .....................................................220, 373, 377, 378

*United States v. Olfano*,
   503 F.3d 240 (3d Cir. 2007).......................................................141, 142, 145

*United States v. Pavelko*,
   992 F.2d 32 (3d Cir. 1993).....................................................290, 299, 303, 304

*United States v. Pavulak*,
   700 F.3d 651 (3d Cir. 2012)............................................................... 332

*United States v. Pelullo*,
   14 F.3d 881 (3d Cir. 1994)............................................................................ 106

*United States v. Perrin*,
   149 F.4th 267 (3d Cir. 2025)...............................................................43, 195

*United States v. Perry*,
   788 F.2d 100 (3d Cir. 1986)......................................................................... 299

*United States v. Polan*,
   970 F.2d 1280 (3d Cir. 1992)....................................................................... 199

*United States v. Polizzi*,
   801 F.2d 1543 (9th Cir. 1986)..................................................................... 337

*United States v. Pollen*,
   978 F.2d 78 (3d Cir. 1992)............................................................................. 45

*United States v. Porter*,
   121 F.4th 747 (9th Cir. 2024) ..................................................................... 232

*United States v. Provenzano*,
   620 F.2d 985 (3d Cir. 1980)...............................................................373, 379

*United States v. Pugh*,
   90 F.4th 1318 (11th Cir.), *cert. denied*, 145 S. Ct. 236 (2024)...................... 71

*United States v. Purkey*,
   428 F.3d 738 (8th Cir. 2005)....................................................................... 216

*United States v. Quinones*,
   511 F.3d 289 (2d Cir. 2007).......................................................................... 197

*United States v. Redd*,
   85 F.4th 153 (4th Cir. 2023) ....................................................................... 121

*United States v. Reliford*,
   58 F.3d 247 (6th Cir. 1995) ........................................................................ 233

*United States v. Riley*,
   621 F.3d 312 (3d Cir. 2010)...............................................................330, 334

*United States v. Rivas,*
   493 F.3d 131 (3d Cir. 2007)................................................................. 326

*United States v. Roark,*
   924 F.2d 1426 (8th Cir. 1991)............................................................. 233

*United States v. Rodia,*
   194 F.3d 465 (3d Cir. 1999)..........................................................75, 76

*United States v. Rodriguez,*
   581 F.3d 775 (8th Cir. 2009)............................................................. 276

*United States v. Romero,*
   282 F.3d 683 (3d Cir. 2002)............................................................... 371

*United States v. Roof,*
   10 F.4th 314 (4th Cir. 2021) .................... 72, 85, 87, 91, 97,98, 110, 113, 117
                                     118, 123, 125, 262, 264, 265, 266, 308, 310

*United States v. Roof,*
   No. 2:15-cr-472, 2016 WL 8678863 (D.S.C. Oct. 14, 2016)..................... 321

*United States v. Runyon,*
   707 F.3d 475 (4th Cir. 2013)............................................................... 263

*United States v. Runyon,*
   994 F.3d 192 (4th Cir. 2021).......................................................112, 125

*United States v. Saipov,*
   No. 17-cr-722, 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023)...............271, 273

*United States v. Salamone,*
   800 F.2d 1216 (3d Cir. 1986)................................................188, 197, 203

*United States v. Salehi,*
   187 F. App'x 157 (3d Cir. 2006) .......................................................... 361

*United States v. Sampson,*
   335 F. Supp. 2d 166 (D. Mass. 2004).................................................. 312

*United States v. Samuel,*
   431 F.2d 610 (4th Cir. 1970)............................................................... 358

*United States v. Sanders,*
   133 F.4th 341 (5th Cir. 2025), *petition for certiorari filed,*
   No. 25-6451 (Dec. 22, 2025) ......................................................46, 212

*United States v. Savage,*
   970 F.3d 217 (3d Cir. 2020).......................148, 150, 152, 162, 176, 248, 258,
   260, 261, 278, 302, 303, 306, 330

*United States v. Schaffer,*
   851 F.3d 166 (2d Cir. 2017)...................................................... 232

*United States v. Schwartz,*
   857 F.2d 655 (9th Cir. 1988)..................................................... 234

*United States v. Segal,*
   534 F.2d 578 (3d Cir. 1976)..............................................193, 194

*United States v. Singletary,*
   268 F.3d 196 (3d Cir. 2001).......................................... 74, 81, 83

*United States v. Smith,*
   No. 24-1199, 2025 WL 2694106 (3d Cir. Sept. 22, 2025)...................... 342

*United States v. Snarr,*
   704 F.3d 368 (5th Cir. 2013)...............................................53, 308

*United States v. Snipes,*
   611 F.3d 855 (11th Cir. 2010).................................................... 293

*United States v. Sobamowo,*
   892 F.2d 90 (D.C. Cir. 1989)..................................................... 376

*United States v. Sparks,*
   949 F.2d 1023 (8th Cir. 1991).................................................... 228

*United States v. Sriyuth,*
   98 F.3d 739 (3d Cir. 1996)...................................................... 104

*United States v. Stadtmauer,*
   620 F.3d 238 (3d Cir. 2010)..................................................... 231

*United States v. Stanford,*
   75 F.4th 309 (3d Cir. 2023) .................................................... 120

*United States v. Stevens*,
   559 U.S. 460 (2010) ................................................................ 73

*United States v. Street*,
   548 F.3d 618 (8th Cir. 2008)................................................... 233

*United States v. Sussman*,
   709 F.3d 155 (3d Cir. 2013)..................................................... 269

*United States v. Tann*,
   577 F.3d 533 (3d Cir. 2009)..................................................46, 47

*United States v. Taylor*,
   277 F. App'x 610 (7th Cir. 2008) ........................................... 152

*United States v. Terry*,
   257 F.3d 366 (4th Cir. 2001)..................................................... 88

*United States v. Tipton*,
   90 F.3d 861 (4th Cir. 1996) .............................................213, 216

*United States v. Titus*,
   78 F.4th 595 (3d Cir. 2023) ....................................249, 275, 325

*United States v. Todman*,
   117 F. App'x 824 (3d Cir. 2004) ............................................. 189

*United States v. Toliver*,
   330 F.3d 607 (3d Cir. 2003)..................................................... 371

*United States v. Troya*,
   733 F.3d 1125 (11th Cir. 2013) .......................................313, 318

*United States v. Tsarnaev*,
   595 U.S. 302 (2022) ................................................................ 340

*United States v. Tsarnaev*,
   968 F.3d 24 (1st Cir. 2020), *rev'd on other grounds*,
   595 U.S. 302 (2022) ................................................113, 252, 272

*United States v. Universal Rehab. Svcs. (PA), Inc.*,
   205 F.3d 657 (3d Cir. 2000) (en banc)..................................... 228

*United States v. Uwaezhoke*,
  995 F.2d 388 (3d Cir. 1993)......................................................142, 154, 171

*United States v. Valentin*,
  118 F.4th 579 (3d Cir. 2024).................................................................. 278

*United States v. Walker*,
  657 F.3d 160 (3d Cir. 2011)...................................................................... 48

*United States v. Wall*,
  92 F.3d 1444 (6th Cir. 1996)..................................................................... 81

*United States v. Wardell*,
  591 F.3d 1279 (10th Cir. 2009)............................................................... 353

*United States v. Weatherly*,
  525 F.3d 265 (3d Cir. 2008)...................................................................... 69

*United States v. Webster*,
  162 F.3d 308 (5th Cir. 1998).................................................199, 213, 216

*United States v. Wells*,
  98 F.3d 808 (4th Cir. 1996) ...................................................................... 81

*United States v. Werme*,
  939 F.2d 108 (3d Cir. 1991)..................................................................... 275

*United States v. Whitten*,
  610 F.3d 168 (2d Cir. 2010)........................................... 252, 279, 280, 302

*United States v. Whittington*,
  721 F. App'x 713 (9th Cir. 2018) ........................................................... 112

*United States v. Williams*,
  591 F. App'x 78 (3d Cir. 2014)............................................................... 380

*United States v. Wilson*,
  979 F.3d 889 (11th Cir. 2020)................................................................ 364

*United States v. Wood*,
  299 U.S. 123 (1936) ................................................................................ 186

*United States v. Wood*,
486 F.3d 781 (3d Cir. 2007).................................................................... 258

*United States v. Wright*,
665 F.3d 560 (3d Cir. 2012)......................................................... 47, 49, 106

*United States v. Yahsi*,
549 F. App'x 83 (3d Cir. 2013) ............................................................ 321

*United States v. Young*,
470 U.S. 1 (1985) ................................................................................ 336

*United States v. Zamichieli*,
No. 18-3053, 2022 WL 17484324 (3d Cir. Dec. 7, 2022) .................. 379, 380

*Uttecht v. Brown*,
551 U.S. 1 (2007) ..................................................................210, 211, 214

*Wainwright v. Witt*,
469 U.S. 412 (1985) ....................................................... 196, 197, 211, 214

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ............................................................................. 72

*Whalen v. United States*,
445 U.S. 684 (1980) ............................................................................. 44

*White v. Wheeler*,
577 U.S. 73 (2015) .............................................................................. 214

*Witherspoon v. Illinois*,
391 U.S. 510 (1968) ............................................................................ 211

*Wright v. Bell*,
619 F.3d 586 (6th Cir. 2010)................................................................ 319

*Zant v. Stephens*,
462 U.S. 862 (1983) ............................................................231, 246, 298

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. VI ........................................................................ 185

U.S. Const. amend. XIII, § 1 ................................................................... 95

U.S. Const. amend. XIII, § 2 ................................................................... 95

18 U.S.C. 245............................................................................ 98, 112, 266

18 U.S.C. 247........................................................................ 64, 111, 112, 218

18 U.S.C. 247(a).....2, 3, 32, 33, 37, 38, 39, 65, 69, 106, 111, 117, 121, 125, 126

18 U.S.C. 247(b) ..........................................2, 38, 65, 69, 70, 73, 80, 83, 88, 90

18 U.S.C. 247(d) ......................................................3, 32, 33, 37, 106, 119, 266

18 U.S.C. 247(e)............................................................................... 122

18 U.S.C. 249.......................................................................101, 112, 218

18 U.S.C. 249(a)........................................................................3, 32, 38, 92, 102

18 U.S.C. 441................................................................................... 79

18 U.S.C. 842................................................................................... 81

18 U.S.C. 844........................................................................... 82, 83, 84, 88

18 U.S.C. 922(g)......................................................................... 74, 80, 81

18 U.S.C. 922(q) ................................................................................ 74

18 U.S.C. 924(c)............................................... 3, 32, 33, 43, 45, 108, 111, 121

18 U.S.C. 924(j) ............................................... 2, 32, 33, 45, 106, 107, 224

18 U.S.C. 931................................................................................... 81

18 U.S.C. 1111.............................................................................. 224

18 U.S.C. 1202................................................................................. 76

18 U.S.C. 3231..................................................................................2

18 U.S.C. 3510(b)............................................................................ 271

18 U.S.C. 3510(c)............................................................................ 271

18 U.S.C. 3591 ................................................................ 33, 49, 273

18 U.S.C. 3592(a) .................................................... 33, 273, 307, 319

18 U.S.C. 3592(c) .................................. 31, 33, 53, 54, 245, 273

18 U.S.C. 3592(d) ................................................................. 31

18 U.S.C. 3593(a) .................................................... 33, 260, 270, 271

18 U.S.C. 3593(b) ............................................................ 30, 319

18 U.S.C. 3593(c) ................................... 31, 33, 229, 270, 271, 307, 313, 321

18 U.S.C. 3593(d) ............................................................ 30, 31

18 U.S.C. 3593(e) ...................................................... 30, 31, 276

18 U.S.C. 3593(f) ........................................................... 261, 265

18 U.S.C. 3594 ................................................................... 31

18 U.S.C. 3595 ........................................... 2, 251, 278, 335, 338

18 U.S.C. 3663A .............................................................. 273

18 U.S.C. 3742 ................................................................... 2

18 U.S.C. 3771 .......................................................... 273, 276, 323

28 U.S.C. 1291 ................................................................... 2

34 U.S.C. 20141 ............................................................... 271

34 U.S.C. 30501(7) ...................................................... 92, 97, 98

34 U.S.C. 30501(8) .................................... 92, 97, 98, 99, 100, 101, 102, 103

42 U.S.C. 1981 ............................................................... 101

42 U.S.C. 1982 ............................................................... 101

42 U.S.C. 3631 ............................................................... 112

Fed. R. App. P. 28 ........................................................... 107

Fed. R. Crim. P. 12.2 ........................................................................281, 282

Fed. R. Crim. P. 24 ................................................................................ 159

Fed. R. Crim. P. 43 .........................................................................371, 372

Fed. R. Evid. 103 ........................................................ 237, 240, 261, 262

Fed. R. Evid. 403 ................................................................................... 228

Ind. Code § 35-31.5-2-138 (2006) ........................................................ 124

Pub. L. No. 100-346, 102 Stat. 644 (1988) ............................................ 71

Pub. L. No. 104-155, 110 Stat. 1392 (1996) ........................................ 111

Pub. L. No. 111-84, 123 Stat. 1290 (2009) .......................................... 101

Third Cir. Local App. R. 28.1 ............................................................... 107

U.S.S.G. § 3E1.1 .................................................................................... 321

## Other Authorities

3 William Blackstone, *Commentaries on the Laws of England* (1771-1772)....... 192

*American Heritage Dictionary of the English Language* (5th ed. 2016)................ 273

*Black's Law Dictionary* (12th ed. 2024) ........................................ 122

Comprehensive Violent Crime Control Act of 1991,
   H. Doc. No. 102-58 (Mar. 12, 1991)................................................. 274

H.R. Rep. No. 621, 104th Cong., 2d Sess. (1996) ............................71, 78, 91

H.R. Rep. No. 86, 111th Cong., 1st Sess. (2009) ......................................... 92

H.R. Rep. No. 456, 115th Cong., 1st Sess. (2017)...................................... 123

*Merriam-Webster Online Dictionary* ............................................... 122

S. Rep. No. 325, 115th Cong., 2d Sess. (2018)........................................... 124

## INTRODUCTION

On Saturday, October 27, 2018, Robert Bowers entered the Tree of Life Synagogue in Pittsburgh, Pennsylvania, armed with a rifle and three handguns just as morning services were about to begin.  In less than 13 minutes, Bowers methodically searched for, shot, and killed 11 congregants: Jerry Rabinowitz, David Rosenthal, Cecil Rosenthal, Rose Mallinger, Bernice Simon, Sylvan Simon, Joyce Feinberg, Irving Younger, Richard Gottfried, Daniel Stein, and Melvin Wax; he also shot and seriously injured two congregants, Daniel Leger and Andrea Wedner.  Bowers also injured four law enforcement officers who responded to the synagogue: Daniel Mead, Timothy Matson, Anthony Burke, and Michael Smigda.

Asked why he had attacked the worshippers, Bowers told officers, among other things, "I just want to kill Jews."  In the months before the shootings, Bowers posted virulent, antisemitic messages on social media, including one message, three days before the attack, that said, "oh you poor, poor jews.  GAS & BAKE NOW!"

A jury found Bowers guilty of 63 civil rights and firearm offenses, including 22 capital offenses.  After lengthy penalty-phase proceedings, the jury recommended a death sentence on each capital count, and the district court imposed those sentences.  This appeal follows.

1

**STATEMENT OF JURISDICTION**

Defendant-appellant Robert Bowers challenges his convictions and sentences in this capital case. The district court had jurisdiction under 18 U.S.C. 3231. The court entered final judgment on August 3, 2023 (App.139) and issued an amended judgment on October 23, 2023 (App.147-155).[1] On May 17, 2024, the court denied Bowers's motion for a new trial or for judgment of acquittal. App.387-413. Bowers filed a timely notice of appeal on May 31, 2024. App.156. This Court has jurisdiction under 18 U.S.C. 3595, 3742, and 28 U.S.C. 1291.

**STATEMENT OF THE ISSUES**

1.    Whether Bowers's death sentences for using a firearm to commit murder during and in relation to a crime of violence, in violation of 18 U.S.C. 924(j), should be vacated on double jeopardy grounds, while leaving intact his death sentences for the predicate crime of violence (religious obstruction resulting in death).

2.    Whether the Church Arson Prevention Act, 18 U.S.C. 247(a)(2), (b), which proscribes violent religious obstruction that is in or affects interstate

---

[1] "App.__" refers to the Record Appendix filed by Bowers. "S-App.__" refers to the government's Supplemental Appendix. "DE__:__" refers to docket entries in the trial court and corresponding page numbers. "GX__" and "GX__ at __" refer to audio exhibits (where applicable, with relevant timestamps) submitted as part of the Supplemental Appendix on a USB drive filed concurrently with this brief. "Br.__" refers to Bowers's opening brief.

or foreign commerce, is valid Commerce Clause legislation facially and as applied to Bowers; and whether the district court properly instructed the jury that the government did not have to prove that Bowers's attack itself had a substantial effect on commerce.

3.      Whether the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act (Shepard-Byrd Act), 18 U.S.C. 249(a)(1), which proscribes willfully causing bodily injury and death because of any person's religion—when that religion was historically considered a "race"—is valid Thirteenth Amendment legislation facially and as applied to Bowers; and if not, whether resentencing is warranted on the remaining capital counts.

4.      Whether the Church Arson Prevention Act, 18 U.S.C. 247(a)(2), (d)(1), which proscribes violent religious obstruction resulting in death and requires proof of physical force used against another or another's property, is a crime of violence as defined by 18 U.S.C. 924(c); and if not, whether resentencing is warranted on the remaining capital counts.

5.      Whether the district court: (a) abused its discretion by denying Bowers's request for additional time to conclude his *Batson* argument; (b) failed to properly conduct the *Batson* analysis; or (c) clearly erred when it found that the government did not discriminate when it used its peremptory strikes against three jurors who opposed the death penalty, one juror who failed to appear for

voir dire and jury selection, and one juror whose recent criminal history included an arrest by a government witness.

6.    Whether the district court properly denied Bowers's motion to disqualify a juror who briefly worked on death penalty cases in China approximately 40 years before trial.

7.    Whether the district court abused its discretion by disqualifying two prospective jurors for cause based on their opposition to the death penalty.

8.    Whether the district court reversibly erred in admitting expert testimony about antisemitic references in Bowers's social-media postings and lay testimony about Judaism and Pittsburgh's Jewish community.

9.    Whether the district court reversibly erred in admitting victim-impact evidence during the penalty phase of Bowers's trial, or in denying a mistrial motion challenging the government's references to victims during closing argument and rebuttal.

10.    Whether the government's penalty-phase use of Bowers's voluntary statements to his own mental-health experts violated his constitutional rights.

11.    Whether the district court properly denied Bowers's request to submit a mitigating factor on avoiding martyrdom and properly excluded evidence of his conditional offer to plead guilty.

12.     Whether the district court abused its discretion in denying Bowers's motion for a mistrial based on the prosecutor's remarks during his penalty-phase rebuttal argument.

13.     Whether the district court abused its discretion in authorizing Deputy Marshals to place ankle restraints on Bowers in the courtroom during penalty-phase proceedings.

14.     Whether Bowers's absence from the jury's courtroom viewing of firearm evidence during final sentencing deliberations, or his alleged absence from the questioning of a Marshal about an exchange with jurors during that viewing, was reversible plain error.

15.     Whether Bowers's death sentences should be vacated based on alleged cumulative error.

## STATEMENT OF RELATED CASES OR PROCEEDINGS

This case has not previously been before this Court.

## STATEMENT OF THE CASE

### A.    Factual History

#### 1.    The Tree of Life Synagogue was home to three Jewish congregations.

The Tree of Life Or L'Simcha Synagogue (Tree of Life) was in Squirrel Hill, a residential neighborhood in Pittsburgh, Pennsylvania, that serves as a center of the city's Jewish community.  App.5772-73.  Its congregation, which

dates back to 1864, had been worshipping there since the 1950s. App.5769, 5780. Between Friday and Saturday evenings, the Tree of Life congregation regularly gathered in the Pervin Chapel (highlighted in yellow in the diagram below) to worship throughout the Sabbath. App.5792-93.



S-App.177.

Tree of Life leased parts of the synagogue to two other Jewish congregations: New Light Congregation and Congregation Dor Hadash. App.5796, 5898, 5959-60, 5998-99. New Light's congregation worshipped downstairs from the Pervin Chapel (highlighted in orange in the diagram below). App.5998-99. Dor Hadash worshipped in a room catercorner from the chapel (highlighted in green in the above diagram). App.5962-63, 6031-32. Dor Hadash prioritized social justice work, including assisting refugees to lawfully

resettle after fleeing their home countries.    App.6248, 6264-65.    The congregation partnered with Jewish organizations, including the Hebrew Immigrant Aid Society (HIAS), to host an annual refugee Shabbat service on October 19, 2018, a week before Bowers's attack.[2,3]  App.6264-65.



S-App.176.

---

[2] HIAS is a national Jewish refugee resettlement and assistance agency. App.7689.  It is one of nine such agencies within the United States that contracts with the federal government, and it is the only one that is based upon the Jewish faith; the others are Christian or secular.  App.7689-90, 7963-64.

[3] Shabbat is the Jewish Sabbath, "the holiest day of the week."  App.7702.

**2.    Bowers spent the year prior to his attack on the Tree of Life Synagogue making hateful and threatening comments about Jewish people online.**

In January 2018, Bowers created a social media account on Gab.com using the name "Onedingo."[4]  App.7764-71.  He wrote in his Gab biography that, "[J]ews are the [C]hildren of [S]atan," and followed (and was followed by) accounts named "With Jews you lose," "Cook with Anne Frank," "Murda kikes," and "Hitler was right."  App.7766-67, 7824, 13610.

Between January and October 2018, Bowers posted hundreds of statements on Gab.com demeaning and targeting the Jewish community.  *See, e.g.*, App.7771-72, 13610-38.  In the days leading up to the attack, these posts frequently used slurs to describe Jewish people, generally stated Bowers's desire to inflict violence upon the Jewish community, and included images of his firearms.  App.7840-42, 7962-65, 13610-38.  For example:

- On September 27, 2018, Bowers posted "hitler did nothing wrong." App.13617.

- On October 2, 2018, at 2:28 p.m., Bowers posted "you must be new here. welcome," "stick around and you will find out just how vile and degenerate the kikes truly are." App.13620.

- On October 2, 2018, at 3:01 p.m., Bowers posted "that's ok. the ovens run 24/7," along with a picture of active smokestacks. App.13620-21.

---

[4] Gab.com is a social media website created as a "free speech platform" in response to what some people viewed as "censorship" on other platforms. App.7717-18.

- On October 3, 2018, Bowers posted "Make Ovens 1488[] Again." App.13623. "1488" is a reference to Nazi ideology: "14" refers to "14 words," a white supremacist mantra originated by David Lane, which reads "We must secure the existence of our people and a future for white children"; "88" refers to "Heil Hitler," because H is the eighth letter of the English alphabet. App.7972-73.

- On October 7, 2018, Bowers posted "#BreivikDidNothingWrong," referencing Anders Breivik, who, in 2011, committed a mass murder in Norway. App.7984, 13624.

- On October 9, 2018, Bowers posted a picture captioned, "THE ONLY GOOD JEW IS A DEAD JEW." App.13626.

- On October 10, 2018, at 4:01 p.m., Bowers posted "Why hello there HIAS! You like to bring in hostile invaders to dwell among us?" and "We appreciate the list of friends you have provided:[] []hias.org/events/national-refugee-shabbat." App.13627.

- On October 10, 2018, at 4:01 p.m., Bowers posted a screenshot of HIAS's website listing Pennsylvania partners in its October 18, 2018, National Refugee Shabbat, including "Pittsburgh, Congregation Dor Hadash." App.13627-28.

- On October 19, 2018, Bowers reposted "Every time a white country is being invaded by people of color you will find evidence that the Jews are behind it somehow….The Jews are trying to erase you white man so that they can control the whole world. You are the ONLY thing left standing in the way of their (((Globalist))) One World Order. Call me a racist or a Nazi. I don't even care anymore. All I know is that my people are under attack, and we're losing. #RiseUp #14Words." App.13631.

- On October 21, 2018, Bowers posted "#DodgeChargerDidNothing Wrong," referring to James Fields, Jr., a member of a neo-Nazi organization who murdered Heather Heyer by ramming his car into a crowd of people during the Charlottesville Unite the Right rally in 2017. App.7984-85, 7987, 13634.

- On October 24, 2018, at 12:51 p.m., Bowers posted "oh you poor, poor jews. GAS & BAKE NOW!" App.13635.

- On October 24, 2018, at 1:09 p.m., Bowers posted a picture of three handguns and six magazines. *Ibid.*

In addition to posting or reposting antisemitic messages, Bowers repeatedly "liked" antisemitic messages posted by other Gab users. App.7767-68; *see* App.13639-75.

In the weeks leading up to his attack at the Tree of Life Synagogue, Bowers also visited HIAS's website numerous times. App.7877. Bowers repeatedly reviewed HIAS's webpage describing the National Refugee Shabbat celebration and listing Dor Hadash as a participant. S-App.187-93. Bowers again visited HIAS's webpage on the morning of his attack. S-App.193.

On the morning of October 27, 2018, Bowers programmed his six hard drives to shred, or delete, their memory if he did not return home within 200 minutes. App.896, 8100-08. At some point, he also manually deleted data on his cellphone. App.7420-21. Moments before entering the Tree of Life Synagogue, at 9:49 a.m., Bowers posted on Gab.com, "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in." App.8131, 13637.[5]

---

[5] "Screw your optics" refers to a debate among white supremacists about the best way to advance their goals (App.7985-86), with some maintaining that using violence is "bad optics" (App.7986) while others argue that violence is necessary to advance their cause (App.7985).

10

### 3.    On October 27, 2018, the three congregations gathered for religious worship and study.

a. On the morning of Saturday, October 27, 2018, 12 Tree of Life members were in the Pervin Chapel in the middle of opening prayers.  App.6213-18.  Audrey Glickman, age 61, was there with her partner, Joseph Charny, age 90.  App.6193, 6198, 6200-01.[6]  Glickman opened the service with a prayer of gratitude and welcome.  App.6217.

David and Cecil Rosenthal, ages 54 and 59, respectively, were brothers who had significant developmental disabilities and were commonly known as "the boys."  App.5803, 6842, 6974.  David accompanied Glickman to the front of the chapel; while he could not read, he had memorized all the prayers and songs, and regularly helped her lead services.  App.6208-10.  Cecil sat in the back of the chapel next to Irving Younger, age 69.  App.5827, 6215, 6884.  Cecil and Younger both helped greet and usher other congregants as they entered the chapel.  App.5827, 6137, 6215.

After Glickman started the service with prayers, Rabbi Jeffrey Myers, age 62, joined Glickman and David at the bima, or pulpit, to lead the congregation in a brief lesson.  *See* App.5764, 6217-18.  That morning, he was prepared to give

---

[6] Ages listed are the ages of each person on October 27, 2018, approximately four-and-a-half years before trial began.

11

a sermon about the Jewish tenet known as "welcome the stranger," which instructs Jewish people to welcome "all guests, no matter who they might be." App.5857-58, 7692-93.

Stephen Weiss was seated in the back of the chapel keeping a headcount to ensure that there was a minyan, or quorum, as required for parts of the service. App.6123, 6133-34, 6140, 6147-48. For nearly 30 years, Weiss had worked for Tree of Life as the congregation's ritual director; in this role he became very familiar with the "labyrinth" that is the Tree of Life Synagogue building. App.5842, 6126-27. Weiss also taught the congregation's youth in their religious school, which met in an upstairs classroom throughout the week. App.6125, 6131-32.

Joyce Fienberg, age 75, a long-time member of the congregation, was also present in the chapel, along with Bernice and Sylvan Simon, ages 84 and 86, respectively. App.5801-03, 6214, 6916-17, 6961-62, 6966. The Simons got married in the Pervin Chapel in their 20s; they had been members of the congregation ever since. App.5802-03, 6138-39, 6214, 6961-62, 6966. They both had difficulty walking, and Bernice used a cane to walk. App.8553-56.

Rose Mallinger, age 97, and Andrea Wedner, age 61, were also present and in their regular seats. App.6147-48, 6214-15, 8161, 11322, 11465. For years, Wedner and Mallinger went to Saturday morning services together;

12

Mallinger regularly read the "[P]rayer for [P]eace" aloud from her pew, praying that "all people can live together in freedom and peace." App.5806, 6136-37, 8162-63.

b. In Dor Hadash's worship space, Jerry Rabinowitz, Daniel Leger, and Martin Gaynor were setting out prayer books and copies of the Torah for the day's congregants. App.5955, 5973. The three men, ages 66, 70, and 63, respectively, were regular attendees of Saturday services and were good friends. App.5955, 5964, 5973, 6027, 6944. Rabinowitz and Leger also worked together: Rabinowitz was a doctor at the University of Pittsburgh hospital and Leger— after working for 40 years as a pediatric nurse—became chaplain at the same hospital. App.5956, 5964-65, 6263-64.

c. In New Light's space downstairs, Richard Gottfried, age 65, and Daniel Stein, age 71, were in the kitchen preparing a meal for a men's breakfast the following day. App.5896, 5915-17, 6871, 6927. Melvin Wax, age 87, who was deaf in one ear and hard of hearing, was in New Light's sanctuary; Wax, Gottfried, and Stein were the "main pillars of the congregation." App.5902-03, 5916, 6892, 8621.

Gottfried's sister, Carol Black, age 66, was also in the sanctuary, along with Barry Werber, age 76, and Rabbi Jonathan Perlman, age 54. App.5891, 5896, 5916, 5996, 6095. Black regularly attended Saturday services with her

brother, where they both served as gabbaim by assisting the person reading from the Torah, but Werber did not usually attend Saturday morning services. App.5906-08, 6000.  October 27, however, was his mother's yahrzeit (the anniversary of her death) and he attended that day to honor her life.  App.5917, 5999-6000.

### 4.    Bowers kills 11 congregants, injures 2, and injures 2 law enforcement officers.

Shortly after 9:49 a.m., when he posted the online message announcing that he was "going in," Bowers entered the Tree of Life Synagogue carrying an AR-15 semi-automatic rifle, three Glock handguns, and scores of ammunition. *See* App.8131.  As the three congregations began their worship services, they started to hear loud bangs coming from the mezzanine level (highlighted in red in the below diagram) between Tree of Life's and Dor Hadash's worship spaces on the main level and New Light's worship space on the lower level.  App.5837, 5918-19, 5974-75.



S-App.177.

### a.     Bowers attacks Dor Hadash congregants.

Jerry Rabinowitz, Daniel Leger, and Martin Gaynor were setting out copies of the Torah and prayer books when they first heard gunshots. App.5974-75. Gaynor initially thought the sounds came from something heavy falling over and imagined that the coat racks on the mezzanine floor had fallen. App.6036-37. However, once Gaynor stepped outside of his worship space, he heard gunshots and screaming; he instinctively turned away from the sound and ran in the opposite direction, eventually escaping the synagogue and calling 911. App.6035-41.

Rabinowitz and Leger, who, as a physician and nurse, were "trained to be helpers," also recognized the sounds as gunshots. App.5975-76. Rabinowitz

15

said "Oh, Dan," indicating that "something dreadful was happening" and they were going to "help." App.5976. Rabinowitz left the room first, with Leger following only steps behind. App.5975. Leger went towards the sound of the gunfire coming from the mezzanine downstairs, where he knew there was a telephone so he could call 911. App.5976-77. As Leger moved towards the phone, he lost sight of Rabinowitz. App.5975.

As Rabinowitz reached the mezzanine level, Bowers killed him by shooting him twice, including once in the head. App.6944, 6946. Rabinowitz's body fell at the foot of the stairs descending from the Pervin Chapel and Dor Hadash's worship space, just above the stairs that descended to New Light's sanctuary. S-App.425.

Bowers shot Leger in the abdomen. App.5975, 5977. Leger fell onto the staircase and gradually began to feel "intense pressure" and "excruciating pain throughout his abdomen and hips." App.5977-79, 5991. Leger remained on the stairs for 45 minutes as his condition worsened. App.5982-83. Believing that he was dying, Leger began to pray. App.5983.[7]

---

[7] Officers eventually rescued Leger. App.5983-84.

### b.    Bowers attacks Tree of Life congregants.

1. Tree of Life congregants also initially mistook the sound of gunfire as the coat rack falling.  App.5837, 6149, 6218.  Irving Younger and Cecil Rosenthal immediately got up and went towards the noise.  App.6150.  Bowers killed Younger near the coat rack on the mezzanine level by shooting him three times, once in the head.  App.6885-86; S-App.425-26.

Joyce Fienberg had also left Pervin Chapel; Bowers shot and killed her on the stairs leading from the chapel to the mezzanine.  App.6927, 7168; S-App.425.  Bowers shot Fienberg four times, in her leg, arm, and torso. App.6919-23; S-App.425.

2. Back in Pervin Chapel, others were realizing that the sounds they were hearing were gunshots.  *See, e.g.*, App.5837-38.  Stephen Weiss recognized the sounds as gunshots from a semi-automatic weapon and started to see shell casings bouncing off the floor outside of the chapel.  App.6150-51.  As Weiss made his way away from the gunfire and towards the front of the chapel, Rabbi Jeffrey Myers urged congregants to get down and stay quiet because he knew many of them could not walk without assistance and might not be able to escape. App.5838-39, 6151-52.  Rabbi Myers started ushering those who were able through a door behind the bima.  App.5840-41.  He asked God's forgiveness for those he had to leave behind.  App.5855-56.

17

Audrey Glickman grabbed David Rosenthal's hand, urged him to be quiet, and headed towards the door behind the bima. App.6129-20. Shortly thereafter, Joseph Charny followed them. App.6220. David realized that something was wrong, panicked, and wanted to go home. App.6220-21. Ultimately, Charny and Glickman were unable to convince David to stay with them, and David reentered Pervin Chapel. App.6221.

David made it out of the chapel and to the mezzanine level. Bowers killed David on the stairs descending to the mezzanine by shooting him twice: once in the abdomen, and then again at contact range with the muzzle of his rifle touching the base of David's neck. App.6974-77; S-App.425, 427. David's body fell on top of Fienberg at the bottom of the stairs descending to the mezzanine. S-App.425, 427.

3. Bowers encountered Cecil Rosenthal at the entrance of Pervin Chapel. Bowers killed Cecil by shooting him six times, four times in his back and twice in his head. App.6841, 6853. Cecil's body fell at the threshold of the chapel. S-App.423.

4. Bowers then entered the chapel where the remaining congregants, who could not flee, were trying to hide. Andrea Wedner had stayed in the chapel because her 97-year-old mother, Rose Mallinger, who used a cane and leaned on Wedner to walk, could not have fled to escape the shooter. App.8156, 8163,

18

8170. Wedner told her mother to get down on the floor but before she could get down herself, Wedner saw Bowers wielding a long gun at the back of the chapel. App.8170-71; GX31. She and her mother got under the pews and laid down head-to-head. App.8172. As she did so, Wedner heard Bowers fire his gun multiple times. *Ibid.* Wedner called 911 and reported that there was a shooter in the chapel. GX31. She remained on the phone with 911 to report the location and number of shots that she was hearing while she and her mother hid under the pews. GX31.

Bowers shot Sylvan Simon in the Pervin Chapel where he was sitting on a pew with his wife Bernice Simon. App.8168; GX37. Bowers shot Sylvan three times: once in his back, once in his chest, and once in his ankle. App.6397, 6966-71. Bernice called 911 and reported that someone was shooting people in the synagogue and that her husband had been shot. GX37; App.5735. She remained with her husband, trying to stanch the bleeding with her prayer shawl, and stayed on the phone with the 911 operator. GX40. Audible gunfire continued throughout Bernice's call. GX37; App.5735.

5. The four Tree of Life congregants who had been able to flee out of Pervin Chapel escaped without physical injury. App.5841. Rabbi Myers called 911 as he searched for a place to hide, reporting the number and location of gunshots to aid first responders. App.5841-45. Ultimately, he hid in a bathroom

19

upstairs from the chapel until officers rescued him.  App.5843, 5852-54.  While he waited, Rabbi Myers could hear gunshots and screaming, feared that he was about to be killed, and began to pray.  App.5846, 5850-51.

Glickman and Charny also made their way upstairs where they initially hid in the choir loft.  App.6224.  Glickman used Charny's phone to call 911, reported that a man had been shot and was bleeding, and quickly got off the phone so that they would not be heard.  App.6222-23, 6226-27; GX55. Glickman and Charny later found a storage room to hide in, covering themselves with prayer shawls so they could not be seen.  App.6227-29. Eventually, they decided it was safe enough to try to find a way out, and they escaped the synagogue.  App.6235-39.

Stephen Weiss had also fled the chapel through the door behind the bima. App.6151, 6154.  Weiss used his unique knowledge of the building to move through the hallways and stairs behind the chapel, intent on getting downstairs to warn New Light's congregation in case they had not already realized someone was shooting in the synagogue.  App.6154-55.

### c.    Bowers attacks New Light congregants.

1. Downstairs in New Light's worship space, congregants were beginning to realize what was happening.  Carol Black heard "a loud bang" and Barry Werber, who was sitting directly in front of her, left the room to investigate.

App.5820, 5891, 5919, 5995, 6008.  Werber saw Jerry Rabinowitz's body lying at the top of the stairs to the mezzanine and returned to New Light's sanctuary to alert the others.  App.6008, 7168; S-App.424.  Rabbi Jonathan Perlman ushered Black, Werber, and Melvin Wax through a door behind the bima to a storage room.  App.5921, 6095, 6112, 6117-18.

During a pause in the gunshots, while standing on the threshold of the storage room where Black and Werber were hiding, Wax told the others that whatever was going on was surely over, and that he wanted to know what had happened.  App.5922-23, 6119.  While trying to keep his own voice down, Rabbi Perlman urged Wax not to investigate and to stay in the storage room.  App.6119.

2. Stephen Weiss made his way to the hallway outside of the storage room where the New Light congregants were hiding.  App.6119-20, 6155-56.  He told Rabbi Perlman, Wax, and Werber that an active shooter was upstairs, and to stay out of sight.  App.6120, 6155.  Weiss then headed back upstairs and escaped through the main sanctuary.  App.6157-59.  Rabbi Perlman also ultimately escaped.  App.5121.

3. Downstairs in New Light's kitchen, Richard Gottfried and Daniel Stein were hiding behind a metal table, near an oven.  *See* S-App.428; GX53.  Gottfried called 911 to report gunfire.  GX53 at 0:00-0:52.

21

After exiting Pervin Chapel, Bowers went downstairs and entered New Light's kitchen. Bowers shot and killed both men as they hid. S-App.428; App.6871, 6929, 6931. He shot Gottfried seven times, and shot Stein twice, once in the head. App.6871-72, 6927; S-App.429.

Bowers made his way through New Light's sanctuary and to the hallway near where Wax, Black, and Werber were hiding. Wax, who seemed to think that the danger had passed, looked into the hallway; Bowers killed him. App.5923-24, 6012; GX34. He shot Wax twice: once in the wrist, and once in the chest at contact range. App.6892, 6894-95.

Bowers stepped over Wax's body and looked into the storage room where Black and Werber were hiding. App.6012-13. Bowers could not see Black or Werber in the dark room, so he backed away. App.6012. Law enforcement eventually rescued Black and Werber and escorted them out of the synagogue. App.5927.

### d.    Outside, congregants realized there was a shooter inside their synagogue and called 911.

While Bowers was attacking congregants inside the synagogue, congregants outside heard the shooting. Rabbi Doris Dyen and Deane Root were driving towards the parking lot when Rabbi Dyen heard gunfire. App.6256-57, 6265-67, 6303-06. It was not until they were approaching the synagogue's entrance that they saw a shot out window and broken glass, heard

rapid gunfire from inside the building, and realized an active shooter was in the synagogue. App.6271-74, 6306-13. Rabbi Dyen and Root called 911 and told other arriving congregants—including Louis Fineberg and Judah Samet—not to enter the synagogue because of the shooting. App.5823, 6248-50, 6274-79, 6313-15.

### e. Bowers injures law enforcement and reenters Pervin Chapel where he shoots three more Tree of Life congregants.

1. After killing all the New Light congregants he could find, Bowers went back upstairs. By this time, law enforcement had responded to the scene. App.6286. Police officers Daniel Mead and Michael Smigda approached the building, with Mead in the lead. App.6282, 6285-86, 6369.[8] When Mead came around a corner of the building, he saw Bowers standing behind a glass door wielding a rifle. App.6287-88. Bowers immediately fired through the glass, shattering Mead's wrist and sending glass shrapnel into Mead's leg and Smigda's face and ear. App.6288-89, 6298-99, 6363, 6379. The force of the bullet shooting through Mead's wrist caused his hand to bend back unnaturally "like a rag doll," before it fell forward, "dangling." App.6288-89.

---

[8] The transcript mistakenly lists Officer Mead's name as "Daniel Meade." *Compare* App.6282, *with* App.13812.

Bowers retreated into the synagogue and moved back towards Pervin Chapel. Smigda saw Bowers walking towards the chapel through a window, and they exchanged gunfire. App.6385-88; S-App.181.

2. Bowers reentered Pervin Chapel where congregants were still hiding. Bowers found Andrea Wedner lying under a pew and still on the phone with 911, head-to-head with her mother Rose Mallinger. Bowers shot Wedner in the arm and hand, sending shrapnel into her body and face. App.8177-78; GX31 at 4:00-4:30. Wedner saw her arm and hand "blown open," leaving them covered in blood and "look[ing] like shredded raw meat." App.8177-78. Bowers then shot Mallinger four times, including once in the head, leaving a gaping wound across her face. App.6937-40. After she was shot, Wedner lay beneath the pew, knowing that her mother was dying and scared that Bowers might come back to kill her if he realized that she was still alive. App.6990-91, 8179; S-App.422.[9]

Bernice Simon was also still on the phone with a 911 dispatcher, sitting next to her now deceased husband, Sylvan Simon. GX40. After Bowers reentered the Pervin Chapel and killed Mallinger, he moved towards the Simons' pew and shot Bernice in the chest, killing her. GX40 at 5:55-6:45;

---

[9] Eventually, law enforcement rescued Wedner and escorted her out of the synagogue. App.6990-91, 8180-82.

24

App.6984; S-App.421.   Bowers then shot Sylvan in the chest, post-mortem. App.6972-74.

In all, within just 13 minutes of announcing that he was "going in" to the Tree of Life Synagogue, Bowers shot at every congregant he encountered, killing 11 and grievously wounding 2 others.  App.8131-34.

### 5. Bowers exchanges gunfire with law enforcement and injures two additional officers.

### a. Bowers barricades himself in a children's classroom.

After Bowers left Pervin Chapel for the second time, he went upstairs to the second-to-last floor of the synagogue and barricaded himself in the classroom where Stephen Weiss taught children religious studies on Tuesdays.  S-App.185; App.6125, 6173-74, 13689.  Bowers pulled some chairs away from the tables in the classroom and arranged them along the wall, creating obstacles for anyone who entered the room.  S-App.184; App.6173-74, 6812-13.  He also arranged boxes on one of the tables in the back of the room and opened a cabinet door to block the view of the back left corner of the room.  App.6175-76; S-App.185-86. He laid in wait in that back corner.  App.6631.

### b. Bowers ambushes officers.

1. Once inside the synagogue, SWAT officers followed a trail of victims, rifle magazines, and other evidence to the room where Bowers was waiting. App.6604-6624, 8139-40.  When officers reached the hallway outside of the

25

room, the door was closed, and the lights—both in the hallway and the classroom itself—were off.  App.6625-26.  Out of concern that additional victims might be in danger, the officers decided to enter the room instead of waiting for assistance.  App.6625, 8141.

As soon as the officers entered the room, Bowers began shooting.  App.6627-28, 8142-43.  Bowers shot SWAT officer Timothy Matson in the head, leg, arm, hand, and buttocks.  App.8148-55.  Another SWAT officer, Michael Saldutte, immediately dove in front of Matson to protect him with Saldutte's own body armor.  App.6630.  As he was lying on the ground, Saldutte could see Bowers's rifle muzzle flash from the back left corner of the room as Bowers kept shooting at the officers.  App.6631.

SWAT officer Anthony Burke, who was a few stairs above the classroom, heard Matson scream in pain and climbed down to help him.  App.7524.  As Burke reached down to pull Matson out, Bowers shot Burke in the wrist.  App.7524-25, 7529.  Burke helped pull Matson out of the room and pushed him down the stairs to get him out of the line of fire.  App.7525.  Burke then tried to grab his rifle and realized that he could not move his hand.  App.7526-27.  Burke climbed up the stairs above the classroom and attempted to assist Saldutte, who was now holding position above the classroom with SWAT officer John Persin.  App.6648, 7526-28.  Persin helped put a tourniquet on Burke's bleeding arm and

26

then joined Saldutte in guarding their position in case Bowers left the classroom and started climbing the stairs. App.6649-50. As Persin assisted Burke, Bowers temporarily stopped shooting at the officers. App.6652-53.

2. While keeping his gun trained on the classroom door, Saldutte began to describe to others via radio where he saw Bowers's muzzle flash within the classroom. App.6653-55. Saldutte eventually realized that because of his position near the room, Bowers could likely hear Saldutte reporting on Bowers's position. App.6633. Immediately after Saldutte ended his last radio communication, Bowers started shooting at the officers again. App.6656, 7530. After a second exchange of gunfire, Bowers stopped shooting. App.6529, 6532.

### 6.   Bowers surrenders and explains that he "just want[ed] to kill Jews."

Soon after he stopped shooting, Bowers called out to the officers that he was hit and asked them to come into the classroom to help him. App.6659. SWAT officer Clint Thimons—who is a trained negotiator—explained to Bowers that the officers would not come into the room and that Bowers would have to come out to ensure that Bowers (or anyone else with him) was no longer a threat. App.6497, 6533-35.

After some time, Thimons saw Bowers slowly crawl towards the classroom door. App.6472, 6540. To facilitate Bowers's surrender and distract him from inflicting further injury on the officers, Thimons kept him talking by

asking his name and inquiring about any other threats in the synagogue. App.6538. As Bowers was crawling towards the door, he told Thimons that he had two handguns on his body and that he had left his rifle in the classroom. App.6539-40.

In his effort to keep Bowers talking, Thimons asked Bowers why he had done this; Bowers responded that he had "had enough," he "couldn't stand by and watch these Jews do this to this country," "they were killing our children," "Jews are the children of Satan," and "all Jews had to die." App.6474, 6540, 6807, 7261-62, 7532. When asked why he surrendered, Bowers responded that, although he was shot, he only surrendered because he ran out of rifle ammunition. App.7205-06.

At approximately 11:13 a.m., officers handcuffed Bowers after disarming him of two Glock handguns, three magazines, and an ammunition pouch. App.6541-47, 6810. When the officers disarmed Bowers, a green device came off his body. App.6479. The device appeared to have a digital timer on it and was displaying "11:40." App.6484. Given the time, officers became concerned that the device was connected to an explosive. App.6479, 6484. Bomb technicians ultimately removed the power source to the device, which was called a "Screaming Meanie," and Bowers later admitted that it was a noise device that he intended to use as a distraction. App.6479, 6483, 7207-08, 7193-96.

Officers moved Bowers to a nearby classroom and requested medical treatment for his injuries. App.6544. To determine if Bowers was working with another assailant, officers told him they had seen another person on camera; Bowers responded, "that must have been some fucking Jew on camera. I did this myself." App.6480-81. While Bowers waited for a medic, he calmly told the officers that "[t]hese people are committing genocide on my people and I just want to kill Jews." App.7265-66. Medics on the SWAT team ultimately treated Bowers and evacuated him from the synagogue. App.7189-92.

### 7. Officers clear the synagogue to ensure that no one is working with Bowers.

Officers prepared to clear the classroom where Bowers had been hiding and sweep the entire building to ensure that the building was secure. App.6466-67, 7005-06. Clearing the room became urgent as officers realized that Burke (who was still bleeding significantly from Bowers's gunshot) was deteriorating, and the only way to get him treatment was to move him down the stairs that passed by the room. App.6477-78. To ensure their safety, the officers deployed a noise flash diversionary device (a flash bang) to distract and stun any possible shooters inside the room. App.6478, 6664.

Once deployed, however, the flash bang bounced off the classroom doorway, hit Persin (who was helping to evacuate Burke), and detonated.

29

App.7006-07. The flash bang stunned Persin and caused permanent partial hearing loss. App.7007-08.

Ultimately, the officers were able to get Burke treatment for his gunshot wound and—after about 90 minutes—cleared the entire synagogue of any other threats. App.6484-85. Law enforcement recovered an AR-15 rifle, a third handgun, a magazine, and other evidence from the room where Bowers retreated after hunting congregants throughout the synagogue. App.7084-95, 7127-30.

## B.    The Federal Death Penalty Act

The Federal Death Penalty Act (FDPA), 18 U.S.C. 3591-3599, provides with limited exception that when the government seeks the death penalty, the district court must convene a separate sentencing proceeding before the same jury that convicted the defendant of a capital crime. 18 U.S.C. 3593(b)(1). At the penalty phase, the jury decides, first, whether the government has established beyond a reasonable doubt at least one threshold mental state under Section 3591(a)(2) and at least one aggravating factor under Section 3592(c) for which notice has been given. 18 U.S.C. 3593(d). If the jury unanimously finds at least one threshold intent factor and at least one statutory aggravating factor, the defendant is death-eligible. 18 U.S.C. 3593(e).

The jury next considers whether the aggravating factors found to exist "sufficiently outweigh" any mitigating factors "to justify a sentence of death." 18 U.S.C. 3593(e). In addition to statutory aggravators, the jury may consider any noticed, non-statutory aggravating factors that it finds unanimously and beyond a reasonable doubt. 18 U.S.C. 3592(c), 3593(d). The jury must also consider any mitigating factors proven by a preponderance of the evidence. 18 U.S.C. 3592(d), 3593(c). Unanimity is not required for mitigating factors; a juror "who finds the existence of a mitigating factor may consider such factor established regardless of the number of jurors who concur that the factor has been established." 18 U.S.C. 3593(e). After weighing the aggravating and mitigating factors, the jury must unanimously recommend a sentence of death, life imprisonment without possibility of release, or some lesser sentence. 18 U.S.C. 3593(e). The jury's recommendation of death or life without the possibility of release is binding on the district court. 18 U.S.C. 3594.

### C.    Procedural History

1. On January 29, 2019, a federal grand jury returned a superseding indictment charging Bowers with 63 offenses related to his attack on worshippers and police officers at the Tree of Life Synagogue. App.13696-710. The superseding indictment charged Bowers with:

a. Intentionally obstructing victims by force in their free exercise of religious beliefs, resulting in death, in violation of 18 U.S.C. 247(a)(2) and (d)(1) (Counts 1-11);

b. Willfully causing bodily injury to victims because of their religion, resulting in death, in violation of 18 U.S.C. 249(a)(1)(B)(i) (Counts 12-22);

c. Using, carrying, brandishing, and discharging firearms to commit murder during and in relation to crimes of violence charged in Counts 1-22, in violation of 18 U.S.C. 924(c)(1)(A) and (j)(1) (Counts 23-33);[10]

d. Intentionally obstructing victims by force and threat of force in their free exercise of religious beliefs, involving attempts to kill and dangerous weapons, and resulting in bodily injury, in violation of 18 U.S.C. 247(a)(2), (d)(1), and (d)(3) (Counts 34-35);

e. Willfully causing bodily injury to victims because of their religion, involving attempts to kill, in violation of 18 U.S.C. 249(a)(1)(B)(ii) (Counts 36-37);

f. Using, carrying, brandishing, and discharging firearms, during and in relation to crimes of violence charged in Counts 34-37, in violation of 18 U.S.C. 924(c)(1)(A) (Counts 38-39);

g. Intentionally obstructing victims by force in their free exercise of religious beliefs, involving attempts to kill and dangerous weapons, and resulting in bodily injury to public safety officers performing their law enforcement duties, in violation of 18 U.S.C. 247(a)(2), (d)(1), and (d)(3) (Counts 40-47);

h. Intentionally obstructing victims by force in their free exercise of religious beliefs, involving dangerous weapons and resulting in bodily

---

[10] Counts 23-33 and 38-39 were originally charged with both Section 247 and 249 offenses as predicate crimes of violence. The district court found that Section 249 was not a crime of violence and therefore could not be a Section 924(c) or (j) predicate. App.239; *see also* pp.107-08, *infra*. As submitted to the jury, the Section 924 violations charged in Counts 23-33 and 38-39 were based only on the Section 247(a)(2) predicates (Counts 1-11, 34-35). App.8270-71.

injury to public safety officers performing their law enforcement duties, in violation of 18 U.S.C. 247(a)(2) and (d)(3) (Counts 48-51); and

i. Using, carrying, brandishing, and discharging firearms, during and in relation to crimes of violence charged in Counts 40-51, in violation of 18 U.S.C. 924(c)(1)(A) (Counts 52-63).

App.13696-706.

The superseding indictment also alleged facts establishing Bowers's eligibility for the death penalty. Congress authorized the death penalty for the death-resulting counts charged under Section 247 (Counts 1-11) and the murder offenses under Section 924 (Counts 23-33). App.13707-09; 18 U.S.C. 247(d)(1), 924(j)(1). The government's Notice of Intent to Seek the Death Penalty for those 22 death-eligible counts alleged four threshold intent factors, four statutory aggravating factors, and five non-statutory aggravating factors. App.13711-15; *see* 18 U.S.C. 3591(a)(2), 3592(c), 3593(a). Bowers ultimately submitted 115 mitigating factors to the jury during the penalty phase. App.13786-13800; *see* 18 U.S.C. 3592(a), 3593(c).

2. Bowers filed a motion to trifurcate the capital trial by subdividing the penalty phase into (a) an eligibility phase, where the jury would consider and make findings on the threshold intent factors and statutory aggravating factors; and (b) a selection phase, where the jury would consider non-statutory aggravating factors and mitigating factors and then weigh all proven aggravating

33

and mitigating factors.  The district court granted Bowers's motion over the government's objection.  DE936:1-14.

a. The 13-day guilt phase of trial began on May 30, 2023, following lengthy jury selection.  The government called 60 witnesses and introduced more than 650 exhibits during the guilt phase.  App.13806-37.  Bowers did not call any witnesses and conceded that he had killed 11 congregants and seriously wounded other congregants and first responders, and that his attack had been planned.  App.5702, 5710 (opening statement); App.8360 (closing argument).  Bowers nevertheless maintained that he was not guilty of the charged crimes.  App.5704-09, 8367-69.   The jury found Bowers guilty on all 63 counts.  App.13742-68.

b. The eligibility phase of trial lasted 12 days.  The government called 11 witnesses, including two medical experts in rebuttal.  App.13838-43.  The government also relied on evidence presented during the guilt phase to establish the threshold intent factors and statutory aggravating factors.  *See* App.8494-99 (opening argument); App.10782-85 (closing argument).

Bowers called nine witnesses, all of whom were medical doctors or psychologists. App.13838-43; *see* p.283, *infra*. Bowers's eligibility-phase defense was that he did not act with the requisite intent to kill.  He maintained that he had epilepsy, schizophrenia, and structural and functional impairments to his

34

brain, and that these conditions caused him to form a delusional belief system which compelled him to go on a murderous shooting rampage at the Tree of Life Synagogue. App.8522, 8532-33 (opening statement); App.10848 (closing argument). On cross-examination of one defense expert, Dr. Richard Rogers, the government elicited numerous statements Bowers had made to Dr. Rogers about the Tree of Life attack and planning, including that Bowers said his goal had been to produce "messy" kills, which the government later cited as additional evidence of Bowers's intent to kill. *See* pp.52-53, 284-86, *infra*. The government's two rebuttal expert witnesses, Drs. Richard Darby and Park Dietz, disputed the defense expert's mental-health diagnoses. *See* pp.59-60, 286, *infra*.

The jury unanimously found Bowers death-eligible. As to each capital count, it found beyond a reasonable doubt that the government had proven all four threshold intent factors, including that Bowers had intentionally killed his victims. App.13773-75. And it found beyond a reasonable doubt that the government had established all of the alleged statutory aggravating factors, specifically: that Bowers had created a grave risk of death to additional persons (other than his deceased victims); engaged in substantial planning and premeditation to cause death; killed eight victims who were particularly vulnerable due to old age or infirmity; and intentionally killed and attempted to kill more than one person in a single criminal episode. App.13776-78.

35

c. The selection phase of trial lasted 11 days. The government called 22 witnesses, including surviving victims and family members of deceased victims, and Bowers called 29 witnesses. App.13844-56. Bowers presented evidence purporting to show, among other things, that his family had a long history of mental illness, that he repeatedly had attempted suicide and been committed to psychiatric hospitals as a child, and that he suffered from schizophrenia. *See, e.g.*, App.11547-67, 11619-11654, 12730-31, 12823-25. On cross-examination of another defense mental-health expert, Dr. George Corvin, the government elicited additional statements Bowers had made about the Tree of Life attack, including that the synagogue was the Jewish people's "Statue of Liberty" and that Bowers had "shit on it," which the government later cited in support of aggravating factors. *See* pp.287-88, *infra*.

After deliberating, the jury voted unanimously for a death sentence on each capital count. App.13802. Having already found all of the statutory aggravators, the jury found all five non-statutory aggravating factors beyond a reasonable doubt, specifically, that Bowers: (1) caused injury, harm, and loss to the deceased victims and their families; (2) expressed animus toward members of the Jewish faith, which played a role in his killings; (3) selected the Tree of Life Synagogue as the site for his attack to maximize harm and instill fear in Jewish communities; (4) demonstrated no remorse for his crimes; and (5) caused

serious injury to surviving victims.  App.13783-85.  The jury unanimously found approximately half of Bowers's mitigating factors to exist, and fewer than 12 jurors found additional mitigators to exist.  App.13786-800.  But no juror found by a preponderance of the evidence, for example, the mitigators alleging that Bowers had brain abnormalities; that Bowers had schizophrenia; that his crimes were motivated by delusional beliefs about Jewish people or committed under mental or emotional disturbance; or that he was unable to conform his conduct to the requirements of law or to appreciate the wrongfulness of his conduct.  *See ibid.*  The jury unanimously found that the aggravating factors sufficiently outweighed the mitigating factors to justify a death sentence.  App.13802.

3. The court sentenced Bowers to death on Counts 1-11 and 23-33, and life imprisonment without the possibility of release on all but four remaining counts, as to which the court imposed statutory-maximum 20-year sentences.  App.147-150.  The court ordered that Bowers pay $323,503.83 in restitution.  App.151.

## SUMMARY OF ARGUMENT

I. In light of recent Supreme Court precedent, the government agrees that imposing cumulative punishments for a Section 924(j) offense and for the predicate crime of religious obstruction resulting in death, 18 U.S.C. 247(a)(2), (d), based on the same conduct, violates double jeopardy.  The appropriate

37

remedy is for the Court to vacate Bowers's death sentences for the Section 924(j) offenses and remand for dismissal of those counts (Counts 23-33), while leaving intact the death sentences on the remaining capital counts (Counts 1-11).

II. Section 247(a)(2), (b), which prohibits obstruction of a person's free exercise of religious beliefs when said obstruction "is in or affects interstate or foreign commerce," is valid Commerce Clause legislation. The statute was constitutionally applied to Bowers's use of weapons and other items that had traveled in interstate and foreign commerce, his use of the Internet to select his victims and announce his crimes, and his interference with the congregations' commercial activity. The district court did not err by instructing the jury that Bowers's offenses did not themselves need to have a substantial effect on interstate commerce; but even if the court did err, the government proved that Bowers did substantially affect interstate commerce.

III. Section 249(a)(1), which prohibits willful, racially motivated violence, includes violence committed because of someone's religion when that religion was historically considered to be a "race," and is valid Thirteenth Amendment legislation. The statute was constitutionally applied to Bowers's attack on the Jewish congregants in the Tree of Life Synagogue. If this Court finds otherwise, his remaining sentences need not be reconsidered because the jury would have heard the same evidence even if there had been no Section 249 counts.

IV. Violent religious obstruction resulting in death, 18 U.S.C. 247(a)(2), (d)(1), requires proof that a defendant used—or attempted or threatened to use—force against another's person or property, and thus is a crime of violence and a valid predicate for a Section 924(j) offense. If this Court finds otherwise, his remaining sentences need not be reconsidered because the jury would have heard the same evidence even if there had been no Section 924 counts.

V. The district court acted within its discretion when it denied Bowers's request for more time during the *Batson* hearing. The court also properly conducted the *Batson* analysis and did not clearly err by concluding that the government did not discriminate in its use of peremptory strikes.

VI. The district court did not err in denying Bowers's implied-bias challenge to Juror 119, whose brief experience 40 years ago reviewing death sentences in China did not trigger a legal presumption of bias. Nor did the court abuse its discretion in denying Bowers's actual-bias challenge given the evidence of impartiality in Juror 119's questionnaire and voir dire responses.

VII. The district court properly exercised its discretion in disqualifying two prospective jurors who strongly opposed the death penalty. Their questionnaire and voir dire responses revealed that their beliefs would have substantially impaired their ability to serve as jurors.

39

VIII. The district court properly admitted guilt-phase testimony about Bowers's social-media postings, Judaism, and religious items at the crime scene, as well as penalty-phase evidence about Pittsburgh's Jewish community. The evidence was probative of Bowers's crimes, relevant to sentencing, and not unfairly prejudicial.

IX. The district court properly admitted victim-impact evidence, including evidence about injuries to surviving victims. The evidence was permissible under Supreme Court precedent and the FDPA, and the government's remarks about victims during closing argument and rebuttal were proper.

X.  The government's use of Bowers's statements to his own mental-health experts in its penalty-phase case did not violate the Fifth Amendment, because Bowers's statements were not compelled and Bowers relied on his statements to the same experts to support his defenses. Nor did the government make improper comments to the jury about Bowers's right not to testify or his right to trial.

XI. The district court correctly denied Bowers's request to submit a mitigating factor on martyrdom and properly excluded evidence that he offered to plead guilty in exchange for a life sentence. Avoiding martyrdom and the conditional plea offer were not mitigating circumstances relevant to the jury's selection of a sentence on the capital counts.

XII. The district court did not abuse its discretion in denying Bowers's motion for a mistrial based on the government's final, penalty-phase rebuttal argument. Bowers's arguments about the prosecutor's remarks mischaracterize the record and omit key context.

XIII. The district court properly exercised its discretion in authorizing Deputy U.S. Marshals to place ankle restraints on Bowers in the courtroom during the penalty phase. The restraints were justified by specific security concerns and were based on facts not reasonably in dispute.

XIV. Bowers's unpreserved claim that he was absent from the jury's courtroom viewing of firearm evidence during final sentencing deliberations, and allegedly absent during the examination of a Marshal about his verbal exchange with jurors during that viewing, fails multiple plain-error prongs. Bowers has not shown, *inter alia*, a clear and obvious right to be present for those matters.

XV. Bowers's summary request to vacate his death sentences for cumulative error is meritless.

## ARGUMENT

**I.    BOWERS'S DEATH SENTENCES FOR THE SECTION 924(J) OFFENSES (COUNTS 23-33) SHOULD BE VACATED FOLLOWING *BARRETT V. UNITED STATES*, BUT RESENTENCING ON THE REMAINING CAPITAL COUNTS IS NOT WARRANTED.**

The government agrees that, in light of recent Supreme Court precedent, the imposition of cumulative punishments for Bowers's convictions on Counts 23-33 violates double jeopardy.  Br.137-40.  Resentencing on the remaining capital counts, however, is not warranted.  Rather, this Court should simply vacate the death sentences on Counts 23-33 and remand for dismissal of those counts, leaving intact the death sentences on Counts 1-11.

### A.    Background

Before trial, Bowers moved to dismiss the Section 924(j) charges (Counts 23-33), which were based on two predicate crimes of violence that were separately charged as standalone offenses: religious obstruction resulting in death (Counts 1-11) and hate crimes resulting in death (Counts 12-22). DE237:14-15; *see* App.13698-13700.  Bowers maintained that separate charges for the Section 924(j) offenses and the underlying predicates violated multiplicity and double jeopardy principles, but conceded that his challenge was foreclosed by *United States v. Berrios*, 676 F.3d 118, 140-44 (3d Cir. 2012), where this Court held that Congress intended to impose consecutive punishments for a Section

42

924(j) offense and the predicate crime of violence. DE237:14-15. The district court denied Bowers's motion. App.182.

More than two years later, on the same day the jury returned its guilt-phase verdict, the Supreme Court held in *Lora v. United States*, 599 U.S. 453 (2023), that Section 924(j) does not incorporate the consecutive-sentence mandate of 18 U.S.C. 924(c)(1)(D)(ii), abrogating contrary decisions by this Court (*Berrios*) and other courts of appeals. *Id.* at 456 n.1, 458-59; *see United States v. Perrin*, 149 F.4th 267, 290 (3d Cir. 2025) (recognizing that *Lora* overruled *Berrios*). As submitted to the jury, each Section 924(j) count was based only on a religious-obstruction predicate under 18 U.S.C. 247. App.228, 8271. The jury found Bowers guilty of the Section 247 offenses resulting in death and the Section 924(j) offenses, App.13742-44, 13746-47, and later recommended death sentences on all of those counts, App.13781-82, 13802. *Lora* notwithstanding, Bowers did not renew his double jeopardy challenge before judgment was entered.

While Bowers's appeal has been pending, the Supreme Court held in *Barrett v. United States*, 146 S. Ct. 482 (2026), that, following *Lora*, double jeopardy principles preclude the imposition of cumulative punishments for both a Section 924(j) offense and a Section 924(c) offense based on the same act. *Id.* at 486-87, 490-96. The Court found no indication in the text of Section 924(c)

43

or Section 924(j) that Congress intended to authorize cumulative punishments under both subsections. *Id.* at 492.

## B.    Standard of Review

The Court's review of double jeopardy challenges is plenary. *United States v. Bishop*, 66 F.3d 569, 573 (3d Cir. 1995).

## C.    Argument

### 1.    The death sentences imposed on Counts 23-33 should be vacated in light of *Barrett*.

The Double Jeopardy Clause "prevent[s] the sentencing court from prescribing greater punishment than the legislature intended" for a single crime. *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). The general rule is that statutes define distinct—and thus cumulatively punishable—offenses so long as "each statute requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). But where the elements completely overlap, multiple punishments are presumptively precluded unless there is "a clear indication of … legislative intent" to allow them. *Whalen v. United States*, 445 U.S. 684, 691-92 (1980). Even if double jeopardy principles prohibit convicting and sentencing a defendant under two provisions, the defendant may still be subject to prosecution under both provisions, so long as "conviction and sentence [are] confined to one." *Ball v. United States*, 470 U.S. 856, 860-61 (1985); *see also Ohio v. Johnson*, 467 U.S. 493, 500 (1984).

44

In this case, Bowers received multiple death sentences for Section 247 and Section 924(j) offenses based on the same conduct, *i.e.*, the killing of 11 victims. In light of *Barrett*, the government agrees that the death sentences on the Section 924(j) counts (Counts 23-33) violate double jeopardy. That is because Section 924(j) requires proof of "a violation of subsection (c)," 18 U.S.C. 924(j), and Section 924(c) in turn requires proof of a predicate crime of violence. *See Berrios*, 676 F.3d at 139-40; App.8270-72 (jury instructions). Therefore, the predicate crime of violence—here, Section 247—is a lesser-included offense of Section 924(j) under *Blockburger*. The Court in *Barrett* held that Congress did not authorize convictions under both Section 924(c) and Section 924(j) for a single act that violates both provisions. 146 S. Ct. at 486-87, 491-97. Because there is likewise no indication that Congress authorized cumulative convictions for a Section 924(j) offense and for the predicate crime of violence, *see Lora*, 599 U.S. at 458-60, 462, Bowers may not be convicted and sentenced under both Section 247 and Section 924(j) based on the same conduct.

"The interest protected by the Double Jeopardy Clause in this multiple punishment context is confined to 'ensuring that the total punishment did not exceed that authorized by the legislature.'" *United States v. Pollen*, 978 F.2d 78, 83 (3d Cir. 1992) (quoting *Jones v. Thomas*, 491 U.S. 376, 381 (1989)). Accordingly, where cumulative punishments are not authorized, a court may

avoid a double jeopardy violation by merging the lesser and greater offenses for purposes of sentencing. *United States v. Centeno*, 793 F.3d 378, 392 (3d Cir. 2015); *see also United States v. Tann*, 577 F.3d 533, 543 (3d Cir. 2009) (merger of multiple 922(g) counts). Alternatively, the court may vacate and dismiss one of the cumulative punishments, leaving the rest intact. *See United States v. Sanders*, 133 F.4th 341, 371, 391 (5th Cir. 2025) (vacating conviction and sentence on 924(j) count after *Lora*), *petition for certiorari filed*, No. 25-6451 (Dec. 22, 2025); *see also United States v. Miller*, 527 F.3d 54, 74 (3d Cir. 2008).

In this case, the government submits that the most appropriate and efficient course is to vacate Bowers's death sentences on Counts 23-33 and remand for dismissal of those counts. That remedy would resolve any double jeopardy issue under *Barrett* and would obviate the need for this Court to resolve Bowers's challenge (Br.61-84) to whether religious obstruction resulting in death qualifies as a crime of violence for Section 924(j) purposes.

### 2.    Resentencing on Counts 1-11 is unwarranted.

Because Bowers received a separate death sentence on each capital count, and because vacating the death sentences on Counts 23-33 cures any double jeopardy violation, resentencing on the remaining counts (Counts 1-11) is not

warranted. *See Tann*, 577 F.3d at 543; *Miller*, 527 F.3d at 74.[11]  Bowers errs in contending otherwise.  Br.141.  He suffered no prejudice given the jury instructions, the overlapping evidence supporting the two sets of offenses, the overwhelming evidence supporting the death sentences, and the weakness of his mitigation case.  *See, e.g.*, *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012); *United States v. Jimenez*, 513 F.3d 62, 83 (3d Cir. 2008).

### a. The district court repeatedly instructed the jury to consider each capital count separately.

During the selection phase, the district court repeatedly instructed the jury to consider each count separately.  For example:

> Each capital count charges a separate crime.  You must consider each count and the evidence related to it separate and apart from every other count.  That is, you must decide separately what the evidence in the case shows about Robert Bowers and the appropriate sentences as to each count.  Your verdict on any count should not control your verdict on any other count.

App.13138-39; *see also* App.13121, 13122-23, 13145.  The court also instructed the jury to weigh aggravating and mitigating factors "separately with respect to each of the capital counts."  App.13160; *see also* App.13165.  The verdict form

---

[11] Again, prosecuting a defendant for the same offense under separate statutes is permissible provided that "conviction and sentence [are] confined to one." *Ball*, 470 U.S. at 860-61.  The district court imposed sentence on the capital counts after the jury returned its sentencing verdict.  App.13502.  The government was entitled to present both sets of charges to the jury during the guilt and penalty phases.

reinforced these instructions, directing the jury to enter its sentence determination "with regard to each of the capital counts." App.13802-03. The district court also gave separate-count instructions during the eligibility phase, App.10759, 10766, and guilt phase, App.8256-57, 8295-96.

The jury is presumed to follow instructions to consider each count separately; such instructions are "persuasive evidence" that the submission of later-vacated counts did not prejudice the defendant on remaining counts. *United States v. Bornman*, 559 F.3d 150, 156 (3d Cir. 2009) (quotation omitted); *accord, e.g.*, *United States v. Walker*, 657 F.3d 160, 171 (3d Cir. 2011). Bowers's prejudice arguments (Br.79-83, 141) contravene this settled law. The instructions here defeat his request for plenary resentencing.[12]

### b. Counts 1-11 were based on the same evidence as Counts 23-33.

The overlapping evidence supporting both sets of counts also weighs against resentencing. This Court applies a "two-step test for prejudicial spillover," considering, first, "whether the jury heard evidence that would have been inadmissible" but for the vacated counts, and second, "whether that

---

[12] Bowers challenges (Br.369-75) the prosecutor's references during selection-phase rebuttal to the total number of aggravating factors across capital counts. In context, the remarks did not invite the jury to ignore the court's instructions to weigh aggravators and mitigators count by count. *See* pp.331-35, *infra*.

evidence...was prejudicial." *Wright*, 665 F.3d at 575 (quotation omitted). Here, the government relied on the same evidence to prove the Section 247 offenses resulting in death as it did the Section 924(j) offenses. That alone defeats a spillover claim, rendering unnecessary the consideration of step two. *See United States v. Murphy*, 323 F.3d 102, 118 (3d Cir. 2003). And the government's penalty-phase evidence—proving nine aggravating factors and rebutting the defense's mitigation case—did not change based on the separate Section 924(j) counts.

### c. Overwhelming evidence justified the death sentences.

The overwhelming evidence supporting the death sentences confirms the absence of prejudice on the remaining capital counts. *Jimenez*, 513 F.3d at 83.

### i. Threshold intent to kill

The government easily proved that Bowers intentionally killed his victims, or otherwise acted with death-eligible intent. 18 U.S.C. 3591(a)(2).

The guilt-phase evidence, which the jury was free to consider during the eligibility phase (App.8487), established that Bowers methodically hunted and killed worshippers inside the synagogue while armed with an AR-15 rifle and three Glock pistols. App.7084-85, 7089-95. He shot and killed four congregants—Jerry Rabinowitz, Irving Younger, Joyce Fienberg, and David Rosenthal—and nearly killed another—Daniel Leger—on the mezzanine level;

shot and killed Cecil Rosenthal on the threshold to Pervin Chapel; shot and killed Sylvan Simon inside the chapel; made his way to the lower level, where he shot and killed Richard Gottfried and Daniel Stein in New Light's kitchen and Melvin Wax in a hallway; and, after shooting at two responding officers, returned to Pervin Chapel, where he shot and killed Bernice Simon and Rose Mallinger, shot Andrea Wedner, and shot Sylvan Simon in the chest post-mortem. *See* pp.14-25, *supra*.

Bowers was lethally efficient: less than 13 minutes elapsed between his posting of a final Gab message before entering the synagogue and his fatal shot into the chest of his eleventh and final murder victim, Bernice Simon. App.6964-66, 8131-34. During his rampage, Bowers tactically reloaded his rifle outside Pervin Chapel, replacing a not-yet empty magazine with a full magazine in preparation for shooting more people. App.6716-17; *see also* App.8121-22 (officers recovered 21 loaded rifle magazines outside Bowers's vehicle).

The manner in which Bowers murdered his victims also evidenced his intent to kill them. Bowers shot six victims in the head, among other places, App.6843, 6852, 6871-72 (Cecil Rosenthal), App.6872-77 (Daniel Stein), App.6885-87 (Irving Younger), App.6937-39 (Rose Mallinger), App.6944-47 (Jerry Rabinowitz), App.6974-82 (David Rosenthal); shot Melvin Wax in the chest at contact range, App.6892-95; shot Joyce Fienberg and Richard Gottfried

50

multiple times, hitting both in the chest and abdomen, App.6919-23, 6927-33; shot Sylvan Simon in the back, chest, and foot (and again in the chest post-mortem), App.6966-74; and shot Bernice Simon in the chest with a bullet that "more or less cut the heart in two," App.6964-66.  The shot to Younger's head tore away portions of his scalp, skull, and brain, and sheared his yarmulke into two pieces.  App.6885-87, 8127-28.  Bullet trajectories showed that Bowers sometimes shot down at victims hiding under pews or behind furniture. App.8038-42, 8057-62, 8065, 6946, 6964-65.

Bowers's own words confirmed his intent to kill.  Three days before the attack, Bowers posted on Gab.com, "oh you poor, poor jews.  GAS & BAKE NOW!"  App.13635.  Eighteen minutes later, he posted a photograph of three handguns and six magazines.  *Ibid.*  His final post on October 27 stated, "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in."  App.13637.  After he was apprehended, Bowers told officers why he had killed congregants, including: "all Jews need to die," "Jews are the children of Satan," and "[t]hese people are committing genocide on my people and I just want to kill Jews."  App.6474, 6540, 6807, 7261, 7265-66, 7532.

Finally, the eligibility-phase testimony of Dr. Richard Rogers, a defense mental-health expert, about Bowers's statements showed Bowers's desire to kill

51

Jewish people and his attack planning. For example, Bowers told Rogers that he had three goals for the attack, one of which was to kill people responsible for white genocide (in his view, Jewish people); began planning the attack in April 2018; considered alternative targets and methods; tested his firearms to minimize the risk they would jam; and researched the schedule for morning services at the Tree of Life Synagogue on October 27, 2018. App.9217, 9220-33, 9242-45. Bowers also told Dr. Rogers that he had programmed his computers to erase his hard drives and deleted certain content from his Gab account. App.9246-47. When driving to the synagogue, Bowers concealed his ammunition—700 rounds by his count—with a blanket. App.9234, 9247-48. Bowers said that he had also planned to attack a nearby Jewish community center, but abandoned that plan on the morning of the attack after discovering a police station between that secondary target and the synagogue. App.9241-43.

Bowers told Dr. Rogers that he intentionally shot at congregants' torsos because he wanted to inflict "messy" kills that would be hard to look at. App.9255; *see also* App.9271 (Bowers "wanted to have the largest amount of goo to cause a horrific reaction"). Bowers found it ironic that he had shot one Jewish victim by an oven. App.9257. Bowers boasted that he had committed the worst shooting attack in antisemitic history. App.9233-34. But he was disappointed over not shooting more Jewish people, and he used an antisemitic trope to

describe his murder tally as a "Yiddish dozen"—one short of twelve.  App.9269-70.

### ii.    Statutory aggravating factors

The government's proof of the four statutory aggravating factors (App.13776-78) was equally powerful.  The evidence discussed above proved several factors.

Bowers's substantial planning and premeditation to cause the death of victims, *see* 18 U.S.C. 3592(c)(9), were evident in: (1) the multiple weapons and quantity of ammunition he brought to the attack[13]; (2) his preparation for the attack as early as April 2018; (3) his consideration of alternative targets and methods of killing; (4) his goals for the attack; (5) his firearm testing beforehand to minimize the risk of jamming; (6) his acts of concealment on the morning of the attack, *i.e.*, programming his computer to erase hard drives and covering his arsenal when driving; (7) his final post on Gab.com announcing that he was "going in" and why; and (8) his post-attack statements to SWAT officers.  *See United States v. Snarr*, 704 F.3d 368, 392-93 (5th Cir. 2013) (applying Section 3592(c)(9)).

---

[13] Bowers also carried a loud noise-making device (called a "Screaming Meanie") that would have given him a tactical advantage had it gone off during the attack.  App.6493, 7207-08.

Likewise, Bowers's preparation for the attack, his calculated and focused movements inside the synagogue, the manner in which he shot and killed congregants, and his statements to police (and to his own mental-health experts) show that he intentionally killed and attempted to kill several people.  18 U.S.C. 3592(c)(16).

The defense did not dispute that, as alleged, eight murder victims were particularly vulnerable due to old age or infirmity.  18 U.S.C. 3592(c)(11); *see* App.8517.   The evidence proved that.   App.8537-39 (Cecil and David Rosenthal; both with developmental disabilities); App.8551-57 (Bernice and Sylvan Simon; ages 84 and 86, respectively); App.8559-62 (Joyce Fienberg; age 75); App.8619-22 (Melvin Wax; age 87); App.8625-27 (Daniel Stein; age 71); App.8642-47 (Rose Mallinger; age 97).

Finally, Bowers created a grave risk of death to one or more persons other than the deceased victims, 18 U.S.C. 3592(c)(5), because he endangered the lives of every congregant in the synagogue and every law-enforcement officer who tried to stop him.  For example, Bowers shot and nearly killed Daniel Leger when he killed Jerry Rabinowitz.  App.5977-95.  Andrea Wedner was lying next to her mother Rose Mallinger when Bowers shot them in the chapel, killing Rose.  App.8170-72, 8177-79.  And Carol Black and Barry Werber were hiding

54

in the lower-level storage room when Bowers shot Melvin Wax at contact range in the doorway.  App.5921-25, 6009-13, 6894.

### iii.   Non-statutory aggravating factors

The selection-phase evidence proving the non-statutory aggravators (App.13783-85) was likewise overwhelming.

First, Bowers caused injury, harm, and loss not only to the murdered victims, but to their families and loved ones.  For example, Richard Gottfried's wife testified that Richard was kind, loving, generous, and smart, and that her "whole world was turned upside down" by his death because Richard "was [her] whole family"; she closed the dental practice they had operated together because "[h]alf of [her] was gone."  App.11021, 11032-33.  Diane Rosenthal testified about how Cecil and David Rosenthal, known as "the boys," were loving and protective sons to her parents and were the "glue" that held the family together; their deaths left a "huge hole" in everyone's hearts.  App.11082-87.  Testimony by other witnesses showed that the deaths of the remaining victims had equally profound effects.  *See* App.11106-24 (Melvin Wax's daughter); App.11181-11204 (Jerry Rabinowitz's brother-in-law); App.11214-51 (the Simons' children); App.11269-11305 (Joyce Fienberg's sons); App.11306-19 (Irving Younger's partner); App.11321-62 (Rose Mallinger's son and granddaughter); App.11385-11415 (Daniel Stein's wife and son).

55

Second, Bowers's hatred of Jewish people fueled his killing spree, as evidenced by his Gab posts, statements to SWAT officers, and statements to Dr. Rogers. Moreover, the government elicited cross-examination testimony from a selection-phase defense expert, Dr. George Corvin, about statements Bowers made to him reflecting Bowers's antisemitism and motive for the attack. App.12930-77; *see* pp.287-88, *infra*.

Third, Bowers selected his target to maximize his intended harm and to instill fear within Jewish communities. A synagogue is a physical house of worship, a sanctuary where Jewish people are expected to wear a yarmulke as a reminder of God's presence everywhere. App.5767, 5771-72. Bowers searched for a site big enough to achieve his goals for the attack, which included killing Jewish people for their alleged involvement in so-called white genocide and dissuading others from committing white genocide. App.9217-18, 9233. The Tree of Life Synagogue met his criteria—Bowers told Dr. Corvin that the synagogue was Jewish people's "Statue of Liberty" and boasted that he had "shit on it." App.12934-36.

Fourth, Bowers expressed zero remorse for his crimes. He hunted down and killed congregant after congregant inside the synagogue. When he could not find more congregants to kill, Bowers did not surrender—he baited law enforcement by leaving an empty magazine near an upstairs classroom, where

he took up a defensive position and fired on officers as they closed in on him. App.12971-72.  Once captured, he told SWAT officers that "all Jews need to die."  App.6474, 7532.  Bowers later told his mental-health experts that his only regret was not having killed *more* Jewish people.  App.9269-71, 12973-75.

Fifth, Bowers caused serious injuries to the victims who survived the shooting.  Bowers shot Officer Matson seven times, including in the head; Matson's wounds were so severe that doctors drilled rods into his bones to hold them in fixed positions.  Matson spent 16 weeks in the hospital; required 25 surgeries (as of trial); experienced memory loss; had to learn to walk again; is in physical pain every day; and became severely depressed.  *See* App.8151-55, 11424-42.  Daniel Leger suffered a gunshot wound to the abdomen that destroyed portions of his bladder and intestines; caused so much internal bleeding that he required massive blood transfusions; and left him in excruciating pain.  He will use a colostomy bag for the rest of his life and now has terrible dreams.  App.11480-11505.  The injuries to other surviving victims were also serious.  *See, e.g.*, App.6289, 6299 (injuries to Officer Mead's wrist and hand required multiple surgeries; Mead can no longer work as a police officer); App.11465-77 (gunshot wounds to Andrea Wedner's arm and hand required multiple surgeries and skin grafts and prevented her from returning to work; the attack left deep psychological scars); App.11090-98, 11105 (gunshot wound to

Officer Burke's hand and wrist required multiple surgeries to replace a dead nerve, inflicted lasting damage, and left Burke depressed).

Given the overwhelming evidence proving all nine aggravating factors, Bowers repeatedly and appropriately concedes that his crimes were "highly aggravated." Br.270; *see* Br.3, 325, 384, 423. Not surprisingly, the jury found all nine aggravators beyond a reasonable doubt. App.13776-78, 13783-85.

### d.    The defense's mitigation case was weak.

In contrast to the extensive aggravating evidence, Bowers's mitigation case was weak. His core selection-phase defenses were that his crimes were the result of his alleged schizophrenia and childhood adversity, which caused his mental health to deteriorate such that he was minimally functioning as an adult. App.13234-43, 13251-60 (closing argument); App.13786-13800 (mitigating factors). The record showed otherwise.

i. Bowers's alleged schizophrenia did not mitigate his crimes. Indeed, the evidence showed that he did not have schizophrenia at all. The disease is largely defined by its symptoms, which include delusions.[14] But Bowers's extreme

---

[14] The criteria for schizophrenia are: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms (*i.e.*, diminished emotional expression or avolition). S-App.195, 200-01 (Defense Exhibit 146 (eligibility phase)). A schizophrenia diagnosis requires, *inter alia*, that at least two symptoms be present for a significant portion of time during a

views about Jewish people and immigrants were not delusional. Dr. Park Dietz, a government expert, researched the views that Bowers expressed about Jewish people and determined that none originated with Bowers—"[t]hey were all ideas that have currency within a subculture that [Bowers] was actively involved with online." App.10176-78; *see also* App.10161-62, 10170-71. The expert testimony explaining references in Bowers's Gab activity, *see* pp.220-27, *infra*, confirmed this point. That Bowers's views were not unique, but rather reflected well-worn, racist beliefs held by a subculture of the population, undermined his assertion that he experienced delusions. App.10183-84.

Nor did Bowers display disordered speech or behavior before, during, or after his crimes. His planning and preparation for the attack, methodical and strategic movements inside the synagogue, and clear articulation of why he killed worshippers showed the exact opposite. Moreover, the video of Bowers's intake processing at the local jail a few days after the shooting showed that he was calm and cooperative, answered questions coherently, followed directions, and otherwise behaved rationally, displaying no psychotic symptoms. App.10260-63. The prison psychiatrist, Dr. Peter Hauber, found that Bowers was not suicidal, delusional, or suffering from hallucinations, and that the beliefs

---

one-month period, with at least one symptom being delusions, hallucinations, or disorganized speech. *Ibid.*

underlying his attack were the product of cultural indoctrination, not mental illness. App.10263-64 (describing Dr. Hauber's report). The defense called Dr. Hauber in surrebuttal to testify about the limited nature of his intake evaluation. App.10617-54. But on cross-examination, Hauber testified that a defendant's behavior close in time to a criminal offense is relevant to his mental state during the offense, and that whether an individual's beliefs are shared by other people is relevant to whether the beliefs are delusional. App.10660, 10668.

At no time between his 2018 crimes and his 2023 trial was Bowers administered medications for schizophrenia, even though the symptoms of schizophrenia become worse without medication. App.9083-85, 10147-48, 10273. Bowers's alleged condition did not worsen. The government experts who evaluated Bowers before trial did not find that he was delusional or displayed disordered thinking. App.9875-78, 10237-38, 10312-15; *see also* App.9329-34 (testimony by corrections officer).

Finally, the defense's own evidence on schizophrenia was contradictory. Dr. Rogers pegged the onset of Bowers's alleged schizophrenia to the 2017-2018 timeframe, App.9169-70, 9225, whereas Dr. Siddhartha Nadkarni dated it back to childhood, App. 8976-78. Rogers testified that Bowers's beliefs that Jewish people were responsible for invaders entering the country and destroying White people were delusional, App.9170-71, 9201, 9287-88, whereas Nadkarni did not

explore Bowers's ideological views and agreed that antisemitic tropes are common, App.9052-53, 9078-79.  Nadkarni placed great weight on Bowers's purported delusion that red dye from his prison uniform had been seeping into his skin, circulating through his body, exiting, and causing his wristband to change color, App.8913-14, 9033-35, 9040, but Rogers did not assign it clinical weight, App.9501, 10067.  *See* App.9337 (testimony that dye from red prison jumpsuits often caused wristbands to turn pink).  Similarly, during the selection phase, defense expert Dr. Corvin cited Bowers's religious views as key evidence of delusions—for example, that Jewish people were an imminent threat to God's kingdom and he was acting on God's command to fight back.  App.12792-93, 12802, 12805, 12823-25, 12896-97, 12906-09.  By contrast, Dr. Rogers did not rely on religious views because they can be value driven and hard to distinguish from strongly held, non-delusional beliefs.  App.9301-03.

That the defense experts did not agree on such key points concerning the onset and nature of Bowers's alleged illness provided additional grounds for rejecting his claim of schizophrenia.  Drs. Rogers and Corvin also damaged their credibility when they admitted that they had not researched key concepts related to Bowers's antisemitic views, such as theories about white genocide and the great replacement—research that would have revealed just how unoriginal and non-delusional his belief system was.  App.9290-91, 12899-12900.  For good

reason, not a single juror found the mitigating factors asserting that Bowers has schizophrenia, was motivated to kill by delusional beliefs about Jewish people, committed his crimes under mental or emotional disturbance, or lacked the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.  App.13795-96 (Nos. 70-74, 76-81).[15]

ii.  The defense's presentation on Bowers's childhood, framed by the testimony of psychologist Dr. Katherine Porterfield, was also unpersuasive.  The government did not contest some of this evidence.  For example, it was not disputed that Bowers had a troubled childhood and neglectful mother, that he was depressed at times, and that his anger led to his hospitalization at age 13.  App.13215-16.  It was also undisputed that Bowers did not suffer any physical or sexual abuse during his childhood.  App.13215.

Dr. Porterfield overstated certain evidence.  She testified that Bowers had several suicidal episodes as a child and one as an adult.  App.11619-21, 11650, 11652-53, 11660-61.  Cross-examination revealed, however, that most of the incidents were not actual threats of, or attempts at, suicide.  App.11781-89; *see*

---

[15] The defense also maintained that Bowers was epileptic and had structural and functional brain impartments.  But the medical testing did not reveal that Bowers ever had a seizure, *see, e.g.*, App.10279 (Dietz testimony), and the defense did not even submit a mitigating factor on epilepsy.  Moreover, no juror found that Bowers's alleged brain impairments mitigated his crimes.  App.13794 (Nos. 61, 65-66).

*also* App.9847 (Bowers told government expert Darby that one purported suicide attempt was an accident and that he faked another suicide attempt when he lost his bakery job, faced eviction, and needed a place to stay).  Dr. Porterfield also testified that Bowers "had a heavy…genetic or heritability risk from so many" of his relatives allegedly having "serious mental illness" or disorders.  App.11671.  But on cross-examination, she declined to provide details on how that genetic loading works because she is not a geneticist, effectively conceding that this opinion was outside her expertise.  App.11734-37.  Dr. Porterfield also conceded on cross-examination that Bowers's mother had raised a question about Bowers's paternity, which undermined his genetic-loading argument.  App.11746-47.

The defense's focus on Bowers's childhood was also unpersuasive because he committed his crimes decades later, when he was 46 years old.  App.6469-70.  The evidence refuted Dr. Porterfield's testimony that Bowers's mental health deteriorated to the point he was minimally functional by October 2018.  App.11676-77.  She agreed that Bowers's relationship with his mother improved after he became an adult.  App.11927-28.  And as an adult, Bowers held jobs carrying significant responsibilities: he worked as a long-haul trucker, part of a heavily-regulated industry that prioritizes safety, App.12263-65, 12271-75, and as an in-home health aide to individuals who suffered traumatic brain injuries,

one of whom was legally blind, App.12278-96. Bowers also provided care to his grandfather and to his cousin who had a disability. App.11793, 12281.

Many of the 115 mitigating factors submitted by the defense were narrowly drawn factual points. App.13786-13800. The verdict form reflects that the jury diligently considered them. *Ibid.* But the jury unanimously declined to find several mitigating factors, App.13786-87, 13792, 13794-96, 13798-800, and the mitigators that some or all jurors found by a preponderance did not come close to outweighing the nine aggravating factors that it unanimously found beyond a reasonable doubt. Whether the jury considered the death penalty on 11 or 22 counts, the aggravators weighed heavily in favor of death sentences. The double jeopardy error was harmless beyond a reasonable doubt as to the remaining capital counts.

## II.    BOWERS'S CONVICTIONS UNDER 18 U.S.C. 247 ARE VALID.

Bowers challenges his convictions under 18 U.S.C. 247 for obstruction of the free exercise of religious beliefs (Counts 1-11, 34-35, 40-51), contending that: (1) Section 247 is facially unconstitutional because it exceeds Congress's Commerce Clause authority; (2) Section 247 is unconstitutional as applied to Bowers's actions because they were not in, and did not affect, interstate commerce; and (3) the district court's commerce instruction was incorrect. Br.105-06. Each of Bowers's arguments fails.

### A.   Background

1. Section 247 prohibits, *inter alia*, intentionally and forcefully obstructing "any person in the enjoyment of that person's free exercise of religious beliefs, or [any] attempts to do so," where "the offense is in or affects interstate or foreign commerce."  18 U.S.C. 247(a)(2), (b).

2. Before trial, Bowers moved to dismiss the Section 247(a)(2) counts, raising, *inter alia*, facial and as-applied constitutional challenges.  DE239:30-62.

The district court rejected each challenge.  App.157-76.  As to his facial challenge, the court found that Bowers failed to show that no set of circumstances existed in which Section 247 would be valid.  App.168-70.  The court noted that every court to consider Section 247's constitutionality has found it to be a valid exercise of Congress's Commerce Clause power.  App.168-69 (listing cases).  It also explained that courts have uniformly rejected Bowers's specific arguments as to the unconstitutionality of Section 247.  App.169.

As to his as-applied challenge, the court found that the indictment sufficiently alleged that Bowers's conduct was "in and affected interstate commerce."   App.171-72 (citation omitted).   The court also cited the government's factual allegations regarding Bowers's use of channels and instrumentalities of interstate commerce.  App.172.

3. At trial, the government presented uncontested evidence that Bowers used weapons and other objects that had traveled in interstate and foreign commerce, that he used the Internet to plan and announce his crime, and that his attack affected each congregation's economic activities.

a. During his attack, Bowers used a semi-automatic rifle manufactured in Connecticut and ammunition manufactured in Missouri and Israel (and sold through a company in Minnesota). App.7085, 7592-93. He carried three handguns—and used at least one—each of which Glock Corporation manufactured in Austria. App.7087-95, 7586-88, 7590, 7666. He carried those handguns in holsters that were manufactured in Austria, Texas, and Florida. App.7182-85, 7272-75, 7560-61, 7567-69.

b. Bowers used the Internet to prepare for and announce his attack on the Tree of Life community. He repeatedly visited HIAS's website in the weeks leading up to October 27, frequently reviewing HIAS's webpages detailing information about their annual National Refugee Shabbat service, which listed Congregation Dor Hadash as a participant. S-App.187-93; App.7876-77. Bowers almost always followed these visits with a post on Gab.com, where he expressed his hatred for Jewish people and his belief that Jewish people were destroying America. *See, e.g.*, S-App.188-90 (October 10 hias.org visit followed by Gab post, "Why hello there HIAS! You like to bring in hostile invaders to

dwell among us?" "We appreciate the list of friends you have provided: hias.org/events/national-refugee-shabbat.").

Most notably, on October 27, moments before Bowers attacked the three congregations worshipping in the Tree of Life Synagogue, Bowers visited hias.org and then posted on Gab.com, "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in." S-App.193.

c. Bowers's attack on the Tree of Life, Dor Hadash, and New Light congregations also affected each congregation's economic activities. Tree of Life leased spaces to the Dor Hadash and New Light congregations, generating approximately $60,000 in rent each year. App.7296, 7301-07. Tree of Life was unable to continue those long-term leases because of Bowers's attack. App.7307. Tree of Life also rented parts of its synagogue as event spaces for weddings, bar and bat mitzvahs, and graduations. App.7301. Bowers's attack cost Tree of Life the rental income derived from these short-term commercial leases as well. App.7307.

Bowers also disrupted Dor Hadash's and New Light's economic activities. Dor Hadash ran a religious studies school, which charged tuition and paid a staff. App.5885-89. New Light paid its rabbi a salary, collected dues from its members (including from those who lived out-of-state), and sold burial lots in

the cemetery it owned (including to people who lived out-of-state). App.7290-99. As a result of Bowers's attack, both congregations had to relocate and engage in new leases to continue their economic activities. App.5890, 7297-98.

4. After the close of evidence, the district court instructed the jury that to prove that Bowers's offenses were "in" interstate commerce the government had to prove beyond a reasonable doubt that Bowers did at least one of the following:

> (1)…used any of the channels or instrumentalities of interstate commerce in the commission of the offense…even if his particular use of the channel or instrumentality of commerce occurred entirely within the Commonwealth of Pennsylvania.

> (2)…used a firearm, ammunition, car, or other items during the offense and that firearm, ammunition, car or other items traveled across state lines at any point in their existence, regardless of whether Mr. Bowers himself carried the firearm, ammunition, car, or other items across the state line or whether he knew that the firearm, ammunition, car, or other items had traveled across state lines.

App.8264-66. The court instructed the jury that it could find that Bowers's offense "affected" interstate commerce if it

> …in any way, interferes with, changes, or alters the movement of transportation or flow of goods, merchandise, money or other property in commerce between or among states. The effect…on interstate commerce does not need to be substantial, nor must the affect [sic] on interstate commerce be certain. It is enough that such an effect was the natural and probable consequence of the offense.

App.8266. The court further instructed that the jury could find a sufficient effect on interstate commerce if Bowers's offense "impacted the synagogue's

commercial activities even if the synagogue's primary purpose is to facilitate worship." *Ibid.*

Bowers objected to these instructions.  DE934-1:15-17; App.8197-8198. The district court overruled his objections.  App.8198.

### B.    Standard of Review

This Court reviews challenges to the constitutionality of a statute *de novo.* *United States v. Weatherly*, 525 F.3d 265, 273 (3d Cir. 2008).  The Court "exercise[s] plenary review to determine whether jury instructions misstated the applicable law."  *United States v. Moreno*, 727 F.3d 255, 261 (3d Cir. 2013) (citation omitted).  If this Court finds any error in the district court's jury instructions, it considers whether that error was harmless.  *Smith v. Horn*, 120 F.3d 400, 416-17 (3d Cir. 1997).

### C.    Section 247(a)(2) is a valid exercise of Congress's Commerce Clause authority.

Section 247(a)(2) provides that whoever "intentionally obstructs, by force or threat of force,…any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so[,] shall be punished as provided in subsection (d)."  18 U.S.C. 247(a)(2).  Subsection (b) requires proof that "the offense is in or affects interstate or foreign commerce."  18 U.S.C. 247(b).  This jurisdictional element requires the government to prove that there is a sufficient

nexus to interstate commerce each time it charges a defendant with violating Section 247.

### 1. Congress used the full scope of its Commerce Clause authority when it enacted Section 247.

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court identified three categories of activity that Congress may regulate under the Commerce Clause. "First, Congress may regulate the use of the channels of interstate commerce," *id.* at 558, meaning "the interstate transportation routes through which persons and goods move," *United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) (citation omitted). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez*, 514 U.S. at 558. These include things such as cars, the Internet, and telephones. *United States v. Ballinger*, 395 F.3d 1218, 1225-26 (11th Cir. 2005). "Finally, Congress' commerce authority includes the power to regulate those activities…that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59. Under this third category, Congress may regulate purely intrastate activity "that is not itself 'commercial'" if it is part of a "class of activity" that has a substantial effect on interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 17-18 (2005).

Section 247's jurisdictional element, which requires that the offense is "in or affects interstate or foreign commerce," 18 U.S.C. 247(b), is "coextensive

with the constitutional power of Congress under the Commerce Clause," *United States v. American Bldg. Maint. Indus.*, 422 U.S. 271, 277 n.6 (1975). The "in…commerce" language "denotes the first two *Lopez* categories—regulation of the channels and of the instrumentalities of commerce." *United States v. Pugh*, 90 F.4th 1318, 1326 (11th Cir.) (quoting *Ballinger*, 395 F.3d at 1231), *cert. denied*, 145 S. Ct. 236 (2024). The "affect[s]…commerce" language "invokes the third *Lopez* category—regulation of intrastate activities that substantially affect commerce." *Ibid.*

Section 247's enactment history confirms that Congress intended the statute's reach to be coextensive with its authority under the Commerce Clause. As originally enacted, Section 247 applied only if, "in committing the offense, the defendant travel[ed] in interstate or foreign commerce, or use[d] a facility or instrumentality of interstate or foreign commerce." Pub. L. No. 100-346, § 1, 102 Stat. 644 (1988). That legislation proved to be "totally ineffective" because of its "highly restrictive and duplicative language." H.R. Rep. No. 621, 104th Cong., 2d Sess. 4, 9-10 (1996) (H.R. Rep. No. 621); *see also Ballinger*, 395 F.3d at 1235, 1239-40 (discussing enactment history).

Consequently, Congress amended Section 247(b) to "broaden[]" the statute's jurisdictional scope to enable prosecutions "if the offense 'is in or affects interstate or foreign commerce.'" H.R. Rep. No. 621, at 7 (citation omitted).

71

By tracking Supreme Court precedent defining Congress's authority under the Commerce Clause, "Congress could not have made clearer its intention to exercise its full commerce power" in amending Section 247. *Ballinger*, 395 F.3d at 1231-35, 1240; *accord United States v. Grassie*, 237 F.3d 1199, 1209 (10th Cir. 2001).

### 2. Section 247's constitutional applications defeat Bowers's facial challenge.

A facial challenge fails unless the challenger establishes "that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). As the district court correctly determined, Section 247 has many constitutional applications (including on the facts of this case) such as "mailing a bomb to a church" or "intentionally driving a car across state lines to transport a bomb." App.169-70 (citation omitted). Thus, as every court to consider this question has concluded, a facial challenge to Section 247 cannot succeed. *See, e.g.*, *United States v. Hari*, 67 F.4th 903, 907-10 (8th Cir. 2023); *United States v. Roof*, 10 F.4th 314, 382-84 (4th Cir. 2021).

Bowers contends that the district court's reliance on hypothetical scenarios is inconsistent with this Court's decision in *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). Br.127-28. But Bowers overlooks that this Court follows—as it must—the Supreme Court's instructions:

> In evaluating a facial challenge we must look beyond the application of an ordinance in the specific case before us. To ultimately succeed on the merits, a plaintiff theoretically has 'to establish that no set of circumstances exists under which [the ordinance] would be valid, or that the [ordinance] lacks any plainly legitimate sweep.'

*Bruni*, 824 F.3d at 362 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

Bowers relies on language from *Bruni* that cautions courts to not "speculate about hypothetical or imaginary cases," but that refers to facial challenges on First Amendment grounds. *See id.* at 362-63 (citation omitted). In the First Amendment context, the Supreme Court has "lowered th[e] very high bar" that generally applies to facial challenges. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But in other, non-First Amendment cases, that "very high bar" still stands, and to succeed on a facial challenge, a challenger must prove that a law can never be applied constitutionally. *Ibid.* Bowers cannot—and does not attempt to—do so.

### 3. Section 247's jurisdictional element defeats Bowers's facial challenge.

a. Bowers's facial challenge also fails because Section 247 contains a jurisdictional element that ensures that, on a case-by-case basis, a jury can convict only if it finds, beyond a reasonable doubt, that the defendant's actions sufficiently involved interstate commerce. *See* 18 U.S.C. 247(b); *Lopez*, 514 U.S. at 561.

73

As the Sixth Circuit has recognized, "the presence of the jurisdictional element defeats [the defendant's] facial challenge." *United States v. Chesney*, 86 F.3d 564, 568 (6th Cir. 1996) (addressing a facial challenge to 18 U.S.C. 922(g)); *United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001) (same; concluding that Section 922(g)(1)'s "jurisdictional element" "distinguishes it from the statutes considered in *Lopez* and *Morrison*"); *see also United States v. Hill*, 927 F.3d 188, 204 (4th Cir. 2019) (finding no case "in which a federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause").

This conclusion is consistent with the Supreme Court's decisions in *Lopez* and *Morrison*. In holding that the Gun-Free School Zones Act exceeded Congress's Commerce Clause power, *Lopez* emphasized that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561. Congress later amended the statute to add a jurisdictional element requiring that the firearm "has moved in or…otherwise affects interstate or foreign commerce," 18 U.S.C. 922(q)(2)(A), and every court to consider the amended statute's constitutionality has upheld it as a valid exercise of Congress's commerce power. *See, e.g., United States v. Dorsey*, 418 F.3d 1038,

74

1045-46 (9th Cir. 2005), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *United States v. Danks*, 221 F.3d 1037, 1038-39 (8th Cir. 1999).

Similarly, in striking down the civil remedy provision in the Violence Against Women Act (VAWA), the Supreme Court emphasized in *Morrison* that the statute contained no interstate commerce jurisdictional element. *Morrison*, 529 U.S. at 613. But VAWA's criminal provision—which "provides an explicit jurisdictional element requiring interstate travel"—has been upheld as valid Commerce Clause legislation. *United States v. Al-Zubaidy*, 283 F.3d 804, 812 (6th Cir. 2002).

b. Bowers argues that *United States v. Rodia*, 194 F.3d 465 (3d Cir. 1999), compels this Court to hold that Section 247's jurisdictional element is insufficient. Br.121-23. That argument lacks merit.

In *Rodia*, this Court considered whether 18 U.S.C. 2252 was valid Commerce Clause legislation. *See* 194 F.3d at 468-69. That statute criminalizes intrastate possession of child pornography that "was produced using materials which have been" transported in interstate commerce. *Id.* at 469-70 (emphasis omitted). This Court acknowledged that "[t]he mere presence of a jurisdictional element…does not in and of itself insulate a statute from judicial scrutiny"; accordingly, the Court considered the text of the element to determine whether it in fact limited the statute to the bounds of the Commerce Clause's reach. *Id.*

75

at 472 (ellipsis in original; citation omitted).  The Court expressed concern that the element was too tenuously related to the statute's regulated activity, but ultimately held that the statute was valid Commerce Clause legislation because it regulated intrastate activity that substantially affected interstate commerce.  *Id.* at 473-81.

*Rodia* does not save Bowers.  Unlike *Rodia*, Section 247's jurisdictional element ("in or affects interstate…commerce") uses the same language that the Supreme Court has acknowledged serves to sufficiently "limit [a statute's reach] to a discrete set of [offenses] that…have an explicit connection with or effect on interstate commerce."  *Lopez*, 514 U.S. at 561-62 (discussing the former 18 U.S.C. 1202(a)'s limit to the receipt, possession, or transportation of firearms "in commerce or affecting commerce" (citation omitted)).  Accordingly, Section 247 withstands Bowers's facial challenge, not "mere[ly]" because it includes a jurisdictional element (Br.121), but because it includes a jurisdictional element that does exactly what this Court and the Supreme Court have demanded: it ties the regulated activity to the limits of Congress's Commerce Clause authority.

Moreover, unlike in *Rodia*, the jurisdictional element here imposes a real limit that restricts Section 247's reach to only those obstructions that in fact involve or affect commerce.  Bowers's obstruction demonstrates this.  His various connections to interstate commerce were critical to his offense: the

76

firearms and ammunition he used to kill and injure his victims; the economic activity he disrupted by attacking a community that engaged in commerce; and the use of the Internet to select his victims, announce his crimes, and amplify his message were all integral to his attack on the Tree of Life Synagogue community. Bowers's crime and the relevant jurisdictional element is thus unlike that in *Rodia*, and Bowers's arguments to the contrary should be rejected.

c. Bowers's remaining arguments regarding Section 247's facial invalidity fare no better. He contends that Section 247 cannot be sustained as legislation regulating conduct "in" commerce because it is a criminal statute like the one the *Lopez* Court struck down. Br.117-18. He ignores, however, that, unlike the original Gun-Free School Zones Act, Section 247 has a "jurisdictional element which would ensure, through case-by-case inquiry, that the [offense] in question affects [or is in] interstate commerce." *Lopez*, 514 U.S. at 561; *see also Dorsey*, 418 F.3d at 1045-46 (holding that the amended Act is constitutional because it contains a jurisdictional element like that in Section 247).

Bowers next argues that Section 247 cannot be sustained as legislation regulating conduct "affect[ing]" commerce because that requirement applies only to "commercial or economic activity" and "obstructing religious exercise by force" has "no effect on commerce." Br.120-21. But the Supreme Court stated otherwise: a statute can either "regulate[] a commercial activity []or

77

contain[] a requirement that the [offense] be connected in any way to interstate commerce." *Lopez*, 514 U.S. at 551; *cf. Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 584 (1997) ("We see no reason why the nonprofit character of an enterprise should exclude it from the coverage of…the Commerce Clause.").

Bowers also points to the absence of express Congressional findings as to the link between religious obstruction and commerce. Br.123-25. Yet the legislative history discusses why Congress drafted Section 247's precise jurisdictional element in light of the *Lopez* decision. *See* H.R. Rep. No. 621, 7-8. In any event, Congress "is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce"—particularly where, as here, the statute makes the connection to commerce "visible to the naked eye." *Lopez*, 514 U.S. at 562-63.

Finally, Bowers argues that the link between forcible religious obstruction and commerce is "too distant to authorize Congressional action." Br.125. Bowers relies principally (Br.126) on this Court's opinion in *United States v. McGuire*, where it commented that "in view of our complex society, there is virtually nothing that does not *affect* interstate commerce in some manner." 178 F.3d 203, 209 (3d Cir. 1999) (citation omitted). But nothing in *McGuire*—which considered whether a car was "used in" an activity affecting interstate

78

commerce, 18 U.S.C. 441(i), based on the presence of a carton of Florida orange juice in the trunk—has any bearing on whether Section 247's jurisdictional hook cabins the statute within Congress's Commerce Clause authority. *See McGuire*, 178 F.3d at 205. Even if the link between *some* forcible religious obstruction and commerce is "too distant to authorize Congressional action" (Br.125), that is not the religious obstruction prohibited by Section 247.

**D.    Section 247(a)(2) is constitutional as applied to Bowers.**

The government proved with uncontested evidence that Bowers's offense occurred in and affected interstate commerce. Bowers injured and killed congregants and law enforcement officers with weapons and ammunition that traveled in interstate and foreign commerce; he used the Internet to select his targets and to call others to action; and he cost the congregations tens of thousands of dollars in commercial rental fees, in addition to disrupting their other economic ventures. Each of these categories of conduct is validly encompassed within Section 247's interstate commerce element.

**1.    Bowers used weapons, ammunition, and holsters that had traveled in interstate and foreign commerce.**

a. The Supreme Court's decision in *Scarborough v. United States*, 431 U.S. 563 (1977), confirms that Bowers's use of firearms, ammunition, and holsters that traveled in interstate and foreign commerce to kill parishioners made his

79

offense one that was "in or affect[ed] interstate or foreign commerce." 18 U.S.C. 247(b). These items were essential to Bowers's Section 247 offenses.

In *Scarborough*, the Court upheld a defendant's conviction for violating a predecessor to 18 U.S.C. 922(g)(1) that prohibited felons from possessing a firearm "in commerce or affecting commerce," 431 U.S. at 564 (citation omitted)—functionally the same jurisdictional requirement Congress included in Section 247(b). The Court found it "apparent" that by prohibiting possessions both "in" and "affecting" commerce, "Congress must have meant more than to outlaw simply those possessions that occur in commerce or in interstate facilities." *Id.* at 572. The Court concluded that by including the "in or affecting" language, Congress had intended to require only the "minimal nexus that the firearm have been, *at some time*, in interstate commerce." *Id.* at 575 (emphasis added); *see also Ballinger*, 395 F.3d at 1241 (relying on *Scarborough* to reject constitutional challenges to Section 247); *United States v. Howald*, 104 F.4th 732, 737-39 (9th Cir.) (same, as to 18 U.S.C. 249(a)(2)), *cert. denied*, 145 S. Ct. 781 (2024).

*Scarborough* remains good law after *Lopez*. In deciding cases involving the current felon-in-possession statute, this Court has recognized *Scarborough*'s "continued vitality" and has therefore held that Section 922(g)(1) is valid Commerce Clause legislation because it requires proof "that the possessed

firearm previously traveled in interstate commerce." *Singletary*, 268 F.3d at 203-04 (3d Cir. 2001); *accord United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996); *Howald*, 104 F.4th at 737-39.

Applying *Scarborough*, courts—including this one—likewise have upheld convictions where the defendant used body armor or explosives that had traveled in interstate commerce. *See, e.g.*, *United States v. Cook*, 488 F. App'x 643, 645-46 (3d Cir. 2012) (affirming conviction for possession of body armor, in violation of 18 U.S.C. 931(a)); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011) (affirming convictions for possession of firearms and ammunition, in violation of 18 U.S.C. 922(g)(1), and possession of an explosive in violation of 18 U.S.C. 842(i)(1)). The logic of these cases applies equally to violations of Section 247, where Congress made clear its intention to exercise "its full commerce power." *Ballinger*, 395 F.3d at 1240. Accordingly, Bowers's undisputed use of firearms, ammunition, and holsters that traveled in interstate and foreign commerce has the required nexus to commerce.

b. Bowers relies upon (Br.129-32) inapt cases. He quotes (Br.130-31) various dissenting opinions, while ignoring the courts' holdings in those cases. *See, e.g.*, *United States v. Wall*, 92 F.3d 1444, 1452 (6th Cir. 1996) ("*Lopez*, however, does not mandate that § 1955 be invalidated."). For example, based upon the dissent in *Bishop*, 66 F.3d 569, he suggests that holding that Section

247 constitutionally applies to his conduct would lead to bizarre results such as the federal criminalization of petty teen thefts. Br.130 (quoting *Bishop*, 66 F.3d at 596 (Becker, J., concurring in part and dissenting from the Court's determination that the federal carjacking statute is valid Commerce Clause legislation)). But this Court rejected that concern in *Bishop*, carefully applied *Lopez*, and determined that the relevant criminal acts were within Congress's reach. *See Bishop*, 66 F.3d at 575-90.

Bowers further argues that *Jones v. United States*, 529 U.S. 848, 857 (2000), supports his position that "an item's prior interstate passage cannot achieve the limiting function" envisioned by *Lopez*. Br.130. But that is not what *Jones* held. *Jones* examined the federal arson statute, which prohibits, *inter alia*, burning "real or personal property *used* in interstate or foreign commerce." 529 U.S. at 853 (quoting 18 U.S.C. 844(i)). By using "the qualifying words 'used in' a commerce-affect[ed] activity," as opposed to the "unqualified" "statutory term 'affecting…commerce,'" Congress chose a narrower jurisdictional element for federal arson than it chose for Section 247. *Id.* at 854 (explaining that in enacting Section 844(i), Congress "did not" seek to protect all property "whose damage or destruction might affect interstate commerce") (alteration in original; citations omitted). Whereas a defendant can violate Section 247 if the "offense is in or affects" interstate commerce, reaching the full breadth of Congress's

Commerce Clause power, a defendant only violates Section 844(i) by burning properties that are themselves "used in" interstate commerce. *Compare* 18 U.S.C. 247(b), *with* 18 U.S.C. 844(i); *see also United States v. Doggart*, 947 F.3d 879, 887 (6th Cir. 2020) (noting the distinction between Section 844(i)'s and Section 247's jurisdictional elements).[16]

Finally, Bowers's attempts (Br.131-32) to distinguish this Court's opinions in *Bishop* and *Singletary* are not persuasive. In *Bishop*, this Court found that a car's prior travel in interstate commerce was enough to render the federal carjacking statute constitutional. 66 F.3d at 575-90. In *Singletary*, this Court found the same as to firearms and the federal felon-in-possession statute, specifically concluding that the "continued vitality of *Scarborough*" means that "the Government need only prove that the possessed firearm previously traveled in interstate commerce." 286 F.3d at 198-205.

Bowers argues that these cases stand for the rule that evidence that an item previously traveled in interstate commerce is sufficient only when the statute "focus[es] on the possession of [the] item" rather than a violent use of that item. Br.131-32. The Supreme Court's holding in *Jones* defeats this argument. There,

---

[16] Bowers also cites (Br.129-30) *Rodia*, but, as discussed *supra*, *Rodia* considered a different jurisdictional element than Section 247's, and it is inapplicable to Bowers's case.

the Court determined that 18 U.S.C. 844(i)'s criminalization of violent behavior—arson—was constitutional when the defendant's target was used in commerce or in an activity affecting commerce. *Jones*, 529 U.S. at 859. Thus, the Court acknowledged that Congress may criminalize violent conduct, and prosecutors may constitutionally apply such statutes to defendants' conduct, as long as there is a sufficient link to interstate commerce. *See, e.g.*, *id.* at 859.[17] The use of a firearm that has traveled in interstate commerce is such a sufficient link. *Scarborough*, 431 U.S. at 575.

### 2. Bowers used a channel and instrumentality of interstate commerce.

Bowers also used a channel and instrumentality of interstate commerce to select his victims and announce his crime. He repeatedly used the Internet to visit HIAS's website, the sole national Jewish refugee resettlement organization in the country, focusing on HIAS's postings about its annual National Refugee Shabbat and the sponsors for that event, including Congregation Dor Hadash. S-App.187-93; App.7691, 7934-39. He then shared his findings online amongst his many antisemitic posts on Gab.com, stating that he appreciated HIAS identifying Dor Hadash as a participant in the event. App.13627-28. Finally,

---

[17] The distinction between Section 247's and Section 844(i)'s jurisdictional elements is irrelevant to this point.

minutes before entering the Tree of Life Synagogue, Bowers used his phone and the Internet to announce his intent to "screw [the] optics" that prevent some other white supremacists from engaging in violence, and that instead, he was "going in" to hunt those worshipping inside. App.13637; App.7985-86, 8131. Exhorting his like-minded followers on Gab.com to "screw [the] optics" and engage in violence against Jewish people was his last message to the world and a core purpose of this mass shooting. App.6540, 7266 (Bowers stating that "all Jews had to die" and he "just want[ed] to kill Jews"); *see also Roof*, 10 F.4th at 385-87.

Despite Bowers's contention otherwise, there is no such thing as "intrastate use of the Internet." Br.132. As this Court has found, the Internet is "a system that is inexorably intertwined with interstate commerce," comprised of "an interconnected network of computers, data lines, routers, servers, and electronic signals" that renders it both a channel *and* an instrumentality of commerce. *United States v. MacEwan*, 445 F.3d 237, 245 n.8 (3d Cir. 2006). It is thus "difficult to find an act more intertwined with the use of the channels and instrumentalities of interstate commerce than that of [using]…the Internet." *Id.* at 245; *see also, e.g.*, *United States v. Morgan*, 748 F.3d 1024, 1033-34 & nn.11-12 (10th Cir. 2014).

Bowers concedes that "the Internet is both a channel and an instrumentality of commerce," but seeks to impose novel rules limiting the circumstances in which use of the Internet satisfies interstate commerce requirements. Br.133. Neither this Court nor the Supreme Court—nor any of the courts that have found Section 247 constitutional both facially and as applied—requires a defendant's use of the Internet to itself be illegal, or requires the relevant statute to primarily target the Internet or Internet usage. This makes sense, especially where the relevant statute validly exercises the full breadth of Commerce Clause power, as Section 247 does.

Further, Bowers's use of the Internet was in fact like that in "*MacEwan*, where the defendant's use of the Internet to download child pornography was how he accomplished the offense of receipt." Br.133. Bowers used the Internet to select his victims and, minutes before entering the synagogue and shooting at everyone he saw, he posted his intent to do so on the Internet. S-App.187-93; App.7985-86, 8131, 13637. That is sufficient to establish that his crime involved the channels and instrumentalities of commerce.

### 3. Bowers's attack affected the three congregations' commercial activities.

a. Finally, Bowers's attack affected interstate commerce by targeting a house of worship that engaged in numerous economic activities. Each of the three congregations participated in the commercial real estate market and was

86

doing so at the time of Bowers's attack. App.7296, 7301-07, 13856-6-39. The Tree of Life congregation leased its building space to both the Dor Hadash and New Light congregations, exchanging tens of thousands of dollars a year. App.13856-6-39. These leases had three-year terms, with the possibility of extensions. App.7295-96, 7304-05. The Tree of Life congregation also had numerous short-term rentals for weddings, bar and bat mitzvahs, and graduations. App.7301. Bowers's crimes prevented the congregations from continuing these economic ventures. App.7306.

As the Supreme Court has said, "[t]he rental of real estate is unquestionably" "an 'activity' that affects commerce." *Russell v. United States*, 471 U.S. 858, 862 (1985); *see also United States v. Forsythe*, 711 F. App'x 674, 679 (3d Cir. 2017) ("[T]here cannot be any doubt that renting property is economic activity."). This is true even where the rentals occur purely intrastate, or the effect of a defendant's actions in a given case is "minimal." *Roof*, 10 F.4th at 389 (quoting *Hill*, 927 F.3d at 202). As the Supreme Court ruled in *Taylor v. United States*, Congress "may regulate…intrastate activities based on their aggregate effect on interstate commerce." 579 U.S. 301, 303 (2016).

b. Further, New Light and Dor Hadash engaged in other economic activities. New Light employed and paid their rabbi, collected dues from in-state and out-of-state congregants, and sold cemetery plots to in-state and out-

of-state congregants.  App.7290-99.  Dor Hadash employed a principal and teachers and charged tuition for its religious studies school, teaching about twenty-five students and earning nearly $20,000 in fees.  App.5885-89, 13856-40.  Bowers's attack interrupted these endeavors as well.  App.5890, 7297-98.

Courts have repeatedly found that these types of commercial activities sufficiently affect interstate commerce.  Houses of worship that include child daycare or schooling, charge for those services, and pay their staff are "actively engaged in commercial activity by participating in the market for childcare services."  *United States v. Terry*, 257 F.3d 366, 369-70 (4th Cir. 2001) (discussing commerce nexus required by 18 U.S.C. 844(i)); *see also Doggart*, 947 F.3d at 885 (stating that commercial activities such as running a daycare or renting out spaces can render a house of worship a "building used in interstate commerce" as required by 18 U.S.C. 844(i)).

c. Bowers argues that only those "statute[s] [that] regulate[] economic or commercial activity" can fall within *Lopez*'s "affects interstate commerce" category.  Br.134-35.  But, by its terms, Section 247 is such a statute.  Section 247(a)(2) criminalizes forcible obstructions of religious freedom that are *in or affect interstate commerce*.  18 U.S.C. 247(b).  That is enough to bring it within *Lopez*'s third (and first, and second) category.

Bowers seems to mean that a statute must regulate activity that is inherently economic, rather than a subset of violence that affects commerce as Section 247 does. *See* Br.135 (citing cases discussing the regulation of, *inter alia*, loansharking and growing wheat). But the law does not require this. *Lopez* itself listed whether the regulated activity was "economic" as only one of the four factors it considered to determine if the statute regulated an activity that substantially affected interstate commerce. 514 U.S. at 559-64. And the cases uniformly upholding the amended Gun-Free School Zones Act after *Lopez*, and the criminal provision of VAWA after *Morrison*, clearly establish that Congress may prohibit crimes that affect commerce even if the regulated activity is not inherently economic. *See, e.g.*, *Dorsey*, 418 F.3d at 1045-46 (upholding Gun-Free School Zones Act, as amended, because "it require[d]…[the defendant's] possession of the firearm [to] have a[] concrete tie to interstate commerce" (second and fourth alterations in original; citation omitted)); *Danks*, 221 F.3d at 1038-39 (same); *Al-Zubaidy*, 283 F.3d at 812 (same as to VAWA's criminal provisions).

### E. The district court properly instructed the jury on the types of evidence that satisfy Section 247's interstate commerce element.

Bowers argues that the rule of lenity and other canons of construction required the district court to narrow Section 247's scope in its jury instructions. Br.135-37. Bowers's reliance on these canons is misplaced.

89

Firstly, canons of construction are used to discern the meaning of *ambiguous* statutes.  "If the legislature's intent is made plain, it is unnecessary for us to refer to other canons of statutory construction, and indeed [courts] should not do so."  *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 205 (3d Cir. 2016) (quotation and citation omitted); *see also ibid.* ("party opponents[']…proffer [of] different interpretations of the statutory language does not make the language ambiguous." (quotation omitted)).  The Supreme Court has imposed an even higher standard for the rule of lenity, instructing that to "invoke the rule, we must conclude that there is a grievous ambiguity or uncertainty in the statute."  *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (quotation and citation omitted).

Section 247(b) is not ambiguous, let alone grievously so.  Unlike the statutes involved in the cases Bowers cites, Section 247(b) clearly states that the statute only covers those "offense[s] in or affect[ing] interstate or foreign commerce."  18 U.S.C. 247(b).  "Congress could not have made clearer its intention to exercise its full commerce power" in amending Section 247.  *Ballinger*, 395 F.3d at 1240.  This Court need not—and indeed "should not"— inquire any further.  *MRL Dev. I, LLC*, 823 F.3d at 205 (citation omitted); *see also Doggart*, 947 F.3d at 888 (declining to apply rule of lenity to Section 247 because the statute is not ambiguous).

90

Secondly, Bowers's requested instruction (Br.136) is an incorrect statement of the law. *Scarborough* and its progeny hold that "[the] use of items that had once traveled [in] interstate [commerce]" (Br.136) *does* render his offense "in or affecting commerce." *See, e.g.*, *Scarborough*, 431 U.S. at 568-75. So, too, does his use of the Internet. *See, e.g.*, *MacEwan*, 445 F.3d at 244-46. And courts have consistently held that although Commerce Clause legislation must regulate activities that have a substantial effect on interstate commerce (if the activities are not "in" commerce), the effect of each individual defendant's conduct on commerce may itself be "minimal." *Roof*, 10 F.4th at 389 (citation omitted); *see also Grassie*, 237 F.3d at 1208-09.

Regardless, the evidence presented here comports even with Bowers's preferred narrowing of Section 247(b). *See generally Horn*, 120 F.3d at 416-17 (concluding that "error in the instruction that defined the crime" is a "trial error" subject to harmless review). An earlier version of Section 247 imposed a $10,000 minimum damage requirement before Congress "eliminate[d]" that requirement and exercised its Commerce Clause authority to an even greater extent by requiring "that the offense is in or affects interstate" commerce. H.R. Rep. No. 621, at 2. Bowers cost the Tree of Life congregation at least $134,000 in lost commercial revenue, far more than even the former $10,000 requirement that Congress previously imposed. *See* App.13856-6-39.

### III.    Bowers's Convictions Under 18 U.S.C. 249 Are Valid.

Bowers next challenges his convictions under 18 U.S.C. 249(a)(1) (Counts 12-22, 36-37).  Bowers argues that Section 249(a)(1) exceeds Congress's power under the Thirteenth Amendment and that the statute is also unconstitutional as applied to his attack on Jewish worshippers.  Br.84-104.  Because the Thirteenth Amendment empowers Congress to protect groups that were historically considered to be "races" from the badges and incidents of slavery, Section 249(a)(1) lawfully prohibits racial violence against Jewish people.

#### A.    Background

1. Section 249 prohibits willfully causing bodily injury to a person when the assault is motivated by a specific, statutorily defined bias.  18 U.S.C. 249(a)(1)-(3).  Section 249(a)(1) applies to racial hate crimes, violent acts undertaken "because of the actual or perceived race, color, religion, or national origin of any person."  18 U.S.C. 249(a)(1).  Congress enacted this subsection through its Thirteenth Amendment enforcement authority.  34 U.S.C. 30501(7)-(8); H.R. Rep. No. 86, 111th Cong., 1st Sess. 15 (2009).

2. The grand jury charged Bowers with 13 violations of Section 249(a)(1).  App.13699, 13702.  He moved to dismiss those counts, raising facial and as-applied constitutional challenges.  DE239:5-40.

92

The district court denied his motion. App.157. As relevant here, the court rejected Bowers's facial challenge, finding that Congress rationally determined that race-motivated violence is a badge or incident of slavery and thus can be prohibited through Congress's Thirteenth Amendment enforcement power. App.159-63.

In addressing Bowers's as-applied challenge, the district court concluded that, contrary to Bowers's assertions, the Thirteenth Amendment protects more than the descendants of enslaved Africans. App.163 (citing *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911)). Relying on Supreme Court precedent interpreting other Thirteenth Amendment legislation, the district court explained that the Amendment protects "all persons." *Ibid.* (citation omitted). The court went on to explain that this precedent supported the conclusion that Section 249(a)(1) reflected the nineteenth century understanding of "race," encompassing not just groups who this nation previously enslaved, but also groups that were previously considered distinct "races"—like Jewish people—even where modern society no longer sees them as such. App.164-67 (citation omitted). Accordingly, the district court found that the government properly charged Bowers under Section 249(a)(1) for his attack on the Jewish congregants worshipping in the Tree of Life Synagogue. App.167.

3. Based on evidence of Bowers's clear animus toward Jewish people, including his Gab statements (App.13610-38) and his post-shooting statements to officers (App.6540, 7266), the jury found Bowers guilty of each Section 249(a)(1) charge.  App.13744-46, 13750.

4. In his post-trial motion for a new trial or acquittal, Bowers again challenged Section 249(a)(1)'s validity as Thirteenth Amendment legislation.  *See* S-App.260-78.  He also argued that the court should vacate his Section 247 and Section 924 death sentences and grant him a new trial, because the Section 249(a)(1) evidence and argument improperly contributed to those sentences.  S-App.275-78.

The district court rejected each of Bowers's arguments.  App.387-412.  As relevant here, it noted that every court given the opportunity has found that Section 249(a)(1) is facially constitutional.  App.393-94.  As to the effect on his death sentences, the court noted that Bowers failed to object to the instruction that allowed the jury to consider the guilt-phase evidence during the eligibility and sentence-selection phases.  App.397.  More importantly, the district court concluded that the evidence admitted to prove the Section 249(a)(1) charges "was also admissible and highly probative for [the Section 247 and Section 924 charges]," as well as to prove various statutory and non-statutory aggravating factors relevant to the penalty phase.  *Ibid.* (citation omitted).  Accordingly, even

94

without the Section 249(a)(1) charges, "the trial would have proceeded with the same exact evidence," so a new trial was not warranted.  *Ibid.* (citation omitted).

## B.    Standard of Review

This Court reviews a defendant's challenge to a statute's constitutionality *de novo*.  *United States v. Gordon*, 290 F.3d 539, 546 (3d Cir. 2002).

## C.    Section 249(a)(1) is a valid exercise of Congress's Thirteenth Amendment enforcement authority.

Congress has the authority to pass legislation that enforces the Thirteenth Amendment.  Section 1 of the Thirteenth Amendment states, "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1.  Section 2 grants Congress the "power to enforce" this ban on slavery "by appropriate legislation."  U.S. Const. amend. XIII, § 2.

The Supreme Court has held that Section 2 empowers Congress "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States."  *The Civil Rights Cases*, 109 U.S. 3, 20 (1883).  Said badges and incidents "extend far beyond" the "actual imposition of slavery or involuntary servitude."  *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971).  This is so because the Thirteenth Amendment "establish[es] and decree[s] universal civil and political freedom throughout the United States."  *The Civil Rights Cases*,

95

109 U.S. at 20. Thus, the Court has repeatedly held that Congress may use its Thirteenth Amendment enforcement power to prohibit discriminatory conduct beyond enslavement. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 438-44 (1968) (concluding that racial discrimination in property sales was a badge or incident of slavery); *Runyon v. McCrary*, 427 U.S. 160, 169-75 (1976) (same as to racial discrimination in contracting for educational services); *Griffin*, 403 U.S. at 105-06 (same as to racial violence committed because victims were enjoying equal rights and privileges).

The Court has also made clear that the term "slavery" (and badges and incidents thereof) in the Thirteenth Amendment is "not limited" to the type of slavery that existed in America before the Civil War. *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911). Rather, the Amendment is "a charter of universal civil freedom for all persons, of whatever race, color, or estate," meant "to abolish slavery of whatever name and form." *Id.* at 241; *see also United States v. Kozminski*, 487 U.S. 931, 942 (1988) (stating that the Thirteenth Amendment is not limited to its "primary purpose" of abolishing "the institution of African slavery as it had existed in the United States at the time of the Civil War").

### 1. Congress acted rationally when it prohibited racial violence in Section 249(a)(1).

The Thirteenth Amendment empowers Congress "rationally to determine what are the badges and incidents of slavery" and to "translate that

determination into effective legislation." *Jones*, 392 U.S. at 440. Accordingly, for Bowers to succeed in his constitutional challenge to Section 249(a)(1), he must show that Congress acted irrationally in deeming racially motivated violence a badge and incident of slavery. He does not attempt to do so. In fact, Bowers implicitly concedes that binding precedent holds that Congress is authorized to proscribe racial violence as a badge and incident of slavery, but seeks to "preserve" his challenge "for future review." Br.91.

As every court to consider the question has found, Congress acted rationally when it prohibited racial violence in Section 249(a)(1). *See, e.g.*, *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) (Section 249(a)(1) is constitutional, as "Congress rationally determined that racially motivated violence constitutes a badge and incident of slavery"); *Roof*, 10 F.4th 314 (4th Cir.) (same); *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) (same); *United States v. Hatch*, 722 F.3d 1193 (10th Cir. 2013) (same); *United States v. Maybee*, 687 F.3d 1026 (8th Cir. 2012) (same).

In enacting Section 249(a)(1), Congress expressly found that "[s]lavery and involuntary servitude were enforced…through widespread public and private violence directed at persons because of their race, color, or ancestry." 34 U.S.C. 30501(7). Congress also noted that "certain religious and national origin groups were and are perceived to be distinct 'races.'" 34 U.S.C. 30501(8).

97

Congress thus determined that relevant legislation must include protections for "such religions or national origins [that] were regarded as races at the time of the adoption of the [Thirteenth]…[A]mendment." *Ibid.* In all, Congress concluded that eliminating such "racially motivated violence is an important means of eliminating…the badges, incidents, and relics of slavery and involuntary servitude." 34 U.S.C. 30501(7).

Given the longstanding links between slavery and racial violence, courts have had "no trouble" unanimously concluding that Section 249(a)(1) is a valid exercise of congressional authority under the Thirteenth Amendment. *Hatch*, 722 F.3d at 1206. As the Tenth Circuit has explained, "unrestrained master-on-slave violence [w]as one of slavery's most necessary features"; such violence operated to "enforce the social and racial superiority of the attacker and the relative powerlessness of the victim." *Ibid.* "Congress could [therefore] conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded to other races." *Ibid.* It is thus "abundantly clear that [Section 249] is appropriate legislation." *Roof*, 10 F.4th at 392.[18]

---

[18] Courts have also unanimously held that a similar law that criminalizes race-based violence—18 U.S.C. 245(b)(2)(B)—is a valid exercise of Congress's Thirteenth Amendment authority. *See, e.g.*, *United States v. Leahy*, 152 F.4th 1356, 1365-72 (11th Cir. 2025).

**2.    Section 249(a)(1) constitutionally protects those, including Jewish people, who were considered distinct "races" at the time of the Thirteenth Amendment's passing.**

**a.    Section 249(a)(1) validly prohibits racial violence committed because of a person's race or religion.**

Congress has explained that when the Thirteenth Amendment was adopted, "members of certain religious and national origin groups were…perceived to be distinct 'races.'"    34 U.S.C. 30501(8).    Congress determined that "to eliminate…the badges, incidents, and relics of slavery, it [was] necessary to prohibit assaults on the basis of [certain] religions…[that] were [then] regarded as races." *Ibid.*

The Supreme Court's Thirteenth Amendment jurisprudence makes clear that Section 249's inclusion of certain religions does not make it unconstitutional.  In *Shaare Tefila Congregation v. Cobb*, the Court concluded that Section 1982—another Thirteenth Amendment statute—prohibited "racial" discrimination and "intended to protect…identifiable classes of persons," even if those classes are not universally "considered to be a separate race by today's standards."  481 U.S. 615, 617 (1987) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987)).  "Jews…were among the peoples then considered to be distinct races and hence[,]" the Court held, they can validly make out a claim of "racial" discrimination.  *Id.* at 617-18.

Accordingly, Section 249(a)(1) is constitutional both facially and as applied to Bowers's attack on three Jewish congregations because they, like groups currently classified as a "race," can be victims of "racial discrimination." *See Shaare Tefila*, 481 U.S. at 617. Because courts cannot rule that a statute is facially unconstitutional when valid applications exist, *see Mazo v. New Jersey*, 54 F.4th 124, 134 (3d Cir. 2022), and because the government's use of Section 249(a)(1) to prosecute Bowers for his attack on Jewish people is such a valid application, *see Shaare Tefila*, 481 U.S. at 617, Section 249(a)(1) is valid Thirteenth Amendment legislation and was appropriately applied to Bowers.

> **b.    Bowers erroneously argues that Section 249(a)(1)'s inclusion of religion in its prohibition against racial discrimination is unconstitutional.**

i. Bowers resists this conclusion, arguing that the Supreme Court's jurisprudence does not apply to Section 249(a)(1) because the statute criminalizes religious discrimination as well as racial discrimination. Br.92-95. But his argument misses the point. Congress was clear that Section 249(a)(1) only criminalizes so-called "religious" discrimination when the religion was considered a "race[]" at the time of the Thirteenth Amendment's adoption. 34 U.S.C. 30501(8). Thus, those religious groups *are racial groups* for the purposes of these statutes. *See Shaare Tefila*, 481 U.S. at 617-18; *see also Saint Francis Coll.*,

100

481 U.S. at 613 ("[S]uch discrimination is racial discrimination..., whether or not it would be classified as racial in terms of modern scientific theory.").[19]

ii. Bowers's other citations similarly do not support his position. He argues that various cases examining 42 U.S.C. 1981 and 1982 stand for the proposition that Thirteenth Amendment legislation may prohibit discrimination based on race, but not on religion. Br.94-95. But that is not what those cases held. Instead, each case considered the language of the statutes at issue, which prohibited discrimination based upon race, and included no reference to discrimination based upon religion. *See* Br.94 (citing, *e.g.*, *Lubavitch-Chabad of Ill. v. Northwestern Univ.*, 772 F.3d 443, 446-47 (7th Cir. 2014) ("Neither [statute] refers to discrimination on the basis of religious identity, beliefs, or observances.")). Because of those statutes' text, it was critical for the courts to determine if the alleged discrimination was based upon, for example, "religious anti-Semitism, typified by the attitude of the medieval Roman Catholic Church"

---

[19] Bowers argues that Section 249(a)(1)'s text does not expressly limit its references to "religion" as meaning only those that were races at the time of the Thirteenth Amendment. Br.96. But the Shepard-Byrd Act, of which Section 249 is a part, specifies that it "prohibit[s] assaults on the basis of real or perceived religions…, at least to the extent such religions…were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States." Pub. L. No. 111-84, Div. E, § 4702(8), 123 Stat. 1290, 2836 (2009) (34 U.S.C. 30501(8)); *see* § 4707(a), 123 Stat. 2838-2840 (18 U.S.C. 249).

or "racial anti-Semitism, typified by Hitler." *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1260-61 (7th Cir. 1990); *see also id.* at 1260-61 (discussing that Sections 1981 and 1982 required an examination of what kind of religious discrimination a plaintiff alleged because neither statute included religion as a standalone basis for the discrimination they prohibited).

Unlike Sections 1981 and 1982, Section 249(a)(1) expressly prohibits discrimination against certain religions that were historically considered races. *See* 18 U.S.C. 249(a)(1); 34 U.S.C. 30501(8). In any event, Bowers's violence against the Tree of Life communities is precisely the "racial anti-Semitism, typified by Hitler" that *Bachman* identified. 902 F.2d at 1260-61; *see, e.g.*, App.7873 (Bowers "liking" a post that said "Gas the Jews. Race war now," four days before attacking the Tree of Life Synagogue); App.13617, 13622 (Bowers posting "hitler did nothing wrong" and "make ovens blaze again").

iii. Bowers also argues that Section 249(a)(1)'s reference to "race" cannot include religion because that would render as surplusage Section 249(a)(1)'s separate inclusion of "religion" as a prohibited basis for violence. Br.95-96. This misses the point. "[R]ace as used in Thirteenth Amendment jurisprudence is a term of art, whose meaning is not limited by today's usage." *United States v. Nelson*, 277 F.3d 164, 176-77 (2d Cir. 2002) (quotation omitted). And "the Supreme Court's case law firmly and clearly rules that Jews count as a 'race'

102

under certain civil rights statutes enacted pursuant to Congress's power under the Thirteenth Amendment." *Id.* at 177.

Accordingly, it is not that "race" is duplicative of "religion." It is that there is overlap between the two terms: violence against certain religious groups qualifies as racial violence (which is a Thirteenth Amendment badge or incident of slavery). *See* 34 U.S.C. 30501(8); *Hassan v. City of New York*, 804 F.3d 277, 303 (3d Cir. 2015) (noting that "[t]he history of religious discrimination in the United States is intertwined with that based on other protected characteristics, including national origin and race"). The government may thus prosecute defendants for committing violence because of a person's "religion" under Section 249(a)(1) if that religion used to be considered a race. *See Saint Francis Coll.*, 481 U.S. at 613; *Shaare Tefila*, 481 U.S. at 617-18.[20]

### D.    None of Bowers's arguments warrants resentencing.

Bowers argues (Br.101-04) that the vacatur he requests of his Section 249 convictions would require his Section 247 and 924 sentences to be reevaluated. This is not so. As explained above in response to his similar argument alleging

---

[20] Bowers's caution (Br.99) against speculating whether the jury would have convicted Bowers for acting because of the congregants' race is misplaced. That was not the government's theory. Bowers acted because of his victims' religion, thus satisfying Section 249(a)(1)'s statutory requirements, and that religion used to be considered a race, thus bringing the statute and prosecution within the Thirteenth Amendment's reach.

prejudicial spillover from the Section 924(j) counts, the evidence introduced at trial was relevant to all three categories of charges (pursuant to Sections 247, 249, and 924) and to both the guilt and penalty phases of the trial. *See* pp.48-49, 94-95, *supra*. Even if this Court were to vacate one set of convictions, the evidence presented at a subsequent trial or resentencing would be the same.

1. Specifically, as relevant to the Section 247 and 249 convictions, Bowers argues that the evidence presented to the jury would have been "less aggravated without the [Section] 249(a)(1) counts," because those counts required proof of motive, but the other counts did not. Br.101. But "motive is always relevant in a criminal case, even if it is not an element of the crime." *United States v. Sriyuth*, 98 F.3d 739, 747 n.12 (3d Cir. 1996). The government was not limited to the minimum quantum of evidence necessary to prove the elements of Bowers's offenses, and it was permitted to admit evidence of his motive for committing both the Section 247 and 249 offenses.

Furthermore, Bowers requested—and the court provided—a jury instruction that rendered Bowers's motive an element of the Section 247(a)(2) offense. He argued (over the government's objection) that Section 247(a)(2) was "a specific intent offense" that required more than the "mere knowledge that a result [that is, religious obstruction] is substantially certain to follow from one's actions." App.812-15. The district court agreed and instructed the jury that the

104

government had to prove that Bowers had the "conscious desire or purpose to obstruct the free exercise of religious beliefs." App.8263. The court further instructed that when considering if the government had met this burden, the jury could consider "all the…facts and circumstances shown by the evidence that may prove what was in his mind at th[e] time." App.8263-64; *see also* App.8361 (Bowers's counsel arguing in closing argument that on the Section 247 counts, the jury was "require[d]…to determine Mr. Bowers'[s] motive and his intent, why he did what he did and what he thought he was going to accomplish by doing it.").

Accordingly, at Bowers's insistence, the government had to prove that Bowers had a specific desire or intent to obstruct the congregants' religious practice—rather than just that he acted intentionally when he interrupted their worship services with gunfire. The government did so by offering the same evidence of animus that also proved his Section 249 offense.

The evidence Bowers complains of was also admissible to counter his defense to the Section 247 charges. In closing argument and in his post-trial motion, Bowers claimed that he did not attack the congregants "to stop or obstruct religious services," but to "stop [Dor Hadash's] support for HIAS." App.8361-66; *see also* S-App.258-60. The government was entitled to rebut this defense; his many comments espousing hate and wishing (and promising)

105

violence to all Jewish people—independent of HIAS—was critical to that rebuttal.

2. Bowers also argues that his Section 247 and 924 should be vacated for resentencing if this Court holds that his Section 249 convictions were unconstitutional because the evidence across the three categories of charges was "intertwined" and similar. Br.103. But, in fact, the overlap in evidence between the categories of charges defeats his claim. As one of the cases Bowers cites explains, "no spillover effect result[s]" when the challenged evidence "was admissible to prove all counts, and…eliminating the invalid count would not have changed trial strategy." *United States v. Pelullo*, 14 F.3d 881, 899 (3d Cir. 1994); *see also, e.g.*, *Wright*, 665 F.3d at 575 (stating that a claim of "prejudicial spillover" fails if the evidence supporting the discarded counts is the same as the evidence supporting the remaining counts). As discussed above, that is the exact case here. Eliminating the Section 249 charges would not change the evidence put before the jury. There is therefore no need for resentencing.

## IV.    BOWERS'S CONVICTIONS UNDER 18 U.S.C. 924 ARE VALID.

Bowers challenges his firearms convictions under 18 U.S.C. 924(j) (Counts 23-33) on the ground that forceful religious obstruction resulting in death, in violation of 18 U.S.C. 247(a)(2), (d)(1), does not qualify as a crime of violence. Br.61-84. As discussed, the Court need not reach this claim if it

106

vacates Bowers's Section 924(j) convictions in connection with his double jeopardy claim.[21]  Regardless, Bowers's challenge lacks merit; forceful religious obstruction resulting in death is categorically a crime of violence.

### A.    Background

The grand jury charged Bowers with 11 counts of violating 18 U.S.C. 924(j)(1), one count for each congregant he killed (Counts 23-33).  App.13700. The indictment identifies two predicate crimes of violence for each of those counts: the religious obstruction charges under 18 U.S.C. 247 (Counts 1-11) and the hate crime charges under 18 U.S.C. 249 (Counts 12-22).  *Ibid.*

Before trial, Bowers moved to dismiss the firearms counts, arguing that neither Section 247 nor 249 qualified as crimes of violence under Section 924. S-App.1-19.  The district court initially denied this motion as to both predicate offenses.  App.177-84.  However, upon a motion for reconsideration, the district court determined that Section 249 did not qualify as a crime of violence. App.211-40.[22]  The court reaffirmed, however, that Section 247 *is* a crime of

---

[21] Bowers asks this Court to dismiss only those 11 Section 924 convictions that are "capital" offenses.  Br.62.  Accordingly, if this Court vacates his Section 924(j) convictions to cure the double jeopardy violation, this Court need not consider whether Bowers's non-capital Section 924 convictions have a valid crime of violence predicate.  *See* Fed. R. App. P. 28(a)(5); Third Cir. Local App. R. 28.1(a)(1).

[22] The district court ruled that Section 249 was not a crime of violence because a defendant could violate it through an act of omission and, according to the

violence and thus a valid predicate offense for the Section 924 counts. App.228-39. As discussed, Bowers was found guilty and sentenced to death for each Section 924(j) offense and each predicate Section 247 offense.

## B.    Standard of Review

The Court exercises plenary review to determine whether an offense qualifies as a crime of violence under Section 924. *See United States v. Brown*, 765 F.3d 185, 188 (3d Cir. 2014).

## C.    Section 247(a)(2), (d)(1) is a categorical crime of violence.

### 1.    Courts use the categorical and modified categorical approaches to determine if an offense is a crime of violence.

As relevant here, Section 924 defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. 924(c)(3)(A). To determine if an offense qualifies as a Section 924 predicate "crime of violence," courts use the "categorical approach," comparing the elements of the proffered predicate offense with the above definition to determine whether the former necessarily matches the latter. *See Descamps v. United States*, 570 U.S. 254, 257

---

then-controlling precedent *United States v. Mayo*, 901 F.3d 218 (3d Cir. 2018), such acts could not be crimes of violence. App.220-28. But since the initiation of this appeal, the Supreme Court has "rejected [this Court's] reasoning in *Mayo*" and it is "no longer good law." *United States v. Minter*, 164 F.4th 243, 247 (3d Cir. 2026) (citing *Delligatti v. United States*, 604 U.S. 423, 429 (2025)).

(2013). A court "may look only to 'the elements of the [offense], not to the facts of [the] defendant's conduct.'" *United States v. Mathis*, 579 U.S. 500, 501 (2016) (alterations in original; quotation omitted) (quoting *Taylor v. United States*, 495 U.S. 575, 601 (1990)).

Courts use the "modified categorical approach" when statutes "list elements in the alternative"—as opposed to listing different means through which a defendant may commit a single offense—and accordingly "define multiple crimes." *Mathis*, 579 U.S. at 505. When considering if such a divisible statute contains a crime of violence, courts engage in the "modified categorical approach" by "look[ing] to a limited class of documents (for example, the indictment [or] jury instructions)" to determine which offense the jury found the defendant committed. *Ibid.* The court "then compare[s] that crime, as the categorical approach commands," to Section 924's crime of violence definition. *See id.* at 506.

### 2.    Section 247 is divisible, so the modified categorical approach applies.

Here, the jury convicted Bowers of violating Section 924(j)(1) because he knowingly used a firearm to murder 11 people during the commission of the charged Section 247 offenses. App.13700, 13746-47. Section 247 lists multiple offenses that require proof of different evidence, carry different punishments,

and criminalize different types of behavior. *See, e.g.*, *Roof*, 10 F.4th at 402-03. Bowers does not dispute this.

Accordingly, the modified categorical approach applies. This method permits the Court to examine certain documents to determine which of the various offenses included in Section 247 is at issue. *See Mathis*, 579 U.S. at 505. Here, the jury instructions are the most instructive. *See* App.8261-62. The district court instructed the jury that "Counts 1 through 11 of the superseding indictment charge Robert Bowers with 11 counts of intentionally obstructing by force a person in the enjoyment of that person's free exercise of religious beliefs resulting in [the] death" of 11 named congregants. App.8261-62.

It is this death-resulting, forcible religious obstruction offense that Bowers argues does not require physical force and thus is not a crime of violence. His arguments cannot succeed.

**D.   A Section 247(a)(2) offense resulting in death requires the use, attempted use, or threatened use of force.**

Bowers argues that a Section 247(a)(2) offense cannot serve as a Section 924 predicate because it can be committed without physical force. Br.65-68. He is wrong.

### 1.   Bowers's offense of conviction contains two elements that require the use of physical force.

a. A Section 924 predicate requires proof that a defendant used, attempted to use, or threatened to use "physical force." 18 U.S.C. 924(c)(3)(A). The Supreme Court has construed "physical force" to mean "force exerted by and through concrete bodies," as opposed to "intellectual force or emotional force." *Johnson v. United States*, 559 U.S. 133, 138 (2010) (interpreting the Armed Career Criminal Act's (ACCA) similarly defined force clause). Put simply, physical force means "force capable of causing physical pain or injury to another person," *id.* at 140, including "the amount of force necessary to overcome a victim's resistance," *Stokeling v. United States*, 586 U.S. 73, 87 (2019).

Bowers's Section 247 offense of conviction—obstructing a person's free exercise of their religion, "by force or threat of force," resulting in the person's death, 18 U.S.C. 247(a)(2), (d)(1)—requires proof of the necessary force. The statute addresses "the incidence of *violent* interference with an individual's lawful [religious] exercise." Pub. L. No. 104-155, 110 Stat. 1392 (1996), amending 18 U.S.C. 247 (emphasis added). Accordingly, as the district court instructed the jury, Section 247's "force" means "physical force" or "violent force." App.8264.[23] The statute therefore categorically matches Section 924's "crime of

---

[23] Courts have also consistently held that other, similarly worded civil rights statutes that have as an element the use or threat of "force" are crimes of

violence" definition. *See, e.g.*, *Stokeling*, 586 U.S. at 85-86 (concluding that the statute that required "the use of force" satisfied the ACCA's elements clause because it had the "same element" as the ACCA) (alteration and citation omitted)).

b. Additionally, courts have consistently found that Section 247(d)(1)'s requirement that a defendant's conduct result in death "only further bolsters the conclusion that the use of physical force applied and necessarily proven at trial is one that is capable of producing death as a result." *United States v. Earnest*, 536 F. Supp. 3d 688, 722-23 (S.D. Cal. 2021) (discussing 18 U.S.C. 249); *see id.* at 723 (applying the same logic to 18 U.S.C. 247). Any "act that results in death obviously requires 'physical force.'" *United States v. Runyon*, 994 F.3d 192, 203 (4th Cir. 2021) (citation omitted). Or, as Justice Scalia phrased it, "it is impossible to cause bodily injury [or death] without using force 'capable of' producing that result." *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part and in the judgment); *see also United States v. Tsarnaev*, 968 F.3d 24, 104 (1st Cir. 2020) ("[A]ny crime for which 'death

---

violence. *See, e.g.*, *United States v. Whittington*, 721 F. App'x 713, 713-14 (9th Cir. 2018) (holding that 42 U.S.C. 3631, which prohibits the interference with federal fair housing rights "by force or threat of force" is a crime of violence); *Cazares v. United States*, No. 04-cr-415, 2021 WL 1153040, at *3-4 (C.D. Cal. Feb. 15, 2021) (same, as to 18 U.S.C. 245(b)(2)).

results'…[ha]s an element [that] automatically satisfies the ACCA's 'violent force' requirement."), *rev'd on other grounds*, 595 U.S. 302 (2022).  Thus, Section 247(a)(2), (d)(1)'s requirement here that the government prove beyond a reasonable doubt that a defendant used force and thereby caused someone's death necessarily satisfies the crime of violence requirement of "force capable of causing physical pain or injury to another person."  *Johnson*, 559 U.S. at 140 (defining "physical force").

For this reason, every court to consider whether Section 247(a)(2), (d)(1) is a crime of violence has readily determined that it is.  *See, e.g.*, *Roof*, 10 F.4th at 404-05; *Earnest*, 536 F. Supp. 3d at 722-24.

### 2. Subsection (d)(1)'s reference to kidnapping does not eliminate the statute's requirement of physical force.

Bowers contends that Section 247(a)(2), (d)(1) is not a crime of violence, because a defendant could commit "kidnap[ping]"—one basis for Section 247(d)(1)'s sentencing enhancement not at issue in his offense—by using psychological, rather than physical, force.  Br.65-68.  Bowers forfeited this argument by failing to raise it in the district court and thus review is for plain error.  *United States v. Abreu*, 32 F.4th 271, 274-75 & n.2 (3d Cir. 2022); *United States v. Hughes*, 117 F.4th 104, 107 (3d Cir. 2024).  Even if Bowers had preserved this argument, it fails on its merits because the use of "psychological force" alone does not violate Section 247(a)(2), (d)(1).

113

### a. Bowers forfeited any argument that a defendant can violate Section 247 using psychological force alone.

Bowers argues that Section 247(d)(1)'s inclusion of kidnapping as a possible basis for a sentence enhancement renders Section 247 an invalid crime of violence predicate because kidnapping can be accomplished without physical force. Br.65-67. To illustrate his point, he describes a hypothetical grandfather who uses trickery to kidnap his granddaughter because he is upset by his son's religious exercise. Br.66.

Bowers concedes that he did not make this argument in the district court. Br.67. Because this Court has made clear that to preserve an argument, "a party must make the same argument in the District Court that he makes on appeal," that concession limits this Court's review to one for plain error. *Abreu*, 32 F.4th at 274-75 (citation omitted).

Bowers argues that his claims should nonetheless be treated as preserved because his current argument that Section 247(a)(2), (d)(1) criminalizes psychological force is "in all meaningful respects identical" to an argument he made in the district court. Br.68. He is incorrect.

In the district court, Bowers offered two sets of arguments concerning Section 247's qualification as a crime of violence. First, he argued in his motion to dismiss that Section 247 criminalizes (1) *de minimis* force, such as "simple vandalism," which he said does not satisfy Section 924's "force" requirement;

114

and (2) physical force against one's own property, such as burning one's own cross in front of a Black church, which he said does not satisfy Section 924's "against the property of another" requirement. S-App.11-13 (citations omitted). Later, in his motion to reconsider the district court's denial of that motion to dismiss, Bowers made additional arguments: (1) that "the slightest offensive touching" could violate Section 247; (2) that Section 247 did not require force that was "against"—which Bowers defined as "directed or targeted at"—another's person or property; and (3) that someone could violate Section 247 by attempting to threaten to use force, which the Supreme Court has held does not satisfy Section 924's force element. S-App.49-57 (citations omitted). These arguments relate only to whether Section 247 requires the requisite *level* of physical force, whether it requires that force or a threat to be directed towards another person, and whether a Section 247 "attempt" always requires physical force. Nowhere in either of those filings did Bowers make any reference or argument about a completed Section 247 offense being committed through "psychological force," and none of these arguments is "identical" to the argument he makes here.

This Court's "precedents reveal at least two characteristics that identical arguments always have": (1) "they depend on the same legal rule or standard" and (2) they "depend on the same facts." *United States v. Joseph*, 730 F.3d 336,

115

342 (3d Cir. 2013); *see also Abreu*, 32 F.4th at 274-75 & n.2 (applying *Joseph* to the question of whether a defendant preserved a crime of violence argument). Bowers's current argument about psychological force used to commit kidnapping has neither characteristic. Indeed, his current argument requires examining the definition of kidnapping (Br.65-66), which is distinct from each of the legal theories he presented in the district court. *See* S-App.11-13, 49-57. And, as to the facts, he argues on appeal that Section 247 encompasses actions involving inveigling, decoys, trickery, and nonphysical pressure or threats. Br.66. His previous arguments, however, posited that Section 247 encompasses offensive physical touching; vandalism and other damage to property; loud noises caused by fireworks, discharging firearms, and revving car engines; and drafting a note threatening violence and planning to take it to a church. S-App.11-13, 49-57.

It is true that in the district court, Bowers raised the *issue* of whether Section 247's "force" matched Section 924's. But to preserve an argument for appellate review, "raising an issue before the district court…is insufficient." *Abreu*, 32 F.4th at 275 (citation omitted). A party must instead raise the same argument. *Ibid.* Bowers did not do this, so review is for plain error.

### b.    A defendant must use physical force to violate Section 247(a)(2), (d)(1).

Bowers cannot establish error, let alone a plain one. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). That standard requires proof of (1) an error, (2) that the error is "clear or obvious," and that (3) it "affected the appellant's substantial rights." *Ibid.* Then, the Court has discretion to correct the error if not doing so would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Ibid.* (citation omitted). There is no plain error here.

### i.    Psychological force alone does not violate Section 247(a)(2), (d)(1).

Bowers does not dispute that a non-aggravated Section 247(a)(2) offense requires proof that a defendant intentionally obstructed someone's religious exercise "by force or threat of force." 18 U.S.C. 247(a)(2). Instead, he skips over the language of the basic offense and challenges whether one of the aggravated offenses listed in subsection (d)(1) is, by itself, a categorical crime of violence. But nothing about the addition of one of Section 247(d)(1)'s aggravating elements can take away from the fact that a standard Section 247(a)(2) offense *already requires* physical force and thus is a categorical crime of violence. *See* pp.111-12, *supra*.

Courts "do not view each element of the crime in isolation" when determining whether an offense is a crime of violence. *Roof*, 10 F.4th at 402.

117

Instead, they "look at the elements of an offense as a whole when deciding if th[e] *offense* meets the requirements of the elements clause." *Ibid.* (emphasis added) (citing, *inter alia*, *Stokeling*, 586 U.S. at 82-84). With or without a possible aggravating element, a Section 247(a)(2) conviction will always require proof beyond a reasonable doubt that a defendant used or threatened force. *See, e.g.*, *Roof*, 10 F.4th at 402. That is sufficient to render Bowers's conviction offense a valid crime of violence; regardless of what a stand-alone kidnapping offense might require, a Section 247(a)(2) offense that involves kidnapping will always require that the defendant have acted with physical force.

> **ii.   Subsection (d)(1) is divisible, and the government did not charge Bowers with an offense that he could commit through psychological force.**

a. Even if subsection (d)(1)'s inclusion of "acts includ[ing] kidnapping" somehow affected Section 247's status as a crime of violence, Bowers's argument still fails because subsection (d)(1) is divisible amongst the various crimes listed therein. Like the broader Section 247, subsection (d)(1) "contains statutory phrases that cover several different generic crimes" and is therefore divisible between those crimes. *Johnson*, 559 U.S. at 144; *see also Chambers v. United States*, 555 U.S. 122, 126 (2009) (concluding that statutes that criminalize behaviors that "differ so significantly" from each other are divisible because they

118

criminalize "different crimes"), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).

Section 247(d)(1) prohibits a variety of conduct: kidnapping, aggravated sexual abuse, homicide, and attempted homicide.  18 U.S.C. 247(d)(1).  These offenses are so different that they are and must be treated as different crimes.  Section 247(d)(1) is thus divisible among those four offenses, and this Court need only determine whether the offense that the government charged and proved Bowers committed required physical force.  As explained above, it did.  *See* pp.111-13, *supra*.

Additionally, as the Supreme Court has held, where there is any uncertainty, courts may take "a peek at the record documents…for the sole and limited purpose of determining whether the listed items are elements of the offense."  *Mathis*, 579 U.S. at 518 (citation omitted).  Where such documents "referenc[e] one alternative term to the exclusion of all others," the statute is divisible.  *Id.* at 519.

The relevant documents here support the conclusion that subsection (d)(1) is divisible.  Both the jury instructions and the verdict form state that the government had to prove that Bowers caused 11 worshippers' deaths; neither document mentions "kidnapping" or any of the other aggravating elements listed in (d)(1).  App.8261-8262, 13742-68.  Because the jury did not find Bowers

119

guilty of forcible religious obstruction through kidnapping, the force that may be used to satisfy a kidnapping conviction is irrelevant.

b. Bowers's arguments to the contrary are unavailing. He argues that Section 247(d)(1) cannot be divisible because it is one sentence with clauses separated by commas rather than semicolons, and because each clause has the same penalty. Br.76-77. But this Court has found that a statute with this exact structure is divisible. *See United States v. Knight*, 705 F. App'x 58, 61 (3d Cir. 2017) (addressing a statutory provision that listed alternative elements distinguishing first- and second-degree robbery); *see also, e.g.*, *United States v. Stanford*, 75 F.4th 309, 317 (3d Cir. 2023) (stating the fact that "[a]lternatively defined offenses…trigger the same penalty" "does not make their subsections means rather than elements"); *United States v. Burwell*, 122 F.4th 984, 990 (D.C. Cir. 2024) (concluding that the presence of commas in one area suggested indivisibility, while presence of commas in another suggested divisibility, and stating that the fact that "the same punishment[s] [attach] for statutory alternatives" "is not dispositive" of the divisibility question).

Acts of homicide, attempts to kill, aggravated sexual abuse, and kidnapping are distinct offenses, and the jury found Bowers guilty of only one. *See* App.13742-68. As cases he himself relies on explain, "where one statutory alternative differs significantly from the other, the court must treat the two as

different crimes." *United States v. Redd*, 85 F.4th 153, 164 (4th Cir. 2023) (quotation and citation omitted); *cf. Burwell*, 122 F.4th at 991 (where alternatives are "synonyms" there "is strong evidence" that they are means rather than elements); *United States v. McKibbon*, 878 F.3d 967, 975 (10th Cir. 2017) (similar). Bowers was charged with and convicted of a Section 247(d)(1) offense involving homicide, which indisputably requires force and is a crime of violence.

### E.    Section 247(a)(2) does not apply to a defendant's use of force against his own person or property.

In addition to requiring proof of the use (or threatened or attempted use) of physical force, Section 924 also requires that force be used against "the person or property of another."    18 U.S.C. 924(c)(3)(A).    Section 247, which criminalizes only the intentional, forceful obstruction of a person in the enjoyment of their own free religious exercise, satisfies that standard.

1. A defendant cannot violate Section 247 in the way Bowers posits, by threatening (or using) force against himself to obstruct another person's religion—unless that self-directed action itself threatens force against another. Instead, a defendant only violates Section 247(a)(2) by using force against the person he obstructs.  *See* 18 U.S.C. 247(a)(2).

The plain text of Section 247(a)(2) prohibits "intentionally obstruct[ing], by force or threat of force…, *any person in the enjoyment of that person's* free exercise of religious beliefs."    18 U.S.C. 247(a)(2) (emphasis added).    "That person"

121

refers back to the "any person" against whom force or threat of force is used. Thus, the use of force must be against the same "any person" whose religious expression was obstructed. *See United States v. Cheeseman*, 600 F.3d 270, 276 (3d Cir. 2010) ("The first step in interpreting the meaning of [a statute] is analyzing its statutory text," with consideration of its "context."). Bowers's hypotheticals of a father using (or threatening) force against himself to obstruct his daughter's religious exercise (Br.68), or a person destroying his own property to obstruct others' religious exercise therein (Br.68-69), do not violate Section 247(a)(2) because the statute only prohibits forceful obstructions (or threats of force) that are directed against the same person whose religious exercise is compromised. And one cannot "obstruct" oneself, as "obstruct" is necessarily outward facing. *See Merriam-Webster Online Dictionary* (defining "obstruct" as "to block," "hinder," or "cut off"); *see also Obstruct*, *Black's Law Dictionary* (12th ed. 2024).

Section 247's certification provision reinforces that the statute does not cover using force against one's own property—or against oneself—absent force or threat of force used against another. That provision requires the Attorney General to attest that every Section 247 prosecution "is in the public interest and necessary to secure substantial justice." 18 U.S.C. 247(e). If a defendant were to destroy his own property, there would be no public interest in prosecuting him under Section 247(a). The certification provision thus underscores that

122

Congress intended courts to interpret Section 247 in accordance with its plain meaning and require the use or threatened use of physical force against the person or property of another to make out a violation.

2. And as the Fourth Circuit has explained, "[e]ven if…a defendant could use force against his own property…as a means to obstruct another person from exercising his or her religious beliefs, that force would necessarily amount to a threat of force against that person as well, since a threat to property must 'cause[] such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs.'" *Roof*, 10 F.4th at 405 n.67 (quoting H.R. Rep. No. 456, 115th Cong., 1st Sess. 2 (2017)).

The legislative history supports this holding, instructing that threats against religious real property—such as a bomb threat to a church—only violate Section 247 when the threat qualifies as a true threat of physical violence that obstructs another person's free exercise of religion. *See* H.R. Rep. No. 456, 115th Cong., 1st Sess. 2 (2017).

3. Bowers's contrary arguments are unavailing.  He cites cases that hold that abusive sexual contact and certain forcible felonies were not crimes of violence because the text of the relevant statutes (unlike Section 247) included the defendant as an object of the prohibited force.  Br.69 (citing *United States v. Juvenile B*, 147 F.4th 837, 844 (8th Cir. 2025); *Portee v. United States*, 941 F.3d

123

263, 271-73 (7th Cir. 2019)).  The statutes at issue made clear that a defendant could "intentional[ly] touch" or "use or threat[en to use] force against" his own person.  *Juvenile B*, 147 F.4th at 844 (discussing 18 U.S.C. 2246(3)); *Portee*, 941 F.3d at 270-71 (discussing Ind. Code § 35-31.5-2-138 (2006)).  The same is not true for a Section 247(a)(2) offense, as a defendant cannot "obstruct" his own religious exercise.

Additionally, adopting Bowers's view of Section 247 would raise First Amendment concerns.  If Section 247 criminalized using or threatening force against one's own person or property to express one's displeasure with another's beliefs (and only criminalized the behavior when done for that expressive purpose)—but without using or threatening force against that other person—the statute could "encroach on protected speech."  S. Rep. No. 325, 115th Cong., 2d Sess. 2 (2018).  Congress has cautioned against such interpretations, stating that Section 247(a)(2) should not be interpreted to interfere with conduct protected by the First Amendment, which quintessentially protects the decision to engage in, not engage in, or comment upon someone's religious exercise.  *Ibid.* A straightforward reading of Section 247, which excludes the expressive conduct that Bowers hypothesizes, avoids any such constitutional concern.  *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

124

Accordingly, a defendant only violates Section 247 when he uses or threatens force against the person or property of another.

### F.    Section 247(a)(2), (d)(1) requires intentional conduct.

Section 247(a)(2) requires proof that a defendant "intentionally" obstructed a person's religious exercise by force.  18 U.S.C. 247(a)(2).  Bowers does not dispute this.  Nonetheless, Bowers argues that a death-resulting Section 247(a)(2) offense is not a crime of violence because death can "result" from reckless conduct.  This argument cannot withstand scrutiny.

Bowers's argument fails for one of the same reasons that his "psychological force" argument fails: he is again asking this Court to consider elements in isolation to determine if each element alone satisfies Section 924's crime of violence definition.  This ignores that—by its plain terms—Section 247 requires *every* obstruction offense to involve the "intentional[]" obstruction "by force or threat of force," whether or not death results.  18 U.S.C. 247(a)(2).  Indeed, "mens rea elements cannot be limited to their individual clauses." *Runyon*, 994 F.3d at 204; *see also Roof*, 10 F.4th at 404 (declining to "rigidly separate" Section 247(a)(2)'s *mens rea* element from subsection (d)(1)'s death-resulting element).  Where a statute requires proof of the sufficient intent, that statute is a crime of violence even if the "death results" clause does not contain an additional *mens rea* requirement. *Runyon*, 994 F.3d at 203-04.  By requiring

125

"intentional[] obstruct[ion], by force," Section 247 meets that standard.    18 U.S.C. 247(a)(2).

### G.    None of Bowers's arguments warrants resentencing.

Bowers again argues that the alleged error in charging him with violating Section 924(j) based upon Section 247 predicate offenses requires resentencing on his other death sentences. Br.78-84.  As discussed more fully above, *see* pp.48-49, 103-06, *supra*, resentencing is not warranted.

Here, Bowers repeats some of the arguments he makes to support his contention that the double jeopardy violation warranted resentencing.    In particular, he contends that the government's references to the total number of death penalty offenses and aggregated number of aggravating factors "reverberated through the capital sentencing hearing."  Br.79-80.  As explained below, that argument did not invite the jurors to disregard the district court's instruction to determine a sentence independently for each count.[24]  *See* pp.331-35, *infra*.  Bowers also argues again that "most or all of the jurors found many substantial mitigating factors that weighed against a death sentence."  Br.84. But the jury did not find that Bowers proved that any of primary mitigating

---

[24] This instruction also overcomes Bowers's suggestions that there was no reason for the jury to consider each count's sentence independently because they knew that a death sentence on one count would be completed, even if they voted for life sentences on other counts.  Br.82.

factors—schizophrenia, brain abnormalities, delusional beliefs, or an inability to appreciate the wrongfulness of his conduct—existed. *See* pp.58-64, *supra*.

None of his other arguments is persuasive. He contends that Section 924(j)'s reference to "murder" implied that he was more culpable than the implication from Sections 247's and 249's "death resulting" language. Br.81 (citation omitted). But "murder," and its attendant elements, would have been a part of the case against Bowers even if there had been no Section 924(j) convictions. That is so because the threshold intent factors and statutory aggravators that the jury considered during the penalty phase captured Bowers's intent to kill, planning, and premeditation. *See* pp.49-55, *supra*.

Bowers also argues that the district court's instruction to the jury to consider guilt-phase evidence when choosing the appropriate sentence improperly encouraged the jury to make a "collective" sentencing determination. Br.82. Bowers not only failed to object to that instruction (App.397), but he also ignores that eliminating the Section 924 counts from consideration would not have changed the evidence the jury heard. *See* pp.103-06, *supra*.

Bowers reliance (Br.82-83) upon a single, factually distinct, out-of-circuit district court opinion is no more convincing. In *United States v. Lighty*, a trial court on habeas review ordered resentencing on a capital, death-resulting

kidnapping conviction after the Supreme Court invalided the defendant's three non-capital crime of violence convictions. Nos. 03-cr-357/12-cv-3065, 2023 WL 2932960 (D. Md. Apr. 13, 2023). That court's determination was based upon a concern that the jury had been instructed to consider "*all* evidence received in the guilt phase of the trial, including the distinct acts that comprised the [Section] 924(c) convictions." *Id.* at *3. But, as discussed, the evidence admitted in this trial for the Section 924(j) offenses was *not* distinct from that admitted for the Section 247 and 249 offenses, or from the evidence admitted during the penalty phases for the capital Section 247 offenses.

Finally, Bowers complains that the "verdict form encouraged jurors to make findings 'with regard to all of the applicable capital counts.'" Br.82 (citations omitted). It did not. The verdict form listed three options from which the jury could choose when they considered the non-statutory aggravating factors: whether a factor had been proven (1) as "to *all* of the applicable capital counts"; (2) as "to *any* of the applicable capital counts"; or (3) "only with regard to the following capital counts." App.13783-85. The other portions of the verdict form that Bowers complains about include materially different language, instructing the jury to make a determination "with regard to *each* of the capital counts." App.13802-03 (emphasis added). None of this language compels this Court to order resentencing. *See* pp.47-48, *supra*.

128

**V.    THE DISTRICT COURT PROPERLY REJECTED BOWERS'S *BATSON* CHALLENGE.**

### A.    Background

The Constitution prohibits any party from using peremptory strikes based upon a prospective juror's race. *See Batson v. Kentucky*, 476 U.S. 79, 88 (1986). When a party alleges a *Batson* violation, courts employ a three-step process to evaluate the claim. First, the claimant must make a "*prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race." *Coombs v. Diguglielmo*, 616 F.3d 255, 261 (3d Cir. 2010) (citation modified). "Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Ibid.* (citation omitted). "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Ibid.* (citation omitted)

Bowers argues the court erred in three ways. First, he maintains that the court erred by denying his request for a continuance between the second and third *Batson* step. Br.206-09. Bowers next claims the district court erred by failing to properly conduct the third step, committing a procedural error that left this Court "without an adequate record to review [his] *Batson* claim." Br.182, 205-18. On the merits, Bowers also briefly contends that the court clearly erred in denying his *Batson* challenge. Br.6.

129

None of his arguments withstands scrutiny. The district court acted well within its discretion when it denied Bowers's request for additional time, properly considered the evidence before it, and ultimately made factual findings fully supported by the record.

### 1. The district court established and implemented voir dire procedures.

In April of 2022, over a year before trial, the district court instructed the parties to "confer and submit a Joint Proposed Juror Questionnaire and Joint Proposed Juror Voir Dire Procedures." S-App.21. Over the next 13 months, the parties conferred upon and litigated a variety of issues concerning how they would conduct voir dire. *See, e.g.*, App.70 (Docket Entry 780); App.91 (Docket Entry 1060); App.106 (Docket Entries 1253, 1257). Ultimately, the court determined that it would give the prospective jurors a questionnaire to complete; the parties would then review the jurors' responses and determine if any should be stricken for cause or hardship. App.242-43. Next, the court would conduct voir dire in person, during which the court and the parties would interview each prospective juror to determine if they were qualified to serve. App.243-44. After qualifying the jurors, the parties would conduct peremptory strikes, and the court would impanel the jury. App.244.

a. After hearing extensively from both parties, the district court decided upon a final juror questionnaire. App.13716. The questionnaire included 91

questions.  App.13717-40.  These questions inquired as to the prospective jurors' biographical information; educational and employment histories; and experience with and opinion of the criminal justice system.  *See* App.13717-24, 13727-30*.*  The questionnaire also included 14 questions about the prospective jurors' opinions about—and their ability to vote for—the death penalty.  *See* App.13735-38.

Relevant to the *Batson* analysis, Question 73 instructed prospective jurors to circle a number between 1 and 10 that "best reflects your overall opinion regarding the death penalty, with '1' being strongly opposed and '10' being strongly in favor."  App.13736.  Question 74 asked jurors to pick one of eight descriptions that best captured their view of whether a person "proven guilty of intentional, premeditated murder of multiple individuals in a single incident in a place of worship without any legal justification or excuse" should be sentenced to death.  *Ibid.*  The descriptions captured a range of opinions about the death penalty and willingness to impose it:

| | **Question 74 Answers** |
|---|---|
| **(a)** | I am strongly in favor of the death penalty, and I would always vote for the death penalty in the type of case described above. |
| **(b)** | I am strongly in favor of the death penalty, and I would have a difficult time voting for a sentence less than death in the type of case described above. |
| **(c)** | I am generally in favor of the death penalty, but I could vote for a sentence less than death in the type of case described above if I believed that sentence was called for in light of the facts and the law in the case. |
| **(d)** | I have no definite opinions for or against the death penalty. In the type of case described above, I could vote to impose the death penalty, or I could vote to impose a sentence less than death, whichever I believed was called for in light of the facts and the law in the case. |
| **(e)** | I am generally opposed to the death penalty, but could vote to impose the death penalty in the type of case described above if I believed that the death penalty was called for in light of the facts and the law in the case. |
| **(f)** | I am strongly opposed to the death penalty, and I would have a difficult time voting to impose the death penalty in the type of case described above. |
| **(g)** | I am strongly opposed to the death penalty, and I will never vote to impose the death penalty in the type of case described above, no matter what the facts [sic]. |
| **(h)** | None of the statements above correctly describes my feelings about the death penalty. |

App.13736. Two of the answers—(d) and (e)—are most relevant here. Both answers demonstrated a willingness to impose the death penalty, but (d) indicated neutrality towards capital punishment, whereas (e) indicated a "general[]" opposition to capital punishment. *Ibid.*

132

By combining answers to Questions 73 and 74, the parties often described prospective jurors as, for example, "3(e)," meaning a juror who chose "3" for Question 73 and "(e)" for Question 74. *Ibid.*

b. In-person voir dire began on April 24, 2023, five weeks after the parties had received the prospective jurors' completed questionnaires. App.91 (Docket Entry 1056); App.97 (Docket Entry 1151). At the end of each day, both parties received transcripts of the voir dire proceedings so they could consider the jurors' responses in "real-time." App.400.

Most of the questioning—done by both the court and the parties—and motions to strike for cause during voir dire focused on the prospective jurors' responses to Questions 73 and 74, as well as any other answers concerning their ability to fairly consider and impose life imprisonment or the death penalty. *See, e.g.*, App.2674-89, 2693-2707.

While voir dire was underway, the parties conferred to determine how they would exercise their peremptory strikes. On Wednesday, May 17, 2023, the district court suggested giving the parties four days after the conclusion of in-person voir dire to "examin[e]" the jurors' responses and "prepare for [peremptory strikes]," and then "[c]onduct[ing] the strikes on [the following] Thursday," May 25, 2023, before taking a four-day break for Memorial Day and resuming with opening statements on Tuesday, May 30, 2023. App.5429, 5535-

36. Bowers's counsel responded that he "agree[d] with the Court's schedule" and that "if all the jurors could come in and we would exercise peremptory challenges on Thursday[, May 25, 2023,]…that's a good schedule." App.5536. The government responded that it "ha[d] the same position" and "th[ought] that all of the striking should be concluded on Thursday and [the jury] should be impaneled." App.5537. Based on this understanding, the court instructed the parties to confer as to the mechanics of conducting peremptory strikes. *Ibid.*

On May 23, 2023, two days before the parties had agreed to conduct their peremptory strikes, the parties filed a joint proposal for peremptory strike procedures. *See* S-App.101-08. The parties agreed that they would raise any *Batson* challenges on May 25, 2023, as expected, but disagreed about the timeline for resolving those challenges. *See* S-App.102-06. While the government proposed a schedule in line with what the parties and the court had previously discussed—*i.e.*, conducting peremptory strikes and resolving any *Batson* challenges in one day so the jury could be impaneled on May 25, 2023—Bowers requested additional time. S-App.102-06. Specifically, Bowers asked to make initial *Batson* arguments on May 25, 2023, but to then have until the next morning to review the voir dire transcripts and submit additional argument in writing. S-App.103-06.

134

The court denied Bowers's request (*see* S-App.109-10), and subsequently denied his motion to reconsider, noting that Bowers's request to adjust the strike timeline "was raised, for the first time, 48 hours before the peremptory strike process [wa]s scheduled to take place" (S-App.115-16).  The court stated that despite Bowers's claim that he needed additional time to review voir dire transcripts, "[t]he parties were provided with transcripts of the voir dire process at the conclusion of each day of individual questioning, which concluded one full week ago on 5/17/23."  S-App.115.  Given the parties' "legal teams, each composed of highly capable attorneys," and the "nearly contemporaneous[]" production of the transcripts during voir dire, the court determined that the original timeline of conducting and completing peremptory strikes on Thursday, May 25, 2023, gave the parties sufficient time.  S-App.115.

### 2.    The parties each exercised peremptory strikes.

On May 25, 2023, the parties exercised peremptory strikes.  App.5558-59.  At that stage in the proceedings, 64 qualified jurors were subject to strikes, including four Black jurors and one Hispanic juror.  App.5542, 5616.  The government peremptorily struck fifteen White prospective jurors, four Black prospective jurors, and one Hispanic prospective juror.  Those jurors' races, sexes, and answers to Questions 73 and 74 are as follows:

135

| Juror Number | Race | Sex | Q. 73/74 Answers |
|---|---|---|---|
| 99 | White | Male | 3(e) |
| 148 | Black | Female | 4(e) |
| 235 | White | Female | 3(f) |
| 257 | Hispanic | Female | 3(d) |
| 216 | White | Female | 5(d) |
| 136 | White | Female | 4(e) |
| 290 | Black | Female | 4(e) |
| 127 | White | Male | 5(c) |
| 47 | White | Female | 5/6(d) |
| 333 | White | Female | 6(d) |
| 160 | White | Male | 7(c) |
| 346 | White | Male | 7(d) |
| 203 | White | Female | 6(e) |
| 332 | Black | Male | 5(d) |
| 344 | White | Male | 4(d)/(e) |
| 181 | White | Female | 4(d) |
| 95 | Black | Male | 6(d) |
| 305 | White | Male | 7(d) |
| 86 | White | Female | 7(d) |
| 234 | White | Male | 5(d) |

S.App.320. Among the alternates, the government struck Juror 441, a White woman who was a 2(f); Juror 411, a White man who was a 4(d); and Juror 390, a White woman who was a 5/6 (d)/(e). S.App.320.

With these strikes, the government removed all jurors whose answers to Question 74 indicated opposition to the death penalty in a case like this, *i.e.*, all (e) or (f) answers. App.406 n.7. It struck all jurors whose answers to Question 73 was less than 5 out of 10 in support of the death penalty generally, with a single exception. App.406 n.7. Nine of those so stricken were White, two were Black, and one was Hispanic. *See* App.406 n.7, S-App.25.

136

As a result, those who remained to serve on the jury rated themselves as 4(d) or higher:

| Juror Number | Race | Sex | Q. 73/74 Answers |
|---|---|---|---|
| 1 | White | Female | 5(d) |
| 5 | White | Female | 6(d) |
| 63 | White | Male | 5(d) |
| 64 | White | Female | 5(d) |
| 119 | Asian | Female | 10(d) |
| 152 | White | Male | 8(c) |
| 191 | White | Female | 5(c) |
| 215 | White | Male | 6(c) |
| 224 | White | Female | 7(c) |
| 270 | White | Male | 4(d) |
| 271 | White | Male | 6(d) |
| 348 | White | Female | 6(d) |

S-App.320-21; *see also* App.406 n.7.   The alternates were Juror 405, a White woman who was a 9(c); Juror 414, a White man who was a 6(c); Juror 425, a White woman who was a 7(c); Juror 435, a White woman who was a 7(d); Juror 440, a White woman who was an 8(c); and Juror 449, a White man who was a 5(d).  S.App.320-21; *see also* App.406 n.7.

> **3.    The district court held a *Batson* hearing and rejected Bowers's contention that the government intentionally discriminated against several prospective jurors.**

a. After each party exercised their strikes, Bowers stated his intention to challenge some of the government's strikes under *Batson*; he then repeated his request for additional time to make his arguments.  App.5559.  The court denied Bowers's request for more time, finding "there has been adequate time to

prepare for the argument." App.5561. The court informed Bowers that after hearing the government's argument, the court would give him "[a]n adequate recess" to present his rebuttal and maintained that the court would resolve the *Batson* challenges that day. App.5561-62.

Bowers went on to argue that the government struck several prospective jurors because of their race, ethnicity, and religion. App.5563. Relevant here, four of the challenged prospective jurors were Black and one was Hispanic. *Ibid.* Bowers argued that striking the only qualified Black and Hispanic venirepersons evinced discriminatory intent. *Ibid.*[25]

The court gave the government 20 minutes to prepare its response to Bowers's allegation of intentional discrimination, gave Bowers an hour and a half to prepare his rebuttal to the government, and instructed the government to be "really brief" in its reply to Bowers's rebuttal. App.5565, 5592-93, 5605, 5613.

Following the parties' arguments (described more fully *infra* at pp.153-78), the court denied Bowers's *Batson* challenges. App.5563-617. In particular, the court stated that it "had prepared itself for anticipated motions following

---

[25] Bowers does not explicitly identify in his brief which jurors he continues to challenge on appeal. The government assumes, based upon his descriptions, that he is challenging the strikes of Jurors 95, 148, 257, 290, and 332, who are all either Black or Hispanic, but not of Juror 86, who is Jewish.

peremptory strikes by reviewing relevant case law, reviewing prospective jurors' questionnaire[] responses[,] and revisiting individual examinations[] [and] transcripts[] closely," in addition to considering the parties' arguments. App.5615-16.

The court found that the defendant made a *prima facie* case of purposeful discrimination by showing that the four Black jurors and the only Hispanic juror remaining in the venire were stricken. App.5616. Next, it found that, "[at] the second stage," the government "proffered, frankly, more than adequate facially neutral bases for each peremptory strike." App.5616-17. Finally, the court found that the government's "positions and arguments…were credible." App.5617. The Court stated that "[t]he defense arguments are understood and noted, but that…[they] do not establish pretext…[or] purposeful discrimination." *Ibid.*

b. All but one of the jurors who ultimately served rated themselves as 5 or higher out of 10, indicating neutral or positive opinions of the death penalty generally. App.406 n.7. One impaneled juror (Juror 270) rated himself as 4(d) (*ibid.*), indicating opposition to the death penalty generally, but with a neutral opinion of the death penalty in a case like Bowers's (*ibid.*; S-App.814). And all the jurors who served answered Question 74 with either (c) or (d) (S.App.450, 476, 502, 528, 606, 684, 710, 736, 814, 918, 944, 970, 996, 1048, 1053, 1074,

139

1100; App.14194), indicating that they were either "generally in favor of the death penalty" or had "no definite opinions for or against" it (App.13736).

### 4. The district court denied Bowers's post-trial request to "reopen" the *Batson* hearing but nonetheless considered his new arguments and again found that he had not proven intentional discrimination.

In his post-trial motion pursuant to Federal Rules of Criminal Procedure 29 and 33, Bowers asked the district court to reopen the *Batson* hearing "to reconsider the government's strikes in light of additional evidence of racial animus." S-App.278-94. He contended that it was only then—more than five months after the *Batson* hearing—that he had "adequate time to review the record" to support his claims of intentional discrimination. S-App.278. Relying on the prospective jurors' answers in their questionnaires and the transcripts of their in-person voir dire, Bowers offered the court new reasons for finding that the government discriminated against certain prospective jurors when it used its peremptory strikes. S-App.166-74, 278-94.

The district court again rejected Bowers's arguments. App.397-412. The court concluded that Bowers had sufficient time before the court impaneled the jury to make any *Batson* arguments (App.397-403), and that, "[i]n any event, [his] Motion is meritless" (App.403-12).

As a preliminary matter, the court found that Bowers "rel[ied] upon arguments that could and should have been raised at the time of the *Batson*

hearing." App.403. The court then "thoroughly reviewed the record" "again," and found that Bowers "failed to show that [the government's] reasons were pretextual at the *Batson* hearing, and [his] attempts to establish pretext five months after empanelment of the jury still come up short." App.407-12.

## B.    Standard of Review

This Court reviews challenges to a district court's denial of a motion for a continuance for an abuse of discretion. *United States v. Olfano*, 503 F.3d 240, 245 (3d Cir. 2007). This Court "will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817-18 (3d Cir. 1982) (quotation and citation omitted).

This Court reviews a district court's application of *Batson*'s legal framework *de novo*, *Riley v. Taylor*, 277 F.3d 261, 277-78 (3d Cir. 2001), and reviews the factual finding that a party's race-neutral bases for striking a juror were credible and not discriminatory for clear error, *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "[This Court] must accept the factual determination of the district court unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no

rational relationship to the supportive evidentiary data." *United States v. Uwaezhoke*, 995 F.2d 388, 394 (3d Cir. 1993) (quotation and citation omitted).

### C. The district court did not abuse its discretion by denying Bowers's request for a continuance.

1. District courts have "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016). Courts must "examine the particular circumstances of each case," including "the efficient administration of criminal justice [and] the accused's rights." *Olfano*, 503 F.3d at 246.

The district court here did exactly what was required of it and acted fully within its discretion when it enforced the voir dire timeline. After 64 prospective jurors were qualified, the court proposed a timeline in which the parties would conduct their peremptory strikes and make any *Batson* challenges on Thursday, May 25, 2023, so that the jury (and the parties) could be ready to start trial on the Tuesday after Memorial Day. App.5535-37. Bowers's counsel initially agreed with the court's proposal. App.5546. That schedule made sense, given that Bowers had a large and experienced defense team, including two jury-selection experts (App.400); Bowers had been anticipating potential *Batson* challenges for over a year (*ibid.*); and both parties had long had access to the jurors' questionnaires and daily transcripts of voir dire to inform their exercise of peremptory strikes (S-App.115).

Only 48 hours before the parties were scheduled to make their strikes, and one week after the court made its proposal, Bowers requested additional time to respond to the government's proffered justifications for its strikes. *See* S-App.115. The court promptly denied that request. *Ibid.* Bowers followed up with several more requests for extensions of the peremptory strike schedule, including an assortment of time periods that Bowers argued would be adequate, ranging from 1-2 additional hours (App.5593-97), to overnight (S-App.103-06), to 5 months (S-App.278). As the district court found, Bowers's view of the amount of time he needed was "a moving target of sorts." App.399. Bowers ultimately contended that he only had "adequate time" to prepare for his *Batson* challenges "one hundred and sixty days after the end of jury selection," which the court rejected as "unrealistic and impracticable." App.399-400.

Each time Bowers petitioned the court to reconsider this timeline, the Court considered the attendant circumstances: the timing of Bowers's request (S-App.115); how long Bowers had the materials that formed the basis of his *Batson* challenges (S-App.115; App.5592-93, 5595-96); the composition of both parties' legal teams—including Bowers's "learned counsel with decades of experience in high-profile capital matters, three Assistant Federal Public Defenders, one capital case jury consultant, and another experienced attorney who specializes in capital voir dire" (App.400 (citation omitted)); relevant

143

caselaw concerning voir dire timelines (App.5594-95); and the court's desire to move the case along by dismissing those prospective jurors who would not serve on the jury and enabling those who would serve to begin preparing for their upcoming months of service (App.5594-97).

Balancing all of these factors, the court repeatedly concluded that the existing peremptory-strike schedule, which included a 90-minute recess during the *Batson* hearing, was sufficient, given (1) the more than 12 months in which Bowers was anticipating and preparing for his *Batson* challenges; (2) the 5 weeks he had between the completion of the questionnaires and the beginning of voir dire; (3) the daily contemporaneous production of voir dire transcripts throughout the 17 days of voir dire, over the course of 4 weeks; and (4) the week he had between the end of voir dire and the start of peremptory strikes. *See* S-App.115; App.399-400, 5559-60, 5592-97. As the district court concluded, "[a]ny assertion that the Court provided the Defense with only a 90-minute lunch break to review the jury selection record is, at best, disingenuous." App.402.

2. Bowers now claims that "there was no way the defense could have predicted the reasons the government would give for the strikes," and thus could not have reasonably made his full *Batson* argument on the same day the strikes were made. Br.186. As the district court appropriately found, however,

"learned counsel with decades of experience in high-profile capital matters" (App.400)—not to mention Bowers's voir-dire-specific professionals—could have easily foreseen that the government would strike jurors for reasons related to the issues the government probed during the rest of the jury selection process. Bowers could not have been surprised to learn that the extensive voir dire questioning concerning jurors' level of opposition to the death penalty, equivocation on their willingness to impose the death penalty, ability to appear for court week after week and withstand distressing evidence and testimony, and specialized knowledge of mitigation evidence, would result in strikes based upon those issues. The district court reasonably found that Bowers's counsel likely anticipated the government's arguments (App.5593), and determined that the weeks they had to review the jurors' questionnaires and testimony were enough to prepare responses thereto.

That Bowers disagrees with the district court's scheduling decision, or even that another court may have granted a similar request, does not prove that the court abused its discretion here. *See Olfano*, 503 F.3d at 246 (citing favorably *United States v. Booth*, 996 F.2d 1395, 1398 (2d Cir. 1993), which "affirm[ed] [the] denial of a continuance request despite the finding that the arguments [for it] were not frivolous"). The district court took all relevant circumstances into consideration and reasonably decided to maintain its jury-selection schedule,

145

which the defense had originally agreed upon. That was not an abuse of discretion.

3. Bowers has also failed to show that he experienced any "actual [or] substantial prejudice" due to the court's denial of his request for more time. *See In re Fine Paper Antitrust Litig.*, 685 F.2d at 817-18 (citation omitted).

According to Bowers, he only had "adequate time to review the record" when he filed his post-trial motion. S-App.278. Even then, as the district court found (and as discussed in more detail below), the evidence Bowers gathered in support of his *Batson* claims was "well short of his burden of establishing purposeful discrimination." App.403; *see* pp.153-78, *infra*. His "attempts to point to additional comparators [for the stricken jurors], all of whom are readily distinguishable, c[a]me up short." App.411. And, in many instances, his arguments seeking to show discriminatory intent instead proved only that the stricken jurors were qualified to serve, which is irrelevant to the *Batson* inquiry. App.406-07. Because Bowers ultimately took the time he contends was necessary to prepare his *Batson* challenges, and the court still determined that he did not meet his burden, there was no prejudice and no remand is necessary.

**D.    The district court properly conducted the *Batson* analysis and appropriately found that the government did not intentionally discriminate during voir dire.**

Bowers contends that the district court failed to perform the proper *Batson* analysis by not adequately considering his evidence that the government intentionally discriminated against the prospective jurors it struck.  Br.209-18. He also states (without argument) that the court erred "by denying [his] challenge to the government's peremptory strikes under *Batson*."  Br.6.  Neither position has merit.

In both the *Batson* hearing and in his post-trial motion, Bowers failed to present evidence that demonstrated that the government's race-neutral bases for its peremptory strikes were in fact discriminatory.  Notably, on appeal, he does not identify which jurors he contends were improperly stricken.  *See* Br.181-218. Regardless, the record is clear.  The district court properly applied the *Batson* analysis and did not clearly err when it found that the government did not discriminate by striking two Black jurors and one Hispanic juror who opposed the death penalty, one Black juror who failed to appear for voir dire and jury selection, and one Black juror who had an extensive criminal history including an arrest by a government witness.  *See* App.397-412, 5563-617.

147

### 1. The district court properly conducted step three of the *Batson* analysis.

a. To perform *Batson*'s third step, courts "should look to all of the evidence and surrounding circumstances, including the context in which strikes were exercised, to determine whether the prosecutor's proffered reasons for striking a juror are pretextual and whether the defendant has shown that the prosecutor had discriminatory intent." *Coombs*, 616 F.3d at 261-62. This Court has held that a district court satisfies its duty under *Batson* to "consider 'all of the circumstances that bear upon the issue of racial animosity'" when it "hear[s] argument from counsel for all the parties, t[akes] the objection under advisement, entertain[s] further argument from the parties, [i]s very familiar with the [relevant] issues surrounding th[e] prosecution, and ha[s] the opportunity to observe the demeanor of counsel and all prospective jurors before ruling on any challenges." *United States v. Savage*, 970 F.3d 217, 268 (3d Cir. 2020) (quoting *Foster v. Chatman*, 578 U.S. 488, 501 (2016)).

The district court here did just that. During the *Batson* hearing, the court heard from both parties, multiple times. *See* App.5563-615. It was deeply familiar with the central issues during voir dire (*i.e.*, the prospective jurors' ability to fairly consider a civil rights case and possibly vote for the death penalty), as it had considered and adjudicated those issues extensively, both before voir dire began and during the qualification stage of voir dire. *See, e.g.*, S-

148

App.60-66; App.2674-89, 2693-707. It had the opportunity to observe counsel and the jurors throughout their discussion of the relevant issues. *See* App.5563-615. And it took time to consider the parties' arguments, in addition to its independent review of the record in anticipation of those arguments. *See, e.g.*, App.5596, 5615.

After hearing the parties' evidence during the *Batson* hearing, the court took a recess before ruling. *See* App.5615. When it returned, the court prefaced its findings by stating it had "closely" reviewed the questionnaires, voir dire transcripts, and caselaw before the hearing. *See* App.5615-16. The court further considered "counsel's arguments and references to the record." App.5616. It then concluded that, as to *Batson*'s step three, "[t]he government's positions and arguments…were credible." App.5617. The court further explained that although "[t]he defense arguments are understood and noted,…in [the court's] view [they] do not establish pretext. And, thus,…the defendant has not established purposeful discrimination." *Ibid.*

The court elaborated upon those reasons in its post-trial ruling denying Bowers's request to reopen the *Batson* hearing. There, it expressly reconsidered the record—as well as Bowers's newly raised evidence and argument—and again found that the government's race-neutral reasons for striking the challenged jurors were credible. App.403-12. The court responded to Bowers's

149

argument (S-App.279) that the government struck every Black and Hispanic juror who was qualified to serve, finding that such evidence established a *prima facie* showing at *Batson* step one, but was not dispositive at step three. App.411-12. The court rejected Bowers's newly made argument (S-App.281, 286-87, 290) that the government questioned Black and Hispanic jurors differently from White jurors, in a way that evinced discriminatory intent. App.408, 411. The court found that "[e]ach of the jurors…expressed or did something that could reasonably…give the Government pause as to whether that individual would be a favorable Government juror," and the "Government followed up on these topics,…not in an unduly disparate or lengthy manner." App.408. And, finally, the court implicitly rejected Bowers's series of newly offered juror comparisons (S-App.279-94), finding that his "attempts to point to additional comparators…c[a]me up short" because they were all "readily distinguishable." App.411; *see also* App.407-12 (discussing the stricken jurors' distinguishing characteristics and testimony). That was sufficient.

b. In challenging whether the district court properly applied the *Batson* framework, Bowers essentially complains that the court failed to refute each of his arguments, point-by-point. But, as this Court has explained, "a judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record." *Savage*, 970 F.3d at 268 (citation omitted).

Instead, the question is whether the court "consider[ed] all relevant circumstances before it issue[d] a final ruling on a defendant's motion." *Riley*, 277 F.3d at 287 (citation omitted). Courts of appeals have therefore found that trial courts skipped *Batson*'s step three when they, for example, accepted the government's proffer without hearing from the defense or by not probing patently deficient bases for strikes. *See, e.g.*, *United States v. McAllister*, 693 F.3d 572, 577 (6th Cir. 2012) (considering whether court properly performed step three where it responded to proffered race-neutral bases for his strikes by saying "[a]ll right"); *Coombs*, 616 F.3d at 257-58 (responding "Let's go" to prosecutor's explanation that he "just didn't like" the juror he struck) (citation omitted).

Nothing like that happened here. The district court gave both parties the opportunity to make their case, even going so far as to reconsider the voir dire record—as well as arguments Bowers made for the first time after trial, five months after the jury was impaneled. App.397-412, 5563-5613. It probed the government's purported justifications and found them credible based upon the court's own memory of voir dire, assessment of the demeanor and emotional responses of specific jurors, and review of the questionnaires and transcripts. App.407-12.

Even when a trial court fails to explain its reasons for finding that no discrimination occurred, courts of appeals first consider whether that finding is

supported by the record before determining that the lower court failed to properly conduct the *Batson* analysis. *See, e.g.*, *Coombs*, 616 F.3d at 263-65 (considering whether record supported the trial court's decision even though the court said nothing more than "Let's go. Are we ready to? Do we have the bills?" in response to government's proffered bases for the challenged strikes) (citation omitted)[26]; *United States v. Taylor*, 277 F. App'x 610, 611-13 (7th Cir. 2008) (remanding for an evidentiary hearing after reviewing the record and concluding that the record, which showed "no material difference" between accepted and stricken jurors—except for race—did not support the trial court's finding of no discrimination) (citation omitted); *Riley*, 277 F.3d at 279-87 (finding that the trial court did not satisfy *Batson* step three only after considering the record and finding that there "[was] little basis for distinguishing" the challenged jurors from the accepted jurors, the government had admitted that the challenged strikes *were* race-based, and there was extensive evidence that the prosecutor's office had a history of striking every Black juror in the preceding year of comparable trials).

---

[26] While *Coombs* involved review under Antiterrorism and Effective Death Penalty Act, *see* 616 F.3d at 260-61, that fact did not dictate the outcome or the procedure this Court undertook. The Court reviews the record to determine if the trial court properly considered and decided a *Batson* challenge even when the issue arises on direct appeal. *See Savage*, 970 F.3d at 268-72.

Again, unlike those cases, the record here supports the district court's finding that the government did not discriminate. As described more fully below, *see* pp.153-78, *infra*, the record demonstrates that the challenged jurors opposed the death penalty, failed to come to court, and had a criminal history involving one of the law enforcement witnesses. The court thus properly applied step three and no remand is warranted.

**2.    The district court did not clearly err when it found that the government did not discriminate in using its peremptory strikes.**

Contrary to Bowers's contention (Br.206), the record amply supports the district court's factual finding that the government credibly struck jurors for race-neutral reasons. The "question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S. 352, 364 (1991). Considerable "[d]eference" to the district court "is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005).

When considering the substance of a *Batson* challenge, courts consider several categories of evidence, including "side-by-side comparisons" of jurors of one race who were struck and jurors of another race who were not; "evidence of a prosecutor's disparate questioning" between jurors of different races; "a

153

prosecutor's misrepresentations of the record when defending the[ir] strikes"; "statistical evidence about the prosecutor's use of peremptory strikes" against some races as compared to others; and "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). This Court has recognized that when a facially race-neutral basis for striking a juror has "a disparate impact on a particular racial group," that may be relevant "circumstantial evidence of discriminatory intent." *Uwaezhoke*, 995 F.2d at 393.

In addition to the arguments Bowers made for the first time in his post-trial motion—including any attempt to discredit the government's race-neutral bases for striking Jurors 95 and 332 (App.403, 410)—Bowers's brief contains multiple arguments that he has never made before. *See, e.g.*, Br.194 (challenging accuracy of statement that Juror 257 oversaw a research program); Br.190 (comparing Juror 148 to Juror 348); Br.193 (challenging accuracy of statement that Juror 290 was emotional "throughout" her questioning) (emphasis and citation omitted). Because Bowers did not make these arguments during the *Batson* hearing (or, for some, at all in the trial court), they are not preserved and are subject to plain-error review. *See United States v. Baskerville*, 448 F. App'x 243, 247 (3d Cir. 2011).

154

### a.   The government credibly struck Juror 257 primarily because she opposed the death penalty.

Prospective Juror 257 is a Hispanic woman.  App.5568.  The government struck her principally because she opposed the death penalty.  She initially rated herself as 2 out of 10 in response to Question 73, before scratching it out and circling 3 out of 10, indicating opposition to the death penalty generally. App.5568-69; S-App.762.  Striking her was consistent with the government's race-neutral use of its strikes to remove prospective jurors who answered with the lowest ratings to Question 73.  Indeed, the government struck "every person who responded in their written questionnaire to Question 73 that they were a three."  App.5568.  That included Jurors 99 and 235, who are White, and Juror 257, who is Hispanic.[27]  *Ibid.*  Juror 257's answer to Question 73 was reason enough for the government to strike her.  App.5569.

Additionally, the government was concerned that Juror 257 would also have "undue influence in the jury room" regarding Bowers's intended mitigation evidence because it involved subjects that she studied both as a student and as a professional.  App.5570-71.  In particular, her research on the impact of

---

[27] The court had already removed the remaining person who rated herself as a "3" on her questionnaire, that is, Juror 26, who is White.  App.5568.  If the court had not removed her, the government would have struck her.  *Ibid.*

psychological, environmental, and biological factors on child development closely related to Bowers's expected defense. *Ibid.*

And, finally, the government observed that Juror 257 "seemed particularly eager" to serve on the jury. App.5571.

None of Bowers's arguments below or on appeal suggests any of these reasons were pretextual.

*i. Side-by-side comparison.* Side-by-side comparisons of jurors are only useful in the *Batson* analysis if the compared jurors are "similar," except for their race. *Miller-El*, 545 U.S. at 241. Though a comparator need not be "identical," *id.* at 247 & n.6, the purpose of a comparator is to expose strikes for one venireperson that would be "*equally on point* as to some white jurors who served"; in that situation, the disparity suggests that the *only* remaining material difference between the jurors—*i.e.*, their race—is the true reason for the strike. *Id.* at 241 (emphasis added). So, any differences between a comparator and the struck venireperson should be "far from significant" when the voir dire record is considered "in its entirety." *Id.* at 247.

Bowers argued below that the district court should not have credited the government's explanation that it struck Juror 257 because of her "3" answer to Question 73. *See* Br.186-87. Bowers stated that the government "accepted" a

156

White man (Juror 261) who "also ranked himself a '3' and nothing related to their ranking distinguished them." *Id.* at 187.  This is not true.

Juror 261 testified that when completing his questionnaire, he misunderstood Question 73 and rated himself an 8 when he really was a 3. App.3173.  In answering Question 74, however, he recorded (without any misunderstanding) that in a case likes Bowers's, without considering any potential mitigation evidence, he was "strongly in favor of" and "would always vote for the death penalty."  App.3173-74.  Juror 257, on the other hand, was a 3(d), indicating opposition to the death penalty generally and neutrality to the death penalty even in a case like Bowers's.  S-App.762.  Indeed, *Bowers* struck Juror 261, likely because of his answer to Question 74, which demonstrated his strong support for the death penalty in a case like this.  App.3197.  Jurors 257 and 261 are therefore not comparable.[28]

Bowers makes other inapt comparisons.  He argues that Jurors 1 and 5 made statements like Juror 257's when detailing their concerns about the death penalty.  Br.186; App.5603-04.  But critically, Bowers ignores that Juror 1 rated

---

[28] Notably, the government acknowledged the exception it made with Juror 261 during the *Batson* hearing, explaining immediately why it did not strike Juror 261 despite its general rule for striking all jurors who rated themselves as 3 out of 10.  App.5568-69.  The government's transparency on the existence of a juror who seemed comparable to Juror 257 at first glance bolsters its credibility rather than impugns it.

herself a 5(d) and Juror 5 rated herself a 6(d), both indicating a more favorable view of the death penalty generally than Juror 257 held. S-App.450, 476. Moreover, Jurors 1 and 5's statements are not like Juror 257's statements. Bowers noted that Jurors 1 and 5 said that they "thought" they could vote for the death penalty; they just "need[ed] to hear everything to make a decision" and "to know the background and the facts to be able to say firmly that that person would deserve the death sentence." App.5603-04. Juror 257, on the other hand, testified that she had spent significant time considering her views on the death penalty independent of her jury service, had become less "open" to the death penalty as she got older, and "believe[d] it is not [her] place to decide whether another person lives or dies." App.3785, 3787, 3804; S-App.761.

Bowers also argued that the government's acceptance of Juror 427 demonstrates that it was not actually concerned about any undue influence Juror 257 might have based upon her experience in child development because Juror 427 had purportedly similar experience. *See* Br.191. But Juror 427 rated herself as a 9(abc)—compared to Juror 257's 3(d)—indicating strong support for the

death penalty.[29]  S-App.1022.  The two were not comparable.[30]  *See Hebert v. Rogers*, 890 F.3d 213, 223 (5th Cir. 2018) ("dissimilar[ity]…on perhaps the most important factual point, views on the death penalty," renders a proffered comparator incomparable).

*ii. Misrepresentation of evidence.*  Bowers's allegations that the government misrepresented evidence as to Juror 257 fare no better.  In discussing Juror 257's likely undue influence, the government noted that Juror 257 was "personally overseeing a research program on the impacts of prenatal and postnatal factors." App.5570-71.  Bowers contends that she "never said on her questionnaire or in her voir dire answers that she was 'overseeing'—or otherwise in charge of—the program."  Br.194.  But she did: in her questionnaire, she stated she was a "Senior Research Associate" who "supervise[d] undergraduate students," "supervise[d] data teams, and train[ed] new staff on data collection, analysis, and clearing protocols."  S-App.745.  During voir dire, she responded to the question, "Can you tell us about the research that you are overseeing.  It looks like you supervise researchers?" with "Yes."  App.3798.

---

[29] Juror 427 explained that she selected (a), (b), and (c) because she believed different circumstances might prompt her to choose any one of them.  App.5120-21.

[30] Additionally, Juror 427 was in the alternate pool.  The parties could not use main panel strikes for alternate jurors.  *See* Fed. R. Crim. P. 24(c)(4).

### b. The government credibly struck Juror 148 primarily because she opposed the death penalty.

Prospective Juror 148 is a Black woman. App.5564, 5582. The government struck her "first and foremost" because she opposed the death penalty. App.5579-80. She rated herself as a 4(e) in response to Questions 73 and 74, reflecting some opposition to the death penalty generally and in a case like Bowers's. App.1870, 1878-80. The government struck nearly all of the jurors who rated themselves 4 out of 10 in their opinion of the death penalty, namely Jurors 136, 344, and 181 who are White, and Jurors 148 and 290 who are Black. App.406 n.7; S-App.320. The one juror who rated themselves a "4" whom the government accepted was Juror 270, who is White. But Juror 270 rated himself a 4*(d)*, thus demonstrating more openness to the death penalty in a case like Bowers's. App.5580-81.

Juror 148 confirmed her view of the death penalty in her testimony. She stated that while it was "something [she] could judge on,…[she] do[es]n't feel that it's necessarily something that [she] should be [judging on]…[and that] it's a heavy burden." App.1881. "[W]hen it comes to a human life," Juror 148 believed that she "should always give that individual the benefit of the doubt, if at all possible" and that the death penalty was "too final." *Ibid.*; S-App.579. She has held these beliefs "all [her] life." S-App.579.

160

The government also expressed concerns about Juror 148's demeanor, which were well founded. She hesitated when explaining that she changed her written answer to Question 74 from the neutral position to the generally opposed position. App.5583. She also seemed "offended and annoyed" at government counsel for giving the court criminal history records for someone who shared her name, but was not her. App.5611; *see also* App.409 ("[T]he Court did note that the juror bristled at the questions asked in response to documents provided to the Court by the Government during questioning."). The government also noted her "gravitas," and believed "that she was someone who would have a lot of influence in the jury room," having been "an active participant in the community including having served as a council member." App.5584. "[G]iven her responses and her hesitation about the death penalty,…that kind of influence" was of concern and part of the government's reason for striking her. *Ibid.*

*i. Side-by-side comparison.* Bowers claims (Br.190-91) that the government's acceptance of Juror 270 proves that it did not strike Juror 148 because of her opinion of the death penalty. But as explained, Juror 270 had a different opinion of the death penalty. Juror 270 rated himself as 4(d)—showing opposition to the death penalty generally, but "no definite position" on the death penalty for a defendant like Bowers. As the government explained during the *Batson*

161

hearing,[31] Juror 270's rating was "more neutral on the death penalty than Juror 148." App.5580.  Bowers no longer contests this fact but instead simply ignores this "significant difference," *Savage*, 970 F.3d at 269, "on perhaps the most important factual point, views on the death penalty," *Hebert*, 890 F.3d 213, 223 (5th Cir. 2018).

*ii. Misrepresentation of evidence.*  Bowers next contends that the government misrepresented the extent of Juror 148's opposition to the death penalty.  Br.187.  The government stated that "Juror 148's responses indicate a strong general opposition to the death penalty, a view that she expressed that she had had her whole life."  App.5581.  Bowers counters that Juror 148 described her view as only "moderately opposed," and argues that the government's impression of her views was thus "factually inaccurate."  Br.187-88 (citation omitted).

First, the government's impression based on Juror 148's answers to her questionnaire and during voir dire was not "factually inaccurate."  In the government's view, Juror 148's statements—which the government accurately recited to the court—demonstrated strong opposition.  App.5581-83.  That Juror

---

[31] Just as with Juror 261, when explaining that it struck Juror 148 because she was a 4, the government promptly noted the exception it made for Juror 270 based upon the difference in their answers to Question 74.  App.5580-81.  The fact that the government freely acknowledged—and credibly explained—the exception it made for Juror 270 further supports the district court's credibility determination.

148 characterized her views differently does not render the government's opinion "factually inaccurate." *See, e.g.*, *Flowers*, 588 U.S. at 313-14 (discussing counsel's misrepresentations of objective facts, such as whether a juror had worked with the defendant's sister, whether a juror was a close friend or a colleague of the defendant's sister, and whether a juror was the defendant's aunt). And the government's understanding that her opposition was "strong" made sense and reflected her *commitment* to her opposition of the death penalty, not the level of her opposition. App.5581 ("Juror 148's responses indicate a strong general opposition to the death penalty, a view that she expressed that she had had her whole life.").

Second, and in any event, "prosecutors can make mistakes when providing explanations" for their peremptory strikes, and such mistakes "should not be confused with racial discrimination." *Flowers*, 588 U.S. at 314. Rather, it is "a *series* of factually inaccurate explanations for striking…prospective jurors"—coupled with "other evidence of discrimination"—that "can be telling." *Ibid.* (emphasis added). As discussed above and below, there was no series of inaccurate explanations and no other evidence of discrimination in this case.[32]

---

[32] Bowers also argues that the government's reference to Juror 148's demeanor was improper. Br.214. He claims both that it evinces implicit bias and that it

*iii. Disparate questioning.* Bowers also argues that the government engaged in disparate questioning of Juror 148. Br.190-91, 197. It did not.

Bowers first compares the government's questioning of Juror 148 to that of Juror 348, "a white woman [the government] accepted who indicated on her questionnaire that she questioned the utility of the death penalty." Br.190, 196. Juror 348, however, answered Questions 73 and 74 differently than Juror 148. Juror 348 rated herself as 6(d), reflecting support for the death penalty generally, and no definite feelings about a case like this one. App.4248-50. She described herself as having a "middle of the road" opinion of the death penalty (App.4248), compared to Juror 148's self-proclaimed "modest[] oppos[ition]" to the death penalty (App.1877-78).

This distinction is key because, despite Bowers's contrary contention (Br.213), more than "mere" disparate questioning is required to show intentional discrimination. The Supreme Court has expressly stated that

---

shows the government was inappropriately striking her "based *solely* on intuition." *Ibid.* (citation omitted). Clearly, the government did not strike Juror 148 "solely" based upon intuition. It struck her because, among other things, she opposed the death penalty, because she had an understandable but negative reaction to government counsel, and because "given her past leadership positions as a council member," she likely "would be a leader in the jury room." App.5584. Further, the district court—which carefully reviewed the record for evidence of discrimination that might support Bowers's *Batson* claim—agreed with the government's factual description of Juror 148.

"disparate questioning or investigation alone does not constitute a *Batson* violation," as it "may reflect ordinary race-neutral considerations." *Flowers*, 588 U.S. at 310-11.   Only when the disparate questioning is "dramatic[]" or otherwise "rises to a certain level of disparity" can it suggest discriminatory intent. *Ibid.*

Here, the difference in questioning reflects the jurors' different opinions of the death penalty.  The government asked Juror 148 about her opposition to the death penalty more than it asked Juror 348 about her neutral position on the death penalty, because the government was concerned about jurors who opposed capital punishment.   This is precisely the type of "race-neutral consideration[]" that the Supreme Court has acknowledged may validly explain disparate questioning. *Flowers*, 588 U.S. at 310.  The district court was therefore correct in its understanding that only disparate questioning that is "undu[e]" or otherwise "inappropriate or suggestive of discriminatory motive" is improper. App.411.

Bowers next complains that the government "use[d] its questioning to offend" Juror 148 and then cited that offense as one of its bases for striking her. Br.197. But Bowers offers no evidence to support this accusation and the district court—which had the opportunity to view both the parties and the jurors during all of voir dire—found nothing of the sort.  The court "recall[ed] a notable

reaction from Juror No. 148" and found that she "bristled at the questions asked in response to documents provided to the Court by the Government during questioning," but did not suggest that the questioning was unjustified or unfair. App.409. The court concluded that the government's concern regarding Juror 148's demeanor—which was, in any event, secondary to its concern regarding her views of the death penalty—was credible and not motivated by discrimination. That finding warrants "great deference on appeal," and Bowers's speculative allegations do not justify a finding of clear error. *Hernandez*, 500 U.S. at 364; *see also Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).[33]

---

[33] In addition to his claims of juror-specific racially disparate questioning, Bowers also cites statistical averages in an attempt to suggest that the government asked certain jurors more questions because of their race. Br.195-96. But "[o]ne can slice and dice the statistics and come up with all sorts of ways to compare" questioning of excluded jurors of one race with questioning of accepted jurors of another race. *Flowers*, 588 U.S. at 308. The key question is whether the length of the party's questions tracks race-neutral or racial lines. *Ibid.* Here, even Bowers's statistics show that the government asked more questions of those jurors it struck than of those it accepted—regardless of their race. *See* Br.195-96. And the record shows that between White jurors who were accepted and Black and Hispanic jurors who were not, the distinction was the race-neutral characteristic that the excluded jurors had greater opposition to the death penalty. *See, e.g.*, pp.153-78, *infra/supra*.

### c. The government credibly struck Juror 290 primarily because she opposed the death penalty.

Prospective Juror 290 is a Black woman.   App.5564, 5586.   The government struck her because she opposed the death penalty.   Like Juror 148, Juror 290 rated herself as 4(e), indicating opposition to the death penalty generally and in a case like Bowers's.   S-App.866.   The government also noted that she stated in her questionnaire that she would "automatically vote against the death penalty, regardless of the facts and the aggravating evidence"[34]; testified that, given her religious beliefs—including "thou shalt not kill"—she had "some conflict" with participating in the trial; and otherwise testified equivocally about whether she could vote for the death penalty.   S-App.866; App.3849, 3852, 3857.   She "got emotional throughout her questioning" about both her ability to vote for the death penalty and when discussing gun violence. App.5587, 3863-64.   She also appeared eager to be on the jury, had critical views of the criminal justice system, was unemployed, and expressed inconsistent concerns about her employment status if she was chosen to serve as a juror. App.5586-88.

---

[34] Juror 290 said "[y]es" when Bowers's counsel asked if she could follow an instruction to not automatically pick one sentence over the other.  App.3847.

*i. Side-by-side comparison.*    Bowers argues that, as with Juror 148, the government's acceptance of Juror 270 proves that the government's explanation for striking Juror 290 was pretextual.  Br.187.  But, again, Juror 270 had "no definite opinions for or against the death penalty," contrary to Juror 290's "general[] oppos[ition] to the death penalty."  S-App.866; *see* pp.161-62, *supra*.  Bowers's comparison between these two jurors is thus incorrect.  *See Hebert*, 890 F.3d at 224 (concluding that so-called comparator who had a different view of the death penalty was not sufficiently similar for side-by-side comparison).

*ii. Misrepresentation of evidence.*    Bowers next contends that he "showed that the government's characterization of [Juror 290's] employment status misrepresented the record."  Br.187; *see also* Br.193.  He did not.  Government counsel stated,

> She indicated she was unemployed.  And she had stated that she was concerned about her unemployment, but then she later said she would not be stressed about finding a job despite the length of this trial, which seemed to be inconsistent to us, but also seemed to indicate sort of significant eagerness to be on this jury.

App.5587.  Juror 290 testified that she "was laid off from [her] job" recently and that she was "concerned about [her] ability to enter new positions" given that the trial "is going to last a long time."  App.3828, 3830.  She later said that she "ha[d] a lot of resources to help [her] find employment.  So that's not [her] main concern."  App.3833.  The government reasonably stated that those statements

168

"seemed to be inconsistent." App.5587. And, as explained above (pp.162-63, *supra*), arguable characterizations of testimony—as opposed to misstatements of objective fact—are not evidence of pretext or discriminatory intent. *See Flowers*, 588 U.S. at 314.

Bowers also contends that the government misrepresented the record because it stated that Juror 290 got emotional "throughout" her questioning. Br.193. To the contrary, the Juror 290's testimony and the district court's findings support the government's description. The court initially thought that Juror 290 was using tissues due to "a seasonal allergy." App.3864. However, her use of tissues "continued," and the court concluded that it "was not a seasonal allergy thing"; instead, "[s]he was becoming a bit emotional," and "was choked up" when government counsel asked if she could put her name on a verdict sheet imposing the death penalty. *Ibid.* Later, Juror 290 testified that she was "very sad" because her cousin was shot and killed a year prior and that discussions of gun violence were therefore "triggering." App.3834, 3855-56. Juror 290 stated that, given this, she "g[o]t emotional" about gun violence during her individual questioning. App.3855. This supports the government's statement that Juror 290 was emotional throughout voir dire.

*iii. Disparate questioning.* Bowers argues that the government's failure to ask a White juror about her cousin's murder, in comparison with its "five

169

questions" to Juror 290 about her cousin's murder, shows that the government's strikes were motivated by race.  Br.197.  These two jurors, however, are not comparable.

Like Juror 290, Juror 191 testified that one of her relatives was murdered: her aunt beat her grandmother to death and was sentenced to prison.  App.2636-37.  The similarities, however, end there.  Juror 191's grandmother was not killed with a gun.  *Ibid.*  And Juror 191 testified that hearing victims' family members testify in this case would have "no impact" on her feelings regarding her grandmother's murder.  App.2641-42.  She explained that hearing "stories that are similar to [hers] ha[s] no impact on how [she] feel[s]."  App. 2640-41.  And, critically, she did not have an emotional response during voir dire.  App.2636-42.  The distinction in questioning was thus based upon a significant and race-neutral distinction between the jurors and does not show that the government discriminated against Juror 290 when it struck her.  *Flowers*, 588 U.S. at 310-11.[35]

---

[35] After referencing the murder of Juror 191's grandmother, Bowers's brief states that the juror "had to be excused" "because testimony about the violence of the offense evoked upsetting memories of the killing in her family."  Br.197 n.62.  This is misleading.  Juror 191 (who became Juror 5 when she was seated on the jury) was later excused not because she was upset about the murder of her grandmother but because pictures from the crime scene in this case reminded her of cleaning up the scene when her brother committed suicide by shooting himself in the head with a shotgun.  App.14115-28.  The government had no reason to foresee that reaction (Juror 191 did not discuss her brother's suicide

170

*iv. Other circumstances: disparate impact.* Finally, Bowers contends that the government's reliance on Juror 290's critical view of the criminal justice system as a race-neutral reason to strike her suggests that the government had discriminatory intent because Black people disproportionately hold those views. Br.198-99.

This contention lacks merit. Bowers cannot show that the district court's finding that criticism of the criminal justice system is a race-neutral reason for strikes was "devoid of minimum evidentiary support" or "b[ore] no rational relationship to the supportive evidentiary data" to constitute clear error. *Uwaezhoke*, 995 F.2d at 394 (citation omitted). Nor does any alleged "disproportionate impact" of the government's questions regarding the criminal justice system support a finding of "invidious intent" given the surrounding circumstances. *Batson*, 476 U.S. at 93. Law enforcement officers were both witnesses and victims in this case. It was thus fair—and fully supported by the record—that when choosing "between jurors who ha[d] concerns about the criminal justice system and those who [did not]," the government would prefer jurors who did not. App.5579.

---

during voir dire) and it therefore cannot be faulted for viewing Juror 191 differently than Juror 290—especially because only Juror 290 was emotional during voir dire.

171

Additionally, Bowers's disparate impact argument has concerning implications. It is rooted in the false assumption that all Black people have the same critical view of the criminal justice system (and that no one of any other race shares that view). Further, if followed to its logical conclusion, Bowers's argument would allow a party to strike a White juror because he viewed the criminal justice system critically but would not allow a party to strike a Black juror who had the same view.[36] That is precisely the sort of racial discrimination that *Batson* is meant to prevent. *See Georgia v. McCollum*, 505 U.S. 42, 48-50, 59 (1992) (holding that a party's "purposeful discrimination on the ground of race in the exercise of peremptory challenges" was unconstitutional).

### d.    The government credibly struck Juror 95 primarily because he did not come to court.

Prospective Juror 95 is a Black man. App.5564, 5576. The government struck him because he twice failed to appear in court when summoned, rescheduled his attendance "several times," and at the time of peremptory strikes, had not responded to the court's "several" efforts to reach him at "all available contact points." App.5549. While there were other race-neutral reasons that the government noted—his youth, employment history, and views

---

[36] Notably, the government moved to strike, and the court did so strike, Juror 233, who is White, in part because of his critical views of the Federal Bureau of Investigation. App.2938-39, 4105-06.

of the death penalty and the criminal justice system—the government maintained that the "failure to show is in our view a definitive reason to have stricken him from the jury." App.5579.

None of Bowers's belated efforts to refute this evidence has merit.

*i. Side-by-side comparison.* There were no prospective jurors comparable to Juror 95 because no other juror failed to come to court despite several summonses from the court. App.410. Bowers does not dispute this fact and instead proffers comparators for the government's secondary reasons for striking Juror 95, while entirely ignoring the primary reason—his failure to appear. *See* S-App.291-94; Br.191.

Each of the jurors that Bowers points to as being of similar age or having similar employment histories (Br.191-92, 198),[37] *came to court.* The government was selecting a jury that would serve for many weeks and would be relied upon to appear every day. The difference between Juror 95 (who failed to appear) and those other jurors is "significant," *Miller-El*, 545 U.S. at 247, and sufficient to end the side-by-side comparison.

---

[37] The government did not in fact argue that Juror 95's employment history was, by itself, grounds for a strike. Rather, the government stated that it was concerned about Juror 95's reliability for multiple reasons, including his employment and age, and that this concern was confirmed when he failed to appear for jury selection. App.5576-77.

173

*ii. Other circumstances: disparate impact.* Bowers contends that the race-neutral basis that Juror 95 had critical views of the criminal justice system suggests that the government had discriminatory intent because those views are disproportionately held by Black people. Br.198.

Again, this contention lacks merit. Just as with Juror 290, the record supports the government's stated choice to strike jurors who could have viewed its witnesses and victims critically, and accepting Bowers's logic would result in improper discrimination. *See* pp.171-72, *supra*.

### e. The government credibly struck Juror 332 primarily because of his criminal history.

Prospective Juror 332 is a Black man. App.5564, 5591. The government struck him because he had a concerning criminal history. He had been arrested 3 times in the 6 years since turning 18, including twice in the 2 years before the trial. App.14041-42; S-App.873, 884. During the 2022 arrest, officers seized a firearm with a revoked license. App.14042. During the 2021 arrest, he had "17 packets of blunts, five baggies of marijuana, baggies of oxy and other narcotics." App.14041-42. And during a 2017 arrest, he reportedly told officers that "if he fell, he would accuse the police of excessive force." App.14042-43. One of the responding officers for that arrest also responded to the Tree of Life Synagogue

174

during Bowers's attack and was listed as one of the government's witnesses.[38] *Ibid.* Just as with Juror 95, there were other factors that concerned the government—inconsistencies in his testimony about the death penalty, his view of Bowers, and his age—but those factors were "secondary." App.5591-92, 14041. The "dispositive" factor in the government's decision to strike Juror 332 was the nature of his criminal history. App.14041.

    *i. Side-by-side comparison.* Bowers contends (Br.192) that the government accepted a juror with a criminal history comparable to that of Juror 332. This is not true.

    The supposedly comparable juror was Juror 215, who is White. *See* Br.192 (citing S-App.292). Juror 215 was 52 at the time of voir dire—whereas Juror 332 was 24 years old—and had been arrested *once*, decades prior, resulting in a single misdemeanor possession conviction. S-App.416-17, 691, 702. That does not compare to Juror 332's firearm and narcotics charges, and three arrests in six years, including two in the preceding two years—not to mention Juror 332's arrest *by a government witness* and alleged statements about his willingness to falsely accuse the arresting officers of assault. In short, as compared to Juror

---

[38] The government did not have these police records during voir dire, but received them before exercising its strikes on April 25, 2023. App.14043-44. Had the government known that Juror 332 had been arrested by one of its witnesses, it likely would have moved to strike him for cause. *Ibid.*

215, Juror 332 had a longer list of prior arrests, for more serious crimes, over the course of fewer years, and in more recent memory; a prior adverse encounter with a government witness; and an alleged history of dishonesty and openness to thwarting the proper administration of justice. These "significant differences" defeat Bowers's attempt to show discrimination through side-by-side comparison. *Savage*, 970 F.3d at 269.

Bowers's other attempts at comparisons fail because they do not capture the "entirety" of the government's reasons for striking Juror 332. *See Miller-El*, 545 U.S. at 247. He points to Juror 191, "a white woman who was 23 years old" (Br.191; S-App.292-93), while ignoring that she had no criminal history at all. S-App.676. And although Bowers tries to compare (Br.192) Juror 332's employment history to that of an accepted White juror (Juror 215), the government never identified Juror 332's employment history as a basis for striking him. *See* App.5590-92 (offering employment history as a basis for striking Juror 95, not Juror 332).

Just as with Juror 95, Bowers's attempts at a side-by-side comparison fail because his chosen comparators are not "similarly situated" to Juror 332. As such, the government's acceptance of Jurors 191 and 215 does not prove that it discriminated against Juror 332 when it struck him.

176

*ii. Misrepresentation of evidence.*  Bowers also argues that the government misrepresented the record as to Juror 332 and that therefore the government's stated reasons for striking him were pretextual.  Br.194.  Specifically, Bowers contends that the government mischaracterized Juror 332's reference to Bowers as "just a guy" by arguing that this statement made it "unclear where [Juror 332] st[ood] on what the defendant did and…the seriousness" of Bowers's crime.  Br.194.  Bowers argues that Juror 332's other statements that he would not "jump to a conclusion," would "want to see the evidence…and formulate [his] own opinion," and would "need to know more…to properly sentence him" prove that the government mischaracterized Juror 332's statements.  Br.194.

But Bowers omits the inconsistencies in Juror 332's statements that led the government to be unclear about his views.  Although Juror 332 did refer to Bowers as "just a guy," he later effectively called him "a monster."  App.4026, 4037.  Juror 332 also stated that he believed a life sentence was equivalent to a death sentence (App.4040), but then said that he would "have no choice but to be for the death penalty" in a hate crimes case (App.4031).  It was the inconsistency in these two sets of statements that made it "difficult to understand where [Juror 332] st[ood] on" his ability to fairly consider which penalty to impose and on his opinion of Bowers.  App.5591-92.  And none of the statements that Bowers highlights in his brief explains away these

177

inconsistencies. If anything, they further confuse the issues of how Juror 332 viewed Bowers and whether he would fairly consider the death penalty.

*iii. Other circumstances: disparate impact.* As with Juror 95, Bowers argues that the government's reliance upon Juror 332's "doubts about the fairness of policing and criminal prosecution" was improper because, according to Bowers, Black people disproportionately have such doubts. Br.198-99.

For the reasons stated above, that argument cannot withstand scrutiny. *See* pp.171-72, *supra*. And it is especially misplaced here because the government did not strike Juror 332 because of any stated "doubts about the fairness of policing and criminal prosecutions." Juror 332 never stated that he had such doubts. When asked about his "opinions or attitudes toward the criminal justice system," Juror 332 stated "it's here for a reason." S-App.885. During voir dire, he stated that he "believe[d] the system does its job" and that even with his experience with the system, he did not "have any ill will towards the law." App.4019-20. The record thus defeats Bowers's contentions concerning disparate impact as to Juror 332.

\* \* \*

In all, Bowers failed to offer any convincing evidence that the government's race-neutral reasons were not credible. Despite his complaints about the way the district court framed its rulings, the record fully supports the

178

court's conclusions, and its rejection of Bowers's *Batson* claims should be affirmed.

## VI. THE DISTRICT COURT CORRECTLY DENIED BOWERS'S MOTION TO DISQUALIFY JUROR 119.

Bowers contends (Br.142-80) that the district court should have dismissed Juror 119 for cause based on implied or actual bias. That claim is meritless. The district court properly denied Bowers's challenges.

### A. Background

#### 1. Jury questionnaire

In her questionnaire, Juror 119 stated that she was born and raised in China; had a bachelor's degree in law from a Chinese university; worked as a paralegal between 1986 and 2010[39] at a Pittsburgh law firm, where her primary responsibility was preparing legal documents; and had been retired for ten years. App.14176-77, 14179-80. The questionnaire did not list any employment in China. App.14177.

Juror 119 indicated in her questionnaire that she was "strongly in favor" of the death penalty (marking "10" out of 10) and that the death penalty was "needed" and "[v]ery [i]mportant." App.14193-94. But when asked about the

---

[39] Elsewhere, Juror 119 reported that she had worked as a paralegal for 14 years. App.14177, 14179.

sentence for someone guilty of murder on facts tracking those in this case, Juror 119 answered that she had "no definite opinion for or against the death penalty," and that she could vote for or against the death penalty based on what she "believed was called for in light of the facts and the law." App.14194. Juror 119 stated that she would not vote "automatically" for the death penalty in a capital case. *Ibid.* Although Juror 119 stated that the death penalty "should [be] use[d] more," she also stated that, in deciding an appropriate sentence in a murder case, the "reason" for the killing would be important to her and agreed that the following factors would also be relevant: the defendant's personal circumstances, childhood, and background, and whether the defendant has a mental illness, abnormal brain development, or brain damage. App.14195.

### 2.    Voir dire

a. During voir dire, the district court followed up on Juror 119's response that she strongly supported the death penalty. App.1681. Juror 119 clarified that she was describing a situation where the defendant was guilty of a serious crime and stated simply that "he should be punished as according to law." *Ibid.* Juror 119 had "no definite opinion" on whether the death penalty should be applied in a given case because she needed to know the facts, stating: "I don't want [to be] jumping to conclusion[s]. I want to see what reason, what is the

circumstance, why this happened.  I want to see the whole picture to make my personal opinion."  *Ibid.*

b. In response to questioning by the government, Juror 119 stated that she would make her decision about an appropriate sentence only after she heard all of the evidence and received the district court's instructions on the law. App.1682.  She confirmed that she would not vote automatically for the death penalty; would take into account the defendant's personal circumstances, childhood, and background, and any mental illness or brain impairments; and would "give meaningful consideration to the evidence."  App.1683-85.

c. In response to defense counsel's questioning, Juror 119 stated that she obtained her law degree in China in 1983 when she was 32 years old.  App.1686-87.  Asked about how the death penalty was applied in China, Juror 119 reported that her first job after graduation had been with "the highest court in Shanghai" at a time when China had a "very strict[]" death penalty law; the country had "just finished a counterrevolution," there was a lot of crime, and society was "very unsafe[]."  App.1687-88.  China had adopted a rapid process for imposing and carrying out death sentences.  App.1689-90 ("Six months from arrested until death penalty.").

At this time, Juror 119 worked in a policy-related office in the Shanghai court, but for "a couple months," she was assigned to another office to help

181

review death sentences.  App.1688-89.  Juror 119 reviewed five or six death sentences.  App.1689.  In one case, Juror 119 and her colleagues "reduced" the defendant's "penalty," giving him a "chance to correct himself in the jail." App.1688.  In another case, where a man had killed his girlfriend, they affirmed the death sentence, and Juror 119 ended up monitoring the man's execution. App.1689.  That was the only execution she monitored.  *Ibid.*  After less than one year, China reverted back to its "normal," less rapid process for imposing and carrying out death sentences.  App.1689-90.

Asked for her opinion on the death penalty in the United States, Juror 119 stated that using it more frequently might deter others from committing serious crimes.  App.1691.  She believed there was a lot of "crime now."  App.1692. Juror 119 was "not against the jail system," but based on what she saw on television, prisoners in American jails appeared to be "comfortable."  *Ibid.*  In movies and television shows, she saw that prisoners serving life sentences sometimes get released "after 20, 30, maybe 50 years."  App.1693.  Asked about an appropriate sentence for "premeditated murder, multiple innocent victims in a place of worship and no legal excuse," Juror 119 stated that it would depend on various factors.  App.1694; *see* App.1695 ("I need to see this person.  I need to see this case to see if he have a chance or not [at changing].").  Asked if there was "a certain age" when changing a person "really is not an option," Juror 119

replied, "50, 60, it's too old to be changed," but immediately added, "It's just in my mind. I don't know." App.1695.

Defense counsel then asked Juror 119 whether she would believe ("somewhere in the back of your mind") that a person with a life sentence might someday get released even if the court instructed her that the defendant was "never going to get out." App.1695-96. She replied: "I cannot make [a] decision until I see the specific case. Specific. All the information together....I cannot hear one thing, two thing[s]. Without a picture, I cannot." App.1696.

d. The district court followed up on Juror 119's responses. In light of her legal training, the court asked, "You understand that, as a juror, you would be required to follow the law as was given to you by the judge, and of course that would just be U.S. law that relates to this case"; Juror 119 replied, "Yes." App.1696-97. Juror 119 affirmed that she would "disregard any other training, experience or knowledge [she] ha[d] of the law other than what the judge" told her. App.1697. Referencing her comments about television and movies, the court then told her that she could not consider anything learned outside the courtroom; Juror 119 again affirmed that she would "make [her] decision based only upon the evidence presented in court." *Ibid.*

183

### 3.    Denial of challenge for cause

a. The defense moved to disqualify Juror 119. App.1698. First, counsel cited "a number of instances" where Juror 119 had "problems comprehending the question or the English." *Ibid.* Second, counsel alleged that, contrary to her questionnaire, Juror 119 "expressed some very definite opinions about the death penalty" during voir dire. *Ibid.* Counsel conceded, however, that Juror 119's responses did not demonstrate an intent to obscure her positions as they "were not intentionally vague." *Ibid.* Third, counsel maintained that Juror 119's experience "reviewing death cases in China" required "a very personal engagement in th[e] process" and placed her "in a unique and…inappropriate position" to serve on the jury in this case. App.1700; *see also* App.1705-06.

The government "strongly" disagreed that Juror 119 should be struck for cause, noting that she had worked for many years as a paralegal in the United States and clearly understood English, and that she was a "thoughtful person"—"time and again, [she] said I can't come to some decision on this case until I get all the facts and all the law and I will follow that." App.1698-99.

b. After carefully reviewing the transcript following voir dire, the district court denied the motion to disqualify Juror 119. App.1699, 2009-10. The court found that she was "clear, communicative, and responsive." App.2010. The court further found that Juror 119's "past experience with Chinese law is just

184

what it is. I don't think it impairs her. It's just what her history is. I see no reason why it can or should…constitute a basis for her disqualification." *Ibid.* Finally, while Juror 119 may have "explained her oral answers in a different fashion than her questionnaire," the court did not "see such striking contradictions as to warrant" dismissal, adding: "I think she more than adequately explained what she meant in the questionnaire through her oral examination. At the end of the day, I found her respectfully far from impaired." *Ibid.* The defense did not exercise a peremptory challenge on Juror 119; she was seated and served on the jury. *See* p.137, *supra*.

## B.   Standard of Review

The Court "review[s] for abuse of discretion the denial of a motion to strike a juror for cause." *United States v. Mitchell*, 690 F.3d 137, 148 (3d Cir. 2012). A court's finding as to actual bias is accorded considerable deference. *Id.* at 142; *see also Patton v. Yount*, 467 U.S. 1025, 1031-32 (1984) (trial judge's finding of juror impartiality may be overturned only for manifest error). Implied bias is a question of law reviewed de novo within the abuse-of-discretion framework. *Mitchell*, 690 F.3d at 148.

## C.   Argument

The Sixth Amendment guarantees criminal defendants the right to trial "by an impartial jury." U.S. Const. amend. VI. "Voir dire examination serves

to protect th[at] right…by providing the parties a means of uncovering juror bias." *Mitchell*, 690 F.3d at 141; *see, e.g.*, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994).

Courts distinguish between bias challenges based on "actual" and "implied" bias. *Mitchell*, 690 F.3d at 142. Actual bias "is the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Ibid.* (quotation omitted). It may be evident "when a venireperson admits partiality or may be inferred from responses to voir dire questioning." *Ibid.* "Implied bias, by contrast, is…'bias attributable in law to the prospective juror regardless of actual partiality.'" *Ibid.* (quoting *United States v. Wood*, 299 U.S. 123, 134 (1936)). It "is rooted in the recognition that certain narrowly-drawn classes of jurors are highly unlikely, on average, to be able to render impartial jury service despite their assurances to the contrary." *Ibid.*

Bowers challenges Juror 119's impartiality only as to penalty-phase proceedings. Br.144. Juror 119's questionnaire and voir dire statements provided no reason to include her among the narrowly-drawn classes of presumptively biased jurors, and they indicated that, far from harboring actual bias, she would be fair and impartial at the capital sentencing. The district court correctly rejected Bowers's challenges.

186

1.   **The district court did not err in denying the implied-bias challenge.**

a.   **Implied bias arises only in exceptional circumstances.**

Implied bias arises only in "extreme" and "exceptional" situations. *Smith v. Phillips*, 455 U.S. 209, 222 & n.* (1982) (O'Connor, J., concurring); *accord, e.g.*, *Mitchell*, 690 F.3d at 147. The test is "whether the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case." *Mitchell*, 690 F.3d at 146.

In *Mitchell*, this Court found that "consanguinity is the classic example of implied bias" and held that this "kinship category of implied bias" applies to "jurors who are close relative[s] of a principal in a case," 690 F.3d at 145, 147 (quotation omitted), but does not cover distant relatives, *id.* at 147. *Mitchell* also rejected an implied-bias claim as to a juror who was an employee of the investigating police department and a co-worker of two "key" police witnesses. *Id.* at 148-50. As the Court explained, "'[p]rudence dictates that courts' considering an implied bias claim 'should hesitate before formulating categories of relationships [that] bar jurors from serving in certain types of trials.'" *Id.* at 149 (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990)); *see Tinsley*, 895 F.2d at 528 (implied-bias doctrine circumvents "the presumption of deference due trial court factual findings on the existence of actual bias"). Although "relationships between law enforcement witnesses and prospective jurors who

187

work with [them]" may be "tinged by partiality," the Court declined "to enlarge the categories of implied bias beyond those accepted at common law and hallowed by years of constitutional interpretation." *Mitchell*, 690 F.3d at 150. The better approach was "to trust in the procedural safeguards built into jury selection," which include challenging prospective jurors based on actual bias and exercising peremptory strikes. *Ibid.*

This Court's pre- and post-*Mitchell* decisions confirm that implied bias arises only in exceptional circumstances. In *Government of Virgin Islands v. Williams*, 476 F.2d 771, 773-74 (3d Cir. 1973), the Court agreed with uniform authority holding that, absent actual bias, "a juror is not disqualified merely because he previously sat in a similar case arising out of a separate and distinct set of circumstances even though the offenses charged in the cases are similar and some of the same prosecution witnesses testify in each case." In *United States v. Salamone*, 800 F.2d 1216, 1225-27 (3d Cir. 1986), a firearms case, the Court held that implied bias did not apply to a juror who was a member of the National Rifle Association. And in *United States v. Flanders*, 635 F. App'x 74, 77-78 (3d Cir. 2015), a murder case, the Court denied an implied-bias challenge to a juror whose uncle and two cousins had also been murdered, finding the connection "far too attenuated" to justify invoking the limited doctrine.

By contrast, the Court presumed bias in the more exceptional case of a

juror who had been robbed seven months before trial in a similar fashion to the charged conduct and failed to disclose it during voir dire.  *United States ex rel. De Vita v. McCorkle*, 248 F.2d 1, 5, 8 (3d Cir. 1957) (en banc); *but see United States v. Kechedzian*, 902 F.3d 1023, 1028 (9th Cir. 2018) (declining to find implied bias based only on fact that juror was previously victim of a similar crime, where juror disclosed it during voir dire).

Significantly, the Supreme Court has rejected the application of implied bias to an employment situation.  In the case of a communist defendant tried for failing to appear before the House Committee on Un-American Activities, the Court refused to presume bias in jurors who were federal government employees, even though an Executive Order subjected them to employment discharge for disloyalty to the government.  *Dennis v. United States*, 339 U.S. 162, 164, 169, 171-72 (1950); *see also United States v. Todman*, 117 F. App'x 824, 826-27 (3d Cir. 2004) (juror's employment by organization that represented person in an unrelated administrative proceeding in which defendant's attorney was opposing counsel was too "attenuated" to meet the "stringent" implied-bias standard).  Courts generally have "declined to find implied bias from a juror's employment alone even where closely related to the substance of the case." *Tinsley*, 895 F.2d at 529 (citing cases).

### b.    Juror 119's past work in China did not trigger implied bias.

Juror 119's brief work in China on death penalty cases decades ago does not satisfy the stringent standard for implied bias.  The district court correctly rejected Bowers's assertion to the contrary.  App.2010.

i. Voir dire examination made clear that Juror 119's work on death penalty cases was temporary and occurred long ago.  She testified that she reviewed "maybe five [or] six" death sentences in order to "help" a different office in the Shanghai court where she was working, and did so only for "a couple months." App.1687-89.  This was in or around 1983, approximately 40 years before trial in this case.  App.1687-88; *cf. United States v. Browne*, 525 F. App'x 213, 215 (3d Cir. 2013) (holding that domestic violence incidents involving juror's relatives that were "not recent" cut against actual bias).  Voir dire also showed that her review was even handed: Juror 119 described one case where she and her colleagues "revised" (rescinded) the death sentence to give the defendant a "chance to correct himself in the jail," and another case where they affirmed the death sentence based on the seriousness of the conduct.  App.1688-89.

The passage of time since Juror 119's review of death sentences, the brief nature of that work, and her objective reviewing function leave no room to find that "the average person" in Juror 119's position "would be prejudiced and feel substantial emotional involvement in the case." *Mitchell*, 690 F.3d at 146.  That

190

she once monitored an execution does not affect the calculus.   App.1689. Bowers mischaracterizes the record in asserting that Juror 119 "supervised" (Br.145), "personally assisted" (Br.164; *accord* Br.170), "personal[ly] participat[ed] in" (Br.166), and "carr[ied] out" (Br.167) executions in China. Juror 119 stated that she served as a "monitor" to an execution and did so in "only one case."   App.1689.   Such past involvement with application of the death penalty, especially so long ago, does not establish implied bias.   *Cf. Williams*, 476 F.2d at 773-74 (prior service as juror in similar case does not give rise to implied bias); *Mitchell*, 690 F.3d at 148-50 (employee of investigating police department not presumed biased).

ii. The Ninth Circuit's rejection of implied bias in *Tinsley*, 895 F.2d at 529, a rape case involving circumstances more conducive to juror removal than those present here, highlights the weakness of Bowers's challenge.   *See Mitchell*, 690 F.3d at 149 (quoting *Tinsley*).   One juror in *Tinsley* was a psychiatric social worker who, for a year and a half, intermittently had counseled a different rape victim suffering from rape trauma; the juror even "testified in the rape victim's behalf, and gave testimony as to the victim's credibility—the very issue at the center of Tinsley's defense[.]"   895 F.2d at 524, 529.   Even though the juror allegedly had "close and sympathetic ties" to that rape victim, the Ninth Circuit held that the circumstances "d[id] not warrant a presumption of bias" in

191

Tinsley's case because neither the juror nor a close relative had been a rape victim, and "[t]here was no personal connection between [the juror] and the defendant, the victim, or any other witness." *Id.* at 529. The court also noted, *inter alia*, that "[t]he rape victim was one client" in the juror's "30-year career." *Ibid.*

Similarly, neither Juror 119 nor a close relative was the victim of a crime, let alone a violent crime, and Juror 119 had no personal or employment connection to Bowers, defense counsel, the government, victims, or any other witnesses. App.14186-87, 14191-92. Likewise, her work on death sentences in another country was a single episode in a lengthy legal career. Several factors here are even less indicative of implied bias than in *Tinsley*. For example, Juror 119's period reviewing death sentences (a "couple months") was shorter than the 18-month period over which the *Tinsley* juror counseled the rape victim, and Juror 119's role was more neutral. App.1688-89. The *Tinsley* juror testified on the rape victim's behalf only three years before the *Tinsley* defendant's trial, 895 F.2d at 524, whereas Juror 119's review of death sentences predated Bowers's trial by approximately 40 years.

Previous work experience was not among the "principal causes of challenge" to jurors at common law. 3 William Blackstone, *Commentaries on the Laws of England*, at 363 (1771-1772); *see Mitchell*, 690 F.3d at 144 n.4 (explaining

192

that a "principal cause" challenge was "the common law analogue of an implied bias challenge"). Juror 119's brief, decades-old experience reviewing death sentences is not an exceptional circumstance warranting a presumption of bias.

iii. Bowers's authorities are inapposite. In four cases (Br.162-63, 167), the juror or the juror's close relatives had been involved in the same type of conduct that was at issue in the case. *See United States v. Eubanks*, 591 F.2d 513, 516-17 (9th Cir. 1979) (sons of juror in heroin case were in prison for heroin-related crimes); *Jackson v. United States*, 395 F.2d 615, 616-18 (D.C. Cir. 1968) (juror was previously involved in a "love triangle" similar to the one at issue in trial); *Burton v. Johnson*, 948 F.2d 1150, 1158-59 (10th Cir. 1991) (in case where defendant presented evidence of battered woman's syndrome, juror was ongoing victim of domestic abuse); *United States v. Henderson*, 613 F. App'x 113, 114-15 (3d Cir. 2015) (juror in drug-conspiracy case had prior drug charge and believed in legalization of drugs).[40] Those scenarios are qualitatively different than objectively reviewing death sentences imposed on unrelated persons.

Bowers's reliance (Br.163) on *United States v. Segal*, 534 F.2d 578 (3d Cir. 1976), involving bribery of an IRS agent, is also misplaced. The district court in *Segal* erred by not permitting questions into whether prospective jurors or their

---

[40] *Henderson* is an actual bias case. 613 F. App'x at 115.

193

family members had worked for the Internal Revenue Service, to assess lingering loyalties. *Id.* at 581. But this Court did not hold that such past employment necessarily amounted to implied bias—only that it "might furnish the basis for an intelligent exercise of peremptory challenges or motions to strike for cause." *Ibid.* Here, neither Juror 119 nor an immediate family member previously worked for the federal government or had a connection to the Tree of Life Synagogue. App.14177, 14191-92.[41]

iv. Bowers's other arguments are meritless. He contends that the district court "misapprehend[ed]" the implied-bias issue in ruling that Juror 119's "'past experience with Chinese law is just what it is.'" Br.158 (quoting App.2010). To the contrary, the court emphasized that this experience was part of Juror 119's past ("what her history is"), not the present, and found that it did not "impair[] her." App.2010. The court did not misapprehend the issue.

Bowers misconstrues Juror 119's voir dire statements in asserting (Br.164-66) that she "embraced" the death-penalty policy China adopted in 1983. When describing China's adoption of a strict death-penalty law, Juror 119 used "we" as shorthand for the country as a whole. App.1688. Her explanation of the

---

[41] *McCoy v. Goldston*, 652 F.2d 654, 659 (6th Cir. 1981), a wrongful death case involving a juror's failure to disclose her son's application to become a probation officer, is inapposite for the same reason. Br.162.

194

policy was descriptive; she did not endorse it. App.1687-88. To the contrary, when defense counsel asked Juror 119 if she believed the policy was "an effective, efficient way of justice," she replied, "No," and explained that, in less than one year, China reverted to its "normal"—more drawn out—process in death penalty cases. App.1689-90.[42]

Bowers's argument (Br.168-69) that bias is evident in Juror 119's non-disclosure of her previous employment in China on her questionnaire is meritless. Defense counsel did not make that assertion below, App.1697-98, 1700, and even conceded that Juror 119's voir dire responses "were not intentionally vague," App.1698, so his argument here should be reviewed only for plain error. *See Perrin*, 149 F.4th at 277. The record shows no intentional concealment. Juror 119's other questionnaire disclosures—that she was from China, lived there as an adult, and obtained a law degree from a Chinese university, App.14175-76—were inconsistent with an intent to conceal her legal work in China. Indeed, during voir dire, Juror 119 forthrightly disclosed her work reviewing death sentences in response to a general question about the death penalty in China. App.1687. The likely explanation for the questionnaire

---

[42] Bowers's other arguments about Juror 119's statements, concerning life imprisonment and American prison conditions, Br.165-66, are actual-bias arguments. As explained below, they do not show bias.

omission is that Juror 119 limited her work history to her decades-long employment in the United States. The record does not support a finding that Juror 119 was intentionally misleading, let alone plainly so. *See United States v. Frost*, 125 F.3d 346, 380 (6th Cir. 1997) (explaining that court had declined to presume bias in cases where jurors unintentionally failed to disclose information).

Finally, Bowers's speculation (Br.169-70) that Juror 119 may have discussed her employment experience in China with other jurors is unsupported by evidence. In theory, any juror could share a past work experience with another juror; that does not make the matter an exceptional circumstance triggering implied bias. Bowers's cases (Br.169) are inapposite. *See Oswald v. Bertrand*, 374 F.3d 475, 480-81 (7th Cir. 2004) (involving "poisoned" jury-selection process); *Stouffer v. Trammell*, 738 F.3d 1205, 1218-19 (10th Cir. 2013) (involving improper juror communication); *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) (involving ex parte contact with juror).

> **2.    The district court did not abuse its discretion in denying the actual-bias challenge.**
>
> > **a.    Actual-bias rulings are accorded substantial deference.**

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded

for cause because of his or her views on capital punishment…is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (quotation omitted). This standard applies both to venirepersons who strongly favor capital punishment and to those who strongly oppose it. *See Morgan v. Illinois*, 504 U.S. 719, 732-34 & n.7 (1992). The key question concerning impartiality is whether the juror "can lay aside his opinion and render a verdict based on the evidence presented in court." *Patton*, 467 U.S. at 1037 n.12; *accord Salamone*, 800 F.2d at 1226; *see generally Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002) (the fact that a juror "strongly supported the death penalty does not raise an inference she could not follow the court's instructions properly").

This Court "defer[s] to rulings of the district court on actual bias because [the district court] possesses a superior capacity to observe the demeanor of prospective jurors and to assess their credibility." *Mitchell*, 690 F.3d at 142; *accord Witt*, 469 U.S. at 428; *Patton*, 467 U.S. at 1038-39. "The bluntness or hesitancy, confidence or discomfort displayed by prospective jurors as they respond to questions about the possibility of returning a capital verdict often reveals as much about bias as the actual answers given." *United States v. Quinones*, 511 F.3d 289, 301 (2d Cir. 2007). Moreover, "[e]very trial judge understands" that prospective jurors "cannot be expected invariably to express

197

themselves carefully or even consistently." *Patton*, 467 U.S. at 1039. Thus, trial judges "properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading" voir-dire questions posed by counsel. *Ibid.*

### b.     Juror 119 was not substantially impaired.

i. The district court did not abuse its discretion in finding that Juror 119's views would not substantially impair the performance of her duties as a juror. App.2010.

During voir dire, Juror 119 repeatedly stated that, if selected, she would not jump to conclusions about whether to impose the death penalty and would consider all of the evidence and the court's instructions on the law—"see the whole picture" (App.1681)—before making her decision. App.1681, 1682, 1684-85, 1696, 1697. These statements tracked Juror 119's questionnaire, which indicated that her decision on a death sentence would depend on "the facts and the law in the case" (App.14194); that she would not automatically vote for or against the death penalty (App.14194); and that she would consider not only the reason for the crime, but the defendant's personal circumstances, childhood and background, and any mental illness or brain impairments (App.14195). Thus, although Juror 119 generally supported the death penalty, her voir dire examination and questionnaire indicated that she would "in good

198

faith…consider the evidence of aggravating and mitigating circumstances as the instructions require[d] h[er] to do," *Morgan*, 504 U.S. at 729, and would "set aside" her opinion and "decide the case on the evidence," *Patton*, 467 U.S. at 1036. *See, e.g.*, *Haight v. Jordan*, 59 F.4th 817, 833-34 (6th Cir. 2023) (no actual bias where, *inter alia*, juror stated he would not automatically vote for death penalty and indicated he would fully consider mitigating evidence); *United States v. Polan*, 970 F.2d 1280, 1284 & n.2 (3d Cir. 1992) (affirming qualification of jurors who, *inter alia*, stated they would base their verdict on the evidence in the case).

The crux of Bowers's bias challenge below was that, during voir dire, Juror 119 "expressed some very definite opinions" in favor of the death penalty that allegedly were in tension with her questionnaire responses, such that "significant ambiguity" existed over her ability to be impartial. App.1698. The record contains no such ambiguity. At no point did Juror 119 indicate that her personal views would affect her ability to impartially decide Bowers's sentence.

Juror 119's assurances of impartiality were stronger than those of jurors in cases where reviewing courts declined to overturn the trial court's finding of impartiality. For example, in *United States v. Webster*, 162 F.3d 308, 343-44 (5th Cir. 1998), the Fifth Circuit declined to "'second-guess'" the district court's denial of a motion to strike a pro-death penalty juror who indicated she was

199

predisposed to convict a defendant. In *United States v. Fulks*, 454 F.3d 410, 428-29 (4th Cir. 2006), the Fourth Circuit held that the district court did not abuse its discretion in qualifying a juror who stated he would vote for the death penalty in 90% of cases unless the mitigating circumstances were "'something outrageous.'" *See also United States v. Nasir*, 17 F.4th 459, 467-68 (3d Cir. 2021) (en banc) (affirming qualification of juror who said only "she 'would think' and 'would hope' that she could be impartial," after revealing her tendency to believe what police officers said) (citation omitted). Indeed, "the Supreme Court has upheld the impaneling of jurors who, during voir dire, expressed doubts, or even disclaimed outright, their ability to be impartial." *United States v. Meehan*, 741 F. App'x 864, 872 (3d Cir. 2018) (citing *Patton*, 467 U.S. at 1032; *Murphy v. Florida*, 421 U.S. 794, 803 (1975)). Here, Juror 119 repeatedly affirmed that she would render a decision based on the evidence and the law. The district court did not abuse its discretion in finding her "far from impaired." App.2010.[43]

ii. On appeal, Bowers contends that Juror 119's statements in three areas cast doubt on her impartiality. He cites statements allegedly reflecting her view that: (1) life sentences are "not permanent" (Br.173-75); (2) life sentences are

---

[43] Bowers errs in contending (Br.179) that the court "did [not] consider whether [Juror 119's] statements about the death penalty indicated actual bias." The court specifically referenced needing to review the entire transcript, App.1699, and gave the matter further consideration, App.2010.

inadequate because "prisoners live luxuriously and burden taxpayers" (Br.175-76); and (3) "50 years old is too old for a life sentence" (Br.177-78). His argument lacks merit.

First, the district court could take into account that defense counsel asked Juror 119 leading and vague questions. *See Patton*, 467 U.S. at 1039. For example, it was defense counsel, not Juror 119, who first mentioned a "burden" on taxpayers, when asking Juror 119 a leading question about her television-based view that American prisoners seemed to live comfortably. App.1693. Defense counsel's question about the finality of a life sentence was also lengthy and confusing; occupying ten transcript lines, it asked Juror 119 whether, notwithstanding a court instruction, she would believe "somewhere in the back of [her] mind" that the defendant would someday get released. App.1695-96; *see also* App.1693-94.

Second, Juror 119's purported opinions concerning life sentences, prison conditions, and the age of defendants were not entrenched. Regarding the first two, she indicated that her comments were based on what she saw on television or in movies. App.1692-93. She also appeared to tie her comment that "50, 60, it's too old to change" to what she saw in a "movie" or on "TV." App.1695. She added caveats indicating her beliefs were not strongly held. *See, e.g.*, App.1692 ("I only see the TV show.  I don't know what real is."); App.1692

("I'm not against the jail system."); App.1694 ("[S]o life in prison may be good. I don't know."); App.1695 ("Maybe that person was changed so they let them go out."). And she indicated that her view about what age may be too old for change was just "[her] personal opinion," adding "It's just in my mind. I don't know." App.1695.

Third, the district court adequately followed up on Juror 119's responses to counsel. Referencing her statements about television shows and movies, the court told Juror 119 she would *not* be permitted "to consider or entertain any of that information you learned or think you learned outside of the courtroom." App.1697. It then asked her to confirm that she could "make [her] decision based only upon the evidence presented in court during the trial"; she replied, "yes." App.1697. Juror 119 also agreed to "disregard any other training, experience or knowledge…of the law other than what the judge" instructed. App.1697. This questioning was well within the bounds of the court's "ample discretion in determining how best to conduct the *voir dire*," *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (plurality op.), and resolved any arguable concerns raised by defense counsel's examination.

iii. Bowers's additional arguments are unsound. He contends that Juror 119 never "retracted," "backed away from," or "disavowed" her alleged views about life sentences, prison conditions, and the cutoff age for a defendant to

202

change.  Br.172-73, 175, 177.  But that misapprehends the standard for juror impartiality, which is whether the juror credibly showed that she "could set aside any opinion [s]he might hold and decide the case on the evidence." *Patton*, 467 U.S. at 1036; *accord, e.g.*, *Salamone*, 800 F.2d at 1226.  Juror 119 did that in response to the district court's specific follow-up questioning, and before then, by repeatedly stating she would make a decision about a sentence only after hearing all of the evidence in the case and the court's instructions on the law.  App.1681-85, 1694-97.  Given Juror 119's express affirmations that she would do exactly what the impartiality standard requires, Bowers's argument that Juror 119 never affirmatively stated she could be "impartial," Br.176, is misplaced.

Bowers's arguments about the adequacy of the court's questioning are equally baseless.  He complains (Br.174) that the court "never actually *asked* Juror 119 whether she could follow the law," but rather admonished her to do so.  But the court prefaced its statement about needing to follow the court's legal instructions with "You understand," and Juror 119 replied, "Yes," indicating she would comply.  App.1696-97.  Bowers also ignores the portion of the colloquy where the court told Juror 119 not to consider what she learned from television shows and movies—the basis for statements Bowers now challenges— and had her affirm again that she would base her decision "only upon the

203

evidence presented in court during the trial." App.1697; *see* Br.174-75. The court's questioning was tailored and appropriate.

Finally, Bowers's repeated reliance (Br.171, 172, 175) on *Miller v. Webb*, 385 F.3d 666, 674-78 (6th Cir. 2004), is misplaced. There, a divided Sixth Circuit panel held that a habeas petitioner received ineffective assistance of counsel because his attorney failed to challenge a biased juror. *Miller*, 385 F.3d at 674-78. The majority pointed to the juror's statement that she would be partial to a key government witness and the juror's equivocal response to a single follow-up question on whether she could be impartial. *Id.* at 674-75. Assuming those facts show bias, they do not resemble this case, where Juror 119 stated unequivocally that she would appropriately base her sentencing decision on the evidence, App.1681, 1682, 1684-85, 1696, and re-affirmed that point during follow-up questioning, App.1697. Bowers cannot show that the court's ruling was an abuse of discretion.

### 3. Remand is unwarranted.

Bowers's alternative request to remand "for further consideration of the bias issue" is meritless. Br.178-80.

a. As to implied bias, the record already shows that Juror 119 reviewed death sentences approximately 40 years before trial while working at a court in Shanghai; the work lasted only a couple of months, she handled only five or six

cases, and she served as a monitor for only one execution. *See supra.* Bowers's argument (Br.179) that "the court failed to ask about [Juror 119's] views on" China's death penalty "campaign or its propriety" is specious; that information was already in the record because defense counsel asked Juror 119 whether her "personal involvement in reviewing these cases and the way China was addressing these serious crimes" was "an effective, efficient way of justice," and Juror 119 responded "No." App.1689.

Bowers's complaint (Br.179) about Juror 119's questionnaire omission is likewise hollow. As discussed, she forthrightly disclosed her work in China on death sentences during voir dire. App.1687-88. Defense counsel even conceded that Juror 119's voir dire responses "were not intentionally vague." App.1698; *see also United States v. Noel*, 905 F.3d 258, 272-73 (3d Cir. 2018) (discussing defense's obligation "to inquire further" if there is a reasonable possibility that additional information would reveal potential bias). Because implied bias is limited to exceptional circumstances and the existing record soundly defeats Bowers's claim, no reason exists to remand the case.

b. Nor is remand on actual bias warranted. As shown, the record amply supports the district court's finding that Juror 119 was not substantially impaired. District courts have "wide discretion" in "areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). The voir

dire examination here was not "so general that it d[id] not adequately probe the possibility of prejudice." *Butler v. City of Camden, City Hall*, 352 F.3d 811, 815 (3d Cir. 2003) (quotation omitted). The Court should affirm the denial of Bowers's challenges.

## VII. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DISMISSING PROSPECTIVE JURORS 159 AND 164 FOR CAUSE.

The district court properly exercised its discretion in disqualifying prospective Jurors 159 and 164, whose views on the death penalty substantially impaired their ability to fairly consider appropriate sentences on the capital counts. Bowers's claims to the contrary (Br.219-29) are meritless.

### A. Background

#### 1. Prospective Juror 159

a. In her questionnaire, Juror 159 indicated that God was very important to her and that she conducted Bible study at a county jail and volunteer church services at state prisons. S-App.618, 622. Asked what her "religious or spiritual affiliation or background" taught her about the death penalty, she responded, "Thou shalt not kill," and indicated her agreement with this teaching. S-App.633. Juror 159 indicated that, in a case of someone found guilty of murder on facts like those in this case, she was "generally opposed" to the death penalty but could vote to impose it if she believed "the death penalty was called for in light of the facts and the law in the case." S-App.632.

206

b. During voir dire, Juror 159 said that she did not believe in the death penalty. App.2107. She "believe[d] that no one should kill." App.2109. She continued: "I just think killing is killing. But if you're going by the law and you're going by specific things, you may have to make a choice. But overall, I think thou shalt not kill." App.2109. Juror 159 stated that her belief in "Thou shalt not kill" was fundamental and that she would regard handing down a death sentence to violate that belief. App.2114. She allowed that her view could change, because she had never been exposed to the death penalty, App.2115, but when asked "whether there's any evidence that could move [her] off of that deeply-held belief that thou shalt not kill," she replied, "I don't know," App.2116.

Defense counsel asked Juror 159 whether there was a "limited situation" where the government's aggravating evidence could be "so compelling and powerful" that she could vote for the death penalty; she responded, "I think I could. I don't know. I think I could. I don't know." App.2126. When asked the inverse question—whether she could vote for a life sentence if she believed it to be appropriate—she replied without equivocation, "I think I could, yes." App.2126. Asked if she would "give real meaningful consideration to both options," Juror 159 replied, "I believe I can" and "I would try my best," but added, "I do come with bias." App.2127.

207

Following up, the district court asked Juror 159 whether she would have difficulty signing her name to a verdict recommending a death sentence, even where she concluded that "the aggravating evidence outweighs the mitigating evidence thereby justifying a death sentence." App.2133. She replied, "I don't know. I don't want to say. I don't know….I have never been in the situation so I can't say what I would do." App.2133. When defense counsel re-asked the question, Juror 159 replied, "I think I could do that….Yes, I could do that. But it all depends on everything that's put before me." App.2134.

c. The government moved to strike Juror 159 on the ground that her ability to impartially consider a death sentence was substantially impaired, citing the influence of her "deeply held moral and religious beliefs," her "unclear at best and certainly equivocal set of responses," and her honesty about having biases. App.2134-35. The district court granted the government's motion. App.2320.

### 2.    Prospective Juror 164

a. Asked by the questionnaire for his general views on the death penalty, Juror 164 wrote, "It should be illegal." S-App.657. He reported being strongly opposed to the death penalty, circling the option reflecting strongest opposition ("1" out of 10). S-App.658. He also reported that he would have a "difficult time voting to impose the death penalty" on someone guilty of murder on facts like those in this case. S-App.658. Juror 164 "prefer[red]" that the death penalty

was "never carried out" in the United States and indicated that it was sought too often.  S-App.658-59.

b. During voir dire, Juror 164 stated that he was "very close to [being] absolutely opposed to the death penalty, at least in court cases."  App.2199.  Explaining his written remark that the death penalty should be "illegal," Juror 164 stated, "I don't think the state should be allowed to execute anyone who does not currently present a danger to society."  App.2200.  He was "willing to allow for an argument to change [his] mind," but "it would have to be a very, very compelling argument."  App.2201-02.  Juror 164 stated that the death penalty "serves no purpose other than to punish people…to a degree that [he] believe[d] violates the Eighth Amendment."  App.2203.  Asked if he "personally simply would not impose the death penalty," he replied, "I would be very hard-pressed to impose death on somebody, yes."  App.2203.

Juror 164 did state that he believed he could follow the court's "instructions…for or against a death penalty sentence."  App.2206.  But when asked if there was any doubt in his mind over whether he could sign a death verdict if the "law, as instructed," did not fit his view of when death is appropriate, Juror 164 replied, "Some, yes."  App.2206.

In response to defense counsel's questioning, Juror 164 stated that he could temporarily set aside his beliefs and follow the law, could meaningfully

209

consider a life sentence and a death sentence, and could return a death verdict "if [he] believed that was the appropriate sentence" in the case. App.2210-11. But when the prosecutor followed up on these statements, Juror 164 conceded there was still "a small amount of doubt" that he "would be able" to sign his name to a death verdict, even if he found that the aggravating factors sufficiently outweighed the mitigating factors. App.2212.

c. The government moved to strike Juror 164 as substantially impaired, citing his statements that the death penalty should be illegal and his candid doubts over imposing a death sentence. App.2215. The district court granted the government's motion. App.2320.

### B.    Standard of Review

The Court reviews for abuse of discretion the district court's disqualification of a juror based on the juror's views about the death penalty. *Uttecht v. Brown*, 551 U.S. 1, 7 (2007).

### C.    Argument

In seating a jury in a capital case, a court must ensure that each juror is willing to impose a death sentence if supported by the facts and law. *See, e.g.*, *Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986). This "'[d]eath qualification'" process "is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the

facts of the case at both the guilt and sentencing phases of a capital trial." *Ibid.* Although a court may not exclude venirepersons "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968), it should exclude those whose "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," *Witt*, 469 U.S. at 424 (quotations omitted). This standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Ibid.* The trial judge need only be "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425-26.

Courts reviewing a *Witherspoon* claim "are to accord deference to the trial court…regardless of whether the trial court engages in explicit analysis regarding substantial impairment," because a judgment about bias "'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 428); *see also Witt*, 469 U.S. at 424. And "isolated statements indicating an ability to impose the death penalty do not suffice to preclude the prosecution from striking for cause a juror whose responses, taken together, indicate a lack of such ability…." *Morales v. Mitchell*, 507 F.3d 916, 941 (6th Cir. 2007).

211

### 1.    Prospective Juror 159 was substantially impaired.

The district court properly exercised its discretion in dismissing Juror 159 for cause.  While Juror 159's questionnaire indicated she was generally opposed to the death penalty, S-App.632-33, her strong opposition became clear during voir dire.  Juror 159 stated that she did not believe in the death penalty, App.2107, elaborating, "I believe that no one should kill," "I just think that killing is killing," and "overall, I think thou shalt not kill."  App.2109.  Juror 159 stated that her religious belief in "Thou shalt not kill" was fundamental and that handing down a death sentence would violate that belief.  App.2114; *see Sanders*, 133 F.4th at 377-78 (affirming excusal of juror who explained her opposition to death penalty by referencing "thou shalt not kill" command from the Bible).

Although Juror 159 allowed that her opposition to the death penalty could change, App.2115, she was uncertain and equivocated over her ability to impose a death sentence.  She replied "I don't know" when asked if there was "*any* evidence that could move [her] off of that deeply-held belief that thou shalt not kill."  App.2116 (emphasis added).  A juror who is "willing[] to consider the death penalty in extreme hypothetical situations" is not immune from removal for cause, *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995); but Juror 159 could not even come up with such a situation.  *See also United States v. Moore*, 149

212

F.3d 773, 780 (8th Cir. 1998) (affirming removal of juror who indicated he would consider death penalty only if the defendant had murdered 100 people, despite juror's assurance he would follow rule of law).

Moreover, the contrast between Juror 159's answers to defense counsel's question about whether there was a "limited situation" where she could vote for the death penalty ("I think I could.  I don't know.  I think I could.  I don't know.") and counsel's question about whether she could vote for a life sentence ("I think I could, yes.") was striking.  App.2126.  The district court homed in on that contrast.  App.2130.  In response to the court's follow-up questions, Juror 159 remained uncertain over whether she could actually sign her name to a death verdict if she concluded that aggravating circumstances sufficiently outweighed mitigating circumstances.  App.2133 ("I don't know.  I don't want to say.  I don't know….").  The court reasonably concluded that Juror 159's equivocation was evidence that her opposition to the death penalty prevented or substantially impaired her from performing her duties as a juror at a capital trial. *See Webster,* 162 F.3d at 340-41; *United States v. Tipton*, 90 F.3d 861, 880-81 (4th Cir. 1996); *see also Clemons v. Luebbers*, 381 F.3d 744, 756 (8th Cir. 2004) (denying habeas petitioner's *Witherspoon* claim where state supreme court found that juror's "equivocal and shifting responses to questions focusing on his ability to impose the death penalty" provided sufficient ground for removal).

213

Bowers thus errs in contending that "there were no indications" that Juror 159 could not set aside her opposition to the death penalty and follow the law. Br.223. To be sure, in isolation, one or more responses to defense counsel's questions may have suggested Juror 159 could consider imposing the death penalty. App.2134. But the district court was entitled to consider her responses and demeanor as a whole. *See Uttecht*, 551 U.S. at 18 ("Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired…."); *Witt*, 469 U.S. at 424-26. At best, Juror 159's voir dire responses left the record ambiguous. But contrary to Bowers's argument (Br.224), "'when there is ambiguity in the prospective juror's statements,' the trial court is 'entitled to resolve it in favor of the State.'" *White v. Wheeler*, 577 U.S. 73, 79 (2015) (per curiam) (quoting *Uttecht*, 551 U.S. at 7); *accord Antwine*, 54 F.3d at 1369. Given its front-row view of Juror 159's demeanor and credibility, the court did not abuse its discretion in excusing her for cause.

### 2.     Prospective Juror 164 was substantially impaired.

Juror 164's strong opposition to the death penalty was clear from his questionnaire. Juror 164 wrote that the death penalty "should be illegal," reported that he was strongly opposed to it, and reported that he would have a

difficult time imposing a death sentence on someone guilty of murder on facts like those in this case. S-App.657-59. Voir dire magnified his opposition. He stated that he was "very close to [being] absolutely opposed to the death penalty, at least in court cases"; that "the state should not be allowed to execute anyone who does not currently present a danger to society"; and that he believed the death penalty violates the Eighth Amendment. App.2199-2200, 2203.

Juror 164 provided no reasonable assurance that he could set aside these strong views and fairly consider a death sentence in this case. He stated that he "would be very hard-pressed to impose death on somebody." App.2203. Despite stating that he could follow the court's instructions, he conceded that he had "[s]ome" doubt whether he could sign a death verdict if the law did not comport with his view of when "death is appropriate." App.2206. Although Juror 164 stated that he could temporarily set aside his beliefs and follow the law in response to questions from defense counsel, App.2210-11, Juror 164's doubt re-emerged during the prosecutor's follow up: Juror 164 admitted having "a small amount of doubt" over his ability to actually sign a death verdict even in a situation where he found that aggravating circumstances sufficiently outweighed mitigating circumstances. App.2212.

Juror 164's strong opposition to the death penalty and uncertainty over whether he could vote for a death sentence or sign a death verdict justified his

215

dismissal. *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 955-56 (9th Cir. 2007) (affirming removal of venireperson whose questionnaire showed that her death-penalty views rendered her substantially impaired, even though her voir dire statements "were more nuanced"); *United States v. Purkey*, 428 F.3d 738, 750-52 (8th Cir. 2005) (affirming removal of venireperson who indicated strong opposition to death penalty in questionnaire); *Webster*, 162 F.3d at 341 (concluding that "the whole of [the venireperson's] testimony could have left the court with the impression that she favored the death penalty as a theoretical necessity, but would not be able to recommend it"); *Tipton*, 90 F.3d at 880-81 (affirming removal of venirepersons whose voir dire examinations suggested they could not impose a death sentence, notwithstanding more neutral answers to counsel's questions).  Contrary to Bowers's argument (Br.225), even if Juror 164 truly supported applying the death penalty to "a very, very limited pool of individuals," App.2202, that did not make him immune from removal.  *See Moore*, 149 F.3d at 780; *Antwine*, 54 F.3d at 1369.

Given Juror 164's responses as a whole, and the district court's firsthand assessment of his demeanor and credibility, the court reasonably concluded that

his views would substantially impair the performance of his duties at the capital sentencing.  The court properly exercised its discretion by dismissing Juror 164.[44]

## VIII. THE DISTRICT COURT PROPERLY ADMITTED EXPERT TESTIMONY ABOUT BOWERS'S SOCIAL-MEDIA POSTINGS AND LAY TESTIMONY ABOUT JUDAISM AND PITTSBURGH'S JEWISH COMMUNITY.

Bowers challenges his death sentences on the ground that the district court erroneously admitted: (1) guilt-phase expert testimony by William Braniff concerning Bowers's postings on Gab.com; (2) guilt-phase testimony by Tree of Life Rabbi Jeffrey Myers about Judaism; (3) guilt-phase testimony about religious items at the crime scene; and (4) selection-phase testimony by historian Barbara Burstin about Pittsburgh's Jewish community.  Br.229-72.  In all respects, the challenged evidence was probative of his crimes, relevant to sentencing issues, and not unfairly prejudicial.  The district court properly admitted it.

### A.    Background

#### 1.    Relevant Guilt-Phase Overview

a. During opening statements, the defense indicated that it would contest Bowers's guilt by challenging whether he acted "because of" the congregants' religion or with intent to obstruct their religious practice.  App.5704, 5707-09;

---

[44] Bowers challenges the death qualification of the jury only to preserve the claim, conceding it is foreclosed by *Lockhart*, 476 U.S. at 165.  Br.228-29.

*see* 18 U.S.C. 247, 249.  Defense counsel argued that Bowers was "at the Tree of Life plain and simply to stop the support of HIAS," based on his belief that HIAS and its supporters were harming the white race and children.  App.5708-09.  Counsel asked the jury, "does the fact that [Bowers] entered a synagogue to kill Jews establish that he was motivated by their actual or perceived religion, or was he motivated by the fact that he believed that these individuals supported HIAS[?]"  App.5708.

b. Rabbi Myers was the government's first witness to testify who was inside the synagogue on the morning of October 27, 2018.  He testified about the shooting, identified and described congregants who were present, and provided background about Judaism, the Tree of Life Synagogue, and the congregations that worshipped in the synagogue building.  App.5764-5860.  As discussed below, some testimony by Rabbi Myers and other guilt-phase witnesses described religious items, such as yarmulkes and prayer books, which were integral aspects of worship and depicted in crime-scene photographs.

Braniff testified as an expert on the tenth day of trial.  Braniff explained terms, concepts, individuals, and events referenced in messages Bowers had posted or liked on Gab.com.  App.7960-87.

c. As relevant here, the district court instructed the jury that, to find Bowers guilty of a Section 247 offense, it needed to find he "obstructed the

[victim] in the enjoyment of that person's free exercise of religious beliefs," and that he did so intentionally, which the court defined as requiring a "conscious desire or purpose to obstruct the free exercise of religious beliefs." App.8262-63. As to Section 249 offenses, the court instructed the jury it needed to find that, in causing bodily injury to the victim, Bowers "acted because of the actual or perceived religion of that person." App.8267. As to Section 924(j) offenses, the court instructed the jury it needed to find that Bowers unlawfully used a firearm to kill the victim "with malice aforethought." App.8272.

### 2. Relevant Selection-Phase Overview

Burstin provided brief testimony (App.11205-13) related to a portion of the site-selection aggravating factor, which alleged in its entirety:

> ROBERT BOWERS targeted men and women participating in Jewish religious worship at the Tree of Life Synagogue, *located in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania, which is home to one of the largest and oldest urban Jewish populations in the United States*, in order to maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities.

App.13714 (emphasis added). Burstin testified that Pittsburgh's Jewish community dates to the 1840s, App.11207; was populated in its first 50 years by two groups of immigrants, App.11207-08; has been centered in the Squirrel Hill neighborhood since World War II, App.11210-11; and is "one of the oldest and largest remaining Jewish communities in the United States," App.11213.

**B.    Standard of Review**

The Court reviews evidentiary rulings for an abuse of discretion, *United States v. DeMuro*, 677 F.3d 550, 557 (3d Cir. 2012), and underlying factual findings for clear error, *United States v. Hall*, 28 F.4th 445, 449 n.1 (3d Cir. 2022). The Court's review of a preserved constitutional challenge to evidence is plenary. *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998).

The Court reviews unpreserved challenges to evidence for plain error. *United States v. Mornan*, 413 F.3d 372, 379-80 (3d Cir. 2005). The defendant must show (1) an error, (2) that was "clear" or "obvious," and (3) that affected his "substantial rights"; the Court may then correct the error only if it (4) "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732-36 (1993) (quotations omitted); *see United States v. Adair*, 38 F.4th 341, 355-56 (3d Cir. 2022).

**C.    Argument**

Several of Bowers's challenges are unpreserved. None has merit.

**1.    The district court properly admitted Braniff's expert testimony.**

**a.    Additional background**

i. The government gave pretrial notice of its intent to present guilt-phase expert testimony from Braniff, then-Director of the National Consortium for the

Study of Terrorism and Responses to Terrorism. DE981-1.[45] Braniff was to testify about antisemitism as it related to references in Bowers's statements, mainly on Gab.com. App.256.

ii. Bowers moved to exclude Braniff's testimony on the grounds that it did not satisfy Federal Rule of Evidence 702, was not relevant under Rule 401, and did not survive Rule 403 balancing. DE981; DE1092:5-21.

The district court denied Bowers's motions in part. App.255-300. The court determined that Braniff was qualified to testify as an expert on domestic terrorism and white supremacism, and about the meaning of terms used by Bowers. App.260-64. The court noted that Braniff was *not* being offered to testify about Bowers's mental state or that Bowers was a member of a specific white-supremacist group. App.264-68. Braniff's testimony would "be limited to providing definitions of terms and phrases used by [Bowers] and a brief factual summary about individuals and events referenced by [Bowers]." App.268.

The court found this testimony reliable and relevant. App.270-79. It was "necessary to assist the trier of fact in understanding the terminology used by [Bowers]," App.275, and was helpful to understanding the events and individuals he referenced, which "an average juror" might not know, App.277.

---

[45] As of trial, Braniff worked at the Department of Homeland Security. App.7918-19.

The court cautioned the government, however, about "taking this testimony too far." App.275-76, 278. The court "underst[ood] [that] some explanation about the Holocaust may be necessary," but it directed that Braniff not "provide overexpansive context or explanation as to who Hitler is." App.278-79. The court allowed the defense to renew objections to any testimony that went beyond providing context for Bowers's statements or "too far into historical wrongs." App.279 (quotation omitted). The court also found that testimony about the white-supremacist concept that White people are being replaced by non-White people was "relevant and helpful to the jury to understand the context and meaning of [Bowers's] statements." App.279-80.

The court denied Bowers's relevance and Rule 403 challenges for essentially the same reasons it found Braniff's testimony helpful under Rule 702. App.297-99.

iii. During the guilt phase, the government introduced the records for Bowers's Gab account, including hundreds of messages posted or liked by Bowers on his account. App.7763-74; *see* App.13610-38 (summary exhibit of posted and reposted messages); App.13639-75 (summary exhibit of subset of liked messages).

Braniff testified as an expert about the meaning of terms, concepts, individuals and events referenced in messages Bowers had posted or liked.

App.7961-87. For example, Braniff testified about derogatory terms such as "kikes" and "Yids," App.7962; explained references to the Holocaust and Naziism, such as "1488," App.7973; explained references to Biblical passages, App.7978-81; identified antisemitic writings, App.7976-78; explained concepts such as the great replacement and blood libel, App.7977, 7981-82; and identified modern and historical figures associated with white supremacism and Naziism, including George Lincoln Rockwell, Anders Breivik, and James Fields, Jr., App.7982-85. Asked to "[v]ery briefly" explain the Holocaust, Braniff testified that it "was the intentional attempts to exterminate Jews in Europe by the Nazis in Germany" and that its "motivating principle" was antisemitism. App.7965. Braniff also testified that he saw references to Hitler in Bowers's Gab account, such as "Hitler did nothing wrong." *Ibid.*; *see* App.13617.

### b. Braniff's testimony was admissible in the guilt phase.

Contrary to Bowers's claim (Br.237-53), Braniff's expert testimony was relevant and helpful to understanding references in Bowers's social-media statements, and was not unfairly prejudicial or cumulative.[46]

i. As a threshold matter, Bowers does not challenge the guilt-phase admission of the contents of his Gab account, where he posted and liked

---

[46] Bowers does not challenge Braniff's qualifications as an expert or the reliability of his testimony under Rule 702.

statements that denigrated and advocated harming Jewish people. Br.7, 235-36; *see United States v. Kolodesh*, 787 F.3d 224, 232 n.6 (3d Cir. 2015) (issue not argued in an opening brief is waived on appeal). For good reason: Bowers's statements were probative of the religious hatred motivating his crimes under Section 249 and his intent to obstruct Jewish congregants' freedom to exercise their religion under Section 247. *See, e.g.*, *Cannon*, 750 F.3d at 506-07 (evidence of racial motivation in Section 249 prosecution included white-supremacist words and tattoos); *United States v. Allen*, 341 F.3d 870, 886 (9th Cir. 2003) (skinhead and white-supremacist evidence properly admitted to prove racial animus in civil rights prosecution); *United States v. Dunnaway*, 88 F.3d 617, 618-19 (8th Cir. 1996) ("racist views, behavior, and speech," including racist tattoos, relevant "to show discriminatory purpose and intent" in civil rights prosecution).

Moreover, Bowers's use of social media to amplify his message was probative of the interstate-commerce element under Sections 247(b). His posts also showed that he acted "with malice aforethought" when murdering congregants. 18 U.S.C. 924(j), 1111(a).

ii. Bowers's implicit concession that the Gab posts were admissible largely defeats his relevance challenge, because Braniff testified about matters in that evidence. App.7960-61. The prosecutor focused her examination on specific references in messages that Bowers either posted or liked. App.7962-86; *see, e.g.*,

224

App.7962 ("happy merchant" image); App.7972-73 ("1488"); App.7975-76 (three-parentheses symbol); App.7980-81 (Biblical passages).

Many of these references would not be obvious to a jury. Consistent with the district court's findings, App.276-77, an average juror could not be expected to know, for example, that:

- in the term "1488," "14" refers to a 14-word mantra in the *White Genocide Manifesto* and "88" refers to "Heil Hitler," as "H" is the eighth letter of the alphabet, App.7972-73;

- "blood libel" refers to historical accusations that Jews consumed the blood of children and is used to scapegoat them for harm befalling children, App.7981-82;

- "white genocide" is the belief that the white race is being eliminated by, among other things, immigration, and that the Jewish community orchestrates it, App.7974-75;

- specific Bible passages have been used to suggest Jewish people are Satanic and to justify violence against them, App.7978-81;

- the "happy merchant" is an antisemitic caricature of Jewish people as greedy, App.7962-63;

- The New Awakening, which published a reading list that Bowers posted, is an American neo-Nazi group, App.7966;

- Joseph Goebbels—an author on the New Awakening reading list— produced Nazi propaganda that dehumanized Jewish people, App.7967-68;

- "Shoah" is Hebrew for the Holocaust, App.7969-70;

- references to lampshades and bars of soap reflect stories circulating online about such items being made from the skin and fat of Jewish people during the Holocaust, App.7972;

225

- "#DodgeCharger" refers to neo-Nazi James Fields, Jr., who murdered a person with his car at a Unite the Right rally, App.7984-85.

Braniff's testimony provided context for evaluating Bowers's posts and Bowers's post-offense statements to officers. The fact that Bowers's own expert, Dr. Corvin, did not know "Shoah" refers to the Holocaust, App.12963, underscored the need for expert testimony in this area.

Although jurors likely had general knowledge of the Holocaust, they may not have known how that genocide was carried out. And Braniff explained the Holocaust only briefly to "placehold" his testimony, App.7965, as he went on to provide context for lesser known references in Bowers's messages, such as lampshades and bars of soap, App.7972; "oven dodger," App.7971; Holocaust denialism (*e.g.*, "Holohoax"), App,7971-72, 13625; and the liked statement, "Goebbels was right," App.7967-68, 13654.

Braniff also explained terminology in Bowers's final Gab post, right before he attacked congregants: "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in." App.13637. Braniff testified that "optics" referred to a debate among white supremacists about whether to advance their goals through violence or through a "lower profile" focused on making "white supremacy…more culturally acceptable." App.7985-86. By rejecting "optics," Bowers chose violence. Braniff also explained that "invaders" referred to immigrants, App.7986, and

226

that the "great replacement" is an iteration of "white genocide" ideology that asserts that "immigrants are replacing white majority populations in white majority countries," App.7977. Without Braniff's testimony, the jury lacked context for Bowers's message.

iii. The district court did not abuse its discretion in admitting this evidence. By helping to explain references in statements Bowers made or endorsed, Braniff's testimony satisfied the "liberal admissibility standard" for relevant evidence under Rules 401 and 402. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000). It also "assist[ed] the trier of fact to understand the evidence" under Rule 702. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) ("liberal policy of admissibility" under Rule 702) (quotation omitted). The fact that Braniff explained terminology, concepts, individuals, and events with which the jury was likely unfamiliar placed his expert testimony within the heartland of Rule 702. *See United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999) (allowing expert testimony about meaning of coded drug language); *United States v. Hassan*, 742 F.3d 104, 130-31 (4th Cir. 2014) (same for testimony about words "commonly used by persons practicing extreme Islam" in terrorism case) (quotation omitted); *United States v. Benkahla*, 530 F.3d 300, 303, 308-10 (4th Cir. 2008) (same for testimony about radical Islam in terrorism case); *United States v.*

227

*Sparks*, 949 F.2d 1023, 1025-26 (8th Cir. 1991) (same for testimony about gang-related graffiti and hand signs).

iv. Nor did the court abuse its discretion in finding (App.298) that the probative value of Braniff's testimony was not "substantially outweighed" by any danger of unfair prejudice. Fed. R. Evid. 403.

"'[U]nfair prejudice' means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one'"; it does *not* mean "merely undesirable from the defendant's perspective." *United States v. Cross*, 308 F.3d 308, 324 n.23 (3d Cir. 2002) (quoting Fed. R. Evid. 403 advisory committee's note). Because this Court accords "great deference" to a district court's Rule 403 decision, *United States v. Universal Rehab. Svcs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc), the Court "will not disturb [the district court's] ruling unless it was arbitrary or irrational," *United States v. Knight*, 700 F.3d 59, 63 (3d Cir. 2012) (quotation omitted).

The ruling here was neither. Braniff helped the jury understand statements that were central to motive, intent, and malice aforethought—elements of his charged crimes. True, the topics were repugnant, but it was Bowers who put them at issue by crafting or liking the Gab posts. Limited expert testimony about Bowers's own statements did not create a danger of "unfair" prejudice and does not warrant finding that the district court acted arbitrarily or

228

irrationally. *See United States v. Lee*, 612 F.3d 170, 190 (3d Cir. 2010) (citing "substantial deference owed to district courts" under Rule 403 and "highly probative value" of the defendant's statements); *see also, e.g.*, *Benkahla*, 530 F.3d at 310 (citing undoubted relevance of expert evidence on radical Islam in denying Rule 403 challenge); *Allen*, 341 F.3d at 885-88 (denying Rule 403 challenge to skinhead evidence in civil rights prosecution).

The testimony was not needlessly cumulative either. Braniff's opinion testimony on direct examination consists of only 28 transcript pages. App.7960-87. In that brief span, Braniff succinctly explained approximately 35 terms, symbols, ideas, individuals, literary works, Biblical passages, and events. He permissibly gave more than one-sentence answers to questions, both to better inform the jury's understanding of the references he was explaining and to give the jury enough detail to assess his credibility. *See Old Chief v. United States*, 519 U.S. 172, 190 (1997) (prosecution requires "evidentiary depth" given its "burden of persuasion"); *United States v. Johnson*, 89 F.4th 997, 1002 (7th Cir. 2024) (similar). The court did not abuse its broad discretion under Rule 403.

### c.    The district court did not plainly err by not excluding Braniff's testimony for penalty-phase purposes.

Bowers makes passing reference (Br.230-31, 252) to 18 U.S.C. 3593(c), which states that the rules of evidence do not apply in capital sentencing proceedings, but that a court "may" exclude "information…if its probative value

is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." During Braniff's testimony, however, Bowers did not argue that specific testimony would prejudice him in the penalty phase, even though the district court indicated, in the context of considering exhibits, that it would be open to hearing such real-time objections. S-App.119.

Bowers does not point to any place in the record (and the government is not aware of one) where he asked the district court to reassess the admissibility of Braniff's testimony under Section 3593(c) for penalty-phase purposes; sought an instruction preventing the jury from considering Braniff's guilt-phase testimony during penalty-phase proceedings; or objected to the court's instructions permitting the jury to consider guilt-phase evidence during the eligibility and selection phases, App.8487, 13129. Those omissions are significant because Bowers challenges Braniff's testimony only as it pertains to his sentence. Br.229, 270. To the extent he is arguing that the district court should have *sua sponte* excluded Braniff's testimony—or other guilt-phase testimony—from penalty-phase consideration, his argument is unpreserved. *Cf. United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002) (challenge to court's failure to *sua sponte* sever co-defendants' cases at penalty phase reviewed for plain error).

The district court did not plainly abuse its discretion, especially given Section 3593(c)'s "relaxed" standard for admitting evidence.  *United States v. Hall*, 945 F.3d 1035, 1042 (8th Cir. 2019) (quotation omitted); *accord United States v. Brown*, 441 F.3d 1330, 1360-61 (11th Cir. 2006).  Because it was probative of the charged crimes, Braniff's testimony was relevant to the circumstances of his offenses—a key consideration at capital sentencing.[47]  *See Zant v. Stephens*, 462 U.S. 862, 879 (1983).  It also bore on Bowers's threshold intent to kill and at least two aggravating factors—his premeditation and religious animus.  App.13773, 13777, 13783.  And it helped rebut Bowers's schizophrenia defense by showing that his antisemitic views were shared by others and were not the product of a delusional mind.  *See* pp.58-60, *supra*.

### d.    Braniff's testimony did not plainly violate the Constitution.

Plain-error review also applies to Bowers's constitutional claims (Br.247, 252) because, except for a passing Eighth Amendment reference (DE1092:16), his motions raised only rule-based challenges below.  DE981; DE1092:5-21; *see United States v. Stadtmauer*, 620 F.3d 238, 264 n.31 (3d Cir. 2010).

Bowers cannot show error, let alone a clear or obvious one.  Braniff's testimony did not violate due process because it was subject to—and cleared the

---

[47] The same is true of the other guilt-phase testimony Bowers challenges.

hurdle of—potential exclusion under Rule 403. *See, e.g.*, *United States v. Porter*, 121 F.4th 747, 752 (9th Cir. 2024); *United States v. Schaffer*, 851 F.3d 166, 177 (2d Cir. 2017). Nor did it deprive Bowers of an "individualized sentencing determination." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). The statements about which Braniff testified were part of Bowers's "record, personal characteristics, and the circumstances of his crime." *Ibid.* Moreover, the jury was free to consider, and did consider, "relevant mitigating evidence," dispelling any Eighth Amendment concern. *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

### e.    Bowers's arguments are meritless.

Bowers mischaracterizes Braniff's testimony and relies on inapposite legal authorities.

i. By presenting Braniff's testimony, the government did not "implicitly s[eek] to hold Bowers responsible for the crimes of others" or "connect him to matters not within his knowledge." Br.247 (quotation omitted). Braniff explained references in statements that Bowers posted or liked. These statements reflected Bowers's state of mind, regardless of whether he was alleged to be a "member" of a white-supremacist group (Br.248).

Bowers's cases are not to the contrary. They involve a prosecutor's closing-argument remark that was (at most) arguably improper, *United States v.*

232

*Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995); properly excluded *mitigating* evidence that had no connection to the defendant's state of mind at the time of his offense, *United States v. McVeigh*, 153 F.3d 1166, 1215 (10th Cir. 1998); irrelevant evidence about violent gangs, where motive was not a central offense element, *United States v. Street*, 548 F.3d 618, 631-32 (8th Cir. 2008); and "[e]vidence of uncharged misconduct to show criminal propensity," *United States v. Roark*, 924 F.2d 1426, 1433-34 (8th Cir. 1991). This case, in contrast, involves the straight-forward application of evidentiary rules to testimony about references in the defendant's own inculpatory statements.

ii. Braniff did *not* "venture[] into generalized historical descriptions of the Holocaust" and antisemitism (Br.242-43), or turn the trial "into a referendum on historical atrocities" (Br.230). For example, Braniff testified about the history of using germs or diseases to dehumanize Jewish because he saw references to vermin, disease, and filth in Bowers's Gab account. App.7968; *see* App.13659 ("rat jew"); App.13616 ("disease"); App.13664-65 ("filth"). Braniff testified about *Mein Kampf* because it was the first book on The New Awakening's reading list, which Bowers posted on Gab.com. App.7966-67; *see* App.13613, 13638. Braniff explained the origins of "blood libel" because the term appeared in a post Bowers liked. App.7981-82; *see* App.13649. Braniff's testimony was anchored in Bowers's Gab posts.

233

iii. Bowers also errs in contending that other evidence already proved his religious animus (Br.249-50), or that "no meaningful dispute" allegedly existed about religious animus or his obstruction of worship (Br.234). During her guilt-phase opening statement, defense counsel suggested that the evidence was insufficient to prove the requisite *mens rea* of the Section 249 and 247 charges. App.5704, 5707-09. During closing argument, counsel challenged whether the evidence showed Bowers intended to obstruct congregants' ability to worship that morning. App.8363. Counsel maintained that "[Bowers] was not there to stop or obstruct religious study." App.8366; *see also* App.8367. Braniff's testimony appropriately responded to that defense.

By pleading not guilty, Bowers "put[] the prosecution to its proof as to all elements of the crime charged." *Mathews v. United States*, 485 U.S. 58, 64-65 (1988). Subject to the rules of evidence, "the prosecution is entitled to prove its case by evidence of its own choice." *Old Chief*, 519 U.S. at 186-87; *accord United States v. Schwartz*, 857 F.2d 655, 658-59 (9th Cir. 1988). No other expert witness testified about Bowers's Gab account. *See Allen*, 341 F.3d at 888 (rejecting claim that, because defendants admitted they were racists, skinhead and white-supremacy evidence was cumulative). The government did emphasize the quantity of animus evidence during penalty-phase jury arguments, Br.249, 251 (citing App.10959, 13182), but that was trial advocacy, not a legal concession

234

that Braniff's testimony was unnecessary. In any event, one of the government's arguments focused on the Gab evidence—the subject of Braniff's testimony. App.13182.[48]

iv. Bowers's reliance on *United States v. Roof* is misguided. Br.252-53 & n.75. That civil rights prosecution was based on a different factual record. That the government allegedly presented less evidence of animus in *Roof* does not mean the district court abused its discretion here by allowing Braniff's testimony.

### 2. The district court did not plainly err in admitting Rabbi Myers's testimony about Judaism.

Bowers's challenge to Rabbi Myers's brief historical testimony about Judaism (Br.255-57) is waived or forfeited, and meritless by any standard.

### a. Additional background

The day after Rabbi Myers testified, the defense alleged he had provided "a history lesson on Judaism, on the Holocaust," and contended that such testimony was irrelevant to the guilt phase. App.5866. Counsel sought "guidance from the Court on how far the government is going to be allowed to

---

[48] Again, Bowers's authorities (Br.250-51 & n.74) are inapposite. *See United States v. Downing*, 753 F.2d 1224, 1243 (3d Cir. 1985) (simply noting that availability of alternative evidence may be considered under Rule 403); *United States v. Bowman*, 302 F.3d 1228, 1239-40 (11th Cir. 2002) (erroneously admitted evidence had scant probative value).

go in terms of emphasizing connections between the Holocaust and this case."

*Ibid.* The government highlighted the belated nature of counsel's argument and maintained that the testimony was relevant. App.5869-71.

After noting the defense's failure to contemporaneously object, App.5871, the court found that testimony about, *inter alia*, "the church's history, traditions, practices are all fair game and relevant where charges of instruction [*sic*] and religious expression are in play." App.5872. The court also found that "[t]he very brief references to the Holocaust … were acceptable as far as they went." *Ibid.*

The government added that "Jews make up a very small percentage of the population. There's no reason to expect that a lay jury has an independent background." App.5872-73. The court "agree[d]" and found that "the rabbi's reasonable background regarding the history of Judaism helped provide some context to understand the Tree of Life and why it exists and what it means to its members." App.5873.

Defense counsel clarified that his "objection wasn't to the history lesson on Judaism," conceding: "I think that's within the scope of the charges." App.5873. Counsel maintained that his "objection [was] to the Holocaust reference, and specifically it exceeded the guidelines the Court had laid down in terms of how far that kind of evidence can go." *Ibid.* The court responded that

those guidelines applied only to Braniff's testimony; regardless, Rabbi Myers's testimony did not exceed them. *Ibid.*

### b.    At most, plain-error review applies.

Bowers is challenging Rabbi Myers's testimony about certain historical aspects of Judaism and Jewish people, Br.255-56, but the defense conceded below that a "history lesson on Judaism" was "within the scope of the charges." App.5873. That concession waived Bowers's claim on appeal. *See Kolodesh*, 787 F.3d at 231. At most, plain-error review applies because the defense did not object contemporaneously to Rabbi Myers's testimony, and when it did so belatedly, it did not object to the historical testimony now being challenged. *See* Fed. R. Evid. 103(a)(1); *United States v. Hodge*, 870 F.3d 184, 203 n.14 (3d Cir. 2017).

### c.    Rabbi Myers's testimony was admissible.

Bowers challenges three short portions of Rabbi Myers's testimony, one of which was actually provided by a different witness. Br.255-57. The district court did not plainly abuse its discretion in admitting that testimony.

Bowers first challenges testimony about the history of Judaism, the development of the conservative movement within Judaism, and the principal differences between Judaism and Christianity. Br.255-56 (quoting App.5765-67). As defense counsel conceded, this testimony was relevant to the religious-

obstruction charges. App.5872-73. The district court did not clearly err in finding that a lay jury would not be expected to have independent background knowledge of Judaism. App.5873. Rabbi Myers, the first survivor from the synagogue attack to testify, briefly oriented the jury and provided context for understanding the evidence that followed. For example, Myers's testimony about the conservative movement provided context for testimony about the three congregations that worshipped at the synagogue: Tree of Life and New Light are conservative congregations, while Dor Hadash is reconstructionist, an outgrowth of conservative Judaism. App.5767-68, 5799, 5958. The testimony satisfied Rule 401's broad standard, *see Gibson v. Mayor and City Council of City of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004), and posed no danger of unfair prejudice.

Bowers's next challenge, to testimony about Jewish people fighting in American wars, is misguided. Br.256. When asked to "generally" describe stained glass panels in a photograph of Pervin Chapel, Rabbi Myers testified that they depicted "Biblical themes as well as Jewish participation in the Revolutionary War," adding that Jewish people had fought in wars for the United States. App.5830-31. This limited testimony was relevant and admissible—it was part of Rabbi Myers's physical description of the chapel

238

where Tree of Life members worshipped and where Bowers shot and killed congregants.

Finally, Bowers incorrectly attributes to Rabbi Myers testimony about New Light's founding by Romanian Jewish refugees—testimony provided by Rabbi Jonathan Perlman. Br.256-57 (quoting App.6100-02). That unobjected-to testimony provided limited background about one of the congregations Bowers attacked, including about New Light's English-language name. App.6101-02. It was not irrelevant or inadmissible, let alone plainly so.[49]

### 3. The district court did not plainly err in admitting testimony about religious items.

Bowers's challenge (Br.263-67) to testimony about religious items is likewise unpreserved and meritless.

#### a. Plain-error review applies

Bowers did not object to testimony concerning religious items and appears to concede as much. Br.263 n.77. But he asserts that (i) "the enormous volume of testimony and minute focus on particular objects made individual objections not feasible"; and (ii) objecting would have been "futile" given the district court's rulings on Rabbi Myers's and Braniff's testimony. *Ibid.* A party must timely

---

[49] Bowers also misattributes to Rabbi Myers the permissible selection-phase testimony by Burstin that the Tree of Life congregation was founded during the Civil War. Br.256 (citing App.11212).

object or move to strike evidence to preserve a claim of error. Fed. R. Evid. 103(a)(1). Bowers cites no authority establishing a voluminous-evidence or "minute focus" exception.

Nor did any "futility" exception apply. Bowers never made his position about the religious-item testimony known to the district court. *See United States v. Mayfield*, 134 F.4th 1101, 1104-05 (10th Cir.), *cert. denied*, 146 S. Ct. 219 (2025); *United States v. Grote*, 961 F.3d 105, 115 (2d Cir. 2020). He *agreed* that Rabbi Myers's historical testimony was appropriate. App.5873. And Braniff provided expert testimony on a different topic. The court never "rule[d]," let alone "definitively," on testimony about religious items. Fed. R. Evid. 103(b). Accordingly, plain-error review applies.

### b.    The testimony was admissible.

The testimony was admissible to prove Bowers's intentional obstruction of congregants' free exercise of their religious beliefs, which included "the freedom to observe religious principles and engage in religious practices, including attendance and participation in religious services and religious study." App.8262-63. It also described the crime scene and provided background on the Tree of Life Synagogue.

First, Rabbi Myers's testimony about the significance of the Torah—"[t]he most sacred object that we possess as Jews…contain[ing] the five books of

240

Moses" (App.5770)—provided a basic fact about Judaism and important context for the religious-obstruction charges. Rabbi Myers later testified that, during the October 27, 2018, morning service, he had planned to read a portion of the Torah about "the Jewish imperative to welcome all guests, no matter who they might be," but he "never gave that sermon." App.5857-58. This testimony directly rebutted the defense claim that Bowers's desire to stop HIAS was based solely on a secular motive; it explained how the Torah's command to welcome the stranger—a foundational principle for HIAS's work—is a core tenet of Judaism as practiced by the congregants. App.7692-93.

Rabbi Myers's testimony about the Torah that was recovered from a town in Czechoslovakia during the Holocaust was also relevant and admissible. That Torah was prominently displayed in a case right next to an entrance to Pervin Chapel, where Bowers shot and killed Cecil Rosenthal. App.5821-24; S-App.420 (crime-scene photograph). Bowers does not appear to challenge the admission of the photograph showing the Torah and the plaque identifying it. App.13682. Any danger of unfair prejudice from Rabbi Myers's brief testimony about this item did not substantially outweigh its relevance, especially on plain-error review. And the government's closing-argument remark about the Torah from Czechoslovakia was proper. *See* pp.248-49, *infra*.

Bowers is also mistaken in criticizing (Br.266) Rabbi Myers's testimony about prayer shawls, yarmulkes, prayer books, and a doorframe adornment ("mezuzah"). Rabbi Myers identified those items in photographs of Pervin Chapel, one of the primary murder scenes, and explained their role in Jewish custom and practices. App.5828-30. Rabbi Perlman also testified that he was wearing in court the yarmulke that fell from his head when attempting to flee the shooting. App.6115. Both rabbis' testimony was probative of how Bowers's attack violently obstructed congregants' "freedom to observe religious principles and engage in religious practices." App.8262-63. They testified that it was disrespectful for a yarmulke, prayer book, or prayer shawl to lie on the floor. App.5830, 6116. But that is what happened when Bowers killed and attempted to kill congregants inside the synagogue. App.5856, 6114-15, 6166, 13683, 13386, 13691. That Bowers must have seen these religious items as he attacked congregants also evidenced his "conscious desire or purpose to obstruct [their] free exercise of religious beliefs." App.8263.

Bowers's challenge to the evidence of two yarmulke pieces strewn on the floor of the synagogue's mezzanine is equally flawed. Br.267 (citing App.8127-29, 13576-77). The case agent testified that they were recovered near the remains of Irving Younger, who "suffered a…traumatic head wound."

242

App.8128. Crime-scene evidence concerning a murdered congregant was highly probative of the charged offenses and posed no risk of unfair prejudice.

Bowers concedes (Br.264) that he "obviously obstructed the victims' exercise of religion" by "attack[ing] them in the middle of religious services," but that concession did not preclude the government from showing the specific ways in which his attack interfered with their worship, especially given the defense's challenge at trial to whether Bowers intended to obstruct congregants' right to worship. App.8363, 8366-67; *see Old Chief*, 519 U.S. at 186-87. The jury was entitled to hear about, for example, the sermon Rabbi Myers could not deliver because of Bowers's violent acts and the violation of Jewish principles of welcoming the stranger and respecting prayer shawls, prayer books, and yarmulkes. Whether Bowers "target[ed] the religious items as such" (Br.264) is not determinative—testimony about the items showed that he saw victims engaged in religious exercise and was proof of how he obstructed their freedom to worship.

### 4. The district court properly exercised its discretion in admitting Burstin's testimony.

Bowers's challenge (Br.257-62) to Burstin's selection-phase testimony about Pittsburgh's Jewish community is meritless.

### a.    Additional background

Bowers unsuccessfully moved to strike the site-selection aggravating factor as broad, vague, and statutorily prohibited.  DE241:62-68; App.206-08.

He later moved in limine to exclude Burstin's testimony on various grounds.    DE1471; DE1481.    According to Bowers, the site-selection aggravating factor (App.13714) required proof that he knew the history of the Jewish community in the Squirrel Hill neighborhood.  App.14148; DE1481:7. The government disagreed that it had to prove such knowledge but maintained that the trial evidence did prove it.  App.14149.

The court denied Bowers's motions.  App.381-82, 14151.  It confirmed that Burstin would not testify about "the community's reaction to the crimes." App.14151.  It rejected Bowers's contention that the evidence did not show his knowledge of the Jewish community in Pittsburgh, citing "his statements at the time, the fact that he went there, [and] the fact that he had potentially two targets."  App.14152.

### b.    Burstin's testimony was admissible.

i. Burstin's testimony proved, as alleged by the site-selection aggravator, that the Tree of Life Synagogue was "located in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania, which is home to one of the largest and oldest urban Jewish populations in the United States."  App.13714; *see* App.11210, 11212-13.

244

She briefly described the origins of Pittsburgh's Jewish community, its growth and movement to different areas over time, and its later concentration in Squirrel Hill. App.11205-13. The testimony, which comprised only eight transcript pages, posed no danger of unfair prejudice and was admissible.

ii. Bowers's challenge relies on two incorrect arguments: (1) that the government needed to prove he knew that Squirrel Hill was home to one of the largest urban Jewish populations; and (2) that evidence of such knowledge was lacking. Br.260-62.

The first point misreads the Death Penalty Notice. The site-selection aggravator focused on Bowers's state of mind, charging that he "targeted men and women participating in Jewish religious worship at the Tree of Life Synagogue" in Squirrel Hill "in order to maximize the devastation, amplify the harm of his crimes, and instill fear within local, national, and international Jewish communities." App.13714. The aggravator described Squirrel Hill only when describing the synagogue's location; it did not allege Bowers knew the particular facts about Squirrel Hill.

Nor did it need to. The FDPA requires only that notice of non-statutory aggravating factors be provided to the defendant, as it was here. *See* 18 U.S.C. 3592(c). As a constitutional matter, the facts concerning Squirrel Hill and the Jewish community of which Tree of Life was a part furthered the purpose of a

245

selection-stage proceeding—ensuring the jury makes "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879; *accord Tuilaepa*, 512 U.S. at 972-73; *see United States v. Higgs*, 353 F.3d 281, 320 (4th Cir. 2003) ("[T]he use of nonstatutory aggravating factors serves only to individualize the sentencing determination."). That Bowers attacked a synagogue in a neighborhood that is home to one of the largest urban Jewish populations in the United States described a circumstance of his crime, whether or not he fully appreciated the significance of Squirrel Hill. And again, the aggravator otherwise focused on Bowers's state of mind.

iii. As to Bowers's second argument, the district court did not clearly err in finding "ample evidence" supporting an inference that Bowers knew Squirrel Hill was home to a large Jewish community. App.14152; *see Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985).

Bowers's goals for the attack included killing those responsible for supposed white genocide and attracting people to his cause. App.9217. He told Dr. Rogers that he considered alternate targets, such as a prominent Jewish person in Cleveland. App.9226-33, 9242; *see also* App.12940. He settled on HIAS—a Jewish refugee organization—because it was "big enough" to satisfy his goals. App.7689, 9233. Bowers did online research, finding on HIAS's

website a list of Jewish congregations and organizations participating in a "National Refugee Shabbat," a list that included Dor Hadash. App.7876-80, 13677. Bowers posted a link to that list on Gab.com, with a message accusing HIAS of "bring[ing] in hostile invaders to dwell among us." App.7821-23, 13627.

After settling on Dor Hadash as a target and a local Jewish community center as a secondary target, Bowers reviewed online photos of the Tree of Life Synagogue and a schedule of synagogue events. App.9221-23. He postponed his attack by about one week, apparently because his research revealed that children would be present on the date he originally selected, and to him, "'killing kids'" would "'not [be] good for the optics.'" App.9222-23 (quoting Dr. Rogers's interview notes). But Bowers was pleased with his target selection, telling Dr. Corvin that the Tree of Life Synagogue was Jewish people's "Statue of Liberty" and he "shit on it." App.12934-36.

Given Bowers's hatred of Jewish people and need for a "big enough" target, the evidence that he chose the Tree of Life Synagogue and a nearby Jewish community center as targets, after conducting careful research, allowed the jury to infer that he knew Squirrel Hill was home to a large Jewish community.

### 5.    Bowers distorts the government's use of evidence.

Bowers mischaracterizes the government's use of the testimony he challenges.

Bowers accuses the government, during selection-phase closing argument, of invoking the Torah from Czechoslovakia that was displayed outside Pervin Chapel "to draw a direct line from the Holocaust" to his crimes. Br.265. But he omits the context of the remark: the prosecutor was discussing Bowers's religious animus and referencing Gab posts in which Bowers downplayed the Holocaust or denied it occurred.    App.13181-82; *see, e.g.*, App.13620 ("holohoax"), 13625 ("Holohoax 2: The Lampshade Cometh"), 13629 ("all kikes should be gassed and baked for real this time"); App.13643 (liked post: "Nobody was gassed at the German Labor Camps."). The prosecutor's point was that the Holocaust was real—the Torah from Czechoslovakia was a "witness" to it—"[b]ut in the defendant's mind, whatever happened to Jews in the Holocaust wasn't enough.  He wants them to gas and bake.…  To him, the only good Jew is a dead Jew." App.13182.  This was fair argument about the religious hatred that fueled Bowers's crimes, including the remark that the Torah was "a witness, over 70 years later, to what happened to Jews at the Tree of Life Synagogue." *Ibid.*; *see Savage*, 970 F.3d at 314 (prosecutor's comment about the defendant using his children as a "'mercy shield'… may have been a hard blow,

248

but it is not one [the Court] can rule as a foul"); *United States v. Bates*, 46 F. App'x 104, 110 (3d Cir. 2002) (government may "summarize its case graphically and forcefully"). The Torah-related remarks were within the prosecutor's "considerable latitude to argue the evidence" to the jury. *United States v. Titus*, 78 F.4th 595, 602 (3d Cir. 2023) (quotation omitted).

Equally meritless is Bowers's accusation that the government "implicitly invited the jury to use its verdict to redress the historical existence of antisemitism" when it argued that many people share Bowers's racists beliefs about Jewish people. Br.254 (quoting App.13209, 13214-15). On their face, the remarks rebutted Bowers's schizophrenia claim by emphasizing that Bowers's beliefs about Jewish people were not delusional. *See* pp.58-60, *supra* (discussing testimony about alleged delusions). As the prosecutor argued, "[t]hese were not beliefs that originated with the defendant. They were beliefs he learned about and adopted as his own." App.13215. Bowers maintains (Br.254) that the prosecutor's arguments were only "nominally presented" to rebut his mental-health claims. There was nothing nominal about them—their sole purpose was to rebut his mental-health assertions. App.13209, 13212-15.

Bowers overreaches again in suggesting the government improperly discussed his murder victims' religious backgrounds during closing argument.

249

Br.254, 262-63.  The arguments and underlying victim-impact evidence were proper.  *See* pp.262-68, *infra*.

Other examples show that the government was focused on Bowers and his crimes when discussing the challenged evidence; it did not invite the jury to hold him "responsible for the crimes of others" (Br.230), "redress historical wrongs" (Br.230), or "'send a message' about larger social problems" (Br.234).  During guilt-phase summation, the prosecutor incorporated Braniff's explanatory testimony when summarizing Bowers's Gab postings, App.8319-21, and cited "[y]armulkes, prayer shawls, prayer books" that were "strewn all over the synagogue after [Bowers's] attack" as evidence of his knowledge and intent on the religious-obstruction charges, App.8326-27; *see also* App.8373-74 (similar arguments during guilt-phase rebuttal).  Likewise, during selection-phase summation, the prosecutor referred to prayer books "torn apart by the defendant's gunfire in a house of worship" in describing Bowers's "desecration of that sacred space, a sanctuary."  App.13220-21.

The government asked the jury to convict and sentence Bowers, not for the crimes of others, but based on evidence that he attacked and killed congregants because he hated Jewish people and wanted to obstruct their freedom to worship.

250

### 6.     Any error did not prejudice Bowers.

Bowers's arguments about prejudice (Br.270-72) erroneously assume the government must prove harmlessness beyond a reasonable doubt.   That standard applies to preserved penalty-phase errors in capital cases, 18 U.S.C. 3595(c)(2), and preserved constitutional errors, *Chapman v. California*, 386 U.S. 18, 24 (1967).  As discussed, Bowers's claims are largely unpreserved or waived. Bowers has the burden of showing that any unpreserved "plain" error affected the outcome of the proceeding.  *United States v. Fulton*, 837 F.3d 281, 294 (3d Cir. 2016).  Regardless, any error did not prejudice Bowers.

The challenged guilt-phase evidence was not voluminous.  Between the end of the guilt phase and final deliberations, the jury heard eligibility-phase and selection-phase cases from both parties, spanning about five weeks, including Bowers's 29-witness mitigation defense (App.13848-56).  Even if the Court were to find the argument about the Torah from Czechoslovakia improper, the remark was brief.  Likewise, the government barely touched on Burstin's limited testimony.  App.13183-84.

Bowers cites the government's display of crime-scene photographs and other trial exhibits, including Gab posts "showing concentration camp crematoria and ashes."  Br.270-71; *see, e.g.*, App.13615-16, 13621-23.  But when summarizing its case, the government was entitled to show admitted trial

251

exhibits reflecting Bowers's hatred of Jewish people and destructive harm to his victims. Bowers does not independently challenge this display.

The district court repeatedly instructed the jury to select a sentence based on the facts and the law, free from passion, emotion, sympathy, and prejudice, App.13124, 13126, 13139, 13161, 13175, instructions the jurors are presumed to have followed, *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The jury considered and made findings on each mitigating factor. App.13786-13800. That it found several mitigators shows that it was not "overmastered by emotion." *United States v. Whitten*, 610 F.3d 168, 191 (2d Cir. 2010). Rather, the death verdicts were the result of overwhelming evidence that proved the nine aggravating factors beyond a reasonable doubt. *See* pp.53-58, *supra*. Given the "highly aggravated" nature of Bowers's crimes (Br.270), the jury would have returned the same sentencing verdict regardless of any alleged error. *See Tsarnaev*, 968 F.3d at 85 ("overwhelming force" of statutory intent and aggravating factors rendered error in admitting testimony harmless beyond a reasonable doubt). Any preserved error was harmless even under a reasonable-doubt standard, and any unpreserved error does not satisfy the third and fourth plain-error prongs.

**IX.   THE GOVERNMENT'S VICTIM-IMPACT EVIDENCE AND ARGUMENTS DID NOT VIOLATE THE CONSTITUTION OR THE FDPA.**

Bowers next contends (Br.272-96) that the district court allowed the jury to consider improper evidence and argument about the impact of his crimes on victims. The record and applicable precedent defeat his claim.

**A.   Background**

The Death Penalty Notice alleged, as non-statutory aggravating factors, that Bowers caused "injury, harm, and loss" to his deceased victims and their "family, friends, and co-workers," and that Bowers caused "serious physical and emotional injury" to surviving victims. App.13713-15.

### 1.   Pre-trial ruling on surviving-victims aggravator

Before trial, Bowers moved to strike threshold mental-state and aggravating factors from the Death Penalty Notice on various grounds. DE241. Bowers argued, *inter alia*, that the FDPA does not authorize the jury to consider "injury to surviving victims" as an aggravator. DE241:56-59. The district court denied that challenge and Bowers's broader motion. App.203.

### 2.   Pre-selection-phase rulings on victim-impact evidence

Before the selection phase, Bowers repeatedly sought to limit the government's use of victim-impact evidence. The district court largely denied these challenges. S-App.130-49; App.355-371, 377-79. The court directed the defense to object, during trial, "to any evidence or argument that it believes is

impermissible"; the court declined to give "a vague standing objection to all victim impact evidence the Defense finds objectionable before any such evidence is introduced." App.371; *see* App.362; S-App.146-48.

Nevertheless, the court provided preliminary "boundaries and instruction" on victim-impact evidence. S-App.149. The court ruled that:

> Victim impact witnesses may offer testimony describing the life which the Defendant chose to extinguish, should a guilty verdict be returned on a capital offense, or demonstrating loss to those close to the victims and the targeted community at issue in this case which has resulted from the crimes in question. Such witnesses may not characterize or give their opinions on the crime, characterize or give opinions on the Defendant, and they may not express an opinion on the appropriate sentence.

S-App.148-49; *accord* App.363-64. The court limited victim-impact witnesses to "close friends and family members." S-App.138. It determined "that a reasonable number of photos or short videos of victims at or near the age of their death will be permitted," leaving open the possibility of admitting photos or short videos "at a different time in [the victim's] life," as to which the defense could "raise a specific objection at the appropriate time." S-App.141; *accord* App.364-65.

As relevant here, the court denied Bowers's request "to categorically bar evidence of the victims' religious devotion or their community service, each of which goes to the victims' uniqueness as individuals." App.367; *accord* S-App.138. The court directed the government "to avoid straying into testimony

that could invite an analysis as to the comparative value of the victims to other members of society," but did not find that "evidence of the victims' devout religious faith constitutes such evidence" or that it was "impermissibly cumulative." App.367 n.1.

The court rejected, as inconsistent with *Payne v. Tennessee*, 501 U.S. 808 (1991), Bowers's request to exclude "evidence of the personal characteristics and experiences of deceased victims that are remote in time from the commission of the crime." App.366-67 (quotation omitted). The court denied the defense's motion to exclude evidence of victims' misfortune unrelated to the synagogue attack, based on the government's statement that it did not plan to elicit incidents removed from the loss caused by a victim's death, "without prejudice to Defendant lodging objections to such evidence, if warranted, at time of trial." App.368.

In one motion (DE1156), Bowers sought to exclude evidence of *non-physical* injuries suffered by surviving victims; the court denied that challenge. S-App.145. Bowers conceded that evidence of surviving victims' *physical* injuries was "'admissible'" and that such injuries "'may also be alleged as a non-statutory aggravating factor, for they are foreseeable consequences of the crime and therefore relevant to the defendant's moral blameworthiness.'" S-App.143 (quoting DE1156:24).

255

### 3. Selection-phase evidence

a. Over two-and-a-half days, the government presented victim-related testimony from 20 witnesses. Sixteen witnesses testified about the 11 deceased victims. App.10995-11033, 11068-88, 11106-24, 11180-11204, 11214-51, 11268-11319, 11321-62, 11385-11415, 11443-64, 11475-77.[50] Four surviving victims (Andrea Wedner,[51] Daniel Leger, Officer Anthony Burke, and Officer Timothy Matson), and the girlfriend of another surviving victim (Officer Daniel Mead), testified about those victims' injuries from the shooting. App.11089-11105, 11252-62, 11420-43, 11464-11505.

The government introduced photographs from each deceased victim's life. App.13844-47 (listing Government Exhibits 1401-1411). The government also introduced two short videos (five and ten seconds, respectively) of Cecil and David Rosenthal walking and saying prayers in Pervin Chapel, with Cecil holding the Torah. *See* App.11451-52 (describing Government Exhibits 1404B, 1404C). And it introduced a limited number of photographs of injuries suffered by four surviving victims. App.13845-48 (listing Government Exhibits 1412-1415).

---

[50] Video statements by the parents of Cecil and David Rosenthal were played during the testimony of those victims' sisters. App.11088, 11464.

[51] Andrea Wedner testified about her own injuries and the death of her mother.

b. When the selection phase began, the district court denied another motion by Bowers to exclude victim-impact testimony (DE1474) and instructed Bowers to assert his objections contemporaneously. App.10906-08, 11007-08, 11131-34. The next day, the defense revisited victim-impact statements it had cited in a previously litigated motion (DE1352) and asked the court to rule on the admissibility of this testimony. App.14160-62. The court overruled the objections to the "specific statements" in that motion, but invited the defense to make any additional objections as the witnesses testified. App.14162-63.

As discussed below, Bowers objected to some victim-impact evidence during the selection-phase proceeding, but often raised objections belatedly. The government maintained those objections were untimely. App.11378-79. The court overruled them. *See, e.g.*, App.11064, 11127-29, 11379-80.

### 4. Selection-phase closing argument

During closing argument, the prosecutor briefly summarized the impact evidence concerning each deceased victim, App.13185-93, emphasizing "how unique these people were," App.13193, and discussed the injuries to surviving victims, App.13196-13203. The prosecutor asked the jury not to "forget the dead. The ones who couldn't speak for themselves[,]" when deciding whether aggravating factors sufficiently outweighed any mitigating factors. App.13221. During rebuttal, the prosecutor noted that relatives of deceased victims "came

in and they bore witness on behalf of those 11 men and women who cannot speak for themselves." App.13293.

Bowers moved for a mistrial or to strike the government's arguments. He maintained, *inter alia*, that the government improperly asked the jury: (a) to impose the death penalty for victims who could not "speak for" themselves; and (b) to consider "victim's [*sic*] devotion to their faith and surviving victim impact," and "the psychological and emotional injuries to surviving victims." DE1524:9, 25. The district court denied Bowers's motion. App.13323.

## B.    Standard of Review

The Court conducts plenary review of preserved constitutional challenges to victim-impact evidence. *Savage*, 970 F.3d at 298. The Court reviews preserved, non-constitutional challenges to evidentiary rulings for an abuse of discretion, *United States v. Jackson*, 443 F.3d 293, 300 (3d Cir. 2006), and reviews legal questions implicated in such rulings de novo, *Hall*, 28 F.4th at 449 n.1. Unpreserved challenges are reviewed for plain error. *Savage*, 970 F.3d at 298; *Hodge*, 870 F.3d at 203 n.14.

The Court reviews the denial of a mistrial motion based on closing argument for an abuse of discretion. *United States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007).

### C.    Argument

Bowers challenges four categories of victim evidence and argument. Some challenges encompass preserved and unpreserved claims. Regardless of whether they were preserved, his challenges do not warrant vacating his death sentences.

### 1.    The Constitution and FDPA permit the presentation of victim-impact evidence.

a. In *Payne*, 501 U.S. 808, the Supreme Court held that the Eighth Amendment generally permits the government to introduce evidence "relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Id.* at 817, 830. The Court recognized that the prosecution "'has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'" *Id.* at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)). The Court rejected the argument that victim-impact evidence encourages the jury to make "comparative judgments" about victims' worth to the community. *See id.* at 823. By presenting "the specific harm caused by the crime in question," victim-impact evidence permits the jury "to assess meaningfully the defendant's moral culpability and blameworthiness." *Id.* at

259

825; *see also ibid.* (Due Process Clause bars victim-impact evidence only if evidence is "so unduly prejudicial that it renders the trial fundamentally unfair"); *Savage*, 970 F.3d at 299 (discussing *Payne*).

b. Consistent with *Payne*, the FDPA authorizes the government to allege aggravating factors related to, and introduce penalty-phase evidence of, "the effect of the offense on the victim and the victim's family," including "oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information."  18 U.S.C. 3593(a).

### 2. The district court properly admitted evidence of victims' religious faith and roles within their religious communities.

Bowers first challenges (Br.274-83) testimony about victims' roles or standing within their religious communities and about "the victims' religious faith," which he characterizes as impermissible "comparative victim-worth evidence."  His claim lacks merit.

### a. Bowers's claim is partially unpreserved.

Bowers errs in asserting that the district court allowed a "standing objection" to testimony about victims' "comparative worth, religiosity, and hardship outside the offense."  Br.274.  He cites (App.8613) a discussion of vulnerable-victim testimony *during the eligibility phase*.  There, because the court had not ruled on one of Bowers's motions (DE1352), it gave him a standing

260

objection to testimony he "specifically identified in writing in the motion." App.8613-14. But the court later ruled on that motion and directed Bowers to object to victim-impact testimony as it was introduced. App.362, 367-68, 371.[52]

At the start of *the selection phase*, the court again told defense counsel to object to victim-impact evidence as it "comes in," and cautioned that counsel would be proceeding at their "own peril" by not doing so. App.10906-08, 11132-34. To be sure, the next day, the court ruled on specific statements identified in one of Bowers's previous motions (DE1352). App.14160-64. But to the extent that motion did not identify a specific statement, Bowers needed to "timely object[] or move[] to strike" to preserve his claim of error. Fed. R. Evid. 103(a)(1); *see Savage*, 970 F.3d at 299 (applying plain-error review because defendant failed to contemporaneously object to victim-impact testimony).

Bowers omits mention of the court's instructions to make contemporaneous objections to victim-impact testimony. And his brief fails to match up the alleged "comparative worth" and "religiosity" testimony he is challenging (at 275-78) with record citations showing either that he contemporaneously objected to it or that the testimony was specifically identified in the motion (DE1352) the court ruled upon during the selection

---

[52] The court later granted a standing objection on whether 18 U.S.C. 3593(f) bars evidence of religiosity, but it did so only on that issue. App.11007.

phase (App.14162-63).  Again, when Bowers objected to specific testimony, he often did so belatedly.  For example, the defense objected to faith-related testimony about Richard Gottfried, Jerry Rabinowitz, Daniel Stein, and Cecil and David Rosenthal *after* the defense declined to cross-examine the government's witnesses, the witnesses were excused, and the proceeding had resumed with other testimony.  App.11062-64, 11376-80, 11477.  Those objections were not "timely," Fed. R. Evid. 103(a)(1), and at least some of this testimony was not covered by the court's motion ruling (App.14162-63).

Failing to object to evidence in accordance with the district court's directives was significant here given the nature, length, and complexity of the trial.  To the extent Bowers fails to show that he properly preserved a claim as to each piece of challenged evidence, the Court should review it for plain error.

### b.    The court committed no error.

i. The testimony about deceased victims' "roles" within their religious communities (Br.275) was permissible under *Payne*.  That victims held leadership positions in—or were considered important, valued, or committed members of—their congregations described their "uniqueness" as "individual human being[s]." *Payne*, 501 U.S. at 823 (quotation omitted); *see Roof*, 10 F.4th at 377 ("[V]ictims' exemplary qualities, such as their singing, preaching, and praying, are part of their 'uniqueness' that *Payne* allows a jury to consider.");

*United States v. Runyon*, 707 F.3d 475, 501 (4th Cir. 2013) (evidence of Navy officer's professional accomplishments comported with the FDPA and Eighth Amendment). Bowers's victims were not "faceless stranger[s]." *Payne*, 501 U.S. at 825 (quotation omitted). "*Payne* holds that a court must consider the victims of an offense as it finds them, not in the light most favorable to the defendant." *Bernard*, 299 F.3d at 479. In addition, the roles and responsibilities of the deceased victims helped to explain their presence in the synagogue at the time of Bowers's attack.

ii. Bowers's challenge (Br.276-78) to selection-phase references to the victims' faith is equally meritless. *Payne* authorized this type of evidence, including testimony that: Richard Gottfried began attending services regularly after his father died, App.11002; Jerry Rabinowitz always stood during a particular prayer to honor the recently deceased who had no one to stand for them, App.11194-95; Daniel Stein celebrated his bar-mitzvah anniversary each year by reading the portion of the Torah he had learned for his bar mitzvah, App.11388-89; and Judaism was one of the most important things in the lives of Cecil and David Rosenthal, App.11447-49. This testimony described the victims as the unique individuals they were. It was not excessive, and neither the witnesses nor the government suggested that the victims' faith made them more worthy of justice than others. *See, e.g.*, App.13193 (government arguing

263

"how unique" the deceased victims were).  Having killed 11 worshippers inside a synagogue as Sabbath services were about to begin, Bowers cannot claim surprise that the window into his victims' lives permitted by *Payne* involved religion.[53]

Three circuits have rejected challenges to the admission of penalty-phase evidence concerning victims' religion and faith.  *See Roof*, 10 F.4th at 376-78 (4th Cir.) ("That some of the victim-impact evidence implicates the victims' devotion and the impact of the victims' death on the targeted religious community is to be expected where Roof intentionally targeted a church and selected Mother Emmanuel's Bible-study group."); *see also United States v. Mikhel*, 889 F.3d 1003, 1052-54 (9th Cir. 2018); *Mitchell*, 502 F.3d at 989-90 (9th Cir. 2007); *Bernard*, 299 F.3d at 478-79 (5th Cir.).  These cases recognize that where, as here, religion played an important role in victims' lives, it is "difficult if not impossible" to describe their uniqueness as human beings, and the effect of their loss, without addressing their faith.  *Mitchell*, 502 F.3d at 990; *accord Roof*, 10 F.4th at 377;

---

[53] Bowers also challenges guilt-phase testimony about religious faith, including that victims wore yarmulkes and prayer shawls and had specific roles during services.  Br.276.  As discussed, that evidence was relevant to the religious-obstruction and hate-crime charges.  The government did not use it improperly in its selection-phase case.

*Bernard*, 299 F.3d at 479.  Bowers does not cite any case holding that the admission of such evidence was improper.

Bowers's attempt (Br.282-83) to distinguish these authorities is misplaced. He cites *Roof*'s reliance on a jury instruction limiting consideration of victim testimony, but that instruction did not factor into the Fourth Circuit's approval of the "faith-related aspect of the evidence"; the court cited the instruction as *additional* support for evidence concerning "victims' exemplary qualities." *Roof*, 10 F.4th at 377.  He likewise errs in cabining *Mikhel*, *Mitchell*, and *Bernard* to situations involving "relatively brief descriptions of religion tethered to the case facts or victims' interactions with family members, so as to reflect their families' losses."  Br.282.  The courts' reasoning was not so narrow.  In all events, the evidence about religion here *was* tethered to the facts, given Bowers's targeting of synagogue worshippers on their Sabbath.  And witnesses testified about victims' faith in the context of describing the victims' interactions and bonds with family members.  App.10998-99, 11003-04, 11025-26, 11196-97, 11446-47, 11456.

iii. As required by 18 U.S.C. 3593(f), the district court instructed the jury that it could not consider the religious beliefs of Bowers or victims in selecting a sentence, App.13167, and the jurors individually certified they did not do so, App.13805.  Jurors are presumed to follow their instructions.  *Richardson*, 481

265

U.S. at 206. The instruction and certification confirm the absence of error in admitting the evidence, let alone a clear or obvious error to the extent Bowers's claim is unpreserved. *See Roof*, 10 F.4th at 377; *Mikhel*, 889 F.3d at 1053-54; *Mitchell*, 502 F.3d at 990.[54]

### 3. The district court properly admitted testimony about victims' past experiences.

Bowers next challenges (Br.284-85) testimony about victims' hardships unrelated to the offense. The limited testimony in this area was proper—it helped to describe victims' uniqueness and convey the magnitude of the losses caused by their deaths. *Payne*, 501 U.S. at 825-26.[55]

---

[54] Bowers's summary contention (Br.280) that the religious-faith evidence violated Section 3593(f) is meritless. If he means to argue that Section 3593(f) restricts evidence of religion permissible under *Payne*, the argument is undeveloped and waived. *Kolodesh*, 787 F.3d at 232 n.6. Any such statutory reading is also erroneous because it ignores context and common sense. *See Abramski v. United States*, 573 U.S. 169, 179 (2014). Section 3593(f)'s title indicates that Congress was focused on preventing juror discrimination, not limiting victim-impact evidence. *Cf. Dubin v. United States*, 599 U.S. 110, 121 (2023) (statute's "title and place in the statutory scheme" can "shed light on its text"). Congress's enactment of statutes authorizing capital punishment when death results from crimes committed because of a person's protected characteristics, *see* 18 U.S.C. 245(b)(2), 247(d)(1), further weighs against reading Section 3593(f) to restrict permissible victim-impact evidence of religion.

[55] Although some of this testimony was covered by the court's motion ruling (App.14162-63), Bowers did not timely challenge other evidence, such as testimony about Rose Mallinger and Bernice and Sylvan Simon.

For example, testimony that Joyce Fienberg, Irving Younger, and Rose Mallinger cared for their family members when they were ill, App.11291, 11310, 11333, 11335, demonstrated those victims' humane and loving qualities. Testimony that Melvin Wax lost his father and started working at a young age demonstrated his positive outlook on life—his daughter testified that he "would describe it as a fabulous childhood.…That was his personality.  He appreciated everything he did have.  He appreciated his family."  App.11108-09.  Similarly, after noting that her parents had faced some challenges in raising Cecil and David Rosenthal at home, Diane Rosenthal testified that having her brothers integrated into their household "was probably the best thing that ever happened to me and my entire family."  App.11071.  In order to describe Richard Gottfried's characteristic strength and stamina, his widow testified that he suffered serious leg injuries in January 2018 but persevered so that he walked again.  App.11029-30.  And her testimony that the couple could not have children conveyed the depth of her loss.  App.11033 ("[W]e never had children, so he was my whole family and it was wiped out in a second."); *see* App.13186-87 (government closing argument about this testimony).  Finally, the testimony

267

about Bernice and Sylvan Simon's loss of a son was brief—occupying three transcript lines—and explained the family's remaining members. App.11221.[56]

This testimony provided a permissible window into the deceased victims' lives and contextualized the loss experienced by family members. As Bowers's own record citation confirms (App.13191-92), the government did not unduly emphasize past hardships during closing argument, or suggest that the jury should vindicate them through its sentence. The single case cited by Bowers in challenging the hardship evidence (Br.284) involved more extensive testimony about past victim hardships that included a kidnapping and hostage-taking, and the Ninth Circuit affirmed the denial of habeas relief in any event. *See Floyd v. Filson*, 949 F.3d 1128, 1148-49 (9th Cir. 2020). Bowers cannot show error.

### 4. The district court properly admitted evidence of surviving victims' injuries.

Bowers contends (Br.285-89) that the FDPA bars impact evidence of surviving victims' injuries at sentencing. Bowers is wrong on the merits, and he partially abandoned his legal position before trial.

---

[56] Bowers's challenge to the testimony of Lisa Burns, Officer Daniel Mead's partner, is misplaced. Mead is a surviving victim. App.11254. And there was nothing improper about Burns's testimony that doctors believed Mead's neuropathy may be the result of his injuries from the synagogue shooting. App.11253-54. The defense could have cross-examined her but chose not to. App.11262; *see also* App.14159.

### a.    Bowers conceded below that evidence of surviving victims' physical injuries was admissible.

Although Bowers moved to dismiss the injury-to-surviving-victims aggravator on the ground that the FDPA precludes consideration of such injuries, DE241:56-59, he conceded in a later motion that "the fact that there were physical injuries to survivors may…be alleged as a non-statutory aggravating factor, for they are a foreseeable consequence of the crime and therefore relevant to the defendant's moral blameworthiness."   S-App.90. Bowers maintained only that evidence of surviving victims' *non-physical* injuries was inadmissible.  S-App.87-90.  During the selection phase, this was Bowers's focus.  App.14156.

By affirmatively conceding that physical injuries to surviving victims may be alleged as a non-statutory aggravating factor, Bowers abandoned his legal argument that the FDPA precludes it.  Thus, his claim on appeal is waived as to physical injuries.  *See United States v. Sussman*, 709 F.3d 155, 162 (3d Cir. 2013) (concession in acquittal motion waived argument on appeal); *United States v. Console*, 13 F.3d 641, 674 (3d Cir. 1993) (abandonment of argument during sentencing resulted in waiver on appeal).

### b. The FDPA allows the jury to consider injuries to surviving victims.

Even if not partially abandoned, Bowers's legal argument is meritless. Bowers effectively concedes (Br.286-87) that he inflicted serious physical and emotional injuries on surviving victims. A capital jury may consider such injuries. By statute, the government may allege aggravating factors "concerning the effect of the offense on the victim and the victim's family." 18 U.S.C. 3593(a). The FDPA's text, courts' consistent treatment of victim-impact evidence, and other definitions of the term "victim" defeat Bowers's contention (Br.287-89) that a "victim" under Section 3593(a) can only be the deceased victim whose murder increases the possible punishment to death.

i. Section 3593's text indicates that Congress had both surviving and deceased victims in mind. Subsection (a) provides that victim-impact evidence "may include" a statement that "identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim." 18 U.S.C. 3593(a). It would be odd to refer to the "extent and scope" of the victim's "injury and loss" if the victim must always be deceased.

Moreover, subsection (c) uses "victim" in a way that plainly includes survivors. It states, "the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice." 18 U.S.C. 3593(c). Section 3510, in turn, provides that in "[c]apital

270

cases," "any victim of [the] offense" has the right to attend "the trial of a defendant accused of that offense," even if the "victim may, during the [capital] sentencing hearing, testify as to the effect of the offense on the victim and the victim's family or as to any other [aggravating] factor." 18 U.S.C. 3510(b). And Section 3510 defines "victim" by cross-reference to 34 U.S.C. 20141, which states that a "victim" includes any person who has "suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime." 34 U.S.C. 20141(e)(2); *see* 18 U.S.C. 3510(c). Section 3593(c)'s discussion of a victim's attendance at trial is strong textual proof that a "victim" is not limited to the deceased. *See United States v. Saipov*, No. 17-cr-722, 2023 WL 371531, *13 (S.D.N.Y. Jan. 24, 2023) (unpublished).

More generally, Section 3593 evinces a broad approach to aggravating factors and victim-impact evidence. It allows the government to present penalty-phase "information…as to *any matter relevant to the sentence*" and "*any information relevant to an aggravating factor* for which notice has been provided under subsection (a)." 18 U.S.C. 3593(c) (emphases added). It provides that the government's aggravators "*may include* factors concerning the effect of the offense on the victim and the victim's family…*and any other relevant information*." 18 U.S.C. 3593(a) (emphases added). These permissive terms further undercut Bowers's narrow reading of "victim." *See, e.g.*, *Chevron U.S.A. Inc. v. Echazabal*,

271

536 U.S. 73, 80 (2002); *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007).

Bowers conceded that surviving victims' physical injuries are "a foreseeable consequence of the crime and therefore relevant to the defendant's moral blameworthiness." S-App.90. Section 3593's text indicates that Congress authorized juries to consider those injuries, as well as non-physical injuries, at capital sentencing proceedings.

ii. Courts, too, have long understood that victim-impact evidence may include testimony about and from surviving victims. In *Payne*, the Court described as "victims of [the defendant's] offenses" both the deceased people he had stabbed and the young boy who "[m]iraculously survived," and tacitly endorsed testimony about the effects of the defendant's crimes on the survivor. 501 U.S. at 811-12, 814-15, 825. In *McVeigh*, the Tenth Circuit cited testimony by "three injured survivors" describing the effects of the Oklahoma City bombing when it addressed a challenge to impact evidence about deceased victims, noting that the government could have called additional witnesses to testify about "the impact of the explosion on the numerous injured victims." 153 F.3d at 1216. Courts have allowed evidence of surviving victims' injuries in other mass-casualty cases. *See Tsarnaev*, 968 F.3d at 80-81 (describing survivors' testimony); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 300-01 (S.D.N.Y.

272

2001) (permitting government's "victim impact evidence" aggravating factor to include injuries to "deceased or surviving" victims); *see also Saipov*, 2023 WL 371531, *13 (rejecting same argument Bowers makes as inconsistent with Section 3593's plain language).

iii. Other victim-centered statutes define "victim" to include those harmed by the defendant's actions, whether or not they survived. The Mandatory Victims Restitution Act, for example, provides that a victim is "a person directly and proximately harmed as a result of the commission of an offense…." 18 U.S.C. 3663A(a)(2); *accord* 18 U.S.C. 3771(e)(2)(A) (Crime Victims' Rights Act). That accords with the ordinary meaning of "victim," which encompasses "[o]ne who is harmed *or* killed by another." *American Heritage Dictionary of the English Language* 1929 (5th ed. 2016) (emphasis added).

iv. Bowers's countervailing arguments are unsound. He notes use of the term "victim" in other FDPA provisions. Br.287-88 (citing 18 U.S.C. 3591(a)(2), 3592(a)(7), 3592(c)(5)). Those provisions refer to a "victim" who was "killed" or "died," or suffered "death," or to a person who was put at grave risk of "death"; they do not suggest that "victim," without further modification, means *only* a person who was killed. Bowers also cites (Br.287-88) two conclusory district court decisions limiting victim-impact evidence to specific deceased victims, but neither accounted for the broad language of Section

273

3593(a) or Section 3593(c)'s reference to victims attending trial. *United States v. Gendron*, 800 F. Supp. 3d 503, 513-14 (W.D.N.Y. 2025); *United States v. Gooch*, No. 04-cr-128, 2006 WL 3780781, *22 (D.D.C. Dec. 20, 2006) (unpublished).[57] Finally, Bowers's reliance on legislative history (Br.288 n.83) is misplaced because the statutory language here is straightforward. *See Gonzales*, 520 U.S. at 6; *United States v. Bowers*, 432 F.3d 518, 522-23 (3d Cir. 2005). Regardless, the cited history merely describes certain victim-impact evidence without restricting other such evidence. *See* Br.288 n.83 (citing Comprehensive Violent Crime Control Act of 1991, H. Doc. No. 102-58, at 166 (Mar. 12, 1991)). The district court committed no error in admitting evidence of survivor injuries from Bowers's mass-shooting attack.

### 5.   The government appropriately referenced victims during argument.

Bowers contends (Br.290-94) that prosecutors improperly suggested that the government or witnesses spoke for the deceased victims, or that the jury should do so through its verdict. This argument ignores context and mischaracterizes the record. The district court properly denied Bowers's challenges. App.13323.

---

[57] The court in *Gendron* struck the aggravating factor alleging injury to surviving victims. The government has appealed that ruling. *United States v. Gendron*, No. 25-2570-cr (2d Cir.).

274

As discussed, a prosecutor has "considerable latitude to argue the evidence" to the jury, *Titus*, 78 F.4th at 602 (quotation omitted), and may "summarize its case graphically and forcefully," *Bates*, 46 F. App'x at 110. *See also United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). A prosecutor may not, however, invite the jury to decide the case based on passion or emotion arising from sympathy for a victim. *See, e.g.*, *Government of the Virgin Islands v. Mills*, 821 F.3d 448, 460 (3d Cir. 2016). Reversal is warranted only when the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation omitted).

Bowers challenges two remarks, neither of which was improper. In the first, the prosecutor told the jury near the end of selection-phase summation, "don't forget the dead. The ones who couldn't speak for themselves[,]" when it weighed aggravators and mitigators. App.13221. That comment reminded the jury of Bowers's deceased victims and the harm inflicted on them—one of the alleged aggravating factors and a valid consideration under *Payne*, 501 U.S. at 825. The prosecutor did not say or suggest that he "spoke for" the victims, or that only the jury could do so. He continued by listing each murder victim and asking the jury to put "the weight of all that loss…on the scale," "[w]eigh it," and return death sentences. App.13221-22. This was fair argument tethered to

275

the facts and legal framework, *see* 18 U.S.C. 3593(e), not an improper appeal to passion or emotion.

In the second remark, near the end of rebuttal, the prosecutor referenced victim-impact testimony in stating that family members "came in and they bore witness on behalf of those 11 men and women who cannot speak for themselves." App.13293. This was proper—*Payne* allows the government to present testimony "reminding the sentencer that…the victim is an individual whose death represents a unique loss to society and in particular to his family." 501 U.S. at 825 (quotation omitted); *see also Jones v. United States*, 527 U.S. 373, 395 (1999) (plurality op.) (juries in capital cases may consider "evidence relating to…the emotional impact of the murder on the victim's family"); 18 U.S.C. 3771(e)(2)(B) (allowing family member of a deceased crime victim to assert victim's rights). And the prosecutor anchored his remark in the weighing process, telling the jury beforehand that the aggravating factors "weigh heavy, 11 murders, and your job now is to consider and weigh all of that." App.13293.

The challenged remarks bear no resemblance to those in Bowers's cited cases. Br.292-93 & n.86. The prosecutors did not profess to "speak for" the victims, *see United States v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009); *People v. Brown*, 624 N.E.2d 1378, 1388 (Ill. App. Ct. 1993); *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. Ct. App. 1992); suggest that only jurors could "speak" or "stand

up" for the victims, *United States v. Alaboudi*, 786 F.3d 1136, 1144-45 (8th Cir. 2015) (quotation omitted); or ask jurors to return a verdict "out of love for the [victims and parents] of the world" and for the defendant's "future and…past victims," *Moore v. Gibson*, 195 F.3d 1152, 1172 & n.11 (10th Cir. 1999) (quotation omitted).

Nor is Bowers well served by linking the remarks to images of victims shown during the government's closing argument, to descriptions of victims being killed or hiding in the synagogue, or to descriptions of surviving victims' injuries. Br.291-93. Bowers does not independently challenge those portions of the government's closing argument, and for good reason: they depicted or described evidence relevant to several aggravators, including the victim-impact, injury-to-surviving-victims, and grave-risk-of-death factors. *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1178 (11th Cir. 2006) (rejecting challenge to prosecutor's closing-argument remark that was based on photograph admitted into evidence). For example, the photographs of each victim, deceased and alive, captured the harm Bowers inflicted on each victim and the unique life that was lost. The testimony about Andrea Wedner urging her mother to stay quiet in Pervin Chapel, and about Barry Werber watching from the closet as Bowers stepped over Melvin Wax's slain body, App.13220-21, underscored the grave risk of death these surviving victims faced.

277

Bowers repeatedly concedes that his offense was "highly aggravated." Br.270; *see* Br.3, 325, 384, 423. He can hardly complain that the government focused on the aggravating traits of his crimes in advocating for a death sentence. The district court did not abuse its discretion in declining to strike the two remarks or grant a mistrial.

### 6.    Vacatur is not warranted.

Any preserved error in the admission of evidence was harmless beyond a reasonable doubt and does not warrant vacating the death sentences. *See* 18 U.S.C. 3595(c)(2); *United States v. Hardwick*, 544 F.3d 565, 573-74 (3d Cir. 2008). And Bowers cannot show that any unpreserved "plain" error in admitting evidence affected the outcome of the proceeding. *Fulton*, 837 F.3d at 294.

The heinous nature of Bowers's crimes, the overwhelming evidence establishing the aggravating factors, and the comparative weakness of the mitigation case, *see* pp.49-64, *supra*, weigh heavily against finding prejudicial error. *See United States v. Valentin*, 118 F.4th 579, 585-86 (3d Cir. 2024); *Savage*, 970 F.3d at 303. The alleged evidentiary errors related to only two aggravators, and the victim-impact aggravator was broader than the religiosity and hardship evidence Bowers challenges.

Moreover, the jury already knew that faith was important to the deceased victims; the guilt-phase evidence showed that Bowers intentionally killed them

278

in a synagogue during Saturday morning services. *See* pp.11-25, *supra*. Similarly, the jury heard guilt-phase evidence of surviving victims' injuries, which was relevant to the counts alleging attempted murder and bodily injury to law-enforcement officers. *E.g.*, App.5993-94, 6288-90, 8152-54, 8181-85. The jury's familiarity with these issues lessened any unfair prejudicial effect of selection-phase evidence. Beyond a reasonable doubt, the alleged evidentiary errors "did not contribute to the verdict obtained." *Hardwick*, 544 F.3d at 573-74 (quotation omitted).

Bowers's arguments (Br.295-96) about the emotional nature of testimony and the courtroom atmosphere are misguided. Bowers's own authority recognizes that "[s]ome emotion is inevitable in capital sentencing." *Moore*, 195 F.3d at 1172-73 (quotation omitted). As the Second Circuit has stated: "It cannot be expected that victim impact testimony will be cool and dispassionate. Some deaths cause more suffering than others. The only way to ensure against victim impacts caused by one's murder of a well-loved human being is to take care to murder no one at all." *Whitten*, 610 F.3d at 190-91.

The district court monitored courtroom decorum. It found that the gallery's reactions to a selection-phase witness's testimony were "more than reasonably subdued, controlled, very brief." App.11373-74; *see also, e.g.*, App.6080 (government noting during guilt phase that courtroom participants

279

were "maintain[ing] an appropriate decorum throughout [this] trial"). And the court repeatedly instructed the jury to select a sentence based on the facts and the law, free from passion, emotion, sympathy, and prejudice. App.13124, 13126, 13139, 13161, 13175. That the jury was "diligent and dispassionate enough to find" several mitigatory factors shows that it was not "overmastered by emotion." *Whitten*, 610 F.3d at 191.

Finally, any alleged error in the comments by prosecutors was not prejudicial given their brevity, the court's instructions, and the strength of the evidence. *Berrios*, 676 F.3d at 135-36. The comments consisted of only six lines of 72 pages of government summation and rebuttal, following approximately 2,000 pages of selection-phase testimony. App.13221, 13293. The court instructed the jury that arguments by counsel were not evidence and on the weighing aggravating and mitigating factors. App.13130, 13160-63; *see United States v. Lawrence*, 735 F.3d 385, 433 (6th Cir. 2013) (holding that such instructions helped limit prejudice from allegedly improper penalty-phase closing argument). Given Bowers's highly aggravated crimes, the comments did not render the death sentences fundamentally unfair. *Darden*, 477 U.S. at 181.

**X.    THE GOVERNMENT'S SELECTION-PHASE USE OF BOWERS'S STATEMENTS TO DEFENSE EXPERTS DID NOT VIOLATE THE CONSTITUTION.**

Bowers contends (Br.297-328) that the government's selection-phase use of his voluntary statements to defense mental-health experts violated his constitutional rights.  That claim lacks merit.

**A.    Background**

**1.    The Fifth Amendment and mental-health evidence**

When a defendant has introduced psychiatric evidence related to his mental state, the Fifth Amendment authorizes the prosecution to present rebuttal evidence from a court-ordered evaluation of the defendant.  *Buchanan v. Kentucky*, 483 U.S. 402, 423-24 (1987).  This rule prevents a defendant from presenting the jury with "a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime."  *Kansas v. Cheever*, 571 U.S. 87, 93-94 (2013).

Federal Rule of Criminal Procedure 12.2 protects the government's right to introduce rebuttal mental-health evidence.  It requires that a defendant provide notice when he intends "to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on" guilt or capital sentencing.  Fed. R. Crim. P. 12.2(b).  In that situation, "the court may, upon the government's motion, order the defendant to be examined

under procedures ordered by the court." Fed. R. Crim. P. 12.2(c)(1)(B). If the defendant introduces the noticed evidence, the government's expert may testify in rebuttal about the defendant's statements during the court-ordered examination. Fed. R. Crim. P. 12.2(c)(4).

A defendant's statements to his own experts are not protected. This Court held long ago that a defendant's voluntary statements during a defense-initiated mental-health evaluation do not implicate the Fifth Amendment. *United States v. Alvarez*, 519 F.2d 1036, 1045 (3d Cir. 1975). Nor are such statements covered by Rule 12.2, which applies only to statements made during court-ordered evaluations. Fed. R. Crim. P. 12.2(c)(1)(B), (c)(4).

### 2.  Bowers noticed his intent to present expert mental-health evidence during the penalty phase.

Before trial, Bowers noticed his intent to introduce expert mental-health evidence bearing on capital punishment. DE972. The defense maintained this evidence would show that Bowers "is a person with schizophrenia, epilepsy, and structural and functional impairments of the brain." DE1058:6.

On the government's motion, the court authorized government experts to examine Bowers in order to rebut or confirm the defense experts' anticipated testimony. DE1200; DE1202. Two government experts, Drs. Richard Darby and Park Dietz, examined Bowers. App.9807-09, 10126-28. After the guilt-

phase verdict, the defense confirmed its intent to offer expert evidence on his mental condition during sentencing proceedings.  DE1350.

### 3. During the eligibility phase, the government elicited and relied on testimony about Bowers's statements to his own expert.

a. The crux of Bowers's eligibility-phase defense was that he did not form the requisite intent to kill because he has schizophrenia, epilepsy, and brain impairments, which caused him to form a delusional belief system that compelled him to go on a murderous rampage.  App.8522, 8532-33 (opening statement); App.10847-48 (closing argument).

Bowers presented nine eligibility-phase witnesses.  *See* App.8663-88 (neurologist Dr. Vijayalakshmi Rajasekaran); App.8689-8713 (neuroradiologist Dr. Joseph Mettenburg); App.8715-39 (radiologist Dr. James Mountz); App.8746-8823 (nuclear-medicine specialist Dr. Andrew Newberg); App.8825-65 (neuroradiologist Dr. Murray Solomon); App.8870-9097 (neuropsychiatrist Dr. Siddhartha Nadkarni); App.9105-9322, 9372-9510 (forensic psychologist Dr. Richard Rogers); App.9540-9717 (neuropsychologist Dr. Erin Bigler); App.10615-79 (jail psychiatrist Dr. Peter Hauber, testifying in surrebuttal).

Two witnesses, Drs. Nadkarni and Rogers, personally evaluated Bowers. App.8880, 8983-84; App.9125-26.  Among other things, Dr. Nadkarni testified that Bowers suffers from epilepsy and schizophrenia, App.8976-77, and Dr.

Rogers testified that, at the time of his crimes, Bowers was suffering from a severe case of schizophrenia that impaired his ability to comply with the law and led him to believe that he was on a mission to save White people, App.9200-01.

b. As relevant here, the government cross-examined Dr. Rogers about Bowers's interview responses, including statements about the synagogue shooting, his motivation and preparations for the attack, and his consideration of other targets. *See, e.g.*, App.9218-71.[58]  That testimony relied in part on Dr. Rogers's interview notes, which were admitted into evidence as defense exhibits (and as duplicate government exhibits).  App.9218-19, 13839-40.

Rogers testified, for example, that Bowers said he had three goals for the attack: (1) "kill those persons committing [white] genocide," in his view, Jewish people; (2) scare anyone thinking of helping others to commit white genocide; and (3) "attract others to his mission of stopping" white genocide.  App.9217. Bowers began planning the attack in April 2018 and initially considered alternative targets, such as a high-level Jewish figure in Cleveland, a prominent European advocate for immigration, and an Israeli non-governmental organization.  App.9225-29, 9232-33, 9245.  He settled on attacking HIAS—the

---

[58] Bowers made only a few statements about the shooting attack to Dr. Nadkarni, who testified that he did not really get into this topic with Bowers. App.9052-53.

immigrant aid organization with which the Dor Hadash congregation was affiliated—because he believed it was big enough to accomplish his goals. App.9233.

Bowers also told Dr. Rogers that he tested his weapons beforehand to minimize the risk they would jam and researched the schedule for services at the Tree of Life Synagogue. App.9220-22, 9243-44. Bowers was not concerned about differentiating Dor Hadash from other congregations during the attack because, in his view, "a Jew is a Jew is a Jew." App.9222-24. Bowers said he brought Israeli-manufactured ammunition to the synagogue attack because that would send a message. App.9248. Bowers also said he had planned to attack a nearby Jewish community center, in addition to the synagogue, but abandoned that plan on the morning of the attack after driving by the center and discovering a police station positioned between it and the synagogue. App.9241-43, 9424.

Bowers told Dr. Rogers that he intentionally shot at victims' torsos during the attack because he wanted to inflict "messy" kills that would be difficult to look at. App.9255; *see also* App.9271 (Bowers "wanted to have the largest amount of goo to cause a horrific reaction"); App.9455 (similar). Bowers recalled shooting one victim in the back three times while the victim was crawling and shooting another in the back of the head. App.9253, 9255. Bowers found it ironic that he had shot one victim by an oven. App.9257. Bowers

boasted to Dr. Rogers that he had committed the worst antisemitic attack in history, App.9233-34, but he was disappointed that he had not shot more Jewish people; relying on a racist trope, he described his murder tally as a "Yiddish dozen"—one short of twelve, App.9269-70.

c. The government's rebuttal experts, Drs. Darby and Dietz, disputed that Bowers was epileptic and schizophrenic, or that any such condition had caused him to commit the synagogue shootings, and testified, *inter alia*, that Bowers was capable of forming the intent to kill another person.  App.9872-81, 10279-80, 10285, 10312-16.

d. In its eligibility-phase closing argument, the government maintained that Bowers's statements to Dr. Rogers—among other evidence—showed that he had intended to kill his victims.  App.10780-81, 10783-85.  The government also cited Bowers's statements to Rogers in arguing that Bowers committed the capital offenses after substantial planning and premeditation.  App.10790-92; *see also* App.10795-96 (citing statement in connection with multiple-killings aggravator).  Bowers did not object to the government's reliance on his statements to Dr. Rogers to prove his death-penalty eligibility.  App.10799, 10871.

286

The government relied on the testimony of its own experts, Drs. Darby and Dietz, only to rebut Bowers's mental-health claims, not as affirmative evidence in its case. *E.g.*, App.10786-89, 10862, 10866, 10868-69.

> **4. During the selection phase, the government elicited and relied on testimony about Bowers's statements to his own experts.**

a. During its selection-phase opening statement, the government discussed Bowers's statements to Dr. Rogers in arguing that the evidence would prove three non-statutory aggravating factors: lack of remorse, App.10948, 10962-64, 10969; religious animus, App.10959-60; and selection of site, App.10960-61. Bowers moved for a mistrial, claiming that the government's reliance on these statements violated the Death Penalty Notice, the Fifth Amendment, and Rule 12.2. App.10970-74. The government maintained that no such violations occurred because the statements were not made during a court-ordered examination. App.10972-75. The district court denied Bowers's motion, App.11008-09, and later renewed motion, App.12302-05.

b. During the selection phase, Bowers called Dr. George Corvin, a psychiatrist who evaluated him, as an expert witness. Corvin diagnosed Bowers with schizophrenia and purported to tie Bowers's violent acts in this case to allegedly delusional beliefs about Jewish people and the threat Bowers believed they pose to the world. App.12684-12774, 12788-12825.

287

c. On cross-examination, the government elicited from Dr. Corvin testimony about Bowers's statements to Corvin, including remarks about Bowers's planning and execution of the synagogue attack. App.12930-76.[59] Bowers told Dr. Corvin that, in preparation, he watched self-defense videos, practiced shooting, and assessed risks in connection with his selected targets. App.12942-44. Bowers also told Corvin that the synagogue was Jewish people's "Statue of Liberty" and boasted that he had "shit on it." App.12934-36; *see also* App.12804-05 (Corvin's direct testimony about Statue of Liberty remark). Bowers said that he had been focused on inflicting "messy" kills and producing a horrific crime scene to show Jewish people what would happen if they supported the immigrant "invasion." App.12968. Bowers had considered putting one of his victims in an oven but thought that might be bad for optics. App.12957. Bowers told Corvin that he wanted a trial in order to see how effective his shooting had been. App.12955; *see* App.12976 (Bowers regretted still holding the record for killing the most Jewish people in a single shooting because he had hoped it would spur others to action).

---

[59] Corvin testified about Bowers's statements based in part on his interview notes, which were admitted as a defense exhibit. *See, e.g.*, App.12931-43; *see* App.13855.

After Dr. Corvin testified, the defense renewed its objection to the government's use of Bowers's statements to defense experts "to support their aggravators and to undermine the nonmental health mitigators." App.13003. The court overruled the objection. *Ibid.*

d. During summation and rebuttal, the government argued that Bowers's statements to his mental-health experts (Drs. Rogers and Corvin), among other evidence, proved the existence of the substantial-planning-and-premeditation aggravating factor (which the jury already found during the eligibility phase), App.13178-80, and the selection-of-site, religious-animus, and lack-of-remorse non-statutory aggravators, App.13181-84, 13193-94, 13208-09, 13292.

Bowers renewed his arguments about the government using his statements to mental-health experts when moving for a mistrial based on the government's selection-phase closing arguments. DE1524:10, 24. The district court denied the motion. App.13323.

e. The court instructed the jury that it could consider Bowers's statements to *government* mental-health experts only "in evaluating Mr. Bowers' asserted mitigating factors related to mental illness"; it could not consider them "in evaluating or in support of any asserted aggravating factors." App.13136-37. The court denied the defense's request for an instruction that the jury could

289

consider Bowers's statements to *defense* mental-health experts only in relation to mitigating factors. DE1508-3:18; App.13050-52, 13169-70.

## B.    Standard of Review

The Court exercises plenary review over a preserved claim that the district court admitted evidence in violation of the defendant's constitutional rights. *United States v. Pavelko*, 992 F.2d 32, 33 (3d Cir. 1993). The Court reviews a ruling on a contemporaneous challenge to a prosecutor's alleged comment on the defendant's failure to testify for abuse of discretion. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). Where the defendant failed to raise an alleged constitutional violation in district court, the Court's review is for plain error. *United States v. Campbell*, 295 F.3d 398, 404 (3d Cir. 2002).

## C.    Argument

### 1.    The government's use of Bowers's statements did not violate the Fifth Amendment.

Bowers does not dispute that the government's use of his statements to government experts, which was limited to rebuttal, comported with the Fifth Amendment. *See Cheever*, 571 U.S. at 93-94; *Buchanan*, 483 U.S. at 423-24. Nor does he challenge the government's eligibility-phase reliance on his statements to Dr. Rogers to help prove his intent to kill and the substantial-planning-and-premeditation aggravating factor. Rather, he attacks the government's selection-phase use of his statents to Drs. Rogers and Corvin to prove three non-

290

statutory aggravators: lack of remorse, religious animus, and site selection. Br.297, 302-16, 325-28. The government's use of Bowers's statements to his own experts was valid because those statements were not compelled.

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 189 (2004). At a broad level, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966); *accord Saranchak v. Beard*, 616 F.3d 292, 303-05 (3d Cir. 2010).

Here, Bowers voluntarily made statements to his experts during interviews conducted for the purpose of developing penalty-phase defenses. Bowers then called those defense experts to testify about their evaluations and diagnoses. Such voluntary statements are not protected by the Fifth Amendment. In *Alvarez*, this Court held that "the privilege against self-incrimination is not relevant" to a defendant's voluntary statements during a defense-initiated psychiatric examination, even where the defendant did not put on a mental-health defense at trial. 519 F.2d at 1045; *see Gibbs v. Shannon*, 618 F. App'x 59, 63 n.5 (3d Cir. 2015) (treating *Alvarez* as "dispositive" in denying certificate of appealability on claim challenging government's use of defendant's statements to "a defense psychiatrist expert"). *Alavarez* defeats any Fifth Amendment

291

challenge to the government's use of Bowers's voluntary statements to defense experts.

### 2. Bowers was not forced to make an impermissible choice between constitutional rights.

Bowers erroneously contends (Br.316-20) that the government's selection-phase use of his statements to Drs. Rogers and Corvin violated *Simmons v. United States*, 390 U.S. 377 (1968), by forcing him to choose between exercising his Eighth Amendment right to present mitigating mental-health evidence and his Fifth Amendment right against self-incrimination.

### a. The Supreme Court has limited *Simmons*.

In *Simmons*, the Supreme Court held that a defendant's testimony in a pretrial suppression hearing, which was necessary to establish Fourth Amendment standing, could not be admitted at trial consistent with the Fifth Amendment. 390 U.S. at 389-91, 394. In the Court's view, the defendant in such a situation was presented with a choice: "either to give up what he believed…to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* at 394. "In these circumstances," the Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Ibid.* Thus, "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him

at trial on the issue of guilt unless he makes no objection." *Ibid.*

The Supreme Court has never extended *Simmons* "beyond its context." *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010); *see Ochoa v. Davis*, 16 F.4th 1314, 1344-45 (9th Cir. 2021) ("*Simmons* does not dictate that suppression hearing statements cannot be considered in proceedings outside the guilt phase or for purposes other than establishing substantive guilt at trial."). Rather, it has cabined *Simmons*.

In *McGautha v. California*, 402 U.S. 183, 215 (1971), *vacated on other grounds sub nom.*, *Crampton v. Ohio*, 408 U.S. 941 (1972), the Court addressed a claim that *Simmons* required bifurcating the guilt and penalty phases of a capital trial, on the theory that a unitary trial impermissibly required the defendant either to forgo testifying about mitigating circumstances or to testify and risk having that testimony used against him as to guilt. 402 U.S. at 210-11. In rejecting this claim, the Court determined that, "to the extent that [*Simmons*'s] rationale was based on a 'tension' between constitutional rights and the policies behind them, the validity of that reasoning must now be regarded as open to question." *Id.* at 212-13. "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.* at 213. The Court "conclude[d] that the policies of the privilege against compelled self-

293

incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." *Id.* at 217.

The Court later vacated *McGautha* in light of *Furman v. Georgia*, 408 U.S. 238 (1972), which held that the death penalty in those cases was cruel and unusual punishment for want of limitations on the jury's discretion. *See Gregg v. Georgia*, 428 U.S. 153, 179, 188-89 (1976) (opinion of Justices Stewart, Powell, Stevens) (discussing *Furman*). But *Furman* did not address unitary trials or "undercut the rationale of *McGautha* that a defendant can be forced to choose between testifying in mitigation and remaining silent on the issue of guilt." *Bonin v. Calderon*, 59 F.3d 815, 840 (9th Cir. 1995). Although *Gregg*'s controlling plurality opinion explained that a bifurcated trial may best satisfy *Furman*'s concern for arbitrary and capricious imposition of the death penalty, it allowed for alternative systems if adequate procedures guided the sentencer's authority. *Gregg*, 428 U.S. at 195; *see id.* at 195 n.47 (noting that "*Furman* did not overrule *McGautha*" but precludes a broad reading of it).

Thus, the Supreme Court has continued to rely on *McGautha* when rejecting claims that requiring a defendant to choose between courses of action in the criminal process impermissibly burdens constitutional rights. *See McKune v. Lile*, 536 U.S. 24, 42 (2002) (plurality op.); *Town of Newton v. Rumery*, 480 U.S.

294

386, 393-94 (1987); *Corbitt v. New Jersey*, 439 U.S. 212, 218-21 & n.8 (1978); *see also United States v. Kahan*, 415 U.S. 239, 240-43 (1974) (per curiam) (*Simmons* does not bar admission at trial of defendant's false statements at pretrial hearing to obtain appointed counsel).

### b.    Simmons does not apply here.

The Supreme Court's post-*Simmons* decisions undercut Bowers's attempt to expand *Simmons*'s reach to cover his voluntary statements to defense experts. *See Taccetta v. Adm'r New Jersey State Prison*, 601 F. App'x 165, 169 (3d Cir. 2015) (recognizing that *McGautha* "expressed skepticism about *Simmons*'s reasoning"); *Shrum v. Cooke*, 60 F.4th 1304, 1309 (10th Cir. 2023) ("The *Simmons* principle has not had a long shelf-life."). Regardless, *Simmons* is inapplicable by its terms.

i. Unlike in *Simmons*, Bowers's statements to his mental-health experts did not concern "collateral or preliminary matters." *Lesko v. Lehman*, 925 F.2d 1527, 1543 (3d Cir. 1991). Rather, Bowers used Drs. Rogers and Corvin at trial to support his lack-of-intent and mitigation arguments; their testimony was an important component of Bowers's penalty-phase case. App.10846-48, 10993-94, 13234-35, 13251-55, 13259-60. The defense introduced the two experts' interview notes, App.13839, 13855, which memorialized many statements the government elicited on cross-examination, *see, e.g.*, App.9222-23, 9231-33, 9254, 12930-36, 12973. *See also* App.9218-19 (Rogers's notes admitted as duplicate

government exhibit).  By placing his statements to those experts at issue in the penalty phase, Bowers lost any alleged right to restrict the government's ability to explore and rely on his statements to the same experts during the penalty phase.  *Cf. Mitchell v. United States*, 526 U.S. 314, 321 (1999) ("It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.").  The Court should reject Bowers's attempt to have it both ways.  *See, e.g.*, *United States v. Bonner*, 302 F.3d 776, 783-84 (7th Cir. 2002).

ii. The cross-examination testimony of Drs. Rogers and Corvin was reasonably related to their direct testimony.  For example, the government had Rogers and Corvin confirm that they omitted from their expert reports certain statements by Bowers, implying they had worked toward a predetermined conclusion.  App.9236, 9247-50, 9253, 12976-77.  And the statements elicited from Dr. Rogers—concerning Bowers's goals, preparations, consideration of alternate targets, and disappointment at not killing more Jewish people— showed that he could and did form the intent to kill congregants and that he killed them after substantial planning and premeditation, notwithstanding his eligibility-phase defense.

Similarly, Bowers's statements to Dr. Corvin belied Corvin's testimony

296

that Bowers was schizophrenic.  For example, Bowers's preparations for the shooting, and description of a synagogue as a "Statue of Liberty" for Jewish people that he "shit on," *see* p.288, *supra*, showed that, far from being delusional, Bowers was focused on details and clear headed about what he wanted to achieve through his attack.  And, Bowers's statements that he had "[n]o regret, nope.  Only regret not more," App.12973, and wanted to learn about how effective the shooting had been, App.12955, impeached Dr. Corvin's direct testimony that Bowers's alleged mental illness prevented him from expressing remorse for his crimes, App.12818.  Bowers expressed no remorse because he was *proud* of what he did, not because he was incapable of it.  Given Bowers's defense, the jury was entitled to hear these additional statements.

iii. The government was also entitled to rely on Bowers's statements to his experts, among all the trial evidence, when making its affirmative case on several aggravating factors.  The jury already had found Bowers guilty, and many of the arguments about aggravating and mitigating factors were factually related.  Take the above examples of Bowers's pride over having shot and killed Jewish worshippers—Bowers's statements rebutted Dr. Corvin's testimony about Bowers's alleged schizophrenia *and* supported the lack-of-remorse aggravator. App.13208.  Similarly, Bowers's antisemitic statements reflected racist tropes shared by a subculture of the population, belying the defense's argument that his

297

beliefs were the product of a delusional mind. Those statements also supported the site-selection and religious-animus aggravators. App.13183-84, 13213-15.

At the selection stage of a capital trial, it is "important" that the jury make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879; *accord Marsh*, 548 U.S. at 173-174. Allowing the jury to consider a defendant's voluntary statements to his own testifying experts in connection with both mitigating and aggravating factors comports with that purpose, where, as here, those statements bear on the defendant's state of mind and the defendant has put that state of mind at issue through his penalty-phase case. It does not force a defendant into an impermissible choice between rights. *See Bonin*, 59 F.3d at 839-40 (rejecting claim that admitting evidence of crimes for which the defendant had not yet been tried, as an aggravating circumstance, forced him "to forgo either his Fifth Amendment right against self-incrimination" to explain his conduct "or his Eighth Amendment right to present all available mitigating evidence in order to avoid the death penalty").

iv. Bowers also has not established an unavoidable conflict between presenting a mitigation defense and having his additional statements to Drs. Rogers and Corvin shared with the jury. Aside from those two experts, eight defense witnesses testified during the eligibility phase and twenty-eight defense

298

witnesses testified during the selection phase. *See* pp.34, 36, 283, *supra*. Bowers could have presented his penalty-phase defenses without discussing the synagogue shooting with his mental-health experts. Of course, Drs. Rogers and Corvin risked undermining their credibility by not discussing the shooting with Bowers, just as Dr. Nadkarni had undermined his own credibility by not covering that topic. App.10787. But contrary to Bowers's arguments (Br.319-20), that tradeoff did not mean Bowers faced an impermissible choice in deciding what mitigation evidence to present. "*Simmons*…do[es] not entitle a defendant to obtain all possible advantages where giving up one is necessary to obtaining the other." *Stuard v. Stewart*, 401 F.3d 1064, 1068-69 (9th Cir. 2005).

v. Bowers mistakenly relies (Br.317-18) on decisions applying *Simmons* over 30 years ago. Each case addressed a defendant's testimony on a pretrial collateral matter and the government's use of that testimony at trial to prove guilt. *Pavelko*, 992 F.2d at 33-35 (statements at initial appearance in support of request for court-appointed counsel); *United States v. Perry*, 788 F.2d 100, 115-16 (3d Cir. 1986) (bail-hearing testimony to rebut presumption of future dangerousness); *In re Grand Jury Investigation*, 587 F.2d 589, 597-98 (3d Cir. 1978) (pre-indictment testimony relevant to Speech or Debate Clause privilege); *United States v. Inmon*, 568 F.2d 326, 331-33 (3d Cir. 1977) (testimony at pretrial double-jeopardy hearing); *United States v. Branker*, 418 F.2d 378, 380-81 (2d Cir.

299

1969) (testimony at appointment-of-counsel hearing). By contrast, here, Bowers's voluntary statements did not concern a collateral matter; he called his experts as witnesses and relied on his statements to them in post-guilt-phase proceedings; and the government appropriately elicited his other statements when cross-examining those same witnesses during the same proceedings.

### 3. Bowers's *Griffin* and Sixth Amendment claims are meritless.

Bowers also contends (Br.321-25) that, during selection-phase closing arguments, the government violated *Griffin v. California*, 380 U.S. 609 (1965), by commenting on his failure to express remorse to Dr. Rogers or Dr. Corvin, and violated the Sixth Amendment by purportedly commenting on his decision to go to trial. Bowers did not raise his Sixth Amendment argument below, *see* DE1524 (mistrial motion), so plain-error review applies to that claim. Regardless, Bowers cannot show that either remark was improper.

a. *Griffin* prohibits the prosecution from commenting on a defendant's failure to testify at trial. 380 U.S. at 615; *see Mitchell*, 526 U.S. at 327-28 ("no negative inference from the defendant's failure to testify is permitted"). But the government did not do that when addressing Bowers's statements to his mental-health experts. On their face, the comments he challenges (App.10969, 13208) referred to statements made or omitted during conversations *outside* the courtroom. Nor would the jury "naturally and necessarily" have taken these

300

comments as a statement about Bowers's decision not to testify. *Brennan*, 326 F.3d at 187 (quotation omitted).

*Griffin* does not apply to Bowers's interviews with defense experts. *Griffin* is based on the fact that a criminal defendant "has an absolute right not to testify" at trial, *Salinas v. Texas*, 570 U.S. 178, 184 (2013) (plurality op.) (quotation omitted), whereas the Fifth Amendment does *not* apply to a defendant's voluntary statements during a defense-initiated psychiatric interview, *Alvarez*, 519 F.2d at 1045.

*Lesko*, 925 F.2d 1527, is inapposite. *See* Br.323-24. There, the prosecutor commented on a capital defendant's failure to apologize for his crimes during his penalty-phase testimony. 925 F.3d at 1540-41. This Court "conclude[d] that a capital defendant does not completely waive his *Griffin* rights by testifying at the penalty phase solely on mitigating factors that are wholly collateral to the merits of the charges against him." *Id.* at 1541-42; *see id.* at 1543 (finding this conclusion consistent with *Simmons*). The defendant's testimony was "limited" and "biographical," concerning his "childhood, family background, and schooling." *Id.* at 1542-43. Because that testimony "did not bear even a tangential relationship to the substance of the charges against him," it did not constitute a waiver of the defendant's *Griffin* right. *Id.* at 1543.

*Lesko* does not help Bowers.  It involved a prosecutor's comment on the defendant's failure to express remorse *during testimony*, not out-of-court interviews with his own experts.  Moreover, the "wholly collateral" nature of the defendant's testimony in *Lesko* was integral to the Court not finding a *Griffin* waiver.  925 F.2d at 1541-42.  By contrast, Bowers's statements to Rogers and Corvin related to key components of his penalty-phase defense.  There was no *Griffin* violation.[60]

b. Likewise, the prosecutor did not inappropriately comment on Bowers's decision to go to trial when he stated:

> [Bowers] is proud, proud of what he did.  So proud, in fact, that he told Dr. Corvin on June 3rd during this trial, that he likes hearing the evidence in the case.  By that date, almost every single surviving victim had testified.  Most of the 911 calls had been played.  And he liked what he was hearing.

App.13208.  The prosecutor was commenting on evidence in the record.  *See Lawrence*, 735 F.3d at 434.  And the lead-in comment about Bowers being "proud, proud of what he did. So proud…"—which is omitted from Bowers's brief (Br.322)—reveals the clear meaning of the prosecutor's argument.  *See Savage*, 970 F.3d at 307-08 (remarks must be evaluated "in context").  The

---

[60] *Whitten*, 610 F.3d 168, is inapposite.  *See* Br.322.  The court there found *Griffin* error based on a reference to the defendant's failure to testify ("The path for that witness stand has never been blocked for [the defendant].").  610 F.3d at 173, 197-200 (quotation and emphasis omitted).  No similar error occurred here.

prosecutor did not fault Bowers for going to trial or ask the jury to consider his exercise of that right in aggravation. Rather, the prosecutor emphasized— appropriately—that Bowers was still proud of his heinous crimes even after hearing the same trial evidence as the jury. Bowers cannot show that this remark was "manifestly intended or of such character that the jury would naturally and necessarily take it to be" a comment on Bowers's failure to plead guilty, *id.* at 308 (quotation omitted), or, for plain-error purposes, that it clearly or obviously met that standard.

### 4.     Any error does not warrant relief.

a. Even if the Court finds *Simmons* error, vacatur of the death sentences is not warranted because "there is no reasonable probability that the outcome of this case would have been different" if the jury's consideration of Bowers's statements had been limited to his mitigation case. *Pavelko*, 992 F.2d at 36.

Bowers does not contend that the alleged error affected the jury's finding of the statutory aggravators (grave risk of death, substantial planning and premeditation, multiple victims, and vulnerable victims) and two non-statutory aggravators (victim impact and surviving-victim injuries). Br.326. These factors were proven by overwhelming evidence and weighed heavily in favor of death sentences. *See* pp.48-55, 57-58, *supra*.

303

Moreover, the site-selection, religious-animus, and lack-of-remorse factors were based on additional evidence, independent of Bowers's statements to his experts. At closing, the government barely mentioned Bowers's statements to defense experts in connection with the religious-animus aggravator; it focused instead on Bowers's Gab posts and post-shooting statements to officers. App.13181-83. As to lack of remorse, the government argued in part that this factor was proved by Bowers's methodical hunting and killing of victims inside the synagogue, failure to surrender, and statements to officers. App.13203-08. As to site selection, the jury could readily infer from his Gab posts and the sanctity of a physical house of worship that he chose the Tree of Life Synagogue to maximize the fear and devastation caused by his attack. App.13183-84.

The "quality and quantity" of the aggravating evidence, coupled with the defense's weak mitigation case, establish that the jury would have returned the same verdict absent the alleged *Simmons* error. *Pavelko*, 992 F.2d at 35-36.

b. The same evidence establishes that any alleged *Griffin* error was harmless. *See also* App.13136 (jury instruction on Bowers's "absolute constitutional right not to testify"). It also precludes Bowers from showing that any clear or obvious Sixth Amendment error satisfies the third and fourth plain-error prongs. *See United States v. Dorsey*, 105 F.4th 526, 529 (3d Cir.), *cert. denied*, 145 S. Ct. 457 (2024).

**XI.** **THE DISTRICT COURT PROPERLY DENIED BOWERS'S REQUEST FOR A MITIGATOR ON MARTYRDOM AND EXCLUDED EVIDENCE OF HIS CONDITIONAL OFFER TO PLEAD GUILTY.**

Bowers's theory that sentencing him to death risked turning him into a martyr was irrelevant, and his offer to plead guilty in exchange for a life sentence did not reflect acceptance of responsibility. The district court correctly denied his request for a mitigating factor on martyrdom and did not err or abuse its discretion by excluding evidence of his conditional plea offer. Bowers's contrary arguments (Br.328-68) are meritless.

### A.    Background

#### 1.    Avoiding martyrdom

Near the end of the selection phase, the defense moved to submit as a mitigating factor the following: "If Mr. Bowers is sentenced to death, he may be seen as a martyr and his death exploited by others to justify future hateful acts." S-App.150; App.13047-48. The government opposed this request. App.13048. The district court "ha[d] concerns about" it, App.13048, and ruled that it would not "identify" the martyrdom mitigator when charging the jury, App.13301.

The court's ruling did not prohibit the defense from arguing martyrdom to the jury. App.13301. During summation, defense counsel argued: "All we can really do is make the right decision going forward. And we are asking you

to make the right decision, and that is life.  To be sure, prison is where Mr. Bowers will die in obscurity, not as a hero and not as a martyr."  App.13226.

### 2.    Conditional offer to plead guilty

Before the penalty phase, the government moved to preclude the defense "from referring or offering the fact that the defendant conditionally offered to plead guilty to avoid the death penalty."  DE1351:13-14.  The government cited Bowers's representations that he had "offered 'to plead guilty as charged and to be sentenced to life in prison without the possibility of release.'"  DE1351:13 (quoting DE100:2).  The district court granted the government's motion over Bowers's opposition.  App.308-09.

### B.    Standard of Review

The Court's review of constitutional claims, and to evidentiary challenges implicating constitutional issues, is plenary.  *United States v. Gonzalez*, 905 F.3d 165, 190 (3d Cir. 2018); *Savage*, 970 F.3d at 298.  The Court otherwise reviews a decision excluding evidence for an abuse of discretion.  *United States v. Greenspan*, 923 F.3d 138, 151 (3d Cir. 2019).

### C.    Argument

#### 1.    Legal background

The Eighth Amendment requires that "'the sentencer…not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or

306

record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)). The underlying "principle [is] that punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). "Viewed as a whole, … mitigation evidence encompasses both culpability and character, all to the extent relevant to the defendant's personal responsibility and moral guilt." *United States v. Gabrion*, 719 F.3d 511, 521-22 (6th Cir. 2013) (en banc) (quotation omitted).

The FDPA's treatment of mitigating evidence mirrors that of the Eighth Amendment.  18 U.S.C. 3592(a).  It sets forth seven categories of evidence deemed relevant to mitigation and a catch-all provision that "simply tracks the Supreme Court's definition of mitigation evidence." *Gabrion*, 719 F.3d at 524; *see* 18 U.S.C. 3592(a)(8) (sentencer "shall consider…[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence").

A sentencing court has discretion to exclude evidence or factors not falling into *Lockett*'s three mitigation categories—character, prior record, or circumstances of the offense.  *Lockett*, 438 U.S. at 604 n.12; *see* 18 U.S.C. 3593(c).

Appellate courts regularly affirm the exclusion of irrelevant mitigators and evidence. *See, e.g.*, *Roof*, 10 F.4th at 369-71 (exclusion of mitigators that prison would be especially onerous for the defendant given his characteristics and notoriety); *Gabrion*, 719 F.3d at 524 (exclusion of evidence that murder occurred in a state that lacked the death penalty); *United States v. Hager*, 721 F.3d 167, 193-95 (4th Cir. 2013) (exclusion of evidence about execution's impact on defendant's family); *Snarr*, 704 F.3d at 399-402 (exclusion of execution-impact and victim-background evidence); *Higgs*, 353 F.3d at 328 (exclusion of mitigator on defendant's ineligibility for death penalty under state law).

### 2. The district court correctly excluded the martyrdom mitigator.

Bowers does not contend that the district court excluded evidence related to the martyrdom mitigator. Nor does Bowers dispute that, beyond the submitted mitigators, the jury could "consider during [its] deliberations any other factor or factors in [his] background, record, character, or any other circumstances of the offense that mitigate against imposition of a death sentence." App.13800. And although Bowers intimates otherwise (Br.347), nothing in the court's ruling (App.13301) prohibited the defense from arguing that a death sentence may cause Bowers to be "seen as a martyr" or his "death exploited by others" in furtherance of hateful acts, however speculative. S-App.150. Indeed, his counsel made that argument at closing—that a sentence

of life imprisonment would mean Bowers "will die in obscurity, not as a hero and not as a martyr." App.13226.

Bowers's complaint is simply that the court should have expressly identified the martyrdom mitigator for the jury. That narrow claim is meritless.

### a.     Avoidance of martyrdom is not mitigating.

i. Avoiding martyrdom was irrelevant to mitigation. The proposed factor was neither an "aspect" of Bowers's "character or record" nor a "circumstance[]" of the offense." *Lockett*, 438 U.S. at 604. Rather, the proposed mitigator concerned how *others* might react to Bowers's post-offense *execution*. *See* S-App.150 ("If Mr. Bowers is sentenced to death, he may be seen as a martyr and his death exploited by others to justify future hateful acts."). That assertion, even if true, did not bear on Bowers's "personal culpability" for the synagogue shooting at all. *Penry*, 492 U.S. at 319.[61]

The martyrdom factor was equally, if not further, removed from the *Lockett* categories than in cases where courts affirmed the exclusion of mitigators. For example, in *Gabrion*, the en banc Sixth Circuit held that the location of the murder in a state with no death penalty had "nothing to do" with the defendant's

---

[61] By implicating questions of deterrence, the proposed mitigator also bordered on being an impermissible "policy" argument about the effectiveness of the death penalty in mass-casualty cases. *Higgs*, 353 F.3d at 328; *see* App.13140 (jury instruction).

background, character, or record. 719 F.3d at 522. Although the murder's location was a circumstance of the offense, it did not "'have any tendency to mitigate *the defendant's culpability*.'" *Id.* at 523 (quoting *Tennard v. Dretke*, 542 U.S. 274, 286 (2004)). In *Roof*, the excluded mitigators posited that life imprisonment would be especially onerous on the defendant given his characteristics and notoriety; the Fourth Circuit held that the factors were too speculative, and their connection to the defendant's character too tenuous, to justify inclusion as mitigators. 10 F.4th at 369-70. Bowers's martyrdom mitigator, in contrast, had no relation to his personal circumstances or the circumstances of his offense; it focused on the hypothetical reactions of *others* to Bowers's execution.

ii. Contrary to Bowers's assertions, the martyrdom factor did not "describe[] the impact of a life sentence on Bowers and therefore sp[eak] to his character." Br.343. Nor did it invite "the jury to weigh in favor of a life sentence the impact of Bowers being committed to" a highly controlled prison. Br.343-44. Separate mitigators addressed those points. *See* App.13798 ("Lifetime imprisonment without the possibility of release is a severe punishment."); App.13799 ("If sentenced to imprisonment without the possibility of release, Robert Bowers will be designated to a highly secure federal prison."); App.13798

310

("The Department of Justice has the power to restrict and monitor any or all of Robert Bowers' communications with the outside world.").

"Mitigation evidence…is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case." *Gabrion*, 719 F.3d at 522. Bowers's speculation that jurors "could have reasonably concluded" that people would be interested in the outcome of his attack, Br.340, does not imbue his proposed mitigator with relevance. Nor does the factor gain currency from statements by a few members of the victim community, *after trial* and during sentencing on the non-capital counts, discussing the need to prevent Bowers from spreading his hateful beliefs while in prison. Br.328-29, 346-47; *see, e.g.*, App.13407-08, 13417, 13458-59, 13473, 13476. In any event, Bowers overstates the extent to which these individuals "suggested that the death penalty would be the simplest way to accomplish" cutting off Bowers's outside communications. Br.347; *see, e.g.*, App.13476 (asking simply that, "to the fullest extent possible under the law," Bowers receive "zero access to the Internet, print or broadcast journalism").

iii. Bowers's reliance on three district court cases where a martyrdom mitigator was submitted to the jury is misplaced. Br.342. Those cases are not binding and have no persuasive value; Bowers does not explain how those courts (if they did so) tried to reconcile the martyrdom factor with Supreme Court

311

precedent and the FDPA.  In another cited case (*Al'Owhali*), Br.343, the jury wrote in a martyrdom mitigator—as the jury here was free to do.

iv. Finally, the Court should reject Bowers's invitation (Br.345-46) to expand the FDPA's standard on mitigation beyond Section 3592(a)(8)'s catchall provision.[62]  There is no "reason to think that the term 'mitigating factors,' as used in the statute, encompasses facts having nothing to do with 'a reasoned moral response to the defendant's background, character, and crime.'" *Gabrion*, 719 F.3d at 524 (quoting *Penry*, 492 U.S. at 319).  "[T]o the contrary[,] all of the examples of mitigating evidence listed in § 3592(a) concern the defendant's background, culpability, or crime.  The same is true for all 16 examples of aggravating factors set forth in § 3592(c)." *Ibid.*  The hypothetical reaction by others to Bowers's execution "is different in kind from" any of these factors. *Ibid.*  The court correctly declined to instruct the jury on martyrdom.

### b.    The factor was not warranted as rebuttal.

Bowers's contention (Br.331-38) that the martyrdom factor was warranted to rebut the government's penalty-phase case is equally meritless.  *See* 18 U.S.C.

---

[62] The district court cases generally cited by Bowers (Br.345-46) are not persuasive to the extent they posit no meaningful limits on mitigators under the FDPA.  In two cases, the mitigator was relevant to comparative-punishment and culpability issues in Sections 3592(a)(3)-(a)(4). *See United States v. Sampson*, 335 F. Supp. 2d 166, 193-95 (D. Mass. 2004); *United States v. Bin Laden*, 156 F. Supp. 2d 359, 369-70 (S.D.N.Y. 2001).  That is not the case here.

3593(c) (parties "permitted to rebut any information received at the [sentencing] hearing"); *United States v. Troya*, 733 F.3d 1125, 1134 (11th Cir. 2013) (discussing Supreme Court precedent holding that a defendant may rebut a prediction of future dangerousness made explicitly or implicitly by the government). His arguments mischaracterize the record and fail to establish a logical connection between the government's arguments and his proposed mitigator.

   i. In asking the jury for death sentences, the government made specific arguments about Bowers's personal culpability, character, and record. *See, e.g.*, App.13182 ("There is so much evidence of this defendant's religious hatred…."); App.13183 ("You know the defendant chose the synagogue because it would help him meet his three goals."); App.13203 (injury to surviving victims "aggravates this defendant's crimes" and "makes him more deserving of the ultimate punishment"); App.13203-04 ("What makes this defendant's crime so uniquely aggravated is that in the wake of all that death, all of the carnage…this defendant has no remorse for what he did. None. None.…You know it from his actions, and you know it from his words."); App.13289 ("Life in prison is the minimum sentence here.…[S]hould this defendant receive the minimum penalty under the law for the murder of 11 innocent people? Does he deserve the minimum punishment, or do those crimes

313

deserve more?").  The government squarely focused on Bowers—on *his* crimes and *his* character.

Bowers therefore fails in attempting to justify a martyrdom mitigator based on the government's evidence and advocacy about his remorselessness, religious animus, and substantial planning and premeditation.  Br.332-35.  Other persons' hypothetical reaction to Bowers's death sentence did not rebut those aggravating factors.  Again, the wording of what Bowers proposed had nothing to do with his personal culpability or character.

ii. Bowers wrongly accuses the government of propagating "fear" within the jury "that [he] would promote hate and violence during a sentence of life in prison" (Br.329), of emphasizing "how his attack could inspire others" (Br.330), and of advancing the "idea[] that a death sentence was the only way to control the hateful ideology underlying the attack" (Br.332).  The government did no such things, and Bowers's citations do not support his allegations.

For example, Bowers erroneously asserts that the government implied that he would pose a danger from prison when it referenced his statement to Dr. Corvin regretting "that he still holds the record for the worst anti-Semitic mass shooting in our country's history."  Br.334-35.  Bowers's statement to Dr. Corvin (App.12976) was backward looking, which was how the government used it— to show that, far from feeling remorse, Bowers regretted that his past actions had

314

not resulted in more (and worse) mass-casualty attacks. App.13209. The argument did not bear on future dangerousness—which was not an alleged aggravating factor (App.13711-15)—or otherwise make Bowers's proposed mitigator relevant.

The government also maintained that "[t]here are many, many, people who believe the same thing [Bowers] does and would be just as proud. And like the defendant, they also are not delusional. They're just white supremacists." App.13209. The transcript clearly shows that this remark was rebutting Bowers's claim that he was delusional and schizophrenic. App.13208-09.

Nor did the government, by referencing Bowers's age and prospects for redemption, "suggest[]" that the alleged danger "could persist for decades." Br.335 (citing App.13275). As the transcript again makes clear, the prosecutor was *rebutting* a mitigating factor—that a life sentence provided "hope" that Bowers might someday understand the wrongfulness of his conduct. App. 13274-75; *see* App.13800 (No. 113). Bowers's age, the passage of time since the attack, and other evidence eliminated any basis for that "hope." App.13275.

Elsewhere, Bowers cites (Br.332) a corrections officer's testimony that Bowers spoke about his beliefs during pretrial detention, but that testimony rebutted Bowers's mental-health claims by showing that he was not psychotic, but rather calm, rational, and able to control his emotions. App.9332-33.

Bowers also alleges (Br.332-32) that the government "attempted to undermine" the notion that the Bureau of Prisons (BOP) would control his communications, but the testimony he cites, elicited on cross-examination of a defense witness, largely served to show the lack of certainty that Bowers would be confined, or would remain confined, at the Administrative Maximum Facility (ADX) if sentenced to life imprisonment. App.12599-12608, 12614, 12631-32. To the extent the testimony touched on prison communications, the government did not suggest that Bowers might spread religious hate through his communications.

iii. Bowers's reliance on the government's argument about conditions of confinement is likewise misguided. Br.335-36 (quoting App.13289-90). The government argued that a life sentence would not sufficiently punish Bowers given the magnitude of his crimes. *See, e.g.*, App.13289-90 ("Do not sentence him to the minimum sentence here. Justice calls for a sentence of death."). The defense itself submitted a mitigator on this point. App.13798 (No. 95). Bowers errs in alleging the government argued that life imprisonment "risk[ed] additional harm by allowing him to continue to spread his hateful ideas." Br.328.

For all of these reasons, the district court committed no error.

### c.    Any error did not prejudice Bowers.

Regardless, any error in denying the martyrdom-mitigator request was harmless.  The court did not exclude evidence, and counsel argued to the jury that a sentence of life imprisonment would mean that "prison is where Mr. Bowers will die in obscurity, not as a hero and not as a martyr."  App.13226.  The jury could consider that argument as an additional mitigating factor if any juror believed it had mitigating value, App.13159, 13800, just as the jury did in a case Bowers cites (Br.343).  Nor can Bowers credibly complain (Br.349-50 & n.103) that the large number of submitted mitigators (115) made it unlikely the jury would write in additional ones, when it was the defense that made the strategic decision to submit so many mitigators.  App.13786-13800.

In all events, several submitted mitigators addressed or implicated the restrictive conditions and severity of a potential life prison sentence.  App.13798-99.  Accordingly, Bowers's counsel could make—and, as explained above, effectively did make—the arguments that he now claims were foreclosed.  For example, counsel could have argued that "committing Bowers to the bowels of a Supermax prison under communications restrictions" was a more severe and deserved punishment for Bowers than "giving his allies the platform of the death penalty process to promote their ideology."  Br.348.  Counsel also could have argued that Bowers "was more likely to die in obscurity in prison…than if

executed." *Ibid.* That the defense has come up with longer ways of making that point on appeal than the argument presented to the jury does not mean they were foreclosed from saying those exact things at trial, or that their failure to do so somehow requires a do-over.

Assuming error occurred, Bowers's martyrdom theory was "at best…negligibly mitigating." *Dixon v. Houk*, 737 F.3d 1003, 1011 (6th Cir. 2013). And Bowers's aggravated crimes greatly outweighed the defense's entire mitigation case. Beyond a reasonable doubt, the jury would have returned the same verdict if the court had submitted an express mitigator on martyrdom. *See, e.g., ibid.*; *Troya*, 733 F.3d at 1138.

### 3. The district court properly excluded evidence of Bowers's conditional plea offer.

Bowers's offer to plead guilty did not reflect acceptance of responsibility or rebut the government's evidence. The district court did not abuse its discretion or violate Bowers's Eighth Amendment right by excluding it.

### a. Offering to plead guilty to avoid the death penalty is not mitigating.

Bowers made a *conditional* offer to plead guilty—his counsel offered that Bowers would plead guilty if he received a sentence of life imprisonment without

the possibility of release.   Br.351-52.[63]   That sentence was effectively the minimum Bowers faced if convicted.   Particularly given the undeniable fact of Bowers's guilt, offering to plead guilty in exchange for the minimum sentence in order to avoid the death penalty was a self-serving bid for leniency, not acceptance of responsibility.   *See United States v. Caro*, 597 F.3d 608, 634-35 (4th Cir. 2010); *Owens v. Guida*, 549 F.3d 399, 418-22 (6th Cir. 2008).   Accordingly, Bowers's conditional offer did not evidence a "factor[] in [his] background, record, or character or any circumstance of the offense that mitigate[d] against imposition of the death sentence."   18 U.S.C. 3592(a)(8).[64]

Several courts, including two federal court of appeals, have rejected claims that an offer to plead guilty in exchange for a non-death sentence is relevant mitigating evidence.   *See Caro*, 597 F.3d at 634-35 (affirming district court's exclusion of conditional offer to plead guilty as irrelevant); *Owens*, 549 F.3d at 418-22 (rejecting claim that state supreme court unreasonably applied *Lockett* in denying challenge to exclusion of conditional offer to plead guilty, and citing decisions of eight state courts); *see also Wright v. Bell*, 619 F.3d 586, 598-601 (6th

---

[63] Bowers cites, *inter alia*, his counsel's reference at a May 2019 status conference to the defense's purported request to the Department of Justice to "settl[e] this case by way of guilty plea to life in prison."   App.13530-31.

[64] Bowers could have pleaded guilty unconditionally and proceeded directly to the penalty phase.   18 U.S.C. 3593(b)(2)(A).

319

Cir. 2010) (reaffirming and applying *Owens*); *United States v. McCluskey*, No. 10-cr-2734, DE1060, at 25-29 (D.N.M. June 23, 2013) (available at DE1351-1:25-29) (excluding evidence of capital defendant's conditional plea offers and reviewing similar decision of another district court). The government is not aware of a contrary decision by a federal court of appeals. Because Bowers's conditional plea offer was irrelevant to mitigation, the district court correctly excluded it.

ii. The penalty-phase testimony of Bowers's mental-health experts provided more reasons to exclude the conditional offer to plead.

First, Bowers told Dr. Corvin that he *wanted* a trial in order to learn how effective his shooting mission had been and that he was enjoying hearing the trial evidence. App.12955, 12975-76. This testimony called into question Bowers's actual willingness to follow through with counsel's earlier, conditional offer to plead guilty in exchange for leniency.

Second, the penalty-phase testimony showed that Bowers was proud of his crimes. He told Dr. Covin that he had no regret over the shooting; his only regret was not having shot more people. App.12973. He also told Dr. Corvin in June 2023, while the trial was ongoing, that he would "continue" the "war" against Jewish people if he had the "chance." App.12975. Similarly, Bowers told Dr. Rogers that he was pleased with the synagogue attack but disappointed

320

that he had not shot more people. App.9269. This testimony shows the self-serving nature of Bowers's plea offer and its utter lack of connection to accepting responsibility or remorse. Given his demonstrated pride in having killed Jewish people, evidence of his conditional plea offer risked "confusing the issues, or misleading the jury." 18 U.S.C. 3593(c). The district court properly excluded it.

iii. Bowers's analogy (Br.359, 363 n.113) to the acceptance-of-responsibility provision in Sentencing Guidelines § 3E1.1 is misplaced. Only in "rare situations" does a defendant who went to trial receive Guidelines credit for accepting responsibility. U.S.S.G. § 3E1.1, cmt. (n.2) (2025). This Court has affirmed the denial of acceptance-of-responsibility credit under Guidelines § 3E1.1 for defendants who offered to plead guilty before standing trial. *See United States v. Muhammad*, 146 F.3d 161, 168 (3d Cir. 1998) (offer to plead guilty amounted to "'tactical maneuvering'" and defendant made no affirmative statement of remorse or contrition); *United States v. Yahsi*, 549 F. App'x 83, 86 (3d Cir. 2013) (offer to plead guilty to lesser offense did not show acceptance of responsibility; defendant contested his guilt throughout trial and sentencing).

iv. Bowers also cites three district court decisions admitting a capital defendant's conditional offer to plead guilty. Br.360-61. But those cases lack persuasive value. In *United States v. Fell*, 372 F. Supp. 2d 773, 784-85 (D. Vt.

321

2005), the court did not explain why the defendant's conditional offer to plead was relevant to acceptance of responsibility and his state of mind. In *United States v. Roof*, No. 2:15-cr-472, 2016 WL 8678863, *2 (D.S.C. Oct. 14, 2016) (unpublished), the court believed that, because the defendant's offer to plead guilty had been widely reported, excluding the evidence might confuse the jury—even though a jury is bound to follow instructions not to consider information outside the trial record. The court also did not explain how a conditional offer to plead guilty shows acceptance of responsibility. And in *United States v. Christensen*, No. 17-cr-20037, 2019 WL 11867003, *1-*2 (C.D. Ill. June 27, 2019) (unpublished), the court found that the government's opposition to the plea-offer evidence had "merit," but admitted it anyway. None of those cases—nor any case cited by Bowers where "an offer to plead" allegedly was "offered as a mitigating factor" (Br.361 n.112)—advances his claim.

### b.   The evidence was not warranted in rebuttal.

Bowers's conditional offer to plead guilty was not proper rebuttal either. Br.353-58. Because the offer was a self-serving bid for leniency, it did not rebut the lack-of-remorse aggravator. *See United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974) ("The proper function and purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party.").

It did not rebut any other portion of the government's case. Bowers alleges that the government referred to "the harm surviving victims and victim family members suffered as a result of [his] 'choice' to take the case to trial." Br.354.[65] He accuses prosecutors of "creat[ing]" "the terribly aggravating impression…that Bowers *chose* to inflict *additional* harm on the victim community—not to mention subjecting the jurors themselves to a traumatizing experience—by demanding a trial." Br.367-68. These allegations are spurious, and Bowers's own record citations disprove them.[66]

i. Bowers first cites (Br.354) testimony and prosecutor statements that two victims, Joe Charny and Judah Samet, had passed away from natural causes in the year before trial. App.5698, 5808-09, 6242, 8322-23. But the limited information about their deaths explained why they were not testifying at trial. That was important context because the superseding indictment referenced each victim in both a religious-obstruction count and a firearm count. App.13704-06

---

[65] Bowers contends in passing that these alleged references by the government were "independent error." Br.354 n.104. This claim is meritless and waived for inadequate briefing. *Kolodesh*, 787 F.3d at 232 n.6.

[66] Consistent with a victim's "right to proceedings free from unreasonable delay," 18 U.S.C. 3771(a)(7), the government did raise concerns about delays in the scheduling of trial and the case's progression toward trial. *See, e.g.*, DE109:14-15; DE256:5-7, 9-11; DE283:6-7, 10-11; DE584:8-10. But those matters were not aired before the later impaneled jury.

(Counts 41, 51, 53, 63).  The jury might have wondered why Mr. Charny did not testify about escaping from Pervin Chapel when the shooting began, App.5840-41, 6147-48, 6153, or why Mr. Samet did not testify about how another congregant alerted him to gunfire and told him not to go inside the synagogue when he arrived that morning, App.6253-54.  Thus, the prosecutor informed the jury during guilt-phase summation that, although Messrs. Charny and Samet had "passed away of natural causes," each man "is still considered a victim in this case."  App.8323.  Nowhere did the government attribute these victims' deaths to trial delays.

ii. Bowers next alleges that Officer Mead's partner, Lisa Burns, "testified that his participation in [the] earlier [guilt] phase of trial *so impacted him that* he required medical care for 33 days afterwards."  Br.355 (emphasis added).  She said no such thing.  When testifying that Officer Mead has neuropathy from injuries sustained in the synagogue shooting, Burns briefly stated that he "was under medical care for 33 days" after his prior testimony.  App.11253-54.  That limited information conveyed that Officer Mead could not testify during the selection phase; it did not tie his earlier act of testifying to his subsequent hospitalization.  App.11265.

iii. Bowers's assertion (Br.354) that some victim family members "struggle[d]" when testifying or observing the proceedings is likewise

324

misguided. As discussed, some emotion is to be expected during the sentencing phase of a capital trial, and nothing untoward or excessive happened in this case.

The government did not blame Bowers for going to trial or invite evidence about his conditional plea offer by referencing the length of time that had passed since his crimes. Br.355. The government mentioned the passage of time to emphasize Bowers's continued animus and lack of remorse. *See* App.10960 ("The defendant continues to hate and denigrate Jews long after the crime."); App.10963 ("The way he talked about his victims [to Dr. Rogers] years after the crime shows his complete lack of remorse."); App.13275 ("Four and a half years since he committed these horrific murders. And he remains filled with hate for Jews. He said he has more, actually. No remorse, and he's proud."). These arguments also rebutted a submitted mitigating factor—that one day Bowers might come to see the wrongfulness of his conduct. App.13800. Bowers's self-serving plea offer through counsel did not counteract the government's wholly legitimate point about his unchanging attitudes over time.

iv. Bowers's complaint that, during selection-phase arguments, the government "implied Bowers's defense had wasted the jury's time" is meritless. Br.356. The statements he cites—challenging the relevance of defense evidence, their theory of the case, the credibility of a defense witness, *see* App.10869-70, 13279, 13280—were fair advocacy, well within the considerable latitude

325

afforded a prosecutor when summarizing evidence during closing argument. *Titus*, 78 F.4th at 602; *see, e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 324 (6th Cir. 2012) (permissible attack on defendant's credibility); *United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007) (proper summation remark that defense counsel's "'job is to take your focus off the issue'"). Pointing out the lack of merit and evidentiary support in Bowers's selection-phase defense did not make his previous bid for leniency relevant.

Equally misguided is Bowers's assertion (Br.356) that, during rebuttal, the government "implied that the trial occurred only because Bowers demanded it." The government was acknowledging Bowers's right to have the jury decide his case, not faulting him for going to trial. *See* App.13295 ("This defendant under the law was entitled to his trial. He had his trial and now it's time for his verdict."). And the remark was an appropriate segue to the prosecutor's final sentence, in which he asked the jury to return "[u]nanimous verdicts that justice demands; a sentence of death." *Ibid.*

v. Finally, the Court should reject Bowers's contention that the district court's guilt-phase jury instructions "bolstered the misleading impression that Bowers sought the trial." Br.357. Bowers *did* seek a trial—he was purportedly willing to plead guilty only if he avoided the death penalty. In any case, the jury instructions Bowers cites communicated core concepts about a defendant's

326

presumption of innocence and the government's burden to prove guilt beyond a reasonable doubt in a criminal case, ensuring the protection of *Bowers's* constitutional rights.  App.5653, 5665, 5674-75, 8242.

### c.    Any error did not prejudice Bowers.

Any error in excluding Bowers's conditional offer to plead guilty was harmless beyond a reasonable doubt.

First, based on his statements to police, the jury knew that Bowers effectively confessed, at the time of apprehension, to having killed Jewish worshippers.  *See* pp.27-29, *supra*.  Moreover, the defense informed the jury at the outset of trial that Bowers was not disputing that he shot and killed 11 congregants or that he wounded other congregants and several first responders. App.5701.  Counsel reiterated that point during guilt-phase closing argument, App.8360, acknowledging that Bowers had "caused extraordinary harm to many, many people, the people he killed, those who live with their injuries, and the families and loved ones of all of them," App.8369.  Bowers's conditional offer to plead guilty would not have enhanced his case in mitigation given those admissions of factual guilt.  *See Hall v. Luebbers*, 341 F.3d 706, 715, 717 (8th Cir. 2003) (alleged error in excluding evidence of capital defendant's willingness to plead guilty harmless because jury heard testimony defendant confessed to murdering victim); *Riley v. Cockrell*, 339 F.3d 308, 317-19 (5th Cir. 2003)

327

(denying certificate of appealability on claim counsel was ineffective for not arguing mitigating effect of prisoner's guilty plea, given trial evidence that prisoner had confessed and led police to evidence).

Moreover, the extensive evidence that Bowers was proud of the synagogue shooting, *see, e.g.*, App.9233-34, 9269, 9271, 12955, 12973, 12975-76, would have eviscerated any negligible, mitigating effect of his conditional offer to plead guilty. That evidence fatally undermines the argument that his conditional offer to plead guilty was a "first step" (Br.353) toward remorse.

Finally, lack of remorse was only one of nine aggravating factors, all of which the government proved with overwhelming evidence. The record supplies no basis for concluding that evidence of Bowers's conditional offer to plead guilty would have affected the jury's sentencing verdict.

## XII. THE DISTRICT COURT PROPERLY DENIED BOWERS'S CHALLENGES TO THE GOVERNMENT'S SELECTION-PHASE REBUTTAL ARGUMENT.

Contrary to Bowers's claim (Br.368-87), the prosecutor did not misstate relevant legal standards during selection-phase rebuttal. Bowers misconstrues the record and omits key context. The prosecutor's remarks were proper.

### A. Background

Before selection-phase closing arguments, the district court instructed the jury, *inter alia*, that it "must consider" whether Bowers "has established the existence of any mitigating factors." App.13146. The court further instructed

328

the jury to determine whether it was "unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors…to justify a sentence of death on that particular count," emphasizing that it must "conduct this weighing process separately with respect to each…capital count[]." App.13160; *see* App.13161-62 (explaining that weighing is a "qualitative," not "mechanical" or "arithmetic," process). The court repeatedly directed the jury to follow its instructions, App.13123-27, 13140, 13164, even "if any statement by counsel about the law…appear[ed] to be different," App.13164.

After argument and rebuttal (discussed *infra*), Bowers moved for a mistrial, challenging a litany of the government's remarks. DE1524; App.13298, 13321-22, 13359-60. Bowers maintained that, during rebuttal, the prosecutor misstated the weighing process by referencing the cumulative number of aggravating factors (across counts), DE1524:13-14; improperly argued that the jury's "job" was to hold Bowers "accountable to the fullest extent of the law," DE1524:19; and improperly suggested that certain evidence was not mitigating or that mitigators must have a nexus to the crime, DE1524:14, 16, 20-21.

The district court denied Bowers's motion and his request for specific curative instructions. App.13323-28. Before deliberations began, the court again instructed jurors to disregard any statements by counsel that were

329

"inconsistent with either the evidence as [they] recall it and/or the instructions as delivered by the Court." App.13330.

## B.    Standard of Review

The Court "review[s] a district court's ruling as to whether a prosecutor's argument is appropriate for abuse of discretion." *Savage*, 970 F.3d at 291.

## C.    Argument

"A prosecutor's comments can create reversible error if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Lee*, 612 F.3d at 194 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "The type of counsel misconduct that warrants granting a new trial is not generally a single isolated inappropriate comment, but rather repeated conduct that permeates the trial." *United States v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010) (quotation and brackets omitted).

Arguments by counsel "must be judged in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990); *accord Lee*, 612 F.3d at 194. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 646-47; *accord United States v. Brown*, 254 F.3d 454, 465 (3d Cir. 2001). A prosecutor's argument often must be adjusted

330

on the spot, especially during rebuttal, leading to imperfect syntax. *See Donnelly*, 416 U.S. at 646-47. The Court reviews any improper arguments for harmless error, "assessing the severity of the conduct, the effect of [any] curative instructions, and the quantum of evidence against the defendant." *Lee*, 612 F.3d at 194 (quotation omitted).

The district court did not abuse its discretion in allowing the challenged rebuttal comments.

### 1. The prosecutor did not misstate the standard for weighing aggravators and mitigators.

a. Bowers first contends (Br.369-75) that the government improperly urged the jury to take a "quantitative approach" to weighing aggravating factors. Bowers focuses on two comments separated by 20 transcript pages. App.13269-70, 13290. Each comment concerned the scope and seriousness of Bowers's crimes, not a request to aggregate all aggravators across the capital counts. Indeed, the prosecutor told the jury, "for mitigators and for aggravators, it's not the number; it's the weight." App.13286.

In the first comment, the prosecutor responded to defense counsel's exhortation "to choose life and not more death" (App.13267) when he stated:

> Here, the defendant murdered 11 innocent worshippers, and there are 22 death-eligible counts you had to consider. And you found that multiple statutory aggravators applied to all 22 counts. You only had to find one. You found 82. Before we even got to this final stage. Please keep that in mind when you're considering

331

whether the law values life.

App.13269-70.  In the second comment, the prosecutor stated:

> [W]e are asking you to put all of [the aggravators] on the scale. There were 82 that you found during the eligibility phase.  Those all carry over and get placed on the scale.  22 counts.  Multiple statutory aggravators applying to those 22 counts.  And now there are five nonstatutory aggravating factors, and each of the 22 death-eligible counts, it applies to all of them.  That's 110.  We're at 192.

App.13290.

These comments did not ask the jury to "cumulate[]" the aggravators "into one sentencing decision."  Br.371.  Each time, the prosecutor indicated that only a certain number of aggravators applied to each count by noting that "[m]ultiple" aggravators applied to the 22 counts.  And the second comment specifically noted that only five nonstatutory aggravators applied to each count. App.13290.

In context, the prosecutor's reference to aggregate aggravating factors described the number of murder victims and the scope and seriousness of Bowers's conduct.  *See United States v. Pavulak*, 700 F.3d 651, 667 (3d Cir. 2012) (on plain-error review, finding that "the prosecutor's momentary focus on the 'big picture' did not improperly invite the jury to cumulate the evidence of the separate charges").  That focus was appropriate given defense counsel's exhortation to the jury to "give the weight of life to mercy," App.13265, "give the weight of life to stopping the killing," App.13265, and "choose life and not

more death," App.13267.   Indeed, immediately before the first challenged comment, the prosecutor stated that the law already "does value life" by requiring that the jury consider whether "the most severe penalty under the law should be applied here, a sentence of death.   That's for the murder of one person….And here we have 11."   App.13269.   The prosecutor then made the point that, to reach the sentence-selection phase, the jury had needed to find only one aggravating circumstance on one count, but it had found a total of 82 across 22 counts.   App.13269-70.   Even if the Court finds the "syntax…imperfect," the prosecutor's rebuttal references to aggregate aggravators did not invite the jury to disregard the court's instruction to weigh aggravators and mitigators for each count.   *Donnelly*, 416 U.S. at 646-47.

Nor did the prosecutor imply that the weighing process was a quantitative exercise.   Br.372.   The prosecutor emphasized the jury's obligation to weigh factors in accordance with the law and to consider whether "the aggravating factors *sufficiently* outweigh the mitigating factors."   App.13273 (emphasis added).   He stated, "No one is asking you to make a judgment here other than a reasoned, moral judgment.   We're asking you to base your decision on the law."   App.13272.   He later added, "Now, for mitigators and for aggravators, it's not the number; it's the weight."   App.13286.   The prosecutor's arguments tracked the district court's instructions.   App.13160-62.

333

Contrary to Bowers's argument (Br.373), the government was entitled to revisit the aggravated nature of Bowers's crimes and the harm they caused to his victims, even if defense counsel focused on mitigation during her closing. The selection-phase verdict turned on whether the jury found that the aggravators sufficiently outweighed the mitigators to justify death sentences. But defense counsel failed to give weight to the aggravators during her closing, even though "[t]he law require[d] [the jury] to weigh them, all of them." App.13293. By reviewing the aggravated conduct, the prosecutor did not exceed the "considerable latitude available in rebuttal" argument. *United States v. Hernandez*, 999 F.3d 1181, 1184 (8th Cir. 2021) (quotation omitted). In all events, Bowers does not independently challenge the scope of rebuttal.

b. Even if the prosecutor's comments contradicted the district court's instruction to conduct a separate weighing for each count, they did not prejudice Bowers. The court told the jury to follow the court's instructions at least seven times, App.13123-27, 13140, 13164, and specifically told it to disregard any contrary statements by counsel, App.13164, including after rebuttal argument, App.13330. The jury is presumed to have followed those instructions. *Richardson*, 481 U.S. at 206; *see Riley*, 621 F.3d at 339 (curative instruction cured risk of prejudice from prosecutor comment). That the verdict form also directed the jury to weigh aggravating and mitigating factors for each count, App.13802,

334

further militates against a finding of prejudice. And the jury found all nine aggravating factors based on overwhelming evidence. *See Lee*, 612 F.3d at 194 ("quantum of evidence" is relevant to harmlessness) (quotation omitted). The instructions, verdict form, and evidence render any error harmless beyond a reasonable doubt. 18 U.S.C. 3595(c)(2).

### 2. The prosecutor did not argue or imply that death sentences were legally required.

a. Bowers errs (Br.375-80) in alleging the government argued that death sentences were legally mandated.

In one challenged remark (Br.375), the prosecutor stated, "Your job is to hold this defendant accountable to the fullest extent of the law. Hold him accountable for his decisions and his violent actions." App.13270. In another remark (Br.377), the prosecutor stated, "The law values life. But let's be clear here. The rule of law protects that value with clear laws that impose the most severe penalty for taking an innocent life. So when we say the law values life, let's focus on the facts of this case and make sure the issues are framed correctly." App.13268. And in a third (Br.379), the prosecutor stated, "Consider and weigh the aggravating factors based on the evidence. Hold this defendant accountable to the fullest extent of the law and make a reasoned moral judgment." App.13272.

Those remarks appropriately responded to defense counsel's arguments

335

for "mercy," for "stopping the killing," and for "choos[ing] life and not more death."  App.13265, 13267.  Context makes clear that the government was redirecting the jury to the court's instructions.  In telling the jury's that its "job" was "to hold this defendant accountable to the fullest extent of the law," the prosecutor was responding to the defense's suggestion that the jury could make some "gut reaction" decision to just "stop the killing," rather than conduct the legally required weighing. App.13270.  The prosecutor did not say that the jury's "job" was to recommend a death sentence.  Indeed, two paragraphs later, the prosecutor told the jury, "[t]he law requires you to perform the weighing of all the aggravating factors and any mitigating factors that you find that the defendant has proven.…And you have to do the weighing.  It's not just, look into your heart and can we stop the killing?"  App.13271; *see also* App.13273 ("[Y]ou're required to follow the law, and that law is clear.  You have to do the weighing."); App.13273 ("And we're at that point now to do the weighing."); App.13274 ("[A]gain, your sentencing decision must be made within the legal framework that Judge Colville has explained, the weighing.").

Bowers's case authority (Br.377-78) is inapposite.  The prosecutor here did not argue that the jury would not be "'do[ing] its job'" if it found that mitigators outweighed aggravators, *United States v. Young*, 470 U.S. 1, 18 (1985); that only a death sentence could "control" Bowers, *Caro*, 597 F.3d at 625-26; or that the

jury needed to finish the "'job'" started by law enforcement and prosecutors, *Cargle v. Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003); *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986). The only job the prosecutor mentioned was to follow the law.

Similarly, when the prosecutor noted that the law imposes "the most severe penalty for taking an innocent life," he was "mak[ing] sure the issues [we]re framed correctly" given defense counsel's arguments about "[t]he weight of life." App.13268. On the next transcript page, he told the jury that its responsibility was "to *consider* whether the most severe penalty under the law should be applied here, a sentence of death." App.13269 (emphasis added). And the prosecutor's many statements about the legally required weighing of aggravators and mitigators rebut the claim that he was suggesting death sentences were mandatory. App.13271, 13273-74.

Nor did the prosecutor commit misconduct by focusing, in one isolated remark, on aggravators "without mentioning the mitigating factors." Br.379 (citing App.13272). Defense counsel's closing argument did not address "what weight" the jury should give to the aggravating factors, App.13270-71, so the prosecutor reminded the jury to "[c]onsider and weigh the aggravating factors based on the evidence." App.13272. Viewed in context, *see Boyde*, 494 U.S. at

337

385; *Lee*, 612 F.3d at 194, the prosecutor's remark was not a "suggestion" that the jury could only impose a death sentence.  Br.379.

b. Because Bowers's misconduct allegation has no record support, the district court properly denied it.  But even if any comment was improper, the court's repeated admonitions to the jury to follow its instructions and disregard any inconsistent arguments by counsel cured any risk of prejudice.  *See supra.* The verdict form confirms that the jury operated with a correct understanding of the sentencing framework, because it likely would not have made such individualized findings on Bowers's 115 mitigating factors, App.13786-800, if it believed that a death sentence was mandatory.  Any error was harmless beyond a reasonable doubt.  18 U.S.C. 3595(c)(2).

### 3.    The prosecutor did not ask the jury to disregard or ignore Bowers's mitigating factors.

a. Bowers misconstrues the record again in alleging that the prosecutor told the jury "not to consider mitigating factors about [his] life history…because those factors had no connection to the attack."  Br.380; *see* Br.380-86.

As the district court instructed the jury, "[t]he law does not require that there be a connection between a mitigating factor and the crime committed." App.13147; *accord* App.13159-60; *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246-48 (2007); *Tennard*, 542 U.S. at 281, 284-86.  And the prosecutor did not argue that such a nexus was required.  The remarks Bowers challenges

(App.13280-81, 13286-87) went to the weight the jury should accord Bowers's mitigating factors. For example, the prosecutor questioned the mitigating value of evidence that "the envelope that once contained Robert Bowers' father's suicide note" was found among Bowers's possessions following his arrest, App.13287, and of evidence having at best a tenuous connection to Bowers's childhood, such as his mother's high-school report card and his aunt's marriage certificate, App.13280-81. The prosecutor acknowledged that "[c]hildhood does matter," but argued that "it does not control who you become as an adult. It does not foreordain, and it does not excuse." App.13281.

This advocacy was proper. A prosecutor's statement that mitigation evidence does not "excuse," "explain," or "justify" the defendant's crimes is a permissible argument that the jury should not give the evidence "much, if any, weight." *Mikhel*, 889 F.3d at 1054 (quotation omitted); *see United States v. Coonce*, 932 F.3d 623, 635-36 (8th Cir. 2019) (argument that jury should not treat as mitigating defendant's conceded mental damage was a permissible "attempt to devalue the mitigating factor"); *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007) (permissible argument that defendant's lack of criminal record should be accorded "no weight" in mitigation). An Eighth Amendment violation occurs only if there is a reasonable likelihood that the jury was prevented from considering mitigating evidence. *Ayers v. Belmontes*, 549 U.S. 7, 14 (2006); *Boyde*,

339

494 U.S. at 386; *Johnson*, 495 F.3d at 966; *see also United States v. Tsarnaev*, 595 U.S. 302, 319 (2022) ("*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence ….") (quotation omitted). "[A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." *Johnson*, 495 F.3d at 978; *accord United States v. Bolden*, 545 F.3d 609, 630 (8th Cir. 2008).

That is what happened here. The prosecutor urged the jury to consider, for example, "how much weight, if any, should…be given" to childhood issues "when [Bowers] committed these crimes as a fully formed adult," and to "ask whether the [submitted] factor is actually mitigating." App.13286-87.[67] The government was not required to accept Bowers's characterization of his mitigating factors, provided it did not tell the jury to ignore or disregard them, which it did not do. Indeed, with respect to mitigators, the prosecutor told the jury, "you can consider them and give them the weight, if any, that you determine they are worth." App.13288; *see also* App.13286 ("when you consider childhood issues…"). Such statements "belie[]" any claim that the prosecutor's

---

[67] The prosecutor made a similar argument during summation. App.13218. Bowers errs in suggesting it was improper. Br.383 n.121.

340

argument prevented the jury from considering mitigating evidence. *Mikhel*, 889 F.3d at 1055.

The prosecutor's arguments also comported with the jury instructions, the legal validity of which Bowers does not challenge. The instructions did not require that jurors find the submitted factors to be mitigating. *See, e.g.*, App.13147-48 ("Any juror persuaded of the existence of a mitigating factor must consider it in this case. Any juror may also weigh a mitigating factor found by another juror, if ultimately convinced that it is a mitigating factor, even if he or she did not also previously find that factor to be mitigating."); *accord* App.13129; *see also* App.13158 (jurors must decide "what weight, if any, should ultimately be given" to factors). Because the prosecutor did not tell the jury to disregard or ignore the submitted mitigating factors, the district court properly rejected Bowers's challenge.

b. As with Bowers's other challenges, the court's repeated admonitions to the jury to follow its instructions significantly reduced the risk of prejudice from any improper comment. And the verdict form again confirms the absence of prejudice. Contrary to Bowers's argument (Br.385), the fact that "the jury found 52 of the 58 life-history-related mitigating factors" shows that, consistent with the Eighth Amendment, the jury was not prevented from considering the mitigating evidence presented. App.13786-93. The jury simply found that the

aggravating factors sufficiently outweighed mitigating factors to justify the death sentences.

### 4.    The cumulative-error doctrine does not help Bowers.

Bowers's resort to the cumulative-error doctrine (Br.386-87) is misplaced. Relief on that ground is warranted only if the "errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quotation omitted). But none of the prosecutor's comments was improper, so there is no error to cumulate. *See United States v. Smith*, No. 24-1199, 2025 WL 2694106, *2 (3d Cir. Sept. 22, 2025) (unpublished) ("Zero plus zero plus zero still equals zero.").

## XIII. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN APPROVING THE USE OF ANKLE RESTRAINTS ON BOWERS DURING PENALTY-PHASE PROCEEDINGS.

Bowers contends (Br.388-426) that placing him in ankle restraints during penalty-phase proceedings violated his right to due process. To the contrary, the restraints were hidden and were justified by specific security concerns. The district court properly approved their use.

### A.    Background

1. On June 30, 2023, the fifth day of eligibility-phase proceedings, the district court authorized the United States Marshals Service (Marshals) to use

342

ankle restraints on Bowers when he was in the courtroom, over the defense's objection. App.9356-64. In a closed courtroom session, the court explained that its decision was based on information received from the Marshals, indicating that the restraints were "warranted and appropriate" to ensure "court security, Mr. Bowers' safety, and the marshals' security," and that "no less restrictive option" was "available." App.9357, 9360-61. Due to the sensitivity of the information, the court initially did not feel "free" to disclose the specific reasons for the restraints, but noted that the Marshals had agreed to take precautions to prevent the jury from seeing the restraints, which included measures to prevent the restraints from making noise. App.9357, 9360, 9364. Skirts at the tables where counsel and Bowers sat would also prevent the jury from seeing the restraints. App.9360. For the remainder of the penalty phase, Bowers wore ankle restraints in the courtroom.

2. On July 3, 2023, the district court issued a sealed memorandum order explaining its rationale for authorizing the ankle restraints. App.13874-78. The order (initially redacted, later unredacted) stated that, on June 29, the court had received an email from the Chief Deputy U.S. Marshal raising concerns over Bowers's increasingly aggressive behavior. App.13874; *see also* App.372-76 (redacted order). A Deputy Marshal reported that Bowers had made quick movements on several occasions to close the distance between Bowers and the

armed Deputy who was guarding him; although Bowers stepped back when directed to do so, Bowers made the same move a short time later.  App.13874. Officers at Butler County Prison, where Bowers was being held, further reported that Bowers had said that he knew who among the Marshals was armed and felt confident he could disarm them.  App.13874.  Based on his experience, the Chief Deputy Marshal believed Bowers might be trying to provoke an altercation with Deputies or testing whether he could disarm the Deputies.  App.13874.

The unredacted order further stated that, the next day, the court met with two Deputy Marshals, who confirmed that, when not restrained, Bowers recently had tried to close the distance between himself and an armed Deputy. App.13875.  They also reported that Bowers recently had appeared restless in the courtroom, frequently had been looking at the exits, and had appeared ready to stand up during some testimony.  App.13875.  The Deputies believed that ankle restraints were necessary and that no adequate, less-restrictive alternatives existed.  App.13875.

The court found that the Marshals' concerns were "bolstered" by the government's observation (made in the presence of defense counsel) that Bowers seemed "agitat[ed]" in the courtroom, and by the court's own "observation that [Bowers] ha[d] been more expressive in recent days."  App.13877. The court found that the information obtained from the Marshals created "the concerning

344

possibility" that Bowers might try to provoke a confrontation with the Deputy Marshals handling him or try to disarm Deputies. App.13877. These possibilities "justifie[d] the modest step of requiring ankle restraints" on Bowers in the courtroom. App.13877. The court cited factors mitigating the risk that jurors would notice the restraints: Bowers sat "at the far side of counsel table on the far side of the courtroom, away from the jury box"; counsel tables had "skirts down to the floor," which would "obscure the restraints from view"; the restraints were "wrapped in duct tape to minimize any noise"; and Bowers was escorted in and out of the courtroom outside the jury's presence. App.13877.

The unredacted order noted that the Deputies had "strongly advised" that specific information about Bowers's behavior be withheld to protect sources and prevent Bowers from changing his pattern. App.13875. Based on then-ongoing security concerns, App.13878, the court initially issued only a redacted copy of its order to the parties, which did not disclose the Marshals' observations about Bowers's recent behavior or his statements at the Butler County Prison. App.372-73, 375.

3. The defense filed written objections and made two *ex parte* submissions detailing the alleged prejudice to Bowers caused by the restraints. App.13883-85 (citing DE1407, DE1427, DE1432, DE1498). The defense objected to the court's withholding of information, failure to hold a hearing, and alleged

345

delegation to the Marshals of the decision on restraints. App.13885. The defense alleged that the ankle restraints were painful and impaired Bowers's ability to focus, communicate with counsel, and comport himself favorably. App.13881-82. It also submitted 12 photographs of the courtroom purporting to show that jurors would be able to see the ankle restraints on Bowers. App.13884 & n.1 (citing exhibits to DE1492).

4. On July 26, during the selection phase, the district court issued a second memorandum order overruling the defense's supplemental objections to ankle restraints. App.13883-92.

The court disclosed all but one reason underlying its initial decision to order restraints: although it explained that the Chief Deputy Marshal's June 29 email to the court had communicated information about statements Bowers made at Butler County Prison, the court did not describe the substance of the statements to protect the Marshals' sources. App.13885, 13887. The court did, however, disclose the Deputy Marshals' description of Bowers's efforts to close the distance between himself and the armed Deputy, and the Marshals' observations that Bowers had appeared restless and unsettled in the courtroom. App.13886. The court noted that the Marshals repeatedly had warned Bowers not to approach the Deputies guarding him, but Bowers had persisted.

346

App.13886 n.2.  On one occasion, Bowers got so close that he was only inches away from the Deputy's weapon.  *Ibid.*

The court also recounted an incident from July 10, when a Deputy Marshal reported a change in Bowers's behavior when the jury entered the courtroom: Bowers turned to face the gallery and began counting something, even though criminal defendants typically are instructed to face forward or toward the jury when it enters.  App.13886.  The Deputy Marshal was concerned that Bowers might have been trying to count the number of Marshals or court security officers in the gallery and immediately informed defense counsel of the incident.  App.13886-87.

The court concluded that Bowers's actions "independently support[ed]" its decision to restrain him in the courtroom, but found those actions even more significant given his statements at Butler County Prison.  App.13887.  The court determined that an evidentiary hearing was not warranted, because the facts on which the court had relied were not reasonably disputed.  App.13890.  The court rejected the defense's contention that it had delegated the decision on restraints to the Marshals.  App.13890.  The court did not make a specific finding on whether Bowers's ankle restraints were visible to the jury, but did emphasize that "the views depicted" in the defense's photographs were "contingent on the precise circumstances that defense counsel created taking them, including the

347

absence of government and defense counsel, the arrangement of chairs, and the position of Mr. Bowers." App.13884 n.2.

5. Bowers filed a renewed motion objecting to the ankle restraints, DE1519, as well as a supplemental *ex parte* statement concerning prejudice, App.13893-95. The district court denied his motion. App.13302.

6. On January 24, 2024, in ruling on post-trial submissions concerning which documents in the voluminous record no longer required sealing, the district court released to the parties the unredacted (but still sealed) version of its first order on ankle restraints (DE1409). App.385-86, 13874.[68]

### B.   Standard of Review

The Court reviews a district court's decision on shackling for abuse of discretion. *Deck v. Missouri*, 544 U.S. 622, 629 (2005); *United States v. Ayala*, 917 F.3d 752, 761 (3d Cir. 2019).

### C.   Argument

The Due Process Clause prohibits courts from "routinely plac[ing] defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." *Deck*, 544 U.S. at 633. This prohibition,

---

[68] As the government explained in a post-trial filing, most of the information pertaining to the shackling issue is no longer sensitive. *See* DE1635; DE1636; DE1640:2 n.1.

which also applies to a trial's guilt phase, is based on concerns that shackling may (1) undermine the presumption of innocence, (2) interfere with the defendant's right to counsel, and (3) undermine the dignity of the judicial process. *Id.* at 630-31; *Ayala*, 917 F.3d at 762. But the prohibition "is not absolute." *Deck*, 544 U.S. at 633. "It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Ibid.* A decision to order physical restraints must be "case specific" and must "reflect particular concerns…related to the defendant on trial," such as "special security needs or escape risks." *Ibid.*

Because district courts are "uniquely positioned and qualified" to assess a defendant's potential security risk, *Sides v. Cherry*, 609 F.3d 576, 586 (3d Cir. 2010), they need "latitude" to make "individualized security determinations," *Deck*, 544 U.S. at 632; *accord Ayala*, 917 F.3d at 763. Although a court may not "delegate" its decision to the Marshals, it may rely "heavily" on their advice, in addition to other information, in deciding whether a defendant should be physically restrained in the courtroom. *Sides*, 609 F.3d at 582 (quotation omitted). "So long as a district court engages in an appropriate inquiry and supplies a reasonable basis for its decision, [this Court] will defer to its determination that physical restraints are necessary to ensure courtroom security." *Id.* at 586.

349

### 1. The district court properly authorized ankle restraints based on specific security needs in this case.

a. Consistent with *Deck*, the district court authorized the Marshals to apply ankle restraints to Bowers based on special circumstances in this case, namely, Bowers's aggressive and restless behavior during the penalty phase and his statement at the Butler County Prison.

Bowers repeatedly attempted to close the gap between himself and the armed Deputy, despite being warned to keep his distance, and was increasing restless in the courtroom, including by appearing ready to stand up during testimony. App.13874-75, 13877. Those actions suggested that Bowers was trying to provoke a confrontation with Deputy Marshals or seize the armed Deputy's gun. App.13877. If Bowers disarmed a Deputy, he would have posed a grave and immediate danger to the court, its staff, the jury, counsel, members of the gallery, and himself. *See Deck*, 544 U.S. at 632 ("We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms."). This possibility was enhanced by the report that Bowers stated he knew who was armed and felt confident he could disarm them. App.13874.

Given a district court's latitude "to make 'individualized security determinations,'" *Ayala*, 917 F.3d at 763 (quoting *Deck*, 544 U.S. at 632), the court properly relied on reports of Bowers's aggressive and restless behavior, as well as his statements in prison, to order the use of ankle restraints inside the

courtroom. *See United States v. Brown*, 454 F. App'x 44, 47 (3d Cir. 2011) (no abuse of discretion where court "conducted a specific inquiry and made specific findings" regarding the use of ankle restraints). Indeed, Bowers's concerning behavior persisted even after restraints were applied: on July 10, Bowers turned to the gallery as the jury entered and began counting something, possibly the number of Deputy Marshals or court security officers. App.13886-87.

Bowers incorrectly suggests that restraints may be used only where the defendant actually has "committed or seriously threatened violence in a custodial setting or against the trial participants." Br.414-15 (citing *Brown*, 454 F. App'x at 47, and *Szuchon v. Lehman*, 273 F.3d 299, 314 (3d Cir. 2001)). That this Court approved restraints on the facts of his two cited cases does not mean restraints are limited to those scenarios. *Deck* does not require a district court to wait until a defendant has committed or attempted violence before imposing reasonable restraints and ensuring courtroom safety. 544 U.S. at 632; *see United States v. Bell*, 819 F.3d 310, 322 (7th Cir. 2016) (district court properly ordered restraints because it could plausibly find that defendant was prone to violent outbursts and disregarded security precautions, even though other judges "might have drawn different conclusions").

The district court's decision on ankle restraints was not a knee-jerk reaction. As the court told Bowers, it endeavored to treat him with "respect and

dignity throughout and to ensure that he [wa]s never needlessly inconvenienced or made uncomfortable." App.9364; *accord* App.9357. During voir dire, for example, Bowers was observed writing on himself; rather than reflexively impose a restriction on Bowers, the court "determined that restrictive measures were unnecessary" after discussing the matter with the Marshals. App.13884. The court's overall treatment of Bowers is further evidence of the careful consideration it gave to applying ankle restraints. Bowers's increasingly aggressive behavior during the penalty phase was troubling and warranted protective action.

b. Bowers has it backwards in arguing that he had "posed no problem in custody and was safely unrestrained for 34 days of trial." Br.391. If true, that made his aggressive movements toward the armed Deputy Marshal *more* concerning because it marked a change in his behavior.

Bowers's violent shooting rampage provided every reason to be vigilant about changes in his courtroom behavior. As the jury found in the guilt phase, Bowers murdered 11 worshippers and seriously wounded many other victims, including law enforcement officers, during the synagogue attack. The district court appropriately recognized that, although these findings alone were not sufficient to justify the use of ankle restraints, they were relevant to the Marshals' security concerns. App.13877 n.2; *see United States v. Wardell*, 591 F.3d 1279,

1293 (10th Cir. 2009) (charged crime, among other factors, is relevant to analysis of need for physical restraints); *United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006) (court properly ordered defendant restrained during trial based on, *inter alia*, his recent conviction for attempted murder and recent assaults on a deputy sheriff and fellow inmate).

c. The ankle restraints were not greater than necessary to ensure the courtroom's security. *See Sides*, 609 F.3d at 581. For example, the court did not order the use of handcuffs. *Cf. id.* at 583; *Mahasin*, 442 F.3d at 690. And the court inquired about less restrictive alternatives, "but the Marshals were clear that they believed no adequate alternatives existed." App.13875. A district court may rely "heavily" on the Marshals' advice when deciding on the use of restraints. *Ayala*, 917 F.3d at 762; *Sides*, 609 F.3d at 582. That includes heeding the professional opinions of a Chief Deputy Marshal and two Deputy Marshals that a defendant's recent behavior was aggressive and troubling. App.13874-75. Given the security concerns raised by Bowers's conduct, the court properly ordered the use of ankle restraints on Bowers.

d. Finally, there is no evidence that the jury actually saw the ankle restraints, which is not surprising because: (1) each counsel table in the courtroom had skirts down to the floor; (2) the jury box was across the courtroom from the defense tables and obscured by the government's tables;

(3) Bowers consistently sat in a far-side chair at counsel table, such that two defense attorneys further obstructed the jury's view of him; (4) the Marshals duct-taped the chain connecting Bowers's ankle bracelets to minimize any noise; and (5) Bowers was escorted in and out of the courtroom outside the jury's presence.   App.13877-78; *see also* DE1492-1 to DE1492-12 (defense photographs).  As the district court found, these steps "mitigated the possibility that any juror…observe[d] the restraints." App.13878.

Bowers is flat wrong in asserting (Br.418) that "[n]either the government nor the court seriously disputed the defense proffer that [his] shackles were observable by multiple jurors."  In a filing, the government described how various aspects of the courtroom layout "obscured" the jury's view of Bowers. App.13884 (quoting DE1451:2).  And the court noted that, as the defense "repeatedly concede[d]," the views depicted in the defense's photographs of the courtroom "are contingent on the precise circumstances that defense counsel created when taking them, including the absence of government and defense counsel, the arrangement of chairs, and the position of Mr. Bowers." App.13884 n.1.  And, importantly, Bowers cites no evidence that the jury actually noticed the restraints.  *See, e.g.*, *Bell*, 819 F.3d at 322-23 (court took appropriate precautions to reduce risk that jury noticed the restraints, which included the use of only leg restraints); *Brown*, 454 F. App'x at 47 (court "noted for the record

that the shackles were covered by a draping over defense counsel's table and thus would not be visible to the jury").

### 2.    Bowers's challenges are meritless.

### a.    An evidentiary hearing was unnecessary.

i. Bowers's main complaint—that the district court should have conducted an evidentiary hearing (Br.409-14)—is meritless.  A court "should hold a proceeding outside the presence of the jury to address the issue [of shackling] with counsel."  *Sides*, 609 F.3d at 582.  The court did that when it heard argument against restraints in a closed session, before considering the defense's written objections and *ex parte* submissions, "allow[ing] the defense to stage and take its own photographs to supplement the record for appellate review," App.13890, and issuing written rulings, App.13874-78, 13883-92.

ii. Bowers concedes that "not every purported dispute about the factual basis for a shackling request will necessitate a hearing."  Br.413.  This Court has "stress[ed] that an evidentiary hearing is necessary only where *genuine* and *material* factual disputes exist as to the danger posed by a prisoner-[party]."  *Sides*, 609 F.3d at 582 n.3.  The facts justifying ankle restraints, on which the court relied, were not reasonably in dispute.  App.13890.

Notably, even after the district court issued its second memorandum order, which disclosed the information about Bowers's attempts to close the gap

between him and the armed Deputy Marshal, App.13886 & n.2, the defense disputed the accuracy of this information only in general terms. Their pleading did not provide an unqualified denial of the conduct or alternative explanation for what occurred. *See* S-App.254 (asserting only that "counsel have not observed" Bowers try to close the distance to the armed Deputy). Likewise, in response to the specific report that Bowers had been pressing up against the Deputy's shoulder and getting close to the Deputy's firearm, and Bowers's disregard of repeated warnings to keep his distance, App.13886 n.2, the defense mustered only a general complaint, based on "information and belief," that the Marshals had "misinterpreted facts." S-App.255; *see also* S-App.255-56 (describing as "pure and unfounded speculation" report that Bowers may have been counting Marshals or security officers in the gallery one day).

*Davidson v. Riley*, 44 F.3d 1118 (2d Cir. 1995), which this Court cited in *Sides*, 609 F.3d at 582, is instructive in comparison. The court in *Davidson* concluded that an evidentiary hearing was warranted because the district court failed to probe a corrections officer's "terse reference" to the prisoner-plaintiff's prior escape attempt and "ignored [the plaintiff's] more detailed assertions that he had evidence to the contrary," including specific documentary evidence that he was not an escape risk. *Davidson*, 44 F.3d at 1125. Bowers's generally worded disagreements here pale in comparison to the detailed assertions in *Davidson*.

356

And the district court did not blindly accept a "terse" statement that Bowers was a security risk; as discussed further below, the court retained and exercised full decision-making authority over the restraints.

To be sure, the district court did not disclose the substance of Bowers's statements until after trial in order to protect the Marshals' sources. But any genuine dispute about the accuracy of Bowers's reported statements would not have mattered, because the court determined that Bowers's actions independently supported the use of restraints. App.13887. Given a court's broad discretion to make security determinations about courtroom threats, *see Deck*, 544 U.S. at 632; *Ayala*, 917 F.3d at 763, and Bowers's increasingly aggressive behavior toward Deputy Marshals, the court reasonably concluded that ankle restraints were justified regardless of the extent to which the defense contested Bowers's prison statements.

iii. The cases Bowers cites (Br.411-12) hurt, rather than help, his argument. As discussed, Bowers did not make the type of detailed assertions that warranted an evidentiary hearing in *Davidson*, 44 F.3d at 1125. There, the Second Circuit also determined that the district court "abdicated its responsibility to determine the need for physical restraints" by simply deferring to corrections officers, *ibid.*, the opposite of what the court did here. Likewise, in *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), the D.C. Circuit held that

357

an evidentiary hearing on restraints was *not* warranted, because the district court made individualized determinations and the defendants failed to "allege any specific inaccuracy or misrepresentation" in the information provided by the government. *Id.* at 46-47; *see id.* at 47 (defendants "must make a more specific factual challenge"). The same conclusion is warranted here.

Bowers also cites (Br.415-16) two death-penalty cases where restraints were approved in circumstances similar to this one. *See United States v. Battle*, 173 F.3d 1343, 1346-47 (11th Cir. 1999) (court "conducted a hearing at which both attorneys were heard," considered alternatives to restraint, and "took reasonable steps to hide the chosen restraints from the jury"); *United States v. Honken*, 541 F.3d 1146, 1162-63 (8th Cir. 2008) (court took steps to mitigate risk jury would see restraints).

Other cases he cites involve inapposite situations where the trial or magistrate judge failed to make an adequate, case-specific finding of need for restraints, *see Claiborne v. Blauser*, 934 F.3d 885, 897-98 (9th Cir. 2019); *Lemons v. Skidmore*, 985 F.2d 354, 358 (7th Cir. 1993); *Ochoa v. Workman*, 669 F.3d 1130, 1140, 1145 (10th Cir. 2012); *United States v. Samuel*, 431 F.2d 610, 615-16 (4th Cir. 1970), or relied on information of unknown origin, *Hameed v. Mann*, 57 F.3d 217, 223 (2d Cir. 1995).

The closest Bowers comes to a case that helps him is *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987), *modified on other grounds*, 833 F.2d 250 (11th Cir. 1987), in which two judges faulted a state trial court for not giving the defense an opportunity to contest information that the defendant had intended to assault the bailiff. *Id.* at 1451-52. The panel majority also found, however, that (unlike here) the trial court did not consider alternatives to restraints. *Id.* at 1452. Regardless, to the extent the divided, out-of-circuit decision in *Elledge* created a "per se rule" requiring evidentiary hearings before restraints may be applied, *id.* at 1453 (Edmondson, J., dissenting), it is inconsistent with this Court's decision in *Sides*.

Finally, the fact that trial courts, on different factual records, may have conducted fuller hearings before ordering restraints, *see* Br.412-13, does not establish that the district court abused its discretion here. An evidentiary hearing was unnecessary because Bowers's increasingly aggressive behavior and restlessness were not reasonably in dispute.

### b.    The court acted reasonably in protecting the information provided by the Marshals.

Bowers is mistaken in faulting the district court for not initially disclosing the information about his aggressive behavior and restlessness in court (disclosed in its second memorandum order) or his statements at the Butler County Prison (disclosed after sentencing). Br.403-04, 413-14. The Marshals "strongly

advised" that this information be withheld.  App.13875.  The court appropriately relied on that advice in deciding when to share information relevant to the potential security threat.  *See Sides*, 609 F.3d at 582.  Unnecessary disclosure threatened to complicate the Marshals' efforts to secure the courtroom: once apprised of the reasons for restraints, Bowers could discontinue communications with the Marshals' intelligence source at Butler County Prison or could find new ways to provoke an altercation or disarm the Deputy Marshal.  *See* App.13875.

In all events, the district court ultimately disclosed all of its reasons for authorizing ankle restraints.  Most of them, including Bowers's repeated attempts to close distance between him and the armed Deputy Marshal and his July 10 attempt to count something in the courtroom gallery, were disclosed before trial concluded, App.13885-87, 13890, which allowed the defense to file a renewed challenge to the court's decision, S-App.253-57.  And the court disclosed the last reason—Bowers's statements at the Butler County Prison— after trial, so it is now part of the record on appeal.  The district court, therefore, made an on-the-record, "case specific" determination that restraints were warranted.  *Deck*, 544 U.S. at 633.  The court did not abuse its discretion by not immediately disclosing the full reasons for that decision.  *Compare, e.g.*, *Brown*, 454 F. App'x at 48 (court "articulated specific findings" relating to need for shackles), *with United States v. Brantley*, 342 F. App'x 762, 768 (3d Cir. 2009)

(court made "absolutely no inquiry into the necessity" for shackling "and certainly no finding that would support it").

### c.  The court did not delegate authority to the Marshals.

Bowers erroneously suggests (Br.392-93, 396) that the district court was too deferential to the Marshals.

The factual justification for using restraints may "come from any proper source," including "the Marshal's Service." *United States v. Salehi*, 187 F. App'x 157, 174 (3d Cir. 2006); *see also Ayala*, 917 F.3d at 762; *Sides*, 609 F.3d at 582. Despite approving ankle restraints on June 30, the court inquired about less restrictive alternatives, heard argument from counsel, relied in part on its own observation of Bowers's courtroom behavior, allowed the defense to file written objections and submit information *ex parte*, and issued two written decisions overruling the defense's objections. *See* pp.342-48, *supra*. In its first order, the court invited "alternative suggestions from the parties about how best to accommodate the very real security concerns expressed by the Marshals." App.13878. In its second order, the court stated that it would "continue to hear[] whatever arguments the defense cares to offer about the continued need for Mr. Bowers' restraints," including "any proposed alternatives to those restraints." App.13890. Far from deferring to the Marshals, the court exercised full decision-making authority over the use of restraints. *See Ayala*, 917 F.3d at 762

361

(court offered to hear argument and accept briefing); *Sides*, 609 F.3d at 582 (court adopted Marshals' advice but indicated that it could order shackles removed).

### 3.    Any error was harmless beyond a reasonable doubt.

The erroneous shackling of a defendant is harmless when the government shows "'beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.'" *Deck*, 544 U.S. at 635 (quoting *Chapman*, 386 U.S. at 24) (brackets removed). This Court has identified four potentially relevant factors: (1) "the strength of the case in favor of the prevailing party"; (2) "the effect the restraints may have had in light of the nature of the issues and the evidence involved in the trial"; (3) "whether measures were taken to prevent the jury from viewing the restraints"; and (4) "whether the district court instructed the jury to disregard the restraints in deciding the case." *Sides*, 609 F.3d at 584 (quotation omitted).

a. The foregoing factors show the absence of prejudice here. First, Bowers cites no evidence that the jury was actually aware of the ankle restraints, and thus there is no indication that the restraints played any role in the jury's verdict. As explained, the court and Marshals took steps to prevent the jury from seeing or hearing Bowers's restraints. *See* pp.353-54, *supra*. The court did not credit the defense's staged photographs (which suggested the restraints may have been visible from the jury box), noting that they were "contingent on the precise

362

circumstances that defense counsel created taking them…." App.13884 n.1. Even if Bowers were improperly restrained, no reason exists to believe the error affected the jury's decision-making.

Second, overwhelming evidence established the aggravating nature of Bowers's crimes and justified the jury's selection of death sentences.

Third, the nature of the evidence and issues in the case mitigated any prejudicial effect of the use of restraints, if they were even visible. Bowers did not dispute that he committed the synagogue shooting, and the thrust of his penalty-phase defense was that his crime was the result of a delusional belief system that prevented him from conforming his conduct to the requirements of law. *See, e.g.*, App.13795-96 (mitigators 72-81). That Bowers was detained was not in question—his own evidence established that fact. *See, e.g.*, App.12473-76.

During the selection phase, Bowers also tried to establish that he would be confined in a highly controlled unit of ADX for the rest of his life if not sentenced to death. In ADX, defense witnesses maintained, Bowers would be subject to myriad restrictions and have no contact with other inmates. App.12521-25, 12531, 12541-44, 12664-65, 12670-71; *see, e.g.*, App.12531 ("It's a very secure institution. It's considered the super max of the agency."). Defense counsel emphasized these points during summation, App.13261-63, arguing, for example, that Bowers "will serve his life in a concrete cell with

363

limited movement and limited contact.…[T]he Bureau of Prisons[] will control everything, including how often the toilet flushes." App.13262-63; *see also* App.13799 (mitigator 105, alleging designation "to a highly secure federal prison" upon life sentence). "Simply put, prison clothes and shackling are not prejudicial when a defendant himself injects his incarceration into the case." *United States v. Wilson*, 979 F.3d 889, 915 (11th Cir. 2020).

Finally, as for a possible curative instruction on the use of shackles, Bowers never requested one. That makes sense, because an instruction would have undermined the measure taken to conceal the restraints from the jurors.

b. Bowers's harmless-error arguments (Br.416-26) are meritless.

i. He contends (Br.418) that the Court must assume that his restraints were visible to the jury unless the government proves beyond a reasonable doubt they were not. But the case on which he relies, *United States v. Banegas*, 600 F.3d 342 (5th Cir. 2010), involved a *pro se* defendant at trial, a district court's failure to provide "particular reasons" for shackling him, and a record that was "sparse as to the facts of shackling." *Id.* at 346-47. The court of appeals found that the sparse record, in particular, made it "unjust" to make the defendant prove visibility of the shackling and placed the burden on the government to prove non-visibility as part of its "general burden" on harmlessness. *Id.* at 347. That same concern is absent where, as here, the record reveals the many

circumstances mitigating the risk that jurors saw the restraints. And even if the jury had seen them, it would not necessarily have prejudiced Bowers. *See Sides*, 609 F.3d at 584-85 ("[T]hat these measures did not always conceal Sides' shackles throughout trial does not compel the conclusion that he was prejudiced."). That fact, the evidence of Bowers's highly aggravated crimes, and the defense's own sentencing arguments establish beyond a reasonable doubt that the restraints did not contribute to the jury's verdict. *Deck*, 544 U.S. at 635.

ii. Bowers next contends (Br.419-21) that the restraints were "highly pertinent to a key disputed issue, whether Bowers could be safely managed in prison." That argument stretches the record too far. The government did not allege future dangerousness as an aggravating factor. App.13782-85.

Nor did the government imply such dangerousness when it cross-examined a Butler County Prison guard or purported BOP experts called as defense witnesses. *See* Br.420. To the extent the government challenged any testimony that Bowers had a good disciplinary record in prison, App.12464-65, it was to rebut mitigating factors, App.13798 (mitigators 97-100), not to argue for a death sentence based on dangerousness. Similarly, the government's cross-examination of BOP witnesses aimed to rebut the mitigation argument that, given Bowers's likely confinement at ADX, the jury should forgo a death sentence because life imprisonment was severe enough punishment. App.13798

365

(mitigator 95); *see, e.g.*, App.12608-09, 12612 (witness acknowledges on cross-examination that Bowers could be placed in general population at ADX, that all ADX cells have televisions, and that ADX inmates will soon receive tablets containing games, music, and program materials); App.12678 (witness admits on cross-examination that she would "not" be "surprise[d]" if there are defendants convicted of hate crimes housed in prisons other than ADX). Bowers's past and future confinement came into play only because the defense sought to use them to obtain leniency for Bowers.[69]

iii. Bowers's contention (Br.421-22) that the ankle restraints undermined his defense "in other important ways" is misguided.  Pointing to defense-prepared photographs, he alleges that the restraints were too tight and painful. Br.400, 422.  But those photographs captured a single moment in time—how the restraints were applied on a particular day.  And Bowers's assertions that the restraints impaired his ability to focus, communicate with his lawyers, or comport himself favorably in the courtroom—which are based on his counsel's *ex parte* representations to the district court—must be assessed in the context of

---

[69] Bowers contends (Br.420) the government elicited testimony that he viewed himself as a prisoner of war.  But one piece of cited testimony actually was elicited by the defense, App.12825 (Dr. Corvin testimony), and another was elicited in response to questions about Bowers's mood and cognition, App.10130.  Regardless, the fact that Bowers was being detained was not in question.

prison life, where inmates frequently wear restraints. Here, a Deputy Marshal explained that "every prisoner we have in our custody wears shackles all day every day that [they] are here. The restraints do not come off." App.9361. And the defense reported that Bowers wore a different set of restraints from the time he left his prison cell until he reached the federal courthouse and throughout the return trip. DE1498:2. While the frequent use of restraints outside the courtroom is not itself justification for using them during trial, it means that ankle restraints were not foreign to Bowers. The alleged prejudice caused by having his movement restricted in the courtroom does not preclude finding harmless error.

iv. Bowers's final contention that a "death verdict was not a foregone conclusion" also fails. Br.423-25. Bowers concedes that his case was "highly aggravated," but contends that it would have taken only one juror to vote against the death penalty. Br.424-25. At bottom, this argument is an assertion that the erroneous shackling of a defendant can never be harmless in a capital case, which is contrary to *Deck*, 544 U.S. at 635. This Court specifically stated in *Sides* that "the strength of the case in favor of the prevailing party" is a factor relevant to the harmless error analysis on shackling claims. 609 F.3d at 584 (quotation

omitted).  If this Court finds error here, it may rely on the overwhelming proof of aggravating circumstances to hold the error harmless.[70]

### XIV. BOWERS'S ABSENCE FROM THE JURY'S COURTROOM VIEWING OF EVIDENCE DURING DELIBERATIONS AND ALLEGED ABSENCE FROM THE QUESTIONING OF A MARSHAL WERE NOT REVERSIBLE PLAIN ERROR.

Bowers contends (Br.426-40) that the district court failed to ensure his presence at two matters during deliberations: the jury's viewing of firearm exhibits and the questioning of a Marshal about the Marshal's exchange with jurors during that viewing.  Bowers concedes (Br.427) that this claim is unpreserved.  It fails multiple prongs of the plain-error test.  *See Greer v. United States*, 593 U.S. 503, 508 (2021) ("Satisfying all four prongs of the plain-error test is difficult.") (quotation omitted).

#### A.   Background

During selection-phase deliberations, the jury asked to "be provided with the weapons in evidence."  App.13331, 13334, 13337.  The parties and district court agreed the firearms would be displayed on a table in the courtroom and jurors could not touch them.  App.13334-38.  Defense counsel indicated, in

---

[70] At most, the Court should remand the case for an evidentiary hearing on the factors supporting the district court's decision and the alleged prejudice to Bowers. *See, e.g.*, *Parrish v. Small*, 315 F.3d 1131, 1133 (9th Cir. 2003). Vacating Bowers's sentence is unwarranted given the court's thorough consideration of the issues.

Bowers's presence, that Bowers would not be there during the jury's viewing: "Mr. Bowers will go back with the marshals, but we'll assume the parties…[will] sit in the gallery?"  The government concurred and suggested that the court remain on the bench during the viewing, which it did.  App.13337-38.

Before the jury entered, the district court asked, "Are you suggesting that all counsel, including Mr. Bowers, is going to be in the back [of the courtroom]?" Defense counsel responded: "Mr. Bowers will go back with the marshals, and we'll just all sit behind the wall."  App.13339.  The court said it would permit the jurors to walk around the table and look at the weapons, and that it would "put the sound deadener on so if they want to talk privately amongst themselves, they can."  App.13339.

When the jurors entered, the court directed that they "not touch the weapons" or "attempt to manipulate them."  App.13340.  The court explained that "[t]he marshals will give you some reasonable privacy, but they need to be nearby."  App.13340-41.  During the viewing, the court interjected, "I'm going to advise that the marshals do not respond to any questions.  We understand the instinct to inquire, but we're going to ask there be no communications between the marshals and the jurors."  App.13341.

After the jury exited, the court asked if the parties had "[a]ny follow-up." App.13342.  When defense counsel responded affirmatively, the court stated,

"We're going to go back online, back into the public session." App.13342. The transcript then notes a "Pause" in the proceeding, without indicating whether Bowers returned to the courtroom. App.13342.

When the proceeding resumed, defense counsel stated that they had observed a Marshal speaking with jurors and asked that a record be developed of what was said. App.13342. In response to the court's questioning, the Marshal provided the following sworn account of his exchange with jurors:

> [T]he first question was a question about where the handguns were all carried. I told them that I did not know. After that, there was a question about…how to load a shotgun. I answered from the bottom and from the side. And then there was a question…was that the magazine for the AR that was there, and I said yes.

App.13343. The government asked a question clarifying that the AR magazine shown was in the same box as the firearm. App.13343. Defense counsel did not ask any follow-up questions. App.13344.

The defense moved for a mistrial; the court denied it. App.13344. As a precaution, the court brought the jury back and instructed it to "disregard completely anything that was said to you or…anything you overheard regarding questions and answers between any of the jurors and the marshals.…[I]t's not evidence." App.13345.

370

### B.   Standard of Review

Plain-error review applies because the defense did not object to Bowers's absence from the evidence viewing or his alleged absence from the questioning of a Marshal. *United States v. Romero*, 282 F.3d 683, 689 (3d Cir. 2002).

### C.   Argument

"A defendant's constitutional right to be present at every stage of his or her criminal proceeding is grounded in the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment," and "is also mandated by Fed.R.Crim.P. 43(a)." *United States v. Toliver*, 330 F.3d 607, 611 (3d Cir. 2003). In terms of due process, a criminal defendant has "the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *United States v. Bertoli*, 40 F.3d 1384, 1397 (3d Cir. 1994) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). Rule 43 provides, with limited exceptions, that "the defendant must be present at…every trial stage, including jury impanelment and the return of the verdict," and at "sentencing." Fed. R. Crim. P. 43(a)(2), (a)(3).

Defendants can waive their presence expressly or by implication. *United States v. Gagnon*, 470 U.S. 522, 528-29 (1985) (per curiam); *Taylor v. United States*, 414 U.S. 17, 19-20 (1973) (per curiam). For example, a defendant's "'failure…to invoke his right to be present under [Rule 43] at a conference which he knows is

371

taking place between the judge and a juror in chambers constitutes a valid waiver of that right.'" *United States v. Johnson*, 677 F.3d 138, 142 (3d Cir. 2012) (quoting *Gagnon*, 470 U.S. at 529).

Rule 43 specifically provides that "[a] defendant who was initially present at trial…waives the right to be present" when, *inter alia*, he "is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial." Fed. R. Crim. P. 43(c)(1)(A). "[I]n a noncapital case," waiver also arises "when the defendant is voluntarily absent during sentencing." Fed. R. Crim. P. 43(c)(1)(B). As the Ninth Circuit has explained, Rule 43's reference to "sentencing" is narrow; "[l]ogically and structurally," it "connotes the proceeding when judgment is pronounced and sentence is imposed, not the proceeding during which it is determined whether the defendant is death eligible and what sentence to recommend." *Mitchell*, 502 F.3d at 988 & n.21. The penalty phase of a capital case "is plainly a 'trial stage,'" and because waivers during that stage are not limited to noncapital cases, a capital defendant may waive his presence at a penalty-phase proceeding. *Id.* at 988.

### 1. Bowers's absence during the evidence viewing was not reversible plain error.

Bowers waived any right to be present at the evidence viewing, and the right did not attach in the first place. At minimum, those conclusions are not plainly wrong. *Olano*, 507 U.S. at 734. Bowers cannot meet the third and fourth plain-error prongs either. *Id.* at 734-36.

a. Bowers waived his presence because, while he was in the courtroom, defense counsel twice informed the district court that Bowers would "go back with the marshals," *i.e.*, not be present, when the jury was viewing the firearm evidence. App.13337, 13339. That may have been a tactical decision to keep Bowers away while the jury viewed up close the weapons he used and carried during his attack. Regardless, counsel and Bowers knew the jury would be viewing evidence in the courtroom and chose for Bowers to leave beforehand. This exceeds the scenario where a defendant fails to object contemporaneously to his absence from a Rule 43 proceeding, which itself constitutes waiver. *See Johnson*, 677 F.3d at 141-42 (sidebar during voir dire); *Bertoli*, 40 F.3d at 1398-99 (*ex parte* interview of jurors); *United States v. Provenzano*, 620 F.2d 985, 997-98 (3d Cir. 1980) (conference on jurors' marijuana smoking). At the very least, Bowers cannot establish that his voluntary absence was plainly not a waiver. That dooms his unpreserved claim. *Olano*, 507 U.S. at 734.

373

Bowers's arguments to the contrary lack merit. Quoting *Lewis v. United States*, 146 U.S. 370, 372 (1892), he asserts (Br.433) that a defendant lacks "power" to waive his trial presence, but that contradicts Supreme Court precedent holding that a defendant can waive presence through his conduct. *See, e.g.*, *Illinois v. Allen*, 397 U.S. 337, 342-43 (1970) (noting that "broad dicta" in *Lewis* has been "expressly rejected"). He asserts (Br.434) that an express, on-the-record waiver was required, even though this Court repeatedly has stated that "'[a] defendant need not be warned expressly of his or her rights under Rule 43, nor must a waiver exist on the record [because] the simple failure to assert the right constitutes a waiver.'" *Johnson*, 677 F.3d at 142 (quoting *Bertoli*, 40 F.3d at 1399); *accord Gagnon*, 470 U.S. at 528-29. And he asserts (Br.433) that waivers are impermissible in capital cases, even though Rule 43(c)(1)(A) does not distinguish between capital and noncapital cases when a defendant voluntarily absents himself during trial. *See Mitchell*, 502 F.3d at 987-88 (explaining that a 1975 amendment to Rule 43 removed such a distinction and holding that a capital defendant waived his penalty-phase presence); *see also Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc) (surveying Supreme Court law and

374

finding "no principled basis for limiting to noncapital offenses" a defendant's ability to waive "the right of presence").[71]

b. Independent of waiver, the right to be present did not attach—at least not plainly—to the jury's courtroom viewing of evidence.

The viewing was part of the jury's internal deliberations. Absent safety concerns, the jury would have examined the firearms alone in the jury room, App.13334-37, just as the court sent other trial exhibits to the jury room for review during deliberations, App.13133-34. *See, e.g.*, *United States v. Chadwell*, 798 F.3d 910, 914 (9th Cir. 2015) (transmission of video exhibit to jury room did not implicate Rule 43(a)); *Dallago v. United States*, 427 F.2d 546, 552-53 (D.C. Cir. 1969) (transmission of exhibits to jury room did not violate Rule 43 or Sixth Amendment). This was not an "evidentiary proceeding" (Br.433); the firearms already had been admitted into evidence, the case was submitted to the jury, and communication with the jury was not authorized during the viewing. Indeed, counsel sat in the gallery as spectators. App.13337, 13339.

Because Bowers's presence would not have contributed to the jury's viewing of the evidence, his absence did not "frustrate the fairness of the

---

[71] Bowers cites a passing, general statement about Rule 43 waivers in a government pretrial pleading, which concerned his absence from a suppression hearing and did not implicate Rule 43. Br.435 (citing DE608:6).

proceedings." *Bertoli*, 40 F.3d at 1397 (quotation omitted); *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow") (quotation omitted).  Bowers's extended arguments about the significance of the already-admitted firearm evidence, Br.427-29, 431, are therefore beside the point.  *See Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 108-18 (1934) (jury's crime-scene viewing outside defendant's presence did not violate due process, even though counsel had pointed out features of scene to jury; defendant's presence would not "have been an aid to his defense").

Bowers does not cite any case recognizing a defendant's right to be present at a jury's courtroom viewing of evidence during deliberations.  Br.431-33.  In an analogous circumstance, the D.C. Circuit held that the replaying of audiotape evidence for the jury during deliberations, with counsel present but not the defendant, "was not a stage of trial implicating the confrontation clause or Rule 43(a)," or due process.  *United States v. Sobamowo*, 892 F.2d 90, 97 (D.C. Cir. 1989); *see also United States v. Holton*, 116 F.3d 1536, 1546 (D.C. Cir. 1997) (applying *Sobamowo*).  To be sure, the Ninth Circuit requires the defendant's presence at a courtroom replaying of audiotapes during deliberations.  *See Chadwell*, 798 F.3d at 915-16 (discussing cases).  But given the absence of on-point authority from this Court or the Supreme Court, any tension or conflict

between the analogous precedents of other circuits shows only that Bowers cannot establish a clear or obvious right to be present during the jury's viewing of firearm evidence. *See United States v. Abrams*, 165 F.4th 784, 810 (3d Cir. 2026); *United States v. Cruz*, 757 F.3d 372, 387 n.11 (3d Cir. 2014).

c. Under the third plain-error prong, Bowers cannot "make a specific showing of prejudice," *Olano*, 507 U.S. at 735, because his presence would not have changed anything that happened during the viewing.

Bowers does not independently challenge the denial of his mistrial motion. Br.9, 60, 426-27. Instead, he tries to import the alleged prejudice he suffered from the Marshal's brief but unauthorized exchange with jurors into the prejudice analysis of his courtroom absence. Br.436-37. Because Bowers cannot show that his absence caused the exchange, any prejudice from the exchange is irrelevant to the right-to-presence claim.

In all events, the district court eliminated any risk of prejudice from the Marshal's brief exchange with jurors by instructing the jury to "disregard" it "completely," shortly after the jury resumed deliberations. App.13342, 13345. The defense did not contest the adequacy of that instruction, App.13345, and the jury is presumed to have followed it, *Richardson*, 481 U.S at 206. Regardless, Bowers exaggerates the significance of the Marshal's response to jurors about loading the rifle (Br.436); he simply said that it was loaded from the bottom and

377

side.  App.13343.  Bowers's decision not to appeal the denial of his mistrial motion speaks to the lack of prejudice.

Bowers also errs in alleging (Br.439) that his courtroom absence suggested to the jury that he needed to be separated from dangerous weapons.  If anything, the *defense* may have believed that Bowers's presence during the viewing of lethal weapons would be bad for "optics."  Br.439.  Regardless, Bowers supplies no reason for finding that jurors disobeyed the court's instructions "to base [their] verdict solely upon the testimony and the evidence in the case" and to not let "fear" influence them.  App.13126-27.

d. Nor can Bowers show that failing to correct any prejudicial plain error would satisfy *Olano*'s fourth plain-error prong.  507 U.S. at 736-37.  Overwhelming evidence justified the death sentences, the viewing was a brief event during a months-long trial, and it was the defense that caused Bowers's courtroom absence.  Vacatur is not warranted.  *See Johnson v. United States*, 520 U.S. 461, 470 (1997) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.") (quotations omitted).

### 2.    Bowers's alleged absence from the Marshal's questioning was not reversible plain error.

Bowers concedes that "it is not clear from the record whether he was present" during the questioning of the Marshal.  Br.440; *see* App.13342-44.  He

errs in arguing that remand for a determination on that point is warranted.

a. Because his claim is forfeited, Bowers "has the burden of establishing each of the four requirements for plain-error relief." *Greer*, 593 U.S. at 508. The ambiguity in the record as to his presence during the questioning precludes him from showing a clear or obvious violation of his right to be present. *See, e.g.*, *United States v. Zamichieli*, No. 18-3053, 2022 WL 17484324, *5 & n.10 (3d Cir. Dec. 7, 2022) (unpublished) (where transcript did not indicate whether defendant was present for court's response to jury note, defendant's bare assertion of absence did not satisfy his burden on plain-error review); *In re Sealed Case*, 356 F.3d 313, 320 (D.C. Cir. 2004) (ambiguity in record precluded defendant from showing a "plain" error).

b. Bowers also has not established that a right to be present plainly attached. The brief questioning of the Marshal consisted of two substantive questions by the court and one follow-up question by the government. App.13342-44. The Marshal's account was undisputed. *Cf. Provenzano*, 620 F.2d at 998 (finding no right to be present at conference on potential dismissal of jurors for marijuana use; the "facts were undisputed" and Rule 43's question-of-law exception applied).

c. Relevant to the third plain-error prong, Bowers has not shown that his alleged absence affected the Marshal's examination. Bowers's counsel was

379

present to protect his interests and determined that more questioning was unnecessary. Counsel then zealously advocated for a mistrial based on the Marshal's exchange with jurors. App.13342-44. Even if Bowers were absent during the questioning, it did not affect his substantial rights. *See Bertoli,* 40 F.3d at 1399 n.8 (finding no prejudice where it was "unclear what [defendant] would have gained by being present" at court's interview of jurors); *United States v. Williams*, 591 F. App'x 78, 94-95 (3d Cir. 2014) (defendant failed, on plain-error review, to show prejudice from court's response to jury's request where defense counsel was present).

d. Finally, the brevity of the questioning, defense counsel's presence and advocacy, and the evidence supporting the death sentences preclude Bowers from showing that relief is warranted under the fourth plain-error prong. *See, e.g.*, *Zamichieli*, 2022 WL 17484324, *5.

## XV. THE CUMULATIVE-ERROR DOCTRINE DOES NOT APPLY.

Bowers summarily contends (Br.441) that the cumulative effect of the errors alleged on appeal warrants relief. That perfunctory argument is meritless. The double jeopardy violations are cured by vacating one set of capital counts. No other errors occurred, so there is nothing to cumulate. *See Copple*, 24 F.3d at 547 n.17. At most, any errors were "nothing more than minor aberrations in a long trial," *ibid.*, and do not warrant relief.

## CONCLUSION

For the foregoing reasons, Bowers's sentences on Counts 23 through 33 should be vacated and the case remanded for dismissal of those counts.  In all other respects, the judgment of conviction and sentences should be affirmed, including the death sentences on Counts 1 through 11.

Respectfully submitted,

A. TYSEN DUVA
  Assistant Attorney General
JOSH A. GOLDFOOT
  Deputy Asst. Attorney General
BARRY K. DISNEY
  Trial Attorney


s/ John-Alex Romano
JOHN-ALEX ROMANO, Attorney
  U.S. Department of Justice
  Criminal Division
  950 Pennsylvania Ave, NW
  Washington, DC 20530
  (202) 353-0249
  John-Alex.Romano@usdoj.gov

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Dep. Asst. Attorney General
DAVID N. GOLDMAN
  Acting Deputy Appellate Chief
JOSHUA R. ZUCKERMAN
  Attorney


s/ Janea L. Lamar
JANEA L. LAMAR, Attorney
  U.S. Department of Justice
  Civil Rights Division
  Ben Franklin Station
  Washington, D.C. 20044-4403
  (202) 532-3526
  Janea.Lamar@usdoj.gov

TROY RIVETTI
  United States Attorney
SOO C. SONG
  Special Assistant U.S. Attorney
LAURA IRWIN
  Appellate Chief
  Western District of Pennsylvania

# CERTIFICATE OF COMPLIANCE

1.      On April 14, 2026, the Court granted the government's motion for permission to file an answering brief of up to 85,000 words.  This brief complies with that Order because it contains 83,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in Calisto MT 14-point font in text and footnotes.

3.      The digital version of the brief electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

4.      This brief has been scanned for viruses by CrowdStrike Falcon Sensor (version 7.33.20505.0), and according to that program, is free of viruses.

**Dated:  April 15, 2026**

/s/John-Alex Romano

JOHN-ALEX ROMANO, Attorney
U.S. Department of Justice
Criminal Division

## CERTIFICATE OF SERVICE

Undersigned counsel of record certifies that all participants in this case are registered users of the Court's electronic case filing system and that the foregoing Answering Brief for the United States was this day delivered by electronic (CM/ECF) case filing to the Clerk of the Court and to all counsel for defendant-appellant.  Additionally, ten paper copies of the government's Answering Brief were sent to the Clerk of the Court by Federal Express.

**DATED:**    **APRIL 15, 2026**

/s/John-Alex Romano

JOHN-ALEX ROMANO, Attorney
U.S. Department of Justice
Criminal Division