No. 24-9002

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

ROBERT BOWERS,

Defendant/Appellant.

On Appeal from the United States District Court
for the Western District of Pennsylvania, no. 2:18-cr-292-RJC
(The Honorable Robert J. Colville)

## REPLY BRIEF OF APPELLANT

SEAN J. BOLSER
Federal Capital Appellate
Resource Counsel Project
Federal Defenders of New
York
One Pierrepont Plaza, 16th
Floor
Brooklyn, NY 11201
(718) 330-1200 (tel.)
(718) 855-0760 (fax)
Sean_Bolser@fd.org

JON M. SANDS
Federal Public Defender
SARAH S. GANNETT
Assistant Federal Public
Defender
250 North 7th Avenue,
Suite 600
Phoenix, AZ 85007
(602) 382-2700 (tel.)
(602) 382-2800 (fax)
Sarah_Gannett@fd.org

CUAUHTEMOC ORTEGA
Federal Public Defender
MARGARET A. FARRAND
Deputy Federal Public
Defender
321 East 2nd Street
Los Angeles, CA 90012
(213) 894-2854 (tel.)
(213) 894-0081 (fax)
Margaret_Farrand@fd.org

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

POINTS RELATED TO THE INDICTMENT

I.   THE SUBMISSION OF ELEVEN COUNTS TO THE JURY
     FOR SENTENCING IN VIOLATION OF DOUBLE
     JEOPARDY REQUIRES REMAND FOR A NEW PENALTY
     PROCEEDING. ...........................................................................2

     A.   Remand is required for vacatur of eleven convictions and
          death sentences. ......................................................................4

     B.   Remand is also required for jury resentencing.......................5

          1.   The erroneous capital counts may have contributed
               to Bowers's death sentences on other counts. ...............7

          2.   This Court should not dismiss the prejudicial effects
               of the eleven erroneous counts based on the
               government's unwarranted assumption that a death
               sentence was a foregone conclusion. ...........................16

               a.   Jurors made substantial mitigation findings.....17

               b.   The mitigation findings here were far more
                    substantial than in cases where courts have
                    found constitutional harmless error. ..................22

               c.   Jurors impose life sentences in highly
                    aggravated cases...............................................24

II.  BOWERS'S CAPITAL § 924(j) CONVICTIONS ARE INVALID
     BECAUSE § 247(a)(2) IS NOT A PREDICATE CRIME-OF-
     VIOLENCE..................................................................................26

# TABLE OF CONTENTS

**Page**

A. Religious obstruction under § 247(a)(2) is not a crime-of-violence because it can be committed with psychological force.................................................................................27

B. Religious obstruction under § 247(a)(2) also is not a crime-of-violence because the required force can be used or threatened against one's *own* "person or property." ........31

C. Section 247(d)(1)'s "death results" element does not supply the necessary use of "physical force" against the "person . . . of another." ........................................................35

D. Bowers's erroneous convictions and death sentences on the eleven capital § 924 charges may have contributed to his death sentences on other counts, requiring resentencing on them. ...........................................................39

III. BOWERS'S UNCONSTITUTIONAL PROSECUTION FOR RELIGIOUS HATE CRIMES UNDER 18 U.S.C. § 249 REQUIRES DISMISSAL OF THOSE CONVICTIONS AND RESENTENCING ON THE REMAINING CAPITAL COUNTS. ......................................................................40

A. The government fails to justify the unprecedented use of the Thirteenth Amendment's prohibition on slavery to authorize prosecution for a hate crime based on religious practices and beliefs.............................................40

B. Because Bowers's sentences on other charges may have been influenced by the invalid § 249 convictions, he should be resentenced on all counts. ...................................46

IV. THE RELIGIOUS-OBSTRUCTION STATUTE IS AN INVALID EXERCISE OF CONGRESS'S COMMERCE CLAUSE AUTHORITY, BOTH FACIALLY AND AS APPLIED IN THIS CASE. ...............................................................49

# TABLE OF CONTENTS

**Page**

A.  Section 247(a)(2) is facially unconstitutional because it regulates purely non-economic, intrastate activity................50

B.  Section 247(a)(2) is unconstitutional as applied to Bowers's conduct. ................................................54

    1.  Bowers's pre-offense Internet and cell phone use did not make his offense "in" interstate commerce. ..........55

    2.  Bowers's use of items previously moved between states did not make his offense "in" interstate commerce.................................57

    3.  Bowers's offense did not "substantially affect" interstate commerce because its economic impacts were not independently substantial............................61

C.  The district court prejudicially erred in instructing the jury on § 247(b)'s jurisdictional element. ...............64

## POINTS RELATED TO JURY SELECTION

V.  THE COURT VIOLATED BOWERS'S FIFTH AND SIXTH AMENDMENT RIGHTS BY EMPANELING A BIASED JUROR WHO AUTHORIZED AND SUPERVISED EXECUTIONS IN CHINA..........................................66

A.  Juror 119 was impliedly biased, warranting vacatur or—at minimum—a remand for further factual development. ..68

    1.  The record is insufficiently developed on the extent of Juror 119's involvement in executions, warranting—at minimum—remand for clarification. ................................................69

    2.  The district court misapprehended the bias inquiry and never determined bias. ........................71

**Page**

3. This Court's caselaw shows Juror 119 was impliedly biased. ........................................................................ 72

B. Juror 119 was actually biased. ............................................. 80

1. The district court did not consider actual bias. ........... 80

2. Juror 119's statements show she was actually biased against life imprisonment and in favor of death. ....................................................................... 80

C. Conclusion ........................................................................... 86

VI. THE DISTRICT COURT'S FAILURE TO ENGAGE BOWERS'S EVIDENCE OF DISCRIMINATION IN THE GOVERNMENT'S PEREMPTORY STRIKES OR MAKE A RECORD FOR THIS COURT TO ASSESS ITS DENIAL OF BOWERS'S *BATSON* CHALLENGES REQUIRES REVERSAL OR REMAND ........................................................................... 87

A. This Court should remand Bowers's case because there is no record on which to review the district court's denial of Bowers's *Batson* challenges. ........................................... 88

B. The district court needlessly denied Bowers sufficient time to review the jurors' questionnaires and voir dire transcripts to rebut the government's reasons for its strikes. ................................................................................. 94

C. The review of the evidence bearing on the government's intent in making its peremptory strikes should be conducted in the first instance in the trial court. ................. 96

VII. JURORS 159 AND 164 STATED THEY COULD VOTE TO SENTENCE BOWERS TO DEATH AND WERE NOT SUBSTANTIALLY IMPAIRED IN THEIR ABILITY TO DO SO, MAKING THEIR DISMISSALS FOR CAUSE REVERSIBLE ERROR. ............................................................... 99

# TABLE OF CONTENTS

A.     Juror 159 was willing to deviate from her religious scruples against killing to vote for a death sentence for Bowers if the evidence warranted. ...................................... 100

B.     Juror 164's views permitted him to vote for death in Bowers's case. ............................................................... 104

## POINTS RELATED TO SENTENCING

VIII. THE COURT VIOLATED THE CONSTITUTION, RULES OF EVIDENCE, AND FDPA BY ADMITTING HISTORICAL AND RELIGIOUS EVIDENCE UNRELATED TO BOWERS OR THE OFFENSE. ................................................................. 106

A.     The government's evidence framed Bowers's crime as part of a historical conflict between antisemitism and Judaism. ............................................................................. 107

B.     Braniff's testimony was cumulative and held Bowers responsible for others' acts and beliefs. ........................... 110

     1.     Braniff's testimony was cumulative........................... 110

     2.     Braniff's testimony held Bowers responsible for others' acts and beliefs............................................. 113

C.     Rabbi Myers's testimony about Jewish history was irrelevant and violated the Eighth Amendment, due process, and § 3593. .......................................................... 117

D.     Testimony about religious items was irrelevant and prejudicial. .................................................................... 119

E.     Burstin's testimony was irrelevant. ................................. 124

F.     The errors were not harmless............................................ 128

**Page**

IX.   THE COURT VIOLATED DUE PROCESS, THE EIGHTH
       AMENDMENT, AND THE FDPA BY ADMITTING
       IMPROPER VICTIM IMPACT EVIDENCE. ............................... 131

       A.   Comparative victim worth and religiosity evidence ........... 131

            1.   The errors are preserved. .......................................... 131

            2.   The court erred by admitting the testimony. ............ 134

       B.   Hardships unrelated to the crime ...................................... 137

       C.   Victim impact testimony from surviving witnesses ........... 141

       D.   Statements about "s[peaking] for the victims" .................. 150

            1.   "Don't forget the dead. The ones who couldn't speak
                 for themselves." ....................................................... 151

            2.   Victims' family members "came in and they bore
                 witness on behalf of those 11 men and women who
                 cannot speak for themselves." ................................... 152

       E.   Vacatur is warranted. ....................................................... 153

X.    THE GOVERNMENT'S USE OF BOWERS'S STATEMENTS
       TO HIS EXPERTS TO PROVE LACK OF REMORSE AND
       OTHER NON-STATUTORY AGGRAVATING FACTORS,
       COLLATERAL TO HIS MENTAL-HEALTH MITIGATION,
       VIOLATED *SIMMONS*. ............................................................ 154

XI.   THE COURT CANNOT HAVE "NEAR CERTITUDE" IN THE
       VERDICT GIVEN THE DISTRICT COURT'S EXCLUSION
       OF THE AVOIDING-MARTYRDOM MITIGATING FACTOR
       AND BOWERS'S OFFER TO PLEAD, WHICH WERE
       PROPER REBUTTAL TO THE GOVERNMENT'S CASE AND
       AFFIRMATIVE MITIGATION. ................................................... 161

# TABLE OF CONTENTS

**Page**

A.  Both proposed mitigating factors were within the scope of rebuttal because the government's case implicated Bowers's failure to plead guilty and the likelihood he would promote his hateful messages during a life sentence. ........................................................................ 162

    1.  The avoiding-martyrdom mitigating factor responded to the government's arguments suggesting the only way to control Bowers was with a death sentence .......................................................... 164

    2.  The offer to plead responded to the government's arguments suggesting Bowers was solely responsible for the trial. ............................................ 167

B.  Both proposed mitigating factors fit comfortably within statutory and constitutional definitions of mitigation. ....... 169

    1.  The avoiding-martyrdom mitigating factor reflected Bowers's background and characteristics and the circumstances of the offense. .................................... 170

    2.  The offer-to-plead mitigating factor reflected Bowers's background and characteristics and the circumstances of the offense. .................................... 172

C.  Failure to submit the mitigating factors prejudiced Bowers. ............................................................................... 175

    1.  Failure to submit the avoiding-martyrdom mitigating factor was not harmless beyond a reasonable doubt. ..................................................... 176

    2.  Failure to submit the offer-to-plead mitigating factor was not harmless beyond a reasonable doubt. 178

# TABLE OF CONTENTS

**Page**

XII.  THE GOVERNMENT'S EFFORT TO EXPLAIN AWAY THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT FAILS, AND REVERSAL FOR RESENTENCING IS REQUIRED. ...................................................................180

    A.    The prosecutor's quantitative weighing approach cannot be explained away. .............................................181

    B.    The prosecutor's argument that jurors' "job" was to "hold [Bowers] accountable to the fullest extent of the law" improperly suggested a death sentence was required. ......185

    C.    The prosecutor improperly demeaned mitigation unconnected to the crimes. ...............................................187

    D.    Bowers was prejudiced by the prosecutor's improper rebuttal arguments. .............................................189

XIII. THE DISTRICT COURT'S SENTENCING-PHASE SHACKLING OF BOWERS, BASED ON CONTESTED BUT UNDISCLOSED ALLEGATIONS WITHOUT A HEARING, REQUIRES REVERSAL OR REMAND FOR AN EVIDENTIARY HEARING. ........................................190

    A.    Factual disputes exist that required the district court to hold an evidentiary hearing before ordering Bowers shackled.. ................................................................191

    B.    The district court's belated disclosures, long after the harm was done, prevented the defense from investigating and challenging the (hearsay) allegations on which it relied. ................................................................193

    C.    The government cannot prove beyond a reasonable doubt that Bowers was not harmed by shackling him in front of the sentencing jurors. ...........................................195

**Page**

XIV. THE GOVERNMENT RECOGNIZED THAT RULE 43 AND THE CONSTITUTION REQUIRED BOWERS'S PRESENCE AT ALL CRITICAL PHASES OF TRIAL AND THAT ANY ABSENCE MUST BE KNOWING, VOLUNTARY, AND STATED ON THE RECORD. ....................................................199

   A.    There was no valid waiver of Bowers's presence at the evidence viewing or the hearing involving the Marshal. ...200

   B.    The government is incorrect that Bowers's right to presence did not attach because the weapons were already admitted in evidence. ............................................202

   C.    The government has not demonstrated harmlessness.......204

   D.    If plain error applies, it is satisfied. ...................................206

   E.    *Remmer* independently requires reversal or remand.........207

XV.  CUMULATIVE ERROR..............................................................209

CONCLUSION ...................................................................................209

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) ........................................................ 56

*Abdul-Kabir v. Quarterman,*
  550 U.S. 233 (2007) ...................................................... 183

*Adams v. Texas,*
  448 U.S. 38 (1980) ........................................................ 105

*Am. Home Assur. Co. v. Sunshine Supermarket, Inc.,*
  753 F.2d 321 (3d Cir. 1985) ........................................ 119

*Antwine v. Delo,*
  54 F.3d 1357 (8th Cir. 1995) ................................ 102, 103

*Azar v. Allina Health Servs.,*
  587 U.S. 566 (2019) ...................................................... 28

*Ball v. United States,*
  470 U.S. 856 (1985) ........................................................ 5

*Barnhart v. Thomas,*
  540 U.S. 20 (2003) ........................................................ 32

*Barrett v. United States,*
  607 U.S. 128 (2026) ........................................................ 4

*Batson v. Kentucky,*
  476 U.S. 79 (1986) .................................................... 89, 98

*Beard v. Stevens,*
  551 U.S. 1111 (2007) .................................................... 104

*Biden v. Texas,*
  597 U.S. 785 (2022) ...................................................... 33

*Blockburger v. United States,*
  284 U.S. 299 (1932) ........................................................ 4

# TABLE OF AUTHORITIES

**Page(s)**

*Booth v. Maryland,*
482 U.S. 496 (1987) ..................................................................... 139

*Borden v. United States,*
593 U.S. 420 (2021) ....................................................................... 36

*Boyde v. California,*
494 U.S. 370 (1990) .............................................................. 13, 167

*Boykin v. Family Dollar Stores,*
3 F.4th 832 (6th Cir. 2021) ....................................................... 192

*Brooks v. Kemp,*
762 F.2d 1383 (11th Cir. 1985) ................................................... 17

*Brown v. United States,*
356 U.S. 148 (1958) ................................................................... 155

*Calhoun v. United States,*
384 F.2d 180 (5th Cir. 1967) ..................................................... 118

*Campbell v. Wood,*
18 F.3d 662 (9th Cir. 1994) ....................................................... 201

*Cargle v. Mullin,*
317 F.3d 1196 (10th Cir. 2003) ................................................. 209

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) ............................................................... 55, 56

*Cazares v. United States,*
2021 WL 1153040 (C.D. Cal. Feb. 15, 2021) .............................. 29

*Chambers v. United States,*
555 U.S. 122 (2009) ............................................................... 37, 38

*Chapman v. California,*
386 U.S. 18 (1967) ........................................... 3, 16, 18, 130

*Chevron U.S.A., Inc. v. Echazabal,*
536 U.S. 73 (2002) ..................................................................... 145

# TABLE OF AUTHORITIES

**Page(s)**

*Clark v. Suarez Martinez,*
543 U.S. 371 (2005) ........................................................ 43

*Coombs v. Diguglielmo,*
616 F.3d 255 (3d Cir. 2010) ............................. 89, 92, 93, 99

*Coulter v. Gilmore,*
155 F.3d 912 (7th Cir. 1998) ........................................ 92

*Counterman v. Colorado,*
600 U.S. 66 (2023) ........................................................ 34

*Deck v. Missouri,*
544 U.S. 622 (2005) ...................................................... 190

*Diaz v. United States,*
223 U.S. 442 (1912) ...................................................... 201

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) ...................................................... 157

*Flowers v. Mississippi,*
588 U.S. 284 (2019) ................................................. 97, 98

*Floyd v. Filson,*
949 F.3d 1128 (9th Cir. 2020) ............................. 140, 141

*Gen. Refractories Co. v. First State Ins.. Co.,*
855 F.3d 152 (3d Cir. 2017) ........................................ 31

*Gibbs v. Babbitt,*
214 F.3d 483 (4th Cir.2000) ........................................ 61

*Gonzales v. Raich,*
545 U.S. 1 (2005) ............................................. 50, 61, 62, 63

*Govt. of the Virgin Islands v. Williams,*
476 F.2d 771 (3d Cir. 1973) ........................................ 74

*Gov't of the Virgin Islands v. Joseph,*
964 F.2d 1380 (3d Cir. 1992) ................... 116, 131, 133, 138

**Page(s)**

*Gregg v. Georgia,*
 428 U.S. 153 (1976) ...................................................................... 157

*Gulf Oil Corp. v. Copp Paving Co., Inc.,*
 419 U.S. 186 (1974) ....................................................................... 56

*Hall v. Luebbers,*
 341 F.3d 706 (8th Cir. 2003) ...................................................... 179

*Hopt v. Utah,*
 110 U.S. 574 (1884) ..................................................................... 208

*Huber v. Taylor,*
 469 F.3d 67 (3d Cir. 2006) ............................................................ 31

*In re Reliant Energy Channelview LP,*
 594 F.3d 200 (3d Cir. 2010) .......................................................... 30

*In re Sealed Case,*
 356 F.3d 313 (D.C. Cir. 2004) .................................................... 208

*In re Terrorist Bombings of U.S. Embassies in East Africa,*
 552 F.3d 93 (2d Cir. 2008) ............................................................ 25

*Jackson v. United States,*
 395 F.2d 615 (D.C. Cir. 1968) ...................................................... 76

*Jennings v. Rodriguez,*
 583 U.S. 281 (2018) ....................................................................... 43

*Jermyn v. Horn,*
 266 F.3d 257 (3d Cir. 2001) .......................................................... 19

*Jones v. Alfred H. Mayer Co.,*
 392 U.S. 409 (1968) ....................................................................... 40

*Jones v. United States,*
 529 U.S. 848 (2000) ................................................................. 58, 59

*Kansas v. Cheever,*
 571 U.S. 87 (2013) ...................................................................... 155

*Kelly v. South Carolina,*
534 U.S. 246 (2002) ................................................................. *passim*

*Kennedy v. Louisiana,*
554 U.S. 407 (2008) ...................................................................... 146

*Lebron v. Nat'l R.R. Passenger Corp.,*
513 U.S. 374 (1995) ........................................................................ 30

*Lesko v. Lehman,*
925 F.2d 1527 (3d Cir. 1991) ................................................ 158, 159

*Lewis v. United States,*
146 U.S. 370 (1892) ...................................................................... 208

*Littlejohn v. Royal,*
875 F.3d 548 (10th Cir. 2017) ...................................................... 197

*Littlejohn v. Trammel,*
704 F.3d 817 (10th Cir. 2013) ...................................................... 209

*Lockett v. Ohio,*
438 U.S. 586 (1978) ...................................................... 125, 157, 161

*Marshall v. Cathel,*
428 F.3d 452 (3d Cir. 2005) ........................................................ 6, 7

*Marshall v. United States,*
360 U.S. 310 (1959) ........................................................................ 81

*Martini v. Hendricks,*
348 F.3d 360 (3d Cir. 2003) ........................................................ 104

*Mathis v. United States,*
579 U.S. 500 (2016) .................................................................. 37, 38

*McElroy v. United States,*
455 U.S. 642 (1982) ........................................................................ 55

*McGautha v. California,*
402 U.S. 183 (1971) .............................................................. 156, 157

# TABLE OF AUTHORITIES

**Page(s)**

*Miller v. Webb,*
385 F.3d 666 (6th Cir. 2004) ........................................................... 82

*Miller-El v. Dretke,*
545 U.S. 231 (2005) ........................................................... 99

*Murphy v. Florida,*
421 U.S. 794 (1975) ........................................................... 82

*Nat.'l Fed. of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ........................................................... 56

*Old Chief v. United States,*
519 U.S. 172 (1997) ........................................ 121, 122, 123

*Outten v. Kearney,*
464 F.3d 401 (3d Cir. 2006) ........................................................... 19

*Owens v. Guida,*
549 F.3d 399 (6th Cir. 2008) ........................................................... 174

*Palmerin v. City of Riverside,*
794 F.2d 1409 (9th Cir. 1986) ........................................ 119, 120

*Patton v. Yount,*
467 U.S. 1025 (1984) ........................................................... 82

*Payne v. Tennessee,*
501 U.S. 808 (1991) ........................................ 126, 138, 139, 150, 151

*Pitchford v. Cain,*
608 U.S. __, 2026 WL 1485608 (May 28, 2026) ................................ 95

*Porter v. McCollum,*
558 U.S. 30 (2009) ........................................ 19, 22

*Remmer v. United States,*
347 U.S. 227 (1954) ........................................................... 205

*Richardson v. Marsh,*
481 U.S. 200 (1987) ........................................ 12, 183, 204

# TABLE OF AUTHORITIES

**Page(s)**

*Riley v. Cockrell,*
  339 F.3d 308 (5th Cir. 2003) ....................................................... 179

*Riley v. Taylor,*
  277 F.3d 261 (3d Cir. 2001) ..................................................... *passim*

*Rompilla v. Beard,*
  545 U.S. 374 (2005) ..................................................................... 19

*Rompilla v. Horn,*
  2000 WL 964750 (E.D. Pa. July 11, 2000) ........................................ 20

*Roper v. Simmons,*
  543 U.S. 551 (2005) .................................................................... 100

*Scarborough v. United States,*
  431 U.S. 563 (1977) ..................................................................... 57

*Sears v. Upton,*
  561 U.S. 945 (2010) ..................................................................... 19

*Shaare Tefila Congregation v. Cobb,*
  481 U.S. 615 (1987) ................................................................ 40, 44

*Sides v. Cherry,*
  609 F.3d 576 (3d Cir. 2010) ......................................................... 191

*Simmons v. South Carolina,*
  512 U.S. 154 (1994) .............................................................. 161, 165

*Simmons v. United States,*
  390 U.S. 377 (1968) .................................................................... 155

*Snyder v. Louisiana,*
  552 U.S. 472 (2008) ..................................................................... 89

*Snyder v. Massachusetts,*
  291 U.S. 97 (1934) ..................................................................... 202

*St. Francis Coll. v. Al-Khazraji,*
  481 U.S. 604 (1987) ................................................................ 41, 44

# TABLE OF AUTHORITIES

**Page(s)**

*Stevens v. Beard,*
  288 F. App'x 4 (3d Cir. 2008) ........................................................ 104

*Stevens v. Horn,*
  187 F. App'x 205 (3d Cir. 2006) ..................................................... 104

*Stokeling v. United States,*
  586 U.S. 73 (2019) ........................................................................ 29

*Sullivan v. Louisiana,*
  508 U.S. 275 (1993) ...................................................................... 17

*Szuchon v. Lehman,*
  273 F.3d 299 (3d Cir. 2001) ......................................................... 101

*Taylor v. United States,*
  414 U.S. 17 (1973) ...................................................................... 201

*Taylor v. United States,*
  579 U.S. 301 (2016) ........................................................... 61, 62, 63

*TD Bank N.A. v. Hill,*
  928 F.3d 259 (3d Cir. 2019) ........................................................... 31

*Tennard v. Dretke,*
  542 U.S. 274 (2004) ...................................................................... 18

*Tinsley v. Borg,*
  895 F.2d 520 (9th Cir. 1990) .................................................... 74, 75

*Tison v. Arizona,*
  481 U.S. 137 (1987) .................................................................... 125

*Turner v. Murray,*
  476 U.S. 28 (1986) .......................................................................... 6

*United States ex rel De Vita v. McCorkle,*
  248 F.2d 1 (3d Cir. 1957) .............................................................. 69

*United States v. Abreu,*
  32 F.4th 271 (3d Cir. 2022) ........................................................... 30

*United States v. Achiekwelu,*
112 F.3d 747 (4th Cir. 1997) ........................................................ 118

*United States v. Alderman,*
565 F.3d 641 (9th Cir. 2009) ......................................................... 51

*United States v. Allen,*
341 F.3d 870 (9th Cir. 2003) ............................................... 112, 113

*United States v. Alvarez,*
519 F.2d 1036 (3d Cir. 1975) ....................................................... 156

*United States v. Aquart,*
912 F.3d 1 (2d Cir. 2018) ............................................................. 184

*United States v. Ballinger,*
395 F.3d 1218 (11th Cir. 2005) ................................................ 52, 64

*United States v. Barrett,*
496 F.3d 1079 (10th Cir. 2007) ................................................... 145

*United States v. Bates,*
46 F. App'x 104 (3d Cir. 2002) .................................................... 108

*United States v. Bell,*
819 F.3d 310, 322 (7th Cir. 2016) ............................................... 193

*United States v. Benkahla,*
530 F.3d 300 (4th Cir. 2008) ....................................................... 115

*United States v. Bernard,*
299 F.3d 467 (5th Cir. 2002) ................................................. 23, 136

*United States v. Bertoli,*
40 F.3d 1384 (3d Cir. 1994) ......................................................... 200

*United States v. Bin Laden,*
126 F. Supp.2d 290 (S.D.N.Y. 2001) ................................... 149, 150

*United States v. Bishop,*
66 F.3d 569 (3d Cir. 1995) ........................................... 51, 57, 58, 60

**TABLE OF AUTHORITIES**

**Page(s)**

*United States v. Brantley,*
342 F. App'x 762 (3d Cir. 2009) ....................................... 190

*United States v. Brown,*
151 F.4th 647 (5th Cir. 2025) ........................................... 5

*United States v. Brown,*
832 F.2d 128 (9th Cir. 1987) ....................................... 203

*United States v. Burns,*
433 F.3d 442 (5th Cir. 2005) ....................................... 118

*United States v. Burwell,*
122 F.4th 984 (D.C. Cir. 2024) ....................................... 39

*United States v. Carney,*
461 F.2d 465 (3d Cir. 1972) ................................... 204, 205

*United States v. Caro,*
597 F.3d 608 (4th Cir. 2010) ....................................... 174

*United States v. Causey,*
185 F.3d 407 (5th Cir. 1999) ......................................... 15

*United States v. Centeno,*
793 F.3d 378 (3d Cir. 2015) ........................................... 7

*United States v. Chambers,*
944 F.2d 1253 (6th Cir. 1991) ......................................... 5

*United States v. Cook,*
488 F. App'x 643 (3d Cir. 2012) ..................................... 59

*United States v. Coonce,*
932 F.3d 623 (8th Cir. 2019) ................................... 187, 188

*United States v. Corum,*
2002 WL 1285078 (D. Minn. June 5, 2002) ..................... 120

*United States v. Cross,*
308 F.3d 308 (3d Cir. 2002) ......................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Doggart,*
947 F.3d 879 (6th Cir. 2020) ........................................................... 63

*United States v. Dorsey,*
418 F.3d 1038 (9th Cir. 2005) ........................................................ 64

*United States v. Dupree,*
617 F.3d 724 (3d Cir. 2010) ........................................................... 108

*United States v. Eubanks,*
591 F.2d 513 (9th Cir. 1979) .......................................................... 76

*United States v. Fulks,*
454 F.3d 410 (4th Cir. 2006) .......................................................... 82

*United States v. Gabrion,*
719 F.3d 511 (6th Cir. 2013) .......................................................... 172

*United States v. Gagnon,*
470 U.S. 522 (1985) .............................................................. 199, 200

*United States v. Gendron,*
800 F.Supp.3d 503 (W.D.N.Y. Sept. 16, 2025) .............................. 146

*United States v. Gibbs,*
190 F.3d 188 (3d Cir. 1999) ........................................................... 115

*United States v. Gonzales,*
520 U.S. 1 (1997) ........................................................................... 145

*United States v. Gooch,*
2006 WL 3780781 (D.D.C. Dec. 20, 2006) ...................................... 147

*United States v. Grassie,*
237 F.3d 1199 (10th Cir.2001) ....................................................... 66

*United States v. Gullo,*
502 F.2d 759 (3d Cir. 1974) ........................................................... 204

*United States v. Hall,*
152 F.3d 381 (5th Cir. 1998) ..................................................... 22, 24

**TABLE OF AUTHORITIES**

**Page(s)**

*United States v. Harmon,*
150 F.4th 197 (3d Cir. 2025) ........................................................ 194

*United States v. Hassan,*
742 F.3d 104 (4th Cir. 2014) ........................................................ 115

*United States v. Hicks,*
403 F. App'x 709 (3d Cir. 2010) ................................................... 190

*United States v. Higgs,*
353 F.3d 281 (4th Cir. 2003) ........................................................ 172

*United States v. Ho,*
311 F.3d 589 (5th Cir.2002) ........................................................... 62

*United States v. Hodge,*
321 F.3d 429 (3d Cir. 2003) ..................................................... 32, 33

*United States v. J.H.H.,*
22 F.3d 821 (8th Cir. 1994) .......................................................... 114

*United States v. Johnson,*
677 F.3d 138 (3d Cir. 2012) ......................................................... 200

*United States v. Joos,*
638 F.3d 581 (8th Cir. 2011) ........................................................... 59

*United States v. Joseph,*
730 F.3d 336 (3d Cir. 2013) ..................................................... 30, 31

*United States v. Kallestad,*
236 F.3d 225 (5th Cir. 2000) .......................................................... 58

*United States v. Kehoe,*
310 F.3d 579 (8th Cir. 2002) .......................................................... 25

*United States v. Kepler,*
74 F.4th 1292 (10th Cir. 2023) ...................................................... 33

*United States v. Kirk,*
70 F.3d 791 (5th Cir. 1995) ............................................................ 54

**TABLE OF AUTHORITIES**

**Page(s)**

*United States v. Knight,*
705 F. App'x 58 (3d Cir. 2017) ........................................ 38

*United States v. Lighty,*
2023 WL 2932960 (D. Md. Apr. 13, 2023) ........................................ 15

*United States v. Lopez,*
2 F.3d 1342 (5th Cir. 1993) ........................................ 51

*United States v. Lopez,*
514 U.S. 549 (1995) ........................................ 50, 51, 53, 55, 65

*United States v. MacEwan,*
445 F.3d 237 (3d Cir. 2006) ........................................ 57

*United States v. Magleby,*
241 F.3d 1306 (10th Cir. 2001) ........................................ 114

*United States v. Maier,*
646 F.3d 1148 (9th Cir. 2011) ........................................ 5

*United States v. Matta-Quiñones,*
140 F.4th 1 (1st Cir. 2025) ........................................ 203

*United States v. Maxwell,*
446 F.3d 1210 (11th Cir. 2006) ........................................ 51

*United States v. McCluskey,*
D.N.M. no. 10-2734 JCH, Dkt. 1060 (June 23, 2013) ........................................ 174

*United States v. McCoy,*
323 F.3d 1114 (9th Cir. 2003) ........................................ 59

*United States v. McVeigh,*
153 F.3d 1166 (10th Cir. 1998) ........................................ 125, 149, 150

*United States v. Meehan,*
741 F. App'x 864 (3d Cir. 2018) ........................................ 82

*United States v. Mikhel,*
889 F.3d 1003 (9th Cir. 2018) ........................................ 22, 23, 135, 187

**Page(s)**

*United States v. Mitchell,*
502 F.3d 931 (9th Cir. 2007) .................................. 101, 135, 136, 201

*United States v. Mitchell,*
690 F.3d 137 (3d Cir. 2012) ...................................... 72, 73

*United States v. Morrison,*
529 U.S. 598 (2000) ........................................ 50, 55, 61, 62

*United States v. Moussaoui,*
591 F.3d 263 (4th Cir. 2010) ........................................ 25

*United States v. Nasir,*
17 F.4th 459 (3d Cir. 2021) ............................................ 82

*United States v. Olano,*
507 U.S. 725 (1993) ...................................................... 206

*United States v. Patton,*
451 F.3d 615 (10th Cir. 2006) ........................... 56, 57, 59, 60

*United States v. Pavulak,*
700 F.3d 651 (3d Cir. 2012) ................................... 181, 182

*United States v. Provenzano,*
620 F.2d 985 (3d Cir. 1980) ................................... 200, 207

*United States v. Pugh,*
90 F.4th 1318 (11th Cir. 2024) ...................................... 52

*United States v. Riley,*
621 F.3d 312 (3d Cir. 2010) ..................... 12, 181, 182, 183

*United States v. Rodia,*
194 F.3d 465 (3d Cir. 1999) ..................................... 51, 59

*United States v. Rogers,*
556 F.3d 1130 (10th Cir. 2009) .................................... 128

*United States v. Roof,*
10 F.4th 314 (4th Cir. 2021) ....................... 65, 66, 134, 172

*United States v. Roof,*
2016 WL 8678863 (D.S.C. Oct. 14, 2016) ............................... 172, 175

*United States v. Runyon,*
994 F.3d 192 (4th Cir. 2021) ........................................ 36

*United States v. Saipov,*
2023 WL 371531 (S.D.N.Y. Jan. 24, 2023) ..................................... 150

*United States v. Salamone,*
800 F.2d 1216 (3d Cir. 1986) ................................................. 104

*United States v. Sampson,*
26 F.4th 514 (1st Cir. 2022) ........................................... 173

*United States v. Sampson,*
335 F.Supp.2d 166 (D. Mass. 2004) ................................. 146

*United States v. Sampson,*
2017 WL 3495703 (D. Mass. Aug. 15, 2017) .................................. 173

*United States v. Sanchez,*
659 F.3d 1252 (9th Cir. 2011) ........................................ 130

*United States v. Sanders,*
133 F.4th 341 (5th Cir. 2025)........................................... 6

*United States v. Savage,*
970 F.3d 217 (3d Cir. 2020) ................................. 24, 91, 108

*United States v. Savage,*
E.D. Pa., no. 2:07-cr-00550, Dkt. 1434 (June 3, 2013) ...................... 10

*United States v. Shakir,*
M.D. Tenn., no. 98-cr-00038, Dkt. 3178 (Apr. 2, 2008) ........... 146, 147

*United States v. Sparks,*
949 F.2d 1023 (8th Cir. 1991) ........................................ 115

*United States v. Stanford,*
75 F.4th 309 (3d Cir. 2023) .................................... 38, 39

**Page(s)**

*United States v. Stevens,*
559 U.S. 460 (2010) ....................................................................... 44

*United States v. Stewart,*
451 F.3d 1071 (9th Cir. 2006) .................................................. 54, 58

*United States v. Stitt,*
250 F.3d 878 (4th Cir. 2001) ......................................................... 23

*United States v. Tann,*
577 F.3d 533 (3d Cir. 2009) ............................................................ 6

*United States v. Tipton*
90 F.3d 861 (4th Cir. 1996) ......................................................... 103

*United States v. Troya,*
733 F.3d 1125 (11th Cir. 2013) ..................................... 163, 165, 197

*United States v. Tsarnaev,*
968 F.3d 24 (1st Cir. 2020) .................................................... 37, 150

*United States v. Webster,*
162 F.3d 308 (5th Cir. 1998) ................................................... 23, 81

*United States v. Whittington,*
721 F. App'x 713 (9th Cir. 2018) .................................................. 28

*United States v. Wilks,*
58 F.3d 1518 (10th Cir. 1995) ................................................. 54, 58

*United States v. Williams,*
591 F. App'x 78 (3d Cir. 2014) ..................................................... 206

*United States v. Wright,*
665 F.3d 560 (3d Cir. 2012) ........................................................... 13

*Victor v. Nebraska,*
511 U.S. 1 (1994) ........................................................................... 16

*Vurimindi v. Att'y Gen.,*
46 F.4th 134 (3d Cir. 2022) ........................................................... 38

**Page(s)**

*Waldorf v. Shuta,*
3 F.3d 705 (3d Cir. 1993) ............................................................. 70, 81

*Walker v. Gordon,*
46 F. App'x 691 (3d Cir. 2002) ...................................................... 119

*Waucaush v. United States,*
380 F.3d 251 (6th Cir. 2004) ......................................................... 61

*Whalen v. United States,*
445 U.S. 684 (1980) .......................................................................... 4

*Wiggins v. Smith,*
539 U.S. 510 (2003) .......................................................................... 6

*Williams v. Taylor,*
529 U.S. 362 (2000) ................................................................... 16, 18

*Witherspoon v. Illinois,*
391 U.S. 510 (1968) ................................................................ 101, 102

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ...................................................................... 207

*Yee v. Escondido,*
503 U.S. 519 (1992) ......................................................... 29, 30, 77

## State Cases

*State v. Antwine,*
743 S.W.2d 51 (Mo. 1987) .............................................................. 103

## Federal Constitutional Provisions and Statutes

U.S. CONST., art. I § 8 ...................................................................... 49

U.S. CONST., amend. V .............................................................. 45, 154

U.S. CONST., amend. VIII ................................................... 117, 131, 154

# TABLE OF AUTHORITIES

Page(s)

18 U.S.C. § 231 ...................................................................... 53

18 U.S.C. § 247 .............................................................. 4, 49, 63

18 U.S.C. § 249 ......................................................... 41, 42, 43, 46

18 U.S.C. § 373 ...................................................................... 28

18 U.S.C. § 844 ................................................................. 52, 63

18 U.S.C. § 921 ...................................................................... 52

18 U.S.C. § 922 ...................................................................... 57

18 U.S.C. § 924 ...................................................................... 33

18 U.S.C. § 931 ...................................................................... 52

18 U.S.C. § 1202 ..................................................................... 53

18 U.S.C. § 1512 ..................................................................... 28

18 U.S.C. § 2119 ..................................................................... 52

18 U.S.C. § 2250 ..................................................................... 52

18 U.S.C. § 2252A ................................................................... 52

18 U.S.C. § 3510 .................................................................... 144

18 U.S.C. § 3551 .................................................................... 148

18 U.S.C. § 3553 .................................................................... 149

18 U.S.C. § 3591 ............................................................... 146, 147

18 U.S.C. § 3592 .............................................. 147, 148, 161, 169

18 U.S.C. § 3593 ................................................................ *passim*

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 3595 ............................................................................. 3, 46

18 U.S.C. § 3663A ............................................................................. 149

18 U.S.C. § 4244 ............................................................................. 156

34 U.S.C. § 20141 ............................................................................. 144

42 U.S.C. § 1981 ............................................................................. 40

42 U.S.C. § 1982 ............................................................................. 40

## Federal Rules and Guideline Provisions

Fed. R. Crim. P. 43 ............................................................................. 207

Fed. R. Evid. 103 ............................................................. 116, 131, 138

Fed. R. Evid. 401 ............................................................................. 114

Fed. R. Evid. 402 ............................................................................. 114

Fed. R. Evid. 403 ............................................................................. 122

Fed. R. Evid. 702 ............................................................................. 114

U.S.S.G. § 2H1.1 ............................................................................. 149

## Legislative History

H.R. Rep. No. 115-456 (2017) ............................................................ 35

Pub. L. 100-346 (June 24, 1988) ........................................................ 28

Pub. L. No. 104-155 (July 3, 1996) .................................................... 28

S. Rep. No. 115-325 (2018) ................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Additional Sources**

Bin Liang and Hong Lu, THE DEATH PENALTY IN CHINA: POLICY, PRACTICE, AND REFORM (Columbia University Press, 2016) ................. 67

GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (Am. Bar Ass'n 1989) ...................................... 19

Harold M. Tanner, STRIKE HARD! ANTI-CRIME CAMPAIGNS AND CHINESE CRIMINAL JUSTICE, 1979-1985, 92, 94 (Cornell East Asia Series 1999)  67

L. Sand, et. al., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL (2024) ...................................................................................... 38

United States Dept. of Justice, JUSTICE MANUAL ............................... 172

*United States v. Mikhel,*
    No. 07-99008, ECF 118 (9th Cir., Brief of Appellant, June 28, 2013) ...................................................................................... 135, 136

*United States v. Titus,*
    2022 WL 17090918 (3d Cir., Brief of Appellant, Nov. 14, 2022) .... 108

## INTRODUCTION

Bowers's crimes were undeniably terrible. But significant errors, inaccurately minimized by the government's brief, improperly skewed his sentencing trial in favor of death. These errors individually and cumulatively warrant vacatur of Bowers's invalid capital convictions and his death verdict, or remand for further proceedings.

As the government concedes, fully half of Bowers's capital convictions are invalid under the Double Jeopardy clause. This undermines the validity of the death verdict because fewer convictions would have affected how the jury weighed the case for death versus life, especially given the government's improper argument encouraging jurors to multiply the aggravating factors by the number of counts of conviction.

The verdict was also infected by bias. A juror who imposed Bowers's death sentence had spent months greenlighting and assisting government-sanctioned killings as a Chinese government official during a brutal anticrime campaign—an experience that calcified her belief that life imprisonment is not a sufficient punishment for murder in America. Other jurors were excluded from serving based on their race.

And the government infused its case with irrelevant and inflammatory evidence and argument, while the court (at the government's behest) prevented Bowers from telling the jury he would have spared all involved the rigors of a capital trial had he been permitted to plead guilty to life in prison without the possibility of release.

This Court should vacate Bowers's invalid capital convictions and death verdict, or remand for further proceedings.

## ARGUMENT

## POINTS RELATED TO THE INDICTMENT

I. **THE SUBMISSION OF ELEVEN COUNTS TO THE JURY FOR SENTENCING IN VIOLATION OF DOUBLE JEOPARDY REQUIRES REMAND FOR A NEW PENALTY PROCEEDING.**

After successfully resisting this claim below when the error could have been avoided (DE248:24-25), the government now concedes that fully *half* of Bowers's capital convictions and related death-penalty sentences should be vacated because they violate double jeopardy. (Gov.Br.42, 44.) The government also appears to acknowledge that those counts should have been dismissed after the guilt-innocence trial and that it was error to submit them to the sentencing jury. (Gov.Br.44-46) (citing authority that "double jeopardy principles prohibit

convicting" defendant under both provisions, "Congress did not authorize convictions" under both, and that "Bowers may not be convicted" under both).[1]

It contends that that this dramatic concession requires only remand for entry of a new judgment. *Id.* However, the government cannot prove beyond a reasonable doubt that submitting the erroneous counts did not affect the jury's sentencing decisions on the remaining death-eligible counts. 18 U.S.C. § 3595(c)(2); *Chapman v. California,* 386 U.S. 18, 26 (1967). In fact, the trial prosecutors themselves recognized the significance of the sheer number of capital-eligible counts to the jury's verdicts, repeatedly urging jurors to weigh aggravation more heavily because of the "22 [capital] counts." *See* App.Br.80-81 (citing transcript references). Bowers is entitled to remand not just for vacatur of the erroneous convictions, but for a new penalty proceeding, where jurors may make a sentencing

---

[1] *But see* Gov.Br.47 n.11 (asserting, without authority or discussion, that "[t]he government was entitled to present both sets of charges to the jury during guilt *and penalty phases*") (emphasis added).

recommendation free from the influence of these wrongfully considered charges.

## A. Remand is required for vacatur of eleven convictions and death sentences.

The parties agree that eleven counts of conviction and death sentences must be vacated because they violate double jeopardy. This is because the predicate crime of violence—here, 18 U.S.C. § 247—is a lesser-included offense of 18 U.S.C. § 924(j) under *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Where the elements overlap like this, cumulative convictions and punishment are presumptively precluded by the Double Jeopardy Clause, unless clearly authorized by Congress. *Whalen v. United States*, 445 U.S. 684, 691-92 (1980). Congress did not authorize cumulative convictions and punishments here, so vacatur is required. *See Barrett v. United States*, 607 U.S. 128, 138-49 (2026).

As the government notes, courts typically vacate the lesser-included offenses. (Gov.Br.46) (citing cases). Here, that would mean vacating the § 247 counts, as Bowers requested in his opening brief. *See* App.Br.137, 141. The government instead recommends vacating the § 924(j) counts, as more "efficient," because it would "obviate the need for this Court to resolve . . . whether religious obstruction resulting in

4

death qualifies as a crime of violence for Section 924(j) purposes."

(Gov.Br.46.) *See* App.Br. Point I. It would be equally efficient, however, to vacate the § 247 counts, which Bowers has also independently challenged, obviating the need for the Court to resolve whether religious obstruction resulting in death violates the commerce clause. *See* App.Br. Point III.

Since the lesser-included offenses here do not carry a lesser penalty, however—that is, since both § 247 and § 924(j) carry the death penalty—the proper remedy is to remand to the district court to determine which counts to vacate. *See Ball v. United States*, 470 U.S. 856, 864 (1985). *See also United States v. Brown*, 151 F.4th 647, 666 (5th Cir. 2025); *United States v. Maier*, 646 F.3d 1148, 1154 (9th Cir. 2011); *United States v. Chambers*, 944 F.2d 1253, 1269 (6th Cir. 1991).

This Court should therefore remand to the district court to determine which eleven counts should be vacated.

## B.     **Remand is also required for jury resentencing.**

The need for a new sentencing proceeding does not depend on which eleven counts are vacated or which court decides. Even if this Court elects which eleven counts are vacated, remand is required for

5

jury resentencing because the dismissal of half of the death-eligible counts dramatically changes the sentencing landscape in this capital case.

While appellate courts have sometimes resolved double jeopardy problems in non-capital cases simply by revising the judgment (Gov.Br.46.)[2], in a capital case, remand for resentencing is required because selection of a life-or-death sentence requires jurors to make "the difficult, individualized judgment" involving a "range of discretion" and many case-specific factors. *Turner v. Murray*, 476 U.S. 28, 34-35 (1986). As Bowers's jury was told (App.13163), a life sentence would have been imposed if even just one juror declined to vote for the death penalty. 18 U.S.C. § 3593(e); *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (prejudice depends on likelihood that "at least one juror would have struck a different balance"); *Marshall v. Cathel*, 428 F.3d 452, 472 (3d

---

[2] *See, e.g.*, *United States v. Tann*, 577 F.3d 533, 535, 543 (3d Cir. 2009) (remanding for merger of firearms and ammunition counts under 18 U.S.C. § 922(g), which the district judge had concurrently sentenced). *See also United States v. Sanders*, 133 F.4th 341, 371, 391 (5th Cir. 2025) (vacating one of two concurrent life sentences in formerly capital case, in which President Biden granted a commutation).

Cir. 2005) ("only one juror need weigh the factors differently"). Indeed, even in non-capital double jeopardy cases, this Court has sometimes remanded for full resentencing. *See, e.g., United States v. Centeno*, 793 F.3d 378, 392 (3d Cir. 2015) (vacating lesser-included assault conviction and remanding for resentencing on remaining counts).

As discussed below, the erroneous convictions on half the capital charges may have contributed to jurors' evaluation of the appropriate penalty on the remaining capital counts. Given ambiguities in the instructions, the quantitative-count-based framing of the case by the government, and the substantial mitigation findings made by the jury, the government cannot prove otherwise beyond a reasonable doubt.

### 1. The erroneous capital counts may have contributed to Bowers's death sentences on other counts.

The government concedes that not one or two but *eleven* capital counts on which Bowers was tried, convicted, and sentenced to death should have been dismissed at least before the jury-sentencing hearing ever began. The government also owns the heavy burden to prove "beyond a reasonable doubt" (in other words, to a near certitude) that erroneously having the sentencing jury consider and return death sentences for these eleven convictions did not contribute to its overall

sentencing decision, including, specifically, its death verdicts on the other capital counts. *See* App.Br.78-79; Gov.Br.64.

Yet the government insists there could have been "no prejudice," because of the court's instructions to jurors, the common evidence on the counts, and the overwhelming aggravation. (Gov.Br.47, 103-04, 126.)[3] None of these reasons withstands scrutiny. And the government misconstrues or simply disregards several of Bowers's key points and authorities that undermine any claim of harmlessness.

*Instructions.* The government wrongly contends the district court's instructions and the prosecutor's summation arguments ensured jurors would put eleven erroneous counts out of their minds in deciding Bowers' punishment for the other counts. (Gov.Br.47-49, 126-28.)

True, jurors were instructed to reach a sentencing verdict "separately as to each count," rather than one unitary verdict (though they were also told Bowers would effectively receive one unitary punishment, *see* App.Br.82). (App.13138-39.) But the jurors were never

---

[3] Some of the government's harmless-error arguments are presented in its response to Bowers's double-jeopardy point, (Gov.Br.46-64), and some in its response to his § 924(j) point, (Gov.Br.126-28).

told they could not consider the other counts in determining the verdict for any given count. Instead, the district court expressly suggested the opposite—that other counts *could* have at least some bearing—by warning only that their "*verdict* on any count should not *control*" (emphasis added) their verdict on other counts. *See* App.Br.81. The court's choice of the word "control" (instead of, say, "affect" or "influence") implied that their verdicts on other counts, and those counts themselves, could be considered by jurors in choosing a sentence for every count. Moreover, in the very "separate verdict" directive the government relies on, the court instructed that jurors must decide "what the evidence *in the case* shows about Robert Bowers and the appropriate sentences as to each count" (emphasis added). (App.13138-39.) Again, the choice of the phrase "in the case" (instead of, say, "on each count") suggested that everything before jurors, including the nature and number of convictions, could be considered in deciding punishment. *See also* App.13129 (instructing jurors to "consider the evidence presented in all phases of this trial").

The government also ignores other ways the district court and the prosecution conveyed that jurors could consider the nature and number

of other counts. For example, the court instructed jurors that "[e]ach capital count charges a separate crime," and then repeatedly told them, as did the prosecutor, that Bowers was being capitally sentenced for "22 offenses" or words to that effect.[4] *See* App.Br.79. And the start of the verdict form further illustrated this, with the sub-title "Counts to Consider," below which appeared a striking two-page long list of every one of those 22 offenses. (App.13781-82.)

Finally, the government also fails to address how the verdict form—the district court's last word to the jury—reinforced the government's argument by inviting jurors to apply aggravating factors to "***all*** of the applicable capital counts." (App.13783-85, 13802-03) (emphasis in original). In contrast, the verdict form in the last federal death penalty case tried in this Circuit, *United States v. Savage*, required jurors to apply the aggravating factors count by count. *See*

---

[4] Likewise, the government's opening statement at the selection phase repeatedly told jurors that they would be sentencing Bowers on "22 counts." (App.10950-51, 10965).

U.S. Dist. Ct. No. 2:07-cr-00550-CFK-3 (E.D. Pa.), Dkt. No. 1434 at 1-55.[5]

Then, the government gives short shrift to the clearest indicator of potential prejudice: the prosecutor's telling jurors towards the end of rebuttal summation, just before the jury retired to deliberate, to multiply the number of counts by the number of aggravators for each count.[6] Jurors should then, he urged, place that aggregate number of "192" aggravating factors "on the scale," arrayed against the defendant's mitigating factors (which the prosecutor reminded jurors numbered 115, a smaller quantity, App.13212). This weighing of the aggravators cumulated across the 22 capital counts would "show [jurors] that a sentence [of] death is appropriate." (App.13290). *See* App.Br.80. It blinks the obvious to declare that this "reference to aggregate aggravating factors" merely reflected "imperfect syntax" or a

---

[5] The district court docket entry is sealed; however, a redacted version of the verdict form is available at https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/Verdict%20Forms/savage_kaboni_ed_pa_2013_anonymous_jury.pdf.

[6] The district court delivered its instructions before summations.

reminder of the number of victims. (Gov.Br.332-34.) *See* Point XII(A), below (discussing prosecutor's use of quantitative approach).

Nothing in the court's previously-delivered instructions negated the prosecutor's invitation to cumulate the counts and their aggravating factors. *See* Gov.Br.333-34. The court never told jurors they could not consider the aggregate number of aggravators or counts, only that they could not "simply count" those and the mitigators "and reach a decision based on which number is greater," and thereby completely ignore the weight of the factors. (App.13161). It is absurd to claim that jurors somehow connected the court's general warning to disregard any counsel statements contradicting its instructions, to the government's "192 aggravating factors" argument.[7] Especially since that argument did not actually contradict the instructions.

Thus, the jury instructions permitted, and the government's summation invited, the jury to view the case as more aggravated and the sentence Bowers deserved as greater because the jury was

---

[7] This hardly can be compared to the specifically-targeted curative instructions given in the cases cited by the government. (Gov.Br.334). *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *United States v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010).

constantly reminded of the total number of capital convictions throughout the sentencing hearing. Indeed, it would have been unnatural and nonsensical for jurors to blind themselves to any of the counts in their deliberations. As the Supreme Court has recognized: "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Boyde v. California*, 494 U.S. 370, 380-81 (1990).

*Common Evidence.* Still, the government argues this error was *per se* harmless because no evidence was admitted on any of the erroneous counts that would not have come in on the others. (Gov.Br.49, 126-27.) But this mistakenly transposes the framework for judging spillover issues at an ordinary non-capital guilt-innocence trial, *see, e.g.*, *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012), onto a capital-sentencing error that threatens different, greater prejudice and is judged by a more demanding standard. Absent evidentiary spillover, it

may be reasonable to suppose a jury's *conviction* on a later dismissed count did not taint its conviction on a different count—especially under a forgiving test requiring the defendant to demonstrate a substantial probability of harm. *See United States v. Cross*, 308 F.3d 308, 318 (3d Cir. 2002). For in deciding on a guilt-innocence verdict, the jury is narrowly tasked with determining whether a specific act was committed, who committed it, and what the actor's intention was. But at the penalty phase of a death-penalty case, jurors exercise vastly broader discretion. The sentencing decision is, as Bowers jurors were told, "a uniquely individual moral judgment," with each left to determine individually what kind or number of aggravating factors are or are not "sufficient" to outweigh mitigating ones. (App.13162-63). And capital-sentencing errors are judged under more exacting standards requiring the government to prove harmlessness and to do so beyond a reasonable doubt. *See* page 3, above.

Given that the erroneous presentation of eleven capital convictions at the selection phase may have prejudiced the jury's sentencing decision on the remaining convictions in other important ways—such as impressing the jury with the sheer weight of an inflated

14

number of capital-eligible convictions with accompanying aggravating factors—it is no answer to cite the absence of different evidence on the two groups of counts.

The only applicable federal capital decisions favor Bowers on this point. Each concluded that the dismissal of one or more counts required vacating the death sentence on another count or counts because it was possible the nature or number of the dismissed counts, rather than any evidentiary discrepancy, prejudiced the defendant. *See* App.Br.81, 83. The government ignores the first, *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999), and fails to distinguish the second, *United States v. Lighty*, Crim. No. 03-457-PJM, Civ. No. 12-3065-PJM 2023 WL 2932960, at *2-3 (D. Md. Apr. 13, 2023).[8] *See* Gov.Br.127-28.

---

[8] In *Lighty*, the dismissed convictions were under § 924 and predicated on crimes of violence, and the death-sentenced conviction was for the crime of violence itself, a kidnaping. And while the government is right that the court noted the § 924 convictions required proof of "distinct acts," *id.*, the same was also true in Bowers's case, where the § 924 convictions, but not the § 247 ones, required proof of intentional murder as well as the use of a firearm.

**2. This Court should not dismiss the prejudicial effects of the eleven erroneous counts based on the government's unwarranted assumption that a death sentence was a foregone conclusion.**

The government argues that a new penalty proceeding is unnecessary because the "overwhelming" evidence supporting the death sentences, and the alleged "weakness" of the mitigation case, prevented any prejudice. (Gov.Br.47.) But the jury made substantial mitigating findings, in areas the Supreme Court has recognized "might well have influenced [a] jury's appraisal of [Bowers's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Indeed, little distinguishes Bowers's case from other highly aggravated federal capital cases where juries imposed life sentences. (App.Br., App.A.) Under these circumstances, the Court cannot have "near certitude," *Victor v. Nebraska*, 511 U.S. 1, 15 (1994), that the submission of eleven erroneous death-eligible counts "did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24.

The question for harmless error review is not whether the government or a panel of federal judges believes the case for death was overwhelming, nor whether a reasonable or typical jury would have believed so. Rather, the rule requires the Court to consider whether the government can demonstrate to a near certitude that the error

16

complained of did not affect *Bowers's jury's* determination. *See Sullivan v. Louisiana,* 508 U.S. 275, 279 (1993).

Even "overwhelming evidence of guilt should not contribute to a reviewing court's conclusion that [an error] did not affect the jury's decision in the penalty phase." *Brooks v. Kemp,* 762 F.2d 1383, 1402 n. 27 (11th Cir. 1985), *vacated on other grounds by Kemp v. Brooks,* 478 U.S. 1016 (1986). True, the jury here made additional findings for the government in the selection phase. But those all related in some fashion to Bowers's guilt. The government offered no aggravating factors unrelated to the crime itself. (DE1524; App.13783-85.) Eliminating half of the death-eligible charges—reducing the government's calculation of the aggravation from 192 to 96—could well have affected at least one juror's view of the sentence, especially where jurors found 87 mitigating factors.

### a. Jurors made substantial mitigation findings.

The government goes to great lengths to demean what it describes as Bowers's "core selection phase defenses": his childhood trauma, neglect, and instability, and his impaired mental health. (Gov.Br.58-64.) But the government's view of the mitigation case—what was at the

17

core, what was strong or weak, whether it "mitigates his crime[s]"[9] —is

irrelevant. Under a constitutional harmless error analysis, it is the

jury's evaluation that matters. *Chapman*, 508 U.S. at 279. And the jury

found true 87 of the 115 mitigation factors Bowers submitted, 58 of

them unanimously. These included factors in every category the defense

argued, including Bowers's childhood trauma, neglect, and instability,

and impaired mental health, ability to be safely confined in prison, and

more. (App.Br.55-57.)

*Childhood trauma, neglect, and instability.* The Supreme Court

has repeatedly held that mitigation related to childhood trauma,

neglect, and instability is powerful evidence, and—contrary to the

government's view—"may alter the jury's selection of penalty, even if it

does not undermine or rebut the prosecution's [] case" because it affects

"the jury's appraisal of [a defendant's] moral culpability." *Williams v.*

*Taylor*, 529 U.S. at 398 (citing *Boyde*, 494 U.S. at 387). Indeed, both the

---

[9] This construction appears to double down on the *Tennard* error argued in Point XIII(E) of the opening brief. As discussed there and below at Point XII(C), it is a foundational concept of death penalty law that mitigation need not be related to the crime. *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004).

Supreme Court and this Court frequently find under the more stringent standard applied in habeas cases, that penalty phase relief is warranted because of failure to present evidence of childhood neglect, trauma, and instability. *See, e.g.*, *Sears v. Upton*, 561 U.S. 945, 954-55 (2010) (citing cases); *Jermyn v. Horn*, 266 F.3d 257, 305 (3d Cir. 2001). *See also Outten v. Kearney*, 464 F.3d 401, 417-19 (3d Cir. 2006) (discussing "importance" of this evidence) (citing American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989)).

The Supreme Court has not hedged on the importance of a defendant's childhood, even when his crime occurs well into adulthood, undercutting the government's argument that Bowers's childhood experience was irrelevant when his crime was committed at 46 (Gov.Br.63). *See Porter v. McCollum*, 558 U.S. 30, 33-34, 37, 43 (2009) ("unreasonable" to discount evidence of childhood despite crime occurring at age 54); *Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005)

(noting importance of childhood neglect, custodial substance use, and family violence to mitigation case of 36-year-old defendant).[10]

For Bowers, jurors found significant evidence of childhood abuse, neglect, and privation.[11] *See* App.Br.10-15. Ten jurors found that "[t]he limitations and impairments of Bowers's parents negatively influenced his development as a child and adult." (App.13786.) Twelve jurors found that he had to live with people who were mentally ill, had problems with drinking, and misused prescription drugs. (App.13797.) Twelve jurors also found he experienced "violence in the home" and "frequent moves and unstable housing" as a child. (App.13797.) Eight jurors found

---

[10] Rompilla's age is referenced in the district court decision, *Rompilla v. Horn*, No. Civ.A.99-737, 2000 WL 964750, at *2, *11 (E.D. Pa. July 11, 2000).

[11] These findings were not based solely on the testimony of defense psychologist Dr. Katherine Porterfield, whom the government criticizes. (Gov.Br.62-63.) The defense presented extensive documentary evidence and lay testimony, which the jury obviously credited. *See* App.11803-25 (Deanna Bowers); App.11931-12341 (Naomi Grim, Jace Wingard, Dennis Kavanaugh, Alan Axelson, Ashley Halter-Peralta, Gary Phillips, Martina Mock, Sandra Elaine Block, Frank Ray, Kelly McKinley, Patricia Diggs, Marty Samuels, Ronald Stone, Barbara Cingel, Jason Erb, Marty McClellan, Shari Dodge, Rev. Jeffrey Dillinger); App.13004-13299 (Clyde Munger, Patricia Fine); DX 300-531, 533-37, 571-74, 576 (photos and records, including, *inter alia*, vital records, medical records, mental health records, and social services records).

all of this "ha[s] a cumulative impact and [is] associated with increased risk of a wide variety of adverse outcomes, including schizophrenia or other mental disorders." (App.13797.) Eleven jurors agreed, "[t]he[se] adverse childhood experiences . . . are worthy of consideration in mitigation." (App.13797.)

*Impaired mental health.* Although jurors made relatively fewer findings regarding Bowers's impaired mental health, they did not, as the government suggests, (Gov.Br.62), reject completely his mental health mitigation. Nine jurors found that Bowers has a multigenerational family history of mental illness and neurological problems. Twelve jurors found that "[t]eachers and other professionals identified the need for Bowers to receive mental health counseling and treatment from an early age," and that "[w]hen Bowers was 13 years old, he had his first psychiatric commitment." (App.13790.) Six jurors found that Bowers has "brain abnormalities" (App.13794), and eight found that when he committed this crime, he "believed he was acting on the side of God against Satan" (App.13795).

*Other mitigation.* Despite all these challenges, Bowers had no criminal record. (App.13797.) Twelve jurors found that he maintained

employment (App.13792) and made other positive contributions, including rescuing a friend from drowning and caring for individuals with traumatic brain injuries (App.13793). Twelve jurors recognized Bowers's good behavior during pretrial detention, including that he never attempted to influence others to adopt antisemitic views. (App.13798, 13799.) Such mitigation helps "humanize" a defendant, despite the horror of his crime. *See Porter*, 558 U.S. at 41. Indeed, eight jurors found that, given all this, "[a] sentence of life in prison without the possibility of release offers the possibility of redemption and change." (App.13800.)

### b. The mitigation findings here were far more substantial than in cases where courts have found constitutional harmless error.

The strength of Bowers's mitigation case is significant in the constitutional harmless error analysis. Where courts find harmless error, it is often because of "the relative paucity" of the mitigating factors. *United States v. Hall*, 152 F.3d 381, 418 (5th Cir. 1998) ("Of [four] mitigating factors, only the first was found by more than one juror."), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000). *See also United States v. Mikhel*, 889 F.3d

1003, 1059 (9th Cir. 2018) ("In fact, *no* juror found any mitigating factor . . . [The jury] found multiple, independent reasons to impose the death penalty, and no reason in mitigation to spare defendants."); *United States v. Bernard*, 299 F.3d 467, 484 (5th Cir. 2002) (citing jury's findings of "hardly any mitigating factors"—one for Vialva and none for Bernard); *United States v. Stitt*, 250 F.3d 878, 898-99 (4th Cir. 2001) (similar).

*United States v. Webster* provides an instructive contrast. There, the Fifth Circuit found harmless error based in part on the "paltry mitigating factors" found by the jury. *United States v. Webster*, 162 F.3d 308, 326 (5th Cir. 1998). Unlike in Bowers's case,

> No juror found that Webster had talents, capabilities, or qualities of some value to society or that he could be of some productive value in a prison setting. Only two jurors believed that he even could be controlled in a prison setting, and only two found he likely would adapt to prison. The jury found only one factor unanimously . . . .

*Id.* The *Bowers* jurors, however, found many "countervailing factors," *id.*—about his contributions, the ability to safely house him in prison, his upbringing, and his impairments—that did not make death a foregone conclusion absent the erroneous counts.

*United States v. Savage*, 970 F.3d 217 (3d Cir. 2020), is similar to *Webster*. In *Savage*, the Court did not even find it necessary to discuss the few mitigating factors found by Savage's jury. 970 F.3d at 298 n.82 (citing *Bernard*). A review of the verdict form there shows jurors found only eighteen mitigating factors, many of which related to the impact of a death sentence on Savage's family and the ability to house him securely. Jurors made limited findings related to Savage's childhood and mental health: Savage grew up in a violent and drug-ridden neighborhood, was impacted by the loss of his father when he was young, and had possible hyperactivity and concentration problems that "could have contributed to his behavior and coping skills at the time of his father's death."[12] The "relative paucity" of Savage's mitigation compared to Bowers's is pellucid. *Cf. Hall*, 152 F.3d at 418.

### c. Jurors impose life sentences in highly aggravated cases.

The government fails to acknowledge that, in comparably aggravated cases, jurors have imposed life sentences or the government

---

[12] For the verdict form, *see* n.5, above. Mitigation findings are at pages 56-59.

has agreed to life dispositions. In almost 400 pages of briefing, not once

does it even reference Appendix A to Bowers's brief, a six-page selection

of federal capital cases involving multiple murders where juries

declined to impose death sentences and in which non-death resolutions

occurred pretrial. These included mass-murder terrorism cases and

hate-crime cases.[13] Appendix A illustrates that, as awful as Bowers's

crimes were, the constitutional harmless error analysis here cannot rest

on the aggravation alone. *See* App.Br., App. A 2-3.[14] Appendix A lists

over twenty cases comparable to Bowers's that—despite their highly

aggravated nature—resulted in life sentences.[15] The government cannot

---

[13] *See, e.g.*, *United States v. Moussaoui*, 591 F.3d 263, 301 n.24 (4th Cir. 2010); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 103-07 (2d Cir. 2008); *United States v. Kehoe*, 310 F.3d 579, 584 (8th Cir. 2002).

[14] The government itself has agreed to pretrial non-death resolutions in highly aggravated, multiple-murder cases, including terrorist, gang, and even hate-crime cases. *See* App.Br., App. A 5-6.

[15] Although no two cases or defendants are exactly the same, the mitigation findings in these cases were not of such a different nature from those here as to explain the disparate results. Indeed, in *Moussaoui*, jurors similarly found few mental health factors and more childhood trauma, neglect, and instability factors. *See* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/Verdict%20Forms/moussaoui_zacarias_ed_va_2006_redacted

demonstrate beyond a reasonable doubt that Bowers's case would not have, too, absent the eleven erroneously-submitted counts.

*       *       *       *       *

Because the government concedes that it violated double jeopardy to submit both the § 247 and § 924(j) counts to Bowers's sentencing jury, and because the government cannot demonstrate beyond a reasonable doubt this did not affect any juror's penalty verdict, the Court must remand to the district court to vacate either the § 247 or the § 924(j) counts and conduct a new sentence selection hearing.

## II.   BOWERS'S CAPITAL § 924(j) CONVICTIONS ARE INVALID BECAUSE § 247(a)(2) IS NOT A PREDICATE CRIME-OF-VIOLENCE.

The government disputes that the § 924(j) convictions should have been dismissed for the separate and independent reason that religious

_and_anonymous_jury.pdf In *Al-'Owhali* (the Embassy Bombing case), jurors focused on the defendant's indoctrination in his early and formative years (and his possible martyrdom by execution, *see* Point XI, below). *See* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/Verdict%20Forms/al_owhali_mohamed_sd_ny_2001_anonymous_jury.pdf. In *Kehoe*, jurors also focused on the defendant's childhood and upbringing. *See* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/Verdict%20Forms/kehoe_chevie_ed_ar_1999_redacted.pdf.

obstruction under § 247 was not a valid predicate crime-of-violence. A textual analysis, however, makes clear that religious obstruction under § 247 is not a crime-of-violence. These counts should be vacated for that reason, regardless of whether they are vacated, as the government suggests, for double-jeopardy reasons.

## A. Religious obstruction under § 247(a)(2) is not a crime-of-violence because it can be committed with psychological force.

The government acknowledges that an offense that can be committed with psychological force alone does not qualify as a crime-of-violence under § 924(c), which requires "physical force." (Gov.Br.111.) But the government then slides past Bowers's discussion of how this disqualification applies to religious obstruction under § 247(a)(2). *See* App.Br.65-66.

Instead, the government invokes legislative history to claim that even though the text of § 247(a)(2) requires only "force," Congress actually meant to limit it to just *physical* force." (Gov.Br.111.) This argument falls flat, because it cites legislative history for a later amendment to a different portion of the statute. While the current "obstructs by force" language in § 247(a)(2) dates to the original 1988

law, *see* Pub. L. 100-346, 102 Stat. 644 (June 24, 1988), the government quotes from the revisers' notes to a 1996 amendment to the statute's definition of religious property. *See* Pub. L. No. 104-155, 110 Stat. 1392 (July 3, 1996). In enacting criminal statutes, Congress clearly knows how to specify "*physical* force," rather than just "force," when it means to require that, and not just in § 924(c). *See also, e.g.*, 18 U.S.C. §§ 373(a), 1512(a)(2). In § 247(a)(2), Congress chose not to include that qualifier. "Even those . . . who believe that clear legislative history can illuminate ambiguous text won't allow ambiguous legislative history to muddy clear statutory language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

The government's case law is equally unpersuasive. It contends that federal courts have "consistently" held that similar federal statutes, whose text requires only "force," actually demand "physical force" and thus constitute crimes-of-violence. (Gov.Br.111-12 n.23.) But the government cites two inapposite decisions. In one, *United States v. Whittington*, 721 F. App'x 713, 713-14 (9th Cir. 2018), the Ninth Circuit found no plain error in treating such an offense as a crime-of-violence because the statute there required not just force but also the use or

threat of a dangerous weapon. The other, *Cazares v. United States*, No. CV 20-9044 PA, 2021 WL 1153040, at \*3-4 (C.D. Cal. Feb. 15, 2021), did not even address whether the offense in question was a crime-of-violence because the defendant had conceded it was.[16]

The government is also wrong that Bowers forfeited his appellate argument that § 247(a)(2) can be committed with non-physical (*i.e.*, psychological) force. (Gov.Br.114-16.) That contention disregards Supreme Court decisions supporting Bowers's position that, because he preserved his "federal claim" that § 247(a)(2) is not a crime of violence, he "can make any argument in support of that claim on appeal" and is "not limited to the precise arguments . . . made below." (App.Br.67) (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992), and citing other such decisions). The Third Circuit has also recognized this rule. *See, e.g., Thompson v. Real Estate Mort. Network*, 748 F.3d 142, 149 n.6 (3d

---

[16] Nor, contrary to the government's argument, Gov.Br.113, is this a circumstance like in *Stokeling v. United States*, 586 U.S. 73 (2019), where a *state* statute using the word "force" had been conclusively interpreted by the state's high court to mean "physical force." *See id.* at 85-86.

Cir. 2014); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 209 (3d Cir. 2010).

Bowers went beyond preserving the general claim by specifically arguing below that § 247(a)(2) is not a crime-of-violence because it can be committed with force that does not qualify as "physical" force; thus, he specifically argued the exact gap between § 247(a)(2) and § 924(j) he now argues on appeal. (DE787:11, 20). And the district court understood this. (DE874:19). Thus, the argument may be considered even under the decisions cited by the government, *United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013), and *United States v. Abreu*, 32 F.4th 271 (3d Cir. 2022).[17] This is true notwithstanding that, on appeal, Bowers has offered a slightly different illustration of how religious obstruction can be committed without "physical force." *See Abreu*, 32 F.4th at 275 ("parties are free to . . . more fully explain an argument on appeal than they did in the District Court" and to "change the way they

---

[17] Neither *Joseph* nor *Abreu* mentioned any of the Supreme Court cases requiring preservation only of a federal claim and not of each argument in support of such a claim, *e.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995); *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

present their arguments") (cleaned up); *Joseph*, 730 F.3d at 341-42

(appellants may "reframe their argument[s]" on appeal).[18]

Accordingly, in deciding the recurring and purely legal issue

whether § 247(a)(2) is a crime of violence, this Court should not blind

itself to whether the offense can be committed with non-physical force

such as psychological force. *See Huber v. Taylor*, 469 F.3d 67, 74-75 (3d

Cir. 2006) (Court is "reluctant to apply the waiver doctrine when only

an issue of law is raised," especially if "the issue's resolution is of public

importance").

**B.    Religious obstruction under § 247(a)(2) also is not a crime-of-violence because the required force can be used or threatened against one's *own* "person or property."**

The government does not deny that if religious obstruction of

another person under § 247(a)(2) can be committed by threatening force

against a defendant's *own* person or using force against his *own*

---

[18] *See also, e.g.*, *TD Bank N.A. v. Hill*, 928 F.3d 259, 276 (3d Cir. 2019); ("where two arguments relate so closely, neither is waived or forfeited"); *Gen. Refractories Co. v. First State Ins.. Co.*, 855 F.3d 152, 162 (3d Cir. 2017) (court could consider new, "never before specified" "theory" that was an "iteration" of party's more general argument raised below) (internal citation omitted).

property—rather than against that of "another" as required by § 924(c)(2)(A)—then it does not qualify as a crime-of-violence. *See* App.Br.69. Yet the government offers a grab-bag of unpersuasive reasons why § 247(a)(2) supposedly excludes this possibility.

The government first professes to rely on the statute's text, declaring that it requires that the "person against whom force or threat is used" must be "the same . . . person whose religious expression was obstructed." (Gov.Br.121-22) (cleaned up). But nothing in the text supports this. Section 247(a)(2) punishes one who "intentionally obstructs, *by force or threat of force*, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs." 18 U.S.C. § 247(a)(2) (emphasis added). The limiting clause "by force or threat of force" modifies only the antecedent phrase, "intentionally obstructs." *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows"). The phrase the government would have it modify, "any person in the enjoyment . . ." comes after, and not even immediately after but ten words later following yet another dependent clause. *See United*

*States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003) (limiting clause should not be read to modify even a preceding noun or phrase if it is "remote").[19] Accordingly, under § 247(a)(2), the "person against whom force or threat is used" need *not* be "the same . . . person whose religious expression was obstructed."

This is further confirmed by comparing § 247(a)(2) with other penal laws. When Congress wishes to exclude force against the defendant's own person or property, it can and does in simple, plain language, as in § 924(c)(3)(A) (requiring force against "the person or property *of another*") (emphasis added) and other criminal statutes, *see, e.g.*, *United States v. Kepler*, 74 F.4th 1292, 1305 & n.15 (10th Cir. 2023) (discussing 18 U.S.C. § 857(b), which criminalizes "threat to injure the person *of another*") (emphasis added). Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Biden v. Texas*, 597 U.S. 785, 803 (2022).

---

[19] Nor does the separate requirement that the Attorney General certify any § 247 prosecution as being "in the public interest," § 247(e), somehow support such a rewriting of its force element in subsection (a), as the government suggests. (Gov.Br.122-23.)

The government also misconstrues legislative history, by arguing that interpreting § 247(a)(2) to encompass actual or threatened force against one's own person or property would "raise First Amendment concerns" by offending Congressional admonitions against interpreting statutes to "'encroach on protected speech.'" (Gov.Br.124) (quoting S. Rep. No. 115-325 (2018)). But the quoted Senate Report addressed only a later amendment to the definition of religious property, not any change to the "obstruct by force" language in § 247(a)(2). Moreover, the quote comes from the report's recognition that criminalizing "threats of force" to a broader range of such property would *not* "encroach on protected speech" because the statute still reached only "true threats," i.e., where "those who hear or read the threat reasonably consider it to be an 'actual threat.'" S. Rep. No. 115-325 (2018) at 3; *see also Counterman v. Colorado*, 600 U.S. 66, 72 (2023). The government cites no authority for the proposition that the First Amendment protects (actually) threatening, let alone using, force to obstruct another's free exercise of religious beliefs. [20]

---

[20] The government also cites a House Report to a later amendment to § 247 (expanding the scope of the religious property protected by the

**C. Section 247(d)(1)'s "death results" element does not supply the necessary use of "physical force" against the "person . . . of another."**

The government also maintains that, even if religious obstruction under § 247(a)(2) alone is not a crime of violence, the additional § 247(d)(1) factor charged here, that "death result[ed]," means it qualifies. (Gov.Br.112-13, 118-21, 125-26.) The government gets this wrong, for two reasons.

First, the government insists that, under the statute, the death must have resulted from "intentional conduct." (Gov.Br.125.) But this conflates the mental states required for different elements of a "death results" § 247 charge. While § 247(a)(2) demands that the defendant intend to use or threaten force and intend to obstruct the victim's religious exercise, as discussed in Bowers's brief, no such intent, or indeed any *mens rea*, is needed under § 247(d)(1) for a resulting death; it can be purely accidental. *See* App.Br.72-73. Thus, although it is true that physical force must have acted on the decedent's body, *see*

---

law), which suggested the statute covered only threats to property such as bomb threats. *See* Gov.Br.123 (citing H.R. Rep. No. 115-456 (2017)). But stray remarks from subsequent legislative history cannot trump the statutory text.

App.Br.71-72, that does not categorically elevate the offense to a crime-of-violence. The phrase "against another" in § 924(c) means a qualifying statute must require physical force that is "purposeful and knowing," employed by the defendant in a "targeted way" against a "conscious object . . . not the mere recipient" of that physical force. *Borden v. United States*, 593 U.S. 420, 424, 432 (2021). *See* App.Br.72. The "death results" factor in § 247(d)(1) does not fit the test.

Rather than meaningfully challenge this analysis, the government invokes several decisions on "death results" factors in other, different statutes without mentioning that they relied either on *mens-rea* features of those laws—tying the death to a particular mental state—that § 247 lacks or on legal principles since rejected by the Supreme Court. (Gov.Br.112, 125.) Thus, the Fourth Circuit in *Roof* considered a statute with a *mens-rea* element "willfully caus[ing] bodily injury" along with "death resulting." And, as discussed in Bowers's opening brief, App.Br.74, it employed a "realistic probability" test the Supreme Court expressly rejected a few months later.[21] Similarly, the First Circuit in

---

[21] *See also United States v. Runyon*, 994 F.3d 192, 203 (4th Cir. 2021) (also relying on that erroneous test, as well as construing a

36

*United States v. Tsarnaev*, 968 F.3d 24, 104-05 (1st Cir. 2020), considered statutes requiring an intent to cause death or serious bodily injury along with "death results." And that decision did not even consider the *mens rea* issue because it came down before *Borden.*

A second, independent reason why the "death results" factor does not elevate Bowers's § 247 convictions to crimes-of-violence is that accompanying, alternative prongs of § 247(d)(1), such as "kidnapping," indisputably do not require physical force. *See* App.Br.75-78. The government wrongly insists that these prongs are all divisible, and thus can be disregarded, because the various prongs criminalize "different types of behavior" that "'differ . . . significantly' from each other." (Gov.Br.118-19) (quoting *Chambers v. United States*, 555 U.S. 122, 126 (2009)). But in *Mathis v. United States*, 579 U.S. 500, 518 (2016), the Supreme Court later broke from *Chambers* and other earlier decisions, adopting a different approach to divisibility and, indeed, finding indivisible the same kind of burglary statute *Chambers* had said was divisible. *Compare Mathis*, 579 U.S. at 517-19 *with Chambers*, 555 U.S.

---

statute that required conspiring to murder for hire along with "death resulting").

at 126. Moreover, even in *Chambers*, divisibility was suggested by "different degrees of seriousness" and different "classes" of punishment between behaviors, rather than just arguable differences in kind. *Id.* at 127; *see also Mathis*, 579 U.S. at 518 (2016); *Vurimindi v. Att'y Gen. U.S.*, 46 F.4th 134, 145 (3d Cir. 2022). And, contrary to the government, § 247(d)(1) does *not* "carry different punishments" (Gov.Br.109), for the alternatives ("death results," kidnapping, etc.).

That leaves this, *see* App.Br.77, as well as other recognized indicators in the text of § 247(d)(1)—especially the terms' appearance in a single sentence without semicolons in a single paragraph and a single subsection, *see* App.Br.76-77—all pointing toward its being indivisible. Indeed, the leading national treatise on federal jury instructions treats it that way. *See* L. Sand, et. al., 1 MODERN FEDERAL JURY INSTRUCTIONS—CRIMINAL, § 17-23 (2024). The decisions the government cites do not aid its cause. One provided no analysis in finding a state statute was divisible even though the alternative conduct appeared in a single sentence. *United States v. Knight*, 705 F. App'x 58, 61 (3d Cir. 2017). Another is distinguishable because the different conduct appeared in different subsections. *United States v. Stanford*, 75 F.4th

309, 317 (3d Cir. 2023). And the last, *United States v. Burwell*, 122

F.4th 984, 990 (D.C. Cir. 2024), actually favors Bowers's position, since

it found alternative prongs in a different federal statute to be indivisible

based on the same textual indicators applicable to § 247(d)(1). *See*

App.Br.77.

Accordingly, Bowers's eleven convictions under § 247(a)(2), (d)(1)

were not crimes-of-violence under § 924(c)(3)(A).

**D.  Bowers's erroneous convictions and death sentences on the eleven capital § 924 charges may have contributed to his death sentences on other counts, requiring resentencing on them.**

As detailed in Bowers's opening brief, App.Br.132-33; *see also id.*

320-21, 472-73, Appendix A, and his reply on the double-jeopardy issue,

Point I, above, the prejudicial effects of the § 924(j) counts may have

skewed at least one juror's highly discretionary life-or-death sentencing

decision, and the instructions would not have prevented that. The

government cannot carry its heavy burden to prove, beyond a

reasonable doubt, the 924(j) counts did not affect the jury's

decisionmaking on the remaining capital counts. Accordingly, the Court

should order resentencing on those convictions.

## III. BOWERS'S UNCONSTITUTIONAL PROSECUTION FOR RELIGIOUS HATE CRIMES UNDER 18 U.S.C. § 249 REQUIRES DISMISSAL OF THOSE CONVICTIONS AND RESENTENCING ON THE REMAINING CAPITAL COUNTS.

### A. The government fails to justify the unprecedented use of the Thirteenth Amendment's prohibition on slavery to authorize prosecution for a hate crime based on religious practices and beliefs.

The Thirteenth Amendment, added to the Constitution in 1865, authorized Congress to "enforce" its prohibition against "slavery [and] involuntary servitude." Civil-rights statutes passed shortly thereafter guaranteed to all the property and contract rights enjoyed by "white citizens." 42 U.S.C. §§ 1981, 1982. The Supreme Court upheld those laws because it believed the Thirteenth Amendment authorized Congress to eliminate not only slavery but its "badges and incidents." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 442-43 (1968). *See* App.Br.88-90. But the Court has never expanded the Amendment's reach beyond the *racial* discrimination underlying slavery. *See* App.Br.92. Thus, the Court ruled that those post-Civil-War laws protect a Jewish plaintiff against private discrimination *only* if motivated by "racial animus" rooted in his "ancestry or ethnic characteristics." *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987); *see also*

40

*St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611 (1987) (discrimination would be "racial" if "based on" plaintiff's "Arabian ancestry"). To justify this, the Court observed that, when those statutes were enacted, "race" was broadly defined as people "belonging to the same stock," including "Hebrews as of the Semitic race." *Id.* (internal quotation omitted); *see* App.Br.92-93.

A century and a half later, in 2009, Congress passed the Hate-Crimes Act, a law forbidding assaults motivated by "race." 18 U.S.C. § 249(a)(1). The only other reported prosecution for antisemitic violence under this section charged that the crime was racially motivated. The DOJ's own guide to the Act advises this. *See* App.Br.98. And in a pretrial order, the district court conveyed the prosecution might need to do likewise. *See* App.Br.86. But throughout Bowers's case, including now on appeal, the government has disclaimed any reliance on the statute's "race" prong to convict him or to affirm his convictions. *See* App.Br.98-99; Gov.Br.103 n.20.

Instead, the government pursued and now defends its Hate-Crimes convictions of Bowers under a different, never-before used prong of the statute, which federally criminalizes assaults committed "because

41

of the . . . *religion*" of the victim, without requiring any other federal

nexus. § 249(a)(1) (emphasis added). Yet the government does not deny

that, as commonly defined today, as used in this modern statute, and as

understood in Bowers's prosecution (including by his jury), this phrase

means because of the victims' religious beliefs and practices, rather

than their ancestry or ethnicity.[22] *See* App.Br.86-87, 96. Thus, it is not

surprising that the government makes no effort to defend the

constitutionality of the "religion" prong generally or its application to

adherents of any save one of the many organized faiths in this country.

Rather, the government noted, when the Thirteenth Amendment

was enacted in 1865, Jewish people were considered a "race" with

shared ancestry and ethnicity. From this, the government leaps to the

conclusion that the Amendment's authority to eliminate the badges and

incidents of slavery empowered Congress, more than a century and a

half later, to criminalize an assault against a Jewish person motivated

*not* by her ancestry or ethnicity, *i.e.*, her "race," but by her religious

---

[22] This is no less true even if, as the government claims, some of Bowers's anti-Semitism cast Jewish people in "racial" terms. (Gov.Br.102.)

beliefs or practices. (Gov.Br.100, 103 & n.20.)

That assertion is as self-contradictory and legally unsupported as it sounds. The government makes no effort to fit its novel theory within established precedent by explaining how an assault motivated by a Jewish victim's religious practices or beliefs could possibly impose a badge or incident of enslavement of Africans, or how it could vindicate even an expanded view of the Thirteenth Amendment as promising all citizens freedom from racial discrimination. *See* App.Br.87-91.

Nor does the government reckon with the serious Article III and separation-of-powers problems that would be created by judicially rewriting § 249(a)(1) to effectively change "religion" to "Judaism" in § 249(a)(1).[23] *See Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to choos[e] between competing plausible interpretations of a statutory

---

[23] Especially since the government would have the Court ascribe an entirely different meaning to "religion" as used in an adjacent section of the statute. (DE249:16 n.4) (arguing "religion" in § 249(a)(2) means "all religions"). *See Clark v. Suarez Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each category would be to invent a statute rather than interpret one.").

text") (internal quotation omitted); *United States v. Stevens*, 559 U.S. 460, 481 (2010) ("[T]his Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction. We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain.") (internal quotations omitted).

Instead, the government pins its argument on *Al-Khazraji* and *Shaare Tefilla*. (Gov.Br.99-100.) But the Supreme Court in *Al-Khazraji* specifically *forbade* stretching the Thirteenth-Amendment-based statute there to cover discrimination motivated by the plaintiff's "religion." 481 U.S. at 613. Likewise, in *Shaare Tefilla*, the Court licensed only a suit claiming discrimination "motivated by *racial* animus." 481 U.S. at 616-18 (emphasis added); *see* App.Br.93. And lower courts have adhered to this distinction. *See id.* at 94.

The government treats these decisions selectively, picking the portions it likes and discarding the ones that undermine its central argument. In the government's view, because the Reconstruction-era statutes considered in *Al-Khazraji* and *Shaare Tefilla* protected only against discrimination based on race, they offer no lessons about the

constitutionality of a modern law prohibiting harms inflicted because of a victim's religious practices or beliefs. (Gov.Br.101.) But below, both the government and the district court said that those cases implicitly defined the scope of the underlying protections the Thirteenth Amendment licensed Congress to afford Jews and other groups not today considered races. (DE249:18, App.165 & n.6.) And neither those nor any other federal decision the government cites (or counsel could find) extends that authority to protecting such persons from religiously-motivated harm.

Finally, it is worth adding that the district court gave two reasons for dismissing the Fifth Amendment equal-protection problem that Bowers warned also would be created by construing § 249(a)(1) as validly singling out just one religion among all for special protection. *See* DE239:23, 1596:11-14. First, the court said that § 249(a)(1) covered only "racial" and not "religious" assaults against Jews. (App.163 n.5.) But, as discussed, the government has disclaimed any effort to ground Bowers's convictions on the "race" prong of the statute. Second, the district court correctly noted that religiously-motivated attacks against adherents of other faiths can be punished under a different section of

the statute, § 249(a)(2), if the attack is sufficiently connected to interstate commerce. (App.163 n.5, App.395.) But the fact remains that for religious hate crimes without that additional federal nexus, the government's theory would leave Jews as the only victim group safeguarded by this law.

For all these reasons, the Court should dismiss Bowers's convictions under § 249(a)(1).

## B. Because Bowers's sentences on other charges may have been influenced by the invalid § 249 convictions, he should be resentenced on all counts.

The government does not deny that, if Bowers's § 249 convictions must be dismissed, it bears a heavy burden under the FDPA to prove, beyond a reasonable doubt (*i.e.*, to a near certainty), that they did not contribute in any way to the jury's death verdicts on his § 247 convictions. *See* 18 U.S.C. § 3595(c)(2)(C); Point I(B), above. But the government mistakenly insists it has carried that burden simply because trial evidence of Bowers's anti-Semitism bore relevance to the § 247 charges, to prove his "intent to obstruct the congregants' religious

practice," and because "motive is always relevant in a criminal case."[24] (Gov.Br.103-06.)

First, this fails to reckon with the key difference Bowers identified between the trial that occurred and the one he should have received without the § 249 charges. *See* App.Br.102 (had antisemitic motivation not been an element of any charges, balancing considerations would have weighed toward excluding a substantial portion of that evidence, especially the more inflammatory and unduly prejudicial portions); *see also, e.g.*, Point VIII, below (discussing government's evidence about the Holocaust and the long history of anti-Semitism in the United States and worldwide).

Second, and more important, by exclusively focusing in its brief on the anti-Semitism evidence, the government disregards other important

---

[24] The government contends that evidence also was relevant to "counter" Bowers's "defense to the Section 247 charges" that his aim was to stop the congregation's support for immigrants. But the government never resisted that theory. The government argued that Bowers was animated both by anti-immigration goals and a desire to obstruct the congregants' religious service, and that—since support for immigrants was central to the congregants' Jewish beliefs and practices—either sufficed to establish the necessary mental state under § 247. *See* App.Br.35.

ways in which the erroneous § 249 charges and convictions prejudiced Bowers at the sentence-selection phase. *See* App.Br.101-04. Most prominent of these was the sheer number of erroneous counts. As the court reminded jurors at that phase, Bowers had been convicted of a total of 63 charges for the synagogue shootings (App.13177), with each count representing a "separate crime." (App.13138.) The majority, 33 counts, were for the slain victims. The government has conceded that the eleven § 924(j) (firearms murder) counts should never have been presented at the sentencing hearing. *See* Point I, above. So, if the Court agrees the § 249 (Hate Crime resulting in death) convictions are also invalid, that means fully two-thirds (22 of 33) of these homicide counts should have been dismissed, at least before the sentence-selection phase ever began. That those 22 homicide counts instead remained in place and sentencing jurors could, and were invited to, consider them was prejudicial—especially since the government explicitly told jurors that the quantitative cumulation of counts and aggravating factors made Bowers more deserving of capital punishment.

Also prejudicial was the more pejorative nature of the 22 invalid homicide convictions. As discussed, the § 924(j) convictions were the

only ones for "murder." *See* App.Br.81. Worse, even though the jury was not being asked to sentence Bowers on the § 249 convictions, the "hate"-crime label the statute attached to them licensed the government to repeatedly ascribe this inflammatory term to Bowers and his acts throughout its selection-phase summations.

For these reasons, the Court should not only dismiss Bowers' § 249 convictions but also remand for resentencing on his § 247 convictions.

## IV. THE RELIGIOUS-OBSTRUCTION STATUTE IS AN INVALID EXERCISE OF CONGRESS'S COMMERCE CLAUSE AUTHORITY, BOTH FACIALLY AND AS APPLIED IN THIS CASE.

The regulation of obstruction of religious exercise—a quintessentially intrastate, noncommercial activity—exceeds Congress's Commerce Clause authority. Even if it did not, Bowers's conduct lacked sufficient connections to interstate commerce to make § 247 constitutional as applied in this case. Bowers's convictions under 18 U.S.C. § 247(a)(2) should therefore be vacated.

**A.** **Section 247(a)(2) is facially unconstitutional because it regulates purely non-economic, intrastate activity.**

Section 247(a)(2) is functionally indistinguishable from the facially-invalidated statutes in *United States v. Lopez*, 514 U.S. 549, 567 (1995), and *United States v. Morrison*, 529 U.S. 598, 618-19 (2000). It regulates a strictly intrastate, non-economic activity, not within any larger federal regulatory scheme.[25] Congress made no findings that religious obstruction substantially affects interstate commerce. (App.Br.123-24.) And any hypothetical effects on interstate commerce are so attenuated as to permit Congress to "regulate [] all violent crime," in violation of states' core police power. *Lopez*, 514 U.S. at 564.

The government argues that § 247 satisfies the Commerce Clause because its jurisdictional element—requiring the offense to be "in or affect[]" interstate commerce—"ensures that, on a case-by-case basis, a jury can convict only if it finds, beyond a reasonable doubt, that the defendant's actions sufficiently involved interstate commerce."

---

[25] The also government argues Congress may regulate intrastate noncommercial activity if it is "part of a 'class of activity' that has a substantial effect on interstate commerce." (Gov.Br.70) (quoting *Gonzales v. Raich*, 545 U.S. 1, 17-18 (2005)). But it does not identify any commerce-affecting class into which religious obstruction might fall.

(Gov.Br.73.) But *Lopez* and *Morrison* "reject the view that a jurisdictional element, standing alone, serves to shield a statute from constitutional infirmities under the Commerce Clause." *United States v. Alderman*, 565 F.3d 641, 648 (9th Cir. 2009) (cleaned up). A jurisdictional element must be "meaningful," *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006), defining a "discrete set" of activities whose connection to interstate-commerce is "explicit." *Lopez*, 514 U.S. at 562; *see also United States v. Bishop*, 66 F.3d 569, 585 (3d Cir. 1995) (a jurisdictional element does not "render [a statute] *per se* constitutional" under the Commerce Clause). Otherwise, "the connection between the activity regulated and the jurisdictional hook may be so attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce." *United States v. Rodia*, 194 F.3d 465, 472 (3d Cir. 1999).

Section 247's jurisdictional element is insufficient, because it fails meaningfully to define a set of interstate-connected activities. As religious obstruction is not inherently commercial or interstate, its jurisdictional element must delineate a link. *United States v. Lopez*, 2 F.3d 1342, 1364-65 (5th Cir. 1993) (Congressional intent to invade state

51

prerogatives must be "clear"). But—unlike many other statutes' jurisdictional elements[26]— § 247(b)'s jurisdictional element never mentions interstate-travel, interstate-transported items, or use of interstate instrumentalities. Instead, its "in" or "affect[ing]" interstate-commerce language simply restates a legal conclusion coextensive with the Commerce Clause itself, *United States v. Ballinger*, 395 F.3d 1218, 1232, 1235 (11th Cir. 2005) (en banc), never specifying how the regulated activity relates to interstate-commerce.[27]

---

[26] 18 U.S.C. § 2119 (taking an automobile "transported, shipped, or received" in interstate commerce); 18 U.S.C. § 2252A(a)(2)(B)( child pornography "mailed, or . . . shipped or transported" in or affecting interstate commerce); 18 U.S.C. § 844(e) (threat made "through the use of the mail, telephone, telegraph, or other instrument of interstate" commerce); 18 U.S.C. § 2250 (travelling interstate without registering as a sex offender). Section 247(a)(2) is also distinguishable from statues targeting commercial commodities. 18 U.S.C. § 844(i) (malicious damage of commercially-connected property); 18 U.S.C. § 921(a)(35) (body armor "sold or offered for sale" in interstate-commerce), 18 U.S.C. § 931 (purchase, ownership, or possession of body armor).

[27] The government relies on *United States v. Pugh*, 90 F.4th 1318, 1326 (11th Cir. 2024), to argue that § 247(b)'s phrase "in commerce" subsumes Bowers's conduct within the first two categories of Commerce Clause regulation identified in *Lopez*: interstate channels and instrumentalities. (Gov.Br.71.) But the jurisdictional element addressed in *Pugh* requires an "object of the criminal act" that is "sufficiently connected to interstate commerce"—specifically, "civil disorders that '*affect commerce* or the movement of any article or commodity *in*

52

The government minimizes the import of *Rodia*, claiming § 247's conclusory "in or affects" jurisdictional element is superior to the one *Rodia* rejected as "too tenuously related to the statute's regulated activity." (Gov.Br.75-76.) In support of that contention, the government asserts that *Lopez* "acknowledged" that an "in or affects interstate . . . commerce" jurisdictional element, like § 247's, "serves to sufficiently "limit [a statute's reach] to a discrete set of [offenses] that . . . have an explicit connection with or effect on interstate commerce." (Gov.Br.76.) In the portion of *Lopez* the government cites, the Supreme Court quoted the jurisdictional element of a predecessor to the current felon-in-possession statute, 18 U.S.C. § 1202(a), which prohibited any "felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce . . . any firearm." *Lopez*, 514 U.S. at 561-62.

But *Lopez*'s citation of § 1202(a) does not suggest "in or affecting" jurisdictional elements always obviate Commerce Clause concerns—especially when the regulated activity (religious obstruction) is inherently intrastate and noncommercial. Section 1202(a) and the felon-

commerce.'" *Pugh*, 90 F.4th at 1326-27 (quoting 18 U.S.C. § 231(a)(3)) (emphasis added).

in-possession statute *Lopez* addressed regulate conduct that is inherently commercial and intrastate: the successive transferring, and intervening possession, of firearms in a commercial market. Guns are "things" moved in interstate-commerce, *United States v. Wilks*, 58 F.3d 1518, 1521-22 (10th Cir. 1995), and the felon-in-possession statute "regulate[s] [their] interstate flow," *id.* at 1521, through a "comprehensive [federal] statutory regime." *United States v. Stewart*, 451 F.3d 1071, 1076 (9th Cir. 2006); *see also United States v. Kirk*, 70 F.3d 791, 796-97 (5th Cir. 1995) (federal machine-gun ban is a valid "attempt to control the interstate [machinegun] market"). Section 247(a)(2), by contrast, targets not a "thing," but the noncommercial obstruction of religion, for which there is no market.

## B. Section 247(a)(2) is unconstitutional as applied to Bowers's conduct.

The government claims Bowers's offense was "in commerce" because Bowers used the Internet and a cell phone before the shootings, and—during the offense—used firearms that had previously crossed state lines, and contends that Bowers's conduct "substantially affected commerce" because the New Light and Dor Hadash congregations

54

terminated their leases and broke other economic obligations as a result. (Gov.Br.66-68, 84-86.) None of these arguments has merit.

### 1. Bowers's pre-offense Internet and cell phone use did not make his offense "in" interstate commerce.

First, ubiquitous pre-offense preparatory activities—like using the Internet or a cell phone—cannot pull an intrastate, noneconomic crime into the flow of commerce to render it "in" interstate commerce. Such activities accompany almost every action taken in modern life: there is virtually nothing people do today that does not involve the Internet or a cell phone. Allowing such commonplace activities to render any crime "in" interstate commerce would impermissibly create "a general [federal] police power of the sort retained by the States." *Lopez*, 514 U.S. at 567; *see also Morrison*, 529 U.S. at 618 ("[T]he suppression of [noneconomic] violent crime and vindication of its victims" lies at the very heart of States' traditional police power).

Even in the commercial context, transactions merely *preceded* by interstate acts are not "in" interstate commerce, because interstate commerce ends "when movement of the item in question has ceased in the destination state." *McElroy v. United States*, 455 U.S. 642, 653 & n.17 (1982) (collecting cases); *see also Carter v. Carter Coal Co.*, 298

U.S. 238, 309 (1936) ("[W]hen interstate commercial intercourse" concludes, "federal regulatory power ceases");[28] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 543 (1935) (slaughter and sale of chickens in intrastate warehouses was not "in" interstate commerce, though the chickens had previously been transported from out of state); *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195-98 (1974) (manufacturing concrete for subsequent use in interstate highways is not itself an activity "in" interstate commerce). If Congress's interstate commerce authority cannot reach even *commercial* intrastate transactions preceded by interstate conduct, it certainly cannot extend to *noncommercial*, intrastate, *criminal* acts preceded by defendant's ancillary telephone-or-Internet use.

The government is also wrong that Bowers used the Internet to commit the offense itself. (Gov.Br.86.) It attempts to analogize this case

_____

[28] *See also United States v. Patton*, 451 F.3d 615, 621-22 (10th Cir. 2006) ("channels" and "instrumentalities" prongs are confined to "interstate transportation itself, not manufacture before shipment or use after shipment," and "things actually being moved in interstate commerce, not all people and things that have ever moved across state lines"); *cf. Nat.'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 556-57 (2012) (Commerce Clause doesn't permit Congress to regulate conduct of individuals not currently active in the health insurance market, simply because they may later become active in it).

to *United States v. MacEwan*, 445 F.3d 237, 244-45 (3d Cir. 2006), in

which the defendant actually did use the Internet to commit the offense

conduct of downloading child pornography, claiming Bowers similarly

"used the Internet to select his victims and, [shortly before the

shooting], he posted his intent to do so on the Internet." (Gov.Br.86.)

But the offense here was not downloading or any other computer-

related activity; it was the actual shootings rather than any planning or

expression of ideas about them.

2. **Bowers's use of items previously moved between states did not make his offense "in" interstate commerce.**

Second, the government is incorrect that *Scarborough v. United

States*, 431 U.S. 563 (1977) renders Bowers's acts "in interstate

commerce", because Bowers used interstate-traded items to commit the

offense. (Gov.Br.80-81.) *Scarborough* addressed not the Commerce

Clause, but only a question of statutory interpretation: the scope of the

predecessor to the current felon-in-possession statute, 18 U.S.C.

§ 922(g)(1). *Patton*, 451 F.3d at 634 ("*Scarborough* decided only a

question of statutory interpretation," though it assumed the felon-in-

possession statute's constitutionality); *Bishop*, 66 F.3d at 586 (3d Cir.

1995) ("*Scarborough* did not directly address Congressional power under the Commerce Clause").

Moreover, *Scarborough* assumed that a commercial commodity's—a gun's—prior interstate travel provided the necessary nexus to interstate commerce under a felon-in-possession statute, where guns are part of an interstate commercial market as they move between possessors. *Wilks*, 58 F.3d at 1521-22 (10th Cir. 1995), *Stewart*, 451 F.3d at 1076. Section 247(a)(2) does not regulate any commodity's movement through any market but only the *intrastate noncommercial* act of obstructing others' religious exercise. "It is one thing for Congress to prohibit possession of a weapon that has itself moved in interstate commerce [as part of a market], but it is quite another thing for Congress to prohibit [noncommercial, intrastate] homicides using such weapons." *United States v. Kallestad*, 236 F.3d 225, 229 (5th Cir. 2000).[29] Deeming noncommercial violent crimes "in" interstate-

---

[29] The government appears to claim that *Jones v. United States,* 529 U.S. 848, 859 (2000) suggests *Scarborough* justifies federal jurisdiction over any violent crime "as long as there is a sufficient link to interstate commerce." (Gov.Br.84.) But *Jones* never addressed *Scarborough* at all. If anything, *Jones*'s holding that arson-targeted property must be actively employed in interstate commerce confirms

commerce whenever committed with an interstate-traded item would unconstitutionally give Congress limitless power to regulate local crime. *United States v. McCoy*, 323 F.3d 1114, 1125 (9th Cir. 2003); *Jones*, 529 U.S. at 857-58; *Rodia*, 194 F.3d at 473.

None of the government's cited cases supports expanding *Scarborough* outside the context of regulations targeting an interstate market for regulated commodities, as with § 247 and religious obstruction. The government cites *United States v. Cook*, 488 F. App'x 643, 645-46 (3d Cir. 2012), and *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011), for the proposition that courts have relied on *Scarborough* to "uph[old] convictions where the defendant used body armor or explosives that had traveled in interstate commerce." (Gov.Br.81.) But those cases' focus on possession of firearms and explosives-related goods only emphasizes *Scarborough*'s commerce-based scope. As the Tenth Circuit has recognized, *Scarborough* permits regulation of "*any firearm* that has ever traversed state lines," *Patton*,

---

that the connection required to interstate commerce is heightened when the conduct—in that case, arson—is, as here, "a paradigmatic common-law state crime." *Jones*, 529 U.S. at 858.

451 F.3d at 634 (emphasis added)—the regulation is of the commodity—

and *Scarborough*'s possession-of-interstate-traded goods theory of

Commerce Clause jurisdiction exists entirely outside *Lopez*'s three

categories for when *conduct* can be regulated. *Id.* (holding the body

armor statute "does not fit within any of the *Lopez* categories," but was

constitutional under *Scarborough*). When the regulation targets non-

commercial conduct—like religious obstruction—rather than a

commercial good, *Scarborough* does not apply.[30]

---

[30] The government cites *Bishop* for the proposition that "a car's prior travel in interstate commerce was enough to render the federal carjacking statute constitutional." (Gov.Br.83.) But *Bishop* upheld the carjacking statute there under *Lopez*'s "substantially affects" prong (3) and "instrumentalities" prong (2), both separate and independent bases for Commerce Clause jurisdiction distinct from *Scarborough*. *Bishop*, 66 F.3d at 575-90; *Patton*, 451 F.3d at 634. *Bishop* discussed *Scarborough* in holding the carjacking statute's jurisdictional element sufficient for purposes of the "substantially affects" analysis, *Bishop*, 66 F.3d at 585-88, it did not rely on *Scarborough* itself as the basis for Commerce Clause jurisdiction—let alone expand *Scarborough*'s jurisdictional rationale to cars or to crimes committed using interstate-traded objects generally.

### 3. Bowers's offense did not "substantially affect" interstate commerce because its economic impacts were not independently substantial.

Third and finally, the termination of leases and economic agreements the government cites (Gov.Br. 66-68, 84-86) cannot render Bowers's noncommercial offense "affecting" interstate commerce, because those events' impact on the national economy was insubstantial. Because religious obstruction is neither "economic" nor "part of an economic 'class of activities' [with] a substantial effect on interstate commerce," *Raich*, 545 U.S. at 17, any commercial impacts of an individual religious obstruction offense cannot be aggregated with those of other, similar, offenses to create the substantial effect on interstate-commerce *Lopez* requires. *Taylor v. United States*, 579 U.S. 301, 306 (2016) (aggregation has only been permitted only "where [regulated] activity is economic"); *Gibbs v. Babbitt*, 214 F.3d 483, 492-93 (4th Cir.2000) (aggregation possible for "economic activity"); *Waucaush v. United States*, 380 F.3d 251, 256-58 (6th Cir. 2004) (gang's intrastate commercial impacts could not be aggregated because gang's activities were not economic). Such impacts would constitute the same attenuated "costs of crime" *Morrison* rejected as insufficient. *Morrison*, 529 U.S. at

612-13; *United States v. Ho*, 311 F.3d 589, 598 (5th Cir.2002) (absent aggregation, regulated act must "by itself substantially affect" interstate commerce).

The government concedes that aggregation is necessary to render the economic effects in this case "substantial" for purposes of the Commerce Clause; it makes no claim that the economic impact of Bowers's attack by itself substantially affected interstate commerce. (Gov.Br.87.) Rather, the government argues that the economic effect of Bowers's attack can be combined with the impacts of other religious-obstruction crimes, citing *Taylor*, 579 U.S. at 303, for the proposition that Congress "may regulate . . . intrastate activities based on their aggregate effect on interstate commerce." (Gov.Br.87.) But *Taylor* held only that aggregation was appropriate where the conduct it addressed—sale of marijuana—was "unquestionably an *economic activity*." *Taylor*, 579 U.S. at 306 (emphasis added); *see also Raich*, 545 U.S. at 17 (Congress can regulate an "*economic* 'class of activities' that have a substantial effect on interstate commerce.") (emphasis added). *Taylor* provides no basis to aggregate wholly-*uneconomic* conduct like § 247's religious obstruction.

The government also appears to suggest aggregation can occur because certain activities of the synagogue were economic—*i.e.* "child daycare or schooling," citing *United States v. Doggart*, 947 F.3d 879, 885 (6th Cir. 2020), for the proposition that such activities can render a house of worship a "building used in interstate commerce" under 18 U.S.C. § 844(i). (Gov.Br.88.) But *Taylor* and *Raich* require the *activity regulated by the statute* to be economic to permit aggregation—not merely that some result of the offense was economic. *Taylor*, 579 U.S. at 306 ("*activities* . . . that 'substantially affect' commerce—may be regulated so long as they substantially affect interstate commerce in the aggregate" and such "activit[ies]" have always been "economic in nature"); *Raich*, 545 U.S. at 17 (Congress can regulate an "*economic 'class of activities*' that have a substantial effect on interstate commerce.") (emphasis added).

Equally misplaced is the government's passing argument that § 247(a)(2)'s regulated conduct is commercial because its jurisdictional clause "criminalizes forcible obstructions of religious freedom that are *in or affect interstate commerce*," (Gov.Br.88) (quoting 18 U.S.C. § 247(b)), and that *Lopez* said an activity's economic nature is "only one

of the four factors it considered" to determine whether an activity

substantially affects interstate commerce. (Gov.Br.88-89.) Section 247's

jurisdictional element does not describe the regulated conduct; it merely

indicates an intent to regulate to the extent of the Commerce Clause's

limits. *Ballinger*, 395 F.3d at 1232, 1235 ("affecting commerce" indicates

an intent to regulate to the full extent of Commerce Clause authority).

And while *Lopez* treated an activity's economic nature as one factor in

whether it "substantially affects" interstate commerce, it did not

address when or whether a particular activity's economic effects can be

aggregated to satisfy that "substantially affects" requirement.[31]

## C. The district court prejudicially erred in instructing the jury on § 247(b)'s jurisdictional element.

The government argues that the rule of lenity and other canons of

construction cannot apply to § 247 because § 247 is not ambiguous.

(Gov.Br.90.) But, as the government acknowledges, the phase "in or

---

[31] Also unavailing is the government's reliance on *United States v. Dorsey*, 418 F.3d 1038 (9th Cir. 2005), for the proposition that "Congress may prohibit crimes that affect commerce even if the regulated activity is not inherently economic." (Gov.Br.89.) *Dorsey* said nothing about whether the economic impact of possession of guns in school zones could be aggregated to show a substantial effect on commerce. *Dorsey*, 418 F.3d at 1045-46.

affect[ing] interstate or foreign commerce" merely references Congress's "full commerce power" (Gov.Br.90); it has no independent meaning. The limits of that power are inherently uncertain, and "necessarily [a matter] of degree." *Lopez*, 514 U.S. at 566-67 (cleaned up) (legal tests for Commerce Clause jurisdiction "are not precise formulations"). Section 247's jurisdictional element thus fails to lend clarity to the statute's scope, beyond referring the reader to the complex and constantly-evolving body of caselaw interpreting the Commerce Clause.

As explained above, the government is also wrong that *Scarborough* and its progeny hold that "[the] use of items that had once traveled [in] interstate [commerce] . . . *does* render [Bowers's] offense 'in or affecting commerce.'" (Gov.Br.91) (citation omitted). *Scarborough* sets forth a specific rule for statutes that regulate interstate-traded commodities like guns. It does not define when conduct is "in or affecting commerce." (*See* Point IV(B)(2), above.)

The government also misleadingly cites *United States v. Roof*, 10 F.4th 314 (4th Cir. 2021), for the proposition that "the effect of each individual defendant's conduct on commerce may itself be 'minimal'" and the effects can be aggregated. (Gov.Br.91.) *Roof* expressly *declined*

to decide "whether th[e aggregation] rule carries over to interference with activity that is not plainly commercial or economic in character," because it found any error was harmless. *Roof*, 10 F.4th at 389.

The government's reliance on *United States v. Grassie*, 237 F.3d 1199 (10th Cir.2001) (Gov.Br.91), is also misplaced. *Grassie* addressed not § 247(a)(2)'s religious-obstruction provision, but § 247(a)(1), which penalizes damage to "religious real property," including arson of commercially-related church property, a fundamentally different offense. The *Grassie* appellant also conceded § 247's Commerce Clause validity, arguing solely that *Jones* changed the analysis, *Grassie*, 237 F.3d at 1206-07—a narrow argument not presented here.

## POINTS RELATED TO JURY SELECTION

**V.    THE COURT VIOLATED BOWERS'S FIFTH AND SIXTH AMENDMENT RIGHTS BY EMPANELING A BIASED JUROR WHO AUTHORIZED AND SUPERVISED EXECUTIONS IN CHINA.**

The government minimizes Juror 119's participation in a brutal 1983 wave of government-sponsored executions by the Chinese government, dismissing it as merely a brief period of reviewing death sentences. That defies the facts. During the precise eight-month period in 1983 when Juror 119 greenlighted executions, the Chinese

government summarily put to death roughly 24,000 people,[32] many for trivial or politically-charged crimes like "hooliganism," "sexual promiscuity," "causing intentional injury," "organization of sects and secret societies," and promoting prostitution.[33] On at least one occasion—and possibly more—Juror 119 personally attended an execution as a government representative, charged with the duty of ensuring the prisoner was killed and not spared. Yet despite these aberrant, emotionally-indelible experiences, the district court never once asked Juror 119 about their impact on her views about the death penalty or her ability to be fair. Instead, it cabined its inquiry to whether she could apply United States, rather than Chinese, "law," while failing to grapple with the fraught nature of her role in a massive wave of rapid, government-sponsored killings. Those experiences should have disqualified Juror 119 as impliedly and expressly biased. At

---

[32] Susan Trevaskes, "From 'Killing Many' to 'Killing Fewer'," in *The Death Penalty in China: Policy, Practice, and Reform*, ed. Bin Liang and Hong Lu (Columbia University Press, 2016), 124.

[33] Harold M. Tanner, *Strike Hard! Anti-Crime Campaigns and Chinese Criminal Justice, 1979-1985*, 92, 94 (Cornell East Asia Series 1999); *see also* Bin Liang, "China's Death Penalty Practice," in *The Death Penalty in China*, 3, 13.

minimum, this Court should remand to permit the district court to apply the proper standard, conduct an adequate voir dire, and address the bias question it brushed aside.

## A. Juror 119 was impliedly biased, warranting vacatur or—at minimum—a remand for further factual development.

The government claims Juror 119 only supervised one execution and played a neutral role as a government official in China's violent 1983 anticrime offensive. (Gov.Br.190-91.) But that is far from clear. Significant questions exist as to how many executions Juror 119 monitored or participated in, and the district court never elicited information about the other death penalty cases she reviewed. The government is also wrong that her employment cannot create implied bias; this Court recognizes employment-based categories of implied bias as well as fact-specific situations in which implied bias arises from a juror's individual experience. Juror 119's record of conducting executions during a violent government crackdown fits comfortably in either category.

**1.** **The record is insufficiently developed on the extent of Juror 119's involvement in executions, warranting—at minimum—remand for clarification.**

It is undisputed that Juror 119 decided whether to execute individuals—and monitored at least one execution[34]—during a violent Chinese government crackdown in 1983, in which approximately 24,000 people were executed in a period of months. (App.Br.147-49 & nn.46-49.) That alone creates a risk that she—as part of that repressive government crackdown—experienced substantial emotional involvement and identification with the process of killing that is irreconcilable with the heightened reliability this Court requires in death penalty cases. *United States ex rel De Vita v. McCorkle*, 248 F.2d 1, 8 (3d Cir. 1957).

Attempting to downplay her role, the government claims Juror 119 monitored an execution in "only one case" (Gov.Br.191), and that "Bowers mischaracterizes the record" by saying she "supervised" (App.Br.145), "personally assisted" (App.Br.164; *accord* App.Br.170),

---

[34] Even if it was only one execution, instead of multiple executions (which the record does not show), Juror 119's participation in a single execution is sufficient to establish implied bias.

"personal[ly] participat[ed] in" (App.Br.166), and "carr[ied] out" (App.Br.167) executions. (Gov.Br.191.) But the record clearly shows participation. Juror 119 described a case where she "need[ed] to go there and like a monitor the whole thing to the end" to "ensure[] the process was completed" and the individual was killed. (App.1689.) Though the government insists this was the "only" case in which she did this, and it only happened "once," (Gov.Br.190-91), Juror 119 never said that. To the contrary, she said *"[t]hat's only one case* I monitor until he[] died." (App.1689) (emphasis added). Taken literally, that statement means it was "only one" of multiple cases she monitored until the person was dead. The government reads it differently, but not grammatically, appearing to assume Juror 119 used incorrect syntax.

Grammatically interpreted, Juror 119 said she monitored multiple executions. At best, her statement is ambiguous as to whether it was one execution or more. That ambiguity was never clarified. *Cf. Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993) (voir dire inadequate where trial court failed to elicit the nature or extent of jurors' discussions about an extraneous matter.) Further factual development is warranted to clarify whether it truly was one execution, if not how many

executions, and what the facts of the cases were in which she monitored executions or determined the executions should proceed.

### 2. The district court misapprehended the bias inquiry and never determined bias.

The government contends that the district court "did not misapprehend the [bias] issue" when it said Juror 119's involvement in executions is "what her history is," arguing that the court's reference to "history" shows it concluded the experience was too attenuated to create bias. (Gov.Br.194.)

But nothing supports that reading. The district court gave no indication it considered the biasing impact of Juror 119's death penalty participation at all—let alone its timeframe. It made no reference to her experiences carrying out executions, only "[h]er past experience with Chinese *law*" (App.2010) (emphasis added)—indicating it viewed the issue as simply whether or not she would be able to apply American law given her experience with a different body of law. The judge's questions confirmed his crabbed view of the issue: he asked Juror 119 only whether she understood that "as a juror, [she] would be required to follow . . . *U.S. law* that relates to this case" (App.1696-97) (emphasis added), and "would have to disregard any other training, experience or

71

knowledge . . . *of the law*." (App.1697) (emphasis added). Neither question asked whether she would be biased by her experience presiding over death-penalty cases and at least one execution.

### 3. This Court's caselaw shows Juror 119 was impliedly biased.

The government cites *United States v. Mitchell*, 690 F.3d 137, 146 (3d Cir. 2012), for the proposition that "[t]he passage of time since Juror 119's review of death sentences, the brief nature of that work, and her objective reviewing function leave no room to find that 'the average person' in Juror 119's position 'would be prejudiced and feel substantial emotional involvement in the case.'" (Gov.Br.190.) It further cites *Mitchell* for the proposition that an "employee of [the] investigating police department [was] not presumed biased." (Gov.Br.191.)

But *Mitchell* says little about the circumstances here. It neither addressed the effect of passage of time or brevity or objective of employment, nor held that employees of investigating agencies can never be impliedly biased. It merely held there was no implied bias on the specific facts before it: a noncapital charge, where the juror was "not an employee of the prosecuting agency," *id.* at 149, but merely a co-worker of two investigating officers but did not work in their same

department—she instead "work[ed] in the fiscal and property" section and was "not in the field." *Mitchell*, 690 F.3d at 142-43; *id.* at 141. Though the Court rejected any blanket rule that "the law . . . categorically impute[s] bias to coworkers of key Government witnesses," *id.* at 150, it affirmed that implied bias *does* extend to "employees of the prosecuting agency," *id.* at 149, and whenever case-specific facts show "the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case." *Id.* at 146.

Unlike the *Mitchell* appellant, Bowers does not ask for any categorical rule that implied bias always applies to co-workers of investigating officers—especially not in noncapital cases like *Mitchell* addressed. This is a death penalty case in which a capital juror participated in a violent spasm of government-sponsored executions in China in 1983—in which tens of thousands were put to death—both by personally supervising at least one execution and personally deciding who should live and who should die. Far from a mere co-worker of investigating officers, who worked in another department (as in *Mitchell*), she was an actual participant in the process of administering

death as a punishment, including for non-violent, non-homicide, and political crimes. (*See* App.Br.147-50 & n.46-49.)

The government also claims the "passage of time since," and short duration and limited nature of Juror 119's death penalty role in China, reduce the likelihood of bias. (Gov.Br.190.) But that assertion relies on the government's dubious, unestablished gloss on the record—that she supposedly monitored an execution only "once," instead of "only one" like she said. The government's cited cases—*Mitchell* and *Williams*— also fail to support the point, as *Mitchell* did not address passage of time and *Williams* merely declined to categorically imply bias due to prior jury service in cases with "similar issues." *Govt. of the Virgin Islands v. Williams*, 476 F.2d 771, 773-74 (3d Cir. 1973). Neither was a death-penalty case, and neither considered the intensely emotional experience of approving and carrying out executions, let alone as an official acting on behalf of the government; such direct responsibility for administering capital punishment suffices to show implied bias even if it was only one execution.

The government also relies on *Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990), calling it "more conducive to juror removal than [this case]."

(Gov.Br.191.) But *Tinsley* is entirely dissimilar. The juror there had counseled "one [rape victim] out of a 30-year career," did not "routinely . . . work with rape victims," and lacked an employment connection to either party in the case. *Id.* at 529. Moreover, the court cited her "professional training [as] a psychiatric social worker," to conclude she was "detach[ed]" from rape trauma and "less likely to be prejudiced by contact with a rape victim." *Id.*

By contrast, Juror 119 did not merely counsel a person once over a thirty-year career. She had an intense, months-long burst of involvement in what was apparently a massive wave of rapid-fire executions. She saw at least one person die and was part of the government apparatus that caused that death. Her official role in the execution campaign cannot help but make her feel responsibility for it—and have given her a stake and motive in believing it was justified. Her detailed voir dire answers indicate that she vividly recalled these experiences, and her continued fervent support for an aggressive death penalty suggests they remained formative for her. No evidence suggested she had professional training that could have detached her from those experiences emotionally. And even if she had, detachment

75

from the process of executing people constitutes bias of its own sort in a death-penalty case where, in contrast to *Tinsley*, jurors have to consider the sentence.

The government claims Bowers's cited cases involving jurors with experiences similar to those on trial are "are qualitatively different than objectively reviewing death sentences imposed on unrelated persons," (Gov.Br.193), but fails to explain how. Each case inevitably involves different circumstances, but—as here—each juror's experience mirrored an issue in the trial. Just as the juror in *United States v. Eubanks*, 591 F.2d 513, 516-17 (9th Cir. 1979), a heroin case, had sons in prison for heroin-related crimes, and the juror in *Jackson v. United States*, 395 F.2d 615, 616-18 (D.C. Cir. 1968), was involved in a "love triangle" like the one at issue in the trial, Juror 119 was previously involved in executing individuals and was now a juror in a trial almost wholly focused on whether an individual should be executed.

The government argues that Juror 119's failure to reveal her death penalty work on her questionnaire must be reviewed only for plain error because Bowers allegedly did not make that specific argument below—and that the omission was unintentional.

(Gov.Br.195-96.) It is wrong on both points. First, the omission from the questionnaire *was* raised below. Defense counsel, in presenting the challenge for cause, cited the disjunction between Juror 119's juror questionnaire and her voir dire answers about the death penalty, noting that he had been surprised to learn for the first time in voir dire that she oversaw an execution. (App.1698.)

Second, as discussed in Point II(A), above, a well-established line of United States Supreme Court decisions recognizes that when a party preserves a "federal claim," he "can make any argument in support of that claim" on appeal and is "not limited to the precise arguments . . . made below." *See* App.Br.67 (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992), and citing other such decisions). The Third Circuit has also recognized this rule. *See* Point II(A), above.

The effect of a juror's omitting information on a questionnaire is part of the overall bias inquiry, not subject to any more specific legal standard; it is evidence of the existence of bias, not a separate, standalone basis for finding bias. Thus the omission-of-information argument depends on "the same facts"—Juror 119's voir dire questionnaire and statements—and "same legal rule" as the bias

inquiry overall. (App.Br.67.) Moreover, the district court was clearly aware of the issue because it specifically mentioned the inconsistencies between her questionnaire and voir dire responses. (App.2010) (court noting that Juror 119 "explained her oral answers in a different fashion than her questionnaires.")

Nor is the government correct that "the record shows no intentional concealment" by Juror 119 of her death penalty experience because her questionnaire disclosed that she had lived and attended law school in China. (Gov.Br.195.) The fact that she revealed some aspects of her life in China on the questionnaire, but omitted only her participation in death penalty cases and executions, suggests the omission was intentional. Nor did Juror 119 "forthrightly disclose[] her work reviewing death sentences in response to a general question about the death penalty in China" as the government argues. (Gov.Br.195.) She went through the entire questioning by the prosecutor without mentioning her work reviewing death sentences once; then mentioned it only after defense counsel asked multiple questions including about the dates of her schooling in China, whether China had the death penalty, and—the question that finally elicited it—"[u]nder what circumstances

is a person sentenced to death in China and executed." (App. 1687.) The information had to be dragged from her by detailed inquiries.

The government is also wrong to claim Juror 119 did not "embrace[]" China's 1983 death penalty law. (Gov.Br.194.) She clearly did. In describing China's "rapid" execution procedure from the 1980s she repeatedly opined that it was necessary to combat rising crime. (App.1690) ("The society is very unsafe[], because a lot of . . . crime[] at that time" and "[p]eople in the street [fighting] each other."); (App.1687-88) ("So at that time we passed a law to punish this type of very severe crime[] in very harshest law.") Though she initially said "No" in response to defense counsel's question whether China's policy was "an effective, efficient way of justice," (App.1689), she appeared to misunderstand the question as asking how long the death penalty process took. Her answer "No" was immediately followed by an explanation that the expedited death penalty law "only last[ed] less than one year," indicating that she believed—possibly due to a language barrier—that defense counsel was mistaken about how long China's execution process took. (App.1689.) When defense counsel asked her if

China's 1983 death penalty process was "very expeditious," Juror 119 said "yes." (App.1690.)

## B. Juror 119 was actually biased.

### 1. The district court did not consider actual bias.

The government claims the district court considered whether Juror 119 was actually biased because it "specifically referenced needing to review the entire transcript, App.1699, and gave the matter further consideration, App.2010." (Gov.Br.200 n.43.) But the district court never addressed Juror 119's views or whether they biased her; its review of the transcript and further consideration following the defense challenge, cited by the government (Gov.Br.200 n.43), regarded only whether she could communicate in English and apply American law, (App.2010), and "[h]er past experience with Chinese law," (*id.*). The court did not mention her substantive views about the death penalty versus life imprisonment.

### 2. Juror 119's statements show she was actually biased against life imprisonment and in favor of death.

The government argues Juror 119 was not actually biased because she made "assurances of impartiality" and promised to consider all of the evidence before deciding the sentence. (Gov.Br.199-200.) But

prospective jurors' vague, generalized assurances of impartiality are not

dispositive—particularly when the potential for bias, as demonstrated

by more specific responses, is so substantial. *Marshall v. United States*,

360 U.S. 310 (1959) (reversing despite jurors' assurances they would not

be influenced by prejudicial news articles); *Waldorf*, 3 F.3d at 711

(jurors' assurance that they could disregard prejudicial publicity did not

obviate their bias). Numerous statements Juror 119 made—

independently and without prompting—clarified that, despite her

professed openness, she did not consider life imprisonment a legitimate

punishment for murder. She opined that life imprisonment in America

is not "some sort of punishment" like the hard labor required in other

countries, that American prisoners live "comfortably" with air

conditioning, that life sentences are not permanent, and that life

imprisonment could not "change" a person fifty years old (like

Bowers)—with such change being, in her view, a necessary condition for

life imprisonment to be an adequate punishment. (*See* App.Br.171-78.)[35]

---

[35] The government claims Juror 119's assurances "were stronger than those of jurors" in cases where appellate courts declined to reverse due to juror impartiality. (Gov.Br.199-200.) But the government's cited cases are not analogous. In *United States v. Webster*, 162 F.3d 308, 343-

"[W]hen a juror makes a [generalized] statement that she thinks she can be fair, but immediately qualifies it with a [more specific] statement of partiality, actual bias is presumed when proper juror rehabilitation and juror assurances of impartiality are absent." *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004). That is the case here. Though Juror 119 initially told the prosecutor she would consider all the evidence, upon questioning by defense counsel she opined that unless unjustified murderers are executed people can just "randomly kill

44 (5th Cir. 1998), the juror merely expressed a predisposition towards the prosecution but then affirmed the prosecution's burden of proof beyond a reasonable doubt and said he would put aside his predisposition and give both sides a fair trial. In *United States v. Fulks*, 454 F.3d 410, 428 (4th Cir. 2006), the juror expressed pro-death-penalty views but confirmed he would consider mitigation. The juror in *United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) initially expressed a weak inclination to believe the police but then assured the district court she would follow the court's instructions. And *United States v. Meehan*, 741 F. App'x 864, 872 (3d Cir. 2018)'s statement that the Supreme Court "upheld the impaneling of jurors who . . . disclaimed outright, their ability to be impartial" is not supported by the cases it cites for that proposition: *Patton v. Yount*, 467 U.S. 1025, 1039-40 (1984), was a habeas corpus case that applied substantial deference—not applicable in this federal direct-review appeal—to the state court's findings of fact, while *Murphy v. Florida*, 421 U.S. 794, 801-02 (1975), involved a juror who initially said his prior "impression" of the defendant would predispose him to convict, but did so based on "leading" questions and then said "he had no deep impression of petitioner at all."

somebody," that life imprisonment in the United States was not "punishment" like hard labor, that inmates enjoy undeserved luxuries, that life sentences are impermanent, and that people 50 or 60 years old are too old to be changed by prison. (App.1692-95.) Defense counsel asked if she could put aside her opinion about life sentences being impermanent but Juror 119 appeared to misunderstand the question as asking about consideration of particular evidence, because she answered in a nonresponsive fashion: "I cannot make decision until I see the specific case. Specific. All the information altogether." (App.1696.)

The government claims Juror 119 was rehabilitated by the court (Gov.Br.202), but she was not. The court told Juror 119 that she would have to follow American rather than Chinese law, and could not consider what she saw on television. (App.1696-97.) But those admonitions were ineffectual, because they were not questions (Juror 119 was not actually asked whether she could comply), and, more important, because they touched only on the narrow issue of United States versus Chinese law and television, rather than Juror 119's

deeper conviction that life imprisonment is not an adequate punishment for murder.

The government attempts to minimize Juror 119's statements as supposedly the result of "leading and vague questions" by defense counsel—specifically, defense counsel's mention of a "burden" on taxpayers and alleged leading questions about Juror 119's view that American prisoners enjoy luxuries and life sentences aren't final. (Gov. Br.201.) But Juror 119 volunteered these views. When asked about her rating of ten out of ten in favor of the death penalty, she independently began explaining her view that the absence of the death penalty permits people to "just go ahead and randomly kill somebody . . . [a]nd not face death penalty [and] live in the jail . . . very comfortably." (App.1692.)

Wholly unprompted, Juror 119 then embarked on a description of her view that life imprisonment in America is an insufficient punishment for murder. While she was "not against the jail system" in principle, Juror 119 explained, she disapproved of the American system of life imprisonment because "[t]hey don't live like—some countries they have hard labor or something. They give some kind of punishment. But

in American jail, they seem like they live comfortable." (App.1692.) She then volunteered—again without any question from defense counsel—that American prisoners are "so comfortable" and enjoy "air-conditioning" when ordinary Americans lack lack air conditioning in their homes. (App.1692.) Juror 119 thus affirmatively explained, without encouragement, that she considered the American jail system inadequate because it does not force prisoners into hard labor and allows them to live comfortably. Defense counsel's later follow-up question whether life imprisonment was "not sufficient, because . . . it's a burden on us tax-wise and they're getting nice conditions" (App.1693), merely summarized what Juror 119 had already said. And Juror 119 agreed with counsel's summary. (*Id.*)

The government also wrongly suggests Juror 119's statements about life sentences not being final was prompted by a "confusing" question from defense counsel. (Gov.Br.201.) Juror 119 initiated the discussion of non-finality herself, saying—in response to defense counsel's unrelated question whether life imprisonment was not "sufficient" because prisoners are a burden "tax-wise" and have nice conditions," and after agreeing on those points—"Yeah. *And also, I do*

85

*see from some movie[s] and TV show[s], somebody has life in jail without parole, but actually* after 20, 30, maybe 50 years, they do get out." (App.1693) (emphasis added). No questioning prompted this statement.

The government claims Juror 119's views about the inadequacy of American life imprisonment, the impermanence of life sentences, and people over 50 being unchangeable were not "entrenched" because Juror 119 made stray comments like "I don't know" and "[i]t's just in my mind." (Gov.Br.201-02.) But she never wavered from her firmly and clearly expressed core views. She unequivocally said American jails lack hard labor and prisoners live "comfortably," which is not "some kind of punishment" like other countries have, and tied that concept to her claim that without the death penalty people could "randomly kill somebody."(App.1692.) And while she allowed that "very young" people might "change" in prison, she was clear that her "personal opinion" was that 50 or 60 is "too old to be changed." (App.1694-95.) A juror's "personal opinion" is precisely what creates bias.

## C.  Conclusion

For all of these reasons, Juror 119 was both impliedly and actually biased, warranting vacatur of Bowers's death sentence. At minimum,

86

this Court should remand to permit the district court to engage with the bias inquiry it previously sidestepped, and to clarify the record regarding the specifics of Juror 119's experience approving and supervising executions.

## VI. THE DISTRICT COURT'S FAILURE TO ENGAGE BOWERS'S EVIDENCE OF DISCRIMINATION IN THE GOVERNMENT'S PEREMPTORY STRIKES OR MAKE A RECORD FOR THIS COURT TO ASSESS ITS DENIAL OF BOWERS'S *BATSON* CHALLENGES REQUIRES REVERSAL OR REMAND.

The government's response to Bowers's *Batson* claim asks this Court to affirm the district court's denial of the defense's challenges to the government's peremptory strikes against every African-American and the lone Hispanic person on the venire. But the district court never engaged the defense's evidence of discriminatory intent nor produced a record for this Court to review. It simply recycled its *Batson* stage-two finding that the government's reasons for its strikes were race neutral for its stage-three decision that there was no discrimination, both at the *Batson* hearing and in denying Bowers's post-trial request to re-open the hearing to review the evidence of pretext. The government's suggestion that the district court's decision is properly before this Court

for appellate review relies, as did the reasons for its strikes, on misrepresenting the record and the proceedings below.

This Court should remand the case to the district court for further development of Bowers's *Batson* challenges.

**A.    This Court should remand Bowers's case because there is no record on which to review the district court's denial of Bowers's *Batson* challenges.**

The government attempts to persuade this Court that the record shows the district court followed the law and engaged the evidence bearing on whether the government's strikes were motivated by discriminatory intent. But the record speaks for itself.

On the day of peremptory strikes, after 45 pages of argument from the government and the defense addressing six strikes, the court in a mere four sentences found that the government's reasons were race neutral and its strikes were not motivated by discriminatory intent, and denied Bowers's challenges. (App.5566-5592; 5601-12; 5613-15; 5617.) The defense's evidence of pretext was "understood and noted," nothing more.

Nevertheless, hoping to convince this Court that there is a record to review, the government holds up the court's nine lines of transcript

as "findings," and characterizes the court's "understand[ing] and not[ing]" as "further explain[ing]" its decision. (Gov.Br.149.) But simply calling them "findings" and an "explanation" does not make them what the decisions of the Supreme Court and this Court require. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("in considering a *Batson* objection . . . all of the circumstances that bear upon the issue of racial animosity must be consulted"); *Batson v. Kentucky*, 476 U.S. 79, 93 (1986) ("a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (quotations omitted); *Coombs v. Diguglielmo*, 616 F.3d 255, 261-62 (3d Cir. 2010) ("A trial court should look to all of the evidence and surrounding circumstances . . ."); *Riley v. Taylor*, 277 F.3d 261, 288-89 (3d Cir. 2001) ("Although a judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record, some engagement with the evidence considered is necessary as part of step three of the *Batson* inquiry.").

When it denied his post-trial motion to reopen the *Batson* hearing, the district court likewise failed to consider any of Bowers's evidence of discriminatory intent—which was even more extensive than in the

hearing. As grounds to reopen the hearing, Bowers presented 25 pages of analysis of the jury-selection record that demonstrated the government's reasons for its strikes were pretextual. (S-App.279-94.) The government, in turn, responded to Bowers's motion with 40 pages of argument that the strikes were not discriminatory. (S-App.378-417.) And in barely six pages—again without addressing any of Bowers's evidence—the district court denied the motion. (App.406-11.)

The court discussed what the government said in the hearing (App.406) ("the government also explained at length the bases for its strikes during the *Batson* hearing . . ."); recited the government's arguments (App.407) ("The government aptly notes that, during the *Batson* hearing, the Defense's arguments . . . The government asserts as follows . . ."); discussed the government's accounts of the respective jurors' questionnaires and voir dire (App.409-10); and reiterated its finding that the government's reasons were race neutral (App.411).

The government, again, attempts to cast this two-page reduction of 65 pages of argument and record evidence as the district court's considering the evidence. But it cannot quote, paraphrase, or even cite to any discussion of the defense's evidence. What the government casts

90

as the district court's "elaborat[ing] upon" the "reasons" it gave for its initial denial of the challenges (Gov.Br.149), is actually a recitation of the government's reasons for its strikes. Likewise, the government credits the court for "reconsider[ing] . . . Bowers's newly raised evidence and argument." (Gov.Br.149.) But the government does not identify any substantive "reconsideration" by the court.[36]

The government criticizes Bowers for "complain[ing] that the court failed to refute each of his arguments point-by-point." (Gov.Br.150.) But Bowers makes no such complaint. His claim is not that the court failed to "comment explicitly on every piece of evidence in the record," *United States v. Savage*, 970 F.3d 217, 268 (3d Cir. 2020), but that the court did not comment on *any* of the evidence in the record.[37]

---

[36] As Bowers noted in his opening brief, the district court's only references to any of the evidence in Bowers's post-trial motion were passing mentions of the disparate questioning and comparative jurors, both of which were rejected under the wrong legal standard. (App.Br.212-13.)

[37] Indeed, Bowers wrote in his brief that "judges need not 'comment explicitly on every piece of evidence in the record . . .'" (App.Br.210 (*quoting Riley*, 277 F.3d at 289).)

The government's presentation of this Court's cases is equally off-base. It relies on *Riley v. Taylor* to urge the Court to assess whether the district court "consider[ed] all relevant circumstances . . ." (Gov.Br.151, citing *Riley*, 277 F.3d at 287.) That language was quoted from *Coulter v. Gilmore*, 155 F.3d 912, 921 (7th Cir. 1998), immediately after the *Riley* panel quoted the same case for the principle that a reviewing habeas court owes no deference to a state court denial of a *Batson* challenge if "'the state judge made [] findings *without ever taking into account the totality of the circumstances on the record.*'" *Riley*, 277 F.3d at 287 (quoting *Coulter*, 155 F.3d at 920) (emphasis added). Thus, this Court expects trial courts deciding *Batson* challenges to review the circumstances and evidence of the motivation for a peremptory strike "on the record."

The government also cites this Court's opinion in *Coombs*, 616 F.3d 255, for the principle that this Court considers whether a lower court's denial of a *Batson* challenge is supported by the record before determining that the lower court applied the *Batson* analysis erroneously (Gov.Br.151-52), and argues that the record in Bowers's case "supports the district court's finding that the government did not

discriminate." (Gov.Br.153.) That is inaccurate. The record the Court

reviewed in *Coombs* was the transcript of the state court's denial of the

petitioner's *Batson* challenge. *Coombs*, 616 F.3d at 263. It did *not*

consider the state's reasons for its strikes or the defense's evidence that

those reasons were pretext. Thus, the government's brief misuses this

Court's decision to urge it to skip over the inadequacies of the district

court's decision of Bowers's *Batson* challenges and just affirm its

unexplained denial.

The district court found that Bowers made a prima facie case in

support of his *Batson* challenge. (App.5616.) It also found that that the

government proffered race-neutral reasons for its strikes. (App.5617.)

Its burden and obligation was then to "evaluate[] all evidence" set forth

by both parties "that tends to show that race was or was not the real

reason." *Riley*, 277 F.3d at 286 (*quoting United States v. McMillon*, 14

F.3d 948, 953 n.4 (4th Cir. 1994)). It did not, and therefore this Court

should remand for further proceedings.

**B. The district court needlessly denied Bowers sufficient time to review the jurors' questionnaires and voir dire transcripts to rebut the government's reasons for its strikes.**

The government's argument propounds the same misdirected focus on which the district court relied to deny the defense's request for an overnight continuance; namely, that the defense had had adequate time to prepare because it had the juror questionnaires and the voir dire transcripts. The government further asserts that Bowers "had been anticipating potential *Batson* challenges" and could have foreseen the basis on which the government would make its strikes. (Gov.Br.142, 144-45.) But this fundamentally misunderstands the situation the defense faced.

While the government's quasi-objective ranking of jurors based on their self-rankings on the questionnaire about their perspectives on the death penalty[38] may have been "foresee[able]" (Gov.Br.145), there was

---

[38] The government concedes it did not abide by hard cutoffs on the self-ranking questions, and made an exception to its own standards for a white man. (Gov.Br.136 (government concession that "[i]t struck all jurors whose answers to Question 73 was less than 5 out of 10 in support of the death penalty generally, with a single exception" and citing the district court's ruling at App.406 n.7); Gov. Br. 160 (conceding

no way the defense could have anticipated the government's subjective

bases for its strikes—*i.e.*, the government's qualitative assessments of

jurors' death penalty perspectives, demeanors, and profiles (such as

work history or perspectives on policing). To evaluate and respond to

these subjective justifications, the defense required time to review the

government's characterizations and compare them against the

transcript of jurors' actual statements. *See Pitchford v. Cain*, 608 U.S.

__, 2026 WL 1485608, at *5 n.3 (May 28, 2026) ("At step three, after the

prosecution has offered its facially race-neutral reasons, defense counsel

typically tries to show (because it is often the only way of proving a

*Batson* violation at step three) that similarly situated white jurors were

treated differently and not challenged.") Likewise, the defense had to

search the record to compare the proffered bases for strikes to the

transcripts of jurors whom the government accepted. The defense could

no more have accomplished all of this in 90 minutes than the

government, just because it had the whole trial record and nine

---

that "[t]he one juror who rated themselves a '4' whom the government accepted was Juror 270, who is White.")

95

attorneys (including three from the trial)[39], could have responded to Bowers's opening appellate brief in one week.

It would not have upset the district court's schedule to grant the continuance, and it would have afforded Bowers's attorneys adequate time to review the record. The district court abused its discretion.

## C. The review of the evidence bearing on the government's intent in making its peremptory strikes should be conducted in the first instance in the trial court.

In response to Bowers's presentation of the evidence of pretext that the district court did not address, the government makes extensive argument in defense of its strikes. This includes supplementing the record with the jurors' questionnaires. Its brief illustrates three reasons why Bowers's case should be remanded.

First, the government's brief itself illustrates the inadequacy of the district court's *Batson* analysis. Even as the government strains to defend the sufficiency of the district court's explanation of its decision, that purported explanation does not address or even give any indication

---

[39] *See* ECF 5, 6, 7, 8, 10, 14, 16, 39, 43. *Cf.* Gov.Br.145 (saying Bowers had adequate counsel to anticipate the government's reasons and review the record).

of the numerous disputes over the government's reasons that its own brief discusses. *See* Gov.Br.156-59 (acknowledging and disputing five arguments Bowers made about striking Juror 257); 161-166 (acknowledging and disputing eight arguments Bowers made about striking Juror 148).

Second, the government's argument illustrates the fact-finding in deciding a *Batson* challenge that is properly reserved to the district court in the first instance. For instance, Bowers disputes the government's claim, asserted as reason for striking Juror 257, that she was "personally overseeing a [psychological] research program"— something she never said (App.Br.194)—while the government argues that it was a fair characterization of the record. (Gov.Br.159.) The government also defends its strike of Juror 148 based on her "strong opposition" to the death penalty (Gov.Br.162)—something Bowers disputes.[40] To decide Bowers's *Batson* challenges, a court will need to look at *all* the evidence in relation. *Riley*, 277 F.3d at 283.

---

[40] The government, relying on *Flowers v. Mississippi,* 588 U.S. 284 (2019), argues in the alternative that if its characterization of Juror 148's views was inaccurate, "prosecutors can make mistakes" that "should not be confused with racial discrimination." (Gov.Br.163

Third, the government's overall claim that each of the jurors was struck because of their perspectives on the death penalty simply is not true. Government counsel did not give purely quantitative reasons for the strikes. Rather, they went on to their subjective impressions of jurors' work experience, demeanor, and articulation of their opinions. It is here that a "prosecutor's own conscious or unconscious racism may lead" her to perceive a prospective juror of color as "'sullen' or 'distant'"—or offended or annoyed or inappropriately eager to be on a jury (App.5571, 5585, 5587)—which would not have come to mind "if a white juror had acted identically." *Batson v. Kentucky*, 476 U.S. 79, 106 (1986) (Marshall, J., concurring).[41] It is that subjectivity that jeopardizes Bowers's—and citizens'—due process and equal protection guarantees. And the "relative plausibility or implausibility of each explanation" for a particular strike "may strengthen or weaken the

---

(quoting *Flowers*, 588 U.S. at 314).) Its brief does not include or address the Supreme Court's next sentence in *Flowers,* "[W]hen considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling." *Flowers* at 314.

[41] *But see id.* ("A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.").

assessment of the prosecution's explanation" of other strikes. *Riley*, 277 F.3d at 283 (cleaned up). *See also Miller-El v. Dretke*, 545 U.S. 231, 265 (2005) (finding discrimination from viewing evidence "cumulatively").

The unresolved disputes about the legitimacy of the government's reasons require remand for the district court to assess the evidence in the first instance. Though it "may be uncomfortable and unpleasant for a trial judge to undertake such a difficult and subtle inquiry with the precision and persistence that may be required to determine counsel's true reasons for striking a juror . . . if *Batson* is to be given its full effect, trial courts must make precise and difficult inquiries to determine if the proffered reasons for a peremptory strike are the race-neutral reasons they purport to be, or if they are merely a pretext for that which *Batson* forbids." *Coombs*, 616 F.3d at 264.

## VII. JURORS 159 AND 164 STATED THEY COULD VOTE TO SENTENCE BOWERS TO DEATH AND WERE NOT SUBSTANTIALLY IMPAIRED IN THEIR ABILITY TO DO SO, MAKING THEIR DISMISSALS FOR CAUSE REVERSIBLE ERROR.

The district court struck jurors 159 and 164 despite the fact that both stated they could follow the court's instructions and neither held beliefs that would have substantially impaired their ability to vote for a

death sentence. The government asks this Court to hold that the strikes were proper because those jurors' views would have required the government to meet its burden of proving that Bowers was amongst "offenders who commit a narrow category of the most serious crimes" and his "extreme culpability" made him "the most deserving of execution." *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quotations omitted). But expecting the government to prove that execution is appropriate for a defendant does not make a juror substantially impaired.

The district court abused its discretion, and this Court should remand Bowers's case for resentencing.

## A. Juror 159 was willing to deviate from her religious scruples against killing to vote for a death sentence for Bowers, if the evidence warranted.

The government stresses Juror 159's religious faith, going beyond simply mentioning her questionnaire answer to reference her participation in prison ministry and tying it to her general opposition to the death penalty. (Gov.Br.206, 207, 212) (discussing juror 159's voir dire answers about "thou shalt not kill"). Its argument is effectively that her religiosity and concomitant religious scruples against the death

penalty, *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968), impaired her capacity to follow the law because she did not promptly and unequivocally state that she could set them aside and vote for a sentence of death. (Gov.Br.212-13.)

But the very essence of religious beliefs is that they are not thoughtlessly set aside. The prospect of being asked to condemn a person to execution would give pause to any person whose spiritual faith militates against capital punishment. If this Court accepts the government's argument—that hesitation is "substantial impairment"— when could a person with religious scruples that question the death penalty ever serve on a capital jury? And what would be the import of excluding citizens of faith who are not immediately ready to vote for death?

Not believing in capital punishment is "by no means the equivalent of being unwilling to impose it." *Szuchon v. Lehman*, 273 F.3d 299, 331 (3d Cir. 2001). Jurors may not be struck for cause "simply because they are opposed to the death penalty on religious grounds[]." *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007). Citizens with "scruples against capital punishment can" serve as jurors, deciding

a case "according to the law and the evidence, because the law does not contain the inexorable command of an eye for an eye." *Witherspoon v. Illinois*, 391 U.S. 510, 529 (1968) (Douglas, J., concurring) (cleaned up).

Though Juror 159 did not disavow her religious beliefs, she was clear that she could follow the judge's instructions and vote for a sentence of death if the evidence convinced her. She indicated on her questionnaire that she could have voted for a death sentence in Bowers's case despite being "generally opposed" to capital punishment, and she stated that though she did not "believe in" the death penalty, she would "change [her] mind" if the case was "convincing enough." (S-App.632; App.2115.)

The government also relies on cases too distinct to support its position. It points to the Missouri state court ruling that the Eighth Circuit examined in *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995). (Gov.Br.212.) But, unlike the jurors struck in *Antwine*, Juror 159 did not say she could only impose death in an extreme hypothetical situation. *Antwine*, 54 F.3d at 1369. Indeed, she had already said she could impose death in Bowers's case, which was the only pertinent question here. In contrast, the jurors struck in *Antwine* also expressed

"unequivocal opposition to imposing the death penalty in the case before them." *Id.* (*quoting State v. Antwine*, 743 S.W.2d 51, 61 (Mo. 1987)); *see also State v. Antwine*, 743 S.W.2d at 61 ("Both initially stated that they would be unable to consider imposing the death penalty regardless of the facts and circumstances adduced at trial."). Juror 159 never expressed an unequivocal inability to vote for death in Bowers's case nor confined her willingness to do so to extreme cases.

The government's reliance on *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), is similarly unavailing. (Gov.Br.213.) In *Tipton*, one of the jurors struck told the court explicitly that if he were on the jury and had to give a death sentence, he did not think he "could live with it . . . I really don't." *Tipton*, 90 F.3d at 880. And another said that he believed his decision "would be based on [his] own biases and prejudices." *Id.* at 881. The government cannot point to any such statement from Juror 159. *See also* Gov.Br.213 (citing *Clemons v. Luebbers*, 381 F.3d 744, 755 (8th Cir. 2004), *as amended* (Dec. 14, 2004) (juror twice said he could not vote for death)).

This Court should reject the government's invitation to equate deeply-held religious scruples with substantial impairment. Where the

103

record does not demonstrate that Juror 159's views would have prevented or substantially impaired her service as a juror in accordance with the court's instructions, *United States v. Salamone*, 800 F.2d 1216, 1226 (3d Cir. 1986), the district court abused its discretion in granting the government's motion to strike her.

## B.  Juror 164's views permitted him to vote for death in Bowers's case.

The government asserts that Juror 164's strong opposition to the death penalty "was clear from his questionnaire." (Gov.Br.214.) But the law is as "clear that mere personal opposition to the death penalty is not cause for exclusion if the prospective juror would nevertheless be able to follow his oath and apply the death penalty if the facts and law required." *Martini v. Hendricks*, 348 F.3d 360, 364 (3d Cir. 2003).[42]

Similar to Juror 159, the government argues that Juror 164's opposition to the death penalty would have substantially impaired his

---

[42] *See also Stevens v. Horn*, 187 F. App'x 205, 214 (3d Cir. 2006) (a prospective juror's having strong conscientious or religious scruples "says remarkably little about whether she could follow the trial court's instructions."), *cert. granted, judgment vacated sub nom. Beard v. Stevens*, 551 U.S. 1111 (2007), *and opinion reinstated in part sub nom. Stevens v. Beard*, 288 F. App'x 4 (3d Cir. 2008).

service simply because it would have been "difficult" for him to impose a death sentence in Bowers's case. (Gov.Br.215.) But "difficult" is not "impossible" or even "unlikely." The government's suggestion that a citizen wrestling with deciding whether to put a person to death should disqualify him from participating in that decision is fraught. It would pull capital sentencing away from being a deliberative process toward being a pro forma imprimatur.

The law expects the prospect of an execution to weigh on jurors' decision-making. This is the reason the Supreme Court struck down an oath of service for capital jurors that required them to swear that the prospect of a death sentence would "not affect [their] deliberations on any issue of fact." *Adams v. Texas*, 448 U.S. 38, 42 (1980). This Court should reject the government's suggestion that jurors so affected are not qualified to serve.

The record does not indicate that Juror 164's views would have substantially impaired his service. He stated that he supported the death penalty for people who "currently present a danger to society" (App.2200), and the government made this very argument about Bowers. *See* Point XI(A)(1), below. Juror 164 further said that he would

105

set aside his opposition to the death penalty, which he could do in the "very serious circumstances" of Bowers's case, and "follow the judge's instructions." (App.2204, 2206.)

The record does not support the finding that Juror 164 was substantially impaired by his views opposing the death penalty. Instead, the government's argument asks this Court to lower the bar for strikes for cause. This Court should reject the government's argument, find that the court abused its discretion in granting the government's motion to strike, and remand for resentencing.

## **POINTS RELATED TO SENTENCING**

## **VIII. THE COURT VIOLATED THE CONSTITUTION, RULES OF EVIDENCE, AND FDPA BY ADMITTING HISTORICAL AND RELIGIOUS EVIDENCE UNRELATED TO BOWERS OR THE OFFENSE.**

The government's compartmentalized analysis of isolated individual exhibits and snippets of testimony by Braniff, Myers, Perlman, and Burstin fails to address the combined impact of that evidence: historic antisemitism, juxtaposed against centuries of Jewish history, virtue, and contributions, with individual religious items and the Holocaust Torah symbolizing an ongoing global injury to Judaism itself, in which Bowers's crimes were subsumed. Beyond individual

topics' relevance, this dichotomy of antisemitism and Jewish history formed a framework and counternarrative that pervaded Bowers's trial, misfocusing the jury on a social and historical injustice instead of Bowers's individual offense.

## A. The government's evidence framed Bowers's crime as part of a historical conflict between antisemitism and Judaism.

The government denies that its invocation of the Holocaust Torah as a "witness" to both a World War II-era massacre of Jewish people in Czechoslovakia, and Bowers's 2018 attack, "dr[e]w a direct line" between those events, claiming the argument merely showed the Holocaust "was real," because the Torah "witness[ed]" it." (Gov.Br.248.) But this makes no sense; no one disputed the Holocaust was real. The Holocaust Torah could not further prove that fact. The government's only possible purpose in talking about its history was to link the Holocaust-era Czechoslovakian massacre and Bowers's 2018 attack.

The government cites cases claiming this was "fair argument," but none of its cited cases approves argument about unrelated events. *United States v. Savage* addressed a comment that defendants' children should not be a "mercy shield" against a death sentence, to underscore

that defendant's relationship with them "did not outweigh the aggravating factors." *Savage*, 970 F.3d at 314. Likewise, *United States v. Titus* and *United States v. Bates* involved prosecutorial argument about the defendants' own conduct: exploiting vulnerable people through excessive pain medication, *United States v. Titus*, No. 22-1516, 2022 WL 17090918, at *48-50 (3d Cir., Brief of Appellant, Nov. 14, 2022), or threatening individuals with bodily harm, *United States v. Bates*, 46 F. App'x 104, 106-07 (3d Cir. 2002). The Holocaust Torah reference had no such connection to Bowers's conduct.

Also wrong is the government's claim that the prosecutor's statements that "what [Bowers] believes is exactly what so many other people believe" and "[t]hese were not beliefs that originated with [Bowers]" were presented not to link Bowers to other antisemites but "to rebut [Bowers's] mental health assertions" by showing Bowers's beliefs were not delusional. (Gov.Br.249.) The government never argued that mental-health justification below and therefore waived it. *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) ("[T]he Government is subject to the ordinary rule that an argument not raised in the district court is waived on appeal.") (cleaned up). Its response to Bowers's

motion in limine to exclude Braniff's testimony defended Braniff's testimony about other groups only as "bias motive evidence." (DE:1159:5; DE:1159:8; DE:1159:9; *see also* DE1159:14 (arguing Braniff's testimony about "various ideologies of white supremacy" was relevant to show the attack "was motivated in large part on [Bowers's] white supremacist beliefs"); DE:1159:18-19, DE:1159:22 ("bias, motive, intent, willfulness, plan, or malice aforethought")). And even if the evidence could bear on mental health, "relevance to [one] point does not disappear merely because [evidence or argument] might [also] support other inferences." *Kelly v. South Carolina*, 534 U.S. 246, 254 (2002).

The government also wrongly denies having invited the jury to hold Bowers "responsible for the crimes of others," "redress historical wrongs," or "'send a message' about larger social problems." (Gov.Br.250.) It clearly did. During penalty-phase closing, the prosecutor invoked the Holocaust Torah and its rescue from a World-War-II-era massacre site, (App.13182), referenced individuals' Constitutional "right to practice religion the way they choose" (App.13182), and held up the Tree of Life as a symbol of Judaism itself: a "building and a congregation that literally mean the Torah, the sacred

text of Judaism." (App.13183.) The prosecutor also situated Bowers among the groups Braniff discussed, accusing the defense's experts of not researching the "Great Transformation," "white genocide" the "White Genocide Manifesto," or the "Christian Identity Movement" or its racist readings of the Bible, then saying Bowers "chose his side in the [optics] debate . . . like many other people." (App.13213-14.)

## B. Braniff's testimony was cumulative and held Bowers responsible for others' acts and beliefs.

### 1. Braniff's testimony was cumulative.

The government insists Braniff's testimony was not cumulative because his direct examination spanned "only 28 transcript pages" that explained 35 items, mostly in one-sentence answers. (Gov.Br.229.) But Braniff's testimony was not only cumulative as to *itself*, but also to other government evidence, including: Bowers's Gab postings, Myers's testimony about the Holocaust and Naziism, and Bowers's statements before, during, and after the crime showing his antisemitic beliefs beyond question. Braniff reiterated what the Gab posts and Bowers's statements already showed: that Bowers harbored intense antisemitic animus. Indeed, the government itself pointed out in closing that Bowers's Gab account contained "over 600 posts" "express[ing]

110

antisemitic, white supremacists slurs, tropes, and ideologies"—including "Hitler did nothing wrong" and "the only good Jew is a dead Jew." (DE1034:3-5, 8.) Against this backdrop, there was no need for Braniff to delve into the tenets and practices of Nazism, let alone centuries-old antisemitic practices from Medieval Europe.

The government downplays its trial concession that Bowers's antisemitism "was crystal clear the day of the crime" (App.10959), as mere "trial advocacy." (Gov.Br.234-35.) But that "advocacy" was undeniably accurate. Bowers told officers at the crime scene "I just want to kill Jews," (App.7266), that all Jews had to die," (App.6540-41, 6549-50; *see also* App.7205-06, 7210-11.) Indeed, the government's brief on appeal reiterates the overwhelming evidence of Bowers's antisemitism from its very first pages, pointing out that in "the months before the shootings, Bowers posted virulent, antisemitic messages on social media, including one message, three days before the attack, that said, "oh you poor, poor jews. GAS & BAKE NOW!" (Gov.Br.1.) These statements demonstrated antisemitism beyond any possible doubt.

The government argues its other evidence was insufficient to prove Bowers's religious animus because the defense's guilt phase

opening argument challenged the *mens rea* element of the Section 249 and 247 charges, and its closing challenged whether Bowers had the required intent to obstruct congregants' religious worship. (Gov.Br.234.) But defense counsel's argument was not that Bowers was not antisemitic; it was that—notwithstanding his undeniable antisemitism—his specific objective for the attack was not to obstruct religious worship but to undermine HIAS's mission of assisting refugees. (App.5708-09; 8366-67.) That argument in no way undermined the evidence of religious animus: whether Bowers's immediate objective was to obstruct HIAS did not depend on whether or not he was antisemitic generally.

To support its claim that Braniff's testimony was not cumulative, the government cites *United States v. Allen*, 341 F.3d 870, 888 (9th Cir. 2003). But *Allen* is inapposite. The Ninth Circuit held in *Allen* that the district court did not abuse its discretion in refusing to permit the defendants—admitted racists, skinheads, and white supremacists—to substitute their admission of their beliefs in place of "photos, literature, and objects" found in one defendant's house that provided information about the racist movements to which they belonged. *Id.* By contrast,

Bowers did not seek to substitute a "bare admission" for Braniff's testimony, or to preclude a "coherent narrative of [his] thoughts." *Allen*, 341 F.3d at 888. That "coherent narrative" was already provided by Bowers's words and Gab account postings, which—as the government acknowledges—he does not challenge.

## 2. Braniff's testimony held Bowers responsible for others' acts and beliefs.

The government contends Braniff's testimony permissibly related to Bowers's antisemitic motive, and was anchored in Bowers's Gab posts, which Bowers conceded were admissible. (Gov.Br.224-25; *see also id.* at 233 (arguing that the testimony was relevant because "anchored in Bowers's Gab posts")). That argument suggests that, because antisemitism itself was relevant, anything relating to Bowers's antisemitic posts or the historical origins of the posts' content was also relevant.

But the relevance of Bowers's posts to show his antisemitism didn't render relevant all additional evidence about things connected to the matters mentioned in those posts—like historical events or practices Bowers may not even have known about. When evidence shows only that a defendant harbors racist attitudes shared by hate

groups—but not that he is a member—expert testimony about those groups "comes dangerously close" to "inviting the jury to find [the defendant] guilty by association." *United States v. Magleby*, 241 F.3d 1306 (10th Cir. 2001) (expert testimony about hate groups lacked adequate foundation where the defendant "harbored similar prejudicial attitudes" but was not shown to be a member); *see also United States v. J.H.H.*, 22 F.3d 821, 828-29 (8th Cir. 1994) (expert testimony about skinhead groups threatened guilt by association where the defendant expressed racist attitudes but was not a skinhead or sympathizer.)

The government claims Braniff's testimony satisfied the admissibility standard of Rules 401, 402 and 702 because it helped jurors understand the evidence. (Gov.Br.227.) But jurors' understanding of the evidence was only relevant to the extent it shed light on *Bowers*'s state of mind—not the long-ago beliefs or motivations of others, of which Bowers was not shown to be aware and did not necessarily intend to endorse when using the relevant terms or phrases. Braniff did not confine himself to the fact that those terms have antisemitic connotations—the relevant fact—or even those connotations' origins. Instead, he delved into centuries-old practices of Medieval Europe, the

Bubonic plague, Jewish people being forced to live in ghettos, and arcane racist Biblical interpretations. (*See* App.Br.241-47.)

The government's cited cases fail to justify this. *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) affirmed a district court order that, "did *not*" allow unlimited expert testimony in a terrorism case on words "commonly used by persons practicing extreme Islam." *Id.* at 131 (emphasis added). *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999) involved expert testimony explicating "coded drug language"—not discussions of historical events or groups unconnected to the defendant—and the Court forbade expert testimony on matters that "need[] no aid or illumination"—like Braniff's testimony about the Holocaust and Nazism. *Id.* at 211-13. In *United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008), a false statements case, the Fourth Circuit permitted expert testimony on "terms, people, and organizations connected to radical Islam" because relevant to the statements' falsity. *Id.* at 209. And *United States v. Sparks*, 949 F.2d 1023 (8th Cir. 1991), involved expert testimony about a gang to which the defendant allegedly belonged—not unaffiliated historical groups.

The government is also incorrect that Bowers never raised a § 3593(c) argument below. (Gov.Br.230.) His omnibus Motion in Limine to exclude or limit Braniff's testimony argued that "[e]vidence that is not admissible under 3593(c) should not be admitted in the trial phase," and that § 3593(c) "requires the [c]ourt to perform a more stringent balancing of probative value against the danger of unfair prejudice than is otherwise required under the Federal Rules of Evidence." (DE1095:1.) "Given this difference in standards of admissibility during the guilt phase and the penalty phase," Bowers argued, "this Court should employ the standard enunciated by § 3593(c) in determining the admissibility of the evidence at issue in this motion during both the guilt phase and the penalty phase." (DE1095:2.)

A motion in limine is adequate to preserve an issue for an appeal if "the district court made a definitive ruling with no suggestion that it would reconsider the matter at trial." *Gov't of the Virgin Islands v. Joseph*, 964 F.2d 1380, 1385 (3d Cir. 1992) (cleaned up). "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). That is what happened here, (App.278), as

the court never indicated it would reconsider the application of § 3593(c) or the admissibility of Braniff's testimony on the topics it allowed. (S-App 119.)[43]

The government also claims Braniff's testimony was "probative of the charged crimes" and Bowers's character, record, intent, and religious animus. (Gov.Br.231-32.) But it only showed these things to the extent it reflected matters within Bowers's knowledge—not historical practices by others.

## C. Rabbi Myers's testimony about Jewish history was irrelevant and violated the Eighth Amendment, due process, and § 3593.

The government wrongly claims Bowers waived or forfeited his objection to Myers's testimony about Jewish history because the objection was delayed and defense counsel later said it was permissible. (Gov.Br.236.) The delay is irrelevant, because the court ruled on the objection, (App.5871-72) ("[I]f it's an objection, I'm going to overrule the objection."), and the court still had time to give a "remedial and

---

[43] Bowers secured a continuing objection to Braniff's use of the terms "white supremacy" or "white supremacist ideologies" and objected to his testimony about the "principles and ideologies of the Nazi regime that led to the Holocaust." (App.7926, App.7965.)

corrective instruction," *Calhoun v. United States*, 384 F.2d 180, 184 (5th Cir. 1967), and "discretion" to strike the testimony or give a curative instruction. *United States v. Achiekwelu*, 112 F.3d 747, 754 (4th Cir. 1997). Though defense counsel later said Jewish history evidence was permissible, (App.5873), that statement was also irrelevant because it was made after the court's ruling. *United States v. Burns*, 433 F.3d 442, 447 (5th Cir. 2005) (A defendant cannot waive a right unless that right is "in existence" at the time of the waiver.)

The government argues Myers's and Perlman's testimony about development of conservative versus reform Judaism, New Light congregation's history, and Jewish participation in American wars provided "background knowledge of Judaism" relevant to the fact that three congregations were housed in the Tree of Life synagogue, and the synagogue's stained glass windows depicted Jewish participation in wars. (Gov.Br.238-39.)[44] But the history of Judaism and its branches was not material to the fact that different congregations worshiped in the building. And the stained glass had no independent significance.

---

[44] Bowers's statement of the case acknowledged that Perlman and Burstin gave testimony on this. *See* App.Br.31, 47.

By directing the jury to Judaism and its history and virtues, the government shifted the trial's focus to Judaism as a historic phenomenon. That phenomenon was then juxtaposed against the historic antisemitism Braniff detailed. The government's focus on Myers's and Perlman's testimony in isolation fails to address this larger dynamic.

## D. Testimony about religious items was irrelevant and prejudicial.

The government claims Bowers failed to preserve his objections to religious items, arguing the district court's overruling of Bowers's objection to Myers's and Braniff's testimony did not make objection futile. (Gov.Br.240.) But as discussed above, the court had already definitively overruled that objection by saying "the church's history, traditions, practices are all fair game and relevant." (App.5872.) Whatever defense counsel said thereafter would have been pointless because the ruling was already made. *See Walker v. Gordon*, 46 F. App'x. 691, 694 (3d Cir. 2002) (after trial court denied motion in limine no objection at trial was necessary to preserve the objection); *American Home Assur. Co. v. Sunshine Supermarket*, Inc., 753 F.2d 321, 325 (3d Cir. 1985) (same); *Palmerin v. City of Riverside*, 794 F.2d 1409, 1413

119

(9th Cir. 1986) (same). The district court ruled broadly that historical background information was relevant—including symbols, origins of words, and practices of historical groups—making it obvious the district court would have overruled any objection to Jewish religious items.

The government argues that evidence of torn yarmulkes, prayer books, prayer shawls, a Holocaust Torah, and the items' religious significance was relevant "to prove Bowers's intentional obstruction of congregants' free exercise of their religious beliefs." (Gov.Br.240.) But no evidence suggested (and the government never claimed) that Bowers intended to harm the items themselves; his only intent was to obstruct worship by attacking congregants. Damage to the items was thus not a reflection of Bowers's intent but only a byproduct of his attack. Nor was this evidence necessary to prove the point, since the attack took place in a synagogue during services. The law reflects this distinction: as at least one court has recognized, § 247(a)(2) "targets the obstruction of a person's free exercise of religious beliefs, not the damage or destruction to the property." *United States v. Corum*, No.01-CR-236, 2002 WL 1285078, at *3 (D. Minn. June 5, 2002).

The government further argues the damaged items were "probative of how Bowers's attack violently obstructed congregants' 'freedom to observe religious principles and engage in religious practices.'" (Gov.Br.242.) But the obstruction was complete once Bowers began firing shots; after that point the religious observance ceased and people began fleeing or were tragically killed. It added nothing to the jury's understanding of the fact that services were obstructed for them to be told that the Torah "is the words of God as given by God on M[ount] Sinai," "reflects the relationship between God and Israelites at that time," or "is the source of who [Jewish people] are and how [they] are to behave on this planet during [their] lifetime," or that each Torah is written by hand over the course of a year. (App.5770, 5821.)

The government incorrectly cites *Old Chief v. United States*, 519 U.S. 172, 190 (1997), to argue it doesn't matter that obstruction was obviously established by the shooting itself, because that fact "did not preclude the government from showing the specific ways in which his attack interfered with [congregants'] worship." (Gov.Br.243.) But *Old Chief* does not give the government carte blanche to present any evidence in any way relevant to its case. *Old Chief* specifically *rejected*

such limitless government discretion, by holding that when a defendant offers to stipulate to the prior conviction element of a felon-in-possession-of-a-firearm charge the government still may not present the "full record" of that prior conviction because it would unfairly prejudice the defense under Rule 403. *Old Chief*, 519 U.S. at 174, 190-91. The "general presumption that the prosecution may choose its evidence" must give way when the evidence the government seeks to admit "goes to an element entirely outside the natural sequence of what the defendant is charged with thinking and doing." *Id.* at 191.

Just as the details of the *Old Chief* defendant's prior assault conviction were "outside the natural sequence of" the charged offense of possessing a firearm as a felon so, too, was damage to stand-alone inanimate objects "outside the natural sequence of" the charged intentional religious obstruction. Bowers's intent was undisputedly to obstruct and injure people, not objects. Evidence about the underlying religious significance of Jewish objects—including the Holocaust Torah—"would be arresting enough to lure a juror into a sequence of

[improper] reasoning," *Old Chief*, 519 U.S. at 185, by equating Bowers with the Holocaust and injuries to Judaism throughout history.[45]

The government also provides no theory of relevance for testimony that the Holocaust Torah was recovered in the 1940s from a village in Czechoslovakia whose Jewish residents were massacred—let alone for the prosecution's refrain that that Torah was itself a "witness" to Bowers's 2018 attack. It merely says the Holocaust Torah was relevant because it was "displayed in a case right next to an entrance to Pervin Chapel" by which Cecil Rosenthal was killed. (Gov.Br.241.) But the Torah's location in the synagogue does nothing to justify telling the jury about its horrific history from the Holocaust, let alone the prosecution inviting the jury to equate Bowers's actions with the Holocaust by linking the two events through the Holocaust Torah's presence at both.

---

[45] The government argues that Myers's testimony that he had planned to read a sermon about "the Jewish imperative to welcome all guests" was relevant to rebut the defense argument that Bowers's intent was to target HIAS, not obstruct religious worship. (Gov.Br.241.) But this is a strawman; Myers's testimony about welcoming strangers is not the evidence to which Bowers objects.

**E. Burstin's testimony was irrelevant.**

The government contends the selection-of-site factor did not require Bowers to know Squirrel Hill's status as a historic Jewish community. Further, the government claims it was permissible for the factor not to require such knowledge, because the fact "[t]hat Bowers attacked a synagogue in a neighborhood that is home to one of the largest urban Jewish populations in the United States described a circumstance of his crime, whether or not he fully appreciated the significance of Squirrel Hill." (Gov.Br.246.)

But the Death Penalty Notice did require Bowers to know about Squirrel Hill's historic significance. The aggravating factor said that Bowers targeted the synagogue,

> located in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania, *which is home to one of the largest and oldest urban Jewish populations in the United States, in order to maximize the devastation, amplify the harm of his crimes, and instill fear* within the local, national, and international Jewish communities.

(App.13714) (emphasis added). It is nonsensical to interpret this language not to indicate that Bowers knew the characteristics of

Squirrel Hill that operated to achieve the goal he allegedly sought: increasing the harm from his acts.

The government is also incorrect that it was permissible for the selection-of-site circumstance not to require Bowers's knowledge of Squirrel Hill's history, because that history "described a circumstance of his crime, whether or not he fully appreciated" it. (Gov.Br.246.) Information unknown to the defendant "has no relevance to any aspect of [the defendant's] character, or record, or the circumstances of the crime." *United States v. McVeigh*, 153 F.3d 1166, 1215 (10th Cir. 1998). As the government concedes, the selection-of-site circumstance "otherwise focused on Bowers's state of mind." (Gov.Br.246.) It is the individual defendant's state of mind—not unanticipated happenstance—that bears on his culpability. *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987); *see also Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (unconstitutional to preclude consideration, in a death penalty case, of defendant's lack of intent to kill).

Arguing for a death sentence based on information unknown to the defendant is also tantamount to presenting victim-impact evidence relating to an unlimited category of victims whose fear was increased

due to the historical nature of the Squirrel Hill community—a community of victims of which Bowers was unaware. That approach contravenes the limited nature of victim impact evidence in capital cases: it must relate to "the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 817 (1991).

The government further argues that "the district court did not clearly err in finding 'ample evidence' supporting an inference that Bowers knew Squirrel Hill was home to a large Jewish community." (Gov.Br.246.) It cites testimony that Bowers considered alternate targets, said HIAS was "big enough" to satisfy his goals, reviewed online photos and an event schedule for Tree of Life synagogue, and told Dr. Corvin "that the Tree of Life Synagogue was Jewish people's 'Statue of Liberty' and he 'shit on it.'" (Gov.Br.247) (citing App.12934-36).

None of this evidence has anything to do with the history of Squirrel Hill. That Bowers considered alternate targets and examined Tree of Life Synagogue photos and a schedule merely shows planning, not knowledge about the neighborhood. The government implicitly acknowledged this in closing argument, saying Bowers's online research

of Dor Hadash and Tree of Life showed "[h]e had been planning since April of 2018." (App.13179.) Bowers's statements about HIAS being "big enough" and the Tree of Life Synagogue being Jewish people's "Statue of Liberty" merely show he considered it a significant target. The government acknowledged this too saying Bowers needed to "[s]elect[] a synagogue . . . [b]ecause it was much more of a symbol than any other target he considered" (App.13184)—not because of Squirrel Hill.

This dearth of defendant knowledge contrasts markedly to *United States v. Roof*, in which the defendant specifically said he chose the site because it was a "historic AME [African Methodist Episcopal] church." (*See* App.Br.262 n.76.) The government brushes *Roof* aside in a single perfunctory paragraph, saying "[t]hat civil rights prosecution was based on a different factual record." (Gov.Br.235.) But every case has different facts. More significant is the difference in government strategy: it made no attempt in *Roof* to mount the type of historical survey the government did regarding antisemitism in this case. Had it done so, the *Roof* case would have included testimony about centuries of racism and civil rights abuses, the Civil War, and Jim Crow.

127

**F.    The errors were not harmless.**

The government argues the harmless-beyond-a-reasonable doubt standard does not apply here because, it claims, Bowers's claims were "largely unpreserved or waived." (Gov.Br.251.) But they were preserved, as explained in the sections above.

Regardless of whether all or merely some errors were preserved, their cumulative effect warrants reversal. The government concedes that—as to preserved errors—the prejudice inquiry requires the government to prove the errors harmless beyond a reasonable doubt. (Gov.Br.251.) The standard is also pertinent where only some errors are preserved. In that situation, "cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group." *United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009) (cleaned up). "If, cumulatively, they are not harmless, reversal is required. If the preserved errors are cumulatively harmless, then "the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to . . . establish plain error." *Id.* (cleaned up).

Here, the preserved errors alone were not harmless. It is undisputed that Bowers objected to Braniff's testimony about the Holocaust and historical antisemitic beliefs and groups. The defense also undisputedly objected to Burstin's testimony about the history of Jewish people in the United States and Squirrel Hill. These two witnesses juxtaposed Jewish history and virtue against the horrors of the Holocaust and centuries of violent antisemitism in Europe. This included the emotion-laden Holocaust Torah, which the prosecution used to compare Bowers's 2018 attack to the ravages of the Holocaust itself. These two narrative pillars—Jewish history and virtue, versus the evils of Antisemitism and Nazism—encouraged the jury to view Bowers's offense as part of a worldwide scourge of antisemitism instead of the specific crime on trial. When the allegedly unpreserved errors are added to the mix—including Myers's and Perlman's testimony about Jewish history—that conclusion is even more strongly compelled.

The government also cites the court's instruction to the jury not to sentence based on "passion, emotion, sympathy, and prejudice" to argue its verdict was fair. (Gov.Br.252.) But even curative instructions fail to "neutralize the harm" of improper prosecutorial statements when

"'[t]hey [do] not mention the specific statements . . . and [are] not given immediately after the damage [is] done.'" *United States v. Sanchez*, 659 F.3d 1252, 1258 (9th Cir. 2011). The court's general admonition was neither prompt nor specific.

Finally, the government claims the jury's finding of some mitigating circumstances shows it was not "overmastered by emotion," and that "overwhelming evidence" made a death verdict inevitable. (Gov.Br.252.) But the fact that most or all jurors found numerous mitigating circumstances across numerous core categories shows a death verdict was *not* inevitable. *See* Point I(B), above. While evidence Bowers *committed the crime* might have been overwhelming, the evidence that he should receive a death sentence for that crime was far more equivocal, especially considered apart from the prejudicial impact of irrelevant evidence of the immense social harm of historic antisemitism and the government's related improper arguments. In this context, the government cannot prove beyond a reasonable doubt that not even one juror's penalty verdict would have been different. *Chapman v. California*, 386 U.S. 18, 26 (1967).

## IX. THE COURT VIOLATED DUE PROCESS, THE EIGHTH AMENDMENT, AND THE FDPA BY ADMITTING IMPROPER VICTIM IMPACT EVIDENCE.

The government minimizes the pervasiveness and force of testimony about deceased victims' heightened virtue and unrelated life tragedies, and survivors' lasting wounds, and the prosecutor's command that jurors "speak for" the deceased. These errors individually and cumulatively warrant vacatur and remand for a new penalty trial.

### A. Comparative victim worth and religiosity evidence

#### 1. The errors are preserved.

The government claims Bowers failed to preserve his arguments regarding certain testimony about comparative victim worth and religiosity. (Gov.Br.260-62.) Though acknowledging the district court definitively denied Bowers's pretrial motions objecting to this evidence, it argues the errors are still unpreserved because the district court said Bowers could object again at trial.

That is not accurate. Whether or not it is possible to re-raise a previously-overruled objection, the fact that a district court already "made a definitive ruling with no suggestion that it would reconsider the matter" suffices to preserve it. *Joseph*, 964 F.2d at 1385 (cleaned up). *See also* Fed. R. Evid. 103(b).

Here, the court definitively ruled on multiple pretrial motions Bowers filed objecting to comparative victim-worth and religiosity evidence, preserving the issue. Between the guilt and eligibility phases, Bowers filed a motion in limine seeking to preclude, *inter alia*, testimony about victims' virtuousness and religiosity, arguing that such evidence "invites an improper comparative worth analysis." (DE1352:15-16.) He specifically objected to evidence of the victims' "devout religious faith" and charity work, including that victims were "pillars of the congregation" (DE1352:12) and "constantly planning trips and programs for the congregation" and evidence of the impact on the congregations of the victims' losses (*id.*), along with specific objections to evidence about each victim (*id.* at 17-19).

The district court overruled the objections on the first day of the eligibility phase and granted the defense a "standing objection." (App.8614-15.) While it acknowledged the defense could object again to particularly problematic pieces of evidence, the court indicated it wasn't aware of any reason it would change its mind. (App.8614-15.)

Later, the district court issued a written order reiterating its overruling of Bowers's objections. (App.362.) While the court cautioned

the government against comparative worth impact evidence, it said it "d[id] not believe evidence of the victims' devout religious faith constitutes such evidence," and did not "find such evidence to be impermissibly cumulative." (App.367 n.1.) This ruling definitively overruled the defense's objections to testimony about victims' devout religious faith and virtuous acts vis-à-vis their congregation and the community, including the statements identified at pages 274-78 of Appellant's Opening Brief, and the objection is preserved. *Joseph*, 964 F.2d at 1385.

Immediately before the penalty phase, Bowers filed another motion in limine, again objecting to comparative-worth testimony about victims' religiosity and virtue and giving specific examples. (DE1474.) The court definitively denied the motion, and overruled defense objections in this motion and prior motion in limine filed before the eligibility phase—at docket numbers 1352 and 1474. (App.14160, 14162.)

The government argues that "the defense objected to faith-related testimony about Richard Gottfried, Jerry Rabinowitz, Daniel Stein, and Cecil and David Rosenthal only *after* the witnesses were excused."

(Gov.Br.262) (citing App.11062-64, 11376-80, 11477.) But that is not accurate. Bowers had already raised specific objections in his motion in limine at docket entry 1352, and the district court had said "I'm going to overrule the objection." (App.8614-15.)

Because the court definitively overruled Bowers's objections to evidence of the victims' religious practices, outstanding acts for their congregation, and religiosity, those objections were preserved.

### 2. The court erred by admitting the testimony.

The government argues that testimony about deceased victims' "roles" within their religious communities was permissible under *Payne* because it reflected their "uniqueness" as "individual human being[s]." (Gov.Br.262) (citing App.Br.275.) For this, the government cites the Fourth Circuit's holding in *Roof*, 10 F.4th at 377, that evidence of the victims' "exemplary qualities, such as their singing, preaching, and praying, are part of their 'uniqueness' that *Payne* allows a jury to consider." (Gov.Br.262.) But exemplary qualities are not the same as being *more* exemplary than others—such as that the victims were "among the most devout" and "most observant" members of their congregations. (App.8300-01; App.13176.) Nor did the victims'

leadership roles "help[] to explain their presence in the synagogue at the time of Bowers's attack," as the government argues. (Gov.Br.263.) They were in the synagogue because it was Saturday morning, when services were taking place.

The government argues this case is similar to *Roof*, *Mikhel*, *Mitchell*, and *Bernard* because the evidence of victims' religion in this case was—as in those cases—"tethered to the case facts, given Bowers's targeting of worshipers on their Sabbath." (Gov.Br.265.) But those cases are distinguishable.

First, the religious-evidence objection was unpreserved in *Mihkel* and *Mitchell* because—unlike here—it was not raised below, and hence was reviewed only for plain error. *United States v. Mikhel*, 889 F.3d 1003, 1053 (9th Cir. 2018); *United States v. Mitchell*, 502 F.3d 931, 989 (9th Cir. 2007). Second, the evidence in *Mikhel, Mitchell, and Bernard* was substantively much more closely tied to the victims' interactions with family members, so as to reflect their families' loss. *Mikhel*, for instance, involved testimony by the victim's wife and daughter about their shared Sabbath celebrations, the last time his wife saw him, and his niece's Bat Mitzvah. *United States v. Mikhel*, No. 07-99008, ECF

135

#118 at 192-93 (9th Cir., Brief of Appellant, June 28, 2013). *Mitchell*, similarly, involved testimony about the victim's role in maintaining Navajo religious traditions within her family. *Mitchell*, 502 F.3d at 989. *Bernard* addressed only "contextual evidence" that the victims were minsters attending a revival meeting when killed, not comparative evidence that they were more religious than others. *United States v. Bernard*, 299 F.3d 467, 479 (5th Cir. 2002). This case, by contrast, involved numerous stand-alone discussions of the victims' religious beliefs or practices for its own sake, emphasizing victims' comparative religiosity untethered to family relationships—such as details of victims' participation in worship services, Dan Leger's description of his personal religious faith, particular prayers victims sang during services, and remote-in-time evidence such as Sabbath dinners one victim had as a child. *See* App.Br.276-77.

The government further argues that the jury was instructed not to consider the victims' religious beliefs in determining Bowers's sentence. (Gov.Br.265.) But the problem is not that the religious beliefs were considered, per se—rather it is that victims' religiosity and virtue were presented as heightened compared to others. Regardless of what the

136

beliefs were, the victims were described as particularly virtuous due in part to the strength of their religious devotion.

Finally, the government argues that Bowers's invocation of 18 U.S.C. § 3593(f) is "summary" and insufficiently developed. (Gov.Br.266 n.54.) That is incorrect. Bowers supported his point about § 3593(f) with multiple citations to caselaw, with argument regarding why it was violated. (App.Br.280.) The government's claim that § 3593(f) has no bearing on what evidence can be presented to the jury—and concerns only "juror discrimination"—is also unfounded. Jurors make decisions based on the evidence; thus evidence encouraging comparisons based on the strength of victims' religious beliefs increases the risk that the jury will decide the sentence on an improper basis.

## B. Hardships unrelated to the crime

The government argues that Bowers failed to preserve his objections to portions of its copious evidence of victims' adverse life events unrelated to the Tree of Life attack, and that this evidence was substantively permissible because it "helped to describe victims' uniqueness and convey the magnitude of the losses caused by their deaths." (Gov.Br.266.) Both claims are incorrect.

The government concedes that Bowers preserved his objections to testimony about victims' hardships unrelated to the crime, except as to "testimony about Rose Mallinger and Bernice and Sylvan Simon." (Gov.Br.266 n.55.) But Bowers specifically objected to that testimony in his pretrial motion in limine filed during the eligibility phase: specifically, testimony "that the Simons youngest child died in a motorcycle accident in 2010." (DE1352:14.) The court definitively overruled that objection. (App.8614-15.) Bowers again raised the issue about the Simons' son's death in his penalty-phase motion in limine (DE1474:9-10), and the district court again denied it, (App.10906), later confirming that its denial had constituted a definitive ruling. (App.14162.) The court's acknowledgment that the defense could always re-raise the objection did not alter the definitiveness of the ruling. *Joseph*, 964 F.2d at 1385; Fed. R. Evid. 103(b).

Testimony about Rose Mallinger's unrelated hardships was similarly preserved. (DE1474:15; App.10906, 14160, 14162.)

This evidence was not necessary to contextualize family members' loss. (Gov.Br.268.) Indeed, the unrelated-hardship evidence here was vastly more extensive than that in either *Payne v. Tennessee*, 501 U.S.

808 (1991), or *Booth v. Maryland*, 482 U.S. 496 (1987). *Payne* merely approved narrowly-tailored testimony that the toddler son of the victim said to his grandmother that he missed his deceased mother and sister and was worried about his sister. *Payne*, 501 U.S. at 826. Likewise, in *Booth* the victims' relatives testified about finding the victims killed, a relative's wedding days after the killing without the victims, and the funeral the very next day, and the victim's children's emotional responses including inability to sleep, triggered memories, anger and hyper-alert fear, loss of appetite, and depression. *Booth*, 482 U.S. at 499-500. This evidence was all focused on the offense itself and its direct impact on the victims; none ventured into the past, to hardships with no relation to the offense.

The evidence here was far more attenuated. Detailed testimony about Mel Wax's childhood decades in the past—including losing his father when he was four and living in poverty—was not necessary to make the point that Mr. Wax "appreciated everything that he did have" and "appreciated his family." (App.11108-09.) And the government does not attempt to argue for the permissibility of testimony that Wax experienced difficulty when stationed in Germany as a soldier shortly

after the Holocaust. (App.11108-09.) Testimony about Cecil and David

Rosenthal's parents' difficulties raising them was not necessary to show

that Cecil and David were "probably the best thing that ever happened

to" their family. (App.11071.) Peg Durachko's testimony that she and

Richard Gottfried were not able to have children was not necessary to

show that Richard was her only family; her separate testimony that

they *in fact* had no children sufficed to make that point. (App.11033.)[46]

The government attempts to distinguish *Floyd v. Filson*, 949 F.3d

1128, 1148-49 (9th Cir. 2020), as involving "more extensive testimony

about past victim hardships that included a kidnapping and hostage-

taking," (Gov.Br.268), but its arguments fail. *Filson* was a habeas case,

which required substantial deference to the state court decision

admitting the unrelated-hardship evidence—as opposed to the much

less deferential direct review here—but even under the deferential

---

[46] The government contends that "Bowers's challenge to the
testimony of Lisa Burns, Officer Daniel Mead's partner, is misplaced"
because "Mead is a surviving victim." (Gov.Br.268 n.56.) But the
impropriety of testimony about unrelated hardships applies equally to
Mead; the fact that he was a surviving victim implicates Bowers's
separate legal challenge to evidence about impacts on surviving victims.
But the unrelated-hardship point is the same.

standard it applied the *Filson* court went out of its way to point to problems with the testimony about the victim's experiences years before the homicide. Just as the government contends the victim hardships in this case showed their personal fortitude, the victim's mother in *Filson* testified that the victim had "thrived in the face of serious learning and developmental disabilities, going on to form close relationships with his family and members of the community." *Filson,* 949 F.3d at 1148. Despite that potential relevance, the Court expressed "concern[] about the propriety of [the victim's mother's] testimony about [the victim's] early life and developmental difficulties because of its limited relevance to Floyd's impact on the victims (or on people close to and surviving them) and its potential risk of prejudice." *Id.* at 1149. The same rationale applies here, even assuming the unrelated hardships also show something about the victims' characters.

## C.   Victim impact testimony from surviving witnesses

The government misconstrues Bowers's argument by claiming that, "[b]y affirmatively conceding that physical injuries to surviving victims may be alleged as a non-statutory aggravating factor, Bowers abandoned his legal argument that the FDPA precludes it."

(Gov.Br.269.) There is a difference between alleging that surviving victims were injured as a non-statutory aggravating factor and alleging their ongoing suffering. Bowers's argument is—and was below—that evidence of *ongoing* impacts to surviving victims, into the future, is not permissible—that is, that "the FDPA does not permit penalty-phase testimony on the *impact of injuries* suffered by survivors." (DE241:56-57) (emphasis added).

The government is incorrect that "[t]he FDPA's text, courts' consistent treatment of victim-impact evidence, and other definitions of the term 'victim'" show that a "victim" under Section 3593(a) need not be deceased. (Gov.Br.270.) The statutory language and cases interpreting it make this plain.

First, the government relies on an incomplete, and misleadingly-truncated, excerpt of 18 U.S.C. § 3593(a) to argue that that section mentions "the extent and scope of the injury and loss suffered by the victim." (Gov.Br.270.) It then argues that "It would be odd to refer to the 'extent and scope' of the victim's 'injury and loss' if the victim must always be deceased." (*Id.*)

But the government omits the rest of the sentence. Section 3593(a) speaks of "the extent and scope of the injury and loss suffered by the victim *and the victim's family*." 18 U.S.C. § 3593(a) (emphasis added). It does not necessarily require the "extent and scope" of injury or loss to relate to the victim at all. There is nothing "odd" about considering the extent and scope of injury or loss to a deceased victim's living relatives.

Second, the government illogically relies on an anomalous statutory definition of "victim," which expressly applies to only a single sentence of 18 U.S.C. § 3593(c), and is *not* used in § 3593(a), to claim that that anomalous definition must apply to subsection (a) as well. It points out that § 3593(c) says, "[f]or the purposes of the preceding sentence [discussing evidence whose danger of unfair prejudice outweighs its probative value], the fact that a victim, *as defined in Section 3510*, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice." 18 U.S.C. 3593(c). Section 3510, in turn, incorporates the definition of "victim" in Section 503(e)(2) of the Victims' Rights and Restitution Act of 1990—*i.e.* "any person who has "suffered direct physical, emotional, or pecuniary harm as a result

of the commission of a crime." 34 U.S.C. § 20141(e)(2); *see* 18 U.S.C. § 3510(c). (Gov.Br.271.)

But § 3593(c)'s use of this specialized definition of "victim" is expressly limited to a single sentence of that subsection, and is not referenced elsewhere in § 3593. Subsection (c)'s special definition expressly applies only the question of whether attendance at a sentencing hearing of particular individuals should be construed to pose a danger of unfair prejudice. If anything, the reference to a separate statutory definition in subsection (c) suggests the other subsections of § 3593 are not subject to that definition.

The government also argues that § 3593 "evinces a broad approach to aggravating factors and victim-impact evidence" because "[i]t allows the government to present penalty phase information . . . as to *any matter relevant to the sentence*" and "*any information* relevant to an aggravating factor for which notice has been provided under subsection (a)," and "provides that the government's aggravators '*may include* factors concerning the effect of the offense on the victim and the victim's family. . . *and any other relevant information.*'" 18 U.S.C. 3593(a) (emphases added). (Gov.Br.271.) But these phrases do not

144

purport to modify "victim." Syntactically, § 3593(a)'s reference to the

"victim and the victim's family" is a separate category from "other

relevant information," which does not define or modify "victim" but

exists as an alternative category of information. And the government

provides no basis, besides its own say-so, to support the claim that

surviving victim impacts are "any matter relevant to the sentence."

Nothing in subsection (a) suggests this.[47]

To the contrary, § 3591, § 3592 and § 3593 repeatedly reference

"the offense"—that is, the capital offense at issue—and "the victim" of

---

[47] For this reason, the government's citation of *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007), and *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002), is misplaced. (Gov.Br.271-72.) *Gonzales* involved use of the word "any" to modify the term in question—"any other term of imprisonment"—whereas in § 3593(a) "any" does not modify "victim" but merely "other" information. *Barrett*, similarly, involved not the scope of the word "victim" but the scope of evidence that can be presented *about* the deceased victim of the capital crime. *Barrett*, 496 F.3d at 1099 (holding that the phrases "may include" and "any other relevant information," in § 3593(a), permit "evidence giving the jury a glimpse of the victim's personality and the life he led"). *Echazabal* addressed permissive "may include" language broadly modifying the definition of job qualification standards; by contrast, § 3593(a)'s catchall "any other relevant information" is a grammatically separate and independent clause from the phrase "injury and loss suffered by the victim and the victim's family" and does not modify it.

"the offense" in a way that shows the "victim" is the victim of the capital crime. Section 3591(a)(2) requires that the defendant have been convicted of an "offense for which a sentence of death is provided," then refers to the "victim" of that capital "offense." *See United States v. Gendron*, 800 F.Supp.3d 503, 514 (W.D.N.Y. Sept. 16, 2025), *appeal pending*, 2d Cir. no. 25-2570 (docketed Oct. 15, 2025) ("[T]he offense" means the "death eligible offense"). And death eligible offenses against individuals must involve a deceased victim. *Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008). Section 3593(a), similarly, says aggravating factors may concern "the effect of the offense on the victim." 18 U.S.C. § 3593(a), with "the offense" defined in § 1391 as the capital offense. 18 U.S.C. §§ 3591(a)(2), 3593(a). "The FDPA [otherwise] makes no express provision for victim impact evidence concerning the victim of a crime for which the defendant is not being sentenced." *United States v. Sampson*, 335 F.Supp.2d 166, 193 (D. Mass. 2004).

For these reasons, "the offense" about which § 3593(a) permits evidence to be introduced "concerning the effect of the offense on the victim and the victim's family" is the capital offense, of which the victim was necessarily deceased. *Gendron*, 800 F.Supp.3d at 514; *United States*

*v. Shakir,* M.D. Tenn., case no. 98-cr-00038, Docket no. 3178 (Order, Apr. 2, 2008) at 2-3; *see also United States v. Gooch*, No. 04-128-23, 2006 WL 3780781, at *22 (D.D.C. Dec. 20, 2006) ("Clearly, the FDPA refers to the victims of a capital crime.")

The government claims these provisions refer to "a 'victim' who was 'killed' or 'died,' or suffered 'death,' or to a person who was put at grave risk of 'death'" but "do not suggest that "victim," without further modification, means *only* a person who was killed." (Gov.Br.273.) But the provisions do not modify "victim" by specifying that the particular victim must have died; rather, they presuppose that the victim is someone who has died, while calling other injured, but not deceased, parties "persons." 18 U.S.C. § 3591(a)(2)(A)-(D) each specify particular circumstances under which "the victim" died. 18 U.S.C. § 3592(a)(7) and (c)(5) do the same, providing for a mitigating circumstance if "the victim" consented to the criminal act that caused his or her death, and distinguishing between "the victim" who died, and other, additional, "persons" who did not die but were put in danger. 18 U.S.C. § 3592(c)(2) (defendant "knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense."); *see also* §§ 3592(c)(6)

and 3592(c)(11) (both defining aggravators relating to "victims" in "homicide" cases).

The government's invocation of the Mandatory Victims' Restitution Act ("MVRA") and Crime Victim Rights Act ("CVRA") (Gov.Br.273), is misplaced, because those statutes do not address capital crimes or sentencings. And the fact that dictionaries define "victim" as someone who is harmed "or" killed (Gov.Br.273) shows only that in some contexts a victim can survive. But in the context of a statute crafted specifically for death penalty-eligible crimes that necessarily involve homicide, the term takes on a distinct meaning.

That the FPDA uses "victim" to mean the capital-offense victim also comports with the structure of Title 18 as a whole. Where a jury returns a death sentence but also convicts the defendant of noncapital crimes, other provisions of Title 18 require the judge to sentence the defendant for those noncapital crimes, separate from the jury's imposition of death. *See* 18 U.S.C. § 3551(b) ("An individual found guilty of an offense shall be sentenced" to a "fine," "probation," or "imprisonment"); *see also, e.g.*, App.13502-03 (after jury returned death sentence, district judge imposed noncapital sentences "in accordance

with the relevant statutes and after consideration of the relevant sentencing factors, including the sentencing guidelines recommendation"). That noncapital sentencing proceeding is the proper forum for consideration of the surviving victims' impact from the noncapital offenses, because that proceeding punishes the noncapital offenses that caused those injuries. At the noncapital sentencing the surviving victims' injuries would bear on "the nature and circumstances" of the attempted murder and firearms offenses, 18 U.S.C. § 3553(a)(1); the Guidelines range, *see* U.S.S.G. § 2H1.1(a)(3)(A) (enhanced base offense level for § 249 violation" "if the offense involved the use or threat of force against a person"), and restitution, *see* 18 U.S.C. § 3663A(b)(2) (reimbursement for medical and psychiatric care*, rehabilitative therapy, and lost income "in the case of an offense resulting in bodily injury to a victim").

The government incorrectly relies on *Payne, United States v. McVeigh,*153 F.3d 1166 (10th Cir. 1998), *United States v. Bin Laden*, 126 F. Supp.2d 290 (S.D.N.Y. 2001), and other cases as indicating that "victim" in the FPDA includes surviving victims. (Gov.Br.272-73.) *Payne* never addressed the FPDA because it predated that statute's enactment

by three years. Nor was the surviving-victim issue addressed at all in *Payne*, *McVeigh*, *Tsarnaev* or *Bin Laden*; *Payne* addressed the permissibility of evidence about victims per se (not the distinction between deceased victims and survivors), the *McVeigh* defendant did not challenge surviving-victim evidence, the defendant conceded the issue in *Bin Laden*, and *Tsarnaev* expressly declined to decide it because the evidence was relevant to other aggravating factors. *Payne*, 501 U.S. at 811; *McVeigh*, 153 F.3d at 1216 n.42; *Bin Laden*, 126 F.Supp.2d at 300-01; *United States v. Tsarnaev*, 968 F.3d 24, 80 (1st Cir. 2020).[48]

## D.    Statements about "s[peaking] for the victims"

The government complains that Bowers's argument that the prosecutor improperly argued that it or its witnesses spoke, or the jury should speak, for the jury "ignores context and mischaracterizes the record." (Gov.Br.274.) Again, it is incorrect.

---

[48] *Saipov* adopted the government's interpretation of "victim" in § 3593 based on the same flawed textual arguments discussed above. *United States v. Saipov*, No. S1 17-CR-722, 2023 WL 371531, at *13 (S.D.N.Y. Jan. 24, 2023).

### 1. "Don't forget the dead. The ones who couldn't speak for themselves."

The government argues that the first comment at the end of selection-phase summation—"don't forget the dead. The ones who couldn't speak for themselves[,]" (App.13221)—permissibly "reminded the jury of Bowers's deceased victims and the harm inflicted on them" as allowed by *Payne*, 501 U.S. at 825. (Gov.Br.275.) But the prosecutor did not need to invoke victims' inability to "speak for themselves" to "remind[] the jury of Bowers's deceased victims and the harm inflicted on them." (Gov.Br.275.) Immediately after the "speak for themselves" statement, the prosecutor listed each victim by name and said his or her "loss alone is sufficient to justify a sentence of death." (App.13221.) The prosecutor could have recited that same list, and same point, without talking about the victims being unable to "speak." Saying the victims could not "speak for themselves" focused on a wholly different concept: that there was a message the deceased victims wanted to impart to the jury—and would have imparted if they were able. The clear implication was that someone else should "speak for" those victims: either the prosecutor (who sought a death sentence) or the jury by handing down such a sentence.

## 2. Victims' family members "came in and they bore witness on behalf of those 11 men and women who cannot speak for themselves."

The government insists the prosecutor's second statement, that the victims' family members "came in and they bore witness on behalf of those 11 men and women who cannot speak for themselves," permissibly "remind[ed] the sentencer" of the victims' individuality and society's loss, (Gov.Br.276) (quoting *Payne*, 501 U.S. at 825) and referenced the weighing process. (Gov.Br.276) (quoting App.13293.)

But the prosecutor was not making a *Payne*-based argument about the impact on victims' families or even the victims' experiences of the offense. He was instead talking about "the aggravating factors of [Bowers's] murders" and the jury's duty to "weigh them [the aggravating factors], all of them" in its life-or-death decision. (App.13293.) By juxtaposing these concepts, the prosecutor connected the fact that the deceased victims could not "speak for themselves" with his exhortation to the jury to give sufficient weight to the aggravating factors favoring death. It was not a description of victim impact but a suggestion that if the victims could "speak" they would emphasize that aggravating evidence and favor a death sentence.

The government brushes aside the emotionally-powerful context in which these remarks were delivered—including the evocative images and descriptions of violence—on the basis that Bowers "does not independently challenge those portions of the government's closing argument." (Gov.Br.277.) This misses the point. Independently-objectionable or not, the surrounding arguments were the context in which the "speak for the dead" statements were made. And that context is critical in determining whether the statements were overly emotional or inflammatory. *See* App.Br.292-93. Nor is Bowers's complaint that the government "focused on the aggravating traits of his crimes in advocating for a death sentence," as the government asserts. (Gov.Br.278.) The problem is the implication that the victims wished to "speak"—and that others either spoke or should speak for them on the proper sentence.

## E.    Vacatur is warranted.

The government cannot show the errors were individually or cumulatively harmless beyond a reasonable doubt. Jurors' sentencing determination was a complex, individualized weighing of numerous aggravating and mitigating factors, in which each juror was instructed

to determine what was or was not "sufficient" for him- or herself, based on individual (not group) findings about mitigation. (App.13162-63.) The evidence about victims' exceptional virtue and religiosity, life hardships, surviving victims' harrowing injuries and indelible lasting effects, and exhortations that the jury should itself "speak for" the victims was powerful and deeply affecting. Had jurors not been constantly reminded of the exceptionally good nature of the victims, their tragic losses outside the crime, the irreversible impacts on grievously-injured survivors, and told it was their job to "speak for" the dead victims, at least a reasonable doubt exists that one or more jurors would have struck the balance between aggravating and mitigating factors differently.

## X. THE GOVERNMENT'S USE OF BOWERS'S STATEMENTS TO HIS EXPERTS TO PROVE LACK OF REMORSE AND OTHER NON-STATUTORY AGGRAVATING FACTORS, COLLATERAL TO HIS MENTAL-HEALTH MITIGATION, VIOLATED *SIMMONS*.

The government's use of statements Bowers made to his mental-health experts pitted his Fifth Amendment self-incrimination privilege against his Eighth Amendment right to introduce mitigating evidence

in the manner condemned as "intolerable" in *Simmons v. United States*, 390 U.S. 377 (1968), and cases from this circuit following *Simmons*.

Over several pages in its response, the government suggests, inaccurately, that Bowers complains it elicited and used statements he made to his experts for the purpose of disputing his mental health evidence. (Gov.Br.295-297.) To be clear: had the government stopped there, it would not have violated Bowers's constitutional rights. Bowers made statements to the experts for the purpose of establishing that he suffered a severe mental illness, and the government was entitled to rely on those statements to rebut that evidence—limited to the precise issue on which they were made. *See Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him.") (citation omitted); *Brown v. United States*, 356 U.S. 148, 155 (1958) (holding that scope of direct examination determines scope of cross examination: "The witness himself . . . determines the area of disclosure and therefore of inquiry.").

But the government did not stop there. It used Bowers's statements to prove and enhance the weight of three unrelated, collateral, non-statutory aggravating factors: religious animus, site selection, and, critically, lack of remorse. None of these aggravating factors rebutted or bore in any way on Bowers's mental-health mitigating factors (and the government does not contend they did). In broadening the use of Bowers's statements beyond the limited purpose for which he made them, the government created the *Simmons* dilemma: it exacted, as the price of offering mitigating evidence, Bowers's privilege against self-incrimination.[49]

In defense, the government first attempts to limit *Simmons* to its exact facts. (Gov.Br.292-95.) It relies on *McGautha v. California*, 402

---

[49] For this reason, the government's citation to *United States v. Alvarez*, 519 F.2d 1036, 1045 (3d Cir. 1975) is misplaced. (Gov.Br.291.) In *Alvarez* an expert opinion, derived from an examination of the defendant, was limited to the separate and distinct issue of sanity, under 18 U.S.C. § 4244—unlike here, where the government used the contents of Bowers's own statement as proof of his death-worthiness. Similarly, this correct characterization of the issues shows why, contrary to the government's assertion, Bowers is not attempting to have it "both ways" (Gov.Br.296) or to use the privilege as both sword and shield. The government was free to use his statements on the issue on which they were made and introduced; it was not free to expand to unrelated factors in support of death.

U.S. 183, 215 (1971), *vacated on other grounds sub nom., Crampton v. Ohio*, 408 U.S. 941 (1972), which, on the way to rejecting the defendant's contention that a unitary capital trial impermissibly burdened the privilege against self-incrimination, suggested that the Hobson's choice rationale underlying *Simmons* may "be regarded as open to question." *Id.* 212-13. But *McGautha* is unhelpful here.

*McGautha* arose in the context of the pre-modern capital punishment era—before *Furman* and the institution of procedural protections by *Gregg v. Georgia*, 428 U.S. 153 (1976), and its progeny and before the Supreme Court's elaboration of the Eighth Amendment's requirement of individualized sentencing and the defendant's absolute right to introduce mitigating evidence in *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and related cases. (App.Br.318-19.) Indeed, *Gregg* forecloses such a broad reading of *McGautha*. 428 U.S. at 195 & n.47.

In any event, *McGautha* did not overrule *Simmons*. And any purportedly "open question" as to the continuing vitality of its Hobson's choice rationale has been answered repeatedly and clearly by this Court, which post-*McGautha*, has extended *Simmons* beyond its specific

factual context to require relief where otherwise a criminal defendant would be required to choose between his Fifth Amendment privilege and other enumerated constitutional rights. *See* App.Br.317-18 (discussing cases). Neither the government's complaint about the age of this Court's cases (Gov.Br.299), nor its reliance on cases from other circuits (Gov.Br.293, 295), undermines this Court's holdings reaffirming *Simmons* and its refusal to permit playing constitutional rights one against the other.

The government obscures that *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), relies on *Simmons* to grant relief to a capital habeas petitioner in circumstances that control the outcome here. In that case, the defendant testified at his own capital sentencing about biographical information, including his deprived childhood and family background. *Id.* at 1540. This Court concluded it was error for the government to comment that he expressed no remorse during that testimony. *Id.* at 1541.

The government's efforts to distinguish *Lesko* fail. It seizes on language from *Lesko* that the defendant's testimony about biographical mitigating factors did not effect a general Fifth Amendment waiver

because the testimony addressed matters "collateral to the merits of the charges against him," *Lesko*, 925 F.2d at 1542. (Gov.Br.295, 301-02.) Here, too, though, Bowers statements to his experts addressed whether he suffered a mental illness that might mitigate his punishment— wholly collateral to the question of his guilt. Indeed, Bowers had already been found guilty, and nothing offered at sentencing was intended to or could have undone the convictions. Like Lesko, then, he had not made a full Fifth Amendment waiver. The government could use his statements only on his mental condition. It was not free, under *Lesko*, relying on *Simmons*, to rely on them to argue non-statutory aggravating factors in support of a death sentence.[50]

Finally, the government's discussion of harm misdirects.[51] It urges that because "the site-selection, religious-animus, and lack-of-remorse

---

[50] In this context, *Simmons* and *Griffin v. California*, 380 U.S. 609 (1965), are flip sides of the same coin: The unconstitutional price of introducing Eighth Amendment mitigation is commenting overbroadly on the defendant's limited waiver of his Fifth Amendment privilege. This Court in *Lesko* wove the two threads together in explaining why the government's use of the defendant's statement beyond the narrow channel in which he made them was constitutional error.

[51] The government also urges that Bowers's complaint about a single paragraph in the government's summation was not preserved

factors were based on additional evidence, independent of Bowers's statements to his experts," he was not prejudiced. (Gov.Br.304.) But, of course, determining whether the government has proved the existence of an aggravating factor is only one step in a capital jury's sentencing evaluation. Each juror must, individually and based on their own moral judgment, decide the weight to accord each factor, in determining whether the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death. 18 U.S.C. §3593(e).

The government's harm analysis elides the jurors' weighing role. As detailed in Bowers's opening brief (App.Br.310-26), the government's closing and rebuttal sentencing arguments focused extensively on the disturbing and graphic statements Bowers made to his experts. Its single paragraph addressing those comments in its responsive brief,

---

and so subject to plain error review. (Gov.Br.302.) But even as to that one paragraph, Bowers's opening brief did not urge a new or different error. His complaint, raised and rejected repeatedly and categorically in the district court (App.Br.307-15)—including after the government's summation (DE1524:1-2, 10)—was to *any use* of his statements beyond responding his mental-health mitigation. His argument on appeal that the government's use also trenched on his Sixth Amendment right to trial illustrates the harm he suffered, stemming from the district court's decision to grant the government carte blanch in its use of his statements. But the error, improper use under *Simmons*, is identical.

Gov.Br.304, fails to engage with the Bowers's argument about the impact those statements would have on the weight jurors would assign the aggravating factors in choosing between life and death. *See* App.Br.325-28. It therefore does not satisfy the government's burden of proving harmlessness beyond a reasonable doubt. Remand for resentencing is therefore required.

**XI. THE COURT CANNOT HAVE "NEAR CERTITUDE" IN THE VERDICT GIVEN THE DISTRICT COURT'S EXCLUSION OF THE AVOIDING-MARTYRDOM MITIGATING FACTOR AND BOWERS'S OFFER TO PLEAD, WHICH WERE PROPER REBUTTAL TO THE GOVERNMENT'S CASE AND AFFIRMATIVE MITIGATION.**

The plain language of the Federal Death Penalty Act and Supreme Court precedent grant a capital defendant wide latitude both to present mitigating evidence and to rebut aggravating evidence offered by the government. *See* 18 U.S.C. §§ 3592(a), 3593(c); *Simmons v. South Carolina*, 512 U.S. 154, 165 (1994) (plurality opinion); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). Despite the government's effort to recast the issues, both the avoiding-martyrdom and offer-to-plead mitigating factors and evidence fit squarely within the scope of rebuttal and the definition of mitigation under the FDPA and the Constitution.

It was therefore error for the district court to exclude them. Given the evidence, the jury's findings, and the reactions of observers—all of which demonstrate how the avoiding-martyrdom mitigating factor and the offer to plead mattered—the Court cannot have the necessary "near certitude" in the verdict to affirm.

**A. Both proposed mitigating factors were within the scope of rebuttal because the government's case implicated Bowers's failure to plead guilty and the likelihood he would promote his hateful messages during a life sentence.**

The government's argument that the mitigating factors were not warranted as rebuttal boils down to a suggestion that Bowers has misunderstood the government's case. It posits other rationales for the trial evidence and argument that would permit the Court to affirm the district court's exclusion of the factors. *See* Gov.Br.313-16, 322-27. But this misapprehends the legal standard for rebuttal.

In, *Kelly v. South Carolina*, the Supreme Court rejected such an approach, holding that for purposes of rebuttal, "relevance to [a] point does not disappear merely because [the evidence or argument] might support other inferences or be described in other terms." 534 U.S. 246, 255 (2002). *Kelly* involved the question, under *Simmons*, whether the

defendant's future dangerousness was "a logical inference from the evidence" or was "injected into the case through the State's closing argument." *Id.* at 252. The state argued that evidence Kelly took part in escape attempts and had been caught with a shank, and its arguments about his "butchery" and frightening nature, were about retribution for past acts and inability to adapt to prison life, rather than future dangerousness. *Id.* at 253, 255. The Court disagreed, noting that "relevance to [one] point does not disappear merely because [evidence or argument] might support other inferences or be described in other terms." *Id.* at 254. "The import . . . simply cannot be compartmentalized this way." *Id.* at 255. *See also United States v. Troya*, 733 F.3d 1125, 1135 (11th Cir. 2013) (rejecting government's attempt to distinguish between future dangerousness and past conduct and moral culpability).

As discussed regarding each factor below, this situation is the same: regardless how the government may now try to cabin the trial evidence and argument, it supported inferences that amply justified the rebuttal the defense sought via the avoiding-martyrdom and offer-to-plead mitigating factors and the proffer of the offer to plea as

substantive evidence. The district court therefore erred in excluding those factors and evidence.

### 1. The avoiding-martyrdom mitigating factor responded to the government's arguments suggesting the only way to control Bowers was with a death sentence.

The government asserts that none of the evidence or argument cited in Bowers's avoiding-martyrdom rebuttal claim was used by prosecutors to suggest that Bowers would spread his hateful ideology during a life sentence. For example, it submits that evidence of lack of remorse was used only in a "backward looking" manner, and that "the argument did not bear on future dangerousness—which was not an alleged aggravating factor." (Gov.Br.314-15.) This is the very argument rejected in *Kelly*, where the Court found that future dangerousness need not be alleged to be implicated. *Kelly*, 534 U.S. at 254. "Evidence of future dangerousness", the Court held, "is evidence *with a tendency to prove dangerousness in the future*; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Id.* (emphasis added). Bowers cited this aspect of *Kelly* in his opening brief, (App.Br.331), but the government fails to contend with it. The same flawed reasoning underlies the

government's discussion of other aspects of the trial evidence, which it alleges actually referenced Bowers's mental health or the likelihood of his confinement at the Administrative Maximum Facility ("ADX"). (Gov.Br.315.)

Whatever other purposes the government intended—highlighting Bowers's lack of remorse, showing that his hateful ideology was shared by others, and demonstrating the limits of the Bureau of Prisons' ability to control Bowers—its argument and evidence also underscored Bowers's future dangerousness, *i.e.*, implied a risk that the world would not be safe from him during a sentence of life imprisonment and that the death penalty was the only way to eliminate the threat he posed. *See Kelly*, 534 U.S. at 246 ("Thus was Kelly's jury . . . invited to infer 'that petitioner is a vicious predator who would pose a continuing threat to the community.'") (quoting *Simmons v. South Carolina*, 512 U.S. 154, 176 (1994)); *Troya*, 733 F.3d at 1135 (The impact of this evidence upon the jury in the present case is manifest: if the jury did not sentence Troya to death, he would be just as lawless in the future."). As the Supreme Court has made clear, these are not mutually exclusive.

As discussed in Bowers's opening brief, (App.Br.331-36), the

prosecutors here "accentuated the clear implication of future

dangerousness raised by the evidence." *Kelly*, 534 U.S. at 255. *See*

App.Br.331-36. Why was it necessary for the government to "touch[] on

prison communications" (Gov.Br.316), for example, if not to invite the

jury to infer that a life sentence would not suffice, and only death could

keep Bowers from spreading hate? That is the message observers of the

trial received,[52] and it is likely the message the jurors received, too. *See*

App.Br.346-47 (citing victim impact statements).

Unlike any other mitigating factor submitted to the jury, the

avoiding-martyrdom mitigating factor would have directly undercut the

premise of this argument. It would have allowed the defense to marshal

evidence about Bowers's background and character to demonstrate that

he was more likely to cause harm in death than during a life sentence

locked away under communications restrictions at ADX. *See*

---

[52] The government asserts that Bowers overstates what the victim community said about this at the post-trial sentencing hearing. (Gov.Br.311.) The record of that proceeding speaks for itself. (App.13407-08, 13417, 13429, 13457-58, 13473, 13476.) The government does not deny that these views were amplified in the media. *See* App.Br.347 n.101.

App.Br.336, 343-44. Without the benefit of this factor, the defense had

no way to rebut the government's contention and encourage the jury to

weigh the relative merits of life versus death sentences as regards

future dangerousness. *Cf. Boyde v. California*, 494 U.S. 370, 378 (1990)

("The Eighth Amendment requires that the jury be able to consider and

give effect to all relevant mitigating evidence offered . . . .").

### 2. The offer to plead responded to the government's arguments suggesting Bowers was solely responsible for the trial.

As with the avoiding-martyrdom mitigating factor, the

government suggests that Bowers's offer to plead and the related

mitigating factor were not proper rebuttal because it can posit other

rationales why the prosecutors offered the evidence and argument that

would have been rebutted. The fact remains, however, that a logical

inference from prosecutors' references to the deaths of some witnesses,

to the harm surviving witnesses[53] and victim family members

---

[53] The government says Bowers mischaracterized the testimony about the effect on Dan Mead of testifying. The testimony was:

> Q: After he testified, Ms. Burns, did Officer Mead require hospitalization?

experienced from testifying, to the lapse of time between the crime and the trial, to the length of the trial, and to the conduct of the defense was also that Bowers was to blame for it all and should be punished for creating those harms. *See Kelly*, 534 U.S. at 252 (observing that the appropriate question was "whether Kelly's future dangerousness was a logical inference from the evidence.") (cleaned up).

The government's emphasis on Bowers's remorselessness and the defense's purported gamesmanship created a misimpression that Bowers should have been permitted to rebut.[54] The jury was entitled to know that the trial took place not just because Bowers exercised his right to it, but because the government refused his offer to plead guilty in exchange for a lifetime sentence. Far from confusing the jury, (Gov.Br.321), Bowers's offer to plead guilty would have set the record

---

A: Yes, he was under medical care for 33 days.

(App.11254.) The fair inference from this testimony was that the events were connected. *See also* App.11265 (prosecutor confirms to district court "After his testimony in this case, he was hospitalized for 33 days, which is why he was not in a position to testify.").

[54] In this context, the district court's usual instructions on "core concepts" (Gov.Br.326), reinforced the misimpression that Bowers was making an unconstrained choice in which the government's actions played no role. *See* App.Br.357.

straight, in simple terms: Had the government been willing to forgo a death penalty trial, Bowers would have pled guilty to life in prison without the possibility of release.[55]

Even if the Court finds that the offer to plead was not mitigating, the district court should have admitted it as substantive rebuttal evidence. There is no requirement that rebuttal evidence also be mitigating, and the government does not suggest that there is.

## B. Both proposed mitigating factors fit comfortably within statutory and constitutional definitions of mitigation.

The parties agree on the definition of mitigation. *Compare* App.Br.338-39 and Gov.Br.306-08. To quote the FDPA, mitigation includes "factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).[56] The government,

---

[55] Bowers's lack of remorse would have presented no obstacle to entry of a guilty plea, which does not require any expression of remorse. Indeed, despite indications of his lack of remorse, the defense renewed Bowers's offer to plead guilty practically on the eve of trial. *See* DE1096:6.

[56] It is true that § 3592(a)(8), by its plain text—the use of the word "including"—contemplates mitigation beyond the examples specified. *See* App.Br.345-46; Gov.Br.312. But the Court need not reach that issue here.

however, disputes that either mitigation factor fits within this definition. That is wrong. Both addressed Bowers's background and characteristics as well as the circumstances of the offense. The district court therefore should have submitted them as affirmative mitigation.

### 1. The avoiding-martyrdom mitigating factor reflected Bowers's background and characteristics and the circumstances of the offense.

The reality that "[i]f Mr. Bowers is sentenced to death, he may be seen as a martyr and his death exploited by others to justify future hateful acts" was "an inherent and inextricable circumstance of the offense." (S-App.150.) As a result, even if one focus of the mitigating factor was others' reactions, it fell within the heartland of mitigation under § 3592(a) and *Lockett.* The government's own proof established that: some white supremacists believe violence is the best way to accomplish their goals (App.7985-86), Bowers saw himself as a "soldier" in the fight against the Great Replacement, was willing to "sacrifice" himself—even die—for it (App.9866), and sought to bring attention to the fight by his crimes (App.9864-65). The government even introduced expert testimony about how supporters build on the actions of white supremacist criminals. (App.7984-85.)

But this factor did not just predict "how *others* might react to Bowers's post-offense *execution*," (Gov.Br.309) (emphasis in original); it also explained the difference between how Bowers would experience life in prison compared to how he would experience a death sentence. This was not speculative. There was substantial evidence—again, presented by the government—to show that Bowers craved recognition (App.9273-74, 9278), and sought to attract others to his mission (App.10790, 13183). There was also extensive testimony regarding the onerous conditions at ADX, which would limit Bowers's access to the outside during a life sentence. The avoiding-martyrdom mitigating factor thus explained that a life sentence would better accomplish the goal of preventing dissemination of Bowers's hateful ideology than the death penalty because: (a) he was ill-equipped, thanks to his loner personality and limited social circle, to promote his ideas from the bowels of a supermaximum prison; (b) a life sentence would not foster his or his cohort's "war" mentality; and (c) it would bring Bowers less attention than an execution. (App.Br.339-41, 343-44.) By contrast, in *Roof*, cited by the government, no testimony was proffered, nor ultimately admitted, in support of the defendant's proposed mitigating factor. *See*

*United States v. Roof*, 10 F.4th 314, 370 (4th Cir. 2021); *United States v. Roof*, No. 2:15-472-RMG, 2016 WL 8678863 at *2 (D.S.C. Oct. 14, 2016).

The substantial evidence tying the factor to Bowers's background, character, and the circumstances of the offense also distinguishes the avoiding-martyrdom mitigating factor in this case from the "policy" arguments about deterrence made in *United States v. Higgs*, 353 F.3d 281, 328 (4th Cir. 2003), or about state abolition of the death penalty made in *United States v. Gabrion*, 719 F.3d 511, 522 (6th Cir. 2013) (en banc).

For all these reasons, the avoiding-martyrdom mitigating factor should have been submitted to the jury as affirmative mitigation.

### 2. The offer-to-plead mitigating factor reflected Bowers's background and characteristics and the circumstances of the offense.

The government slides past the hard fact that, consistent with the U.S. Sentencing Guidelines, Department of Justice guidance for handling death penalty cases treats an offer to plead guilty to a life sentence as mitigating. *See* U.S. Dept. of Justice, Justice Manual § 9-10.140(D)(9). It does not—perhaps because it cannot—explain why it takes a different position here than in Department death-penalty

guidance. That guidance itself should be dispositive, since Bowers

offered to plead guilty at the outset of this prosecution and again on the

eve of trial. (And at other moments in the case.)

There is no reason to doubt that those offers were in good faith.

True, the offers were conditional. But counsel are aware of only one

example of a federal capital defendant pleading guilty to the

indictment, with no protections offered by the government,[57] while the

government has agreed in countless other cases to plea agreements

conditioned on life sentences.[58] Bowers showed full accountability for

his crimes in agreeing to plead guilty to life imprisonment without the

possibility of release. More importantly, he showed a willingness to

spare the time, expense, and trauma involved in a capital trial. This

---

[57] That case was *United States v. Sampson*, and despite the guilty plea, the government's insistence on seeking the death penalty resulted in decades of litigation, including two jury sentencings that resulted in death verdicts. *United States v. Sampson*, No. 01-10384-LTS, 2017 WL 3495703, at *1, *3 (D. Mass. Aug. 15, 2017). Mr. Sampson's second death sentence was on appeal at the time of his death in 2021 at age 62. *United States v. Sampson*, 26 F.4th 514, 515 (1st Cir. 2022).

[58] Some of these cases are described in App.A at 5-6, though there are hundreds more examples.

was unquestionably mitigating, and the jury should have known this about him.

The government also ignores the distinctions Bowers offered between this case and *United States v. Caro*, 597 F.3d 608, 635 (4th Cir. 2010); *Owens v. Guida*, 549 F.3d 399, 419-22 (6th Cir. 2008); and *United States v. McCluskey*, Doc. 1060, No. 10-2734 JCH (D.N.M. June 23, 2013). *See* App.Br.362-64 (observing that Bowers's plea offer was earlier and demonstrated fuller acceptance of responsibility than in these cases). Since it cannot overcome those distinctions, its citations to these cases offer little assistance to this Court.

Other factors the government cites, including Bowers's lack of remorse and the conditional nature of his plea offer, go not to whether the plea offer was mitigating, but what weight jurors might elect to give it. Here, it is conceivable some jurors might have given *more* weight to Bowers's willingness to plead despite his lack of remorse for the crimes, since foregoing a trial was contrary to interests the government attributed to him (promoting his cause, attaining attention).

Throughout this litigation, the government has repeatedly relied on *United States v. Roof* as the exemplar—a similar case where it

agrees with the district court's rulings (which were largely unfavorable to the defense).[59] Here, however, where the *Roof* court admitted the offer to plead—aligning with the majority of district courts to consider the issue, *see* App.Br.361 n. 111 & 112—the government seeks to diminish the decision. (Gov.Br.322.) But the court in *Roof* was correct, where—as here—the "defendant has unambiguously claimed responsibility for the charged conduct" submission of the mitigating factor is appropriate. *See Roof*, 2016 WL 8678863, at *2.

## C. Failure to submit the mitigating factors prejudiced Bowers.

The government argues that because this case was so aggravated, the failure to submit these mitigating factors was harmless. (Gov.Br.318, 328.) As discussed in Point I(B), above, this misapprehends the constitutional harmless error standard, which requires the Court to consider whether, had the mitigating factors been submitted, there is "near certitude" all the jurors' verdicts would have been the same. Given the reactions of trial observers and jurors' other

---

[59] *See, e.g.*, DE91:3, DE105:6-7, DE197:4, DE422:7, DE804 (throughout), DE901:6-7, DE924:2, DE1159:19.

findings, that is impossible to say, much less prove to a near certitude.

To the contrary, it is reasonable to believe at least one juror would

have been moved by knowing either (1) that a death sentence might be

more likely to promote Bowers's agenda; or (2) that Bowers had been

willing to avoid the time, expense, and trauma of a trial by way of a

guilty plea to life imprisonment without the possibility of release.

### 1.    Failure to submit the avoiding-martyrdom mitigating factor was not harmless beyond a reasonable doubt.

The government does not contest the power of an avoiding-

martyrdom mitigating factor, nor could it: in the opening brief, Bowers

offered four terrorism and gang cases in which similar factors were

submitted and juries returned life verdicts. (App.Br.342-43.)

Rather, the government suggests that any error was harmless

because counsel did argue this factor, and the jury could have written it

in. But given the court's ruling excluding the avoiding-martyrdom

mitigating factor, counsel could not make the kind of fulsome appeal

given in *United States v. Mohamed Rashed Daoud Al-'Owhali*. *See*

App.Br.337 (quoting closing argument in No. S(7) 98 Cr. 1023 (LBS)

(S.D.N.Y. 2001)). Bowers should not have had to rely on jurors deriving

this factor and writing it in based on the one line defense counsel dared speak, in probable violation of the court's order excluding the mitigating factor.

Bowers's opening brief did not overstate the degree to which his profile and his ability to spread his message mattered to observers of the trial and likely mattered to jurors, too. (Gov.Br.311.) Victim family members testified at his post-trial sentencing about their gratitude that "now and forever, [Bowers's] voice and hateful thoughts and ideas are permanently silenced, never to be heard from again." (App.13429.)[60] At least one directly attributed this to the death penalty: "What is the purpose of what we call the death penalty? I believe it's to cut off the individual from society cleanly and clearly." (App.13457.) While the government is correct that some mitigating factors addressed aspects of the concerns, (Gov.Br.317) (citing App.13798-99), none collected them

---

[60] *See also* App.13417 ("This evil person must be completely isolated from the outside world with no access to [media] and no means of reaching others to try to influence them in his perverted beliefs."); 13457 ("Since he is in prison, reports have come out about others emulating his words and deeds. And he remained free to communicate his ideas to whomever he wished. So we go on suffering.").

the way the avoiding-martyrdom mitigating factor did, nor showed how they bore on the question of sentencing in the same manner.

All it would have taken to change the verdict from death to life imprisonment without the possibility of release was to tip the scales—already heavily weighted with mitigation—for one juror. By depriving the defense of this powerful mitigating factor, which could marshal the evidence in such a unique and responsive way, the district court prejudiced Bowers, requiring a new sentencing hearing.

### 2. Failure to submit the offer-to-plead mitigating factor was not harmless beyond a reasonable doubt.

The government argues that the district court's refusal to tell jurors about Bowers's offer to plea was harmless, because jurors knew he had admitted to the crimes. This is not the same thing. His admissions had no effect on the five years victim family members and witnesses waited for the trial—a period in which some passed away. His admissions did not protect victim family members and witnesses from the pain of testifying to the traumatic events and the pain of their losses. And his admissions did not save the court, the parties, the jurors, or other participants the time, expense, and difficulty of the

trial. But a plea to life imprisonment without the possibility of release would have. And Bowers was willing to enter such a plea, virtually from day one.

The failure to advise jurors of this likely affected their view of Bowers. Why, they must have wondered, was this obviously guilty person, insisting on a trial? Why would he admit his guilt to police, but drag everyone through this terrible trial? As awful as Bowers's crimes were, as remorseless as he was, this behavior—this refusal to do the right thing—must have made him seem especially callous. That impression, which the government encouraged (App.Br.355-57), and the jury instructions reinforced (App.Br.357), was wholly inaccurate.[61]

The verdict form shows that at least one juror—and probably more—likely would have been open to this information and weighed it in deliberations. Eight jurors found that "A sentence of life in prison without the possibility of release offers the possibility of redemption and

---

[61] Neither *Hall v. Luebbers*, 341 F.3d 706, 715, 717 (8th Cir. 2003), nor *Riley v. Cockrell*, 339 F.3d 308, 317-19 (5th Cir. 2003), is apposite, because neither involved the same setup. *Riley*, moreover, was a post-conviction decision, decided under a different standard of review. 339 F.3d at 319.

change." And four jurors found that "A sentence of life imprisonment without the possibility of release provides hope that Robert Bowers may one day come to understand the wrongfulness of his conduct." (App.13800.) Jurors' willingness to consider Bowers's potential despite the government's characterization of him, and without knowing about his offer to plead, demonstrates why remand for a new sentencing hearing is required. Given this, the government cannot establish beyond a reasonable doubt that the failure to submit his offer to plead was harmless, *i.e.*, might not have shifted the views of at least one juror on sentencing.

## XII. THE GOVERNMENT'S EFFORT TO EXPLAIN AWAY THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT FAILS, AND REVERSAL FOR RESENTENCING IS REQUIRED.

The prosecutor's rebuttal closing argument contradicted the district court's instructions in three ways that go to the heart of capital sentencing: advocating quantitative weighing, arguing jurors' job was to impose the death penalty rather than a just sentence, and suggesting that mitigation must explain or excuse the crime. Bowers timely objected, concerned that the last word jurors heard on how to make the most important decision in his case should be correct. Rather than

addressing the errors, however, the district court punted to jurors the responsibility to identify whether any error had even occurred. The law requires more, and the government's effort to minimize, contextualize, and otherwise avoid its impact cannot rescue the prosecutor's argument, nor the district court's failure to reckon with it.

## A. The prosecutor's quantitative weighing approach cannot be explained away.

The government attempts to justify the quantitative approach urged in its rebuttal closing argument by disingenuously describing the multiple quantitative references as "imperfect syntax." (Gov.Br.330-31, 333.) But this was neither an isolated nor an errant remark. The prosecutor conducted the same mathematical analysis at two different points in the rebuttal closing. (App.13269-70, 13290.), This went to the heart of the sentencing decision, and it was never corrected by the district court. Under these circumstances, reversal is required.

As the government is forced to concede, the prosecutor *twice* urged the quantitative approach, and not in the same breath—twenty transcript pages apart. (Gov.Br.332.) This was no "momentary focus, "single [ ] remark," or "isolated inappropriate comment." *United States v. Pavulak*, 700 F.3d 651, 667 (3d Cir. 2012); *United States v. Riley*, 621

F.3d 312, 339 (3d Cir. 2010).[62] Rather, while the prosecutor paid lip service to "reasoned moral judgment" (App.13272), his real emphasis was on how jurors should weigh the 192 aggravating factors and the "unbearable loss of all these victims"—another quantitative reference—which "all goes on the scale." (App.13294-95.) This was not a mistake, nor slip of the tongue.

Nor has Bowers taken it out of context, as the government suggests. (Gov.Br.332.) The "big picture" reference in *Pavulak*, 700 F.3d at 667, was not at all comparable to the prosecutor's exhortation to Bowers's jury to cumulate the aggravating factors. In *Pavulak,* a non-capital case, the prosecutor "discussed the law and evidence for each count separately" before making a brief comment about the "same MO" used by the defendant. *Id.* Here, although the prosecutor said each victim's death was sufficient to justify a capital sentence, he continued, "but the weight of all that loss is so much more than sufficient." (App.13222.) He concluded, "[p]ut it on the scale. Weigh it . . . ."

---

[62] Both *Pavulak* and *Riley* also were reviewed for plain error, whereas the error here was preserved. *See Pavulak*, 700 F.3d at 667; Riley, 621 F.3d at 339.

(App.13222.) This cumulation continued through the end of the rebuttal. *See* App.13294 ("You need to weigh the largest antisemitic attack and mass killing in U.S. History and weigh all of those aggravating factors, and when you do that, all of that, it's not a close call.). This formed the basis for the government's final request to the jury: "a sentence of death." (App.13295.) And it was reinforced by the selection phase verdict form's collection of all the counts together. *See* Point I(B), above.

The government clings to the adage that the jury is presumed to follow instructions (Govt.Br.332) without acknowledging the Supreme Court's warning that jurors may be influenced in conducting their deliberations by such prosecutorial argument. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21 (2007). The cases it cites for rescue, *Richardson* and *Riley*, provide no help. (Gov.Br.334.) *Richardson* left open whether the effectiveness of the limiting instruction may have been undone by prosecutorial argument. 481 U.S. 200, 211 (1987). And *Riley* held that the defendant had not proved prejudice. 621 F.3d 312, 339 (3d Cir. 2010).

As discussed in Point I(B)(1), above, the problem here was that the prosecutor's argument came after the district court's instructions, and the district court failed to correct it. It left the jury to decide whether the parties had made any misstatements about the law, an assessment the jurors were both unlikely and unqualified to make. This case is therefore more like *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (holding that district court's curative instructions "were not sufficiently focused and emphatic"), where the Second Circuit remanded for a new capital sentencing hearing, and which the government fails to address.

The error here was especially harmful given the government's concession that the prosecutor performed his calculations using the wrong math: the government now agrees that fully half of the 22 convictions repeatedly cited should be dismissed. Gov.Br.42; *see also* Point I. above. Where the government concedes that charges were wrongfully considered by the jury at sentencing and does not dispute the fact of its quantitative argument, the court must remand the case for resentencing. *See Aquart*, 912 F.3d at 44.

**B.** **The prosecutor's argument that jurors' "job" was to "hold [Bowers] accountable to the fullest extent of the law" improperly suggested a death sentence was required.**

The government tries to reframe the prosecutor's statement that jurors' "job" was to "hold [Bowers] accountable to the fullest extent of the law" as meaning that jurors should weigh the aggravating and mitigating factors. (Gov.Br.335-36.) That is not what the prosecutor said. No matter how many references to "the law" or "weighing" the prosecutor made, the only description of jurors' "job" he gave invoked "the fullest extent of the law," *i.e.*, the death penalty. (App.13270-71.) This carried the clear implication that jurors must impose a death sentence. And too, the prosecutor's statements about weighing, Gov.Br.337, were meaningless, because he told jurors what their "job" was at the end of any weighing: to impose a death sentence.

The government does not even address the other argument that Bowers highlighted in his opening brief (App.Br.377), *viz.* that the prosecutor underscored the instruction that it was the jury's job to impose death by urging them that, "[t]he law values life. But let's be clear here. The rule of law protects that value with clear laws that impose *the most severe penalty* for taking an innocent life." (App.13268

(emphasis added).) In case there was any doubt about his meaning, the prosecutor explained that "life in prison is the minimum sentence here." (App.13289.)

And this Court should recognize and reject the government's strawman argument that defense counsel's argument invited these erroneous suggestions that the death penalty is required. *See* Gov.Br.335-36. The defense focus in closing argument on mitigation and mercy may have invited a parallel prosecution focus in rebuttal on aggravation and retribution, but it did not invite misstatements of the law. Indeed, the prosecutor's rebuttal argument directly violated the judge's pretrial ruling that the parties should avoid language suggesting jurors were anything but "neutral arbiter[s] of the facts and the evidence." (App.324.) *See also* App.Br.377-78 (citing cases).[63]

As discussed above, the district court's refusal to correct the prosecutor's incorrect description of the jurors' role requires reversal.

---

[63] The government criticizes Bowers's citation of these cases. However, Bowers never suggested this situation was the same as those. Rather, the opening brief analogized this case to them. *See* App.Br.377 (using term "similar").

### C. The prosecutor improperly demeaned mitigation unconnected to the crimes.

The government argues that the prosecutor did not mean to suggest the jury could not consider mitigation unconnected to the crime, only that the jury should not give it weight. While that may be the argument the government would like to defend on appeal, it is not the one the prosecutor made at trial. He said that mitigation should relate to the crime: "this case is about October 27, 2018, and the murders of 11 innocent worshippers at the Tree of Life. And that's the type of evidence and consideration that you should have been reviewing throughout these two months." He asked what Bowers's family history mitigation "ha[d] to do with any of this?" And concluded, "[childhood] does not control who you become as an adult. It does not foreordain, and it does not excuse." (App.13280-81.)

This language was not, as in *United States v. Mikhel*, an attempt to elaborate the statutory term "justify." (Gov.Br.339.) *See Mikhel,* 889 F.3d 1003, 1054-55 (9th Cir. 2018) ("The government's remarks that any mitigating factors did not 'justify'—or for the sake of variety, did not 'excuse' or 'explain'—defendants' crimes were consistent with [the FDPA's] statutory language."). Nor does it compare to *United States v.*

*Coonce*, where the government argued that the defendant's brain damage was not mitigating because he was at fault for it. *United States v. Coonce*, 932 F.3d 623, 636 (8th Cir. 2019) ("This is not a nexus argument but rather an attempt to devalue the mitigating factor."). Instead, the prosecutor strayed here into what the *Coonce* court called "impermissible nexus arguments." *Id.* (citing *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 245-46 (2007)).

The government is incorrect that the court's instructions gave jurors the power to determine that submitted factors were not mitigating. *See* Gov.Br.341. As the government concedes regarding the avoiding-martyrdom and offer-to-plead points, the district court decides whether a factor is mitigating, as a matter of law. *See* Gov.Br.307-08. Jurors' role is to find the facts and decide what weight to afford the facts found. (App.13158-59). By telling jurors in rebuttal that, contrary to the instructions and the verdict form, only the crime matters, the prosecutor distorted that process in contravention of longstanding constitutional precedent. *See* App.Br.380-81 (citing cases).

The district court's instructions to the jury do not absolve the prosecutor of its error here any more than on any other point. The

court's instructions came before the prosecutor's argument, which contradicted them, and the court failed to give a sufficient curative instruction. *See* Point I(B), above.

### D. Bowers was prejudiced by the prosecutor's improper rebuttal arguments.

The government cannot prove beyond a reasonable doubt that these errors, individually or collectively, did not affect the verdict. Given the significant mitigation findings, if any single juror adopted one or more of the government's erroneous approaches to the sentencing process, it likely affected the outcome. If any single juror took a quantitative view of the weighing process, the 192 aggravating factors would have outweighed the 115 mitigating factors. If a single juror believed their job was to impose the death penalty, the 115 mitigating factors may not have been weighed at all. And the same might be true if a just a single juror believed mitigation had to be connected to the crime. That jurors entered findings on some factors does not change this, it simply means jurors noted indisputable truths before being led astray by the prosecutor's misrepresentations. The district court should not have let the prosecutor have the last—erroneous—word. Because it did, reversal is required.

**XIII. THE DISTRICT COURT'S SENTENCING-PHASE SHACKLING OF BOWERS, BASED ON CONTESTED BUT UNDISCLOSED ALLEGATIONS WITHOUT A HEARING, REQUIRES REVERSAL OR REMAND FOR AN EVIDENTIARY HEARING.**

Five days into Bowers's sentencing proceeding, the district court took the "inherently prejudicial" step, *Deck v. Missouri*, 544 U.S. 622, 628 (2005), of shackling Bowers in leg irons—a measure permissibly employed only as the "last resort," *United States v. Hicks*, 403 F. App'x 709, 711 (3d Cir. 2010)—for the remaining 19 days of his capital trial. It did so without a hearing. It did so on the basis of secret information withheld from the parties. And it did so despite acknowledging that, prior to that moment, it had observed no behavior by Bowers warranting the "extraordinary measure" of restraints. *United States v. Brantley,* 342 F. App'x 762, 770 (3d Cir. 2009). (App.9358.) This was error, for two principle reasons: (1) the defense specifically challenged the (hearsay) observations on which the district court relied, putting the facts squarely in dispute, and (2) the district court only belatedly disclosed its reasons for shackling, near the end of the sentencing proceeding, long after the harm had been done, depriving the defense of

any meaningful opportunity to investigate and respond. The error

harmed Bowers.

## A. Factual disputes exist that required the district court to hold an evidentiary hearing before ordering Bowers shackled.

The government concedes, as it must (Gov.Br.355) that this

Court's precedent required the district court to hold a hearing, before

shackling Bowers, to "resolve" "genuine and material factual disputes."

*Sides v. Cherry*, 609 F.3d 576, 582 (3d Cir. 2010). But it seeks to justify

the district court's failure to hold such a hearing by reciting its own

preferred, but untested, version of the facts: that unnamed marshals

interpreted ambiguous—but facially nonviolent and non-threatening—

physical movements by Bowers as aggressive, and that a hearsay report

asserted that Bowers said (at an unspecified time, under unspecified

circumstances, to an unspecified listener) that he knew which officers

were armed and believed he could disarm them. (Gov.Br.343-44.) It

treats this version of facts as established, as if a hearing had been held.

When the court belatedly disclosed even these bare outlines of the

allegations against Bowers, however, defense counsel unequivocally

denied the hearsay reports. Defense counsel disputed as

191

misrepresentations or misunderstandings, the officers' speculation about any subjective intent motivating Bowers's movements. And counsel averred that they had conducted their own investigation and had learned of no statement by Bowers that could be conceived as a security threat. (App.Br.397, 405-06.)

The government's responsive brief rests on unnamed officers' speculation as to what Bowers's ambiguous movements and statements evidenced about his intent, while ignoring his attorneys' countervailing claim that the officers guessed wrong. Such a dispute requires a hearing. Counsel's clear denials established two competing accounts of Bowers's subjective thoughts. *Boykin v. Family Dollar Stores*, 3 F.4th 832, 840 (6th Cir. 2021) ("unequivocal denial" creates a genuine factual dispute). The district court erred by simply deferring to the marshals' speculative version, without testing it.[64]

---

[64] The government suggests that *Sides*'s evidentiary hearing requirement was satisfied when the court "heard arguments against restraints in a closed session." (Gov.Br. 355.) But it cites no case, from this Circuit or any other, where that approach—informing counsel of a shackling order based on undisclosed reasons and requiring them to object, blind—was approved as an adequate hearing.

In any event, even assuming the accuracy of the officer's speculation as to the meaning of Bowers' movements and statement, the district court still erred in ordering shackling. As Bowers's opening brief discussed, this Court has approved shackling on proof that the defendant committed or seriously threatened violence in a custodial setting—but no such accusations are present here. (App.Br. 414-15) (discussing cases). The government fails to address these cases. Indeed, it cites only a single out-of-circuit opinion, *United States v. Bell*, 819 F.3d 310, 322 (7th Cir. 2016), as if the case supports its position that shackling is not limited to cases in which the defendant committed or threatened violence in custody. But in *Bell* it was determined (after the court held a hearing on shackling) that the defendant had possessed weapons in prison. *Id.* at 322. There was no similar allegation about Bowers.

**B.**   **The district court's belated disclosures, long after the harm was done, prevented the defense from investigating and challenging the (hearsay) allegations on which it relied.**

The government's response, too, telescopes the sequence of disclosures below, obscuring that the district court only belatedly shared the specific allegations underlying its shackling order—long

after the harm was complete and irreparable.[65] *See United States v. Harmon*, 150 F.4th 197, 201 & n.2 (3d Cir. 2025) ("The due-process violation [Appellant] alleges is lack of notice and opportunity to respond. Without notice of the [district court's] reliance on the victim impact statement at the motion-for-sentence-reduction stage, there was no chance to object at that stage before [the court] rendered its decision."). It is important, therefore, to keep clear the actual timeline.

- June 30, 2023 (the fifth day of the sentencing hearing): The court, over defense objection, ordered Bowers shackled without notice or explanation, based solely on unspecified representations by unnamed marshals. (App.9356-60). It refused to further explain. (App.Br.392-94.)

- July 3, 2023: The court entered an order sealed from the public and counsel. (App.372-76, 13874-78.) It also filed a version accessible to counsel, but with the key paragraphs redacted. (App.372-76.) The redacted version revealed only that, the night before its shackling order, the court had been emailing *ex parte* with the chief deputy marshal. It provided no details or substance about the allegations made by those (still unnamed) involved. (App.Br.395-96.)

---

[65] For example, when discussing the content of the court's sealed and redacted July 23, 2023, order explaining its shackling rationale, the government details the contents of that order, Gov.Br.343-44, obscuring the fact that those contents were not even partially revealed until near the end of the sentencing hearing and not fully disclosed until months after the trial was over.

- July 26, 2023 (approximately a month after the original shackling order and a week before the jury's sentencing verdict): The court entered a further, longer order (App.13883-92), revealing, for the first time, the contours of some of the original allegations, but it still declined to fully unredact either its July 3 order, which set out the precise allegations, or the email from the chief deputy marshal from the night before the shackling order was issued. (App.Br.402-03.)

- January 24, 2024 (nearly six months after the trial): The court finally disclosed an unredacted version of its July 3 sealed order and memorandum.[66]

By the time the court finally disclosed to the defense the allegations on which it had ordered shackling, it was too late: the defense opportunity to investigate and challenge those allegations had passed. Worse, the prejudice of exposing to the jurors the court's view that Bowers was so dangerous he had to be restrained in court was complete and irreparable.

## C. The government cannot prove beyond a reasonable doubt that Bowers was not harmed by shackling him in front of the sentencing jurors.

The government argues that, even if the district court erred, Bowers suffered no prejudice. It fails, however, to meet its high burden

---

[66] The unredacted version offered previously undisclosed details of the content of a statement allegedly made by Bowers, but omitted other critical information, such as to whom the statement was made, its context, whether it was hearsay, etc.

of proving the error was harmless beyond a reasonable doubt. At a minimum, if it does not reverse outright Bowers's death sentences, this Court should remand for an evidentiary hearing on prejudice.

First, the government suggests that the district court made a finding of fact that the courtroom set-up and remediation steps prevented the jurors from observing Bowers's shackles. (Gov.Br.354) ("As the district court found, these steps 'mitigated the possibility that any juror . . . observe[d] the restraints.'") (citing App.13878); *see also* Gov.Br.362-63. But the court made no such finding.

Defense counsel submitted color photographs showing that, despite mitigation efforts, jurors were still able to observe Bowers's leg irons—in particular, during sidebars when his lawyers left counsel table and when the jurors entered and left the courtroom. (App.Br.400-01) (citing DE1492; 1492:1-13; DE1498:2; DE1525:2.) The defense was not required to show the irons would have been continuously observable. The government did not then, and does not now, dispute that the photos show that jurors could see the shackles at the specific times described by the defense, which recurred throughout the proceedings. And it points to no statement by the district court that substantively

196

addressed—let alone rejected—this evidence, except to the extent the court acknowledged the photos' accuracy.

Second, the government urges that, even if jurors saw the shackles, Bowers suffered no harm because they already knew that he was in custody and would remain incarcerated, whatever the sentencing verdict. (Gov.Br.363-64.) But revealing his custody status was not the problem; it was the implication that the district court itself viewed him as dangerous, even while incarcerated, with future dangerousness in custody being perhaps the most important factor that capital sentencing jurors consider. (App.Br.420-21) (citing *Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017).)

That the government did not allege a future-dangerousness aggravating factor against Bowers (Gov.Br.365-66) does not lessen the harm from the suggestion that the court viewed him as a danger. As discussed in Point XI(A)(1), above, the "import of the [issue] simply cannot be compartmentalized this way." *United States v. Troya*, 733 F.3d 1125, 1135 (11th Cir. 2013) (quoting *Kelly v. South Carolina*, 534 U.S. 246, 255 (2002)). As in *Troya*, the government "indisputably" put Bowers's future dangerousness at issue, through its emphasis on his

statements to his experts that he viewed himself as a prisoner of war, who was committed to the fight as long as he remained alive. (App.Br.420.) And in any event, a central theme of the defense case for life was the ability of the Bureau of Prisons to confine Bowers safely. (App.13797-99.) The suggestion that the court itself viewed Bowers as a custodial danger—to such an extent as to require in-court restraints— undermined the weight of the defense's mitigating factors about the ability safely to incarcerate him, placing a judicial thumb on scale for death.

Third, and last, the government disputes Bowers' contention that the restraints impaired his ability to participate in his own defense. (Gov.Br.366-67.) As detailed in Bowers opening brief, the shackles caused him pain, distracting and impairing his ability to focus and communicate with counsel, and creating a risk that the jurors would perceive his discomfort as dangerous or threatening. (App.Br.398-99, 401.) The government minimizes the impact of shackling by comparing his experience to that of other detainees—held in custody, but not on trial and, in particular, not sitting in front of capital jurors on trial for their lives. (Gov.Br.367.) Apples and oranges do not capture the

irrelevancy of the comparison. The current dispute, if the government's proposed comparison is credited, only underscores the need for a remand for a hearing.

For all these reasons, this Court should reverse Bowers' death sentences and remand for a new capital sentencing hearing. Alternatively, it should remand for an evidentiary hearing on the shackling decision, its prejudicial effects, or both.

## XIV. THE GOVERNMENT RECOGNIZED THAT RULE 43 AND THE CONSTITUTION REQUIRED BOWERS'S PRESENCE AT ALL CRITICAL PHASES OF TRIAL AND THAT ANY ABSENCE MUST BE KNOWING, VOLUNTARY, AND STATED ON THE RECORD.

The government relies on dissimilar noncapital cases, involving in camera conferences between judges and jurors, to argue Bowers validly waived his right to presence at an evidence-focused proceeding where the jurors viewed the weapons at the heart of the criminal charges against him. Those cases fail to support its position. Because Bowers had a right to be present to ensure a "reasonably substantial . . . opportunity to defend against the charge," *United States v. Gagnon*, 470 U.S. 522 (1985), a new sentencing proceeding is warranted.

**A.  There was no valid waiver of Bowers's presence at the evidence viewing or the hearing involving the Marshal.**

The government relies on noncapital cases involving defendants' presence at in camera discussions between jurors and judges to argue that Bowers validly waived his presence at the weapons viewing during his capital sentencing. (Gov.Br.373) (citing *United States v. Johnson*, 677 F.3d 138 (3d Cir. 2012), *United States v. Bertoli*, 40 F.3d 1384, 1396-97 (3d Cir. 1994), and *United States v. Provenzano*, 620 F.2d 985, 997-98 (3d Cir. 1980)). But these cases are inapposite, because they rest on the proposition that "an *ex parte* conversation between a trial judge and a juror" does not rise to the level of a proceeding the defendant has a constitutional right to attend. *Bertoli*, 40 F.3d at 1397 (quoting *Gagnon*, 470 U.S. at 526). That rule is based on the nature of such ex parte discussions: no evidence is received against the defendant, whose presence would likely be "counterproductive" by impeding jurors' ability to speak freely. *Id.* (citing *Gagnon*, 470 U.S. at 527). None of those concerns apply where the proceeding concerns presentation of evidence to jurors, and the defendant's presence could make a difference.

The government's own cases confirm that personal waiver is required when a proceeding *does* relate to the fullness of the defendant's

right to mount a defense—particularly where the case is capital. *United States v. Mitchell*, 502 F.3d 931, 984-88 (9th Cir. 2007), upheld a capital defendant's waiver of presence during the evidentiary portion of his sentencing proceeding only because the defendant personally announced his refusal, and *Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc), required the court to address the defendant personally and obtain a written and oral waiver on the record. None of that happened here. Counsel directing Bowers to leave the courtroom was not Bowers's voluntary act but merely counsel's instruction, with no record that Bowers understood what was happening or agreed to it. *Diaz v. United States*, 223 U.S. 442, 455 (1912), on which *Taylor v. United States*, 414 U.S. 17, 19-20 (1973) (per curiam), and Rule 43(c)(1)(A) rest, limited voluntary-absence waiver to cases "where the offense is not capital"—a limitation the government ignores. As Bowers showed in his opening brief, App.Br.435, the government's own prior position was that presence at a critical stage could not be waived by counsel alone, which makes its current argument irreconcilable with the record it helped create.

**B.** **The government is incorrect that Bowers's right to presence did not attach because the weapons were already admitted in evidence.**

The government further argues the viewing was not an "evidentiary proceeding"—but merely part of the jury's internal deliberations"—because the firearms were already in evidence. (Gov.Br.375.) But the jurors' re-viewing of the weapons happened in real time, as did the marshal's comments on those weapons. The government's argument would mean a court officer could answer any question about admitted evidence during deliberations without implicating Rule 43. And it is obvious that Bowers's presence could have contributed to the fairness of the exchange between the Marshal and the jurors about how guns worked; he could have noticed the exchange and either corrected the Marshal or alerted the court that improper information was being exchanged so it could be promptly corrected..

The government cites *Snyder v. Massachusetts*, 291 U.S. 97 (1934), for the proposition that a "jury's crime-scene viewing outside defendant's presence did not violate due process" because the "defendant's presence would not 'have been an aid to his defense.'" (Gov.Br.376.) But *Snyder* is inapposite: it involved an outdoor crime-

scene viewing, where the court held the defendant's presence would be "useless" because counsel merely pointed out features of the scene as they already existed. *Id.* at 106-07. That was not the case here: the weapons viewing occurred inside the courthouse with the judge on the bench, Bowers's counsel sidelined in the gallery, and a uniformed marshal on the floor who then answered the jury's factual questions about how the weapons worked. Bowers's presence might have deterred the unauthorized exchange entirely.

Also inapposite are the government's cited cases involving passive evidence review, such as replays of audiotapes without comment and exhibits merely transmitted to the jury room. (Gov.Br.375-76.) It fails to address or distinguish *United States v. Matta-Quiñones*, 140 F.4th 1 (1st Cir. 2025), or *United States v. Brown*, 832 F.2d 128 (9th Cir. 1987), both of which Bowers cited in his opening brief and are directly on point. (App.Br.438.) A court marshal who answered the jury's questions about how the murder weapons loaded and operated cannot be shielded by a passive-exhibit analogy, and the government's failure to engage either case is tantamount to a concession that its analogy cannot survive scrutiny.

**C.    The government has not demonstrated harmlessness.**

The government argues any error was harmless, but fails to engage with the central role the weapons played in its aggravating case—the very case the jury was deliberating when the marshal answered their questions about how those weapons worked. It raises three responses to the prejudice argument, none of which holds up.

First, it invokes *Richardson v. Marsh*, 481 U.S. 200, 206 (1987), for the presumption that juries follow instructions—like the judge's instruction here to "disregard . . . anything" the jurors heard. (Gov.Br.377.) But, as noted in Point I, above, *see* p.12 n.7, *Richardson* applied that presumption to a specific, targeted instruction given contemporaneously with the evidence. Here, the instruction came after the jury had already returned to deliberations and had to be recalled. This belated instruction, asking jurors to erase concrete factual explanations delivered by a uniformed court officer in the middle of capital penalty deliberations, was ineffective. Some bells cannot be unrung. *See United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974) ("Whatever efficacy curative instructions possess cannot help but be weakened by the lapse of time."); *United States v. Carney*, 461 F.2d 465,

467-68 (3d Cir. 1972) (instructions will not suffice where "there is inherent danger that jurors . . . may be unable or unwilling to erase from their minds that which has improperly come to their attention"). The government offers no response to that principle.

Second, the government argues that because Bowers "does not independently challenge the denial of his mistrial motion," Gov.Br.377, the prejudice from the marshal's exchange is irrelevant to his right-to-presence claim. That is wrong. *Remmer v. United States* held that any unauthorized contact with a juror "about the matter pending before the jury" is "deemed presumptively prejudicial," and that "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact . . . was harmless." *Remmer v. United States*, 347 U.S. 227, 229 (1954). That burden can only be discharged through a proper adversarial hearing with the defendant present. The brief examination of the marshal here did not qualify: it consisted of two questions from the court and one from the government, the marshal's account was accepted at face value, and the record does not establish that Bowers was even present. The *Remmer* presumption therefore remains unrebutted.

Third, the government's speculation that Bowers's removal was an "optics" decision, Gov.Br.378, lacks support in the record. Its reliance on *United States v. Williams*, 591 F. App'x 78, 94-95 (3d Cir. 2014), fares no better. (Gov.Br.380.) *Williams* involved a court's response to a jury note about testimony—not a marshal providing new factual information about murder weapons to a capital-penalty jury. The marshal's answers were not clarification of admitted evidence; they were new testimony delivered outside any evidentiary protection.

## D.    If plain error applies, it is satisfied.

Plain error is inapposite, because this issue involves waiver not forfeiture. See *United States v. Olano*, 507 U.S. 725, 733-34 (1993) (cleaned up). But, as discussed, any error was plain and affected Bowers's substantial rights. The government argues the brevity of the questioning, the presence of defense counsel, and the weight of the evidence militate against relief under prong four of the plain error standard. (Gov.Br.378, 380.) But *Olano*'s fourth prong asks whether failing to correct the error would "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736-37. Excluding a capital defendant from the penalty-phase examination of

his murder weapons while a uniformed marshal answers the jury's questions about how they worked—without a valid personal waiver and over defense counsel's mistrial motion—is precisely that kind of error. *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976) (capital proceedings demand heightened reliability).

**E.** ***Remmer* independently requires reversal or remand.**

The government argues that record ambiguity precludes Bowers from satisfying his plain-error burden. (Gov.Br.379-80.) But as explained above, *Remmer's* burden falls on the government, not Bowers, and that burden was never discharged through a proper hearing.

Rule 43(b)(3) exempts only proceedings involving "a conference or hearing on a question of law." Fed. R. Crim. P. 43(b)(3). The government cites *United States v. Provenzano*, 620 F.2d 985, 997-98 (3d Cir. 1980), for this exception. (Gov.Br.373.) But *Provenzano* involved a conference about whether to dismiss jurors who had smoked marijuana. The facts were undisputed and the issue was a pure legal question about the consequence that should follow. Here, however, the marshal's examination was the opposite: a factual inquiry into what was said between him and the deliberating jurors. That is a factual question

bearing directly on jury contamination, not questions of law. Thus, the exception does not apply.

The government's argument that because the record does not clearly establish Bowers's absence from the marshal examination, he cannot satisfy his plain-error burden is unpersuasive. (Gov.Br.379) (citing *In re Sealed Case*, 356 F.3d 313, 320 (D.C. Cir. 2004)). *In re Sealed Case*, which the government cites, involved a record neutral and silent from the outset. Here, the record affirmatively placed Bowers outside the courtroom under marshal escort. (App.13337, 13339.) What followed was only a "pause" before the marshal was sworn and examined. (App.13342.) That is not a neutral record; it is a record the district court failed to make adequate. "[W]here the personal presence is necessary in point of law, the record must show the fact." *Lewis v. United States*, 146 U.S. 370, 372 (1892); accord *Hopt v. Utah*, 110 U.S. 574 (1884). The court's failure to create that record should not redound to Bowers's detriment. Remand for a factual determination—and, if he was absent, a proper *Remmer* hearing—is the appropriate remedy.

## XV. CUMULATIVE ERROR

The government's only response regarding cumulative error is that there is no error to cumulate. (Gov.Br.380.) As discussed, however, multiple errors occurred affecting selection of the penalty. *See Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003) (finding cumulative error requiring reversal of death sentence in combination of improper victim impact evidence, failure to present mitigation, and prosecutorial misconduct). Alternatively, the Court may find the issues cumulatively present reason to remand for further record development. *Cf. Littlejohn v. Trammel*, 704 F.3d 817, 826, 868 (10th Cir. 2013).

## CONCLUSION

Bowers respectfully requests that this Court vacate his specified convictions and death sentences, or remand for further proceedings.

Respectfully submitted this 1st day of June, 2026.

<div style="margin-left: 40%">

ROBERT BOWERS

by his attorneys:

*s/ Sean J. Bolser, Esq.*
Federal Capital Appellate Resource
Counsel Project
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

</div>

718-330-1200
Sean_Bolser@fd.org

*s/ Sarah S. Gannett, Esq.*
Office of the Federal Public Defender
District of Arizona
250 N. 7th Avenue, Suite 600
Phoenix, AZ 85007
602-382-2700
Sarah_Gannet@fd.org

*s/ Margaret A. Farrand, Esq.*
Office of Federal Public Defender
Central District of California
321 E. 2nd Street
Los Angeles, CA 90012
213-894-7528
Margaret_Farrand@fd.org

210

# CERTIFICATION OF BAR MEMBERSHIP, IDENTICAL TEXT, VIRUS CHECK, AND WORD COUNT

I, Sean J. Bolser, Esquire, of the Federal Public Defender's Office, certify that:

1) I am a member in good standing of the bar of this Court;

2) The text of the electronic format of the Reply Brief of Appellant is identical to the hard copy format;

3) A virus check was performed on the Reply Brief of Appellant, using Trend Micro Apex One, version 14.0.14096 (last update November 18, 2025) and no virus was detected;

4) This Reply Brief of Appellant contains fewer than 42,500 words: specifically, it contains approximately 40,573 words.

I make this combined certification under penalty of perjury. *See* 28 U.S.C. § 1746.

/s/ *Sean J. Bolser*
Sean Bolser, Esq.


Date: June 1, 2026

# CERTIFICATE OF SERVICE

I, Sean J. Bolser, Esquire, of the Federal Public Defender's Office, certify that I served on this date a copy of the attached Reply Brief of Appellant, via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in New York, New York, and/or by hand delivery, addressed to the following:

John-Alex Romano
United States Department of Justice
Criminal Division
Room 7101
1400 New York Avenue NW
Washington, DC 20005
Direct: 202-353-0249
Email: John-Alex.Romano@usdoj.gov

> */s/Sean J. Bolser*
> Sean J. Bolser, Esq.
> Assistant Federal Public Defender

Date: June 1, 2026